# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

NAVAJO HEALTH FOUNDATION -- SAGE
MEMORIAL HOSPITAL, INC.,

        Plaintiff,

vs.                                                                                    No. CIV 14-0958 JB/GBW

SYLVIA MATHEWS BURWELL, Secretary
of the United States Department of Health and
Human Services; YVETTE ROUBIDEAUX,
Acting Director of Indian Health Services; JOHN
HUBBARD, JR., Area Director, Navajo Area
Indian Health Services; and FRANK DAYISH,
Contracting Officer, Navajo Area Indian Health
Services,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion to Dismiss Under

Fed. R. Civ. P. 12(b)(3) or Motion to Transfer Under 28 U.S.C. § 1401(a),[1] filed November 25,

2014 (Doc. 8)("Motion"). The Court held a hearing on January 27, 2015. The primary issues

are: (i) whether the United States District Court for the District of New Mexico is a proper venue

for this case under 28 U.S.C. § 1391(e)(1)(A); (ii) whether the District of New Mexico is a

proper venue for this case under 28 U.S.C. § 1391(e)(1)(B); and (iii) whether the Court will

---

[1]Although the Motion states that Defendants Sylvia Mathews Burwell, Yvette
Roubideaux, John Hubbard, and Frank Dayish are moving to transfer venue under § 1401(a), that
section refers to stockholder derivative actions. See 28 U.S.C. § 1401 ("Any civil action by a
shareholder on behalf of his corporation may be prosecuted in any judicial district where the
corporation might have sued the same defendants."). Because § 1404 is the section under which
parties can file a motion to transfer venue, the Court will construe their motion as being brought
under § 1404(a) rather than § 1401(a).

transfer the case to the United States District Court for the District of Arizona under 28 U.S.C. § 1404(a).  First, the Court concludes the District of New Mexico is a proper venue for this case under § 1391(e)(1)(A), because Defendant Frank Dayish is domiciled in New Mexico.  Second, the Court holds that the District of New Mexico is not a proper venue for this case under § 1391(e)(1)(B), because a "substantial part of the events or omissions giving rise to the claim" did not occur in New Mexico.  28 U.S.C. § 1391(e)(1)(B).  Third, the Court will not transfer the case to the District of Arizona under § 1404(a), because Sage Hospital filed suit in the District of New Mexico, and because the District of New Mexico is a more convenient forum for the witnesses, the parties, and for obtaining the relevant documents than the District of Arizona is. Consequently, the Court will deny the Motion.

## FACTUAL BACKGROUND

This case arises from the decision of the Indian Health Service ("IHS")[2] not to renew its contract with Plaintiff Navajo Health Foundation -- Sage Memorial Hospital, Inc. to provide healthcare to Navajo Indians on the Navajo Reservation under the Indian Self Determination and Education Assistance Act, 25 U.S.C. § 450 ("ISDEA").[3]  The Court takes its facts from (i) the First Amended Complaint, filed November 24, 2014 (Doc. 5)("Complaint"); (ii) the documents attached to the Motion; (iii) the documents attached to the Plaintiff's Opposition to Motion to Dismiss or Transfer, filed December 11, 2014 (Doc. 14)("Response"); and (iv) the documents

---

[2]IHS is a division of the Department of Health and Human Services that is the principal health care provider for members of federally recognized American Indian tribes.  See Indian Health Service, Wikipedia.org, http://en.wikipedia.org/wiki/Indian_Health_Service (last visited Feb. 3, 2015).

[3]The ISDEA authorizes the United States to enter into contracts with American Indian tribes through which the tribes promise to supply federally funded services that a federal agency normally would provide.  See 25 U.S.C. § 450f(a).

attached to the Defendants' Reply in Support of Their Motion to Dismiss, filed December 29, 2014 (Doc. 18)("Reply").[4]

1.    **The Parties.**

Sage Hospital is a private non-profit corporation that has owned and operated a healthcare facility in Ganado, Arizona -- which lies within the Navajo Reservation -- since 1974. See Complaint ¶ 6, at 4.  Sage Hospital sits approximately 192 miles from Albuquerque, New Mexico; 272 miles from Phoenix, Arizona; and two miles from the New Mexico border.  See Declaration of Christi El-Meligi ¶ 11, at 9, filed December 11, 2014 (Doc. 14-1)("El-Meligi Declaration").  The Navajo Nation Council has designated Sage Hospital a "tribal organization" for the purpose of contracting with the Department of Health and Human Services ("HHS"). Complaint ¶ 6, at 4.  Sage Hospital provides healthcare services to Navajo Indians living in the Ganado, Linlichee, Klagetoh, Wide Ruins, Lower Greasewood Springs, Cornfields, Nazlini, and Steamboat chapters of the Navajo Nation -- which are all located in Arizona.  See History, Navajo Health Foundation - Sage Memorial Hospital, http://sagememorial.com/about-us/history (last visited Nov. 4, 2014).

Defendant Sylvia Mathews Burwell is the HHS Secretary.  Complaint ¶ 7, at 4.  As Secretary, Burwell is responsible for conducting all HHS duties, including contracting on the United States of America's behalf with tribal organizations to provide healthcare to Native Americans.  See Complaint ¶ 7, at 4.  Defendant Yvette Roubideaux is IHS' Acting Director. See Complaint ¶ 8, at 4.  Roubideaux is responsible for carrying out all IHS duties, including

---

[4]Courts may consider evidence outside the complaint in resolving a motion to dismiss for improper venue.  See Hancock v. AT&T, Inc., 701 F.3d 1248, 1260 (10th Cir. 2012)("In reviewing dismissals for improper venue, we have considered evidence outside the complaint such as the defendant's affidavits.").

contracting with tribal organizations to provide healthcare to American Indians.  See Complaint ¶ 8, at 4.

Defendant John Hubbard, Jr., is the Area Director of the Navajo Area IHS -- which is based in Window Rock, Arizona.  See Complaint ¶ 9, at 4-5; Declaration of John Hubbard ¶ 1, at 1, filed November 25, 2014 (Doc. 8-5)("Hubbard Declaration").  Hubbard's personal residence is in Ganado, Arizona.  See Hubbard Declaration ¶ 5, at 2.  The Navajo Area IHS is responsible for healthcare services throughout the Navajo Nation.  See Hubbard Declaration ¶ 1, at 1.  The Navajo Area IHS office sits approximately 168 miles from Albuquerque and 282 miles from Phoenix.  See El-Meligi Declaration ¶ 11, at 9.  Hubbard directs all Navajo Area IHS programs and approximately 4,000 staff located at the Kayenta Health Center in Arizona, the Chinle Hospital in Arizona, the Shiprock Northern Navajo Medical Center in New Mexico, the Crownpoint PHS Hospital in New Mexico, and the Gallup Indian Medical Center in New Mexico.  See Hubbard Declaration ¶ 1, at 2.  Forty percent of the Navajo Area IHS user population resides in New Mexico, fifty-five percent resides in Arizona, and five percent resides in Utah.  See Hubbard Declaration ¶ 4, at 2.  The Navajo Nation's land base is larger in Arizona than in New Mexico or Utah.  See Hubbard Declaration ¶ 4, at 2. None of Hubbard's official duties related to Sage Hospital or its IHS contract has any connection to New Mexico.  See Hubbard Declaration ¶ 3, at 2.

Defendant Frank Dayish is the Contracting Officer for the Navajo Area IHS.  See Complaint ¶ 10, at 5.  Dayish's personal residence is in Gallup, New Mexico.  See Declaration of Frank Dayish ¶ 3, at 2, filed November 25, 2014 (Doc. 8-4)("Dayish Declaration").  Dayish is responsible for negotiating and maintaining IHS' contracts throughout the Navajo Reservation, including its contract with Sage Hospital.  See Complaint ¶ 10, at 5.  Dayish has the authority to

sign ISDEA contracts and funding agreements with Sage Hospital and to award funds under those agreements. See Complaint ¶ 10, at 5. Dayish's official duty station is in Window Rock, and Window Rock is where he performs all of his official duties. See Dayish Declaration ¶ 3, at 1.

2.   **Sage Hospital's Tumultuous History.**

From 1974 to 2007, Sage Hospital's facilities grew increasingly obsolete, and the quality of its healthcare services plummeted. See Complaint ¶ 12, at 6. Consequently, by 2007, Sage Hospital was fighting multiple regulatory and financial battles to stay afloat. See Complaint ¶ 12, at 6. The Centers for Medicare and Medicaid Services[5] was in the process of terminating Sage Hospital's certification, the Arizona Department of Health Services was threatening to revoke Sage Hospital's Rural General Hospital Healthcare license, the federal Environmental Protection Agency had warned Sage Hospital about sanitary deficiencies with its water supplies, and Sage had already lost its accreditation from the Joint Commission on Accreditation of Health Care Organizations ("Joint Commission") -- an independent, non-profit organization that accredits hospitals throughout the United States. Complaint ¶ 12, at 6; id. ¶ 16, at 7-8. To make matters worse, Sage Hospital was virtually insolvent. See Complaint ¶ 13, at 6. Consequently, it could not afford to keep high-quality healthcare professionals, and had to end its general surgery and obstetric practices. See Complaint ¶ 13, at 6.

---

[5]The Centers for Medicare and Medicaid Services is a federal agency within HHS that administers the Medicare program and works in partnership with state governments to administer Medicaid, the State Children's Health Insurance Program, and health insurance standards. See Centers for Medicare and Medicaid Services, Wikipedia.org, http://en.wikipedia.org/wiki/Centers_for_Medicare_and_Medicaid_Services (last visited Feb. 3, 2015). It is also responsible for enforcing quality standards in federally funded hospitals through its survey and certification process. See Centers for Medicare and Medicaid Services.

In October, 2007, Sage Hospital's Board of Directors rejected a plan to shutter the hospital, and instead hired M. Morgan & Associates to oversee Sage Hospital's financial and personnel management and make the necessary adjustments to turn around Sage Hospital's operations.  See Complaint ¶ 14, at 7.  After Sage Hospital's former Chief Executive Officer -- Lauren Bernally -- resigned, the Board of Directors appointed Ahmad Razaghi to replace her.  See Complaint ¶ 15, at 7.  From 2007 to 2009, Sage Hospital negotiated with the Centers for Medicare and Medicaid Services and the Arizona Department of Health Services to stay open without losing additional services, and implemented its plan to improve the quality of Sage Hospital's healthcare services.  See Complaint ¶ 17, at 8.

Sage Hospital's turnaround plan succeeded.  See Complaint ¶ 17, at 8.  In September, 2009 -- for the first time in a decade -- Sage Hospital received its unconditional Arizona Department of Health Services license, and Centers for Medicare and Medicaid Services certification.  See Complaint ¶ 17, at 8.  On May 4, 2009, the Joint Commission awarded Sage Hospital its "Gold Seal of Approval," signifying that Sage exemplified the highest quality of patient care.  Complaint ¶ 17, at 8 (internal quotation marks omitted).  In March, 2010, the United States Surgeon General, Vice Admiral Dr. Regina M. Benjamin, on behalf of HHS, awarded Razaghi the "Chief Executive Officer Managerial Excellence Award" for "leadership, successes and improvements which equate to improved and enhanced patient care."  Complaint ¶ 17, at 8 (internal quotation marks omitted).  In a January 10, 2012, letter, the EPA told Sage Hospital that it had fulfilled the EPA's Administrative Order and thanked Sage Hospital for its cooperation in complying with the Federal Safe Drinking Water Act, 42 U.S.C. § 300f.  See Complaint ¶ 17, at 8.  In June, 2012, Sage Hospital received the American Hospital Association Institute for Diversity's "Best in Class Hospital Award" for leadership in addressing health

disparities and improving diversity in governance.  Complaint ¶ 17, at 8.  The award recognized

Sage Hospital and only one other hospital out of 900 hospitals nationwide.  See Complaint ¶ 17,

at 8.

On September 12, 2013, the Arizona Department of Health Services licensed Sage

Hospital through September 30, 2016.  See Complaint ¶ 17, at 8.  In March, 2014, the Joint

Commission granted Sage Hospital "Critical Access Hospital Accreditation," stating that it did

not identify any areas for improvements.  Complaint ¶ 17, at 8-9 (internal quotation marks

omitted).  Sage Hospital also received an unqualified -- i.e., "clean" -- audit from its independent

auditors every year from 2007 to 2013.  Complaint ¶ 17, at 9 (internal quotation marks omitted).

Sage Hospital accomplished all of this despite IHS' failure to provide full contract support

costs.[6]  See Complaint ¶ 17, at 9.

In Resolution No. CO-64-03 (Oct. 22, 2003), the Navajo Nation Council renewed Sage

Hospital's  tribal organization status through 2005.  See Complaint ¶ 19, at 9.  In Resolution No.

CJN-35-05 (June 3, 2005), the Navajo Nation Council reaffirmed Sage Hospital's tribal

organization status, authorizing Sage Hospital to manage and operate contracts with IHS through

September 30, 2020.  See Complaint ¶ 19, at 9-10.  Soon after receiving tribal organization status

through September 30, 2020, Sage Hospital entered into a contract with IHS that became

effective in 2009 ("2009 Contract").  Complaint ¶ 19, at 10.  Sage Hospital and IHS extended the

2009 Contract through September 30, 2013.  See Complaint ¶ 21, at 10.  In an August 22, 2013,

---

[6]The ISDEAA requires the United States to pay, among other things, a tribal
organization's "contract support costs," which are "reasonable costs" that a federal agency would
not have incurred, but which the tribe would incur in managing the program, 28 U.S.C. § 450j-
1(a)(2).   "[C]ontract support costs" can include indirect administrative costs, such as special
auditing or other financial management costs, 28 U.S.C.  § 450j-1(a)(3)(A)(ii); they can include
direct costs, such as workers' compensation insurance, 28 U.S.C. § 450j-1(a)(3)(A)(i); and they
can include certain startup costs, 28 U.S.C. § 450j-1(a)(5).

letter to IHS, Sage Hospital offered two proposals: (i) to extend IHS' contract with Sage Hospital through September 30, 2016; and (ii) to approve an Annual Funding Agreement for the 2014 fiscal year with no material changes in Sage Hospital's budget, services, or programs from the 2013 fiscal year.  See Complaint ¶ 21, at 10-11.

IHS did not accept either of Sage Hospital's proposals, but instead chose to fund Sage Hospital on a monthly basis while conducting a performance monitoring review ("Review") and forensic audit ("Audit").  Complaint ¶ 22, at 11.  IHS conducted the Review and Moss Adams, LLP -- an independent accounting firm -- conducted the Audit.  Complaint ¶ 2, at 2-3; id. ¶¶ 22-25, at 11-12.  Both the Review and the Audit began in January, 2014.  See Complaint ¶ 22, at 11. At the outset of the process, IHS promised that it would allow Sage Hospital to review draft reports, correct errors, and discuss any adverse findings before IHS finalized the reports.  See Complaint ¶ 22, at 11.  Sage Hospital cooperated fully with both the Review and the Audit, ultimately producing approximately 23,000 pages of documents and hosting several on-site visits for IHS and Moss Adams, LLP.  See Complaint ¶ 22, at 11.  Sage Hospital also offered to make its officials available, and to provide additional documents, if either IHS or Moss Adams, LLP required additional information.  See Complaint ¶ 22, at 11.  Sage Hospital satisfied all requests for documents and information by July, 2014.  See Complaint ¶ 23, at 11.  Sage Hospital asked to review IHS' draft reports, but IHS did not allow Sage Hospital to do so.  See Complaint ¶ 23, at 11.  Unsure of what IHS was planning and with the end of fiscal year 2014 looming, Sage Hospital, on September 19, 2014, submitted to IHS a another three-year contract renewal proposal and an Annual Funding Agreement for fiscal year 2015.  See Complaint ¶ 23, at 11.

Unbeknownst to Sage, Moss Adams, LLP finished the Audit on July 25, 2014, and IHS finished the Review on September 15, 2014.  See Complaint ¶ 25, at 11-12.  Yet IHS did not

provide any draft reports to Sage Hospital, and did not provide either its final report or Moss Adams, LLP's final report to Sage Hospital until September 29, 2014 -- the penultimate day of the 2014 fiscal year.  See Complaint ¶ 25, at 12.  IHS' report recommended that "the current contractual relationship [should] be severed through the issuance of a declination for continued contracting with the current [Sage] Board of Directors."  Complaint ¶ 49, at 22 (quoting IHS Review at 32)(alterations in Complaint but not in IHS review)(internal quotation marks omitted). Both IHS' and Moss Adams, LLP's reports either overlooked or did not read the documents that Sage Hospital provided, and did not seek any additional information or clarifications from Sage Hospital.  See Complaint ¶ 25, at 12.  Consequently, fundamental factual errors, unwarranted speculation, and irrelevant observations permeated their reports.  See Complaint ¶ 25, at 12.  It appears that their reports credited the untrue allegations of disgruntled former Sage Hospital employees without testing those allegations through requesting documents from Sage or interviews with Sage Hospital employees.  See Complaint ¶ 32, at 15.  Neither report identified any instance of misuse of federal funds, improper patient care, or any violation of Sage Hospital's IHS contract.  See Complaint ¶ 25, at 12.

### 3.    **The Declination.**

On September 29, 2014, IHS informed Sage Hospital by letter that it would not renew Sage's contract.  See Complaint ¶ 26, at 12; Letter from the Department of Health and Human Services to Stenson Wauneka, President of the Board of Directors of the Navajo Health Foundation (dated Sept. 26, 2014), filed November 25, 2014 (Doc. 8-2)("Declination").  The Declination explained that Sage Hospital's Board of Directors was misusing government funding and providing inadequate care to its patients.  See Declination at 4-9.  The Declination relied on

and included the reports from the Review and the Audit as attachments.  See Complaint ¶ 26, at 13.

Sage responded to the Declination with its own letter, dated October 2, 2014.  See Letter from Stenson D. Wauneka, Chairman, Board of Directors, to John Hubbard, filed November 25, 2014 (Doc. 8-3)("Sage's Declination Response").   In Sage's Declination Response, Sage Hospital demanded that IHS immediately rescind the Declination for the following reasons:

> First and foremost, your purported Declination of Sage's proposed Amendment No. 1 and Renewal No. 1 ("Renewal") violates 25 C.F.R. § 900.33 and is invalid. The regulations are clear that where the proposed Renewal does not constitute a material and substantial change to the scope or funding of Sage's PFSAs you do not have the authority to base the decision on performance concerns.   The DOI/HHS Internal Agency Procedures Handbook specifically states that "[t]he T/TO's performance under the existing contracts shall have no effect on the contract renewal process except as stated in 25 C.F.R. 900.33.   (Any alleged grounds the agency may have for terminating the contract must be dealt with under Subpart P - Retrocession and Reassumption procedures . . .)."  Because Sage's proposed Annual Funding Agreement for FY 2014 ("2014 AFA") is substantially the same as the one approved for FY 2013, you are required to apply the standard under 25 C.F.R. § 900.32, which answers the question "Can the Secretary decline an Indian . . . tribal organization's proposed successor annual funding agreement?" with an unequivocal "NO."   Your refusal to provide Sage technical assistance under these circumstances also violates federal law.   See 25 U.S.C. § 450f(b)(2).   Your purported Declination violates the Act, your own regulations and internal guidance documents, and the congressional policy underlying the Act, and is invalid.

Complaint ¶ 27, at 12-13 (quoting Sage's Declination Response at 2)(internal quotation marks omitted).

Sage's Declination Response further states that IHS violated the procedures to which it agreed by not permitting Sage Hospital to review its draft reports.  See Complaint ¶ 28, at 13. Reciting its dramatic turnaround and multiple awards, Sage Hospital challenged the Declination's conclusions that it was unable to satisfactorily provide healthcare services, as

without a factual basis.  <u>See</u> Complaint ¶ 28, at 13.  Sage Hospital also urged IHS to continue to provide funding pending the resolution of IHS' concerns.  <u>See</u> Complaint ¶ 28, at 13.

IHS funds account for approximately fifty-five percent of Sage Hospital's revenue.  <u>See</u> Complaint ¶ 31, at 15.  IHS did not tell Sage Hospital that it would cut its funding at any point from 2009 to the present.  <u>See</u> Complaint ¶ 31, at 15.  Nor did IHS discuss with Sage Hospital the matters purportedly motivating the Declination during any negotiations or other meetings with Sage Hospital before issuing the Declination.  <u>See</u> Complaint ¶ 31, at 15.  IHS also never asserted that Sage Hospital was grossly negligent in handling funds, or that Sage Hospital endangered the health and safety of any person under the ISDEA.  <u>See</u> Complaint ¶ 31, at 15.

### 4. <u>IHS' Actions After the Declination.</u>

On or about September 29, 2014, IHS told Sage Hospital's supplier in Gallup -- without notifying Sage Hospital -- to immediately stop delivering pharmaceuticals to Sage Hospital.  <u>See</u> Complaint ¶ 44, at 20.  Since that day, Sage Hospital's spending on pharmaceuticals has risen by 300% to 400%.  <u>See</u> Complaint ¶ 44, at 20.  IHS' one-day notice of Declination also left Sage Hospital without insurance coverage for medical malpractice claims under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) -- causing Sage Hospital to spend an additional $530,000 on medical malpractice insurance.  <u>See</u> Complaint ¶ 45, at 20.

In a Media Advisory for immediate release on October 12, 2014, entitled "HHS Announces Change in Health Care Services for beneficiaries in the Ganado Service Area," IHS announced to the public "that the IHS will change how it is providing health care services to its beneficiaries in the Granado Service Area who were formerly served by the Navajo Health Foundation-Sage Memorial Hospital (NHF-SMH).  IHS no longer provides funding to NHF-SMH for delivery of health care services in Ganado."  Complaint ¶ 46, at 20-21 (internal

quotation marks omitted).  The Media Advisory explains: "For outpatient medical, behavioral health, optometry, dental and other clinic-based services, IHS facilities in Chinle, Arizona and Gallup, New Mexico, and the PL 93-638 contracted Tsehootsooi Medical Center in Fort Defiance, Arizona [a competitor of Sage apparently favored by IHS] are available to provide services to individuals."   Complaint ¶ 46, at 21 (alterations in Complaint but not in source)(internal quotation marks omitted).

As of October 14, 2014, IHS' website listed twelve healthcare centers on the Navajo Reservation, but did not mention Sage Hospital.  See Complaint ¶ 47, at 21.  Navajo Area IHS officials also told school officials at Wide Ruins not to release sixty-five students whose parents had authorized their children to go to Sage Hospital for free vaccinations.  See Complaint ¶ 47, at 21.  IHS has circulated, promoted, and continues to falsely state to schools, local governments, and others in Sage Hospital's service area that it is closing.  See Complaint ¶ 47 at 21.  In a letter dated October 9, 2014, Sage Hospital requested an informal conference with IHS to resolve their dispute.  See Complaint ¶ 48, at 21-22.  After Sage Hospital learned of IHS' additional damaging actions and experienced the Declination's collateral effects, however, Sage Hospital withdrew its conference request on October 17, 2014, stating that the informal conference would not "accord Sage the opportunity for immediate relief that IHS' actions have necessitated."  Complaint ¶ 48, at 22 (internal quotation marks omitted).

## PROCEDURAL BACKGROUND

Sage Hospital filed the Complaint on October 23, 2014, asserting four causes of action. See Complaint at 22-31.  First, Sage Hospital contends that IHS' declination of Sage's August 22, 2013, three-year contract proposal violates 25 U.S.C. § 450f(b)(2), and 25 C.F.R. §§ 900.32 and 900.33.  See Complaint ¶ 55, at 23.  Sage Hospital asks the Court for immediate injunctive

relief to: (i) reverse IHS' declination of Sage Hospital's three-year contract proposal that it submitted on August 22, 2013; (ii) compel Burwell to award and fund the three-year contract; (iii) provide Federal Tort Claims Act coverage for Sage Hospital and its employees; (iv) restore Sage Hospital's ability to purchase pharmaceuticals and other supplies from its suppliers; and (v) cease IHS' disparagement of Sage Hospital.   See Complaint ¶¶ 54-56, at 23-24.   Sage Hospital points out that, because the ISDEA provides for both injunctive and mandamus relief to remedy violations of the ISDEA and its implementing regulations, it does not need to prove the traditional equitable grounds for obtaining injunctive relief.  See Complaint ¶ 56, at 24.

Sage Hospital argues that, even if had to demonstrate the traditional equitable grounds for obtaining injunctive relief, those traditional grounds are easily met here.  See Complaint ¶ 57, at 24.  Sage contends that IHS' declination of Sage's August 22, 2013, proposal is causing Sage Hospital immediate and irreparable injury, because it threatens to ruin Sage Hospital's healthcare business, force it to close, and cause it to lose good will among its patients.  See Complaint ¶ 57A, at 24.  Sage Hospital asserts that it will likely succeed on the merits of its case, because the Defendants clearly violated the ISDEA and its promulgating regulations.  See Complaint ¶ 57B, at 24.  Sage Hospital points out that 25 C.F.R. § 900.33 prohibits IHS from declining to renew Sage Hospital's ISDEA contract based on performance concerns to the extent that there were no material and substantial changes to the scope or funding of Sage Hospital's programs and services.  See Complaint ¶ 57B, at 24.  Sage Hospital asserts that 25 C.F.R. § 900.32 prohibits IHS from declining Sage Hospital's annual funding agreement for FY 2014, because that proposed agreement was substantially the same as the one that IHS approved for FY 2013. See Complaint ¶ 57B, at 24.  Sage Hospital says that IHS' refusal to provide Sage Hospital with technical assistance to address any relevant issues is "concededly in violation of 15 U.S.C.

§ 450f(b)(2)."  Complaint ¶ 57B, at 24.  Sage Hospital argues that the balance of hardships tips in its favor, because, while an injunction will merely require the Defendants to comply with federal law, the Court's failure to order an injunction will ruin Sage Hospital's business and cause 200 Sage Hospital employees to lose their jobs.  See Complaint ¶ 57C, at 24.  Sage Hospital asserts that an injunction will also be in the public interest, because it will allow American Indians to get much-needed and high-quality healthcare at Sage Hospital, rather than obtaining lower-quality healthcare at more distant IHS facilities.  See Complaint ¶ 57D, at 25.

Second, Sage Hospital contends that IHS' declination of Sage Hospital's September 19, 2014, proposal for FY 2015 -- to the extent that it is substantially the same as the FY 2014 proposal -- violates 25 U.S.C. § 450f(b)(2) and 25 C.F.R. §§ 900.32 and 900.33.  See Complaint ¶¶ 59-60, at 25.  Sage Hospital asks the Court for immediate injunctive relief to: (i) reverse IHS' declination of Sage Hospital's September 19, 2014, proposal for FY 2015 to the extent that it is substantially the same as the FY 2014 proposal; (ii) compel Burwell to award and fund the September 19, 2014, proposal to the extent that it is substantially the same as the FY 2014 proposal; (iii) provide Federal Tort Claims Act coverage for Sage Hospital and its employees; (iv) restore Sage Hospital's ability to purchase pharmaceuticals and other supplies from its suppliers; and (v) cease IHS' disparagement of Sage Hospital's business.  See Complaint ¶¶ 61, at 25.  Sage Hospital reiterates that, because the ISDEA provides for both injunctive and mandamus relief to remedy violations of the ISDEA and its implementing regulations, it does not need to prove the traditional equitable grounds for obtaining injunctive relief.  See Complaint ¶ 61, at 25.

Sage Hospital argues that, even if it had to demonstrate the traditional equitable grounds for obtaining injunctive relief, those grounds are easily met here.  See Complaint ¶ 62, at 25-26.

Sage Hospital contends that IHS' declination of Sage Hospital's September 19, 2014, proposal is causing Sage Hospital immediate and irreparable injury, because it threatens to ruin Sage Hospital's healthcare business, force it to close, and cause it to lose good will among its patients. See Complaint ¶ 62A, at 26.  Sage Hospital asserts that it will likely succeed on the merits of its case, because the Defendants clearly violated the ISDEA and regulations thereunder.   See Complaint ¶ 62B, at 26.  Sage Hospital points out that 25 C.F.R. § 900.33 prohibits IHS from declining to renew Sage Hospital's ISDEA contract on performance concerns where there are no material and substantial changes to the scope or funding, or to Sage Hospital's programs and services.  See Complaint ¶ 62B, at 26.  Sage Hospital asserts that 25 C.F.R. § 900.32 prohibits IHS from declining Sage Hospital's annual funding agreement for FY 2015 to the extent that the agreement is substantially the same as those IHS approved in FY 2013 and 2014.  See Complaint ¶ 62B, at 26.  Sage Hospital says that IHS' refusal to provide Sage Hospital with technical assistance to address any relevant issues is "concededly in violation of 15 U.S.C. § 450f(b)(2)." Complaint ¶ 62B, at 26.  Sage Hospital reiterates that the balance of hardships tips in its favor, because, while an injunction will merely require the Defendants to comply with federal law, the Court's failure to order an injunction will ruin Sage Hospital's business and cause 200 Sage Hospital employees to lose their jobs.  See Complaint ¶ 62C, at 26.  Sage Hospital argues that an injunction will also be in the public interest, because it will allow American Indians to get much-needed and high-quality healthcare at Sage Hospital, rather than obtaining compromised quality care at more distant IHS facilities.  See Complaint ¶ 62D, at 26-27.

Third, Sage Hospital asserts that, because it is entitled to immediate injunctive relief to reverse the Declination and to compel Burwell to award and fund the three-year contract proposal that Sage submitted on August 22, 2013, the Defendants are required to pay Sage

Hospital the full amount requested in the FY 2014 additional funding agreement.  See Complaint ¶ 64, at 27.  Sage Hospital contends that, under 25 U.S.C. § 450m-1(a), it is entitled to an accounting of funds that IHS provided to Sage Hospital from October 1, 2013, to the date of judgment.  See Complaint ¶ 66, at 27.

Fourth, Sage Hospital argues that IHS violated 41 U.S.C. § 7103(f)(3).  See Complaint ¶¶ 67-72, at 27-29.  Sage Hospital explains that, on August 25, 2014, it submitted to IHS a Contract Support Costs claim for $62,569,681 ("Claim") under the Contract Disputes Act, 41 U.S.C. §§ 7101, 7103, 7107, and 7109; and under §§ 101(a) and (d) of the ISDEA.  Complaint ¶ 68, at 27.  According to Sage Hospital, the Claim specifies, for each fiscal year from 2009 to 2013, the total Contract Support Costs shortfall.  See Complaint ¶ 69, at 27-28.  Sage asserts that IHS responded to the Claim by "an inapplicable form letter," dated October 23, 2014, that Dayish signed ("Oct. 23, 2014, Letter").  Complaint ¶ 70, at 28.  Sage Hospital contends that the proposed date for deciding the Claim -- October 21, 2015 -- is unreasonable, because the Claim and its exhibits provide all of the information that IHS needs to decide the Claim.  See Complaint ¶ 71, at 28.  Sage Hospital argues that, consequently, the Oct. 23, 2014, Letter violates 41 U.S.C. § 7103(f)(3).  See Complaint ¶ 71, at 28.  Sage Hospital asks the Court to direct Dayish to issue a decision on the Claim in a specified period of time that the Court finds reasonable.  See Complaint ¶ 72, at 29.

### 1.   The Motion.

The Defendants filed the Motion on November 25, 2014.  See Motion at 1.  In the Motion, the Defendants ask the Court either to dismiss the case for improper venue under rule 12(b)(3) or to transfer the case to the United States District Court for the District of Arizona under § 1401.  See Motion at 4-12.  Beginning with their improper venue argument, the

Defendants explain that a plaintiff may bring a civil suit against a United States employee in his or her official capacity in any district in which:

> (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of the property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action.

Motion at 4 (quoting 28 U.S.C. § 3191(e)(1))(internal quotation marks omitted).  According to the Defendants, the plaintiff bears the burden of establishing venue, and "must make a prima facie showing on the basis of affidavits and other written material to withstand the motion." Motion at 4 (quoting Mohr v. Margolis, Ainswoth & Kinlaw Consulting, Inc., 434 F. Supp. 2d 1051, 1058 (D. Kan. 2006))(internal quotation marks omitted).

The Defendants argue that none of § 1391(e)(1)'s three conditions for venue are met in this case.  See Motion at 4.  The Defendants assert that § 1391(e)(1)(A) does not apply, because they do not reside in the District of New Mexico.  See Motion at 4-6.  The Defendants argue that the residence of a federal officer is the place where he or she performs his or her official duties. See Motion at 5 (citing Reuben H. Donnelley Corp. v. F.T.C., 580 F.2d 264, 266 n.3 (7th Cir. 1978); Lamont v. Haig, 590 F.2d 1124, 1128 (D.C. Cir. 1978); Dunston v. N.Y.C. Police Dep't, No. CIV 10-8117, 2010 WL 5065903, at *3 n.4 (S.D.N.Y. Dec. 7, 2010);  Burnett v. Caruso, No. CIV 10-10749, 2010 WL 1609256, at *1 (E.D. Mich. Apr. 19, 2010); Ibrahim v. Chertoff, No. CIV 06-2701, 2007 WL 155821, at *4 (S.D. Cal. May 25, 2007); Caremark Therapeutic Servs. v. Leavitt, 405 F. Supp. 2d 454, 464 (S.D.N.Y. 2005); Neville v. Dearie, 745 F. Supp. 99, 102 (N.D.N.Y. 1990), superseded by statute on other grounds as stated in Kampfer v. Scullin, 989 F. Supp. 194, 201 (N.D.N.Y. 1997); Archuleta v. Sullivan, 725 F. Supp. 602, 605 (D.D.C. 1989)). The Defendants point out that they each perform their official duties outside of New Mexico: Burwell performs her official duties in the District of Columbia, Roubideaux performs her

official duties in Maryland, and Hubbard and Dayish perform their official duties in Arizona. See Motion at 5-6.  The Defendants argue that, consequently, Sage Hospital cannot establish venue in New Mexico through § 1391(e)(1)(A).  See Motion at 6.

The Defendants say that, although Sage Hospital may argue that venue is proper because Hubbard performs some of his duties in New Mexico, the majority of courts have found that federal officers have only one official residence for venue purposes.  See Motion at 6 (citing, e.g., Fl. Nursing Home Ass'n v. Page, 616 F.2d 1355, 1360 (5th Cir. 1980), rev'd on other grounds, 450 U.S. 147 (1980); Cook Grp., Inc. v. Purdue Research Found., No. CIV 02-0406, 2002 WL 1610951, at *5 (S.D. Ind. June 24, 2002); Republican Party of N.C. v. Martin, 682 F. Supp. 834, 836 (M.D.N.C. 1988)).  The Defendants argue that, consequently, the fact that Hubbard traveled New Mexico to perform some of his duties does not mean that venue is proper there.  See Motion at 6.

The Defendants concede that a minority of courts appear to disagree with this approach, holding that federal officers can have more than one official residence if they: (i) perform "a significant amount" of their official duties in the other state; and (ii) those official duties are related to the cause of action.  Motion at 6 (citing Dehaemers v. Wynne, 522 F. Supp. 2d 240, 248 (D.D.C. 2007); Bartman v. Cheney, 827 F. Supp. 1, 2 & n.2 (D.D.C. 1993)).  The Defendants argue that, where a lawsuit lacks "any adequate connection" to the plaintiff's chosen forum, a federal official cannot be found to have a second residence there for venue purposes. Motion at 6-7 (citing Protess v. Howell, No. CIV 95-2553, 1995 WL 270219, at *3 (N.D. Ill. May 5, 1995)).  The Defendants assert that this lawsuit lacks any adequate connection to New Mexico.  See Motion at 7.  The Defendants point out that Hubbard does not perform a significant amount of his duties in New Mexico, and that his few responsibilities in New Mexico have

- 18 -

nothing to do with Sage Hospital or with its IHS contract.  <u>See</u> Motion at 7 (citing Hubbard Declaration ¶¶ 2-4, at 1-2).  The Defendants argue that, accordingly, even under the minority residence rule, Sage cannot establish proper venue.  <u>See</u> Motion at 7.

The Defendants contend that, although Sage Hospital may assert that venue lies in New Mexico because IHS has facilities there, venue does not lie automatically in every judicial district where a federal agency has an office.  <u>See</u> Motion at 7 (citing <u>Reuben H. Donnelley Corp. v. F.T.C.</u>, 580 F.2d at 267 (holding that the 1962 amendments to 28 U.S.C. § 1391(e) did not alter the general rule that the federal government resides only in the District of Columbia); <u>High Sierra Hikers Ass'n v. U.S. Forest Serv.</u>, No. CIV 04-3478, 2005 WL 886851, at *2 (N.D. Cal. Apr. 8, 2005)(rejecting the plaintiffs' argument that the United States Forest Service resides in the Northern District of California solely because it has offices there); <u>Harke v. F.A.A.</u>, 369 F. Supp. 741, 746 (E.D.N.Y. 1973)("The statutory reference to the district in which a defendant 'resides' may not reasonably be construed to include every district where some subordinate has an office.")).  The Defendants assert that these rules "are not meant to be overly technical barriers to suit," but were instead developed to address the difficulties for the federal government if it were forced to defend against claims brought across the country.  Motion at 7 (quoting <u>Buffalo Teachers Fed'n, Inc. v. Helsby</u>, 426 F. Supp. 828, 829 (S.D.N.Y. 1976))(internal quotation marks omitted).

The Defendants contend that § 1391(e)(1)(B) does not apply, because all of the challenged actions or omissions that give rise to the claims in this case occurred outside the District of New Mexico.  <u>See</u> Motion at 8-9.  The Defendants explain that this lawsuit focuses on IHS' non-renewal of a contract with Sage -- a hospital located in Arizona -- via a letter that Hubbard -- a government official who works in Arizona -- signed.  <u>See</u> Motion at 8.  The

- 19 -

Defendants argue that it should be obvious from these facts that all of the events giving rise to Sage Hospital's claims occurred in Arizona and not in New Mexico.  See Motion at 8.  The Defendants assert that the Complaint underscores this point by repeatedly pointing out that: (i) Sage Hospital is under the jurisdiction of Arizona state agencies; (ii) Sage Hospital's service area is exclusively in Arizona; (iii) Sage Hospital's satellite facility is located in Arizona; and (iv) if the Court grants Sage Hospital's request for injunctive relief, the federal government would send funding to Arizona.  See Motion at 8-9 (citations omitted).

In the Defendants' view, aside from the Complaint's boilerplate allegation that one or more defendants "reside" in New Mexico, it makes only one allegation related to New Mexico: that IHS allegedly informed Sage Hospital's patients that they could receive medical care in Gallup.  Motion at 9 (citation omitted).  The Defendants argue that issuing a statement in Arizona to people living in Arizona about medical care available in New Mexico is not a substantial event that can support venue in New Mexico under § 1391(e)(1)(B).  See Motion at 9 (citing Sutain v. Shapiro & Lieberman, 678 F.2d 115, 117 (9th Cir. 1982)(affirming dismissal for lack of venue where events in district were not substantial); Davies Precision Machining, Inc. v. Def. Logistics Agency, 825 F. Supp. 105, 106 (E.D. Pa. 1993)(holding that marginal transactions in the forum do not constitute a "substantial part of the events giving rise to the claim.")).

The Defendants argue that § 1391(e)(1)(C) does not apply, because the real property involved in this action is outside of the District of New Mexico.  See Motion at 9-10.  The Defendants assert that the real property involved in this action is Sage Hospital's facilities -- which are located exclusively in Ganado.  See Motion at 9.  The Defendants conclude: "Because Plaintiff has not demonstrated that venue is proper in New Mexico, the Court should dismiss the case for improper venue under Federal Rule of Civil Procedure 12(b)(3)."  Motion at 10.

The Defendants assert that, in the alternative, the Court should exercise its discretion under § 1404(a) to transfer this case to the District of Arizona.  See Motion at 10.  The Defendants explain that, in considering a motion to transfer venue under § 1404(a), courts have discretion to weigh a number of factors, including the plaintiff's choice of forum, and the accessibility of witnesses and other sources of proof.  See Motion at 10 (citing Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d 1153, 1167 (10th Cir. 2010)(listing factors for courts to consider in analyzing a motion to transfer venue under § 1404(a)).  The Defendants argue that, here, those factors weigh in favor of transfer.  See Motion at 10.

First, the Defendants argue that the Court should not give any deference to Sage Hospital's choice of forum.  See Motion at 10.  The Defendants reiterate that New Mexico is neither Sage Hospital's place of business nor the location where the events giving rise to Sage Hospital's claims occurred.   See Motion at 10.   The Defendants assert that, in these circumstances, courts give no deference to the plaintiff's choice of forum.  See Motion at 11 (citing  Employers Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d at 1168 ("The plaintiff's choice of forum receives less deference . . . if the plaintiff does not reside in the district.  Courts also accord little weight to a plaintiff's choice of forum where the facts giving rise to the lawsuit have no material relation or significant connection to the plaintiff's chosen forum."); WildEarth Guardians v. U.S. Forest Serv., No. CIV 11-3171, 2012 WL 1415378, at *3 (D. Colo. Apr. 24, 2012)).

Second, the Defendants assert that the other relevant factors also weigh in favor of transfer.  See Motion at 11.  The Defendants point out that: (i) they reached the challenged conclusions and took the challenged actions in either Arizona or the Washington, D.C. area; (ii) Sage Hospital is located in and does business solely in Arizona; and (iii) the documents,

witnesses, and all other conceivable evidence for this case is located outside the District of New Mexico.  See Motion at 11.  The Defendants also state that, to the extent that this factor has any relevance, litigating the case in Arizona will not inconvenience Sage Hospital's counsel, because they already try cases in Arizona on a regular basis.  See Motion at 11.  In the Defendant's view, "[n]othing is stopping Plaintiff from bringing and litigating this case in Arizona, where it belongs."  Motion at 11.

  **2.**  **The Response.**

  Sage Hospital responded to the Motion on December 11, 2014.  See Response at 1.  First, Sage Hospital asks the Court to deny the Defendants' rule 12(b)(3) motion, because the District of New Mexico is a proper venue under both § 1391(e)(1)(A) and § 1391(e)(1)(B).   See Response at 4-10.  Sage Hospital argues that the District of New Mexico is a proper venue for this action under § 1391(e)(1)(A), because Dayish resides in New Mexico.  See Response at 4. Sage points out that Congress amended § 1391 in the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. 112-63, 125 Stat. 758 ("Clarification Act").  Response at 4. Sage says that § 1391(c)(1) now reads: "For all venue purposes - (1) a natural person . . . shall be deemed to reside in the judicial district in which that person is domiciled."  Response at 4 (quoting 28 U.S.C. § 1391(c)(1))(emphases in Response but not in statute)(omission in Response but not in statute)(internal quotation marks omitted).  Sage Hospital contends that, because Dayish is domiciled in New Mexico, a plain-language reading of §§ 1391(c)(1) and 1391(e)(1)(A) indicates that the District of New Mexico is a proper venue for this case.  See Response at 4 (citing Dayish Declaration ¶ 3, at 1).

  Sage Hospital argues that, even applying the Defendants' pre-Clarification Act residence standard, the District of New Mexico is a proper venue for this case under § 1391(e)(1)(A).  See

Response at 5.  Sage Hospital contends that, under the pre-Clarification Act standard, a federal employee resides in any district in which he or she performs "a significant amount" of his or her official duties.  Response at 6 (citing Bartman v. Cheney, 827 F. Supp. 1, 2 (D.D.C. 1993)).  Sage Hospital asserts that Hubbard and Dayish both perform a significant amount of their official duties in New Mexico.  See Response at 6.  Sage Hospital points out that: (i) five of the twelve healthcare facilities at which Hubbard directs programs and staff are located in New Mexico; (ii) forty percent of the Navajo Area IHS user population resides in New Mexico; and (iii) Sage Hospital and IHS negotiated its 2008 Annual Funding Agreement in New Mexico.  See Response at 6-7 (citations omitted).  Sage Hospital argues that, consequently, even if the Court applies the pre-Clarification residence standard, the District of New Mexico is a proper venue for this case under § 1391(e)(1)(A).  See Response at 7.

Sage Hospital asserts that the District of New Mexico is also a proper venue under § 1391(e)(1)(B), because a substantial part of the relevant events in this case occurred in New Mexico.  See Response at 8. Sage Hospital points out that three important events occurred in New Mexico: (i) Sage Hospital and the Navajo Area IHS negotiated the 2008 Annual Funding Agreement in Shiprock, New Mexico; (ii) after declining to renew Sage Hospital's contract, IHS instructed Sage Hospital's pharmaceutical supplier in Gallup to cut off supplies to Sage Hospital; and (iii) IHS used the Gallup Independent and the Navajo Times -- newspapers which have large circulations in New Mexico -- to inform Sage Hospital's New Mexico patients that it was closing and that they should go to other facilities to receive treatment.   See Response at 9.  Sage Hospital acknowledges that some of the events giving rise to this suit occurred in Arizona, but states:

> [T]he fact that substantial activities took place in district B does not disqualify district A as proper venue as long as "substantial" activities took place in district

> A, too.  Indeed, district A should not be disqualified even if it is shown that the
> activities in district B were more substantial, or even the most substantial.

Response at 9 (quoting First of Mich. Corp. v. Bramlet, 141 F.3d 260, 263-64 (6th Cir.

1998))(internal quotation marks omitted).  In support of this proposition, Sage Hospital also cites

Navajo Nation v. Urban Outfitters, Inc., 918 F. Supp. 2d 1245 (D.N.M. 2013)(Hansen, J.), in

which the Honorable C. Leroy Hansen, United States District Judge for the District of New

Mexico, noted that the fact that "some" relevant acts occurred in the forum state is a "significant

enough connection" to respect the plaintiff's choice of forum.  Response at 10 (quoting Navajo

Nation v. Urban Outfitters, Inc., 918 F. Supp. 2d at 1254-55)(internal quotation marks omitted).

Second, Sage Hospital asks the Court to deny the Defendants' request to transfer the case

to the District of Arizona.  See Response at 10.  Sage Hospital states that courts consider the

following factors in ruling on a motion to transfer venue:

> (1) the plaintiff's choice of forum, (2) the locus of operative facts, (3) the
> convenience and relative means of the parties, (4) the convenience of
> witnesses, (5) the availability of process to compel the attendance of
> witnesses, (6) the location of physical evidence, including documents, (7) the
> relative familiarity of the courts with the applicable law, and (8) the interests
> of justice, including the interest of trial efficiency.

Response at 10-11 (citing Silver v. Brown, 678 F. Supp. 2d 1187, 1204 (D.N.M.

2009)(Browning, J.), aff'd in part and rev'd in part on other grounds, 382 F. App'x 723 (10th

Cir. 2010)).  Sage Hospital argues that the moving party must show that these factors favor

transfer; if the moving party fails to meet its burden, the court should not disturb the plaintiff's

choice of forum.  See Response at 11 (citing Wm. A. Smith Contracting Co., Inc. v. Travelers

Indem. Co., 467 F.2d 662, 664 (10th Cir. 1974)).  Sage Hospital says that, when analyzing a

motion to transfer venue, the trial court must draw all reasonable inferences in favor of the non-

moving party.  See Response at 11 (citing <u>Hancock v. Amer. Tel. and Tel. Co., Inc.</u>, 701 F.3d at 1260-61).

Sage Hospital contends that seven of the eight factors that the Court set forth in <u>Silver v. Brown</u> weigh against transfer and one factor is irrelevant.  See Response at 11.  Sage Hospital argues that the first factor -- the plaintiff's choice of forum -- weighs against transfer.  See Response at 11.  Sage Hospital maintains that courts typically give the plaintiff's choice of forum considerable weight in analyzing a transfer motion.  See Response at 11 (citing <u>Tex. E. Transmission Corp. v. Marine Office-Appleton & Cox Corp.</u>, 579 F.2d 561, 567 (10th Cir. 1978)).  Sage Hospital acknowledges that, to discourage forum shopping, a plaintiff's choice of forum is entitled to less weight when he or she brings suit in a foreign district, but contends that the Court should not be concerned about forum shopping, because the District of New Mexico is near Sage's principal place of business.  See Response at 12 (citing <u>Waste Distillation Tech., Inc. v. Pan Amer. Res., Inc.</u>, 775 F. Supp. 759, 764 (D. Del. 1991)(stating that "it is sufficient that the forum is near the plaintiff's principal place of business" for plaintiff's choice of forum to be entitled to deference)).

Sage Hospital asserts that the second factor -- the locus of this case's operative facts -- also weighs against transfer.  See Response at 12.  Sage Hospital contends that, as it has already explained, a substantial part of the events giving rise to this suit occurred in New Mexico -- including IHS and Sage Hospital's negotiation of the 2008 Additional Funding Agreement and IHS' instruction to Sage Hospital's pharmaceutical supplier to stop supplying Sage Hospital.  See Response at 12 (citing <u>Emberton v. Rutt</u>, No. CIV 07-1200 JB/RLP, 2008 WL 4093714, at *12-13 (D.N.M. Mar. 31, 2008)(Browning, J.)(holding that, where at least some of the operative

events occurred in New Mexico, the Court found it not in the interests of justice or trial efficiency to transfer the case)).

Sage Hospital addresses the second, fourth, and sixth factors together, asserting that they all weigh against transfer.  See Response at 12-13.  Sage Hospital explains that both the Navajo Area IHS office and Sage Hospital's facilities are closer to the United States District Court in Albuquerque than to the United States District Court in Phoenix.  See Response at 13 (stating that IHS' office is 168 miles from Albuquerque but 282 miles from Phoenix, and Sage Hospital's facilities are approximately 192 miles from Albuquerque but 272 miles from Phoenix).  Sage Hospital asserts that, because the majority of the witnesses and relevant documents in this case are located in and around Sage Hospital's facilities and the Navajo Area IHS office, the District of New Mexico is a more convenient forum than the District of Arizona for the parties, the witnesses, and for obtaining the relevant documents in this case.  See Response at 13-14.  Sage Hospital adds that the Defendants' actions have put Sage Hospital "on its heels financially" and it cannot afford the extra expense of trying this case in the District of Arizona.  Response at 14 (citing Silver v. Brown, 678 F. Supp. 2d at 1204 (stating that the Court may take into consideration the parties' relative means in deciding whether to grant a motion to transfer venue)).  Sage Hospital argues that, consequently, the second, fourth, and sixth factors all weigh against transfer.  See Response at 14.

Regarding the fifth factor -- the availability of process to compel the witnesses' attendance -- Sage Hospital points out that there is no issue on the availability of process in the New Mexico, Arizona, or Washington, D.C.  See Response at 11 n.9.  Sage argues that, as a result, this factor is irrelevant.  See Response at 11 n.9. Sage Hospital asserts that the seventh factor -- the relative familiarity of the courts with the applicable law -- weighs against transfer,

because the District of New Mexico has extensive experience interpreting ISDEA's federal contracting requirements, while the District of Arizona and the United States Court of Appeals for the Ninth Circuit do not.  See Response at 14-15 (citing Ramah Navajo Sch. Bd. v. Sebelius, No. CIV 07-0289 MV/SMV (D.N.M. May 9, 2013)(Doc. 143)(Vazquez, J.); S. Ute Indian Tribe v. Leavitt, 497 F. Supp. 2d 1245 (D.N.M. 2007)(Johnson, J.); Crownpoint Inst. of Tech. v. Norton, No. CIV 04-0531 JP/DJS (D.N.M. Sept. 16, 2005)(Doc. 86)(Parker, J.)).

Sage Hospital asserts that the eighth and final factor -- the relative congestion of the courts' dockets -- also weighs against transfer.  See Response at 15-16.  Sage Hospital contends that the Court's docket is less congested than the District of Arizona.  See Response at 15 (citing U.S. District Court - Caseload Profile, filed December 11, 2014 (Doc. 14-2).  Specifically, Sage points out that: (i) the District of Arizona has 443 pending cases per judge while the District of New Mexico has 439; (ii) the District of Arizona has 787 weighted filings per judge while the District of New Mexico has 600; (iii) the District of Arizona has a median time of 7.7 months from filing to disposition while the District of New Mexico has a median time of 10.3 months; and (iv) the District of Arizona has a median time of 29.2 months from filing to trial while the District of New Mexico has a median time of 26.9 months.  See Response at 15-16 (citation omitted).  Sage Hospital argues that, consequently, the relative congestion of the courts' dockets also weighs against transferring this case to the District of Arizona.  See Response at 16.

### 3.     The Reply.

The Defendants replied to the Response on December 29, 2014.  See Reply at 1.  The Defendants first address Sage Hospital's argument that the District of New Mexico is a proper venue because the new amendment to § 1391(c)(1) provides that a natural person resides wherever he or she is domiciled.  See Reply at 2.  The Defendants contend that § 1391(c)(1)

defines only the residency of "natural persons," and does not apply to federal employees sued in their official capacity.  Reply at 2.  The Defendants argue that § 1391(e)(1) -- which applies to "civil action[s] in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity" -- governs this case.  Reply at 2 (quoting 28 U.S.C. § 1391(e)(1)).

The Defendants point out that the Supreme Court of the United States has held that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent" and do not constitute an action against officers themselves. Reply at 3 (quoting Monell v. N.Y. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978))(internal quotation marks omitted).  The Defendants state that, in other words, "state officers sued for damages in their official capacity are not persons for purposes of the suit because they assume the identity of the government that employs them."  Reply at 3 (quoting Hafer v. Melo, 502 U.S. 21, 27 (1991))(internal quotation marks omitted).  The Defendants argue that, consequently, suing Dayish in his official capacity is the legal equivalent of suing IHS.  See Reply at 3.  The Defendants assert that, because IHS cannot be considered a "natural person" under § 1391(c)(1), it follows that § 1391(c)(1) cannot apply to Dayish as an official-capacity defendant.  See Reply at 3.

The Defendants also challenge Sage Hospital's alternative argument that Dayish and Hubbard reside in New Mexico because they perform a significant amount of their duties in New Mexico.  See Reply at 3.  The Defendants argue that the Court should not adopt Sage Hospital's approach, because it is a minority view that began with a case -- Doe v. Casey, 601 F. Supp. 581 (D.D.C. 1985), rev'd on other grounds, 796 F.2d 1508 (D.C. Cir. 1986) -- which wrongly imported its reasoning from the state context into the federal context.  See Reply at 4.  The

Defendants point out that one of the cases that the D.C. District Court cited in Doe v. Casey contradicted its holding, because it stated that "a federal official has only one official residence, but that is not necessarily true of a state official."  Reply at 4 (citing Fla. Nursing Ass'n v. Page, 616 F.2d 1355, 1360 (5th Cir. 1980), rev'd on other grounds, 450 U.S. 147 (1981)).  The Defendants argue that the other case that the D.C. District Court cited in Doe v. Casey had nothing to do with its holding, because it concluded that an officer's official residence, rather than his or her personal residence, controls for venue purposes.  See Reply at 4 (citing Lamont v. Haig, 590 F.2d 1124, 1128 n.19 (D.C. Cir. 1978)).

The Defendants assert that, moreover, the reasoning behind Doe v. Casey's holding "does not quite work."  Reply at 4.  The Defendants point out that "the potential inconvenience to federal officials resulting from a rule recognizing multiple official residences is far greater than for state officials, who can never be deemed to reside in another state."  Reply at 4 (quoting Cheeseman v. Carey, 485 F. Supp. 203, 207 (S.D.N.Y. 1980))(internal quotation marks omitted). The Defendants contend that the fact that a plaintiff can generally sue federal officials in the district in which the plaintiff resides under § 1391(e) makes a multiple-residence rule far less necessary in cases against federal officials.  See Reply at 4 (citing Cheeseman v. Carey, 485 F. Supp. at 207).

The Defendants argue that, even if the Court disagrees with the majority rule and instead follows Doe v. Casey, it should still hold that Hubbard and Dayish do not reside in New Mexico, because they do not perform a significant amount of their official duties in New Mexico.  See Reply at 5.  The Defendants point out that Sage Hospital's argument relies solely on the fact that the Navajo Nation is located partly in New Mexico.  See Reply at 5.  The Defendants assert that, while Hubbard and Dayish have official duties relating to New Mexico, they performed those

duties in Arizona.  See Reply at 5 (citing Dayish Declaration ¶ 3, at 1)("I perform all of my official duties in Window Rock, Arizona."); Hubbard Declaration ¶ 5, at 2 ("I perform the significant part of my official duties in Window Rock, Arizona.")).

The Defendants point out that Sage Hospital also fails to address the Defendants' argument that, if the Court adopts the multiple-residences rule, it should also adopt the test for determining "which residences matter for state officials."  Reply at 5-6 (citing Republican Party of N.C. v. Martin, 682 F. Supp. 834, 836 (M.D.N.C. 1988)(examining, among other things, "the relationship of the defendant's activities within the district to the cause of action")).  The Defendants assert that Sage Hospital does not attempt to argue that any of Defendants' official duties in New Mexico have anything to do with Sage Hospital.  See Reply at 6.  The Defendants assert that Sage Hospital cannot make such a showing.  See Reply at 6.

The Defendants challenge Sage Hospital's argument that the District of New Mexico is a proper venue under § 1391(e)(1)(B), because "a substantial part of the relevant events occurred in New Mexico."  Reply at 6.  The Defendants say that Sage Hospital's argument rests on three facts: (i) IHS' and Sage Hospital's signing of the 2008 Additional Funding Agreement in New Mexico; (ii) IHS' instructions to Sage Hospital's supplier in Gallup to stop supplying pharmaceuticals to Sage Hospital; and (iii) IHS' statement to Navajo area patients after the Declination that they could receive medical care at two locations in Arizona and one location New Mexico.  See Reply at 6.  The Defendants contend that there are two problems with this argument.  See Reply at 6.

First, the Defendants argue that none of the events to which Sage Hospital points "gave rise to the claims in this case."  Reply at 6 (quoting 28 U.S.C. § 1391(e)(1)(B))(internal quotation marks omitted).  The Defendants argue that the signing of the 2008 Additional Funding

Agreement has nothing to do with the Defendants' decision not to sign a different contract six years later.  See Reply at 6.  The Defendants assert that, similarly, IHS' statements about other medical providers are irrelevant to Sage Hospital's claims.  See Reply at 6.

Second, the Defendants assert that none of the events to which Sage Hospital points are "substantial."  Reply at 6 (quoting 28 U.S.C. § 1391(e)(1)(B)(explaining that venue is proper in any district where "a substantial part of the events or omissions giving rise to the claim occurred)).  The Defendants argue that neither the signing of a different contract six years before the Declination nor a few communications telling Navajo Indians to go to other healthcare facilities is substantial, because those events did not give rise to Sage Hospital's claims.  See Reply at 7 (citing Tillotson v. City of El Paso, No. CIV 09-0963 JB/CG, 2010 WL 597993, at *4 (D.N.M. Jan. 29, 2010)(Browning, J.)(holding that, where "almost every event described in the Amended Complaint occurred in El Paso," except the plaintiff's "dismissal from Thriftway Supermarkets" in New Mexico, no "substantial" part of the events or omissions giving rise to the claim occurred in New Mexico)).

Responding to Sage Hospital's transfer-of-venue argument, the Defendants contend that the eight-factor test that Sage Hospital cites from Silver v. Brown is "not at all helpful," because the "main reason" that the Court should transfer the case lies with factors two and three: the locus of operative facts and the convenience of the parties, respectively.  Reply at 7.  In the Defendants' view, the balance of the remaining factors is largely neutral.  See Reply at 7.

Addressing the first factor -- the plaintiff's choice of forum -- the Defendants argue that "when the operative facts underlying the cause of action did not occur within the forum chosen by the plaintiff, the choice of forum is entitled to less consideration."  Reply at 7-8 (quoting A.J. Taft Coal. Co. v. Barnhart, 291 F. Supp. 2d 1290, 1310 (N.D. Ala. 2003))(internal quotation

marks omitted).  The Defendants assert that, as previously argued, no operative facts occurred in

New Mexico, because the three events to which Sage Hospital points did not give rise to the

claims in this case and are insubstantial.  See Reply at 8.  The Defendants argue that, moreover,

none of the cases that Sage Hospital cites support its argument.  See Reply at 8.  According to

the Defendants, Navajo Nation v. Urban Outfitters, Inc., held that the Navajo Nation itself is

located in New Mexico and that, therefore, New Mexico is a suitable forum in which the tribe

litigates as a plaintiff.  See Reply at 8 (citing Navajo Nation v. Urban Outfitters, Inc., 918 F.

Supp. 2d at 1255-56).  The Defendants point out that, unlike the Navajo Nation, the plaintiff in

this case -- Sage Hospital -- operates and is located in Arizona.  See Reply at 8.  In the

Defendants' view, Navajo Nation v. Urban Outfitters, Inc. is, therefore, inapposite.  See Reply at

8.

      The Defendants argue that Waste Distillation Technology v. Pan American Resources  --

a case on which Sage Hospital relies -- highlights the problems with Sage Hospital's choice of

venue in this case.  See Reply at 8.  According to the Defendants, in that case,

> the plaintiff's principal place of business was in a town just north of New York
> City.  The plaintiff first filed suit in the Southern District of New York, but that
> court dismissed the case for lack of personal jurisdiction.  After the plaintiff filed
> suit in Delaware, the defendant moved to transfer the case to the Central District
> of California.  The court rejected the argument that the plaintiff should be
> penalized for litigating away from its principal place of business, reasoning that
> the plaintiff attempted to do so but that its home turf was not available.  The
> District of Delaware was thus the closest District with jurisdiction and selection of
> this forum was controlled by the plaintiff's rational and legitimate concerns.  The
> court then rejected the argument that the Central District of California was just as
> inconvenient for the plaintiff, because the plaintiff's President would have an
> approximate commute to this courthouse of 3 hours by car or 1½ hours by train
> and by contrast, if the transfer were granted, both parties would be forced to
> attend the trial via the air, on the other side of the country.

Reply at 9 (citations omitted)(internal quotation marks omitted).  The Defendants argue that the

court's concerns in Waste Distillation Technology v. Pan American Resources cut the opposite

way here.  See Reply at 9.  The Defendants point out that, unlike the plaintiff in that case, Sage

Hospital did not first attempt to file suit on its "home turf" only to be turned away, but instead

appears to want to avoid its home turf at all costs.  Reply at 9.  The Defendants assert that,

consequently, Waste Distillation Technology v. Pan American Resources is inapposite.

The Defendants contend that the second factor -- the locus of operative facts -- also

weighs in favor of transfer.  See Reply at 10.  The Defendants assert that the three "non-

significant events" to which Sage Hospital points do not give rise to this lawsuit.  See Reply at

10.  The Defendants say that, despite Sage Hospital's arguments to the contrary, every

significant event that gave rise to this case occurred in Arizona.  See Reply at 10.

Turning to factors three, four, five, and six, the Defendants challenge Sage Hospital's

assertion that Albuquerque is a more convenient forum because it is eighty miles closer to Sage

Hospital than Phoenix is.  See Reply at 10.  The Defendants argue that one of the cases that Sage

Hospital cites indicates that miles become relevant only "when the distance between an existing

venue for trial of a matter and a proposed venue under § 1404 is more than 100 miles."  Reply at

10 (quoting In re Volkswagen AG, 371 F.3d 201, 204 (5th Cir. 2004))(internal quotation marks

omitted).  The Defendants argue that, even if mileage were relevant, the District of Arizona has a

Flagstaff courthouse that is closer to Sage Hospital than Albuquerque is.  See Reply at 11.

The Defendants assert that the seventh factor -- the relative familiarity of the courts with

the applicable law -- is neutral.  See Reply at 11.  The Defendants contend that Sage's assertions

that the District of New Mexico has extensive experience interpreting the ISDEA's federal

contracting requirements, and that the Arizona District Court and the Ninth Circuit do not, are

"simply wrong."  Reply at 11.  The Defendants assert that the Ninth Circuit has dealt with

ISDEA contracts and declination decisions.  See Reply at 11 (citing Los Coyotes Band of

- 33 -

Cahuilla & Cupeno Indians v. Jewell, 729 F.3d 1025 (9th Cir. 2013)).  The Defendants point out that the only difference is that the Ninth Circuit ruled that the HHS Secretary properly declined an ISDEA contract, while the District of New Mexico held that the Secretary violated the ISDEA.  See Reply at 11 (citing Ramah Navajo Sch. Bd. v. Sibelius).  Sage Hospital states: "Whether unfavorable case law for the Plaintiff exists in another forum is, however, not relevant to the decision to transfer a case."  Reply at 11.

The Defendants argue that the final factor -- the interests of justice -- is also neutral.  See Reply at 11-12.  The Defendants contend that, although Sage Hospital correctly identifies "the relative congestion of dockets" as a consideration under this factor, its argument that this factor favors choice of venue is unpersuasive.  Reply at 11-12.  The Defendants explain that, as Sage Hospital points out, for the twelve-month period ending in June, 2014, New Mexico had one percent less pending cases and a faster median time from filing to trial, but Arizona had a significantly better median time from filing to disposition -- 7.9 months versus 10.2 months -- as evidenced by the fact that Arizona is ranked twenty-fourth in the nation among district courts for that statistic while New Mexico came in at sixty-fourth.  See Reply at 12.  The Defendants argue that, because this case will likely be decided on paper, perhaps even more relevant for the purposes of this case are the respective Districts' six-month lists.  See Reply at 12.  The Defendants say that the most recent statistics demonstrate that the District of New Mexico's cumulative six-month list was at 152 -- compared to thirty-five in Arizona.  See Reply at 12.  The Defendants argue that, because their numbers and Sage Hospital's numbers on the relative congestion of the courts' dockets point in different directions, this factor is also a wash.  See Reply at 12.  The Defendants conclude that, in the end, whether the transfer this case "comes down to one truth: the case has nothing to do with New Mexico."  Reply at 12.

4.      **The Hearing.**

The Court held a hearing on January 27, 2015.  See Transcript of Hearing (taken January 27, 2015)("Tr.").[7]  At the hearing, the parties largely reiterated the arguments from their briefing. See Tr. at 3:1-49:24 (Court, Grohman, Frye).  Shortly after the Defendants began their argument, the Court asked them whether § 1391(e)(1)(A) is limited to federal employees sued in their official capacity.  See Tr. at 3:23-24 (Court).  The Defendants responded that § 1391(e)(1)(A) is limited to those employees, because it says that "a civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority."  Tr. at 4:15-19 (Grohman).  The Court pointed out that, if under color of legal authority means under state action, then § 1391(e)(1)(A) also covers federal employees sued in their individual capacity.  See Tr. at 4:20-25 (Court).  The Court asked the Defendants whether § 1391(e)(1)(A) applies to actions brought under Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971)("Bivens"), in addition to official capacity actions.  See Tr. at 4:24-5:1 (Court).  The Defendants said that they did not know whether it also applied to Bivens actions.  See Tr. at 5:2-8 (Grohman).

The Court said that, if § 1391(e)(1)(A) applies only to federal employees sued in their official capacity, it  provides plaintiffs with numerous places to sue the United States, and the named employees or officials are somewhat irrelevant.   See Tr. at 5:9-20 (Court).   The Defendants said that is exactly why Congress passed § 1391(e)(1)(A) -- it wanted to limit where the United States could be sued.  See Tr. at 5:21-6:7 (Grohman).  The Court asked whether the District of New Mexico would be a proper venue for a case in which a plaintiff sued four Federal

---

[7]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

Bureau of Investigation agents in their official capacity who were domiciled in New Mexico. See Tr. at 6:24-7:6 (Court).  The Defendants said that the District of New Mexico would be a proper venue for such a case.  See Tr. at 7:14-17 (Court, Grohman).  The Court asked the Defendants why the venue analysis would be different in an official capacity case.  See Tr. at 7:18-20  (Court).  The Defendants responded that there is a difference, because suing federal government employees in their official capacity is exactly the same thing as suing an arm of the federal government.  See Tr. at 7:21-24 (Grohman).  The Defendants explained that, if a plaintiff sued the Navajo Area IHS office, New Mexico would not be a proper venue for that case, because the office is located in Arizona.  See Tr. at 7:23-8:2 (Grohman).

The Court asked the Defendants to explain the next step of their § 1391(e)(1)(A) argument if one defendant is domiciled in New Mexico.  See Tr. at 10:10-14 (Court).  The Defendants responded that, when defendants are sued in their official capacity, it is their official residence that matters for venue purposes.  See Tr. at 10:15-17 (Court).  The Court stated that the Defendants' interpretation would require the Court to read additional language into § 1391(e)(1)(A) -- i.e., that a defendant who is sued in his official capacity resides where he or she works.  See Tr. at 10:22-12:5 (Court, Grohman).

Turning to the next step of their argument, the Defendants stated that there is a split of authority between federal courts on whether a federal employee sued in his or her official capacity can have more than one official residence.  See Tr. at 14:1-8 (Grohman).  The Defendants asserted that, according to the treatise by Wright & Miller, a majority of federal courts have held that federal employees have only one official residence but a minority have said that federal employees can have an official residence wherever they perform a substantial amount of their official duties.  See Tr. at 13:25-15:22 (Grohman)(citation omitted).  The

Defendants contended that, even if the Court adopted the minority view, the Complaint's allegations would not establish venue, because "none of the defendants took any actions related to this suit in New Mexico."  Tr. at 15:21-22 (Grohman).

In response, Sage Hospital argued that no court has applied the 2011 amendments to §1391.  See Tr. at 16:5-7 (Frye).  Sage Hospital explains that the 2011 amendment provided that, for all venue purposes, a natural person shall be deemed to reside in the judicial district in which that person is domiciled.  See Tr. at 16:7-12 (Frye).  Sage Hospital stated that the purpose of the 2011 amendment was to expand plaintiffs' venue options in suing the United States.  See Tr. at 17:6-12 (Frye).  The Court said that it seems odd that § 1391(e)(1)(A) could turn on a defendant's personal residence.  See Tr. at 19:12-21 (Court).  The Court pointed out that, if the IHS Navajo Area office had ten employees domiciled in Idaho, the plaintiff could bring this case in Idaho.  See Tr. at 19:21-25 (Court).  The Court asked Sage Hospital why it could not say that, because Burwell is the only real defendant in this case, her residence is the only one that matters for venue purposes.  See Tr. at 20:14-19 (Court).  Sage Hospital responded that Dayish's residence matters, because that is whom Sage Hospital chose to sue.  See Tr. at 21:11-15 (Frye).

The Defendants then reiterated their argument why § 1391(e)(1)(B) does not apply -- namely, that none of the events that give rise to this case occurred in New Mexico.  See Tr. at 25:3-26:9 (Grohman).  In response, Sage Hospital points out that three facts indicate a substantial part of the events or omissions giving rise to their claims occurred in New Mexico: (i) IHS and Sage Hospital signed the 2008 Additional Funding Agreement in Shiprock; (ii) IHS told Sage Hospital's supplier in Gallup to stop supplying Sage Hospital; and (iii) Sage Hospital serves 1,773 patients that live in New Mexico and the Declination fundamentally affects Sage Hospital's relationship with them.  See Tr. at 29:1-30:6 (Frye).  The Court asked whether it is

relevant that this case is going to affect Sage Hospital's patients in New Mexico.  See Tr. at 30:19-24 (Court).  Sage Hospital responded that the Defendants committed the alleged wrongs in the Navajo Nation as a whole, which includes New Mexico.  See Tr. at 31:1-10 (Frye).  Sage Hospital asserted that the Defendants harmed it through telling its New Mexico supplier to cut off its supplies and telling its New Mexico patients to go to other hospitals.  See Tr. at 31:1-32:8 (Frye).  Sage Hospital added that one part of the relief that it seeks is a memorandum of understanding in which IHS will agree to allow Sage Hospital's New Mexico supplier to provide it with supplies.  See Tr. at 35:21-36:2 (Frye).

Sage Hospital explained that IHS told its patients to go to other hospitals, because the federal government would not pay for their medical care at Sage Hospital.  See Tr. at 32:9-13 (Court, Sage).  Sage Hospital said that it is still serving its patients without federal money as if its IHS contract were still in place in the hopes that it will receive reimbursement from the federal government when this case is resolved.  See Tr. at 32:13-33:2 (Court, Frye).  The Court asked whether it is business as usual at Sage Hospital, and Sage Hospital responded that it is business as usual with a few exceptions.  See Tr. at 33:3-3-11 (Court, Frye).  First, Sage Hospital pointed out that two of its employees left after they learned that IHS would no longer provide student loan assistance to them because they no longer worked for an IHS facility.  See Tr. at 3:10-18 (Frye).  Second, Sage Hospital stated that, as it gets closer to bankruptcy -- which is projected to occur in approximately ten months -- its doctors are increasingly beginning to look for other, more stable jobs.  See Tr. at 33:23-34:6 (Frye).

Taking up their alternative argument -- the motion to transfer venue -- the Defendants began by asserting that Sage Hospital cannot dispute that the locus of operative facts is a factor that weighs in favor of transfer.  See Tr. at 37:1-6 (Grohman).  The Defendants contended that

the operative fact in this case is the Declination -- which did not occur in New Mexico, but instead occurred in either Arizona or in Washington, D.C.  See Tr. at 37:6-19 (Court, Grohman). The Defendants asserted that the parties' and witnesses' convenience also weighs in favor of transferring the case to Arizona, because the Defendants work in Arizona, one of them lives in Arizona, they have been speaking to Arizona lawyers at the United States Attorney's Office for the District of Arizona in Phoenix, and they are familiar with the Arizona court system.  See Tr. at 37:19-38:12 (Grohman).   The Defendants reiterated the argument in the Reply that the plaintiff's choice of forum does not receive deference when -- as occurred in this case -- the plaintiff does not live in the forum and the case's underlying facts did not occur in the forum. See Tr. at 39:11-20 (Grohman).   The Defendants asserted -- and the Court agreed -- that the relative congestion of the courts' dockets is a neutral factor, because the District of New Mexico and the District of Arizona have very similar dockets.  See Tr. at 39:21-41:5 (Court, Grohman).

The Court asked the Defendants whether they would comprise the majority of the witnesses in the case.  See Tr. at 41:9-11 (Court).  The Defendants responded that nowadays a lot of things are "decided on paper" and that they could provide declarations no matter where they are located.  Tr. at 41:12-15 (Grohman).  The Defendants said that they are more comfortable being sued in Arizona and believe that they should not be subject to suit anywhere in the country. See Tr. at 41:15-25 (Grohman).  The Court asked whether the Defendants' relative level of comfort in a given jurisdiction is a relevant factor to consider in ruling on the Motion, because the plaintiff feels more comfortable brining this case in the District of New Mexico, and a party only brings a motion to transfer venue if it is not comfortable with that particular venue.  See Tr. at 42:10-19 (Court).

The Court asked what other factors -- as far as convenience, location of records, and things like that -- make it better for the Defendants to be in the District of Arizona. See Tr. at 42:20-23 (Court). The Defendants responded that the relevant records are most likely located at Sage Hospital and the Navajo Area IHS office -- both of which are in Arizona. See Tr. at 42:24-43:1 (Grohman). The Court asked whether those facilities are closer to a District of Arizona courthouse than a District of New Mexico courthouse. See Tr. at 43:2-4 (Court). The Defendants responded that the District of Arizona has a courthouse in Flagstaff. See Tr. at 43:5-6 (Grohman). The Court said that its impression was that the District of Arizona judges use Flagstaff courthouse exclusively for criminal cases, similar to how the District of New Mexico judges use the Las Cruces courthouse. See Tr. at 43:7-12 (Court). The Defendants asserted that they did not know whether the Flagstaff courthouse hears civil cases, but that it is likely similar to the Court being able to hold a case in Santa Fe or Las Cruces when parties ask it to do so. See Tr. at 43:16-24 (Grohman). The Defendants clarified that they only mentioned the Flagstaff courthouse, because it is an option that would potentially be more convenient for both parties. See Tr. at 43:25-44:3 (Grohman).

In response, Sage Hospital argued that the locus of operative facts for this case is the entire Navajo Reservation, because the entire reservation is within the Navajo Area IHS office's purview. See Tr. at 44:9-21 (Frye). Sage Hospital contended that the parties' convenience, the witnesses' convenience, and the documents' location all cut against transferring the case, because Sage Hospital and the Navajo Area IHS office are closer to the District of New Mexico courthouse in Albuquerque than the District of Arizona courthouse in Phoenix. See Tr. at 44:25-45:24 (Frye). Sage Hospital conceded that the interests of justice -- which includes the relative congestion of the courts' dockets -- is a neutral factor. See Tr. at 46:1-3 (Frye). Sage Hospital

pointed out, however, that the courts' relative familiarity with the applicable law cuts against transfer, because it only found one ISDEA case in the Ninth Circuit -- the <u>Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell</u> case that the Defendants cite in the Reply -- and could not find any ISDEA cases in the District of Arizona.  <u>See</u> Tr. at 46:12-47:2 (Frye).  Sage Hospital noted that the locus of operative facts also weighs against transfer, because significant events that give rise to Sage's claims occurred in New Mexico.  <u>See</u> Tr. at 49:1-5 (Frye).

The Court said that it was inclined to hold that the District of New Mexico is a proper venue for this case under § 1391(e)(1)(A), because Dayish is a natural person who resides in New Mexico, and it is irrelevant whether he is sued in his official capacity or in his individual capacity.  <u>See</u> Tr. at 49:16-50:1 (Court).  The Court explained that it was inclined to conclude that the District of New Mexico is not a proper venue under § 1391(e)(1)(B), because it did not think that a substantial part of the events or omissions that give rise to the claims occurred in New Mexico.  <u>See</u> Tr. at 50:11-21 (Court).  The Court stated that it was not inclined to transfer the case, because both sides seem to have an equally strong interest in one district or the other. <u>See</u> Tr. at 50:23-25 (Court).  The Court explained, however, that it wanted to think about both issues and would file an opinion as soon as possible.  <u>See</u> Tr. at 51:2-7 (Court).

## LAW REGARDING VENUE

"Venue is defined as the appropriate district court in which to file an action."  <u>Whiting v. Hogan</u>, 855 F. Supp. 2d 1266, 1282 (D.N.M. 2012)(Browning, J.)(citing <u>NLRB v. Line</u>, 50 F.3d 311, 314 (5th Cir. 1995)).  The purpose of venue is to assure that lawsuits are filed in appropriately convenient courts for the matters raised and for the parties involved in the action. <u>See</u> <u>Leroy v. Great W. United Corp.</u>, 443 U.S. 173, 185 (1979).  Venue should not be confused with subject-matter jurisdiction, <u>see</u> <u>Wachovia Bank v. Schmidt</u>, 546 U.S. 303, 315-16 (2006), or

with personal jurisdiction, see Leroy v. Great W. United Corp., 443 U.S. 173, 185 (1979)("The question of personal jurisdiction, which goes to the court's power to exercise control over the parties, is typically decided in advance of venue, which is primarily a matter of choosing a convenient forum."). "To the extent that they are relevant, the laws relating to venue give added protection to defendants beyond those that are provided by the statutory and constitutional prerequisites of personal jurisdiction." 14D C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3801, at 15 (2007).

## LAW REGARDING TRANSFER OF VENUE

"Congress enacted the federal change-of-venue statute, codified at 28 U.S.C. § 1404, to allow a district court to transfer an action filed in a proper, though not necessarily convenient, venue to a more convenient district." Whiting v. Hogan, 855 F. Supp. 2d 1266, 1284 (D.N.M. 2012)(Browning, J.). Section 1404(a) vests "discretion in the district court to adjudicate motions to transfer according to individualized, case-by-case consideration of convenience and fairness." Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988)(quoting Van Dusen v. Barrack, 376 U.S. 612, 622, (1964)).

"The statutory language guides the court's evaluation of the particular circumstances of each case and is broad enough to allow the court to take into account all factors relevant to convenience and/or the interests of justice." Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977. The statute permits a "flexible and individualized analysis," and affords district courts the opportunity to look beyond a narrow or rigid set of considerations in their determinations. Stewart Org., Inc. v. Ricoh Corp., 487 U.S. at 29.

> Among the factors [a district court] should consider is the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if

one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d at 1516 (internal quotation marks omitted).  See Silver v. Brown, 678 F. Supp. 2d at 1204 (stating the factors that the courts consider in making a venue determination under § 1404(a)).

"28 U.S.C. § 1406 permits transfer to cure a venue defect."  Whiting v. Hogan, 855 F. Supp. 2d at 1266.  It provides: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406. Although both § 1404(a) and § 1406(a) "were broadly designed to allow transfer instead of dismissal, § 1406(a) provides for transfer from forums in which venue is wrongly or improperly laid."  Van Dusen v. Barrack, 376 U.S. 612, 634 (1964).

The "interest of justice" is a separate element of the transfer analysis that relates to the court system's efficient administration.  Van Dusen v. Barrack, 376 U.S. at 626-27.  "For this element, courts look to factors including docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy."  Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citations omitted).  In some circumstances, "[t]he interest of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result."  Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977 (citing Coffey v. Van Dorn Iron Works, 796 F.2d 217, 220-21 (7th

Cir. 1986)).  The Tenth Circuit has interpreted the phrase -- "if it is in the interest of justice" -- to grant a district court discretion in making the decision to transfer the action.  Driggers v. Clark, 422 F. App'x 747, 749-50 (10th Cir. 2011)(unpublished)(citing Trujillo v. Williams, 465 F.3d 1210, 1222 (10th Cir. 2006)).

## ANALYSIS

The Court will deny the Motion.  First, the Court concludes that the District of New Mexico is a proper venue for this case under § 1391(e)(1)(A), because Defendant Frank Dayish is domiciled in New Mexico.  Second, the Court holds that the District of New Mexico is not a proper venue for this case under § 1391(e)(1)(B), because a "substantial part of the events or omissions giving rise to the claim" did not occur in New Mexico.  28 U.S.C. § 1391(e)(1)(B). Third, the Court will not transfer the case to the District of Arizona under § 1404(a), because Sage Hospital filed suit in the District of New Mexico, and because the District of New Mexico is a more convenient forum for the witnesses, the parties, and for obtaining the relevant documents than the District of Arizona.

## I.      THE DISTRICT OF NEW MEXICO IS A PROPER VENUE FOR THIS CASE UNDER § 1391(E)(1)(A), BECAUSE DAYISH RESIDES IN NEW MEXICO.

The District of New Mexico is a proper venue for this case under § 1391(e)(1)(A), because Dayish resides in New Mexico.  Section 1391(e)(1)(A) states that, in actions where a defendant is an officer or employee of the United States, venue is proper "in any judicial district in which (A) a defendant in the action resides."  28 U.S.C. § 1391(e)(1)(A).  Section 1391(c)(1) says that, "for all venue purposes . . . a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled."  28 U.S.C. § 1391(c)(1).  The Tenth Circuit has held that, "[t]o establish domicile in a particular state, a person must be physically present in the state and intend

to remain there . . . indefinitely."  Smith v. Cummings, 445 F.3d 1254, 1260 (10th Cir. 2006).

See 13E Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3805 (4th

ed. 2014)("Courts agree that there are two elements to establishing domicile -- one physical and

one mental.  Physically, the person must be present in the new state and, mentally, she must

intend to remain there indefinitely and to make it her home.").

       "As in any case of statutory construction, our analysis begins with the language of the

statute.  And where the statutory language provides a clear answer, it ends there as well."

Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999)(internal quotations and citations

omitted).  See Caminetti v. United States, 242 U.S. 470, 485 (1917)("Where the [statute's]

language is plain and admits of no more than one meaning, the duty of interpretation does not

arise, and the rules which are to aid doubtful meanings need no discussion.").  The Tenth Circuit

has stated that "[o]ur own statutory interpretation begins with the plain language of the Act."

Qwest Corp. v. Public Utilities Comm'n of Co., 479 F.3d 1184, 1192 (10th Cir. 2007)(internal

quotations and citations omitted).

       On its face, § 1391(c)(1)'s meaning is direct, clear, and unambiguous: for all venue

purposes, a plaintiff may bring a case in any district in which a defendant, who is a natural

person, resides.  Dayish is a natural person.  See Mohamad v. Palestinian Authority, 132 S. Ct.

1702, 1707 (2012)(equating "individual" to a "natural person").  He is domiciled in New

Mexico.  See Dayish Declaration ¶ 3, at 1 ("My personal residence is in Gallup, New Mexico.").

Consequently, the District of New Mexico is a proper venue for this case under § 1391(e)(1)(A).

       The Defendants point to numerous cases in which federal courts have held that, for venue

purposes, federal employees reside where they perform their official duties.  See Motion at 5

(citing Reuben H. Donnelley Corp. v. F.T.C., 580 F.2d at 266 n.3; Lamont v. Haig, 590 F.2d at

1128; <u>Dunston v. N.Y.C. Police Dep't</u>, 2010 WL 5065903, at *3 n.4;  <u>Burnett v. Caruso</u>, 2010

WL 1609256, at *1; <u>Ibrahim v. Chertoff</u>, 2007 WL 155821, at *4; <u>Caremark Therapeutic Servs.</u>

<u>v. Leavitt</u>, 405 F. Supp. 2d at 464; <u>Neville v. Dearie</u>, 745 F. Supp. at 102; <u>Archuleta v. Sullivan</u>,

725 F. Supp. at 605)).  The Defendants argue that, because they each perform their official duties

outside of New Mexico, § 1391(e)(1)(A) does not apply.  <u>See</u> Motion at 6.  The Court disagrees.

The cases that the Defendants cites are inapposite, because they were all decided before

Congress significantly amended § 1391.  Before January 7, 2012, § 1391 read, in pertinent part:

**(a)**   A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in

**(1)**   A judicial district where any defendant resides, if all defendants reside in the same State,

**(2)**   A judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or

**(3)**   A judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

**(b)**   A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in

**(1)**   a judicial district where any defendant resides, if all defendants reside in the same State,

**(2)**   a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or

**(3)**   a judicial district in which the action may otherwise be brought.

    **(c)**       For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. . . .

    **(d)**       An alien may be sued in any district.

    **(e)**       Actions Where Defendant Is Officer or Employee of the United States.  --

        **(1)**       In general. -- A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides . . . .

H. Rep. 112-10 at 27 (2011)("House Report").

The current version of § 1391 reads, in pertinent part:

    **(b)**       **Venue in general.** -- A civil action may be brought in --

        **(1)**       a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

        **(2)**       a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

        **(3)**       if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

    **(c)**       **Residency.** -- For all venue purposes --

        **(1)**       a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled;

        **(2)**       an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to

the court's personal jurisdiction with respect to the civil action in question and, if a plaintiff, only in the judicial district in which it maintains its principal place of business; and

**(3)**  a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants.

. . . .

**(e)**  Actions where defendant is officer or employee of the United States --

**(1)**  **In general.** -- A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides . . . .

28 U.S.C. § 1391.

While the pre-Clarification Act version of § 1391 did not explicitly define residency for venue purposes, the current version does:  "For all venue purposes . . . a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled."  28 U.S.C. § 1391(e)(1)(A). Consequently, although interpreting residence under § 1391(e)(1)(A) as being a federal employee's place of work did not conflict with the pre-Clarification Act version of § 1391, using the same interpretation with the current version of § 1391 does.  Congress used the same word -- "resides" -- in §§ 1391(b)(1), 1391(c)(1), and 1391(e)(1)(A).  Following the approach of the cases which the Defendants cite would require the Court to give "resides" one meaning under 1391(e)(1)(A) -- i.e., where the federal employee works -- and another meaning under §§ 1391(b)(1) and 1391(c)(1) -- i.e., where the individual is domiciled.  Without a clear

indication that Congress desired such a result -- either in § 1391's text or legislative history -- the Court will not assume that Congress intended courts to interpret the same word in the same statute in different ways.   Cf. Richards v. United States, 369 U.S. 1, 11 (1962)("We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act . . . .").

Moreover, the interpretation of the cases that the Defendants cite reads additional language into § 1391.   Congress could have easily amended § 1391(e)(1)(A) to allow plaintiffs to bring cases "in any judicial district in which a defendant in the action works" or "in any judicial district in which a defendant's office is located."   Alternatively, Congress could have written 1391(c)(1) to say: "For all venue purposes, except cases brought under § 1391(e)(1)(A), a natural person . . . shall be deemed to reside in the judicial district in which that person is domiciled." Congress did none of those things.   To read this additional language into § 1391 would, therefore, "trench upon the mandate of Congress as to venue and thereby would be an intrusion into the legislative field."   United States ex rel. Brown Minneapolis Tank Co. v. Kinley Const. Co., 816 F. Supp. 2d 1139, 1169 (D.N.M. 2011)(Browning, J.).

The Clarification Act's legislative history also does not dictate a different result.   For example, in the section describing the reasoning behind the amendments to § 1391, the House Report for H.R. 394 -- which eventually became the Clarification Act -- states:

> Under current paragraphs 1391(a)(1) and (b)(1), venue in a suit against a natural person may lie in a district where the defendant "resides."   Most courts have interpreted the term "resides" as a reference to the party's domicile, borrowing the approach that governs the determination of citizenship for purposes of diversity of citizenship jurisdiction.   However, a minority of appellate courts (the Second, Ninth, and Tenth) have interpreted residence as a possibly broader concept than citizenship and have permitted a defendant to be considered a resident in a state and district other than that person's state of domicile.   Such a reading might permit a court to find venue to be a proper place where a party has a summer home.   Paragraph 1391 would provide that, for venue purposes, a

natural person would be deemed to reside in the judicial district in which that person is domiciled, thereby resolving the division of authority regarding the residence of parties by adopting the majority rule. As noted in the ALI Project, proposed new paragraph 1391(c)(1) --

> conforms . . . to the great bulk of precedent, by expressly limiting party-based venue in suits against individuals to the district or (in a multi-defendant case) the state in which the defendant is domiciled. This strict definition of residence for venue purposes in suits against individuals means that any plaintiff desiring to sue multiple individuals not domiciled in the same state will have to bring suit in a claim-based venue [where the events or omissions giving rise to the claim occurred] . . . rather than in a party-based venue. . . .

House Report at 20-21 (footnotes omitted)(omissions in House Report, but not in ALI Project).

At no point does the House Report state that the new residency test in § 1391(c)(1) does not apply to § 1391(e)(1)(A). Instead, it merely explains that Congress' express purpose in amending § 1391 was to resolve a split of authority among federal courts about how to define "residence" in former §§ 1391(a) and 1391(b) -- which Congress combined into the current version of § 1391(b). Similarly, the Honorable Sheila J. Lee, United States Representative for the Eighteenth Congressional District of Texas and a Senior Member of the Judiciary Committee, stated in her floor speech to the United States House of Representatives, that H.R. 394 "[c]larifies that a person is deemed to reside in the judicial district in which that person is domiciled." 112 Cong. Rec. H1369 (daily ed. Feb. 28, 2011)(statement of R. Johnson). Neither Representative Lee nor any of the other Untied States Representatives who spoke on H.R. 394 before it passed stated that the modifications to § 1391(c)(1) do not apply to § 1391(e)(1)(A). See 112 Cong. Rec. H1367-H1362 (daily ed. Feb. 28, 2011)(statements of R. Lee, R. Smith, and R. Johnson). Notably, after the House of Representatives passed H.R. 394, the United States Senate approved it without any modifications or debate on H.R. 394's proposed new § 1391(c)(1). See 112 Cong. Rec. S6927 (daily ed. Oct. 31, 2011).

- 50 -

Although the House Report's and the Representatives' failure to mention § 1391(e)(1)(A) could indicate -- by negative inference -- that Congress did not intend for the new residency test in § 1391(c)(1) to apply to § 1391(e)(1)(A), this would be pure speculation. Consequently, the Defendants' interpretation would force the Court to not only go beyond § 1391's unambiguous text but also read additional language into its legislative history. The Court will not undertake such a misguided quest.

The Defendants also argue that § 1391(c)(1) does not apply to § 1391(e)(1)(A), because "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent" and do not constitute an action against officers themselves. Reply at 3 (citing Monell v. New York Department of Social Services; Brandon v. Holt; Hafer v. Melo). In other words, the Defendants assert that it was unnecessary for Sage Hospital to name any of the individual defendants in this case, because suing them in their official capacity is the "legal equivalent of suing . . . [their] employer." Reply at 3. There are three problems with this argument. First, it contradicts § 1391(e)(1)(A)'s plain language. Section 1391(e)(1)(A) states:

> A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides . . . .

28 U.S.C. § 1391(e)(1)(A). Congress could have written § 1391(e)(1)(A) to say that a civil action may be brought "in any judicial district in which the defendant's employer is located." It also could have written § 1391(e)(1)(A) to state that a civil action may be brought "in any judicial district in which the defendant's employer resides" or that a civil action may be brought "in any judicial district in which the defendant's agency is located." Congress did none of those things. Instead, it clearly said that a civil action may be brought "in any judicial district in which

a defendant in the action resides." 28 U.S.C. § 1391(e)(1)(A). Accordingly, Congress could not have been clearer that it is the individual employee's residence that matters for venue purposes, rather than merely the location of his or her agency or employer.

Second, the Defendant's argument is inconsistent with the ISDEA. The ISDEA provides that district courts "may order appropriate relief including . . . mandamus to compel an officer or employee of the United States . . . to perform a duty provided under this subchapter or regulations promulgated hereunder." 25 U.S.C. § 450m-1. Typically, to compel someone to do something, the plaintiff must name that individual as a defendant in the action. Cf. Washington v. Crowley, No. CIV 6630 DGL, 2014 WL 4219585, at *5 (W.D.N.Y. Aug. 25, 2014)("To bring a claim seeking equitable relief, however, plaintiff must name a defendant who has sufficient ability to provide plaintiff the relief he is seeking."); Norsworthy v. Rivers, No. CIV 09-2989 LKK/CMK, 2010 WL 3429644, at *1 (C.D. Cal. Aug. 30, 2010)("[T]o obtain injunctive relief, plaintiff must name a defendant (or defendants) who has authority to alter the conditions of his confinement."); Nance v. Stommel, No. CIV 08-0977 REB/KLM, 2008 WL 5104810, at *4 (D. Colo. Dec. 3, 2008)("[A]ssuming that Plaintiff is entitled to pursue claims for injunctive relief, he has failed to name a defendant in his official capacity who can be enjoined or required to act in satisfaction of Plaintiff's request."); Swygert v. Veal, No. CIV 06-0725 ALA, 2008 WL 5070148, at *3 (E.D. Cal. Nov. 26, 2008)("Swygert is granted leave to amend his complaint to name a defendant that can provide injunctive relief."). To obtain mandamus relief under § 450m-1, therefore, a plaintiff must name the specific federal employees whom they seek to compel to perform specific duties under the ISDEA, rather than merely their employer. The Court therefore cannot say that it is immaterial whether the plaintiffs sue individual employees or their employers.

Third, the cases that the Defendants cite do not support their argument.  In <u>Monell v. New York Department of Social Services</u>, in an opinion that the Honorable William J. Brennan, then-Associate Justice of the Supreme Court, authored, the Supreme Court held that a local government is a "person" that can be sued under 42 U.S.C. § 1983.  436 U.S. at 690.  In a footnote, Justice Brennan stated:

> Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent -- at least where Eleventh Amendment considerations do not control analysis -- our holding today that local governments can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are "persons" under § 1983 in those cases in which, as here, a local government would be suable in its own name.

<u>Monell v. N.Y. Dep't of Soc. Servs.</u>, 436 U.S. at 690 n.55.  Far from asserting that employees sued in their official capacity are not natural persons, Justice Brennan said the opposite: "local government officials sued in their official capacities are 'persons' under § 1983."  436 U.S. at 690 n.55.  Moreover, even if <u>Monell v. New York Department of Social Services</u> did not directly contradict the Defendants' argument, it would still not support it, because the case had nothing to do with the standard for residency under § 1391(e)(1)(A).

<u>Brandon v. Holt</u> is inapposite for similar reasons.  In that case, in an opinion that the Honorable John Paul Stevens, then-Associate Justice of the Supreme Court, authored, the Supreme Court held that a judgment against a federal employee in his or her official capacity "imposes liability on the entity that he represents."  469 U.S. at 471-72.  Again, the Supreme Court did not conclude that federal employees sued in their official capacity are not "natural persons" and also did not say anything about the requirements for proper venue in an official capacity suit under § 1391(e)(1)(A).

<u>Hafer v. Melo</u> comes the closest to supporting the Defendants' argument.  In that case, in an opinion that the Honorable Sandra Day O'Connor, then-Associate Justice of the Supreme

Court, authored, concluded that state officials sued in their individual capacities are "persons" for purposes of § 1983.  502 U.S. at 22-23.  Justice O'Connor explained:

> State officers sued for damages in their official capacity are not "persons" for purposes of the suit because they assume the identity of the government that employs them.  By contrast, officers sued in their personal capacity come to court as individuals.  A government official in the role of personal-capacity defendant thus fits comfortably within the statutory term "person."

Hafer v. Melo, 502 U.S. at 27.  Justice O'Connor's statement, in dicta, that state officers sued in their official capacity are not "persons," rests on the Eleventh Amendment to the Constitution of the United States' prohibition on suits in federal court "by private parties seeking to impose a liability which must be paid from public funds in the state treasury," Edelman v. Jordan, 415 U.S. 651, 663 (1974).  Justice O'Connor did not mention either suits against federal employees in their official capacity or the venue requirements for such cases.  Moreover, even if she did, the holding likely would not still be good law, because Hafer v. Melo came before Congress amended § 1391.  For these reasons, Hafer v. Melo is inapposite.

Aside from these cases, the Defendants do not cite -- and the Court has been unable to find -- a Tenth Circuit or Supreme Court case that addresses whether venue under § 1391(e)(1)(A) turns on a federal employee's place of work or where he or she domiciled.  The Court has found only two cases that have interpreted the new version of § 1391(e)(1)(A): (i) Villa v. Salazar, 933 F. Supp. 2d 50 (D.D.C. 2013); and (ii) Springle v. City of New York, No. CIV 11-8827 NRB, 2013 WL 592656 (S.D.N.Y. Feb. 14, 2013).  Although both of these cases hold that venue under § 1391(e)(1)(A) turns on the federal employee's place of work rather than his or her domicile, they rely on pre-Clarification Act decisions to do so.  See Villa v. Salazar, 933 F. Supp. 2d at 55 ("Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(A) because the Secretary of the Interior and Assistant Secretary for Indian Affairs

- 54 -

reside in the District of Columbia." (quoting Lamont v. Haig, 590 F.2d 1124, 1126-32 (D.C. Cir. 1978)); Springle v. City of New York, 2013 WL 592656, at *8 ("Where the natural person is a public official, courts in this Circuit have held that 'residence for the purpose of venue is where the officials perform their duties.'" (quoting Dunston v. N.Y.C. Police Dep't, No. CIV 10-8117, 2010 WL 5065903, at 3 n.4 (S.D.N.Y. Dec. 7, 2010)).   They also do not address whether the Clarification Act's amendment to § 1391(c) affects the venue analysis under § 1391(e)(1)(A). For these reasons, and because the holdings of those cases directly contradict § 1391's plain language without any explanation, the Court will not rely on these cases to reach a different result.

The Supreme Court's holding in Stafford v. Briggs, 444 U.S. 527 (1980), also does not alter the Court's decision.  In that case, in an opinion that the Honorable Warren E. Burger, then-Chief Justice of the United States, authored, the Supreme Court held that § 1391(e) did not apply to damages suits against federal employees in their individual capacity.  See 444 U.S. at 542. The Supreme Court reasoned that, in enacting § 1391(e), Congress intended nothing more "than to provide nationwide venue for the convenience of individual plaintiffs" in damages suits brought against federal employees in their official capacity, because those suits are "in essence against the United States." 444 U.S. at 542.  The Supreme Court did not address, however, whether residence under § 1391(e)(1)(A) turns on a federal employee's place of work or domicile.   Moreover, Chief Justice Burger acknowledged that Congress passed the pre-Clarification Act version of § 1391 to make official capacity suits -- which could previously only be brought only in Washington, D.C. -- more convenient for plaintiffs.   By interpreting § 1391(c)(1)(e) in a manner that makes it possible for plaintiffs to sue the United States in more places than the cases that the Defendants cite, the Court's decision furthers this purpose.

The Court's literal reading of §§ 1391(c) and 1391(e)(1)(A) makes it possible for citizens of the United States to sue the United States in more places than the prior case law that said venue was limited to where the federal employee worked.  Congress expanded § 1391(e)'s venue provision in 1962 by allowing suits to be brought against federal employees outside of the District of Columbia, in turn making it easier for plaintiffs to adjudicate their claims and federal courts to oversee agencies' and their employees' actions.  In theory, plaintiffs could manipulate the Court's interpretation to bring suit in the District of Idaho against ten federal employees who work in the District of Colorado, simply because one of the defendants is domiciled in Idaho. The chances of the plaintiff going to such remote places to litigate a case is unlikely, however, because they would also not be convenient for the plaintiff.  Moreover, the district court's ability to transfer a case for the parties' convenience under § 1404(a) is a check on any abuses.

In the end, in light of § 1391(c)'s clear language to the contrary, it simply seems difficult to continue to apply old case law that says, in an official capacity case, the residence of a defendant is the place where he or she works.  Neither the Supreme Court nor the Tenth Circuit require that result, and, while other district courts in other circuits may have to wrestle with their circuits' contrary precedent, the courts in the Tenth Circuit are free to apply § 1391(c)'s plain language.  Consequently, the Court holds that, because Dayish is domiciled in New Mexico, the District of New Mexico is a proper venue for this case under § 1391(e)(1)(A).

## II.   THE DISTRICT OF NEW MEXICO IS NOT A PROPER VENUE FOR THIS CASE UNDER § 1391(E)(1)(B).

The District of New Mexico is not a proper venue for this case under § 1391(e)(1)(B). Sage Hospital argues, in the alternative, that the District of New Mexico is a proper venue for this case under § 1391(e)(1)(B), because a substantial part of the relevant events occurred in New Mexico.  See Response at 8.  In support of its argument, Sage Hospital points to three significant

events in this case that allegedly occurred in New Mexico: (i) Sage Hospital and the Navajo Area

IHS negotiated the 2008 Annual Funding Agreement in Shiprock; (ii) after declining to renew

Sage Hospital's contract, IHS instructed Sage's pharmaceutical supplier in Gallup to cut off

supplies to Sage Hospital; and (iii) IHS used the Gallup Independent and the Navajo Times --

newspapers which have large circulations in New Mexico -- to inform Sage Hospital's New

Mexico patients that it was closing and that they should go to other facilities to receive treatment.

See Response at 9.

> Section 1391(e)(1)(B) states:
>
> A civil action in which a defendant is an officer or employee of the United States
> or any agency thereof acting in his official capacity or under color of legal
> authority, or an agency of the United States, or the United States, may, except as
> otherwise provided by law, be brought in any judicial district in which . . . a
> substantial part of the events or omissions giving rise to the claim occurred . . .

28 U.S.C. § 1391(e)(1)(B).  Under this prong, the Court must determine "whether the forum

activities played a substantial role in the circumstances leading up to the plaintiff's claim."

Crowe & Dunlevy, P.C. v. Stidham, 609 F. Supp. 2d 1211, 1221 (N.D. Okla. 2009)(citing Multi-

Media Int'l, LLC v. Promag Retail Serv., 343 F. Supp. 2d 1024, 1033 (D. Kan. 2004)).

In Fodor v. Hartman, No. CIV 05-02539 PSF, 2006 WL 1488894 (D. Colo. May 30,

2006), the Honorable Phillip S. Figa, then-United States District Judge for the District of

Colorado, applied the "substantial part of the events or omissions giving rise to the claim"

standard to determine under § 1391(a)(2).  2006 WL 1488894, *3-4.  In that case, the plaintiff --

Eugene Fodor -- was a virtuoso violinist who brought breach of contract claims against the

defendants -- Impressario Productions, LLC, and its owner, Vernon Hartman -- for failing to

abide by their agreement to organize, promote, and produce a concert tour featuring Fodor.  See

2006 WL 1488894, at *4.  After Fodor filed suit in the District of Colorado, the defendants

moved to dismiss the case for improper venue.  See 2006 WL 1488894, at *3.  The defendants pointed out that they negotiated the contract with Fodor in New York City, New York; worked on the project in Pennsylvania; and never traveled to Colorado to work on the project or to conduct any tour production activities.  See 2006 WL 1488894, at *3.  Although the defendants conceded that they occasionally called Fodor in Colorado and sent him electronic mail transmissions and paper mail in Colorado, they argued that those communications were insufficient to establish that a "a substantial part of the events giving rise to the claim occurred." 2006 WL 1488894, at *3.  Fodor, for his part, argued that he received the initial contract proposal from the defendants in Colorado, he had to perform many of key elements necessary for the project in Colorado, and the damage to his reputation from the defendants' failure to perform the contract occurred in Colorado.  See 2006 WL 1488894, at *3-4.

Judge Figa explained that the defendants' communications to Fodor in Colorado was not indicative of "substantiality," but instead represented only "tangential contacts."   2006 WL 1488894, at *3.  He pointed out that, similarly, courts have held that "the locus of damage to a plaintiff has not been found to be the basis for setting venue."  2006 WL 1488894, at *3 (citing Woodke v. Dahm, 70 F.3d 983, 985 (8th Cir. 1995)).  Judge Figa concluded that, because the alleged breaches of contract occurred in New York City and Pennsylvania, and the relevant actions that occurred in Colorado were only tangential to Fodor's claims, the District of Colorado was not a proper venue for the case under § 1391(a)(2).  See 2006 WL 1488894, at *5.

The Court faced a similar issue in Whiting v. Hogan.  In that case, the plaintiffs -- who were driving down Interstate 40 near Holbrook, Arizona -- alleged that one of the defendants -- Dana Hogan -- acted negligently, carelessly, and in violation of the laws and regulations of the State of Arizona when she veered her tractor trailer suddenly into their lane and forced them off

the interstate.  See 855 F. Supp. 2d at 1270.  After the plaintiffs filed suit in New Mexico, Hogan and the other defendants in the case -- Hogan's employer and insurer -- moved to dismiss the plaintiffs' claims for improper venue.  See 855 F. Supp. 2d at 1271-74.  The plaintiffs argued that the District of New Mexico was a proper venue under § 1391(a)(2), because they incurred medical expenses in New Mexico.  See 855 F. Supp. 2d at 1271-74.

The Court first explained that "medical expenses are the damages suffered and do not constitute a substantial part of the events giving rise to the claim."  855 F. Supp. 2d at 1286 (citing Hanyuan Dong v. Garcia, 553 F. Supp. 2d 962, 965 (N.D. Ill. 2008)("The fact that [the plaintiff] alleges to have suffered his injuries after returning to Illinois does not constitute  'a substantial part of the events or omissions giving rise to the claim.'")).  The Court stated that the events giving rise to the claim -- Hogan's negligence and the accident -- occurred in Arizona. See 855 F. Supp. 2d at 1286.  The Court concluded that, consequently, the District of New Mexico was not a proper venue for the case under § 1391(a)(2).  See 855 F. Supp. 2d at 1287.

In Tillotson v. City of El Paso, the plaintiff -- Eric A. Tillotson -- brought a number claims for the El Paso Police Department's investigation and arrest of him for felony stalking based on events that took place in El Paso, Texas, and for adverse employment actions allegedly committed, with one exception, in El Paso.  See 2010 WL 597993, at *3.  After Tillotson filed suit in the District of New Mexico, the defendants moved to dismiss the case for improper venue. See 2010 WL 597993, at *3.  The Court noted that the only event related to Tillotson's claims that occurred in New Mexico was his dismissal from Thriftway Supermarkets in Ruidoso, New Mexico.  See 2010 WL 597993, at *3.  The Court concluded that those allegations did not constitute a "substantial part of the events or omissions giving rise to the claim" in a nineteen-count, twenty-three defendant case.  2010 WL 597993, at *3.  Rather, it appeared to the Court

that the only district in which a substantial part of the events or omissions giving rise to the claims occurred is the Western District of Texas. See 2010 WL 597993, at *3. Consequently, the Court transferred the case to the Western District of Texas.

Here, Sage Hospital's claims focus almost exclusively on the Defendants' conduct in Arizona. Sage Hospital contends that the Defendants violated the ISDEA and the regulations promulgated thereunder when they refused to renew Sage Hospital's contract with IHS. Sage Hospital is located in Arizona. See Complaint ¶¶ 54-71, at 24-31. The Navajo Area IHS office is located in Arizona. See Complaint ¶ 9, at 4-5. Hubbard and Dayish -- the two IHS officials most directly responsible for the Declination -- work in the Navajo Area IHS office in Arizona. See Complaint ¶ 9, at 4-5 (explaining that Hubbard's office is in Arizona); Dayish Declaration ¶ 3, at 1 (stating that Dayish's office is in Arizona). Although Hubbard is responsible for IHS contracts in New Mexico, none of his official duties related to Sage Hospital or its IHS contract have any connection to New Mexico. See Hubbard Declaration ¶ 3, at 2 ("None of my official duties related to Sage Memorial Hospital or its P.L. 93-638 contract have any connection to New Mexico."). Similarly, Dayish "perform[s] all of [his] official duties in Window Rock, Arizona." Dayish Declaration ¶ 3, at 1. Neither party has presented any evidence as to where the other two defendants -- Burwell and Roubideaux -- perform their official duties. It appears that Hubbard sent the Declination from the Navajo Area IHS office in Arizona. See Declination at 1. Moreover, IHS' Review and Moss Adams, LLP's Audit -- which Sage Hospital contends the Defendants disregarded when they declined to renew Sage Hospital's contract -- also occurred in Arizona. See Complaint ¶¶ 22-26, at 11-13. By all accounts, it appears that the epicenter of Hospital's claims is Arizona and not New Mexico.

The three facts to which Sage Hospital points do not constitute a "substantial part of the events or omissions giving rise to the claim." 28 U.S.C. § 1391(c)(1)(B). First, IHS' use of the Gallup Independent and the Navajo Times to "disparage" Sage Hospital's reputation among its New Mexico patients do not give rise to the claim; the claim arose before IHS took those alleged actions. Complaint ¶ 56, at 24. Similar to the harm that the defendants caused Fodor's reputation in Colorado in Fodor v. Hartman when they breached their contract, that the Defendants' actions may have harmed Sage Hospital's reputation among its New Mexico patients does not establish a "substantial part of the events giving rise to the claim." 28 U.S.C. § 1391(e)(1)(B). See Hanyuan Dong v. Garcia, 553 F. Supp. 2d at 965 ("The fact that [the plaintiff] alleges to have suffered his injuries after returning to Illinois does not constitute 'a substantial part of the events or omissions giving rise to the claim.'")).

Second, Sage Hospital has not demonstrated how a contract that the 2008 Additional Funding Agreement -- a contract that Sage Hospital signed with IHS more than six years before the Declination -- has anything to do with its claims in this case. As the Complaint explains, Sage Hospital underwent a dramatic transformation between 2007 and 2014. There is no indication that IHS relied on any information from the 2008 negotiations in deciding to decline the contract extension in 2014 or that Sage Hospital's claims are based on anything that occurred during those negotiations.

Finally, IHS' instruction to Sage Hospital's supplier in Gallup does not establish a "substantial part of the events giving rise to the claim." 28 U.S.C. § 1391(e)(1)(B). Similar to Whiting v. Hogan, in which a "substantial part of the events giving rise to the claim" did not occur in New Mexico, because the crux of the case concerned one event -- the car accident in Arizona -- the crux of this case is the Declination and the events leading up to it -- all of which

occurred in Arizona.  By contrast, the Defendants' instruction to Sage Hospital's supplier to stop supplying Sage Hospital represents only a small piece of Sage Hospital's case.  Consequently, it cannot -- standing alone -- establish venue under § 1391(e)(1)(B).

The cases that Sage Hospital cites are similarly inapposite.  In Navajo Nation v. Urban Outfitters, Inc., for example, the plaintiffs -- the Navajo Nation -- sued Urban Outfitters and other defendants, alleging, among other things, trademark infringement and false advertising for using "Navajo" in relation to its products.  See 918 F. Supp. 2d at 1249-51.  After the plaintiffs filed suit in the District of New Mexico, the defendants moved to transfer the case to the Eastern District of Pennsylvania.  See 918 F. Supp. 2d at 1251-53.  Judge Hansen determined that the District of New Mexico was the Navajo Nation's "home forum" -- which meant that its choice of venue was entitled greater deference in the motion-to-transfer analysis.  918 F. Supp. 2d at 1251.  The case is unpersuasive for two reasons.  First, it did not involve a tribal organization like Sage Hospital, but instead focused on the entire Navajo Reservation -- which spans the New Mexico/Arizona border.  Second, it did not address a motion to dismiss for improper venue and did not address a situation where -- as occurred in this case -- a small portion of the defendants' alleged unlawful acts happened in New Mexico.  Consequently, Navajo Nation v. Urban Outfitters, Inc., is unpersuasive.

In the only other case that Sage Hospital cites for this issue -- First of Michigan Corp. v. Bramlet -- the Sixth Circuit reversed and remanded a district court's decision that, under § 1391(a)(2), a substantial part of the events or omissions giving rise to a claim can occur only in one judicial district, rather than in multiple districts.  See 141 F.3d at 263-64.  The Sixth Circuit did not explain, however, what events or omissions are significant enough to satisfy § 1391(a)(2).  The Court agrees with the Sixth Circuit's holding, but disagrees with Sage

Hospital that it dictates a different result in this case.  The Court's holding does not turn on the assumption that a substantial part of the events or omissions giving rise to a claim can occur in only one judicial district, but instead on the lack of allegations or evidence indicating that a substantial part of the events or omissions giving rise to Sage Hospital's claims occurred in New Mexico.  Consequently, the Court concludes that the District of New Mexico is not a proper venue for this case under § 1391(e)(1)(B).

## III.   THE COURT WILL NOT TRANSFER THE CASE TO THE DISTRICT OF ARIZONA.

The Court will not transfer this case to Arizona.  Under § 1404(a), the movant "has the burden of establishing that the suit should be transferred."   Wm. A. Smith Contracting Co., Inc. v. Travelers Indem. Co., 467 F.2d at 664.  Section 1404(a) vests "discretion in the district court to adjudicate motions to transfer according to individualized, case-by-case consideration of convenience and fairness."  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. at 29 (quoting Van Dusen v. Barrack, 376 U.S. at 622).  "The statutory language guides the court's evaluation of the particular circumstances of each case and is broad enough to allow the court to take into account all factors relevant to convenience and/or the interests of justice."  Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc., 626 F.3d at 977.   The statute permits a "flexible and individualized analysis," and affords district courts the opportunity to look beyond a narrow or rigid set of considerations in their determinations.  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. at 29.

In determining whether to transfer a case pursuant to § 1404(a), the court should weigh a number of factors, including: (i) the plaintiff's choice of forum; (ii) the locus of the operative facts; (iii) the convenience and relative means of the parties; (iv) the convenience of witnesses; (v) the availability of process to compel the attendance of witnesses; (vi) the location of physical

evidence, including documents; (vii) the relative familiarity of the courts with the applicable law; and (viii) the interests of justice, including the interest of trial efficiency.  See Hickam v. Janecka, No. CIV 06-1132 JB/RLP, 2007 WL 2219417, at *1 (D.N.M. May 7, 2007)(Browning, J.)(setting forth these factors).

The first factor -- the plaintiff's choice of forum -- weighs slightly against transfer. "Unless the balance is strongly in favor of the movant the plaintiff's choice of forum should rarely be disturbed." Wm. A. Smith Contracting Co., Inc. v. Travelers Indem. Co., 467 F.2d at 664.  See Tex. E. Transmission Corp. v. Marine Office-Appleton & Cox Corp., 579 F.2d at 567 (stating that plaintiff's choice of forum receives "considerable weight").  "The plaintiff's choice of forum receives less deference, however, when the plaintiff does not reside in the district." Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d at 1168.  Courts also accord little weight to a plaintiff's choice of forum "where the facts giving rise to the lawsuit have no material relation or significant connection to the plaintiff's chosen forum." Cook v. Atchison, Topeka & Santa Fe Ry. Co., 816 F. Supp. 667, 669 (D. Kan. 1993).

Sage Hospital acknowledges that, to discourage forum shopping, a plaintiff's choice of forum is entitled to less weight when he or she brings suit in a foreign district, but contends that the Court should not be concerned about forum shopping, because Sage Hospital sits only thirty miles from the New Mexico border.  See Response at 12 (citing Waste Distillation Tech., Inc. v. Pan Amer. Res., Inc., 775 F. Supp. at 764 (stating that "it is sufficient that the forum is near the plaintiff's principal place of business" for plaintiff's choice of forum to be entitled to deference)).  The Court disagrees that it should not be concerned about forum shopping in these circumstances.

As the Defendants point out, in <u>Waste Distillation Technology, Inc. v. Pan American Resources, Inc.</u>, the plaintiff attempted to file suit on its "home turf," but the United States District Court for the Southern District of New York dismissed for lack of personal jurisdiction. 775 F. Supp. at 765.  The plaintiff then filed suit in the District of Delaware, and the defendants moved to transfer the case to the Central District of California.  <u>See</u> 775 F. Supp. at 765. Denying the motion, the Honorable James L. Latchum, United States District Judge for the District of Delaware, reasoned that, because the plaintiff did not choose to litigate away from its principal place of business and chose the closes forum to its home state, it was not attempting to forum shop and its choice of venue is entitled to significant deference.  <u>See</u> 775 F. Supp. at 765.

Unlike the plaintiff in that case, Sage Hospital did not first attempt to file suit on its "home turf" only to be turned away.  775 F. Supp. at 765.  Instead, it initially brought the case in the District of New Mexico -- and now opposes this motion -- at least, in part, because it does not want to litigate this case in its home forum.  Although the forum-shopping concerns are not as significant where a plaintiff files a case in a foreign jurisdiction that is closer to its home, because it is more likely that the plaintiff's decision was motivated by convenience, those concerns are not extinguished altogether in such a case.  Because Sage Hospital is based in Arizona, and because the facts giving rise to the lawsuit "have no material relation or significant connection to the plaintiff's chosen forum," <u>Cook v. Atchison, Topeka & Santa Fe Ry. Co.</u>, 816 F. Supp. at 669, the first factor weighs only slightly against transfer.

In many ways, this is a battle over the attorneys' preference for where to litigate this case. Sage Hospital has chosen a New Mexico lawyer to litigate this case and Sage Hospital's lawyer has a strong preference to stay in New Mexico.  The preference is understandable, as is the Defendants' preference to litigate the case in Arizona.  As Sage Hospital is the "master of [its]

complaint," Hansen v. Harper Excavating, Inc., 641 F.3d 1216, 1220 (10th Cir. 2011), however, its choice to bring this case in the District of New Mexico, with a lawyer who is familiar with Indian contracting law and prefers to litigate this case closer to his office, remains a factor worthy of some deference.

The second factor -- the locus of operative facts -- weighs in favor of transfer. The crux of this case is the Declination and the Defendants' continued refusal to provide Sage Hospital funding -- all of which occurred and is occurring in Arizona. Sage Hospital and the Navajo Area IHS office are both located in Arizona and the two most significant defendants -- Dayish and Hubbard -- also work in Arizona. Accordingly, this factor weighs in favor of transfer.

Factors three, four, and six -- the parties' convenience, the witnesses' convenience, and the location of physical evidence, respectively -- all weigh heavily against transfer. Because this case concerns the Defendants' decision not to renew Sage Hospital's contract, the relevant witnesses and documents will all likely be found in or around the Navajo Area IHS office or Sage Hospital's facilities, both of which are closer to the United States District Court in Albuquerque than the United States District Court in Phoenix. Sage Hospital sits approximately 192 miles from Albuquerque and 272 miles from Phoenix. See El-Meligi Declaration ¶ 11, at 9. The Navajo Area IHS office sits approximately 168 miles from Albuquerque and 282 miles from Phoenix. See El-Meligi Declaration ¶ 11, at 9. The courthouse in Albuquerque is, therefore, significantly more convenient for the relevant witnesses and documents than the courthouse in Phoenix. It is also more convenient for the parties. Sage Hospital is closer to Albuquerque than Phoenix, both Dayish and Hubbard live closer to Albuquerque, and the Defendants have not presented any evidence that the District of Arizona is more convenient than the District of New Mexico for Burwell or Roubideaux. Although the Defendants have presented the courthouse in

Flagstaff as an option, they have not presented any evidence that the District of Arizona hears civil cases in that courthouse.  The Court also believes that the Flagstaff courthouse is more similar to the Las Cruces courthouse in New Mexico -- that is, judges predominantly handle criminal matters there.[8]  In any case, as the moving party, it was the Defendants' burden to establish that the District of Arizona is a more convenient forum and they have failed to do so.  Consequently, factors three, four, and six all weigh heavily against transfer.

Regarding the fifth factor -- the availability of process -- Sage Hospital has represented, and the Defendants have not challenged, that "there is no issue of the availability of process to compel testimony of witnesses in either this Court or the Arizona . . . federal court."  Response at 17 n.9.  Accordingly, the fifth factor is neutral.

The seventh factor -- the relative familiarity of the courts with the applicable law -- is also neutral.  Although the Court has not previously handled ISDEA cases, other District of New Mexico judges have.  See, e.g., Ramah Navajo Sch. Bd. v. Sebelius; S. Ute Indian Tribe v. Leavitt; Crownpoint Inst. of Tech. v. Norton).  By contrast, neither the parties nor the Court found a case in which the District of Arizona applied the ISDEA, and the parties found only one case in which the Ninth Circuit applied the ISDEA: Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell.  It is unclear whether the seventh factor is to be interpreted broadly -- i.e.,

---

[8]The Court spoke to the Judicial Assistant for the Honorable Mark E. Aspey, United States Magistrate Judge for the District of Arizona, who is the only federal judge based in the Flagstaff courthouse.  The Judicial Assistant informed the Court that, although it is not impossible to try cases in that courthouse, it is difficult to do so, because there is only one courtroom and there is limited space for holding potential jurors.  The Judicial Assistant reported that, to her knowledge, only one civil jury trial had been held in that courthouse over the last twelve years and the most recent criminal case which was tried there was two or three years ago.  Although this information is not determinative on this issue, it does make it less likely that the parties would be able to try the case in Flagstaff and more likely that this case would have to be tried in the courthouse in Phoenix.

looking at all of the judges in that judicial district's experience with the subject matter -- or narrowly -- i.e., looking at the particular trial judge's experience.  In the Court's view, it would make the most sense to compare the experience of the particular judge who currently has the case to the experience of all of the judges in the district to which the case would be transferred.  For example, if the District Judges in the Southern District of New York are more familiar with complex securities cases than the Court, this factor would weigh in favor of transferring a complex securities case to that district.  If, however, the Court had an oil and gas case -- an area in which the Court has extensive experience and the District Judges in the Southern District of New York do not have much experience -- it would not make much sense to transfer the case to the Southern District of New York.  Applying that framework to this case, the Court questions what value there is in having other District of New Mexico judges who are not handling this case be more familiar with the ISDEA than District Judges in the District of New Arizona when the Court has no such experience.  Consequently, this factor weighs only slightly against transfer.

The eighth and final factor -- the interests of justice -- is neutral.  The parties concede that the District of Arizona and the District of New Mexico have nearly identical dockets.  The Tenth Circuit has explained that, when evaluating the administrative difficulties of court congestion, "the most relevant statistics are the median time from filing to disposition, median time from filing to trial, pending cases per judge, and average weighted filings per judge." Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc., 618 F.3d at 1169.  For every statistic which indicates that the District of Arizona has a less congested docket, there is another statistic that indicates the opposite.  For the twelve-month period ending in June, 2014, the District of New Mexico had one percent less pending cases and a faster median time from filing to trial, but Arizona had a significantly better median time from filing to disposition -- 7.9 months versus

10.2 months.  Yet the most recent cumulative six-month list made the District of Arizona look considerably less congested -- with thirty-five pending motions -- than the District of New Mexico, which was at 152.  In the end, the District of New Mexico and the District of Arizona -- which both sit on the border with Mexico and possess large American Indian reservations -- serve very similar populations and get their work done at a similar pace.  There is no indication that this case would move more quickly in the District of Arizona than if it is litigated here.  Consequently, this factor is neutral.

In sum, the second factor weighs strongly in favor of transfer; the first and seventh factors weigh slightly against transfer; the third, fourth, and sixth factors weigh strongly against transfer; and the fifth and eighth factors are neutral.  On balance, therefore, the factors weigh against transferring the case to the District of Arizona.

**IT IS ORDERED** that the Defendants' Motion to Dismiss Under Fed. R. Civ. P. 12(b)(3) or Motion to Transfer Under 28 U.S.C. § 1401(a), filed November 25, 2014 (Doc. 8), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Paul E. Frye
Frye Law Firm
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Damon P. Martinez
  United States Attorney
Karen Grohman
  Assistant United States Attorney
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

*Attorneys for the Defendants*