**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

NAVAJO HEALTH FOUNDATION -- SAGE
MEMORIAL HOSPITAL, INC.,

        Plaintiff,

vs.                                                No. CIV 14-0958 JB/GBW

SYLVIA MATHEWS BURWELL, Secretary
of the United States Department of Health and
Human Services; YVETTE ROUBIDEAUX,
Acting Director of Indian Health Services; JOHN
HUBBARD, JR., Area Director, Navajo Area
Indian Health Services; and FRANK DAYISH,
Contracting Officer, Navajo Area Indian Health
Services,

        Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

      **THIS MATTER** comes before the Court on the Plaintiff's Motion for Immediate

Injunctive Relief With Supporting Memorandum of Points and Authorities, filed December 22,

2014 (Doc. 17)("Motion"). The Court held a hearing on February 12, 2015. The primary issues

are: (i) whether the Court will order a permanent injunction; and (ii) whether the Court will order

a preliminary injunction. The Court will not order a permanent injunction. The Court will,

however, order a preliminary injunction to require Defendants Sylvia Matthews Burwell, Yvette

Roubideaux, John Hubbard, Jr., and Frank Dayish (collectively, "the Defendants"), to fund the

Navajo Health Foundation -- Sage Memorial Hospital, Inc., according to the terms of: (i) the

Annual Funding Agreement Between Navajo Health Foundation /Sage Memorial Hospital and

the Secretary of the Department of Health and Human Services Fiscal Year 2013, filed January

13, 2015 (Doc. 21-2)("2013 AFA"); and (ii) the Indian Self-Determination Contract Between

Navajo Health Foundation/Sage Memorial Hospital and the Secretary of the Department of Health and Human Services, filed January 13, 2015 (Doc. 21-1)("2010 Contract"), until this case is resolved on the merits.  The Court will also order both parties to comply with the terms and conditions of the 2013 AFA and the 2010 Contract until this case is resolved on the merits. Among other things, this means that the Defendants must reinstate Sage Hospital's coverage under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)("FTCA"), as Section 4 of the 2013 AFA provides.  The Court will not require Sage Hospital to post a bond.

## FACTUAL BACKGROUND

The Court must make findings of fact to order a preliminary injunction.  See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.).  "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."  Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009)(quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).  "The Federal Rules of Evidence do not apply to preliminary injunction hearings."  Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003).

1.      This case arises from the Navajo Area Office of the Indian Health Service's ("NAIHS")[1] decision not to renew its contract with Sage Hospital to provide healthcare to

---

[1] The Indian Health Service ("IHS") is a division of the Department of Health and Human Services that is the principal health care provider for members of federally recognized American Indian tribes.  See Indian Health Service, Wikipedia.org, http://en.wikipedia.org/wiki/Indian_ Health_Service (last visited Feb. 3, 2015).  The NAIHS is a regional IHS office that is "primarily responsible for healthcare to members of [t]he Navajo Nation and Southern Band of San Juan Paiutes, but care to other Native Americans (Zuni, Hopi) is also provided."  Navajo Area, Indian Health Service: The Federal Health Program for American Indians and Alaska Natives, http://www.ihs.gov/navajo/ (last visited Mar. 24, 2014).  Although the parties say, at different times, that either the NAIHS or the IHS declined Sage Hospital's contract proposals, only the HHS or DOI Secretary has the authority to decline such proposals.  See 25 U.S.C. § 450f(a). There is no evidence, however, that Burwell was directly involved in any of the declination

Navajo Indians in the Navajo Nation under the Indian Self Determination and Education Assistance Act, 25 U.S.C. § 450 ("ISDEA").[2]

2.      The Navajo Nation Council has formally designated Sage Hospital a Navajo "tribal organization"[3] under the ISDEA.  Declaration of Stenson Wauneka ¶ 3, at 1,[4] filed December 22, 2014 (Doc. 17-1)("Wauneka 1st Decl.").

3.      Sage Hospital employs approximately 200 people on a campus in Ganado, Arizona -- which lies within the Navajo Nation.  See Declaration of Christi El-Meligi ¶ 3, at 5, filed December 22, 2014 (Doc. 17-1)("El-Meligi 1st Decl.").

_____

decisions in this case.  It is therefore more accurate to say that Defendants Yvette Roubideaux, John Hubbard, Jr., and Frank Dayish declined those proposals on behalf of Burwell.  For consistency and clarity, the Court will use "NAIHS" to describe the entity that declined Sage Hospital's contract proposals and is legally responsible for those declination decisions, when, in fact, the Defendants Roubideaux, Hubbard, Jr., and Dayish, declined those proposals on Burwell's behalf.

[2]The ISDEA authorizes the United States to enter into contracts with American Indian tribes in which the tribe agrees to supply federally funded services that a federal agency normally would provide.  See 25 U.S.C. § 450f(a).

[3]The ISDEA defines a tribal organization as

the recognized governing body of any Indian tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities: Provided, That in any case where a contract is let or grant made to an organization to perform services benefiting more than one Indian tribe, the approval of each such Indian tribe shall be a prerequisite to the letting or making of such contract or grant . . . .

25 U.S.C. § 450b(l)(emphasis in original).

[4]Because many of the parties' exhibits either do not have their own internal pagination, or use inconsistent pagination conventions, the Court will use CM/ECF's pagination -- i.e., the number in the upper-right hand corner of each document -- for pincites of the parties filings and exhibits, unless the Court notes otherwise.

     1.       **<u>Sage Hospital's Tumultuous History</u>.**

     4.       From 1974 to 2007, Sage Hospital's facilities grew increasingly obsolete, and the quality of its healthcare services plummeted.  <u>See</u> Declaration of Ahmad Razaghi ¶ 3, at 21, filed December 22, 2014 (Doc. 17-1)("Razaghi 1st Decl.").

     5.       Consequently, by 2007, Sage Hospital was fighting multiple regulatory and financial battles to stay afloat.  <u>See</u> Razaghi 1st Decl. ¶ 3, at 21.  <u>See id.</u> ¶¶ 7-8, at 23.

     6.       The Centers for Medicare and Medicaid Services[5] was threatening to terminate Sage Hospital's certification, the Arizona Department of Health Services was threatening to revoke Sage Hospital's Rural General Hospital license, and the Joint Commission on Accreditation of Health Care Organizations ("Joint Commission") -- an independent, non-profit organization that accredits hospitals throughout the United States -- was threatening to refuse Sage Hospital accreditation.  Razaghi 1st Decl. ¶ 3, at 21.  <u>See id.</u> ¶¶ 7-8, at 23.

     7.       Sage Hospital was also in violation of Administrative Orders that the Environmental Protection Agency ("EPA") issued in 1999 and 2006, and was also in ongoing litigation against the NAIHS.  <u>See</u> Razaghi 1st Decl. ¶ 7, at 23.

     8.       Because of its substandard employee housing and benefits, and its precarious financial condition, Sage Hospital struggled to recruit and retain top-quality staff.  <u>See</u> Razaghi 1st Decl. ¶ 13, at 25.

---

[5]The Centers for Medicare and Medicaid Services is a federal agency within Department of Health and Human Services that administers the Medicare program, and works in partnership with state governments to administer Medicaid, the State Children's Health Insurance Program, and health insurance standards.  <u>See</u> <u>Centers for Medicare and Medicaid Services</u>, Wikipedia.org, http://en.wikipedia.org/wiki/Centers_for_Medicare_and_Medicaid_Services (last visited Feb. 3, 2015).  It is also responsible for enforcing quality standards in federally funded hospitals through its survey and certification process.  <u>See</u> <u>Centers for Medicare and Medicaid Services</u>.

9.     Consequently, Sage Hospital was forced to close its general surgery and obstetric care departments before January, 2007.  See Razaghi 1st Decl. ¶ 8, at 23.

10.    In October, 2007, Sage Hospital's Board of Directors (the "Board") rejected a plan to close the hospital, and instead chose to hire M. Morgan & Associates -- a third-party management company[6] -- to oversee its financial and personnel management, and to make the necessary changes to turn around its operations.  See Razaghi 1st Decl. ¶ 3, at 21; Wauneka 1st Decl. ¶ 5, at 1.

11.    The Board hired Ahmad Razaghi -- one of M. Morgan & Associates' principals -- to serve as its temporary Chief Executive Officer ("CEO").  Wauneka 1st Decl. ¶ 5, at 1.

12.    Under Razaghi's tutelage, Sage Hospital's turnaround effort succeeded.  See Razaghi 1st Decl. ¶ 10, at 23.

13.    From 2007 to 2009, Sage Hospital negotiated with the Centers for Medicare and Medicaid Services and the Arizona Department of Health Services to keep Sage Hospital open without losing additional healthcare services.  See Razaghi 1st Decl. ¶ 9, at 23.

14.    In 2009, Sage Hospital settled its lawsuit against the NAIHS.  See Razaghi 1st Decl. ¶ 9, at 23.

15.    In September, 2009 -- for the first time in a decade -- Sage Hospital received both an unconditional Arizona Department of Health Services license, and its Centers for Medicare and Medicaid Services certification.  See Razaghi 1st Decl. ¶ 10, at 23-24.

---

[6]M Morgan & Associates is the predecessor management company to Razaghi Healthcare.  See Transcript of Motion Proceedings Before the Honorable James O. Browning, United States District Judge, Albuquerque, Bernalillo County, New Mexico, commencing on February 12, 2015 at 19:8-15 (Court, Frye), filed February 27, 2015 (Doc. 49)("Tr.").

16.     On May 4, 2009, the Joint Commission awarded Sage Hospital its "Gold Seal of Approval," signifying that Sage Hospital exemplified the highest quality of patient care. Razaghi 1st Decl. ¶ 10, at 23-24.

17.     In March, 2010, the United States Surgeon General, Vice Admiral Dr. Regina M. Benjamin, on behalf of the Department of Health and Human Services ("HHS"), awarded Razaghi the "Chief Executive Officer Managerial Excellence Award" for "leadership, successes and improvements which equate to improved and enhanced patient care."  Razaghi 1st Decl. ¶ 10, at 23-24.

18.     In June, 2012, Sage Hospital received the American Hospital Association Institute for Diversity's "Best in Class Hospital Award" for leadership in addressing health disparities and improving diversity in governance; the award recognized Sage Hospital and only one other hospital out of 900 hospitals nationwide.  Wauneka 1st Decl. ¶ 7, at 2.

19.     In a January 10, 2012, letter, the EPA informed Sage Hospital that it had fulfilled all of the requirements of the EPA's 1999 and 2006 Administrative Orders.  See Razaghi 1st Decl. ¶ 11, at 24.

20.     On September 12, 2013, the Arizona Department of Health Services licensed Sage Hospital as a Rural General Hospital through September 30, 2016.  See Razaghi 1st Decl. ¶ 11, at 24.

21.     In March, 2014, the Joint Commission granted Sage Hospital "Critical Access Hospital Accreditation," stating that it could not identify any requirements for improvements. Razaghi 1st Decl. ¶ 11, at 24.

22.     Each year, from 2007 to 2013, Sage Hospital also received an unqualified -- i.e., "clean" -- audit from its independent auditors.  Razaghi 1st Decl. ¶ 11, at 24.

23.     Sage Hospital completed its turnaround effort without eliminating any services, and began expanding its services in 2009.  <u>See</u> Razaghi 1st Decl. ¶ 12, at 24.

24.     Sage Hospital's overhead -- which includes Board stipends and payments to Razaghi and his related companies -- has decreased steadily from $9 million in FY 2006, which constituted 41.9% of total expenses for that year, to $8 million in FY 2013, which constituted 24.5% of total expenses for that year.  <u>See</u> Declaration of Michael Katigbak ¶ 8(D), at 37, filed December 22, 2014 (Doc 17-1)("Katigbak 1st Decl.").

**2.     <u>Allegations That Sage Hospital Was Misusing Federal Funds.</u>**

25.     During the turnaround effort, Sage Hospital terminated or allowed to resign several employees, many of whom were politically active in the Navajo Nation.  <u>See</u> Razaghi 1st Decl. ¶ 14, at 26.

26.     In July, 2013, Dr. Douglas Peter -- the NAIHS' Chief Medical Officer -- began receiving reports from current and former Sage Hospital senior management employees that the hospital was misusing federal funds.  <u>See</u> Declaration of John Hubbard, Jr. ¶ 3, at 2-3, filed February 5, 2015 (Doc. 36-1)("Hubbard Decl.").

27.     The current and former employees alleged that Razaghi had diverted millions of dollars to his companies over several years.  <u>See</u> Hubbard Decl. ¶ 3, at 2-3.

28.     They further alleged that Razaghi had used Sage Hospital's operating funds to settle a lawsuit that his brother had filed against him, even though Sage Hospital was not a named party in the suit.  <u>See</u> Hubbard Decl. ¶ 3, at 3.

**3.     <u>Sage Hospital's Contracts and Annual Funding Agreements with the NAIHS.</u>**

29.     Sage Hospital and the NAIHS entered into a three-year contract in 2010, which was set to expire on September 30, 2013.  <u>See</u> 2010 Contract; Razaghi Decl. ¶ 6, at 22-23.

30.     Sage Hospital and the NAIHS also agreed to an annual funding agreement ("AFA") for the 2013 Fiscal Year ("FY").  See 2013 AFA.

31.     In the 2013 AFA, Sage Hospital and the NAIHS agreed that the NAIHS would fund Sage Hospital at a total amount of $18,044,042.00, with $11,481,661.00 in base funding and $6,562,381.00 for direct and indirect contract support costs.  See 2013 AFA at 22, 30.

32.     On August 22, 2013, Sage Hospital submitted a proposed three-year renewal of the 2010 Contract and a successor AFA for FY 2014.  See Renewal No. 1 and Amendment No. 1 to the Indian Self-Determination Act Contract Between Navajo Health Foundation/Sage Memorial Hospital, Inc. and the Secretary of the Department of Health and Human Services, filed January 13, 2015 (Doc. 21-3)("2013 Renewal"); Annual Funding Agreement Between Navajo Health Foundation -- Sage Memorial Hospital, Inc., and The Secretary of the Department of Health and Human Services Fiscal Year 2014, filed January 13, 2015 (Doc. 21-3)("2014 AFA"); Hubbard Decl. ¶ 4, at 3; Razaghi 1st Decl. ¶ 16, at 26.

33.     The 2013 Renewal proposed the following amendments to the 2010 Contract -- the added sections are underlined and the deleted sections are crossed out:

Article I, Section 2(B):

    **(B) In General.**  Each provision of the ISDA and each provision of this Contract shall be liberally construed for the benefit of Sage to transfer the funding and certain programs, functions, services, and activities (hereinafter "PFSAs"), or portions thereof, and associated resources, that are otherwise contractiable under section 102(a) of the ISDA (25 U.S.C. § 450f(a)), including all related administrative functions, from the Secretary to Sage.

Article II, Section 1:

    **SECTION 1 - TERM.**  Pursuant to section 105(c)(1) of the ISDA (25 U.S.C. § 450j(c)(1)), the original term of this Contract shall be 3 years, from October 1, 2010 through September 30, 2013.  Pursuant to 25 U.S.C. §§ 450f(a)(2) and 450j(c)(1), 25 C.F.R. §§ 900.12 and 900.8(h), the Navajo Nation Council's Resolution CJN-35-05 passed on June 3, 2005 ("Resolution") attached

as Attachment 1 to the Contract, and Article V, Section 2(A) of the Contract, the Contract is amended as stated in this Renewal and Amendment and renewed for a three-year term from October 1, 2013 through September 30, 2016.

Article II, Section 7(D):

**(D) Confidentiality Standards.** Sage will maintain confidentiality in accordance with applicable Federal, Arizona, ~~Navajo Nation~~ and Navajo Nation statutes and regulations, including without limitation the Health Insurance Portability and Accountability Act of 1996.

2013 Renewal at 5-6.

34.    The 2014 AFA contains only minor amendments to the 2013 AFA.  Compare 2014 AFA *passim*, with 2013 AFA *passim*.

35.    The 2014 AFA proposed modest increases in Sage Hospital's funding from the 2013 AFA: base funding would increase from $11,481,661.00 to $13,222,149.00 and contract support costs would increase from $6,562,381.00 to $7,516,697.00.  Compare 2013 AFA at 22, 30, with 2014 AFA at 2-3.

36.    Because of the mounting allegations against Sage Hospital, the NAIHS did not approve either the 2013 Renewal or the 2014 AFA, opting instead to provide Sage Hospital funding on a month-to-month basis while investigating the allegations.  See Hubbard Decl. ¶ 4, at 3; Razaghi Decl. ¶ 16, at 26.

37.    Although the NAIHS generally must approve or decline a contract proposal within ninety days, the NAIHS requested, and Sage Hospital agreed to, a series of extensions of the ninety-day periods.  See Hubbard Decl. ¶ 4, at 3.

**4.    The Events Leading up to the NAIHS' Performance Monitoring Review.**

38.    In September, 2013, and early October, 2013, the local media in and around Ganado contained reports of intense public criticism of Sage Hospital's management and allegations that Sage Hospital was misusing federal funds.  See Hubbard Decl. ¶ 5, at 3; Arlyssa

Becanti, <u>Ganado Officials Want Razaghi Out</u>, The Gallup Independent (Oct. 9, 2013), filed December 22, 2014 (Doc. 17-1)("Becanti Article").

39.     On October 9, 2013, The Gallup Independent -- a newspaper with a wide circulation in the Navajo Nation -- published an article entitled <u>Ganado Officials Want Razaghi Out</u>.  <u>See</u> Becanti Article at 30.

40.     The article reported that, at an October 8, 2013, meeting, the Ganado Chapter of the Navajo Nation passed a resolution requesting that "Mr. Ahman [sic] Razaghi, Chief Executive Officer of Sage Memorial Hospital be terminated and immediately escorted off the Navajo Nation land."  Becanti Article at 31.

41.     The article explained that multiple former Sage Hospital employees spoke at the meeting in favor of the resolution, and alleged that Sage Hospital had unlawfully terminated them and had misused millions of dollars in federal funds.  <u>See</u> Becanti Article at 31.

42.     On September 30, 2013, The Gallup Independent published a second article -- on the front page above the fold -- with the headline: <u>Ex-employees: 'This is illegal.'  Sage Memorial Hospital operations a tangled web</u>.  <u>See</u> Sherry Robinson, <u>Ex-employees: 'This is illegal.'  Sage Memorial Hospital operations a tangled web</u> at 32, The Gallup Independent (Sept. 30, 2013), filed December 22, 2014 (Doc. 17-1)("Robinson Article").

43.     That article detailed how Caleb Lauber -- a former director of Sage Hospital's outpatient clinic and diabetic grant program -- had filed a complaint with the Navajo Labor Commission, in which he stated:

> After assuming my new duties [at Sage Hospital] . . . I was subjected to personalized attacks and then fired.  This was in response to speaking out about severe discrepancies that I found in the diabetic grant program, and attempting to better the medical care and treatment plan provided to patients in the outpatient clinic.

Robinson Article at 33 (internal quotation marks omitted).

44.     According to the article, Lauber "discovered that there was $256,000 unaccounted for from the 2009 fiscal year, along with financial irregularities for fiscal 2010," which prompted him to make his accusations public.  Robinson Article at 33 (internal quotation marks omitted).

45.     On October 16, 2013, Jonathan Hale -- the Chairman of the Health, Education and Human Services Committee of the Navajo Nation Council -- wrote a letter to the former HHS Secretary -- Kathleen Sebelius -- voicing a number of concerns about Sage Hospital.  See Letter from Jonathan Hale, Chairman of the Health, Education and Human Services Committee of the Navajo Nation Council, to Kathleen Sebelius, Secretary of the U.S. Department of Health and Human Services at 11 (Oct. 16, 2013), filed February 5, 2015 (Doc. 36-1)("Hale Ltr."); Hubbard Decl. ¶ 5, at 3-4.

46.     Hale said that, "[r]ecently, through newspapers, community meetings, and meetings with federal and state officials, significant concerns have been raised that Sage Memorial Hospital and its managing companies may have mismanaged federal funds, diverted funds for personal use, set up corporate schemes to hide improprieties and falsified credentials." Hale Ltr. at 11.

47.     Hale noted that, without a thorough investigation, "the Navajo Nation cannot be assured that funds designated for the health of its people are being properly managed."  Hale Ltr. at 11.

48.     Accordingly, Hale requested that the NAIHS: (i) conduct an immediate investigation into Sage Hospital's alleged misuse of federal funds; (ii) determine whether Sage Hospital was performing the contracted programs, functions, services, and activities ("PFSAs")

to acceptable standards; and (iii) conduct a performance monitoring review.  See Hale Ltr. at 11-12; Hubbard Decl. ¶ 5, at 3-4.

49.     Because of the Hale Ltr. and the NAIHS' growing concerns about Sage Hospital's possible misuse of federal funds, the NAIHS organized a performance monitoring review to occur during the week of January 6, 2014.  See Hubbard Decl. ¶ 6, at 4.

50.     The NAIHS informed Sage Hospital that it would receive a copy of the final performance monitoring review report, see Hubbard Decl. ¶ 6, at 7, and promised to provide draft reports for Sage Hospital to review, so that it could correct any errors and discuss any adverse findings with the NAIHS,  see Razaghi 1st Decl. ¶ 4, at 21-22.

**5.     Moss Adams' Audit.**

51.     On January 15, 2014, the NAIHS contracted with Moss Adams -- an accounting firm -- to conduct a forensic audit of Sage Hospital's financial records and accounting practices. See Declaration of James Thompson ¶ 3, at 2-3, filed February 5, 2015 (Doc. 36-2)("Thompson Decl.").

52.     Moss Adams performed its audit in two phases.  See Thompson Decl. ¶ 3, at 2-3.

53.     During Phase I, Moss Adams reviewed Sage Hospital's financial transactions and operations from October 1, 2009, to December 31, 2013.  See Thompson Decl. ¶ 3, at 2-3.

54.     During Phase II, Moss Adams reviewed Sage Hospital's financial transactions and operations from October 1, 2007, to April 11, 2013.  See Thompson Decl. ¶ 3, at 2-3.

55.     Moss Adams completed Phase I on February 10, 2014, and Phase II on July 2, 2014.  See Thompson Decl. ¶ 3, at 2-3.

56.     On April 29, 2014, the NAIHS sent a letter to Sage Hospital.  See Letter from Floyd F. Thompson, Executive Office of the Navajo Area Indian Health Service, to Stenson D.

Wauneka, President of the Board of Directors of Sage Hospital (Apr. 29, 2014), filed February 5, 2015 (Doc. 36-1)("Thompson's 1st Ltr.").

57.     Thompson's 1st Ltr. said that the NAIHS was "pleased to see that Sage will continue to cooperate with [the NAIHS'] review," and explained that the NAIHS would continue its review, because "there is reasonable cause to believe that grounds for re-assumption[7] of the contract or suspension of contract payments, or other serious contract performance deficiencies may exist."  Thompson's 1st Ltr. at 14.

58.     On July 11, 2014, the NAIHS sent a second letter to Sage Hospital.  See Letter from Floyd F. Thompson, Executive Office of the Navajo Area Indian Health Service, to Stenson D. Wauneka, President of the Board of Directors of Sage Hospital (July 11, 2014), filed February 5, 2015 (Doc. 36-1)("Thompson's 2nd Ltr.").

59.     In Thompson's 2nd Ltr., the NAIHS warned Sage Hospital that "there remain outstanding requests for information relevant to the forensic audit requested by our contracted auditors (Moss Adams) and request that any and all outstanding responses be submitted to the Attention of Moss Adams no later than close of business on July 16, 2014 . . . ."  Thompson's 2nd Ltr. at 16.

60.     The NAIHS also reiterated that there is "reasonable cause to believe that grounds for re-assumption of the contract or suspension of contract payments, or other serious contract performance deficiencies may exist."  Thompson's 2nd Ltr. at 16.

61.     On July 15, 2014, Sage Hospital sent a letter to the NAIHS in response to Thompson's 2nd Ltr.  See Letter from Stenson D. Wauneka, President of the Board of Directors

---

[7]The ISDEA defines "reassumption" as "rescission, in whole or in part, of a contract and assuming or resuming control or operation of the contracted program . . . without consent of the Indian tribe or tribal organization."  25 C.F.R. § 900.246.

of Navajo Health Foundation -- Sage Memorial Hospital, Inc. (July 15, 2014), filed February 11,

2015 (Doc. 41-1)("Response to Thompson's 2nd Ltr.").

       62.     In the Response to Thompson's 2nd Ltr., Sage Hospital wrote:

> During the past seven months during which the performance monitoring review
> has been undertaken, Sage has made every effort to be open and cooperative with
> NAIHS and your contract auditors, Moss Adams, L.L.P.  Sage has provided
> 23,286 pages of documents dealing with approximately $124 million in operating
> transactions.  As of July 13, 2014, Sage has provided requested documents for
> 451 of 454 transactions (or $12,434,115 out of a total $12,439,940).  For the
> remaining 3 transactions totaling $5,825, we have provided detailed explanations
> for these relatively immaterial amounts.  In total, we believe that more than 99.3%
> of your document requests (or 99.9% of the dollar supports have been addressed).
>
> . . . .
>
> In your July 11 letter you state, "there remain outstanding requests for
> information" relating to the performance monitoring review, and you attempt to
> set a deadline of July 16, 2014 for Sage to submit any "outstanding responses."
> You further state, "no additional information will be considered after this date."
> Sage's counsel and management have made numerous requests to have NAIHS's
> contracted auditors identify any specific items that remain outstanding, and we
> have received no response since June 2, 2014.  While we appreciate the desire to
> compete this process, we want to make sure that your contracted auditors do not
> come up with a list of outstanding items after July 16 that we cannot respond to.
> Accordingly, we request that you identify any items that are considered to be
> "outstanding" and provide us with a reasonable opportunity to address those
> items.

Response to Thompson's 2nd Ltr. At 11-12.

       63.     On July 25, 2014, Moss Adams submitted its final report to the NAIHS, which

contained its findings from both Phase I and Phase II.  See Report of Independent Accountants

Forensic Consulting Procedures, filed January 13, 2015 (Doc. 21-18)("Moss Adams Report");

Thompson Decl. ¶ 3, at 2-3; Hubbard Decl. ¶ 7, at 4.

64.     Although Sage Hospital produced approximately 23,000 pages of documents, it did not cooperate fully with the NAIHS' and Moss Adams' requests.  See Thompson Decl. ¶ 4, at 3.[8]

---

[8]Sage Hospital contends that it "cooperated fully with IHS and Moss Adams" throughout the NAIHS' performance monitoring review and Moss Adams' audit.  Motion at 11.  In support of this assertion, Sage Hospital cites the Declaration of Michael Katigbak, its Chief Financial Officer.  See Motion at 11 (citing Declaration of Michael Katigbak ¶ 5, filed December 22, 2014 (Doc 17-1)("Katigbak 1st Decl.")).  In the paragraph that the Motion cites, Katigbak says "Sage cooperated fully with IHS and Moss Adams, ultimately producing approximately 23,000 pages of documents and hosting several on-site visits by both IHS and Moss Adams.  Sage offered to make its officials available and to provide additional documents if IHS or Moss Adams required additional information or clarification."  Katigbak 1st Decl. ¶ 5, at 35-36.  Sage Hospital expands on this explanation in the Reply, in which it states that the ISDEA limits Moss Adams and the NAIHS' right to demand documents to three years.  See Reply at 15 (citing 25 U.S.C. § 450c(b); 25 C.F.R. § 900.41(a)-(c)).  Sage Hospital argues that, when Moss Adams expanded the scope of its requests to documents from October 1, 2007, Sage Hospital informed the NAIHS that it had no right to earlier documents.  See Reply at 15.  Sage Hospital states that it satisfied every request that Moss Adams made for the appropriate time period.  See Reply at 15.

Although the ISDEA may not have entitled Moss Adams and the NAIHS to all of the documents that it requested, Sage Hospital's refusal to provide those documents demonstrates that it did not "cooperate[] fully" with their requests.  Motion at 11.  James Thompson -- who is a partner at Moss Adams, a Certified Public Accountant, and led the Sage Hospital audit -- also provided multiple examples of Sage Hospital's failure to fully cooperate with the audit:

> We asked to obtain a listing of Sage's annual audits from prior auditors, and we hoped to ask the auditors about financial information they had been provided by Sage, obtain a copy of their audit adjustments, and inquire whether the auditors had any disagreements with Sage concerning accounting matters.  However, Sage's counsel would not permit us to speak with prior auditors.
>
> . . . .
>
> [W]hen we requested bid files to support vendor contracts being let for bid we were provided with copies of all vendor invoices and were never provided with copies of bud documents.  We also requested copies of all contracts, including amendments, between Sage and Mr. Razaghi or his related companies, but we were provided duplicate copies of certain contracts and were not provided copies of some contracts.

Thompson Decl. ¶ 6, at 4; id. ¶ 13, 7-8.  Accordingly, the Court will not credit Sage Hospital's assertion that it "cooperated fully with IHS and Moss Adams," but instead qualify the statement and explain how Sage Hospital did not cooperate fully with those entities.  Motion at 11.

65.    For example, when Moss Adams requested the bid files for vendor contracts, Sage Hospital provided only the vendor invoices and never provided the bid documents themselves. See Thompson Decl. ¶ 13, at 6-7.

66.    When Moss Adams requested copies of all contracts between Sage Hospital and Razaghi, or his related companies, Sage Hospital provided duplicate copies of certain contracts and did not provide copies of other contracts at all.  See Thompson Decl. ¶ 13, at 6-7.

67.    From FY 2007 through FY 2014, Sage Hospital employed three auditing firms -- Eide Bailey, LLP from 2007 to 2010, Wipfli, LLP in 2011, and Bradshaw, Smith & Co., LLP, from 2012 to 2014.[9]  See Declaration of Michael Katigbak ¶ 8, at 3,[10] filed February 11, 2015 (Doc. 41-1)("Katigbak 2nd Decl.").

---

[9]The Defendants assert that Sage Hospital "routinely terminated auditors each year." Response at 8 (citing Thompson Decl. ¶ 6, at 4).  Sage Hospital says that this statement is "utterly false."  Reply at 18.  The Court will not adopt the Defendants' statement, because it mischaracterizes the evidence.

The paragraph that the Defendants cite in the Thompson Decl. in support of its assertion cites page three of the Moss Adams Report.  See Thompson Decl. ¶ 6, at 4 (citing Moss Adams Report at 3).  Page three of the Moss Adams Report states: "SMH routinely terminated auditors each year . . . .  The fiscal year 2010 audit was performed by E[id]e Bailly LLP, . . . the 2011 audit was performed by Wipfli LLP, . . . and the 2012 and 2013 audits were performed by Bradshaw, Smith & Company LLP . . . ."  Moss Adams Report at 3.  The Defendants cite the Katigbak 2nd Decl., in which Katigbak says that "[f]or the audits for fiscal years 2007 through 2014, the audit firms used were Eide Bailly for 2007 to 2010, WIPFLI for 2011, and Bradshaw Smith for 2012 to 2014."  Katigbak 2nd Decl. ¶ 8, at 3.

Thus, the Defendants' assertion -- which omits the fact that Sage Hospital employed Eide Bailey, LLP from 2007 to 2010, and implies that it only employed that firm for one year -- is incomplete and misleading.  That Sage Hospital terminated one auditing firm -- WIPFLI -- after one year does not establish that it "routinely terminated auditors each year."  Response at 8.  Accordingly, rather than adopting the Defendants' unsupported assertion, the Court will include the full timeline of Sage Hospital's auditing firms to provide a more accurate and more complete picture of its auditing history.

[10]Because the Katigbak 2nd Decl. does not contain CM/ECF's pagination, the Court will use the document's internal pagination -- i.e., those in the middle of the bottom of each page -- for pincites.

68.     Moss Adams asked Sage Hospital for a listing of its annual audits from prior auditors; Moss Adams also sought to ask the prior auditors about the financial information that Sage Hospital provided, obtain a copy of their audit adjustments, and inquire whether they had any disagreements with Sage Hospital concerning accounting matters.  <u>See</u> Thompson Decl. ¶ 6, at 4.

69.     Sage Hospital's counsel would not, however, allow Moss Adams to speak with its prior auditors.  <u>See</u> Thompson Decl. ¶ 6, at 4.

70.     Moss Adams also had numerous concerns regarding payments to, and approved by, the Board.  <u>See</u> Thompson Decl. ¶¶ 7-12, at 4-7.

71.     Sage Hospital's payments to its Board, and the Board's credit card expenses, tripled between 2010 and 2014; Board meetings at offsite resorts also became increasingly frequent.  <u>See</u> Thompson Decl. ¶ 7, at 4.

72.     In 2013, Board reimbursements and stipends exceeded $230,000.00; the Board's credit card expenses reached $348,000.00.  <u>See</u> Thompson Decl. ¶ 7, at 4.

73.     The total of Board travel expenses for FY 2013 was $61,942.00 -- $645 per month per Board member -- which is less than Sage Hospital's five-year average of $66,820.00.  <u>See</u> Declaration of Stenson D. Wauneka ¶ 5, at 1-2, filed February 11, 2015 (Doc. 41-3)("Wauneka 2nd Decl.").

74.     The Board authorized the purchase of computers and iPads, apparently for the Board members' personal use.[11]  <u>See</u> Moss Adams Report at 6; Thompson Decl. ¶ 7, at 4.

---

[11]Sage Hospital asserts that "IHS' seeming fixation with the Board awarding itself the 'gifts' of computers and iPads, is . . . no cause for concern.  That property . . . is listed as property of Sage, not of the individual Board members . . . ."  Reply at 19 (citations omitted). Sage Hospital cites three sources in support of this assertion: (i) the El-Meligi 2nd Decl., which restates the assertion nearly verbatim, but does not cite any sources to support it, <u>see</u> El-Meligi

75.     Moss Adams asked Sage Hospital to provide invoices for those purchases; Sage Hospital provided copies of invoices totaling approximately $32,000.00 for purchases made in 2011, but did not provide any documentation for the purchases that it made in 2012.   See Thompson Decl. ¶ 7, at 4.

76.     The Board approved a $1.8 million bonus for Razaghi Healthcare on August 6, 2012.[12]   See Thompson Decl. ¶ 7, at 4-5; Declaration of Ahmad R. Razaghi ¶ 3, at 1-2,[13] filed February 11, 2015 (Doc. 41-3)("Razaghi 2nd Decl.").

_____

2nd Decl. ¶ 9, at 4-5; (ii) a purchase order detailing the cost of the iPads and computers, see PO Inquiry (Oct. 1, 2014), filed February 11, 2015 (Doc. 41-1)("Sage Hospital PO"), which says nothing about whether those items were listed as Sage Hospital's property or the individual Board members'; and (iii) an article detailing the results of a 2013 survey of hospitals and healthcare systems, see Results from 2013 Biennial Survey of Hospitals and Healthcare Systems (Dec. 12, 2013), filed February 11, 2015 (Doc. 41-2)("2012 Biennial Survey"), which also says nothing about whether those items were listed as Sage Hospital's property or the individual Board members'.   As Sage Hospital has provided no evidence to support is assertion aside from the El-Meligi 2nd Decl., and the Moss Adams Report found that the Board authorized the purchase of computers and iPads for their personal use, the Court will include the fact that the computers and iPads were "apparently for Board members' personal use" in its factual background.

[12]The Defendants argue that "[t]he Board approved a $1.8 million bonus to Mr. Razaghi on August 6, 2012."   Response at 9 (citing Thompson Decl. ¶ 7, at 5).   Sage Hospital responds that the Board approved the $1.8 million bonus for Razaghi Healthcare, rather than for Razaghi personally.   See Reply at 20.   The Court agrees with Sage Hospital.

The Defendants' assertion is taken verbatim from the Thompson Decl., which, in turn, cites page eleven of the Moss Adams Report.   See Thompson Decl. ¶ 7, at 5 (citing Moss Adams Report at 11).   The only mention of a $1.8 million bonus on page ten of the Moss Adams Report is in this paragraph:

> There was no documentation in the Board minutes relative to the August 6, 2012 increase in board stipends from $250 per meeting to $500 per meeting nor was there support that an independent market analysis was reviewed by the board prior to the approval of the $1.8 million CEO bonus.

Moss Adams Report at 10-11.   Although "CEO bonus" suggests that Razaghi, and not his management company, received the $1.8 million bonus, the Moss Adams Report later says that "[t]he 2012 payment of a $1.8 million management bonus to Razaghi Healthcare was based on the results of 2011 financials . . . ."   Moss Adams Report at 14 (emphasis added).   Moreover,

77.     Although Moss Adams found no evidence that the Board had reviewed an independent fair market analysis before approving the $1.8 million bonus, the Board did conduct a fair market review before approving the bonus, and also performed a confirming study after Sage Hospital's former employees criticized the bonus amount in the press.[14]   See Thompson Decl. ¶ 7, at 4-5; Razaghi 2nd Decl. ¶ 3, at 1.

_____

Razaghi states that the Board

> did not approve a $1.8 million bonus to me.  The Board approved such a contractually-supported bonus (for a five-year period after the turnaround of Sage's operations and finances was completed successfully) to Razaghi Healthcare.  Razaghi Healthcare is a company with employees and contracted expertise that was using its revenues for general corporate purposes, and to plan for the much needed Ganado Outpatient Medical Center until that development was derailed by Sage ex-employees and IHS. . . .  The $1.8 million payment was a success fee based on the successful turnaround achieved in the prior five-year period.  Razaghi Healthcare bore the risk that the turnaround would not be successful, in which case such a[] success fee would not be paid.

Razaghi 2nd Decl. ¶ 3, at 1.  Razaghi's statements and the Moss Adams Report both indicate that the Board approved a $1.8 million bonus for Razaghi Healthcare, rather than Razaghi personally.

Neither party has explained the governance structure of Razaghi Healthcare, how many people it employs, or what, if any, ownership interest Razaghi has in the company.  If Razaghi is the sole owner of Razaghi Healthcare and does not distribute bonuses among his employees, he may have received the entire bonus personally through his company.  In that case, whether Razaghi or Razaghi Healthcare received the bonus would be a distinction without a difference.  Based on the evidence in the record, however, the Court can conclude only that Sage Hospital paid the $1.8 million bonus to Razaghi Healthcare.

[13]Because the Razaghi 2nd Decl. does not contain CM/ECF's pagination, the Court will use the document's internal pagination -- i.e., those in the middle of the bottom of each page.

[14]The Defendants assert that "there was no evidence that the Board had reviewed an independent fair market analysis prior to approving the bonus."  Response at 5.  The evidence in the record, however, contradicts this statement.  Razaghi explains that

> there was a fair market value study performed prior to the Board's decision on the bonus amount in August 2012 and a confirming study after the amount of the bonus was criticized by ex-employees in the press in the fall of 2013.  Both studies found that the bonus was reasonable and well within fair market

78.     Both the initial review and the confirming study found that the bonus amount was reasonable and well within fair-market parameters.  See Razaghi 2nd Decl. ¶ 3, at 1.

79.     At an August 6, 2012, meeting, the Board approved an increase in its stipend from $250.00 per meeting to $500.00 per meeting.  See Thompson Decl. ¶ 7, at 5.

80.     By comparison, each of the twelve members of the Board of Directors of the American Indian hospital in Fort Defiance receives a stipend of $1,200.00 per meeting plus expenses.  See Wauneka 2nd Decl. ¶ 5, at 3.

81.     The vote whether to increase the Board's stipend was not on the initial meeting agenda, but was added after the Board approved Razaghi Healthcare's $1.8 million bonus.  See Thompson Decl. ¶ 7, at 5.

82.     Sage Hospital paid Razaghi "severance" compensation from 2011 to 2013 for a total of $523,905.00, but Moss Adams could not determine whether the Board properly approved those payments.  Thompson Decl. ¶ 7, at 5.

83.     Razaghi's contract provided that he would receive a severance package only upon the termination of his contract.  See Thompson Decl. ¶ 7, at 5.

84.     Sage Hospital paid over $13 million to Razaghi and to his companies between October 1, 2009, and December 31, 2013; Razaghi's management personnel did not comply with Sage Hospital's "procurement or travel policies"; and Sage Hospital did not receive competitive bids for its large purchases or obtain Board approval for all purchases over $50,000.00 -- "both

---

parameters. . . .  In March 2013, the Board clarified the record to show that the payment covered 5 years beginning in 2007.

Razaghi 1st Decl. ¶ 3, at 1.  Although direct evidence that the Board conducted a fair-market-value assessment of the $1.8 million would be more helpful and persuasive than relying solely on Razaghi's 2nd Decl., that Moss Adams did not find evidence of a fair-market-value assessment does not contradict Razaghi's statements that the Board performed two of them.  Accordingly, the Court will include both facts in its factual background.

of which violated its contract-approval requirements."[15]  Thompson Decl. ¶ 10, at 6.  See Moss Adams Report at 14.

85.     Moss Adams also reviewed payments that Sage Hospital made to one of its vendors: Four Seasons Construction.  See Thompson Decl. ¶ 11, 7.

86.     Sage Hospital paid Four Seasons Construction approximately $2.1 million between October, 2009, and December, 2013, but Moss Adams found that the work may have been awarded without a bidding process, as Moss Adams never found a bid file for that project.[16] See Thompson Decl. ¶ 11, at 7.

87.     A number of Four Seasons Construction employees were on Sage Hospital's payroll.  See Thompson Decl. ¶ 11, at 7.

88.     At least one invoice that Moss Adams uncovered during its audit showed that Sage Hospital was charged twice for the same services that those employees provided -- once from Sage Hospital directly and a second time through Sage Hospital's  payments to Four Seasons Construction.  See Thompson Decl. ¶ 11, at 7.

_____

[15]Sage Hospital states that it "did follow its procurement policies for both the Razaghi Healthcare contract and Four Seasons Construction . . . ."  Reply at 21 (citing Thompson Decl. ¶ 10, at 6).  Sage Hospital took this line verbatim from the Razaghi 2nd Decl. -- which does not cite any sources -- and provides no other support for it.  The Defendants assert that "Moss Adams also confirmed . . . that Mr. Razaghi's management personnel did not follow Sage's procurement or travel policies; and that Sage did not receive competitive bids for its large purchases or obtain Board approval for all purchases over $50,000.00 -- both of which violated its contract-approval requirements."  Response at 10 (citing Thompson Decl. ¶ 10, at 6).  In support of this assertion, the Defendants cite the Thompson Decl., which, in turn, cites the Moss Adams Report.  See Thompson Decl. ¶ 10, at 6 (citing Moss Adams report at 14).  The Moss Adams Report states: "Mr. Razaghi's management personnel do not follow SMH procurement or travel policies and are not getting competitive bids or board approval for all purchases over $50,000."  Moss Adams Report at 14.  Because Sage Hospital cites only the Razaghi 2nd Decl. and the Defendants cite the Moss Adams Report -- a more comprehensive and objective source -- the Court will adopt the Defendants' assertion rather than Sage Hospital's.

[16]The Court resolved the parties' only dispute regarding this fact in footnote 12.

89.     Moss Adams asked Sage Hospital for time sheets/records for the payroll periods under review, but Sage Hospital never provided them.  See Thompson Decl. ¶ 11, at 7.

90.     Sage Hospital paid approximately $500,000.00 towards the settlement of a lawsuit between Razaghi and his brother, even though Sage Hospital was not a named party in the case.[17] See Thompson Decl. ¶ 12, at 7.

91.     Sage Hospital provided only redacted invoices for legal services to Moss Adams, so Moss Adams was unable to verify the nature of the charges.  See Thompson Decl. ¶ 11, at 7.

92.     Razaghi received $231,560.72 for the settlement from a liability insurer not associated with Sage Hospital; he promptly remitted that exact amount to Sage Hospital.  See Check to Morgan & Associates, LLC for $231,560.72 Re: Razaghi et. al. v. Razaghi et. al. (Aug. 21, 2013), filed February 11, 2015 (Doc. 41-3); Check from Morgan & Associates to Navajo Health Foundation -- Sage Memorial Hospital for $231,560.72 (Oct. 29, 2013), filed February 11, 2015 (Doc. 41-3); Razaghi 2nd Decl. ¶ 4, at 2.

93.     Moss Adams interviewed the Board members as a group with their attorney present; as the interview questions were presented "each member looked to their attorney and answered questions carefully in a manner which suggested scripted answers.  In the event that members did not know an answer, their attorney would lead them to answer questions and identify a certain Board member to answer."[18]  Navajo Area Indian Health Service Report on Navajo Health Foundation -- Sage Memorial Hospital, Inc. Performance Monitoring Review in

---

[17]Sage Hospital asserts that its counsel "determined that Razaghi was entitled to indemnification for that suit under the applicable contract."  Reply at 21.  Sage Hospital does not cite -- and the Court has been unable to find -- any evidence to support this statement.  Accordingly, the Court will not include that fact in its factual background.

[18]The Defendants assert that they were not allowed to interview the board members.  The quoted passage from the NAIHS Report contradicts this assertion.

January 2014 (Sept. 15, 2014) at 22, filed January 13, 2015 (Docs. 21-12 & 21-13)("NAIHS

Report")

> **5.       The NAIHS' Performance Monitoring Review.**

94.     The NAIHS completed its performance monitoring review report on September

15, 2014.  See NAIHS Report; Hubbard Decl. ¶ 8, at 4-5.

95.     The NAIHS Report's major findings include, in pertinent part:

It has been demonstrated through the performance monitoring review that
a breach of fiduciary responsibility and accountability exists with the current
Board of Directors of [Sage Hospital ("SMH")] that jeopardizes the financial
resource base expressly intended for the delivery of sage and adequate patient
care.  Additionally, it has been demonstrated that the Board of Directors of SMH
relinquished its oversight responsibility to a contracted management program and
that this relationship contributed to the negligent absence of meaningful oversight
over program operations as demonstrated in the defined findings listed below:

1)       Services have been eliminated (ophthalmology, general surgery, Sanders
dental clinic, and obstetric[] care) since the first SMH contract was
awarded in 2003.

2)       Other Programs, Functions, Services, and Activities (PFSAs), including
Financial Management, Contracts/Grants/Awards Management, Human
Resources, Information Technology services, Facilities Management, and
Facility Safety had multiple deficiencies in addition to potential OSHA
violations uncovered during the on-site review.

3)       The SMH Board violated its own Arizona Articles of Incorporation,
Code of Conduct and SMH Policies and Procedures by:

A)       Breaching fiduciary duty to the corporation,
B)       Deriving improper personal benefits,
C)       Authorizing the release official statements, tax returns, and
cost reports that did not fully disclose the Razaghi's
related party transactions, and
D)       Not maintaining adequate internal control system to ensure
records were maintained to support travel expenses, large
contract procurement, and credit card expenses.

Examples include

1.   The SMH Board has violated their own approval requirements for contracts by allowing the Razaghi management company to award contracts without evidence of competitive bids, as determined by NAIHS program reviewers and a forensic audit. This included awards to Mr. Razaghi's related companies and other large vendor relationships that were awarded for more than $50,000.

2.   The SMH Board violated its own Code of Conduct adopted January 24, 2008 by accepting, at no cost to Board members, "gifts" of value such as iPads and laptop computers, without evidence that they are on SMH property records as determined by audited invoices reviewed as part of the program review.  In addition, Board members per the forensic audit also received compensation in the form of "payments for meal expenses" that were charged to SMH credit cards in addition to daily meal allowances provided to board members, incurred questionable reimbursements from meetings and travel unsubstantiated by reimbursement documents and received the benefit of hotel costs at resorts that exceeded the daily lodging per diem rates.

3.   The SMH Board allowed Mr. Ahmad R. Razaghi to receive a total of $523,905 of "severance compensation" payments while serving as the CEO of SMH annually from August, 2007 to July, 2013 in the amounts of $91,000.00 per annum.  There was nothing provided in the board minutes to document if the board officially approved these severance payments and the reasoning why severance pay would be payable while the management contracts were still in place and termination had not taken place to trigger payments of termination benefits.  It was also noted (section 5.0.1 of the No. 1 Amendment No. 1 and Extension No. 1 to CEO Services Contract signed May 17, 2013, Page 9), that if SMH terminates the services contract, the Board agrees to pay Razaghi Healthcare as "severance pay", an amount equal to the average of the most recent four years of funds paid to Razaghi Healthcare (RH).  Hence, the more funds authorized to be paid to RH by the SMH Board, the more advantageous to RH in the event of a termination of contract by the SMH Board.

4.    The SMH Board paid for Mr. Razaghi's attorney(s) for personal lawsuits involving Mr. Razaghi which did not have SMH as a named party involved in the legal proceedings.

5.    The SMH Board for several years allowed payments for services/goods for which no supporting documents substantiating the reason for payments exists.  Also, the Board may be responsible for employees of SMH being on the payroll at the same time these employees worked for a construction company which invoiced SMH for the exact same hours worked on SMH projects.

6.    The SMH Board in August, 2012 agreed to a bonus for Mr. Razaghi of $1.8 million without a Fair Market Value (FMV) analysis report.  The FMV report was received in March, 2013 which was after the bonus was paid and was prepared by Razaghi Healthcare, not an independent party. Subsequently, in December 2013, a compensation appraisal was performed.  Per NAIHS forensic auditors, the original FMV were not prepared under any fair market value standards that would be applicable for this type of report. In addition, at the same Board meeting, where the above bonus was approved, the Board voted to increase their own compensation from $250/meeting to $550/meeting.

4)   The SMH Board circumvented Indian Preference in hiring, by allowing the Razaghi management company and other corporations to select and provide key management staff over the life of the 638 Contract (CEO, Chief Financial Officer (CFO), Human Resources, Chief of Clinical Services, Information Technology, Facility Superintendent, and Director of Nursing) as determined by the program review.

5)   Historical and NAIHS audits noted that SMH Board allowed SMH to operate with material weaknesses and deficiencies in internal controls. The Board has no management personnel that are independent of Razaghi management company personnel reporting directly to the Board in key positions such as the CEO and CFO to provide checks and balances on the A. Razaghi management company activities (as well as other corporations associated with Mr. Razaghi) as determined by the program review and forensic audit.  The forensic audit also identified lack of supporting records for Razaghi related company contracts or charges for services.  The SMH board also restricted the scope of the forensic audit by not allowing auditors to perform interviews of management or board

members and did not produce all requested records requested during the forensic audit.

6)    The SMH Board has submitted multiple amended Form 990 tax returns and Medicare cost reports since 2010 which indicates issues relative to a lack of Board oversight and management internal controls.  Additionally 990 tax returns do not fully disclose the compensation and relationship of the Razaghi related companies which may jeopardize the tax-exempt status of the organization or subject board members, officers, and management to penalties if the IRS determines this compensation was unreasonable resulting in excess benefit or private inurement.  Also, cost reports may be in error if it is determined that Razaghi's related companies qualified for cost reporting as entities under common ownership.

7)    The Board has allowed the Purchased Referred Care program to operate in violation of Federally mandated regulations regarding program requirements.

8)    The Board has failed to authorize sufficient funds to provide for an integrated functional health information (Electronic Health Record) system to meet patient service requirements, resulting in lost revenue opportunities.

9)    The Board in FY 2014 failed to comply with I.R.S. Grants Management requirements for Special Diabetes Program Initiative funding resulting in a lost revenue opportunity.

NAIHS Report at 14-16.

### 6.    The 1st Declination.

96.    On September 19, 2014, Sage Hospital was unaware that Moss Adams had completed its audit report on July 25, 2014, and that the NAIHS had completed its performance monitoring review report on September 15, 2014.  See El-Meligi 1st Decl. ¶ 7, at 6.

97.    With the end of FY 2014 looming, and without a decision from the NAIHS regarding the 2013 Renewal or the 2014 AFA, Sage Hospital submitted a proposed three-year contract renewal and a successor AFA for FY 2015.  See Renewal No. 1 and Amendment No. 1 to the Indian Self-Determination Act Contract Between Navajo Health Foundation/Sage

Memorial Hospital, Inc. and the Secretary of the Department of Health and Human Services, filed January 13, 2015 (Doc. 21-10)("2014 Renewal"); Annual Funding Agreement Between Navajo Health Foundation -- Sage Memorial Hospital, Inc. and the Secretary of the Department of Health and Human Services, filed January 13, 2015 (Doc. 21-10)("2015 AFA"); El-Meligi 1st Decl. ¶ 6, at 6.

98.     The 2015 AFA proposed that the NAIHS would fund Sage Hospital at a total amount of $32,614,916.00, with $19,995,900.00 in base funding and $12,619,016.00 for direct and indirect contract support costs.  See Letter from Chrsti-El-Meligi, Chief Executive Officer of Sage Hospital to Alva Tom, Acting Director of the Office of Indian Self-Determination (Sept. 19, 2014) at 2-3, filed January 13, 2015 (Doc. 21-10)("El-Meligi Ltr.").

99.     The NAIHS communicated its decision to decline the 2013 Renewal and 2014 AFA in a letter to Sage Hospital dated September 26, 2014, which Sage Hospital did not receive until September 29, 2014 -- one day before the end of FY 2014.  See Letter from the Department of Health and Human Services to Stenson Wauneka, President of the Board of Directors of the Navajo Health Foundation (Sept. 26, 2014), filed December 22, 2014 (Doc. 17-1)("1st Declination"); Katigbak 1st Decl. ¶ 4, at 35.

100.     The 1st Declination explains the NAIHS' decision as follows:

In its Proposal, [Sage Hospital ("NHF")] seeks to enter into a three-year contract, Annual Funding Agreement, and ancillary agreements such as a supply contract with Gallup Regional Supply Service Center.  For the reasons stated below, the NAIHS declines NHF's Proposal in its entirety, based on declination criteria (A) and (C): "[T]he service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory," and "the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract."   See 25 U.S.C. §§ 450f(a)(2)(A) & (C).

. . . .

- 27 -

> IHS has determined that NHF has failed to properly administer its current contract and AFA pursuant to the terms of ISDEAA and its own governing documents.  In particular, the NAIHS has determined that the Board of Directors of NHF (Board) has failed to fulfill its fiduciary responsibilities to the hospital.  The resulting waste and/or misuse of contract funds directly affects the ability of NHF to provide satisfactory services to the patients intended to be served by the contract.  Accordingly, the NAIHS has determined that NHF is not able to properly maintain or complete the functions in the proposed contract and AFA.

1st Declaration at 14-15.

101.    As examples of Sage Hospital's misconduct, the 1st Declaration restates the NAIHS Report's and the Moss Adams Report's conclusions.  See 1st Declaration *passim*.

102.    The 1st Declaration also informed Sage Hospital that, given the nature and seriousness of the NAIHS' concerns about Sage Hospital's ability to properly manage federal funds, the NAIHS "does not believe that technical assistance could be provided at this time that would allow [Sage Hospital] to overcome the stated objections in this letter."  1st Declaration at 15.

103.    The 1st Declaration stated, however, that the NAIHS "is willing to provide technical assistance and work with the Navajo Nation with respect to future contracting concerning Sage Memorial Hospital."  1st Declaration at 15-16.

104.    On or about September 29, 2014, Sage Hospital's pharmaceutical supplier in Gallup -- without notifying Sage Hospital and at the NAIHS' direction -- cut off Sage Hospital's pharmaceutical supplies, endangering patient safety and causing Sage Hospital a significant cost increase.  See El-Meligi 1st Decl. ¶ 10, at 7.

105.    Sage Hospital responded to the 1st Declaration with a letter dated October 2, 2014.  See Letter from Stenson D. Wauneka, Chairman, Board of Directors, to John Hubbard, filed November 25, 2014 (Doc. 8-3)("1st Declaration Response").   In the 1st Declaration

Response, Sage Hospital demanded that the NAIHS immediately rescind the 1st Declination for the following reasons:

> First and foremost, your purported Declination of Sage's proposed Amendment No. 1 and Renewal No. 1 ("Renewal") violates 25 C.F.R. § 900.33 and is invalid. The regulations are clear that where the proposed Renewal does not constitute a material and substantial change to the scope or funding of Sage's PFSAs you do not have the authority to base the decision on performance concerns. The [Department of the Interior ("DOI")]/HHS Internal Agency Procedures Handbook specifically states that "[t]he T/TO's performance under the existing contracts shall have no effect on the contract renewal process except as stated in 25 C.F.R. 900.33. (Any alleged grounds the agency may have for terminating the contract must be dealt with under Subpart P - Retrocession and Reassumption procedures . . .)." Because Sage's proposed Annual Funding Agreement for FY 2014 ("2014 AFA") is substantially the same as the one approved for FY 2013, you are required to apply the standard under 25 C.F.R. § 900.32, which answers the question "Can the Secretary decline an Indian . . . tribal organization's proposed successor annual funding agreement?" with an unequivocal "NO." Your refusal to provide Sage technical assistance under these circumstances also violates federal law. <u>See</u> 25 U.S.C. § 450f(b)(2). Your purported Declination violates the Act, your own regulations and internal guidance documents, and the congressional policy underlying the Act, and is invalid.

1st Declination Response at 3.

106. On October 12, 2014, in a press release entitled "HHS Announces Change in Health Care Services for beneficiaries in the Ganado Service Area," the NAIHS announced that it would "change how it is providing health care services to its beneficiaries in the Ganado Service Area who were formerly served by the Navajo Health Foundation -- Sage Memorial Hospital (NHF-SMH)," and that it "no longer provides funding to NHF-SMH for delivery of health care services in Ganado." NAIHS Announces Change in Health Care Services for Beneficiaries in the Ganado Service Area (Oct. 12, 2014) at 19, filed Feb. 5, 2015 (Doc. 36-1)("Press Release").

107. The Press Release also stated that the NAIHS' staff had been working with the Navajo Nation and other NAIHS facilities to review and address the future delivery of health

care services in the Ganado service area, and stated that NAIHS facilities in Chinle, Arizona; Fort Defiance, Arizona; and Gallup, New Mexico could provide healthcare services.  See Press Release at 19.

108.    Although the NAIHS and its staff never told Sage Hospital's patients that Sage Hospital was closing, they did make it known that the hospital would no longer receive ISDEA funding.  See Hubbard Decl. ¶ 14, at 8.

109.    The NAIHS did not tell Ganado-area schools that Sage Hospital was closing.  See Hubbard Decl. ¶ 14, at 8.

### 7.    The 2nd Declination.

110.    The NAIHS communicated its decision to decline the 2014 Renewal and the 2015 AFA in a letter to Sage Hospital dated December 12, 2014.  See Letter from the Department of Health and Human Services to Stenson Wauneka, President of the Board of Directors of the Navajo Health Foundation (Dec. 12, 2014), filed December 22, 2014 (Doc. 17-1)("2nd Declination"); Hubbard Decl. ¶ 16, at 8.

111.    The 2nd Declination explained that the NAIHS would not agree to the 2014 Renewal and 2015 AFA for the same reasons that it declined the 2013 Renewal and 2014 AFA. See 2nd Declination passim.

112.    Similar to the 1st Declination, the NAIHS noted that "it did not believe that technical assistance could be provided at this time that would allow [Sage Hospital] to overcome the objections stated in this letter."  2nd Declination at 11.

113.    The NAIHS added, however, that, "if [Sage Hospital] would like to discuss assistance that it believes NAIHS could provide that would eliminate the reasons for this declination, please call the Area office."  2nd Declination at 12.

- 30 -

114.     Aside from this line in the 2nd Declination, the NAIHS did not offer Sage Hospital any technical assistance from 2007 to the present.[19]  See El-Meligi 1st Decl. ¶ 9, at 7; Razaghi Decl. ¶ 19, at 27-28.

**8.      The 1st and 2nd Declination's Repercussions.**

115.     The NAIHS funds provide approximately fifty-five percent of Sage Hospital's revenues.  See Katigbak 1st Decl. ¶ 10, at 38.

116.     Without a reversal of the 1st Declination, Sage Hospital will lose that revenue, while still performing its full array of healthcare services.  See Katigbak 1st Decl. ¶ 10, at 38.

117.     Because of the 1st Declination, Sage Hospital has to purchase pharmaceutical supplies from commercial vendors rather than from the Gallup Regional Supply Service Center, a low-cost federal supplier.  See El-Meligi 1st Decl. ¶ 14, at 8.

118.     The 1st Declination also forced Sage Hospital to purchase professional liability insurance for its doctors at a cost of approximately $50,000.00 per month rather than relying on the protections of the FTCA at no cost.[20]  See El-Meligi 1st Decl. ¶ 11, at 7.

---

[19]The Defendants contend that the NAIHS "had offered various forms of technical assistance to Sage between 2011 and 2014 . . . ."  Defendants' Opposition to Plaintiff's Motion for Immediate Injunctive Relief (Doc. 17) at 14, filed February 5, 2015 (Doc. 36)("Response"). The Defendants provide no evidence to support this statement, however, and the evidence in the record contradicts it.  First, Razaghi -- who was Sage Hospital's CEO from October, 2007, to September, 2013 -- has stated: "At no time from 2007 through the Declination did IHS . . . suggest that Sage needed IHS' technical assistance or offer any."  Razaghi 1st Decl. ¶ 19, at 27-28.  Second, Christine El-Meligi -- who has been Sage Hospital's CEO since September, 2013, has stated: "At no time from the date I became Sage's CEO through the date of this Declaration did IHS . . . suggest that Sage needed IHS' technical assistance or offer any."  El-Meligi 1st Decl. ¶ 9, at 7.  Although El-Meligi is incorrect that the NAIHS did not offer Sage Hospital any technical assistance whatsoever -- because the NAIHS offered technical assistance in the 2nd Declination -- the Court credits her and Razaghi's statements to the extent that the NAIHS did not offer Sage Hospital any technical assistance until the 2nd Declination.  Furthermore, because (i) the NAIHS did not send the 2nd Declination until December 12, 2014 -- almost three months after the 1st Declination; and (ii) the one line in the 2nd Declination that offers technical assistance put the onus on Sage Hospital to identify what assistance it needed, it is difficult to conclude that the single line was anything more than an empty gesture.

119.    If injunctive relief is not promptly granted, Sage Hospital's approximately 200 employees will likely lose their jobs by December 22, 2015.  See El-Meligi 1st Decl. ¶ 15, at 9.

120.    Cash-flow projections for FY 2014 -- which ends on September 30, 2015 -- indicate that, if the 1st Declination is not reversed, Sage Hospital will be on the brink of insolvency before December 22, 2015.  See Katigbak 1st Decl. ¶ 10, at 38-39.

## PROCEDURAL BACKGROUND

Sage Hospital filed the Complaint on October 23, 2014.  See Doc. 1 ("Complaint").  Sage Hospital filed the First Amended Complaint on November 24, 2014, asserting four causes of action.  See Doc. 5 ("FAC").  First, Sage Hospital contends that the 1st Declination violates 25 U.S.C. § 450f(b)(2), and 25 C.F.R. §§ 900.32 and 900.33.  See FAC ¶ 55, at 23.  Sage Hospital

---

[20]The Defendants assert that this contention "is factually incorrect," pointing to an independent audit report, in which Sage Hospital's auditor noted:

> The Hospital has malpractice coverage to provide protection for professional liability losses on a claims-made basis subject to a limit of $1 million per claim and an annual aggregate limit of $3 million. . .

> Liability protection is also provided under the Federal Tort Claims Act (FTCA) for the Hospital and its employees when they are providing services within the scope of employment included under FQHC activities.

Response at 29 (quoting Sage Hospital's Independent Auditor's Report at 12, filed January 13, 2015 (Doc. 21-11)("Bradshaw Audit"))(omission in Response, but not in Bradshaw Audit).  This passage from the Bradshaw Audit does not contradict Sage Hospital's statement.  That Sage Hospital already has medical malpractice insurance does not mean that losing the FTCA's protections would have no impact on its malpractice insurance needs.  If the FTCA covered Sage Hospital and its employees when they were "providing services within the scope of employment" included under FQHC activities, Sage Hospital likely had the additional malpractice insurance to cover its employees when they were not providing such services.  Bradshaw Audit at 25.  Although Sage Hospital lost its FTCA coverage after the 1st Declination, it has continued to provide "its full array of healthcare services for its Navajo patient population" -- i.e., services that the FTCA previously covered.  Katigbak 1st Decl. ¶ 10, at 38-29.  Accordingly, it stands to reason that Sage Hospital would need to protect itself from the gap in coverage left by losing the FTCA's protections through purchasing additional malpractice insurance.

- 32 -

asks the Court for immediate injunctive relief to: (i) reverse the 1st Declination; (ii) compel Burwell to award and fund the 2013 Renewal and the 2014 AFA; (iii) provide FTCA coverage for Sage Hospital and its employees; (iv) restore Sage Hospital's ability to purchase pharmaceuticals and other supplies from its suppliers; and (v) cease the NAIHS' public disparagement of Sage Hospital.  See FAC ¶¶ 54-56, at 23-24.  Sage Hospital points out that, because the ISDEA provides for both injunctive and mandamus relief to remedy violations of the ISDEA and its implementing regulations, Sage Hospital does not need to prove the traditional equitable grounds for obtaining injunctive relief.  See FAC ¶ 56, at 24.

Sage Hospital argues that, even if it had to demonstrate the traditional equitable grounds for obtaining injunctive relief, those traditional grounds are easily met here.  See FAC ¶ 57, at 24.  Sage Hospital contends that the 1st Declination is causing Sage Hospital immediate and irreparable injury, because it threatens to ruin Sage Hospital's healthcare business, force it to close, and cause it to lose goodwill among its patients.  See FAC ¶ 57A, at 24.  Sage Hospital asserts that it will likely succeed on the merits of its case, because the Defendants clearly violated the ISDEA and its promulgating regulations.  See FAC ¶ 57B, at 24.  Sage Hospital points out that 25 C.F.R. § 900.33 prohibits the NAIHS from declining to the 2013 Renewal based on performance concerns if there were no material and substantial changes to the scope or funding of Sage Hospital's programs and services from the 2010 Contract.  See FAC ¶ 57B, at 24.  Sage Hospital asserts that 25 C.F.R. § 900.32 prohibits IHS from declining the 2014 AFA, because it is substantially the same as the one that the NAIHS approved for FY 2013.  See FAC ¶ 57B, at 24.  Sage Hospital says that the NAIHS' refusal to provide Sage Hospital with technical assistance to address any relevant issues is "concededly in violation of 15 U.S.C. § 450f(b)(2)."  FAC ¶ 57B, at 24.  Sage Hospital argues that the balance of hardships tips in its

favor, because, while an injunction will merely require the Defendants to comply with federal law, the Court's failure to order an injunction will ruin Sage Hospital's business and cause 200 Sage Hospital employees to lose their jobs.  See FAC ¶ 57C, at 24.  Sage Hospital asserts that an injunction will also be in the public interest, because it will allow American Indians to get much-needed and high-quality healthcare at Sage Hospital, rather than obtaining lower-quality healthcare at more distant NAIHS facilities.  See FAC ¶ 57D, at 25.

Second, Sage Hospital contends that the 2nd Declination -- to the extent that the 2014 Renewal and the 2015 AFA are substantially the same as the 2013 Renewal and 2014 AFA, respectively -- violates 25 U.S.C. § 450f(b)(2) and 25 C.F.R. §§ 900.32 and 900.33.  See FAC ¶¶ 59-60, at 25.  Sage Hospital asks the Court for immediate injunctive relief to: (i) reverse the 2nd Declination -- to the extent that the 2014 Renewal and the 2015 AFA are substantially the same as the 2013 Renewal and 2014 AFA, respectively; (ii) compel Burwell to award and fund the 2014 Renewal to the extent that it is substantially the same as the 2013 Renewal; (iii) provide FTCA coverage for Sage Hospital and its employees; (iv) restore Sage Hospital's ability to purchase pharmaceuticals and other supplies from its suppliers; and (v) cease the NAIHS' disparagement of Sage Hospital's business.  See FAC ¶¶ 61, at 25.  Sage Hospital reiterates that, because the ISDEA provides for both injunctive and mandamus relief to remedy violations of the ISDEA and its implementing regulations, it does not need to prove the traditional equitable grounds for obtaining injunctive relief.  See FAC ¶ 61, at 25.  Sage Hospital argues that, even if it had to demonstrate the traditional equitable grounds for obtaining injunctive relief, those grounds are easily met here.  See FAC ¶ 62, at 25-26.  Sage Hospital then reiterates the same arguments that it made for obtaining injunctive relief for the 1st Declination.  See FAC ¶ 62, at 25-26.

Third, Sage Hospital asserts that, because it is entitled to immediate injunctive relief to reverse the 1st Declination and to compel Burwell to award and fund the 2013 Renewal, the Defendants are required to pay Sage Hospital the full amount requested in the 2014 AFA.  See FAC ¶ 64, at 27.  Sage Hospital contends that, under 25 U.S.C. § 450m-1(a), it is entitled to an accounting of funds that the NAIHS provided to Sage Hospital from October 1, 2013, to the date of judgment.  See FAC ¶ 66, at 27.

Fourth, Sage Hospital argues that the NAIHS violated 41 U.S.C. § 7103(f)(3).  See FAC ¶¶ 67-72, at 27-29.  Sage Hospital explains that, on August 25, 2014, it submitted to the NAIHS a Contract Support Costs[21] claim for $62,569,681 ("Claim") under the Contract Disputes Act, 41 U.S.C. §§ 7101, 7103, 7107, and 7109; and under §§ 101(a) and (d) of the ISDEA.  FAC ¶ 68, at 27.  According to Sage Hospital, the Claim specifies, for each fiscal year from 2009 to 2013, the total Contract Support Costs shortfall.  See FAC ¶ 69, at 27-28.  Sage asserts that the NAIHS responded to the Claim by "an inapplicable form letter," dated October 23, 2014, that Dayish signed ("Oct. 23, 2014, Letter").  FAC ¶ 70, at 28.  Sage Hospital contends that the proposed date for deciding the Claim -- October 21, 2015 -- is unreasonable, because the Claim and its exhibits provide all of the information that the NAIHS needs to decide the Claim.  See FAC ¶ 71, at 28.  Sage Hospital argues that, consequently, the Oct. 23, 2014, Letter violates 41 U.S.C. § 7103(f)(3).  See FAC ¶ 71, at 28.  Sage Hospital asks the Court to direct Dayish to issue a

---

[21]The ISDEA requires the United States to pay, among other things, a tribal organization's "contract support costs," which are "reasonable costs" that a federal agency would not have incurred, but which the tribe would incur in managing the program, 28 U.S.C. § 450j-1(a)(2).  "[C]ontract support costs" can include indirect administrative costs, such as special auditing or other financial management costs, 28 U.S.C.  § 450j-1(a)(3)(A)(ii); they can include direct costs, such as workers' compensation insurance, see 28 U.S.C. § 450j-1(a)(3)(A)(i); and certain startup costs, see 28 U.S.C. § 450j-1(a)(5).

decision on the Claim in a specified period of time that the Court finds reasonable.  See FAC

¶ 72, at 29.

      **1.**     **The Motion.**

Sage Hospital filed the Motion on December 22, 2014.  See Motion at 1.  In the Motion,

Sage Hospital requests immediate injunctive relief under the ISDEA to: (i) reverse the 1st

Declination and the 2nd Declination; and (ii) compel Burwell to award and fund the 2013

Renewal and the 2014 and 2015 AFAs.  See Motion at 7.  Sage Hospital argues that the NAIHS

cannot refuse to renew a contract that is substantially the same as its predecessor.  See Motion at

18 (citing 25 C.F.R. § 900.33 ("Are proposals to renew term contracts subject to the declination

criteria?  [HHS] will not review the renewal of a term contract for declination issues where no

material and substantial change to the scope or funding of a program, functions, services, or

activities has been proposed by the . . . tribal organization.")(modifications in Motion, but not

§ 900.33)(emphases omitted)).  Sage Hospital asserts that, similarly, the NAIHS cannot decline a

proposed successor AFA if it is substantially the same as its predecessor:

> Can the Secretary decline an Indian tribe or tribal organization's proposed
> successor annual funding agreement?  No.  If it is substantially the same as the
> prior annual funding agreement . . . and the contract is with DHHS or the BIA, the
> Secretary shall approve and add to the contract the full amount of funds to which
> the contractor is entitled, and may not decline any portion of a successor annual
> funding agreement . . . .

Motion at 19 (quoting 25 C.F.R. § 900.32)(modifications in Motion, but not § 900.32)(internal

quotation marks omitted).

Sage Hospital asserts that, where a proposed AFA or contract renewal is not substantially

the same as its predecessor, the ISDEA sets forth specific "declination criteria" -- i.e., conditions

under which the NAIHS may decline a contract proposal:

[T]he Secretary shall, within ninety days after receipt of the proposal, approve the proposal and award the contract unless the Secretary provides written notification to the applicant that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that --

    **(A)**    the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;

    **(B)**    adequate protection of trust resources is not assured;

    **(C)**    the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;

    **(D)**    the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title; or

    **(E)**    the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor.

Motion at 19-20 (quoting 25 U.S.C. § 450f(a)(2))(internal quotation marks omitted).

According to Sage Hospital, § 450f(a)(2) provides the only permissible grounds for the NAIHS to decline a tribal organization's contract proposal.  See Motion at 20 (citing 25 C.F.R. § 900.22).  Sage Hospital contends that courts do not give any deference to the IHS' declination decisions, and that the NAIHS must prove its declination findings by clear and convincing evidence.  See Motion at 20 (citing 25 U.S.C. § 450f(a)(2)); id. at 24 (citing S. Ute Indian Tribe v. Sebelius, 657 F.3d 1071, 1078 (10th Cir. 2011); Ramah Navajo Sch. Bd., Inc. v. Babbitt, 87 F.3d 1338, 1344 (D.C. Cir. 1996); Shoshone-Bannock Tribes of Fort Hall Reservation v. Shalala, 988 F. Supp. 1306, 1313 (D. Or. 1997)).  Sage Hospital asserts that, if the NAIHS may only properly decline a portion of a contract proposal, it must approve all other severable portions of the proposal.  See Motion at 20-21 (citing 25 C.F.R. § 900.25).  Sage Hospital argues that, even

where the NAIHS may decline a proposal in whole or in part, it "shall . . . provide assistance to the tribal organization to overcome the stated objections."  Motion at 21 (quoting 25 U.S.C. § 450f(b)(2))(omissions in Motion, but not in § 450f(b)(2))(internal quotation marks omitted).

Sage Hospital argues that, because the 2013 Renewal and the 2014 AFA are substantially the same as the 2010 Contract and 2013 AFA, respectively, §§ 900.32 and 900.33 requires the Defendants to approve those proposals.  See Motion at 25-26 (citations omitted).  Sage Hospital asserts that the IHS also violated the ISDEA when it failed to share information that may have helped Sage Hospital avoid the 1st Declination and refused to provide Sage Hospital with any technical assistance to overcome the NAIHS' concerns.  See Motion at 26 (citing 25 U.S.C. § 450f(b)(2); 25 C.F.R. §§ 900.28, 900.30).  Sage Hospital adds, without further explanation, that "[t]he same is true" of the 2014 Renewal and the 2015 AFA to the extent that they are substantially the same as the 2010 Contract and the 2013 AFA.  Motion at 26.

Sage Hospital next addresses the potential remedies available to the Court.  See Motion at 27-30.  Sage Hospital asserts that the ISDEA provides for: (i) money damages typically recoverable in contract actions, including consequential damages; (ii) contract support costs; (iii) injunctive relief; and (iv) "mandamus to compel an officer or employee of the United States . . . to perform a duty provided under [the ISDEA] (including immediate injunctive relief to reverse a declination finding under section 450f(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract)."  Motion at 26-27 (quoting 25 U.S.C. § 450m-1)(alterations in Motion, but not in § 450m-1)(emphases omitted)(internal quotation marks omitted).  Sage Hospital contends that immediate injunctive and mandatory relief is necessary and appropriate in this case.  See Motion at 27 (citing Guidance Endodontics, LLC v. Dentsply Intern., Inc., 633 F. Supp. 2d 1257, 1277 (D.N.M. 2008)(Browning, J.)(explaining that

the loss of goodwill, customers, and future profits; the diminishment of competitive advantage in the market place; and impending bankruptcy are irreparable harms)).

Sage Hospital explains that, without an order compelling the Defendants to reverse the 1st Declination, and to fund the 2013 Renewal and successor AFAs, Sage Hospital will lose approximately fifty-three percent of its revenue and would be on the brink of insolvency in less than a year.  See Motion at 27 (citations omitted).  Sage Hospital says that the Court's failure to act would also lead to the following repercussions: (i) 200 Navajo employees would lose their jobs within eight months; (ii) the Ganado area's struggling economy would go into a tailspin; (iii) Sage Hospital's patients would have to seek medical services at great distances from their homes and schools; and (iv) Sage Hospital would have to purchase pharmaceutical supplies at a higher cost from commercial vendors and purchase medical malpractice insurance for its doctors at a cost of $50,000.00 per month rather than maintaining the FTCA's protections for free.  See Motion at 27-29.

Sage Hospital asserts that, because it is bringing the Motion under § 450m-1(a), rather than rule 65 of the Federal Rules of Civil Procedure, it does not have to satisfy rule 65's factors to obtain equitable relief.  See Motion at 29 (citing Crownpoint Inst. of Tech v. Norton, No. CIV 04-0531 JP/DJS, Findings of Fact and Conclusions of Law at 26, filed Sept. 16, 2005 (D.N.M.)(Parker,  J.)(Doc. 86)("Crownpoint").    Sage Hospital argues that, if the Court determines otherwise, it has wide discretion to determine whether a bond is required for Sage Hospital to obtain a preliminary injunction, and, if so, the amount of any such bond.  See Motion at 30 (citing, e.g., Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)(affirming grant of injunction without bond requirement where there was no proof of likelihood of harm to other party);  Temple Univ. v. White, 941 F.2d 201, 219 (3d Cir.

1991)(affirming grant of injunction without requiring hospital to post bond where hospital served mostly low-income people and would have become insolvent without the relief requested)). Sage Hospital argues that the United States "has ample ways of recouping any money not properly devoted to patient care," a factor which, in Sage Hospital's view, militates against requiring a bond.  Motion at 30.

### 2.    The Response.

The Defendants responded to the Motion on February 5, 2015.  See Defendants' Opposition to Plaintiff's Motion for Immediate Injunctive Relief (Doc. 17), filed February 5, 2015 (Doc. 36)("Response").  The Defendants say that the cases on which Sage Hospital relies are distinguishable and do not support Sage Hospital's contention that "the Court should not reach the merits of NAIHS's declination decision."  Response at 18.  The Defendants point out that, in Crownpoint, the Honorable James A. Parker, Senior United States District Judge for the District of New Mexico, held that the Bureau of Indian Affairs failed to issue its declination within the ISDEA's prescribed timeframe.  See Response at 18.  The Defendants argue that, unlike in that case, "there can be no question that NAIHS acted within the statutorily-allowed time frame . . . and applied the proper criteria to decline Sage's proposal . . . ."  Response at 18. The Defendants assert that, unlike in Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d 1059 (D.S.D. 2007), where the Secretary of the Interior violated the ISDEA by failing to articulate the findings that supported his declination decision, the NAIHS gave a detailed explanation of its reasons for denying the 2013 Renewal and 2014 AFA.  See Response at 19.

The Defendants contend that

[t]he other case relied upon by Sage, Southern Ute Indian Tribe v. Sebelius, 497 F. Supp. 1245 (D.N.M. 2007), involves [contract support costs ("CSC")].  Sage has presented Contract Disputes Act claims to NAIHS alleging CSC underpayments for prior-year ISDEAA agreements, which claims are the subject

- 40 -

of a separate motion for summary judgment, to which defendants will file a separate response. Furthermore, the <u>Southern Ute Indian Tribe</u> decision addresses the Secretary's discretion to decline a tribe's proposal for a self-determination contract pursuant to 25 U.S.C. § 450f(a)(2)(D), a statutory ground that was not relied upon in NAIHS's declination decision and is not at issue here. This provision allows the Secretary to decline a proposal if "the amount of funds are in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title." In <u>Southern Ute Indian Tribe</u>, the Secretary argued that the amount of funds proposed by the tribe was in excess of the funding level because it included CSC when Congress had not appropriated sufficient funds for CSC for the fiscal year in which the contract was proposed. The district court rejected the Secretary's argument that it was prohibited from entering into the contract by the Appropriations Clause of the United States Constitution and the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A) and (B).

Response at 19-20 (citations omitted).

The Defendants assert that Sage Hospital can obtain injunctive relief only if it can prove: (i) the likelihood of success on the merits; (ii) the likelihood of irreparable harm; (iii) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor; and (iv) an injunction is in the public interest. <u>See</u> Response at 17 (citing <u>Wyandotte Nation v. Sebelius</u>, 443 F.3d 1247, 1254-55 (10th Cir. 2006)). The Defendants argue that Sage Hospital has not established these elements. <u>See</u> Response at 17.

The Defendants assert that the United States Court of Appeals for the Tenth Circuit has identified three disfavored preliminary injunctions: (i) those that "alter the status quo"; (ii) mandatory preliminary injunctions; and (iii) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. Response at 17 (quoting <u>Schrier, M.D. v. Univ. of Colo.</u>, 427 F.3d 1253, 1258-59 (10th Cir. 2004))(internal quotation marks omitted). The Defendants argue that Sage Hospital seeks a mandatory preliminary injunction that would "disturb the status quo ante," because the NAIHS has been funding the hospital's operations "through monthly contract modifications based on the FY 2013 AFA, which in fact expired . . . on September 30, 2014." Response at 17-18. The Defendants

assert that the relief that the Motion seeks is disfavored, because it would afford Sage Hospital "substantially all the relief it seeks and would render a trial on the merits largely or completely meaningless."  Response at 18.

The Defendants argue that Sage Hospital has not demonstrated a likelihood of success on the merits.  See Response at 20.  The Defendants assert that the ISDEA's plain language requires the NAIHS to approve contract proposals from tribal organizations unless they fall within one of § 450f(a)(2)'s declination criteria.  See Response at 21.  The Defendants contend that they had legitimate reasons for declining the 2013 Renewal under 25 U.S.C. §§ 450f(a)(2)(A) & (C).  See Response at 22.  The Defendants point out that, as evidenced by the NAIHS Report and the Moss Adams Report, the Board "failed to fulfill its fiduciary responsibilities to the hospital, and this led to serious issues with hospital operations that impeded satisfactory health care services." Response at 22.

The Defendants contend that § 900.33 did not prevent them from applying § 450f(a)(2)'s declination criteria to the 2013 Renewal, because there was a material and substantial change in the scope or funding of Sage Hospital's PFSAs.  See Response at 21-22.  The Defendants assert that the NAIHS Report and the Moss Adams Report put the NAIHS on notice that Sage Hospital did not have a financial management system or the necessary internal controls in place to ensure that its ISDEA funds would be used only for lawful purposes.  See Response at 22.  The Defendants contend that, because the NAIHS was previously unaware of this information, the PFSAs in the 2013 Renewal "were not the same as they were previously viewed by NAIHS." Response at 22.

The Defendants argue that, because the 2014 AFA and the 2015 AFA were not substantially the same as the 2013 AFA, § 900.32 did not preclude them from applying

§ 450f(a)(2)'s declination criteria to those proposals.  See Response at 23-24.  The Defendants

argue that the NAIHS may decline an AFA as not being "substantially the same" as its

predecessor "when there is information that was not known to the [HHS] Secretary that rendered

the successor proposal not the same as it was previously viewed by the [HHS] Secretary."

Response at 24.  The Defendants argue that the HHS Secretary articulated this interpretation in

the final agency decision in Mashantucket Pequot Tribal Nation v. IHS, DHHS Departmental

Appeals Board, Appellate Division, No. A-06-60, Decision No. 2028, 2006 WL 1337419 (May

3, 2006)("Pequot").  Response at 25.

        According to the Defendants, in Pequot, § 900.32 "was implicated regarding language

that had existed in a prior contract between the Pequot Nation and IHS, but had taken on new

meaning in light of an intervening report conducted by the DHHS Office of the Inspector

General."  Response at 25.  The Defendants assert that the report led the IHS to decline the

Pequot Nation's contract proposal to provide pharmacy services to its employees who were not

members of the tribe.  See Response at 25.  According to the Defendants, the HHS Departmental

Appeals Board ("DAB") determined that the proposal was not a successor AFA under § 900.32,

noting that the HHS Office of the Inspector General ("OIG") had issued a report questioning the

inclusion of these services in Pequot Nation's ISDEA contract.  Response at 25.  The Defendants

say that the DAB held that the OIG report "rendered the successor AFA not the same as it was

previously viewed by the IHS."  Response at 25 (citation omitted)(internal quotation marks

omitted).  The Defendants add that the HHS Secretary's interpretation of HHS regulations is

controlling "unless plainly erroneous or inconsistent with the regulation."  Response at 25 (citing

Auer v. Robbins, 519 U.S. 452, 466 (1997)).

The Defendants contend that whether a proposed AFA is substantially similar to its predecessor does not turn on whether it is for the same amount, but instead on "whether the proposals are alike in substance."  Response at 25.  The Defendants argue that, just as the HHS Office of Inspector General report led the IHS to decline the Pequot Nation's successor AFA as "not substantially the same" as its predecessor, the Moss Adams Report and the NAIHS Report properly led the NAIHS to decline Sage Hospital's 2014 AFA and 2015 AFA as "not substantially the same" as the 2013 AFA in this case.  Response at 26 (internal quotation marks omitted).

The Defendants assert that the Moss Adams Report "disclosed serious deficiencies in the Board's governance over the ISDEAA funds and its seeming relinquishment of control of ISDEAA funds to a contracted management company."  Response at 26.  The Defendants argue that the NAIHS Report revealed, among other things, that Sage Hospital "does not have a functioning electronic health records system and the existence of numerous potential health and safety violations that impeded satisfactory health care services."  Response at 26.  In the Defendants' view, because the NAIHS was previously unaware of this information, it rendered the 2014 AFA and 2015 AFA "not substantially the same" as the 2013 AFA.  Response at 26.

The Defendants contend that the NAIHS' failure to offer Sage Hospital technical assistance did not invalidate its declination decisions.  See Response at 27.  According to the Defendants, the ISDEA provides that, when the HHS Secretary declines a proposed contract, he or she must state any objections in writing to the tribal organization and "provide assistance to the tribal organization to overcome the stated objections."  Response at 27 (quoting 25 U.S.C. § 450f(b)(2))(internal quotation marks omitted).  The Defendants argue, however, that "[n]o amount of technical assistance could have overcome the fact that the current Sage Board of

Directors breached its duties of fiduciary responsibilities and accountability to the hospital and effectively relinquished its oversight responsibility to a contracted management company." Response at 27.  The Defendants contend that the ISDEA does not require the NAIHS to engage in "exercises of futility."  Response at 27.  The ISDEA adds that Sage Hospital has not identified what information the NAIHS failed to share or how that information would have helped Sage Hospital avoid the declination.  See Response at 26.

The Defendants contend that Sage Hospital has failed to demonstrate irreparable injury. See Response at 28.  The Defendants assert that Sage Hospital waited for months before bringing this action for injunctive relief, and "'delay in seeking preliminary relief cuts against finding irreparable injury.'"  Response at 28 (quoting Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs., 31 F.3d 1536, 1543-44 (10th Cir. 1994)).  The Defendants point out that, after the 1st Declination, Sage Hospital sent a notice to the community, expressly stating that it was not in danger of closing and that it would continue to provide healthcare services.  See Response at 28. The Defendants assert that Sage Hospital does not contend that it is in any danger of imminent closure and has presented no evidence that it would have to close before the case could be heard on its merits.  See Response at 28.  The Defendants note that, even in the absence of ISDEA funding, the federal government reimburses Sage Hospital as a Critical Access Hospital under Medicare and Medicaid.  See Response at 28.

The Defendants contend that Sage Hospital has presented no evidence that the Court's failure to order injunctive relief would require Sage Hospital to obtain pharmaceutical supplies from commercial vendors.  See Response at 29.  The Defendants say that, moreover, "whatever may have been the immediate effect of the termination of [Sage Hospital's] federal supply contract as of October 1, 2014, any such alleged harm is in the past and presumably has been

- 45 -

ameliorated with the passage of time." Response at 29. The Defendants argue that Sage

Hospital's contention that the declinations forced it to purchase malpractice insurance at a cost of

$50,000.00 per month "is factually incorrect." Response at 29. The Defendants explain that, in

an audit report for FY 2012 and FY 2013, Sage Hospital's auditor stated the following in the

notes to the financial statements:

> Medical Malpractice Claims
>
> The Hospital has malpractice coverage to provide protection for
> professional liability losses on a claims-made basis subject to a limit of $1 million
> per claim and an annual aggregate limit of $3 million.
>
> Liability protection is also provided under the Federal Tort Claims Act
> (FTCA) for the Hospital and its employees when they are providing services
> within the scope of employment included under [Federally Qualified Health
> Center ("FQHC")] activities.

Response at 29 (citation omitted). The Defendants argue that, accordingly, Sage Hospital's own

audited financial statements belie its assertions. See Response at 29.

The Defendants contend that Sage Hospital's argument that forcing Sage Hospital's

patients to seek medical services at great distances from their homes and schools similarly does

not establish irreparable harm, because only third parties -- i.e., Sage Hospital's patients -- would

suffer. See Response at 30 (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).

The Defendants note that, in FY 2014, Ganado-area IHS beneficiaries went to IHS hospitals in

Fort Defiance, Arizona; Chinle, Arizona; and Gallup, New Mexico, for outpatient care at almost

twice the rate as they went to Sage Hospital. See Response at 30. The Defendants argue that,

although the hospitals in Chinle, Gallup, and Fort Defiance are not as close to the Ganado-area

beneficiaries as Sage Hospital, they offer health services and medical specialties that are more

comprehensive than those that Sage Hospital offers. See Response at 30.

The Defendants assert that the balance of hardships weighs against granting the injunction.  See Response at 30.  The Defendants argue that Sage Hospital has more than sufficient cash reserves of approximately $15,878,00.00 to continue operations as a private hospital during the time that it will take to litigate this case.  See Response at 31.  The Defendants reiterate that Sage Hospital has not shown that there are any exigent circumstances -- such as the imminent closure of the hospital -- to justify issuing a preliminary injunction.  See Response at 31.  The Defendants say that, on the other hand, granting the injunction would force the NAIHS into signing a contract when its findings show that Sage Hospital lacks the internal controls and financial management systems to ensure that ISDEA funds would be used only for lawful purposes.  See Response at 31.  The Defendants contend that, consequently, the balance of harms actually weighs against granting the injunction.  See Response at 31.

The Defendants argue that the public interest will not be served by allowing Sage to "potentially continue its waste and/or abuse of ISDEAA funds."  Response at 31.  The Defendants argue that, when the IHS determines that spending has become "possibly unlawful and improper," it has a responsibility to rectify the situation.  Response at 31.  The Defendants contend that, "[i]n that regard, Sage should not be relieved of the obligation to provide a bond or other security as a condition of obtaining the requested injunction under Fed. R. Civ. P. 65."  Response at 31.  The Defendants assert that, because Sage Hospital is seeking a lump sum payment of "tens of millions in federal funds" pending the resolution of this case on the merits, "a security or bond is warranted to ensure that these funds are preserved to provide health care services to IHS beneficiaries and not diverted for improper bonuses and excessive compensation due to the lack of adequate financial controls and financial management procedures in place at Sage."  Response at 32.

3.      **The Reply**.

Sage Hospital replied to the Response on February 11, 2015.  See Plaintiff's Reply to

Defendants' Opposition to Plaintiff's Motion for Immediate Injunctive Relief, filed February 11,

2015 (Doc. 41)("Reply").  In the Reply, Sage Hospital reiterates its arguments from the Motion -

- namely, that § 900.33 prevented the NAIHS from rejecting the 2013 Renewal, because it was

substantially the same as its predecessor; and that § 900.32 prevented the NAIHS from rejecting

the 2014 AFA, because it was substantially the same as its predecessor.  See Reply at 6-7.  Sage

Hospital asserts that, although the applicable regulations are unequivocal and clear, the IHS

seeks to avoid their application by arguing that contract renewal proposals and AFAs are not

"substantially the same" if "information was not known to the Secretary that rendered the

successor proposal not the same as it was previously viewed by the Secretary."   Reply at 7

(quoting Response at 24).  Sage Hospital asserts that the NAIHS relies on only one unpublished

administrative decision -- Pequot -- to support its argument.  See Reply at 10.

Sage Hospital argues that Pequot does not support the NAIHS' position for the following

reasons:

> The excerpts from Pequot attached to IHS' Opposition show that (1) the tribal
> organization in that case sought to contract for services (sales of pharmaceuticals
> to non-Indians employed at the Foxwood casino) that the Secretary was not
> authorized to administer for the benefit of Indians under the ISDEAA, (2) the
> decision was based on the dispositive fact that the tribal governing body did not
> comply with a provision of a different act of Congress to make a
> contemporaneous determination that there were no alternative services available
> to these non-Indians, (3) no reasonable person could have come to the conclusion
> that alternative services were unavailable for the non-Indians, in any event, and
> (4) under those facts, 25 C.F.R. § 900.32 could not supply an independent basis
> for requiring the Secretary to approve that particular portion of the AFA because
> the Secretary had not proposed to reduce the proposed funding amounts for the
> successor year.  Contrary to Pequot, the Navajo Nation Council has violated no
> statutory (or other) duty, the Sage PFSAs are all properly contractible under the
> ISDEAA, and IHS' declination in this case would reduce the funding amount, to
> zero.

Reply at 11 (emphasis in original).

Sage Hospital asserts that, even if §§ 900.32 or 900.33 were ambiguous, courts must strictly construe all ISDEA regulations in favor of tribal organizations like Sage Hospital. See Reply at 11 (citing Salazar v. Ramah Navajo Chapter, 132 S. Ct. 2181, 2194 (2012)(stating that ISDEA "is construed in favor of tribes"); 25 C.F.R. § 900.3(a)(5)("[E]ach provision of the Act and each provision of contracts entered into thereunder shall be liberally construed for the benefit of . . . tribal organizations." (alterations in Reply but not § 900.3(a)(5))). Sage Hospital contends that this rule trumps any agency deference, regardless whether the agency's position is developed through litigation, as it was in this case. See Reply at 11 (citing S. Ute Indian Tribe v. Sebelius, 657 F.3d at 1078; Ramah Navajo Sch. Bd., Inc. v. Babbitt, 87 F.3d at 1344). Sage Hospital argues that the contracting procedures that the departments charged with implementing the ISDEA -- i.e., the DOI and the HHS -- developed also support Sage Hospital's position. See Reply at 12 (citing Internal Agency Procedures Handbook for Non-Construction Contracting Under Title I of the Indian Self-Determination and Education Assistance Act at 3-4, filed February 11, 2015 (Doc. 41-5)("Handbook")(stating that a tribe or tribal organization's "performance under the existing contract shall have no effect on the contract renewal process except as stated in 25 C.F.R. § 900.33 . . . ." (emphasis omitted))).

Sage Hospital argues that an ISDEA proposal is "a physical document or set of documents submitted by a tribal organization to IHS, not some brooding omnipresence or evolving performance assessment by IHS." Reply at 12 (citing 25 U.S.C. § 450f(a)(2) ("[A] tribal organization may submit a proposal to . . . renew a self-determination contract, to the Secretary for review." (alterations in Reply, but not in § 450f(a)(2))); 25 C.F.R. § 900.8 (specifying contents of initial contract proposal); 25 C.F.R. § 900.9 (prohibiting the Secretary

from requiring a tribal organization to submit any other information beyond that identified in § 900.8); 25 C.F.R. § 900.12 (specifying the proposal content requirements for renewal of a contract or a successor AFA)).

Sage Hospital explains that the IHS is not powerless to take action if it determines that a tribal organization is misusing federal funds.  See Reply at 13.  According to Sage Hospital, if a tribal organization's performance under an ISDEA contract

> involves (1) the violation of the rights or endangerment of the health, safety, or welfare of any persons; or (2) gross negligence or mismanagement in the handling or use of funds provided to the tribal organization pursuant to such contract or grant agreement, or in the management of trust fund, trust lands or interests in such lands pursuant to such contract, . . . [the] Secretary may, under regulations prescribed by him and after providing notice and a hearing on the record to such tribal organization, rescind such contract . . . in whole or in part, and assume or resume control or operation of the program, activity, or service involved if he determines that the tribal organization has not taken corrective action as prescribed by the Secretary . . . .

Reply at 13 (quoting 25 U.S.C. § 450m)(alterations in Reply but not § 450m).  Sage Hospital asserts that the IHS sidestepped the procedural safeguards in the ISDEA to which Sage Hospital is entitled, including: (i) advance notification of alleged deficiencies in contract performance; (ii) a forty-five-day period for the tribal organization to address any alleged deficiencies; (iii) mandatory technical assistance from the NAIHS; (iv) a second written notice from the NAIHS if the deficiencies are not remedied; (v) a hearing on the record if the tribal organization disagrees with the Secretary's findings; and (vi) "windup" cost reimbursement to the tribal organization if the tribal organization ultimately loses.  Reply at 14 (citing 25 U.S.C. § 450m; 25 C.F.R. §§ 900.248-.254).

Sage Hospital contends that the Defendants' argument on why the Court should deny injunctive relief "proceeds from two principal misunderstandings."  Reply at 14.  First, Sage Hospital says that it is not seeking a traditional preliminary injunction, but instead requests

immediate injunctive relief under § 450m-1(a).  See Reply at 14.  Sage Hospital explains that, if it prevails on the Motion, there will be no trial on the merits, because the merits will have been finally determined for its first three claims for relief.  See Reply at 14.  Second, Sage Hospital argues that the Defendants overlook that the Congress of the United States of America "clearly sought to guide the district courts' discretion" by expressly providing for immediate injunctive relief in the ISDEA, rendering the typical standards for the issuance of preliminary injunctions inapplicable.  Reply at 14 (citations omitted).

Sage Hospital next attacks the findings on which the NAIHS relied in issuing the 1st Declination.  See Reply at 16.   Sage Hospital says that one of the 1st Declination's findings was that Sage Hospital had eliminated services since its first contract was awarded in 2003.  See Reply at 16 (citing Response at 4).  Sage Hospital asserts that, to the extent that this statement is true, it is irrelevant to whether Sage Hospital has properly performed the PFSAs listed in the 2010 Contract that Sage Hospital proposed to continue to perform in the 2013 Renewal.  See Reply at 16.  Sage Hospital explains that, before 2007, it had to terminate its general surgery and obstetric care departments for lack of adequate facilities or qualified staff.  See Reply at 16. Sage Hospital says that its agreements with the IHS through 2008 required Sage Hospital to perform only "contract health services," and "dispensing pharmaceutical drugs and medical supplies."  Reply at 17.  Sage Hospital asserts that, after settling its litigation against the NAIHS in 2009, it agreed to perform a wide range of PFSAs in a 2009 agreement and has performed those PFSAs ever since.  See Reply at 17.  According to Sage Hospital, the NAIHS has never asserted otherwise.  See Reply at 17.

Sage Hospital contends that the 1st Declination improperly relies on the NAIHS Report's conclusion that, in FY 2014, the Board "failed to comply with I.H.S. Grant Management

requirements for Special Diabetes Program Initiative funding resulting in a lost revenue opportunity."   Reply at 17 (quoting NAIHS Report at 16)(internal quotation marks omitted). Sage Hospital asserts, without further explanation, that this finding is "similarly irrelevant and, in any event, false."   Reply at 17 (citing Declaration of Christi El-Meligi ¶ 3, at 2, filed February 11, 2015 (Doc. 41-4)("El-Meligi 2nd Decl."); Notice of Award (Nov. 13, 2014), filed February 11, 2015 (Doc. 41-4)(noting that the IHS awarded Sage Hospital a grant for the "Special Diabetes Program for Indians")).

Sage Hospital argues that the 1st Declination's other findings concern potential Occupational Safety and Health Administration ("OSHA") violations, supposed violations of Sage Hospital's own policies -- including Board members' self-dealing, payments to or for the benefit of Razaghi under his contracts with the Board, and concerns about Sage Hospital's internal controls. Reply at 17.  Sage Hospital asserts:

> Reliance on the Moss Adams report was and is flawed.  Its cover letter to Defendant Dayish dated July 25, 2014 states that "[w]e were not engaged to, and did not conduct an audit or examination, the objective of which would be the expression of an opinion on the records, controls, and activities of [Sage]. Accordingly, we do not express such an opinion."  Consequently, Moss Adams is said by IHS to have "uncovered numerous concerns."  Moss Adams' observations are qualified by such words as "apparently," it disclaimed any ability to verify whether the Board properly approved certain payments, and it attributed its inability to determine various matters on the false claim that Sage did not provide requested documents.  Even IHS concludes by saying that Sage expenditures have "become <u>possibly</u> unlawful and improper."

Reply at 17-18 (citations omitted)(emphasis in Reply).

Sage Hospital asserts that these concerns are irrelevant to this case.  <u>See</u> Reply at 18. Sage Hospital says that, consistent with the ISDEA, the 2010 Contract provides that, "'[e]xcept as specifically provided in the [ISDEA], Sage is not required to abide by guidelines, manuals, or policy directives of the Secretary . . . .'"   Reply at 18 (quoting 2010 Contract at 18-

19)(alterations in Reply but not in 2010 Contract)(citing Handbook at 3-4 (stating that a tribal organization's performance of a contract shall have "no effect" on the contract renewal process)). Sage Hospital asserts that the HHS Secretary "has no lawful power to oversee the internal governance of any tribal organization and unilaterally sever the contractual relationship if she disapproves of the manner in which the organization chooses to carry out its PFSAs."  Reply at 18.  Sage Hospital asserts that "[w]hat is missing from IHS' and Moss Adams' concerns" is any recognition that Sage Hospital's overhead, which includes Board stipends and payment to Razaghi Healthcare and its related companies, has decreased steadily over the years in both percentage -- "from 41.9% to 24.5%" -- and absolute -- from $9 million per year to $8 million per year -- terms, even as total revenues have almost doubled.  Reply at 16.

### 4.    The Hearing.

On February 12, 2015, the Court held a hearing on the Motion.  See Transcript of Motion Proceedings Before the Honorable James O. Browning, United States District Judge, Albuquerque, Bernalillo County, New Mexico, commencing on February 12, 2015, filed February 27, 2015 (Doc. 49)("Tr.").  Sage Hospital took the floor first, reiterating many of its arguments from the briefing and clarifying a few points in response to the Court's questions.  See Tr. at 4:14-32:8 (Frye, Court).   The Court asked Sage Hospital how it would reconcile § 450f(a)(2) -- which gives the NAIHS five permissible grounds to decline a contract proposal -- with § 900.33 -- which says that the NAIHS must approve a renewal proposal unless there is a material and substantial change to the scope or funding of the contractor's PFSAs.  See Tr. at 21:15-18 (Court).  The Court asked why the agency would narrow its own discretion by enacting § 900.33.  See Tr. at 6:22-7:1 (Court); id. at 22:4-5 (Court).  Sage Hospital responded that § 900.33 was enacted for two reasons.  See Tr. at 7:2-8:12 (Frye).  First, Sage Hospital explained

that, in 1988, Congress "beefed up" the procedural protections for tribal organizations that contracted with the federal government, because it found a history of federal agencies being unwilling to "contract away their jobs and resources" to tribal organizations.  Tr. at 7:2-8 (Frye).  Second, Sage Hospital said that the IHS also has separate contract "rescission procedures," which allow the IHS to rescind a contract in a number of situations, including when the tribal organization has demonstrated gross negligence in administering federal funds.  Tr. at 7:16-8:12 (Frye)(citing 25 U.S.C. § 450m).

The Court asked Sage Hospital to explain the rescission process and how it differs from the declination process.  See Tr. at 11:10-12 (Court).  Sage Hospital said:

> [T]he rescission process has its own criteria . . . .  [T]he regulations require the initial notice, the 45-day period to cure, the mandatory technical assistance.  The second notification from the Secretary if the Secretary deems those problems not to have been fixed.
>
> And then even after that, if the tribe disagrees, there is a notice and formal hearing within 30 days of receipt of that second notice from the Secretary.  "The contract will not be rescinded by the Secretary before the issuance of a final decision in any administrative hearing or appeal."
>
> And the footnote to that is the contractor -- even if there are . . . valid grounds for a rescission -- can pick up its windup costs incurred after the effective date of the rescission, under [§ 900].254.  So that's the organized way to do this.

Tr. at 11:13-12:14 (Frye).

The Court asked Sage Hospital whether it could explain why Moss Adams had such a hard time obtaining documents from Sage Hospital throughout the auditing process.  See Tr. at 12:23-25 (Court).  Sage Hospital responded that it gave Moss Adams access to every document that an auditor would want to examine and only refused to provide documents that were more than three years old, because the NAIHS had no legal authority to ask for them.  See Tr. at 13:5-9 (Frye).  The Court expressed skepticism, pointing to the multiple entries in the Moss Adams

Report that noted Sage Hospital's failure to respond to a variety of document requests.  See Tr. at 14:13-17.  Sage Hospital replied that Moss Adams was sloppy, "and they just overlooked what we did give them."  Tr. at 14:18-19 (Frye).

When asked about the $1.8 million bonus to Razaghi Healthcare, Sage Hospital explained that, before it hired Razaghi Healthcare, it employed a person who was doing the work of a contract management company at the rate of $300.00 an hour.  See Tr. at 15:15-19 (Frye).  Sage Hospital said that, when Razaghi Healthcare took over the hospital, it offered to receive only $140.00 an hour for a five-year period in exchange for a $1.8 million bonus if the turnaround effort was successful -- for a total sum that was slightly less than $300.00 an hour.  See Tr. at 15:19-16:6 (Frye).  According to Sage Hospital, this payment structure meant that Razaghi Healthcare bore some of the risk that the turnaround effort would not succeed.  See Tr. at 16:6-10 (Frye).

The Court asked Sage Hospital if, assuming § 900.33 did not circumscribe the NAIHS' declination authority, the NAIHS could decline the 2013 Renewal under § 450f(a)(2)(C), which says that "[t]he Secretary provides written notification to the applicant that contains specific finding that clearly demonstrates that, or that is supported by controlling legal authority that adequate protection of trust resources is not assured."  Tr. at 22:16-23:6 (Court)(quoting 25 U.S.C. § 450f(a)(2)(C))(internal quotation marks omitted).  Sage Hospital replied, without further explanation, that § 450f(a)(2)(C) is referring to resources held in trust by the United States rather than money that comes from the NAIHS directly, so it does not apply here.  See Tr. at 23:8-12 (Frye).  The Court asked whether the NAIHS could decline the 2013 Renewal under § 450f(a)(2)(A), which says that "the service to be rendered to the Indian beneficiaries of a particular program or function to be contracted will not be satisfactory."  Tr. at 23:13-16

(Court)(quoting 25 U.S.C. § 450f(a)(2)(A))(internal quotation marks omitted).  Sage Hospital responded that § 450f(a)(2)(A) is also inapplicable, because Sage Hospital has performed its PFSAs satisfactorily, as its certifications from multiple state and federal agencies demonstrate. See Tr. at 23:17-24:2 (Frye).  Sage Hospital said that the NAIHS' concerns about Sage Hospital's "financial irregularities," and not its ability to provide quality medical care to its patients, drove the declination decisions.  Tr. at 24:3-9 (Court, Frye).

The Court asked Sage Hospital whether any other courts have ordered the United States to award a tribal organization a three-year contract under the ISDEA.  See Tr. at 30:8-15 (Court). Sage Hospital said that several courts have done so, citing Crownpoint and Seneca Nation of Indians v. Department of Health and Human Services., 945 F. Supp. 2d 135 (D.D.C. 2013), as examples.  See Tr. at 30:16-31:4 (Frye).  Sage Hospital added that, if the Defendants still want to rescind their contract with Sage Hospital after the Court orders an injunction, they have to use the rescission process to do so.  See Tr. at 31:17-22 (Court, Frye).

The following exchange then occurred between Sage Hospital and the Court:

THE COURT:      The word "injunction" in the statute that you're relying heavily on, it seems to me it imports what federal judges do as far as issuing injunctions.  And you're making a sharp distinction between preliminary injunctions and final injunctions and saying I don't need to worry about the criteria for a preliminary injunction; is that fair?

MR. FRYE:       Not quite.  I'm not making any distinction about the application of the public interest and the --

THE COURT:      Likelihood of success on the merits, and those sorts of things.

MR. FRYE:       Right.  We have to show an entitlement to relief on the merits in order to get the injunction we're seeking now. But the other things don't depend on whether it's characterized as a preliminary or permanent injunction,

- 56 -

because it's the statute that provides for the injunctive
relief.

Tr. at 32:19-33:11 (Court, Frye).  The Court noted that it seemed odd to order relief without a

trial, to which Sage Hospital replied that the Motion is not about the merits of the 1st Declination

or the 2nd Declination, but instead about the NAIHS' authority to issue those declinations under

these circumstances.  See Tr. at 34:16-35:5 (Court, Frye).  Sage Hospital said that, in other

words, this case turns on a legal dispute, and not a factual one.  See Tr. at 35:3-35:13 (Frye).

The Defendants began their response by reiterating many of the arguments from their

briefs -- namely, that the NAIHS Report's and the Moss Adams Report's conclusions

demonstrated that the 2013 Renewal and 2014 AFA were not "substantially the same" as their

predecessors.  Tr. at 40:18-24 (Belgrove).  The Court asked the Defendants whether a tribal

organization's financial irregularities would affect "the scope or funding" of the tribal

organization's PFSAs.  Tr. at 41:9-13 (Court)(quoting 25 C.F.R. § 900.33)(internal quotation

marks omitted).  The Defendants replied that those irregularities would change the PFSAs'

scope.  See Tr. at 41:14 (Belgrove).  The Defendants added that, more than just financial

irregularities, the 1st Declination talks about how Sage Hospital did not fulfill its fiduciary duties

and did not properly administer its contract with the NAIHS.  See Tr. at 48:7-10 (Belgrove).  The

Defendants explained that, in other words, the NAIHS "thought that the Board was properly

overseeing the functions of the different executives of the hospital, and that there was

accountability . . . there were internal controls.  And that's what the difference is.  That's the

PFSA that materially changed."  Tr. at 48:11-17 (Belgrove).

Turning to § 450f(a)(2)'s declination criteria, the Court asked the Defendants to point to

any findings in the Moss Adams Report or the NAIHS Report, which demonstrate that "'the

service to be rendered to the Indian beneficiaries of the particular program or function to be

contracted will not be satisfactory.'"    Tr. at 48:18-49:5 (Court)(quoting 25 U.S.C. § 450f(a)(2)(A)).  The Defendants responded that "it's not necessarily [Sage Hospital's] medical care," pointing out that the 1st Declination mentions: (i) OSHA safety violations; (ii) the lack of a functioning electronic medical records system; and (iii) an inference that Sage Hospital's waste and misuse of federal funds would affect its ability to provide satisfactory services to its patients.  Tr. at 49:6-19 (Belgrove).  The Defendants noted that Sage Hospital had also "cut out surgery, cardiologists, podiatrists" and "weren't performing traditional medicine" -- which were all services that Sage Hospital had agreed to perform in its ISDEA contract.  Tr. at 49:19-24 (Belgrove); see id. at 52:15-55:13 (Belgrove).  The Court asked whether Sage Hospital had made those cuts recently, pointing out that Sage Hospital said that it had cut those programs before 2007.  See Tr. at 49:25-50:3 (Court).  The Defendants replied: "I don't know if there is anything in the record that shows that's the case."  Tr. at 50:4-6 (Belgrove).

The Defendants argue that the cases that Sage Hospital cites in support of its request for immediate injunctive relief are inapposite.  See Tr. at 55:14-17 (Belgrove).  According to the Defendants, those cases involved declination letters that were either not issued within the requisite ninety-day period or contained no detailed declination findings.  See Tr. 55:14-24 (Belgrove).  The Defendants said that, in this case, because there are specific and detailed declination findings, the NAIHS should be permitted to demonstrate the merits of its declination decisions.  See Tr. at 55:25-26:5 (Belgrove).

The Defendants then explained their decision to use § 450f(a)(2)'s declination procedure rather than § 450m's rescission procedure:

> Under the statute and regulations, the Secretary has a 90-day period in which to approve or decline a contract proposal or AFA.  If nothing is done in that period, then it's deemed approved.

> In this instance, after review of all the records and extensive findings of Moss Adams and the performance monitoring review, the Indian Health Service was in that final 90-day period. And so, basically, the decision had to be made to either approve or decline the proposal. It would have been a waste of resources to award a proposal, when the Indian Health Services had knowledge and was on notice of grounds on which it should have been declined. And the contracting officer has a duty of good faith. It would have been bad faith to award the contract, and then immediately implement rescission procedures.

Tr. at 57:17-58:8 (Belgrove). The Defendants then reiterated their arguments from the Response regarding the Pequot decision -- i.e., where the IHS receives an intervening report indicating that the services in the successor AFA would be unlawful, the successor AFA is not "substantially the same" as the prior AFAs under § 900.32. Tr. at 60:5-62:9 (Court, Belgrove). The Court expressed some skepticism about deferring to the Burwell's interpretation of HHS regulations, pointing out that there is an ongoing debate among the justices of the Supreme Court of the United States about the issue. See Tr. at 61:8-20 (Court).

When Sage Hospital took the podium for its rebuttal, the Court asked it to explain the standard for rescinding an ISDEA contract under § 450m. See Tr. at 63:2-64:1 (Court). Sage Hospital said that § 900.247 sets forth the standards for emergency and non-emergency rescissions.[22] See Tr. at 64:6-9 (Frye). According to Sage Hospital, a non-emergency rescission is appropriate where there is: (i) "a violation of the rights or endangerment of the health, safety, or welfare of any person"; or (ii) "[g]ross negligence or mismanagement [in the] handling of contract funds." Tr. at 64:9-25 (Frye)(quoting 25 C.F.R. § 900.247)(internal quotation marks omitted). Sage Hospital said that the NAIHS has much broader authority to choose not to renew

---

[22]Section 900.247 uses the word "reassumption," which the ISDEA defines as "rescission, in whole or in part, of a contract and assuming or resuming control or operation of the contracted program by the Secretary without consent of the Indian tribe or tribal organization." 25 C.F.R. § 900.246. See Tr. at 64:18-22 (Frye)(explaining how § 900.246 defines reassumption as "rescission").

a contract under § 450m's rescission procedures for the types of infractions that it is alleging in this case than under § 450f(a)(2)'s declination procedures.  See Tr. at 65:1-6 (Court, Frye).

Addressing the Defendants' other arguments, Sage Hospital argued that courts have routinely rejected the idea of deferential review for agency actions under the ISDEA.  See Tr. at 67:16-68:15 (Frye)(citing S. Ute Indian Tribe v. Sebelius, 657 F.3d at 1078; Ramah Navajo Sch. Bd., Inc. v. Babbitt, 87 F.3d at 1344; Shoshone-Bannock Tribes of Fort Hall Reservation v. Shalala, 988 F. Supp. at 1313)).  Sage Hospital then reiterated the distinctions between this case and Pequot, and the criticisms of the declinations' findings that it noted in the Reply.  See Tr. at 69:6-75:21 (Court, Frye).

The Court said it would take the matter under advisement, but that it was inclined to grant the Motion.  See Tr. at 78:13-14 (Court); id. at 79:24 (Court).  The Court said that it did not think that it had to defer to Pequot's interpretation of § 900.32, and that, even if it did, the case did not seem to avoid § 900.32's plain language.  See Tr. at 78:22-79:3 (Court).  The Court said that, given §§ 900.32's and 900.33's plain language, it likely would not have to decide some of the merits issues, but would only have to decide whether the 2013 Renewal and 2014 AFA were substantially similar to their predecessors.  See Tr. at 79:15-20 (Court).

## LAW REGARDING THE ISDEA

The ISDEA authorizes American Indian tribes and tribal organizations to contract with either the DOI or the HHS Secretary[23] to provide their members federally funded services that a federal agency would otherwise provide directly.  See 25 U.S.C. 450a(f); S. Rep. No. 100-274, at

---

[23]The ISDEA defines "the Secretary" throughout 25 U.S.C. § 450, without specifying the specific department that the Secretary supervises.  25 U.S.C. § 450.  In the ISDEA's "definition" provision, it defines "the Secretary" as "either the Secretary of Health and Human Services or the Secretary of the Interior or both."  25 U.S.C. § 450b(i).  Accordingly, in this Law Regarding section, when the Court refers to "the Secretary" it means "either the DOI or the HHS Secretary."

1 (1987), reprinted in 1988 U.S.C.C.A.N. at 2620 ("1987 Senate Report").  When Congress

passed the ISDEA in 1975, it recognized that "the prolonged Federal dominion of Indian service

programs has served to retard rather than enhance the progress of Indian people and their

communities," and has "denied to the Indian people an effective voice in the planning and

implementation of programs for the benefit of Indians."  25 U.S.C. § 450(a)(1).  Congress thus

enacted the ISDEA to "permit an orderly transition of federal domination of programs for, and

services to, Indians to effective and meaningful participation by the Indian people in the

planning, conduct, and administration of those programs and services."  25 U.S.C. § 450a(b).

An ISDEA contract proposal typically consists of two parts: (i) a multi-year agreement

that satisfies 25 U.S.C. § 450*l*(c); and (ii) an AFA.  See 25 U.S.C. § 450j(c).  The AFA must

contain: (i) "terms that identify the programs, services, functions, and activities to be performed

or administered, the general budget category assigned, the funds to be provided, and the time and

method of payment"; and (ii) "such other provisions, including a brief description of the

programs, services, functions, and activities to be performed (including those supported by

financial resources other than those provided by the Secretary), to which the parties agree."  25

U.S.C. § 250l(c).

1.       **The Declination Process.**

The ISDEA contracting process begins when a tribe or tribal organization submits a

contract proposal to the Secretary.  See 25 U.S.C. § 450a(2).  Unless the tribe or tribal

organization agrees to an extension, the Secretary must approve or decline the proposal within

ninety days.  See 25 U.S.C. § 450a(2)(A); 25 C.F.R. §§ 900.16, 900.17.  Otherwise, the proposal

is deemed approved.  See 25 U.S.C. 450j-1(a); 25 C.F.R. § 900.18.

Should the Secretary decide to decline the proposal in part of in its entirety, he or she must do so based on one of these five reasons:

**(A)**    the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;

**(B)**    adequate protection of trust resources is not assured;

**(C)**    the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;

**(D)**    the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title; or

**(E)**    the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities, . . . because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 450f(a)(2).  See 25 C.F.R. § 900.22 (setting forth the same declination criteria).

There are a number of limitations on the Secretary's authority to apply § 450f(a)(2)'s declination criteria.  The Secretary cannot decline a contract renewal proposal "where no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the Indian tribe or tribal organization."  25 C.F.R. § 900.33.  Similarly, the Secretary cannot decline a successor AFA proposal that is "substantially the same" as its predecessor.  25 C.F.R. § 900.32.  The Secretary also cannot decline any proposal based on any objections "that will be overcome through the contract."  25 C.F.R. § 900.33.  Moreover, if the Secretary can decline only a portion of a contract proposal, he or she must approve all other severable portions of the proposal.  See 25 C.F.R. § 900.25.

After the Secretary declines a proposal, he or she must: (i) state any objections in writing to the tribe or tribal organization; (ii) provide assistance to the tribe or tribal organization to overcome the stated objections; and (iii) provide the tribe or tribal organization with a hearing on

the record with the right to engage in full discovery on any issue raised in the matter and the opportunity to appeal the Secretary's objections.  <u>See</u> 25 U.S.C. § 450f(b).  The tribe or tribal organization may, in lieu of filing an appeal, initiate an action in federal district court.  <u>See</u> 25 U.S.C. §§ 450f(b)(3), 450m-1.  In any hearing, appeal, or action in federal court regarding a contract declination, the Secretary bears "the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)."  25 U.S.C. § 450f(e)(1).  Courts faced with ISDEA declination claims have thus required the Secretary to establish "by clear and convincing evidence" the validity of the grounds of his or her declination decision.  <u>S. Ute Indian Tribe v. Leavitt</u>, 497 F. Supp. 2d 1245, 1252 (D.N.M. 2007)(Johnson, J.); <u>see</u> <u>Cheyenne River Sioux Tribe v. Kempthorne</u>, 496 F. Supp. 2d at 1068.

        **2.**       **<u>The Reassumption Process</u>.**

        The Secretary also has the authority to reassume ISDEA contracts.  <u>See</u> 25 U.S.C. § 450m.  Reassumption means "rescission, in whole or in part, of a contract and assuming or resuming control or operation of the contracted program . . . without consent of the Indian tribe or tribal organization."  25 C.F.R. § 900.246.  A federal agency within the HHS or the DOI may unilaterally reassume a contract on either an emergency or non-emergency basis.  <u>See</u> 25 C.F.R. § 900.246.  An emergency reassumption is permitted when a tribe or tribal organization fails to fulfill the ISDEA contract's requirements and that failure poses: (i) an immediate threat of imminent harm to the safety of any person; or (ii) an imminent substantial and irreparable harm to trust funds, trust lands, or interest in such lands.  <u>See</u> 25 C.F.R. § 900.247.  A non-emergency reassumption is permitted when there has been: (i) a violation of the rights or endangerment of the health, safety, or welfare of any person; or (ii) gross negligence or mismanagement in the

handling or use of contract funds, trust funds, trust lands, or interest in trust lands under the contract.  See 25 C.F.R. § 900.247.

In an emergency reassumption, the Secretary must: (i) immediately rescind, in whole or in part, the contract; (ii) assume control or operation of all or part of the program; and (iii) give written notice of the rescission to the tribe or tribal organization, and to the community that the contract serves.  See 25 C.F.R. § 900.252.  The written notice must include: (i) a detailed statement of the findings that support the Secretary's decision; (ii) a statement explaining the tribe or tribal organization's right to a hearing on the record within ten days of the reassumption, or such later date as the tribe or tribal organization may approve; (iii) an explanation that the tribe or tribal organization may be reimbursed for actual and reasonable "wind up costs" incurred after the effective date of the reassumption; and (iv) a request for the return of property, if any. 25 C.F.R. § 900.253.

In a non-emergency reassumption, the Secretary must: (i) notify the tribe or tribal organization in writing of the deficiencies in contract performance; (ii) ask the tribe or tribal organization to take specific corrective action within a reasonable period of time, which cannot be less than forty-five days; and (iii) offer and provide, if requested, the necessary technical assistance and advice to help the tribe or tribal organization overcome the deficiencies.  See 25 C.F.R. § 900.248.  If the tribal organization fails to ameliorate the deficiencies, the Secretary shall provide a second written notice to the tribe or tribal organization that the Secretary will reassume the contract, in whole or in part.  See 25 C.F.R. § 900.249.  The second written notice shall include: (i) the intended effective date of the reassumption; (ii) the details and facts supporting the intended reassumption; and (iii) an explanation of the tribe or tribal organization's right to a formal hearing within thirty days of receiving the notice.  See 25 C.F.R. § 900.250.

The Secretary cannot reassume the contract before the issuance of a final decision in any administrative hearing or appeal.  See 25 C.F.R. § 900.251.

### 3.    Relief Available Under the ISDEA.

The ISDEA provides a comprehensive range of remedies for a tribe or tribal organization whose contract the Secretary unlawfully terminates.  See 25 U.S.C. § 450m-1(a).  Section 450m-1(a) provides that, in an ISDEA action, a federal district court "may order appropriate relief," including

> money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this subchapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this subchapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 450f(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

25 U.S.C. § 450m-1(a).

Applying the § 450m-1(a) to the DOI Secretary's contract declination decision in Crownpoint, Judge Parker said that "[t]he specific mandamus relief authorized by the ISDA relieves [the plaintiff] of proving the usual equitable elements including irreparable injury and absence of an adequate remedy at law."  Crownpoint at 26 (citations omitted).  Other federal district courts have similarly concluded that a tribe or tribal organization does not need to demonstrate the traditional grounds for equitable relief to obtain injunctive or mandamus relief under the ISDEA.  See, e.g., Pyramid Lake Paiute Tribe v. Burwell, No. CIV 13-1771 CRC, 2014 WL 5013206, at *7 (D.D.C. Oct. 7, 2014)("Because the IDEAA specifically provides for both injunctive and mandamus relief to remedy violations of the Act, 25 U.S.C. § 450m-1(a), however, the Tribe need not demonstrate the traditional equitable grounds for obtaining the relief it seeks."); Red Lake Band of Chippewa Indians v. Dep't of the Interior, 624 F. Supp. 2d 1, 25

(D.D.C. 2009)(granting specific performance on an ISDEA contract without considering the ordinary grounds for such relief because injunctive relief is provided for in the statute); Susanville Indian Rancheria v. Leavitt, No. CIV 07-259 GEB/DAD, 2008 WL 58951, at *10-11 (E.D. Cal. Jan. 3, 2008)(holding that a plaintiff seeking injunctive relief under the ISDEA need not satisfy the traditional equitable requirements); Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d at 1068 (ordering a writ of mandamus where the plaintiffs had not established the traditional equitable requirements, but had established that the DOI Secretary's contract declination decision violated the ISDEA).

### 4.        The Rules for Interpreting Ambiguous ISDEA Provisions.

When faced with an ambiguous federal statute, federal courts typically defer to the administering agency's interpretation.  See Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842-45 (1984); State of Utah v. Babbitt, 53 F.3d 1145, 1148 (10th Cir. 1995).  In cases involving American Indians, however, the Tenth Circuit has "taken a different approach to statutory interpretation," holding that "normal rules of construction do not apply when Indian treaty rights, or even non-treaty matters involving Indians, are at issue." Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1461 (10th Cir. 1997)(quoting EEOC v. Cherokee Nation, 871 F.2d 937, 939 (10th Cir. 1989))(internal quotation marks omitted).  Consequently, the Tenth Circuit has held that federal statutes "are to be construed liberally in favor of Native Americans, with ambiguous provisions interpreted to their benefit."  EEOC v. Cherokee Nation, 871 F.2d at 939 (citation omitted)(internal quotation marks omitted).

The ISDEA is designed to "circumscribe as tightly as possible the discretion of the Secretary."  Ramah Navajo Sch. Bd. v. Babbitt, 87 F.3d at 1344.  The ISDEA instructs that "[e]ach provision of [the ISDEA] and each provision of contracts entered into thereunder shall be

liberally construed for the benefit of the tribes or tribal organizations . . . ."   25 C.F.R. § 900.3(a)(5).   The Tenth Circuit has confirmed that the canon of construction favoring American Indian tribes applies to ISDEA claims, noting that "it would be entirely inconsistent with the purpose of the [ISDEA], as well as with the federal policy of Native American self-determination in general, to allow the canon favoring Native Americans to be trumped in this case."   Ramah Navajo Chapter v. Lujan, 112 F.3d at 1462.   The Tenth Circuit has explained that this canon of construction "controls over more general rules of deference to an agency's interpretation of an ambiguous statute."   S. Ute Indian Tribe v. Sebelius, 657 F.3d at 1078. Consequently, in the Tenth Circuit, federal courts must not afford any deference to the HHS or the DOI's interpretation of ambiguous provisions of the ISDEA.

Only a few federal district courts have addressed whether the "arbitrary and capricious standard" of the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA"), applies to ISDEA claims.   The majority of district courts have concluded that ISDEA's text, its legislative history, and the general presumption favoring Indian tribes dictates a de novo review of ISDEA claims. See, e.g., Seneca Nation of Indians v. Dep't of Health and Human Servs., 945 F. Supp. 2d at 141-42 & n.5; Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d at 1066-67; Cherokee Nation of Okla. v. United States, 190 F. Supp. 2d 1248, 1258 (E.D. Okla. 2001), rev'd on other grounds by, 543 U.S. 631 (2005); Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala, 988 F. Supp. at 1318.   A minority of district court cases -- three of which are unpublished -- used the APA's arbitrary and capricious standard to review ISDEA claims. See, e.g., Citizen Potawatomi Nation v. Salazar, 624 F. Supp. 2d 103, 108 (D.D.C. 2009); Suquamish Tribe v. Deer, CIV No. 96-5468 (W.D. Wash. Sept. 2, 1997); Cal. Rural Indian Health Bd., Inc. v. Shalala, CIV No. 96-3526 (N.D. Cal. Apr. 24, 1997); Yukon-Kuskokwim

Health Corp. v. Shalala, CIV No. 96-155 (D. Alaska Apr. 15, 1997).  Those courts have reasoned that, because the ISDEA does not provide a standard of review, courts must use the APA's arbitrary-and-capricious standard.  See Citizen Potawatomi Nation v. Salazar, 624 F. Supp. 2d at 108 ("Both the Supreme Court and our Court of Appeals have declared that, where a statute does not provide a standard of review, as is true of the ISDA, courts must look to the APA standard.").

## LAW REGARDING PRELIMINARY INJUNCTIONS

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal."  Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted).  To show that the extreme remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law."  N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984).  Before a district court may issue a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the moving party must establish that: (i) "[it] will suffer irreparable injury unless the injunction issues"; (ii) "the threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party"; (iii) "the injunction, if issued, would not be adverse to the public interest"; and (iv) "there is a substantial likelihood [of success] on the merits."  Resolution Trust Corp. v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992).  See Winter v. Natural Res. Defense Council, Inc., 555 U.S. 7, 19 (2008)("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." (citing Munaf v. Geren, 553 U.S. 674, 688-89 (2008))).  The movant

bears the burden of demonstrating that those equitable factors weigh in its favor.  See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972).

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held . . . .'"  Schrier v. Univ. of Colo., 427 F.3d 1253, 1258 (10th Cir. 2005)(quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).  The Tenth Circuit has identified the following three specifically disfavored preliminary injunctions: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 977 (10th Cir. 2004)(en banc)("O Centro Espirita"), aff'd on other grounds, 546 U.S. 418 (2006))(internal quotation marks omitted).  Accord Westar Energy, Inc. v. Lake, 552 F.3d 1215, 1224 (10th Cir. 2009)(citing O Centro Espirita, 389 F.3d at 975).  With respect to preliminary injunctions that will change the status quo, "the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued."  Salt Lake Tribune Publ'g Co. v. AT&T Corp., 320 F.3d 1081, 1099 (10th Cir. 2003)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098-99 (10th Cir. 1991))(internal quotation marks omitted).

"[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction . . . ."  United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)).  See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(finding that a preliminary injunction should not issue where a remedy of money

- 69 -

damages was available). Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy. See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd. v. Marnatech Enter., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## ANALYSIS

The Court will grant the Motion in part and deny it in part. The Court will not order permanent injunctive relief at this stage. The Court will, however, order a preliminary injunction under rule 65 of the Federal Rules of Civil Procedure to require the Defendants to fund Sage Hospital going forward according to the terms of the 2013 AFA and the 2010 Contract until this case is resolved on the merits, and order both parties to comply with all of the terms and conditions of the 2013 AFA and the 2010 Contract until this case is resolved on the merits. Among other things, this means that the NAIHS must reinstate Sage Hospital's FTCA coverage as Section 4 of the 2013 AFA provides. The Court will not require Sage Hospital to post a bond.

## I.  THE COURT WILL NOT ORDER PERMANENT INJUNCTIVE RELIEF AT THIS STAGE.

The Court will not order permanent injunctive relief at this stage. Section 450m-1 affords federal district courts broad discretion to award permanent injunctive relief in ISDEA cases:

> In an action brought under this paragraph, the district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this subchapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this subchapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding under section 450f(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

25 U.S.C. § 450m-1.  Accordingly, if the Court determines that the NAIHS has violated the ISDEA, it may award immediate injunctive relief without proceeding to summary judgment or to trial.

As explained in more detail in the remainder of this Memorandum Opinion and Order, Sage Hospital has shown that: (i)  the NAIHS cannot rely on information beyond the four corners of Sage Hospital's contract proposals to determine whether those proposals are substantially the same as their predecessors under §§ 900.32 and 900.33; and (ii) Sage Hospital's contract proposals' contents are substantially the same as their predecessors' contents.  Based on the record before the Court, therefore, the Court is inclined to find that the Defendants violated the ISDEA and award a permanent injunction.  A few considerations counsel against awarding a permanent injunction at this stage, however.

First, although the Defendants have not made any arguments or submitted any evidence regarding issue (ii), they also have not expressly conceded it.  Perhaps relying on their mistaken assumption that the Court cannot award a permanent injunction at this stage, the Defendants have focused exclusively on their argument that the NAIHS may consider the NAIHS Report and the Moss Adams Report in determining whether Sage Hospital's contract proposals are substantially the same as their predecessors under §§ 900.32 and 900.33.  See Response *passim*. Accordingly, the Defendants have not offered any arguments or evidence on why Sage Hospital's contract proposals' contents are not substantially the same as their predecessors' contents.  In the most extreme example, the Defendants have said nothing about the fact that the 2015 AFA proposes a fifty-five percent increase in funding from the 2013 AFA -- an increase which, at face value, suggests that the 2015 AFA is not "substantially the same" as the 2013 AFA.  Compare El-Meligi Ltr. at 2-3 (setting forth Sage Hospital's request that the NAIHS fund

Sage Hospital at a total amount of $32,614,916.00, with $19,995,900.00 in base funding and $12,619,016.00 for direct and indirect contract support costs), with 2013 AFA at 22, 30 (providing that the NAIHS would fund Sage Hospital at a total amount of $18,044,042.00, with $11,481,661.00 in base funding and $6,562,381.00 for contract support costs).  The Defendants have thus put the Court in an uncomfortable position.  Their preoccupation with the purely legal issue -- i.e., how the Court should interpret §§ 900.32 and 900.33 -- and their expectation that the Court could only award a preliminary injunction has led them to disregard the central issues in this case.  If the Court awarded a permanent injunction at this stage, the Defendants would have to fund their ISDEA contracts with Sage Hospital through September 30, 2017 -- at a minimum cost of $94,831,454.00[24] -- without ever having briefed those issues.

It is possible that the Defendants want the Court only to resolve the legal questions and do not intend to challenge the factual issues.  In that case, a summary judgment motion from Sage Hospital or settlement should lead to a relatively speedy resolution of those claims.  If the Defendants have additional arguments on why the Sage Hospital's contract proposals' contents are not substantially similar to their predecessors' contents, and have evidence to support those arguments, however, ordering a preliminary injunction while proceeding to summary judgment gives the Defendants an opportunity to hash out those arguments and have their full day in court.

------

[24]If the Court grants the full relief that Sage Hospital seeks, it will force the Defendants to fund the 2014 AFA -- at a cost of $20,738,846.00 -- the 2015 AFA -- at a cost of $32,614,916.00 -- and continue funding Sage Hospital through September 30, 2017.  Although the Defendants would have to negotiate new AFAs for FY 2016 and FY 2017, those would likely be between Sage Hospital's existing AFA amounts, so somewhere between $20,738,846.00 and $32,614,916.00 each year.  Accordingly, even if the Court takes a low estimate of the total impact of ordering a permanent injunction, the Defendants are looking at a minimum of $94,831,454.00 in total cost for a permanent injunction at this stage ($20,738,846.00 for FY 2014 + $ 32,614,916.00 for FY 2015 + $20,738,846.00 FY 2016 + $ 20,738,846.00 for FY 2017).

With such a bare record, the Court is reluctant to foreclose the Defendants from offering any evidence or arguments on those issues.

This caution is not to say that ordering a permanent injunction this early in an ISDEA case is never appropriate.  If the parties explicitly concede all factual disputes -- in a stipulation, the briefing, or their oral arguments -- and are solely looking for the court to resolve the legal issues in a case, permanent injunctive relief may be appropriate at this early stage.  As a further development of the record in such situations would not help the court resolve the legal issue, forcing the parties to proceed to summary judgment would be a waste of time.  Erring on the side of ordering a preliminary injunction in close cases, however, resolves the legal disputes while allowing the parties to raise any remaining factual disputes that may not have been front and center in their mind this early in the case.

Second, the Court has been unable to find a case in which a court faced with an ISDEA claim has awarded a permanent injunction at this early stage in a case.  In all but one ISDEA case that Sage Hospital cites in its Motion and Reply, the district court ordered a permanent injunction only after litigating the tribe or tribal organization's motion for summary judgment. See Pyramid Lake Paiute Tribe v. Burwell, 2014 WL 5013206, at *7-8; Red Lake Band of Chippewa Indians v. Dep't of the Interior, 624 F. Supp. 2d at 27; Susanville Indian Rancheria v. Leavitt, 2008 WL 59051, at *10; Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d at 1061-69.  The remaining ISDEA case that Sage Hospital cites -- Crownpoint -- is also instructive.  In that case, the tribal organization filed a request for permanent injunctive and mandamus relief less than a month after filing its FAC.  See Crownpoint at 1.  Nevertheless, Judge Parker did not rule on the request until after he had conducted a series of hearings and a trial on the motion that spanned six days.  See Crownpoint at 2.  These cases suggest that,

although the ISDEA allows courts to order immediate injunctive relief, courts should take whatever time it may require to develop a full factual record rather than rushing to judgment based on a few affidavits.  Especially in a case like this one where millions of dollars in federal funds are at stake, a more cautious approach ensures that the Court will not miss anything in the process.

Third, a permanent injunction is unnecessary this stage of the case.  A preliminary injunction can address the large majority of Sage Hospital's concerns about facing insolvency and losing its patients' goodwill.  As the Court will order the Defendants to fully fund Sage Hospital under the 2013 AFA and the 2010 Contract until the resolution of this case on the merits, and the Defendants will be ordered to comply with all of the terms and conditions of those contracts, Sage Hospital should be able to avoid insolvency and continue operating at its pre-1st Declination levels.  Because a permanent injunction is unnecessary at this stage, the Court will not order one at this point.  To the extent that Sage Hospital succeeds on the merits of its claims -- at either the summary judgment stage or at trial -- the Court will order any necessary and appropriate permanent injunctive relief at that point.  Instead of ordering any relief under § 450m-1, the Court will award a preliminary injunction under rule 65 of the Federal Rules of Civil Procedure.  This approach preserves the status quo while giving the Defendants an opportunity to add evidence to the record to support their decision to apply § 450f(a)(2)'s declination criteria to Sage Hospital's contract proposals.

## II.    THE COURT WILL ORDER A PRELIMINARY INJUNCTION UNDER RULE 65 OF THE FEDERAL RULES OF CIVIL PROCEDURE.

To establish its right to preliminary relief, a moving party must demonstrate that the following factors weigh in its favor:

(1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant ultimately will prevail on the merits; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest.

Wyandotte Nation v. Sebelius, 443 F.3d at 1254-55.  Rather than setting forth a strict checklist, "these factors provide guideposts for a court in its attempt to minimize any harm that would result from the grant or denial of preliminary relief."  O Centro Espirita, 389 F.3d at 999.  If the moving party demonstrates that the first, third, and fourth factors "tip strongly in his favor," the test is relaxed and the moving party "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue for litigation and deserving of more deliberate investigation."  Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc., 455 F.3d 1107, 1113 (10th Cir. 2006)(internal quotation marks omitted).  The Court will order a preliminary injunction, because it is not disfavored in this case; Sage Hospital will suffer irreparable harm without such an injunction; Sage Hospital has demonstrated a substantial likelihood of success on the merits; the balance of harms weighs in Sage Hospital's favor; and an injunction would not be contrary to the public interest.

## A.   A PRELIMINARY INJUNCTION IN THIS CASE IS NOT DISFAVORED.

There are three types of specifically disfavored preliminary injunctions, only two of which are relevant here: (i) injunctive relief that would alter the status quo; and (ii) mandatory injunctive relief.  See O Centro Espirita, 389 F.3d at 975.  The Tenth Circuit has cautioned that "movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard.  Instead, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with

regard to the balance of harms . . . ."  O Centro Espirita, 389 F.3d at 976.  Here, a preliminary injunction in which the NAIHS must continue funding Sage Hospital according to the 2013 Renewal and 2014 AFA does not alter the status quo and is not mandatory.

Ordering the NAIHS to continue funding Sage Hospital according to the 2013 Renewal and 2014 AFA would not alter the status quo.  The status quo is when the NAIHS was funding Sage Hospital under the 2010 Contract and the 2013 AFA and abiding by the terms of those agreements.  See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1155 (10th Cir. 2001)("[T]he status quo is the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." (internal quotation marks omitted)).  Whether the NAIHS properly declined the contract proposal is not outcome determinative.  Rather, the Court "looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights."  Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d at 1155.

A preliminary injunction would require the NAIHS to fund Sage Hospital and abide by the terms of its agreements with Sage Hospital as it has done since at least 2010.  The situation is similar to that in Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., where EchoStar Satellite had long been activating Dominion Video's subscribers and the injunction required that EchoStar not depart from that course, but continue activating subscribers.  See 269 F.3d at 1155.  In that case, the Tenth Circuit noted that "the injunction . . . prohibits EchoStar from refusing to activate new Dominion customers on the same terms and conditions previously applicable.  It does not compel EchoStar to do something it was not already doing during the last uncontested period preceding the injunction."  269 F.3d at 1055.  Likewise, ordering a preliminary injunction in this case does not compel the NAIHS to do something that it has not already been doing for

years.  The NAIHS has funded Sage Hospital under ISDEA contracts since at least 2007, and was doing so before the present disputes and subsequent litigation began.  Accordingly, ordering a preliminary injunction in this case would not alter the status quo.

Although a preliminary injunction in this case escapes being disfavored as altering the status quo, it must also not be mandatory in nature.  That point is more complicated, but ultimately the preliminary injunction in this case is also not mandatory.  The Tenth Circuit has upheld both the grant and the denial of injunctions in circumstances similar to this case.[25] Compare SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1099 n.9 (noting that the injunction at issue was mandatory because "it required Visa to take the affirmative step of approving issuance of the new cards"), with Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d at 1155 (holding that injunction was not mandatory because, although EchoStar Satellite had to activate new subscribers, it prohibited "EchoStar from refusing to activate new Dominion customers on the same terms and conditions previously applicable"). The lesson to be drawn from these opposing results is that a preliminary injunction that prohibits the breach of an existing contract -- or, stated differently, one that enforces a contract -- is not automatically within or outside of the disfavored classification.

In Guidance Endodontics, LLC v. Dentsply Intern., Inc., the Court found a temporary restraining order ("TRO") that required the defendant to continue performing its duties under the contract which was in place before the litigation, to be prohibitory rather than mandatory.  See 633 F. Supp. 2d at 1276.  The Court noted that "enforcing a contract tends to be mandatory when the nature of the breach can only be remedied by the performance of actions different than those

---

[25]The superficial discrepancy is likely the result of a certain degree of flexibility in the law, but also a result of the abuse-of-discretion standard of review and some different facts between the two cases.

provided in the contract."   633 F. Supp. 2d at 1276.   Similar to the TRO in Guidance Endodontics, LLC v. Dentsply Intern., Inc., ordering a preliminary injunction in this case does not impose any additional duties on the NAIHS beyond what is included in its ISDEA contract with Sage Hospital.   Accordingly, Guidance Endodontics, LLC v. Dentsply Intern., Inc. suggests that preliminary injunctive relief in this situation would be prohibitory rather than mandatory.

The most important factor in determining whether a preliminary injunction is mandatory, however, is the negligible chance that the Court will find itself having to perpetually supervise the preliminary injunction.   The Tenth Circuit indicated in SCFC ILC, Inc. v. Visa USA, Inc., that this concern is largely what motivates the rule.   See 936 F.2d at 1099 (noting that mandatory injunctions "affirmatively require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure that the nonmovant is abiding by the injunction" (emphasis added)).   Any preliminary injunction, of course, might end up placing the Court in such a role.   Simply funding a contract and abiding by its terms, however, is a relatively routine activity for the NAIHS, and thus should not require an intensive amount of court supervision.   Whether the NAIHS is complying with the terms of the preliminary injunction will be readily ascertainable.   As a more general matter, regardless whether this assumption is justified, the Court trusts the federal government to more readily comply with an order from a federal district court judge than a private party.   Enforcing a preliminary injunction in this case is thus unlikely to place a heavy burden on the Court.

The Court does not see any significant feature that would make this preliminary injunction mandatory, and the Court will thus follow the approach taken in Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.   Because a preliminary injunction in this case is neither

mandatory nor disruptive of the status quo, the Court will evaluate it under the normal standard of review.

### B. SAGE HOSPITAL HAS DEMONSTRATED THAT IT WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT ORDER A PRELIMINARY INJUNCTION.

The first element of the test for injunctive relief is whether Sage Hospital is in danger of irreparable harm if the Court does not grant a preliminary injunction.  The evidence reveals that Sage Hospital is in a precarious financial situation and that it is unlikely to obtain needed funding from any source other than the NAIHS.  That Sage Hospital is threatened with irreparable injury weighs in favor of granting a preliminary injunction.

Sage Hospital faces a dire financial situation if the Court does not award a preliminary injunction.  ISDEA funds provide approximately fifty-five percent of Sage Hospital's revenue.  See Katigbak 1st Decl. ¶ 10, at 38.  The 1st Declination cut off those funds entirely on September 30, 2014.  See 1st Declination *passim*.  Without a reversal of the 1st Declination, Sage Hospital will lose that revenue, while still performing its full array of healthcare services.  See Katigbak 1st Decl. ¶ 10, at 38.  Moreover, because of the 1st Declination, Sage Hospital has to purchase pharmaceutical supplies from commercial vendors rather than from the Gallup Regional Supply Service Center, a low-cost federal supplier.  See El-Meligi 1st Decl. ¶ 14, at 8.  The 1st Declination also forced Sage Hospital to purchase professional liability insurance for its doctors at a cost of approximately $50,000.00 per month rather than relying on the FTCA's protections at no cost.  See El-Meligi 1st Decl. ¶ 11, at 7.  If injunctive relief is not promptly granted, Sage Hospital's approximately 200 employees will likely lose their jobs before December 22, 2015.  See El-Meligi 1st Decl. ¶ 15, at 9.  Sage Hospital's cash-flow projections for FY 2014 indicate that, if the Court does not reverse the 1st Declination, Sage Hospital will be

on the brink of insolvency before December 22, 2015.  See Katigbak 1st Decl. ¶ 10, at 38-39.  At the February 12, 2015, hearing, Sage Hospital updated this assessment by noting that it would be in a precarious financial position if the Court does not order injunctive relief within two months or "a little longer than that" -- placing Sage Hospital's potential insolvency date closer to April 12, 2015.  Tr. at 80:3-19 (Frye, Court).

As the Supreme Court of the United States has noted, where a business "would suffer a substantial loss of business and perhaps even bankruptcy . . . the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless."  Doran v. Salem Inn, Inc., 422 U.S. 922, 932 (1975).  See Commodity Futures Trading Comm'n v. British Am. Commodity Options Corp., 434 U.S. 1316, 1322 (1977)(upholding stay of regulation on the grounds that the regulation would cause irreparable harm because it would have "potentially fatal consequences for a number of the firms" involved in the case).  The Tenth Circuit has held that "[a] threat to trade or business viability may constitute irreparable harm."  Tri-State Gen. & Transmission Ass'n, Inc. v. Shoshone River Power, Inc., 805 F.2d 351, 356 (10th Cir. 1986).  Similarly, other circuit courts have held that the potential destruction of the plaintiff's business can constitute an irreparable harm justifying injunctive relief.  See Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1382 (6th Cir. 1995); Fla. Businessmen for Free Enter. v. City of Hollywood, 648 F.2d 956, 958 nn. 2-3 (5th Cir. 1981); Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977); Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir. 1970); Nat'l Screen Serv. Corp. v. Poster Exchange, Inc., 305 F.2d 647 (5th Cir. 1962).

Sage Hospital has said that it will be in a precarious financial position if the Court does not award a preliminary injunction before April 12, 2015, or "a little longer than that," and will

face insolvency by December 22, 2015, at the latest.  Tr. at 80:15-19 (Frye).  Generally, the Court gives parties at least 120 days to conduct discovery.  Add to that consideration that the parties have not yet conducted a status conference, and the earliest that this case could go to trial would be late-August of this year.  Most likely, this case would be tried at the end of the year or early in 2016.  In light of that projected trial date, and the fact that Sage Hospital has already gone more than six months without half of its revenue, failing to order a preliminary injunction would cause Sage Hospital irreparable harm.  See Temple Univ. v. White, 941 F.2d 201, 213-15 (3d Cir. 1991)(upholding district court's ruling that plaintiff faced irreparable harm from loss of forty-four percent of its revenue from state funding).  It is often tricky to determine precisely when a company will become insolvent -- particularly one with annual expenses upwards of $30 million a year.  See Bradshaw Audit at 12.  Even if Sage Hospital is not technically insolvent before this case goes to trial, its patients, employees, and creditors may see the writing on the wall and begin jumping ship well before then.  It is particularly important that Sage Hospital not begin to lose its professionals -- both doctors and nurses -- for fear that the facility is becoming insolvent.  Even in this best-case scenario, Sage Hospital's losses before trial will be difficult to calculate with certainty, a factor that cuts in favor of finding irreparable harm.  See Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d at 1263 (identifying the inability to ascertain damages as a factor supporting an irreparable harm determination).

The Defendants assert that Sage Hospital will not suffer irreparable harm, because Sage "has more than sufficient cash reserves of approximately $15,878,000.00 to continue operations as a private hospital during the time it will take to litigate this case."  Response at 31 (citing Bradshaw Audit at 12).  The figure that the Defendants cite, however, comes from a report that last analyzed  Sage Hospital's cash accounts on September 30, 2013.  See Bradshaw Audit at 12.

By contrast, Sage Hospital has offered sworn declarations from its CEO and its CFO, both of which state that Sage Hospital will face insolvency before December 22, 2015.  See Katigbak 1st Decl. ¶ 10, at 30-39; El-Meligi 1st Decl. ¶ 15, at 9.  As those declarations were executed on December 22, 2014, they provide a more recent assessment of Sage Hospital's financial health. Accordingly, the Court will credit those statements over the statement from the Bradshaw Audit's evaluation from 2013.

The Defendants also contend that "[i]t is undisputed that Sage delayed for months before bringing this action for injunctive relief, and 'delay in seeking preliminary relief cuts against finding irreparable injury.'"  Response at 28 (quoting Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs., 31 F.3d 1536, 1543-44 (10th Cir. 1994)).  The evidence belies the Defendants' assertion.  Rather than waiting "for months" before bringing this action, Sage Hospital received the 1st Declination on September 29, 2014, see Katigbak 1st Decl. ¶ 4, at 35, and promptly filed the Complaint, requesting immediate injunctive relief, less than a month later, on October 23, 2014, see Complaint at 1.  Sage Hospital's one-month delay in filing the Complaint is significantly shorter than the plaintiffs' three-month delay in Kansas Health Care Association v. Kansas Department of Social and Rehabilitation Services, which the Tenth Circuit found was not fatal to the plaintiffs' irreparable-injury claims.   See 31 F.3d at 1543. Consequently, Sage Hospital's brief one-month delay in filing the Complaint is not fatal to its irreparable-injury claims.  Given Sage Hospital's demonstration that it will face financial instability as early as this April, and will be insolvent before December 22, 2015, if the Court fails to award a preliminary injunction, and the fact that the Defendants have offered no sound evidence to contradict this assessment, failing to award a preliminary injunction will result in

irreparable harm to Sage Hospital. This factor, thus, cuts in favor of granting a preliminary injunction.

### C. SAGE HOSPITAL HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

Sage Hospital has shown a likelihood of success on the merits, a factor that weighs heavily in favor of ordering a preliminary injunction. Section 900.32 of the ISDEA likely prohibits the NAIHS from declining the 2014 AFA and the 2015 AFA. Section 900.33 of the ISDEA likely prohibits the NAIHS from declining the 2013 Renewal and the 2014 Renewal. Even if §§ 900.32 and 900.33 permitted the NAIHS to apply § 450f(a)(2)'s declination criteria to Sage Hospital's contract proposals, those criteria likely did not permit the NAIHS to decline any of those proposals. Even if the NAIHS permissibly applied § 450f(a)(2)'s declination criteria to the 2013 Renewal and the 2014 AFA, it violated § 450f(b)(2) of the ISDEA by failing to provide Sage Hospital technical assistance.

### 1. Section 900.32 of the ISDEA Likely Prohibits The NAIHS from Declining the 2014 AFA.

Section 900.32 likely prohibits the NAIHS from declining the 2014 AFA. Section 900.32 prohibits the NAIHS from declining a successor AFA proposal that is "substantially the same" as its predecessor. 25 C.F.R. § 900.32. The text of the 2014 AFA is substantively identical to the text of the 2013 AFA. Compare 2014 AFA *passim*, with 2013 AFA *passim*. Section 900.32 affords no discretion to the NAIHS to decline or approve such a proposal. When faced with such a proposal, the NAIHS' duty is clear and unambiguous: it "shall approve and add to the contract the full amount of funds to which the contractor is entitled, and may not decline, any portion of a successor annual funding agreement." 25 C.F.R. § 900.32. Accordingly, the NAIHS likely violated the ISDEA when it declined the 2014 AFA.

The Defendants do not contend that the Court should disregard § 900.32 and apply only § 450f(a)(2)'s declination criteria.  Nor do they challenge Sage Hospital's argument that the 2014 AFA's text is substantially the same as its predecessor's.  Instead, they seek to avoid the straightforward application of § 900.32 by arguing that the 2014 AFA is not substantially the same as the 2013 AFA, because the Moss Adams Report and the NAIHS Report uncovered information about Sage Hospital's operations that was previously unknown to the NAIHS.  See Response at 24.

The Defendants rely only on Pequot -- an unpublished administrative decision -- to support their position.  In that case, a tribal organization sought, as part of a proposed successor AFA with the HHS, authorization to sell pharmaceuticals to non-Indian employees of one of its casinos.  See Pequot, 2006 WL 1337439, at *1.  The AFA for the previous year included the following language: "The Nation agrees to provide all medically necessary pharmacy services for the Mashantucket Pequot Tribe, beneficiaries of the Tribe's health benefit plans, other tribe[s] that have a government to government relationship and their health benefit plans." Pequot, 2006 WL 1337439, at *3 (citation omitted)(internal quotation marks omitted).  The predecessor AFA also stated that the "Tribal Council has taken into account the health care and service needs of its membership, community and employees, and has determined that the provisions for such care and services will not result in a denial or diminution of health services to eligible Indians."  Pequot, 2006 WL 1337439, at *3 (citation omitted)(internal quotation marks omitted).  The tribal organization's proposed successor AFA's text was substantially similar to its predecessor's.  See Pequot, 2006 WL 1337439, at *3.

After the tribal organization submitted the proposed successor AFA, the OIG issued a report from an audit of the tribal organization's healthcare services, which uncovered that the

tribal organization "had extended eligibility for federally discounted drugs to its non-Indian employees without making the required determination that reasonable alternative drug services were not available to these employees." Pequot, 2006 WL 1337439, at *4. Donna E. Shalala, then-HHS Secretary -- who was apparently unaware that the tribal organization had been providing pharmaceutical services to non-Indians -- declined the proposed successor AFA on the ground that it included "activities that cannot lawfully be carried out by the contractor." Pequot, 2006 WL 1337439, at *1. The tribal organization appealed the decision to an Administrative Law Judge, who found that the declination was unlawful and reversed Shalala's decision. See Pequot, 2006 WL 1337439, at *1.

Thereafter, the DAB reversed the ALJ's decision and upheld the declination for four reasons. See Pequot, 2006 WL 1337439, at *4-17. First, the DAB concluded that Shalala could not lawfully contract with the tribal organization to provide healthcare services to non-Indians under the ISDEA. See Pequot, 2006 WL 1337439, at *4-7. Second, the DAB determined that the tribal organization failed to comply with the Indian Health Care Improvement Act, 25 U.S.C. § 1680c(b)("IHCIA"), which required the organization to determine that there were no reasonable alternative services available to meet the non-Indians pharmaceutical needs. See Pequot, 2006 WL 1337439, at *8-11. Third, the DAB held that no reasonable person could have concluded that alternative services were unavailable to meet the non-Indians pharmaceutical needs. See Pequot, 2006 WL 1337439, at *11-15. Thus, even if the tribal organization had conducted the requisite alternative-services analysis and determined that no alternative services existed, such a conclusion would have been unreasonable. See Pequot, 2006 WL 1337439, at *11-15. Fourth, and finally, the DAB determined that § 900.32 could not supply an independent basis for requiring Shalala to approve that portion of the proposed AFA, because that regulation

is limited to programs that the HHS had previously funded.  See Pequot, 2006 WL 1337439, at

*15-17.   In other words, the DAB concluded that, because the HHS had never funded the

pharmaceutical  program  for  non-Indians,  § 900.32  did  not  apply.   See Pequot,  2006  WL

1337439, at *15-17.

> At the end of the decision, the DAB noted:

> [T]he  successor  AFA  here  was  not  "substantially  the  same"  as  the  prior  year
> AFA.   As discussed earlier [the IHCIA] requires that a tribe's governing body
> make  a  contemporaneous  decision  that  no  reasonable  alternative  services  are
> available.   Thus, each proposal can be viewed as substantively different from the
> prior proposal since each is necessarily based on a different decision.   Moreover,
> the OIG report raised legal issues concerning the proposal which might not have
> been apparent to IHS when it approved the FY 1999 AFA.

Pequot, 2006 WL 1337419, at *17 (footnote omitted)(emphasis added).

The Defendants assert that, just as the OIG report led Shalala to decline the successor

AFA proposal in Pequot as "not substantially the same" as its predecessor, the Moss Adams

Report  and  the  NAIHS  Report  properly  led  the  NAIHS  to  decline  the  2014  AFA  as  not

substantially  the  same  as  the  2013  AFA.   See Response  at  25-26  (citation  omitted)(internal

quotation marks omitted).   The Defendants add that the HHS Secretary's interpretation of her

own regulations -- even in administrative decisions like Pequot -- is controlling "unless plainly

erroneous or inconsistent with the regulation."   Response at 25 (citing Auer v. Robbins, 519 U.S.

at 466).   The Court disagrees on both counts.

As an initial matter, Tenth Circuit law suggests that the Court should not give any

deference  to  Pequot's  interpretation  of  § 900.32.    When  agencies  interpret  their  own

regulations -- to, for example, adjudicate whether a regulated party was in compliance with them

-- courts accord agencies what is known as Auer or Seminole Rock deference.   See Auer v.

Robbins; Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945).   The Court has previously

said that <u>Auer</u> deference "is applied in the same manner as <u>Chevron</u> deference and is substantively identical." <u>Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Services</u>, No. CIV 12-0069 JB/JKM, 2015 WL 711044, at *31 (D.N.M. Feb. 9, 2015)(Browning, J.). Although the Tenth Circuit has not ruled on whether courts should apply <u>Auer</u> deference to an agency's interpretation of the ISDEA's promulgating regulations, Tenth Circuit precedent indicates that courts should not. The Tenth Circuit observed in <u>Ramah Navajo Chapter v. Lujan</u> that the ISDEA's purpose is "to assure maximum participation by Indian tribes in the planning and administration of federal services, programs and activities for Indian communities." 112 F.3d at 1461 (citations omitted)(internal quotation marks omitted). The Tenth Circuit thus held that the canon of statutory construction favoring American Indian tribes applies to ISDEA claims, noting that "it would be entirely inconsistent with the purpose of the [ISDEA], as well as with the federal policy of Native American self-determination in general, to allow the canon favoring Native Americans to be trumped in this case." <u>Ramah Navajo Chapter v. Lujan</u>, 112 F.3d at 1462. The Tenth Circuit has explained that this canon of construction "controls over more general rules of deference to an agency's interpretation of an ambiguous statute." <u>S. Ute Indian Tribe v. Sebelius</u>, 657 F.3d at 1078. <u>See</u> <u>Cobell v. Norton</u>, 240 F.3d 1081, 1101 (D.C. Cir. 2001)("While ordinarily we defer to an agency's interpretations of ambiguous statutes entrusted to it for administration, <u>Chevron</u> deference is not applicable in this case.").

While the Court recognizes that <u>Chevron</u> deference is distinct from <u>Auer</u> deference, the Tenth Circuit's rationale for not applying <u>Chevron</u> deference to the ISDEA's statutory provisions applies with equal force to <u>Auer</u> deference. Moreover, the ISDEA's promulgating regulations explicitly instruct that "[e]ach provision of [the ISDEA] and each provision of contracts entered into thereunder shall be liberally construed for the benefit of the tribes or tribal

organizations . . . ."  25 C.F.R. § 900.3(a)(5).  Given Tenth Circuit precedent mandating that

courts should not apply <u>Chevron</u> deference in ISDEA cases, and § 900.3(a)(5)'s explicit

instruction that courts should construe the ISDEA's promulgating regulations in favor of tribes

and tribal organizations, the Court concludes that the canon of construction favoring Indian tribes

and tribal organizations trumps <u>Auer</u> deference.  Accordingly, although the Court will carefully

consider <u>Pequot</u>'s interpretation of § 900.32, it is not required to defer to it.[26]

---

[26]A number of the current justices on the Supreme Court of the United States have also challenged <u>Auer</u>'s logical underpinnings as being on much shakier grounds than those of <u>Chevron</u> deference.  Justice Scalia, after years of applying the doctrine followed by years of gradually beginning to question its soundness, finally denounced <u>Auer</u> deference in his dissent in <u>Decker v. Northwest Environmental Defense Center</u>, 133 S. Ct. 1326 (2013).  The Court cannot describe the reasons for Justice Scalia's abandonment of the doctrine better than the Justice did:

> For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations."  <u>Talk America, Inc. v. Michigan Bell Telephone Co.</u>, 131 S. Ct. 2254, 2265 (2011)(Scalia, J., concurring).  This is generally called <u>Seminole Rock</u> or <u>Auer</u> deference.
>
> The canonical formulation of <u>Auer</u> deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation."  But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation.  Obviously, that is not enough, or there would be nothing for <u>Auer</u> to do.  In practice, <u>Auer</u> deference is <u>Chevron</u> deference applied to regulations rather than statutes.  The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.
>
> Our cases have not put forward a persuasive justification for <u>Auer</u> deference.  The first case to apply it, <u>Seminole Rock</u>, offered no justification whatever -- just the *ipse dixit* that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."  Our later cases provide two principal explanations, neither of which has much to be said for it.  First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it.  The implied premise of this argument -- that what we are looking for is the agency's intent in adopting the rule -- is false.  There is true of regulations what is true of statutes.  As Justice Holmes put it: "[w]e do not inquire what the legislature

meant; we ask only what the statute means." Whether governing rules are made by the national legislature or an administrative agency, we are bound by what they say, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'" That is true enough, and it leads to the conclusion that agencies and not courts should make regulations. But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective. Making regulatory programs effective is the purpose of rulemaking, in which the agency uses its "special expertise" to formulate the best rule. But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is." Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience. Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation will be given effect if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors. If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for <u>Auer</u> deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that Congress enacted, as we do per <u>Chevron</u>, it is a fortiori reasonable to defer to them regarding the meaning of regulations that they themselves crafted. To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all. The theory of <u>Chevron</u> (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute. While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations. For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands. "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner." Montesquieu, <u>Spirit of the Laws</u> bk. XI, at 151-152 (O. Piest ed., T. Nugent transl. 1949). Congress

_____

cannot enlarge its own power through <u>Chevron</u> -- whatever it leaves vague in the statute will be worked out by someone else.  <u>Chevron</u> represents a presumption about who, as between the Executive and the Judiciary, that someone else will be. (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.)    So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its own rules -- that is something else. Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect.  "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power."  Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it."  1 Wm. Blackstone, <u>Commentaries on the Laws of England</u> 58 (1765).  And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation.  The Federalist No. 81, at 543-544 (Alexander Hamilton)(J. Cooke ed. 1961).   <u>Auer</u> deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures."  <u>Auer</u> is not a logical corollary to <u>Chevron</u> but a dangerous permission slip for the arrogation of power.

It is true enough that <u>Auer</u> deference has the same beneficial pragmatic effect as <u>Chevron</u> deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court.  The agency's view can be relied upon, unless it is, so to speak, beyond the pale.  But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute.  For as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear.  The circumstances of this case demonstrate the point.   While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing.  It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here.  And there is another respect in which a lack of <u>Chevron</u>-type deference has less severe pragmatic consequences for rules than for statutes.   In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute.  That is not possible, of course,

Even giving careful consideration to Pequot, however, the Court will not adopt its interpretation of § 900.32.  The relevant paragraph of the decision states:

> [T]he successor AFA here was not "substantially the same" as the prior year AFA.  As discussed earlier [the IHCIA] requires that a tribe's governing body make a contemporaneous decision that no reasonable alternative services are available.  Thus, each proposal can be viewed as substantively different from the prior proposal since each is necessarily based on a different decision.  Moreover, the OIG report raised legal issues concerning the proposal which might not have been apparent to IHS when it approved the FY 1999 AFA.

Pequot, 2006 WL 1337419, at *17 (footnote omitted).  The second and third sentences of the paragraph refer to the IHCIA's requirement that a tribal organization take into account the availability of alternative services in making its decision to provide those services to non-Indians.  See Pequot, 2006 WL 1337419, at *7-8.  Because this determination must be contemporaneous, it stands to reason that every successor AFA "can be viewed as substantively different" from its predecessor.  Pequot, 2006 WL 1337419, at *17.  Because this contemporaneous alternative-service-determination requirement is unique to the IHCIA, and the IHCIA does not apply in this case, those sentences are inapplicable here.  See Pequot, 2006 WL 1337419, at *17.

------

when, as here, a party harmed by the violation has standing to compel enforcement.

    In any case, however great may be the efficiency gains derived from Auer deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. at (Scalia, J., dissenting).  Justice Scalia's attack on Auer was in a dissent, but another two Justices, the Honorable John G. Roberts and Samuel A. Alito, joined in a concurring opinion stating that "[i]t may be appropriate to reconsider [Auer deference] in an appropriate case.  But this is not that case."  133 S. Ct. at 1338 (Roberts, C.J., concurring).  Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.  Accordingly, were this case brought under another statute rather than the ISDEA, the Court would have to accord Auer deference to the HHS Secretary's interpretation of § 900.32.

The paragraph's final sentence -- which states that "the OIG report raised legal issues concerning the proposal which might not have been apparent to IHS when it approved the FY 1999 AFA" -- is the only line in the decision that can be construed as supporting the Defendants' argument.  Arguably, it suggests that the NAIHS may consider information beyond the proposed AFA's text -- like the Moss Adams Report and the NAIHS Report's findings -- in determining whether the proposal is "substantially the same" as its predecessor.  25 C.F.R. § 900.32.  A few considerations counsel against adopting its interpretation of § 900.32, however.

First, Pequot's expansive interpretation of § 900.32 conflicts with a plain-text reading of the ISDEA.  Section 900.32 states:

> Can the Secretary decline an Indian tribe or tribal organization's proposed successor annual funding agreement?
>
> No.   If it is substantially the same as the prior annual funding agreement . . . and the contract is with DHHS or the BIA, the Secretary shall approve and add to the contract the full amount of funds to which the contractor is entitled, and may not decline, any portion of a successor annual funding agreement. Any portion of an annual funding agreement proposal which is not substantially the same as that which was funded previously (e.g., a redesign proposal; waiver proposal; different proposed funding amount; or different program, service, function, or activity), or any annual funding agreement proposal which pertains to a contract with an agency of DOI other than the BIA, is subject to the declination criteria and procedures in [§450f(a)(2)].

25 C.F.R. § 900.32.  Section 900.32 makes clear that whether the HHS Secretary may apply § 450f(a)(2)'s declination criteria to a proposed successor AFA turns on the proposal's contents rather than on a holistic assessment of the tribe or tribal organization's performance of the existing AFA that includes information from outside sources.  Section 900.6 underscores this interpretation by defining an AFA narrowly as "a document that represents the negotiated agreement of the Secretary to fund, on an annual basis, the programs, services, activities and functions transferred to an Indian tribe or tribal organization under the Act."  25 C.F.R. § 900.6.

See 25 C.F.R. § 900.12 (detailing the requirements for a proposed successor AFA, and stating that "[t]he proposal shall provide funding information in the same detail and format as the original proposal and may also identify any significant proposed changes").

Second, the ISDEA's legislative history indicates that courts should interpret § 900.32 narrowly.  The ISDEA originally delegated the DOI and HHS Secretaries broad authority to "perform any and all acts and to make such rules and regulations as may be necessary and proper for the purposes of carrying out" the ISDEA.  25 U.S.C. § 450k(a)(1983).  Their failure to adequately enact regulations that transferred their contracting authority to American Indian tribes, however, ultimately motivated Congress to amend the ISDEA twice -- first in 1988 and again in 1994.  Among the many problems that Congress noted in enacting its 1988 amendments to the ISDEA were:

> (1) the "[i]nappropriate application of federal procurement laws . . . result[ing] in excessive paperwork and unduly burdensome reporting requirements;" (2) the agency creation of an oppressive "contract monitoring bureaucracy;" (3) agency "imposition [of] additional reporting requirements on tribal contractors which often are not required under applicable law and regulations;" and (4) reallocation of funds due tribal contractors "to pay for such items as federal computer equipment acquisition and software development costs . . . federal pay and retirement costs . . . [and] federal contract monitoring costs."

Shoshone-Bannock Tribes of Fort Hall Reservation v. Shalala, 988 F. Supp. at 1316 (quoting 1987 Senate Report at 7-8)(alterations in Shoshone-Bannock Tribes of Fort Hall Reservation v. Shalala but not 1987 Senate Report).  Accordingly, Congress proposed not to apply "otherwise applicable federal procurement law and acquisition regulations," to ISDEA contracts to "decrease the volume of contract compliance and reporting requirements associated with tribal contracts, and to decrease the volume of unnecessary contract monitoring requirements on the Federal agencies."  1987 Senate Report at 19.  Congress thus expected that "the federal contract

monitoring bureaucracy that has replaced the federal service bureaucracy will be greatly reduced over the next three years."  1987 Senate Report at 19.

As an added protection against agency malfeasance, Congress gave tribes and tribal organizations the option to circumvent the ISDEA's administrative hearing process and bring their ISDEA claims straight to federal court.  See 25 U.S.C. § 450m-1.  Congress explained that amendment as follows:

> The strong remedies provided in these amendments are required because of those agencies' consistent failures over the past decade to administer self-determination contracts in conformity with the law.  Self-determination contractors' rights under the Act have been systematically violated particularly in the area of funding indirect costs.  Existing law affords such contractors no effective remedy to redressing such violations.  Tribal contractors are denied access to injunctive relief to compel agency compliance with the law where the effect of any court order would be to require the Federal government to add funds to the plaintiff's contract.  Furthermore, tribal contractors are unable to recover legal fees under the Equal Access to Justice Act even when they prevail on contract disputes in agency administrative proceedings.

1987 Senate Report at 37.

Even after Congress enacted the 1988 amendments, the DOI and HHS Secretaries' reluctance to hand over contracting authority to Indian tribes continued.  Six years later, "frustrated with the Secretary's resistance to the 1988 amendments, Congress reinforced almost every section of the ISDEA, adopted a model self-determination contract . . . , and stripped the Secretary of all her delegated rulemaking authority except for 16 narrow areas."  Shoshone-Bannock Tribes of Fort Hall Reservation v. Shalala, 988 F. Supp. at 1316 (citing 25 U.S.C. §§ 450l, 450k(a)(1)).  Accordingly, nearly every significant amendment that Congress has made to the ISDEA since its inception reflects a desire to curtail the DOI and HHS Secretaries' authority to administer ISDEA contracts, and to expand tribes and tribal organizations' authority to administer those contracts themselves.  In light of this legislative history, the Court is reluctant

to read § 900.32 expansively as allowing the DOI and HHS Secretaries to apply § 450f(a)(2)'s declination criteria to a proposed successor AFA based on information beyond the proposal's four corners.

Third, the ISDEA already provides a remedy for the NAIHS in these situations.  Where the NAIHS can establish that the tribe or tribal organization is violating its patients' rights, endangering its patients' health or safety, or committing gross negligence or mismanagement in handling ISDEA funds, it can cancel the ISDEA contract.  The ISDEA authorizes the NAIHS to reassume unilaterally a contract on either an emergency or a non-emergency basis.  See 25 C.F.R. § 900.246.  An emergency reassumption is permitted when a tribe or tribal organization fails to fulfill the ISDEA contract's requirements and that failure poses: (i) an immediate threat of imminent harm to the safety of any person; or (ii) an imminent substantial and irreparable harm to trust funds, trust lands, or interest in such lands.  See 25 C.F.R. § 900.247.  A non-emergency reassumption is permitted when there has been: (i) a violation of the rights or endangerment of the health, safety, or welfare of any person; or (ii) gross negligence or mismanagement in the handling or use of contract funds, trust funds, trust lands, or interest in trust lands under the contract.  See 25 C.F.R. § 900.247.  That the ISDEA provides a specific procedure for rescinding a contract where a tribe or tribal organization commits the malfeasance that the Defendants have accused Sage Hospital of committing underscores the Court's narrow interpretation of § 900.32.

Given the clarity of § 900.32's text, the ISDEA's explicit instruction to courts to construe its regulations in favor of tribal organizations like Sage Hospital, the ISDEA's legislative history indicating Congress' repeated concern about agency malfeasance in administering ISDEA contracts, and that the ISDEA already provides the NAIHS a remedy in these situations, the

Court will not adopt <u>Pequot</u>'s broad interpretation of § 900.32.  As the Defendants offer no other authority to support their AFA declination decisions, and § 900.32's plain text indicates that those decisions were unlawful, the Court concludes that the NAIHS violated § 900.32 of the ISDEA when it declined the 2014 AFA.

**2.      The NAIHS Likely Violated the ISDEA When It Declined the 2015 AFA.**

The 2nd Declination explains that the NAIHS would not agree to the 2015 AFA for the same reasons that it declined the 2014 AFA.  <u>See</u> 2nd Declination *passim*.  The text of the 2015 AFA appears substantively identical to the text of the 2013 AFA.  <u>Compare</u> 2015 AFA *passim*, <u>with</u> 2013 AFA *passim*.  The cover letter for the 2014 AFA, however, explains that the 2015 AFA requests that the NAIHS fund Sage Hospital at a total amount of $32,614,916.00, with $19,995,900.00 in base funding and $12,619,016.00 for direct and indirect contract support costs.[27]  <u>See</u> El-Meligi Ltr. at 2-3.  This figure represents a fifty-five percent increase in funding from the 2013 AFA.  <u>See</u> 2013 AFA at 22, 30 (providing that the NAIHS would fund Sage Hospital at a total amount of $18,044,042.00, with $11,481,661.00 in base funding and $6,562,381.00 for contract support costs).  The Court is reluctant to conclude that an AFA that provides for a fifty-five percent increase in funding is "substantially the same" as its predecessor.  25 C.F.R. § 900.32.  The NAIHS must justify its contract declination decision, however, "by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)."  25 U.S.C. § 450f(e)(1).  As the NAIHS has offered no evidence and submitted no argument on whether the 2015 AFA's contents are "substantially the same" as the 2013 AFA's contents, the NAIHS has not met its burden and § 900.32 likely prohibits the NAIHS from

---

[27]The funding amounts in the 2015 AFA appear to be provided in detail in Attachment B to the 2015 AFA, which neither party has provided the Court.

declining the 2015 AFA.  Moreover, even if the NAIHS demonstrates that the 2015 AFA's contents are "substantially the same" as the 2013 AFA's contents, the Court's concerns about applying the declination criteria to Sage Hospital's other proposals apply with equal force here. Accordingly, the NAIHS likely violated the ISDEA when it declined the 2015 AFA.

> **3.     Section 900.33 of the ISDEA Likely Prohibits the NAIHS from Declining the 2013 Renewal.**

Section 900.33 likely prohibits the NAIHS from declining the 2013 Renewal, because it did not contain a "material and substantial change to the scope or funding" of one of Sage Hospital's PFSAs.  Section 900.33 says that proposals for term contract renewals are not subject to § 450f(a)(2)'s declination criteria "where no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the Indian tribe or tribal organization."   25 C.F.R. § 900.33.   The 2013 Renewal proposed the following amendments to the 2010 Contract -- the added sections are underlined and the deleted sections are crossed out:

Article I, Section 2(B):

> **(B) In General.**  Each provision of the ISDA and each provision of this Contract shall be liberally construed for the benefit of Sage to transfer the funding and certain programs, functions, services, and activities (hereinafter "PFSAs"), or portions thereof, and associated resources, that are otherwise contractable under section 102(a) of the ISDA (25 U.S.C. § 450f(a)), including all related administrative functions, from the Secretary to Sage.

Article II, Section 1:

> **SECTION 1 - TERM.**  Pursuant to section 105(c)(1) of the ISDA (25 U.S.C. § 450j(c)(1)), the original term of this Contract shall be 3 years, from October 1, 2010 through September 30, 2013. Pursuant to 25 U.S.C. §§ 450f(a)(2) and 450j(c)(1), 25 C.F.R. §§ 900.12 and 900.8(h), the Navajo Nation Council's Resolution CJN-35-05 passed on June 3, 2005 ("Resolution") attached as Attachment 1 to the Contract, and Article V, Section 2(A) of the

> Contract, the Contract is amended as stated in this Renewal and Amendment and renewed for a three-year term from October 1, 2013 through September 30, 2016.

Article II, Section 7(D):

> **(D)  Confidentiality Standards.**  Sage will maintain confidentiality in accordance with applicable Federal, Arizona, ~~Navajo Nation~~ and Navajo Nation statutes and regulations, including without limitation the Health Insurance Portability and Accountability Act of 1996.

2013 Renewal at 5-6.

The 2013 Renewal proposes only minor amendments to update the 2013 Renewal for a new three-year term and to fix a few typographical errors.  The 2013 Renewal offers no modifications to the provisions of the 2010 Contract that speak to the scope and funding of Sage Hospital's PFSAs.  Compare 2013 Renewal at 5-6, with 2010 Contract *passim*.  Because the 2013 Renewal did not propose a substantial and material change to Sage Hospital's PFSAs in the 2010 Contract, § 900.33 precluded the NAIHS from applying § 450f(a)(2)'s declination criteria to it.  Accordingly, the NAIHS likely violated § 900.33 when it declined the 2013 Renewal.

The Defendants urge the Court to adopt the same expansive interpretation of § 900.33 that they propose for § 900.32.  In their view, the information that the Moss Adams Report and NAIHS Report uncovered about Sage Hospital's performance of the 2010 Contract effected a substantial and material change in the scope of the PFSAs in the 2013 Renewal.  See Tr. at 41:14 (Belgrove).  The Defendants argue that the NAIHS "thought that the Board was properly overseeing the functions of the different executives of the hospital, and that there was accountability . . . . [T]here were internal controls.  And that's what the difference is.  That's the PFSA that materially changed."  Tr. at 48:11-17 (Belgrove).  The Court will not adopt the Defendants' interpretation of § 900.33 for three reasons.

First, the Defendants' interpretation conflicts with § 900.33's plain language.  Section

900.33 reads:

> Are all proposals to renew term contracts subject to the declination criteria?
>
> Department of Health and Human Services and the Bureau of Indian Affairs will not review the renewal of a term contract for declination issues where no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the Indian tribe or tribal organization.

25 C.F.R. § 900.33.  By using the words "has been proposed by," § 900.33 indicates that the

NAIHS' authority to decline a contract renewal proposal turns on the proposal's contents rather

than on information that an outside report uncovers about the tribal organization's performance

of the existing contract.  25 C.F.R. § 900.33.  If § 900.33 provided the NAIHS authority to

consider such outside information in determining whether to apply § 450f(a)(2)'s declination

criteria, it would read as follows:

> Are all proposals to renew term contracts subject to the declination criteria?
>
> Department of Health and Human Services and the Bureau of Indian Affairs will not review the renewal of a term contract for declination issues where <u>there is</u> no material and substantial change to the scope or funding of a program, functions, services, or activities ~~has been proposed by the Indian tribe or tribal organization~~.

25 C.F.R. § 900.33.  That § 900.33 contains no such language or deletions shows that the

NAIHS' authority is strictly limited to the contract renewal proposal's contents.

Second, the DOI and HHS Handbook -- which sets forth those agencies' internal

procedures -- expressly rejects the Defendants' approach.  It states that the tribe or tribal

organization's "performance under the existing contract shall have no effect on the contract

renewal process . . . ."  Handbook at 4.  Third, the Court's concerns about adopting an expansive

interpretation of § 900.32 apply with equal force here.  Both the ISDEA's text and its legislative history indicate that courts should err on the side of interpreting the ISDEA's regulations narrowly.  As the Defendants have presented no authority to suggest otherwise, the Court concludes that § 900.33 does not allow the NAIHS to consider information beyond a contract renewal proposal's four corners in determining whether to apply § 450f(a)(2)'s declination criteria.  Because there is no substantial and material change in the scope or funding of Sage Hospital's PFSAs in the 2013 Renewal, the NAIHS violated § 900.33 of the ISDEA when it declined the 2013 Renewal.

### 4. The NAIHS Likely Violated § 900.33 When It Declined the 2014 Renewal.

The 2nd Declination explains that the NAIHS would not agree to the 2014 Renewal for the same reasons that it declined the 2013 Renewal.  See 2nd Declination *passim*.  The 2014 Renewal appears to offer no modifications to the provisions of the 2010 Contract that speak to the scope and funding of Sage Hospital's PFSAs.  Compare 2014 Renewal at 7-9, with 2010 Contract *passim*.  As the NAIHS cannot decline a contract renewal proposal "where no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the Indian tribe or tribal organization," 25 C.F.R. § 900.33, the NAIHS likely violated the § 900.33 when it declined the 2014 Renewal.

### 5. Even If §§ 900.32 and 900.33 Permitted the NAIHS to Apply § 450f(A)(2)'S Declination Criteria to Sage Hospital's Contract Proposals, Those Criteria Likely Did Not Permit the NAIHS to Decline Any of Those Proposals.

Even if §§ 900.32 and 900.33 permits the NAIHS to apply § 450f(a)(2)'s declination criteria to Sage Hospital's contract proposals, those criteria likely do not permit the NAIHS to

decline any of those proposals.  Upon satisfying §§ 900.32 and 900.33's threshold requirements, the NAIHS may decline a contract proposal only based on one of these five reasons:

    **(A)**    the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;

    **(B)**    adequate protection of trust resources is not assured;

    **(C)**    the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;

    **(D)**    the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title; or

    **(E)**    the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities, . . . because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 450f(a)(2).  See 25 C.F.R. § 900.22 (setting forth the same declination criteria).  The NAIHS must justify its contract declination decision "by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)."  25 U.S.C. § 450f(e)(1).

       The Defendants contend that the NAIHS properly declined Sage Hospital's contract proposals on two grounds: (i) "the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory," 25 U.S.C. § 450f(a)(2)(A); and (ii) "the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract," 25 U.S.C. § 450f(a)(2)(C). Addressing both factors together, the Defendants argue that the Moss Adams Report and the NAIHS Report demonstrate that the Board "failed to fulfill its fiduciary duties to the hospital, and this led to serious issues with hospital operations that impeded satisfactory healthcare services."  Response at 28.  Based on the evidence before the Court, the Defendants will likely fail to meet their burden under either § 450f(a)(2)(A) or § 450f(a)(2)(C).

First, the Defendants will likely fail to "clearly demonstrat[e]," 25 U.S.C. § 450f(e)(1), that the quality of Sage Hospital's healthcare services "will not be satisfactory," 25 U.S.C. § 450f(a)(2)(A).  Fifteen of the 1st Declination's nineteen adverse findings focus exclusively on criticisms of Sage Hospital's internal financial controls -- or lack thereof -- and are thus inapplicable here.  See 1st Declination at 1-7.  Another finding discusses Sage Hospital's "potential" OSHA violations, which "affect the safety of employees, visitors, and patients":

> During the performance monitoring review, serious potential Occupational Health and Safety Administration (OSHA) violations were identified which affect the safety of employees, visitors, and patients.  These potential OSHA violations involved the condition of the building housing the water system; elements of the water system including lack of backflow prevention; no safe secondary water source; disconnection of the centralized boiler system; multiple blocked electric panels; multiple unguarded electronic circuit breakers; and multiple power strips (surge protectors) which had been interconnected.

1st Declination at 8.  As this paragraph mentions nothing about Sage Hospital's ability to provide satisfactory care to its patients, it is also inapplicable.  Only three of the 1st Declination's nineteen adverse findings mention the quality of Sage Hospital's healthcare services:

> During the course of the contract, services have been eliminated (ophthalmology, general surgery, Sanders Dental Clinic, obstetrical care, pediatrics, and podiatry), which has negatively impacted the delivery of health care to Indian beneficiaries.

> The Board has allowed the Purchased/Referred Care program to operate in violate of federally mandated regulations regarding program requirements.  The failure of the program to have a plan that describes the process for accessing such care, the medical priorities, the annual budget for referred care, the appeals process, and a system for tracking deferred services disadvantages patients who seek such care.

> The Board has failed to authorize sufficient funds to maintain a functional health information system for electronic health records to meet patient care information requirements.  This failure contributes to the loss of potential revenue and impedes the delivery of satisfactory health care services to patients.

1st Declination at 8.

As an initial matter, the NAIHS has offered no evidence to support the first paragraph's implication that Sage Hospital eliminated those services during its performance of the 2010 Contract. To the contrary, the evidence suggests that Sage Hospital eliminated those services before 2007. The 1st Declination is taken almost verbatim from the NAIHS Report, but omits the NAIHS Report's qualification that Sage Hospital has eliminated those services "since the first [Sage Hospital] contract was awarded in 2003." NAIHS Report at 14. Razaghi states that, "[p]rior to January 2007, Sage was forced to terminate general surgery (including orthopedics and opthalmolology [sic]) and obstetrical care for lack of adequate facilities and/or qualified staff." Razaghi's 2nd Decl. ¶ 7 at 23. Moreover, Razaghi explains:

> As of FY 2008, Sage contracted with IHS to perform only (1) contract health services, and (2) dispensing of medical supplies. The [2010 Contract] greatly expanded the scope of services under the ISDEAA relationship, which consisted of the following programs, functions, services and activities (called "PFSAs"): Inpatient Services, General Ambulatory and Specialty Care Services, Emergency Department, Emergency Medical Transport, Optometry Clinic, . . . Dental Clinic, and Podiatry Clinic. The [2010 Contract] did not include surgery, obstetrics ophthalmology, or inpatient pediatrics. The PFSAs also included podiatry, and, after Sage determined that there was insufficient demand for an on-staff podiatrist, Sage has satisfied that PFSA through its "contract health" dollars, as permitted under the [2010 Contract] and the ISDEAA. Finally, Sage was providing dental services for another health care organization . . . at a facility at Sanders, AZ, but that facility was dilapidated and unsanitary . . . . Sage, with IHS' agreement, provided those dental services both at Sage's Ganado facility . . . and at a satellite facility at Greasewood, AZ.

Razaghi 2nd Decl. ¶ 12 at 24-25. It appears that Sage Hospital reinstated its dental and podiatry services with the 2010 Contract, and has continued to provide those services ever since then. See 2013 AFA at 9 (listing podiatry and dental care among Sage Hospital's PFSAs). The Defendants have offered no evidence to the contrary.

Sage Hospital has not provided the other services -- general surgery, obstetric care, ophthalmology, and pediatrics -- since 2007. Neither the 2013 Renewal nor the 2014 AFA,

however, include those services in Sage Hospital's PFSAs.  A tribe or tribal organization's elimination of services that are not a part of its ISDEA proposal can cut one of two ways.  It may demonstrate that the tribe or tribal organization is falling apart and that the problems that plagued the eliminated services will likely soon spread to the proposed PFSAs.  On the other hand, it may allow the tribe or tribal organization to divert more resources to the contracted PFSAs to improve patient care in those areas.  The evidence in the record shows that Sage Hospital's elimination of services fell into the latter category: it was a key component of Sage Hospital's turnaround effort and allowed the hospital to stabilize and ultimately improve the quality of patient care for its contracted PFSAs.  See Razaghi 2nd Decl. ¶ 9, at 23.  In light of Sage Hospital's success in the intervening years since eliminating those services, and the lack of evidence suggesting that the elimination of those services would affect its contracted PFSAs in the 2013 Renewal and the 2014 AFA, the first paragraph does not demonstrate that "the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory."  25 U.S.C. § 450f(a)(2)(A).

The second and third paragraphs suffer from a different flaw.  Each pairs a fact that the NAIHS Report of Moss Adams Report supports -- e.g., "the Board has failed to authorize sufficient funds to maintain a functional health information system for electronic health records" -- with a conclusory statement about that fact's impact on the quality of Sage Hospital's healthcare services.  As far as the Court can tell, there is no evidence in the record to support these statements.  The 1st Declination does not point to any evidence in support of these conclusory statements.  The Moss Adams Report says nothing about the quality of Sage Hospital's patient services.  Only three sentences in the forty-two-page NAIHS Report imply that Sage Hospital's healthcare services are unsatisfactory: "Several concerns were expressed

regarding the delivery of patient care.  Patients feel they were unable to get access to some services as in the past.  There were also concerns that a lot of good doctors have left [Sage Hospital] employment."  NAIHS Report at 24.  The NAIHS Report states that these sentences are summaries of the NAIHS' interviews of two "community members representing the Ganado and Cornfields Chapters," who apparently "requested to be interviewed."  NAIHS Report at 24. Aside from these three sentences, the NAIHS has not offered -- and the Court has been unable to find -- any other evidence to indicate that Sage Hospital provides unsatisfactory healthcare services to its patients.

These findings are insufficient to "clearly demonstrat[e]," 25 U.S.C. §450f(e)(1), at the summary judgment stage or at trial that "the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory," 25 U.S.C. § 450f(a)(2).  The Court is reluctant to rely on the NAIHS' unsworn summary of its interviews with two "community members" who are relaying third- or fourth-hand information from purported patients of Sage Hospital.  At a minimum, the NAIHS should provide this information in the form of reliable evidence -- e.g., sworn affidavits or witness testimony -- from the patients themselves.   Additionally, it is hard for the Court to determine whether Sage Hospital's healthcare services "will be satisfactory," 25 U.S.C. § 450f(a)(2), without some indication of how Sage Hospital stacks up against its peers.  The NAIHS should provide, for example, evidence that a state or federal agency recently refused to certify Sage Hospital for providing substandard care; testimony or sworn affidavits from expert witnesses explaining the standard for patient care in hospitals in general -- or among hospitals that serve American Indian tribes in particular -- and why Sage Hospital's care falls below that standard; or testimony or sworn affidavits from patients comparing their recent experiences receiving treatment at Sage Hospital

to experiences at other hospitals.  Simply put, the Court would need more than bare conclusory allegations about the quality of Sage Hospital's healthcare services to uphold the NAIHS' declination decisions under § 450f(a)(2).

Indeed, the weight of evidence in the record suggests that Sage Hospital has offered exemplary care to its patients since at least 2009.  In September, 2009, Sage Hospital received both an unconditional Arizona Department of Health Services license, and its Centers for Medicare and Medicaid Services certification.  See Razaghi 1st Decl. ¶ 10, at 23-24.  On May 4, 2009, the Joint Commission awarded Sage Hospital its "Gold Seal of Approval," signifying that Sage Hospital exemplified the highest quality of patient care.  Razaghi 1st Decl. ¶ 10, at 23-24. In March, 2010, the United States Surgeon General, Vice Admiral Dr. Regina M. Benjamin, on behalf of HHS, awarded Razaghi the "Chief Executive Officer Managerial Excellence Award" for "leadership, successes and improvements which equate to improved and enhanced patient care."  Razaghi 1st Decl. ¶ 10, at 23-24.  In June, 2012, Sage Hospital received the American Hospital Association Institute for Diversity's "Best in Class Hospital Award" for leadership in addressing health disparities and improving diversity in governance, which recognized Sage Hospital and only one other hospital out of 900 hospitals nationwide.  Wauneka 1st Decl. ¶ 7, at 2.  In a January 10, 2012, letter, the EPA informed Sage Hospital that it had fulfilled all of the requirements of the EPA's 1999 and 2006 Administrative Orders.  See Razaghi 1st Decl. ¶ 11, at 24.  On September 12, 2013, the Arizona Department of Health Services licensed Sage Hospital as a Rural General Hospital through September 30, 2016.  See Razaghi 1st Decl. ¶ 11, at 24.  As recently as March, 2014, the Joint Commission granted Sage Hospital "Critical Access Hospital Accreditation," stating that it could not identify any requirements for improvements.  Razaghi 1st Decl. ¶ 11, at 24.  Given the variety of certifications and awards that Sage Hospital has received

recently, the Defendants face an uphill battle in proving that Sage Hospital's performance of the PFSAs in its contract proposals "will be unsatisfactory."  25 U.S.C. § 450f(a)(2)(A).

Second, the Defendants likely will not be able to establish that "the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract."  25 U.S.C. § 450f(a)(2)(C).  Neither the ISDEA nor the case law interpreting it have explained what the phrase "cannot be properly completed or maintained" in § 450f(a)(2)(C) means.  Black's Law Dictionary gives six definitions of "proper," only two of which are potentially applicable here: (i) "[a]ppropriate, suitable, right, fit, or correct; according to the rules . . . a proper request"; and (ii) "Conforming to the best ethical or social usage; allowable, right, and becoming . . . .  Using only proper means."  Black's Law Dictionary, "proper" (10th ed., 2014).  Section 450f(a)(2)(C)'s text thus suggests that it authorizes the NAIHS to decline contract proposals where the tribe or tribal organization will not comply with federal law or regulations in administering the contract.

The rest of the ISDEA also supports this interpretation.  Sections 900.35-.60 set forth myriad standards for tribes and tribal organizations' financial-management, procurement-management, and property-management systems.  See 25 C.F.R. §§ 900.33-60.  Outside of § 450f(a)(2)(C), however, the ISDEA provides no mechanism for the NAIHS to enforce these standards.  Accordingly,  reading § 450f(a)(2)(C) as providing such a mechanism gives those provisions teeth rather than rendering them effectively advisory.

Applying this interpretation of § 450f(a)(2)(C), the Defendants likely will not be able to establish that "the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract."  25 U.S.C. § 450f(a)(2)(C).  Although the 1st Declination is filled with allegations that Sage Hospital has allowed its programs to operate "in

violation of federally mandated regulations regarding program requirements," may have committed "potential" OSHA violations, and may have violated the ISDEA's financial management system requirements, the Defendants have failed to offer any evidence to establish that Sage Hospital has actually committed any of those violations.  1st Declination at 9.  The Moss Adams Report focuses exclusively on allegations that Sage Hospital has violated its own Articles of Incorporation, Code of Conduct, and Policies and Procedures.  See Moss Adams Report *passim*.  It contains no findings that Sage Hospital violated federal law.  Although the NAIHS Report mentions that the Board "has allowed the Purchased Referred Care program to operate in violation of federally mandated regulations regarding program requirements," it does not point to a single regulation and offers no evidence of these alleged violations.  NAIHS Report at 16.  Even Thompson, who ran Moss Adams' audit of Sage Hospital did not offer any information to suggest that Sage Hospital violated any federal laws or ISDEA financial management guidelines.  See Thompson Decl. *passim*.

As the Court has mentioned previously, the Defendants bear "the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)."  25 U.S.C. § 450f(e)(1).  Bare conclusory allegations that Sage Hospital violated federal law will not suffice.  Instead, the Defendants must come forward with evidence -- in the form of witness testimony, sworn affidavits, or documents -- that clearly establishes those violations.  Without more than the bare record before the Court, the Defendants likely will not be able to establish that "the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract."  25 U.S.C. § 450f(a)(2)(C).

**6.      Even If the NAIHS Permissibly Applied § 450f(A)(2)'S Declination Criteria To The 2013 Renewal And The 2014 AFA, It Likely Violated § 450f(B)(2) of The ISDEA by Failing to Provide Sage Hospital Technical Assistance.**

Even if the 1st Declination permissibly declined the 2013 Renewal and 2014 AFA, it likely violated § 450f(b)(2) by failing to provide Sage Hospital assistance to overcome the NAIHS' objections to the 2013 Renewal and the 2014 AFA.  The 1st Declination sets forth the NAIHS' obligation under § 450f(b)(2): "Pursuant to 25 U.S.C. § 450f(b)(2), IHS must offer to provide technical assistance to a Tribal contractor when the Secretary declines to enter into an ISDEAA contract with the Tribal contractor."  1st Declination at 15.  The 1st Declination said, however, that "given the nature and seriousness of IHS's concerns about NHF's ability to manage ISDEAA funds properly, IHS does not believe that technical assistance could be provided at this time that would allow [Sage Hospital] to overcome the stated objections in this letter."  1st Declination at 15.  The Defendants urge that § 450f(b)(2) did not require the NAIHS to offer Sage Hospital assistance to overcome the stated objections, because  "[n]o amount of technical assistance could have overcome the fact that the current Sage Board of Directors breached its duties of fiduciary responsibilities and accountability to the hospital and effectively relinquished its oversight responsibility to a contracted management company."  Response at 27.  They add that the ISDEA does not require the NAIHS to engage in "exercises of futility."  Response at 27.  The Defendants' argument lacks a sound basis in law.

Contrary to the Defendants' suggestions, § 450f(b)(2) contains no "futility" exception.  It creates a clear non-discretionary duty for the NAIHS to provide technical assistance after every declination decision: "Whenever the Secretary declines to enter into a self-determination contract . . . , the Secretary shall . . . provide assistance to the tribal organization to overcome the stated objections."  25 U.S.C. § 450f(b)(2).  As the Tenth Circuit has explained, "[i]t is a basic canon of

statutory construction that use of the word 'shall' indicates a mandatory intent." <u>United States v.</u> <u>Myers</u>, 106 F.3d 936, 941 (10th Cir. 1997).

Moreover, the Defendants do not cite, and the Court has been unable to find, a case in which a court has afforded the NAIHS -- or any agency for that matter -- any discretion to refuse to provide technical assistance to a tribe or tribal organization after a declination decision. Because the 1st Declination failed to offer Sage Hospital technical assistance, and the Defendants failed to provide Sage Hospital any technical assistance to overcome the 1st Declination's stated objections, the NAIHS likely violated § 450f(b)(2) of the ISDEA.

Accordingly, Sage Hospital has shown a likelihood of success on the merits of its ISDEA declination claim. This factor, thus, cuts in favor of granting a preliminary injunction.

**D.     THE BALANCE OF HARMS WEIGHS IN FAVOR OF SAGE HOSPITAL.**

The next prong is whether "the threatened injury to" Sage Hospital "outweighs whatever damage" the preliminary injunction may inflict on the NAIHS. <u>SCFC ILC, Inc. v. Visa USA,</u> <u>Inc.</u>, 936 F.2d at 1098. Sage Hospital has already demonstrated that it faces irreparable harm and will likely face insolvency if the Court does not order a preliminary injunction. The scales thus already tip in Sage Hospital's favor. By contrast, any harm flowing to the NAIHS from a preliminary injunction is minimal. Although Sage Hospital has not provided the Court with a specific figure that it seeks from the NAIHS in a preliminary injunction, adding the $11,481,661.00 in base funding to the $6,562,381.00 for contract support costs -- both of which are set forth in the 2013 AFA -- brings Sage Hospital's total funding request to approximately $18,044,042.00 for a full year. <u>See</u> 2013 AFA at 22, 30. The Court is skeptical that it would take a full year for the parties to go to trial, but even in that worst-case scenario, that figure is a

drop in the bucket when compared to the size of the annual federal budget -- which typically ranges between $3 trillion and $4 trillion.[28]

More importantly, however, the Defendants have not provided any evidence of concrete harms that they will suffer if the Court awards a preliminary injunction. They have only vaguely asserted that "granting Sage's request would force NAIHS into signing a contract when its performance monitoring review and its forensic consultant's findings show that Sage lacks the internal controls and well-functioning and efficient accounting and financial management systems procedures to ensure that ISDEAA funds would be used only for lawful purposes." Response at 31. Consequently, it is unlikely that the NAIHS will suffer greatly, if at all, if its decades-long relationship with Sage Hospital is continued for a short while until trial. In light of the potential repercussions that Sage Hospital faces if the Court does not award a preliminary injunction, and the Defendants' failure to provide evidence of any meaningful injury that it will suffer, the Court concludes that the balance of harms weighs in Sage Hospital's favor. Again, this factor weighs in favor of ordering a preliminary injunction.

### E.   A PRELIMINARY INJUNCTION WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST.

Sage Hospital asserts that a preliminary injunction would not be adverse to the public interest, because, if injunctive relief is not granted, "it is likely that 200 Navajo employees at Sage will lose their jobs within eight months and the struggling economy in the Ganado area would go into a tailspin." Motion at 29. The Defendants have offered only a cursory argument why granting a preliminary injunction is not in the public interest: "The IHS, as a federal agency, has a duty not only to serve its beneficiaries, but also to protect the public fisc. . . .  Thus, when

---

[28]" During FY2014, the federal government spent $3.504 trillion on a budget or cash basis, up $50 billion or 1% vs. FY2013 spending of $3.455 trillion." United States Federal Budget, Wikipedia.org, http://en.wikipedia. org/wiki/United_States_federal_budget (last visited April 9, 2015).

IHS determines that spending has become possibly unlawful and improper, it has a responsibility to rectify the situation, as it did here."  Response at 31.  The Court concludes that ordering a preliminary injunction in this case would not be adverse to the public interest.

In addition to the likelihood that Sage Hospital's employees may lose their jobs without a preliminary injunction, Sage Hospital has conclusively demonstrated that it provides valuable high-quality healthcare services to members of the Navajo Nation and the surrounding community surrounding Ganado.  To force those patients to go to other facilities at much greater distances is not in the public interest.  Accordingly, the Court concludes that a preliminary injunction in this case would not be adverse to the public interest.

## III.   THE PRELIMINARY INJUNCTION WILL REQUIRE THE DEFENDANTS TO FUND SAGE HOSPITAL AT PRE-1ST DECLINATION LEVELS.

The Court has a few options from which to choose in determining the appropriate level of funding for this preliminary injunction.  In the 2013 AFA, Sage Hospital and the NAIHS agreed that the NAIHS would fund Sage Hospital at a total amount of $18,044,042.00, with $11,481,661.00 in base funding and $6,562,381.00 for direct and indirect contract support costs.  See 2013 AFA at 22, 30.  The 2014 AFA proposes that the NAIHS fund Sage Hospital at a total amount of $20,738,846.00, with $13,222,149.00 in base funding, and $7,516,697.00 for direct and indirect contract support costs.  See 2014 AFA at 2-3.  The 2015 AFA proposes that the NAIHS would fund Sage Hospital at a total amount of $32,614,916.00, with $19,995,900.00 in base funding, and $12,619,016.00 for direct and indirect contract support costs.  See El-Meligi Ltr. at 2-3.  As the "main purpose of a . . . preliminary injunction is to preserve the status quo," and the 2013 AFA is the most recent document to which both parties agreed, the Court concludes that it provides the most appropriate funding level until the parties can resolve this case on the merits.  Stein v. Disciplinary Bd. of the Supreme Ct. of N.M., No. CIV 04-0840 JB/DJS, 2005

WL 2313607, at *3 (Aug. 26, 2005)(Browning, J.)(unpublished).  Accordingly, the Court will order the Defendants to fund Sage Hospital according the 2013 AFA and the 2010 Contract going forward.

The Court also orders the parties to abide by their existing obligations under the 2010 Contract and the 2013 AFA.  For example, Sage Hospital must continue to provide all PFSAs set forth in those documents, and the Defendants must reinstate Sage Hospital's coverage under the FTCA as provided for in Section 4 of the 2013 AFA.  See 2013 AFA at 2.

## IV. THE COURT WILL NOT REQUIRE SAGE HOSPITAL TO POST A BOND.

Sage Hospital contends that, because the "United States has ample ways of recouping any money not properly devoted to patient care," the Court should not require it to post substantial bond or other security.  Motion at 30.  The Defendants assert that,

> because Sage is seeking the lump sum payment of tens of millions in federal funds pending the resolution of this appeal on the merits, a security or bond is warranted to ensure that these funds are preserved to provide health care services to IHS beneficiaries and not diverted for improper bonuses and excessive compensation due to the lack of adequate financial controls and financial management procedures in place at Sage.

Response at 31-32.  The Court will not require Sage Hospital to post a bond.

Rule 65(c) provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The rule's language appears mandatory, but the Tenth Circuit has held that "a trial court has 'wide discretion under Rule 65(c) in determining whether to require security.'"  Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)(quoting Cont'l Oil Co. v. Frontier Refining Co., 338 F.2d 780, 782 (10th Cir. 1964)).  The Tenth Circuit has said that "a trial court may, in the exercise of discretion, determine a bond is

unnecessary to secure a preliminary injunction if there is an absence of proof showing a likelihood of harm." Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(internal quotation marks omitted).

The United States Courts of Appeals for the First and Third Circuits have held that, in determining whether to order a bond "the court should consider the possible loss to the enjoined party together with the hardship that a bond requirement would impose on the applicant." Crowley v. Local No. 82, Furniture & Piano, 679 F.2d 978 (1st Cir.1982), rev'd on other grounds, 467 U.S. 526 (1984). For instance, in Temple University v. White, 941 F.2d 201, 219 (3d Cir. 1991), the plaintiff -- Sacred Heart hospital -- was on the brink of financial ruin and would have become insolvent absent a preliminary injunction ordering the Pennsylvania Department of Public Works to continue funding the hospital. See 941 F.2d at 219. Upholding the district court's decision to waive the bond requirement, the Third Circuit highlighted that, because of Sacred Heart's financial state, it likely would not have been able to post a bond, and, had the hospital collapsed, it would not have been able to pursue its claim for increased Medicaid payments or serve its Medicaid patients. See 941 F.2d at 219.

While a preliminary injunction does not place a substantial burden on the Defendants, requiring Sage Hospital to post a bond may force it into insolvency. Based on the figures set forth in the 2013 AFA, it appears that funding Sage Hospital for a year will cost the NAIHS approximately $18,044,042.00. See 2013 AFA at 22, 30. At this point, the Court expects the case to go to trial in approximately 120 days. Taking Sage Hospital's yearly ISDEA support figure and dividing it roughly by three would require Sage Hospital to post a bond of $6,000,000.00. Forcing Sage Hospital to post such a large bond risks defeating this preliminary injunction's purpose: keeping Sage Hospital afloat until this case's resolution. Sage Hospital

already runs the risk of insolvency in months; the Court sees no sound reason to add to its financial troubles.  Moreover, up to this point, the Defendants have not demonstrated that a bond is required to ensure that Sage Hospital will not misuse ISDEA funds.  As the Court has explained previously, based on the evidence in the record, it is inclined to award a permanent injunction, and is awarding a preliminary injunction now only to preserve the status quo and to give the Defendants an opportunity to develop their arguments on the remaining factual issues before the Court.  As the money will be used to preserve a hospital that provides medical care to Navajo Indians on the Navajo Nation, and the United States can recoup any funds that Sage Hospital expends for an impermissible purpose through its own suit, ordering a bond at this stage would be inappropriate.

**IT IS ORDERED** that the requests in the Plaintiff's Motion for Immediate Injunctive Relief With Supporting Memorandum of Points and Authorities, filed December 22, 2014 (Doc. 17)("Motion"), are granted in part and denied in part.  The Court will deny the Motion's request for permanent injunctive relief.  The Court will, however, order a preliminary injunction for the Defendants Sylvia Matthews Burwell, Yvette Roubideaux, John Hubbard, Jr., and Frank Dayish to fund Sage Hospital according to the terms of: (i) the Annual Funding Agreement Between Navajo Health Foundation/Sage Memorial Hospital and the Secretary of the Department of Health and Human Services Fiscal Year 2013, filed January 13, 2015 (Doc. 21-2)("2013 AFA"); and (ii) the Indian Self-Determination Contract Between Navajo Health Foundation /Sage Memorial Hospital and the Secretary of the Department of Health and Human Services, filed January 13, 2015 (Doc. 21-1)("2010 Contract"), going forward until the resolution of this case on the merits.  Moreover, Sage Hospital and the Defendants are ordered to comply with all of the terms and conditions of the 2013 AFA and the 2010 Contract.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Paul E. Frye
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Angela M. Belgrove
Office of the General Counsel, Region IX
United States Department of Health & Human Services
San Francisco, California

--and--

Damon P. Martinez
   United States Attorney
Karen Grohman
   Assistant United States Attorney
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

   *Attorneys for the Defendants*