# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

NAVAJO HEALTH FOUNDATION -- SAGE
MEMORIAL HOSPITAL, INC.,

        Plaintiff,

vs.                                                                     No. CIV 14-0958 JB/GBW

SYLVIA MATHEWS BURWELL, Secretary
of the United States Department of Health and
Human Services; ROBERT MCSWAIN,[1]
Acting Director of Indian Health Services; JOHN
HUBBARD, JR., Area Director, Navajo Area
Indian Health Services; and FRANK DAYISH,
Contracting Officer, Navajo Area Indian Health
Services,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Motion for Summary

Judgment on its Fourth Claim for Relief, with Memorandum of Supporting Points and

Authorities, filed January 26, 2015 (Doc. 27)("MSJ"); (ii) the Motion to Vacate and Reschedule

Hearing on Plaintiff's Motion for Summary Judgment, filed April 1, 2015 (Doc. 56)("Motion to

Vacate"); and (iii) the Defendants' Motion for Leave to File Surreply, filed April 7, 2015

(Doc. 60)("Motion to File Surreply").  The Court held a hearing on the Motion to Vacate and on

the Motion to File Surreply on April 10, 2015, and a hearing on the MSJ on April 22, 2015.  The

primary issues are: (i) whether the Court should grant the Motion to File Surreply; (ii) whether

the Court should grant the Motion to Vacate; (iii) whether to deem Plaintiff Navajo Health

---

[1]On February 10, 2015, Robert McSwain became Acting Director of Indian Health
Services.  He will, therefore, be substituted for Yvette Roubideaux as a defendant in this action.
See Fed. R. Civ. P. 25(d)(1) (permitting such substitutions).

Foundation -- Sage Memorial Hospital's Contract Disputes Act Claim for Unpaid Contract Support Costs[2] Due in FY 2009 through FY 2013 Under Indian Self-Determination and Education Assistance Act Contracts and Annual Funding Agreements, filed January 26, 2015 (Doc. 27-1)("Claim"), denied, because Defendant Frank Dayish has failed to provide a date certain by which he will decide the Claim; and (iv) whether, even if the Claim is not deemed denied, Dayish's proposed fourteen-month period to decide the Claim is reasonable under the Contract Disputes Act, 41 U.S.C. §§ 7101-09 ("CDA").  The Court will grant the Motion to File Surreply, because Sage Hospital raises new arguments in the Reply to Defendants' Opposition to Plaintiff's Motion for Summary Judgment, filed March 19, 2015 (Doc. 53)("MSJ Reply"), to which Defendants Sylvia Matthews Burwell, Secretary of Health and Human Services ("HHS"), Robert McSwain, Acting Director of Indian Health Services, John Hubbard, Jr., Area Director of Navajo Area Indian Health Services, and Dayish (collectively, the "Defendants") should be allowed to respond.  The Court will deny the Motion to Vacate, because vacating and continuing the April 22, 2015, hearing on the MSJ would prejudice Sage Hospital, and because the Defendants' sole reason for vacating and continuing the hearing -- that Paula Lee, the Defendants' preferred attorney, will not be able to attend in person -- is ameliorated by allowing

---

[2]Contract Support Costs ("CSC")

consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which . . . (A) normally are not carried on by the respective Secretary in his direct operation of the program; or (B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

25 U.S.C. § 450j-1(a)(2).  Such costs include overhead administrative costs, as well as expenses such as federally mandated audits and liability insurance.  See Cherokee Nation of Okla. v. Leavitt, 543 U.S. 631, 635 (2005).

Ms. Lee to appear at the hearing via videoconference.  Finally, the Court will grant the MSJ on two grounds.  First, the Court will deem the Claim denied, because Dayish has not given Sage Hospital a "date certain" by which he will decide the Claim; rather, he conditioned his October 21, 2015, deadline upon Sage Hospital's cooperation.  Second, even if Dayish had given Sage Hospital a date certain by which he will decide the Claim, his proposed fourteen-month period for deciding the Claim is unreasonably long under the CDA.  Accordingly, even if the Court did not deem the Claim already denied, it would order Dayish to approve or deny the Claim by July 25, 2015.

## FACTUAL BACKGROUND

"Sage is a health care facility in Ganado, Arizona, within the exterior boundaries of the Navajo Reservation."  MSJ ¶ 1, at 2 (setting forth this fact).  See Defendants' Opposition to Plaintiff's Motion for Summary Judgment ¶ 1, at 9, filed February 26, 2015 (Doc. 48)("Response")(not disputing this fact); Declaration of Stenson Wauneka ¶ 3, at 1,[3] filed December 22, 2014 (Doc. 17-1)("Wauneka Decl.").  "Sage is a Navajo tribal organization[4] for

---

[3]Because many of the parties' exhibits either do not have their own internal pagination, or use inconsistent pagination conventions, the Court will use CM/ECF's pagination -- i.e., the number in the upper-right hand corner of each document -- for pincites of the parties' briefing and exhibits, unless the Court notes otherwise.

[4]A tribal organization is

the recognized governing body of any Indian tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities: Provided, That in any case where a contract is let or grant made to an organization to perform services benefiting more than one Indian tribe, the approval of each such Indian tribe shall be a prerequisite to the letting or making of such contract or grant . . . .

25 U.S.C. § 450b(l)(emphasis in original).

the purpose[] of contracting with IHS under the [Indian Self-Determination Education Assistance Act]."[5]  MSJ ¶ 1, at 2 (setting forth this fact).  See Response ¶ 1, at 9 (not disputing this fact); Wauneka Decl. ¶ 3, at 1.  "IHS is an agency within the Department of Health and Human Services and is responsible for providing federal health services to American Indians and Alaska Natives."  MSJ ¶ 2, at 2 (setting forth this fact).  See Response ¶ 2, at 9 (not disputing this fact); About IHS, filed December 29, 2014 (Doc. 17-1).

"Since 2004, Sage has contracted with IHS under the ISDEAA to provide health services to a largely Navajo patient population."  MSJ ¶ 3, at 2 (setting forth this fact).  See Response ¶ 3, at 9 (not disputing this fact); Declaration of Christi El-Meligi ¶ 3, at 5, filed December 22, 2014 (Doc. 17-1)("El-Meligi 1st Decl.").  "Defendant [Frank] Dayish is the Contracting Officer [('CO')] for the Navajo Area IHS."  MSJ ¶ 4, at 3 (setting forth this fact).  See Response ¶ 4, at 9 (not disputing this fact); Declaration of Christi El-Meligi ¶ 4, at 2, filed January 26, 2015 (Doc. 27-1)("El-Meligi 2d Decl.").  "Dayish is responsible for ISDEAA contracts and funding agreements for IHS programs, functions, services and activities undertaken by ISDEAA contractors within the Navajo Area of IHS, including Sage."  MSJ ¶ 4, at 3 (setting forth this fact).  See Response ¶ 4, at 9 (not disputing this fact); El-Meligi 2d Decl. ¶ 2, at 1.  "Dayish has exercised the authority to sign ISDEAA contracts and funding agreements with Sage for such IHS programs and to award funds pursuant to those agreements."  MSJ ¶ 4, at 3 (setting forth this fact).  See Response ¶ 4, at 9 (not disputing this fact); El-Meligi 2d Decl. ¶ 2, at 1.  "As

---

[5]The ISDEAA authorizes the United States of America to enter into contracts with American Indian tribes in which the tribe agrees to supply federally funded services that a federal agency normally would provide.  See 25 U.S.C. § 450f(a).

Contracting Officer, Dayish has exercised the authority to decide initially disputes arising under

ISDEAA contracts."  MSJ ¶ 4, at 3 (setting forth this fact).  See El-Meligi 2d Decl. ¶ 2, at 1.[6]

_____

[6]The Defendants state:

Defendants provide the following clarification to Sage's statement that "[a]s Contracting Officer, Dayish has exercised the authority to decide initially disputes arising under ISDEAA contracts" to the extent that it does not acknowledge the Agency-wide effort to resolve all CSC claims in a fair and consistent manner and to do so in collaboration with tribes.  With regard to CDA claims filed against IHS alleging underpayment of CSC, including Sage's, the IHS has followed the following process.  Upon receipt of a claim, the IHS CO sends a letter acknowledging the claims, requests additional documentation and explanation of the claims that are not available to IHS and are necessary to complete its analysis, and sets forth a date for responding to the claims.  Due to the complexity of the CSC claims, as well as IHS's goal to ensure consistency in the analysis of all claims, the claims are then analyzed by an IHS team that includes financial analysts and staff from the appropriate IHS Area Office, including the CO.  After IHS completes its analysis of the tribal contractor's claims, it notifies the tribal contractor of the results of the analysis or reaches out to the tribal contractor and typically its legal counsel and financial expert to discuss the claims.  The IHS's legal counsel, financial experts, and frequently IHS Area Office staff participate in these meetings.  Most of the time, IHS and the tribal contractor are able to reach an understanding about the eligible costs actually incurred by the tribal contractor but not paid by the IHS as CSC under the tribal contractor's ISDEAA contract and annual funding agreement, allowing the parties to quickly settle the claims at the next step of the CDA process.  As set forth in IHS's October 23, 2014 letter to Sage, it is the IHS's goal to work cooperatively with tribal contactors to exchange relevant documents and discuss the claims prior to issuing its final decision.

Response at 9-10 (citations omitted).  The local rules state:

The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Because the Response does not specifically controvert the proposed fact, but instead provides additional facts, the Court will deem the proposed fact undisputed.

1.      **The IHS' Process for Resolving CSC Claims.**

"Over 1,600 CSC CDA[7] claims have been presented to IHS."  Response at 13 (setting

forth this fact).[8]  See Declaration of Susan Blair ¶ 4, at 3, filed February 26, 2015

(Doc. 48)("Blair 1st Decl.").[9]

_____

[7]There is no indication in any of the briefing that "CSC CDA" claims are different from CSC claims.  Instead, the parties appear to use the phrases interchangeably.  For clarity and consistency, the Court will use "CSC claims" to describe claims for CSC specifically -- i.e., claims that tribes and tribal organizations bring to recover CSC under the ISDEAA -- and will use "CDA claims" to describe claims brought by non-ISDEAA entities that contract with the federal government.

[8]The local rules state: "The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies."  D.N.M.LR-Civ. 56.1(b).
       The Defendants did not comply with the local rules when they provided a "Statement of Facts" with four unlettered paragraphs which include multiple statements that do not "refer with particularity to those portions of the record upon which the non-movant relies."  D.N.M.LR-Civ. 56.1(b).  See Response at 6-8.  Moreover, in another portion of the Response, the Defendants dispute one of Sage Hospital's proposed facts with four unnumbered and unlettered paragraphs that appear to restate and add more detail to the facts in the Defendants' "Statement of Facts."  Response at 12-14.  This approach not only fails to comply with the local rules, but is also confusing.  As the local rules require, the non-movant should set forth all additional facts in lettered paragraphs.  See D.N.M.LR-Civ. 56.1(b).  These paragraphs should be grouped together rather than scattered throughout the Response.  Although the Court could disregard these facts for the Defendants' failure to comply with the local rules, in the interest of fully and fairly resolving the MSJ, and because considering these facts does not prejudice Sage Hospital, the Court will address these facts as if the Defendants had properly included them in the Response.

[9]Sage Hospital does not specifically controvert the Defendants' proposed fact, but instead argues that it is immaterial:

    Defendants assert generally that CSC claims like Sage's are complex, describe the process that the Indian Health Service ("IHS") would prefer to take in resolving CSC claims, provide national statistics regarding Defendants' success in resolving claims state that claims generally take one to two years to resolve completely, and provide information about the status of CSC claims arising in the Navajo Area IHS.  Even if all this information were accurate and complete, Defendants' various contentions do not raise any genuine issue of material fact precluding the grant of summary judgment.

> Upon receipt of a [CSC] claim, the IHS CO sends a letter acknowledging the claims, request[ing] additional documentation and explanation of the claims that are not available to IHS and are necessary to complete its analysis, and sets forth a date for responding to those claims.

Response ¶ 4, at 9 (setting forth this fact). See Blair 1st Decl. ¶ 13, at 5; id. ¶ 15, at 6; Declaration of Frank Dayish ¶¶ 17-19, at 4-5 (dated Feb. 26, 2015), filed February 26, 2015 (Doc. 48-1)("Dayish Decl.").[10] "Due to the complexity of the CSC claims, as well as IHS's goal to ensure consistency in the analysis of all claims, the claims are then analyzed by an IHS team that includes financial analysts and staff from the appropriate IHS Area Office, including the CO." Response ¶ 4, at 9 (setting forth this fact). See Blair 1st Decl. ¶ 13, at 5; Dayish Decl. ¶ 7, at 3.[11] "IHS hired an outside financial accounting firm, Cotton & Co., additional staff in its Office of Finance and Accounting (OFA), and new attorneys in the HHS Office of the General Counsel, to assist in handling the claims." Response at 13 (setting forth this fact). See Blair 1st Decl. ¶ 5, at 3.[12] "In addition, numerous staff in IHS's twelve Area Offices, thirty attorneys in the HHS Office of General Counsel, as well as numerous attorneys in the U.S. Attorney's Office, are assisting in tracking, evaluating, and resolving the CSC CDA claims." Response at 13

---

Reply at 6-7 (emphases in Reply).

 The Court has previously explained that "[a]rguments and concerns about the materiality and relevance of a fact do not dispute [it]." Walton v. N.M. State Land Office, 49 F. Supp. 3d 920, n.2 (D.N.M 2014)(Browning, J.)(citing O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.)("[Defendant's] argument that the facts underlying the state criminal case are immaterial does not specifically controvert those facts, and the Court will therefore deem those facts admitted.")). Accordingly, the Court will deem the proposed fact undisputed and will address materiality, if necessary, in its analysis.

 [10]The Court disposed of Sage Hospital's sole response to this fact in note 9, supra.

 [11]The Court disposed of Sage Hospital's sole response to this fact in note 9, supra.

 [12]The Court disposed of Sage Hospital's sole response to this fact in note 9, supra.

(setting forth this fact).  <u>See</u> Blair 1st Decl. ¶¶ 6-7, at 3-4.[13]  "Extensive documentation is needed to evaluate the claims, and the analysis is complex."  Response at 13 (setting forth this fact).  <u>See</u> Blair 1st Decl. ¶¶ 13-15, at 5-6.[14]

"After IHS completes its analysis of the tribal contractor's claims, it notifies the tribal contractor of the results of the analysis or reaches out to the tribal contractor and typically its legal counsel and financial expert to discuss the claims."  Response ¶ 4, at 9 (setting forth this fact).  <u>See</u> Blair 1st Decl. ¶ 16, at 6-7.[15]  "The IHS's legal counsel, financial experts, and frequently IHS Area Office staff participate in these meetings."  Response ¶ 4, at 9 (setting forth this fact).  <u>See</u> Blair 1st Decl. ¶ 13, at 5-6; <u>id.</u> ¶ 16, at 6-7.[16]  "IHS is attempting to resolve the claims expeditiously and in cooperation with tribal contractors, without resorting to litigation."  Response at 13 (setting forth this fact).  <u>See</u> Blair 1st Decl. ¶¶ 8-10, at 4.[17]  "[I]nformation needed is not readily apparent from financial documents and, instead, requires in-depth conversations between the financial experts for both the tribe and IHS in order for the parties to reach an understanding."  Response at 13 (setting forth this fact).  <u>See</u> Blair 1st Decl. ¶¶ 14-16, at 6-7.[18]

> Most of the time, IHS and the tribal contractor are able to reach an understanding about the eligible costs actually incurred by the tribal contractor but not paid by the IHS as CSC under the tribal contractor's ISDEAA contract and annual

---

[13]The Court disposed of Sage Hospital's sole response to this fact in note 9, <u>supra</u>.

[14]The Court disposed of Sage Hospital's sole response to this fact in note 9, <u>supra</u>.

[15]The Court disposed of Sage Hospital's sole response to this fact in note 9, <u>supra</u>.

[16]The Court disposed of Sage Hospital's sole response to this fact in note 9, <u>supra</u>.

[17]The Court disposed of Sage Hospital's sole response to this fact in note 9, <u>supra</u>.

[18]The Court disposed of Sage Hospital's sole response to this fact in note 9, <u>supra</u>.

funding agreement, allowing the parties to quickly settle the claims at the next step of the CDA process.

Response ¶ 4, at 9-10 (setting forth this fact).  See Blair 1st Decl. ¶ 16, at 6-7.[19]  "[I]t is the IHS's goal to work cooperatively with tribal contractors to exchange relevant documents and discuss the claims prior to issuing its final decision."  Response ¶ 4, at 10 (setting forth this fact).  See Blair 1st Decl. ¶ 17, at 7.[20]  This process "is time consuming and resource intensive, and the time required to respond to each claim is heightened due to the complexity of each claim, the total number of claims being addressed by IHS, and the time needed to meet with and discuss the claims with tribal contractors."  Response at 5 (setting forth this fact).  See Blair 1st Decl. ¶ 14, at 6; id. ¶ 18, at 7.[21]  "As IHS continues to make progress in resolving the claims, the majority of which have already been resolved, IHS does anticipate that the time required to reach resolution will be shortened."  Response at 13 (setting forth this fact).  See Blair 1st Decl. ¶ 18, at 7.[22]

**2.      Sage Hospital's CSC Claim.**

"By letter dated August 25, 2014 to Defendant Dayish, Sage submitted to IHS a CSC claim for FY 2009 through FY 2013 for a total of $62,569,681."  MSJ ¶ 5, at 3 (setting forth this fact).  See Response ¶ 5, at 10 (not disputing this fact); El-Meligi 2d Decl. ¶ 3, at 1.  "Sage submitted approximately 270 pages of documents with its CDA claims letter for $62,569,681, including Sage's audited financial statements for (FYs) 2009-2013."  Response ¶ 5, at 10 (setting forth this fact).  See Reply to Defendants' Opposition to Plaintiff's Motion for Summary

---

[19]The Court disposed of Sage Hospital's sole response to this fact in note 9, supra.

[20]The Court disposed of Sage Hospital's sole response to this fact in note 9, supra.

[21]The Court disposed of Sage Hospital's sole response to this fact in note 9, supra.

[22]The Court disposed of Sage Hospital's sole response to this fact in note 9, supra.

Judgment at 11-15, filed March 19, 2015 (Doc. 53)("Reply")(not disputing this fact); Claim *passim*. Sage Hospital also submitted "contracts and funding agreements between Sage and IHS in the custody of IHS, a Schedule of Attachments A and B prepared by Sage showing details of the CSC shortfalls, expectancy damages, and total claim . . . ."   MSJ ¶ 6, at 3 (setting forth unmodified version of this fact).   See Claim *passim*.[23]

"Sage did not rely on IHS' reports to Congress, and Sage's claim expressly states that Sage has used the method of calculating the shortfall preferred by IHS, namely, full amount of CSC minus amount of CSC paid."   Reply ¶ 4A, at 11 (internal quotation marks omitted)(setting forth this fact).   See Surreply in Opposition to Plaintiff's Motion for Summary Judgment *passim*, filed April 7, 2015 (Doc. 60)("MSJ Surreply")(not disputing this fact); Claim at 2; Spreadsheets of Sage Hospital's CSC at 2, filed January 26, 2015 (Doc. 27-2)("CSC Spreadsheets"); McGee Decl. ¶ 3, at 1.   "The Claim specifies, [for FYs 2009-13,] the CSC shortfall based on the full amount of CSC incurred by Sage minus the amount of CSC paid by IHS, the expectancy damages from lost billings, and the total claim for each such year."   MSJ ¶ 6, at 3 (setting forth this fact); Response ¶ 6, at 10 (not disputing this fact).   See Claim at 1.   "The Claim . . . explains

_____

[23]Sage Hospital asks the Court to find it undisputed that "[t]he Claim is supported by contracts and funding agreements between Sage and IHS in the custody of IHS, a Schedule of Attachments A and B prepared by Sage showing details of the CSC shortfalls, expectancy damages, and total claim; and Sage's audited financial statements for FY 2009 through 2013." MSJ ¶ 6, at 3.   The Defendants "dispute that the claims are supported by the documentation submitted by Sage."   Response ¶ 6, at 10 (citing Blair 1st Decl. ¶ 13, at 5; id. ¶ 15, at 6; Dayish Decl. ¶¶ 18-19, at 7).   Whether the documents that Sage Hospital submitted support the Claim is a legal question that the Court will consider, if necessary, in its analysis.   Accordingly, the Court will not include that part of the proposed fact in the factual background.   As the Defendants do not specifically dispute that Sage Hospital submitted those documents with the Claim, the Court will deem that portion of the proposed fact undisputed.   Finally, the Court has omitted the last part of the proposed fact, because the Court has already deemed it undisputed in a previous fact that Sage Hospital submitted its audited financial statements for FY 2009-13 with the Claim.

the expectancy damages claim for lost third-party revenues and the manner of calculating them."

MSJ ¶ 6, at 7-8 (setting forth unmodified version of this fact).  See CSC Spreadsheets at 2.[24]

**3.**     **Dayish's Response to the Claim.**

Dayish responded to the Claim with a letter "based on a template designed to ensure

consistent responses to all tribes with CSC claims" that was dated October 23, 2014.  Response

¶ 7, at 11 (setting forth unmodified version of this fact).  See  Reply ¶ 3, at 11 (not disputing this

fact); Letter from Frank Dayish, Contracting Officer, Navajo Area Indian Health Service to

Stenson D. Wauneka, Board President, Navajo Health Foundation - Sage Memorial Hospital Inc.

---

[24]Sage Hospital asks the Court to find it undisputed that "[t]he Claim clearly explains the expectancy damages claim for lost third-party revenues and the manner of calculating them." MSJ ¶ 6, at 7-8 (citing CSC Spreadsheet at 2).  The Defendants dispute that Sage Hospital "is entitled to expectancy damages, and that its claim letter 'clearly explain[s] the expectancy damages claim for lost-third party revenues and the number of calculating them' and that the documentation provides any support for those claims."  Response ¶ 6, at 11 (quoting MSJ ¶ 6, at 7-8)(citing Blair 1st Decl. ¶ 19, at 7)(alterations in Response but not in MSJ).
Sage Hospital responds:

> While arguing that Sage has not explained its method of computing expectancy damages, IHS paradoxically states that "as a matter of law, IHS has taken the position that the expectancy damages claims are invalid because, among other reasons, they are too speculative and remote."  Thus even assuming for the sake of argument that Sage did not explain fully its method of computing expectancy damages, that would be irrelevant to the time it should take Dayish to issue his initial CO decision denying Sage's claim "as a matter of law."

Reply ¶ 6, at 19 (citations omitted).
The CSC Spreadsheet, which Sage Hospital attached to the Claim and cites in support of its proposed fact, sets forth a total dollar amount of expectancy damages from FY 2009-13 and Sage Hospital's manner of calculating them.  See CSC Spreadsheet at 2.  Whether Sage Hospital's expectancy damages claims are valid, whether Sage Hospital clearly explained how it lost income from third party billing, and whether Sage Hospital has provided sufficient information to establish its expectancy damages claims are all legal issues that the Court will, if necessary, address in its analysis.  The Defendants do not provide, however, any information disputing Sage Hospital's proposed fact that the Claim explains Sage Hospital's expectancy damages claims and Sage Hospital's manner of calculating them. Accordingly, the Court will adopt the proposed fact's modified version as undisputed.

(Oct. 23, 2014), filed January 26, 2015 (Doc. 27-17)("Dayish Ltr.").[25]  The Dayish Ltr. states, in

pertinent part:

> On August 27, 2014, I received your letter dated August 25, 2014.  The letter makes a claim under the Contract Disputes Act and the Tribe's Indian Self-Determination and Education Assistance Act (ISDEAA) contract for fiscal year 2009, alleging "damages arising out of the failure of [IHS] to pay full contract support costs (including indirect costs and direct contract supports)."

> Because your claim exceeds $100,000, the CDA requires that the Indian Health Service (IHS) either issue a decision on the claim within 60 days of the date of receipt or notify the contractor when it will issue the decision. 41 U.S.C. § 7103(f)(2); 25 C.P.R. § 900.223(a).  At this time, the IHS has not had an opportunity to adequately review and make a final decision on your claim for a variety of reasons, including the size, complexity, age, and lack of specificity of

---

[25]Sage Hospital asks the Court to find undisputed that "IHS responded to the Claim by an inapplicable form letter dated October 23, 2014 signed by Defendant Dayish."  MSJ ¶ 7, at 8 (citing El-Meligi 2d Decl. ¶ 5, at 1). The Defendants dispute this fact and argue that,

> [f]or claims over $100,000, the CDA requires the CO to issue a decision within 60 days or notify the contractor when a decision will be issued.  As Sage admits in its Statement No. 7, the IHS's October 23, 2014 response letter notified Sage it would issue a decision by October 21, 2015.  Further, while based on a template designed to ensure consistent responses to all tribes with CSC claims, the letter was tailored to respond to the information required to analyze Sage's claims; for example, IHS did not request documents on its template list that Sage had already provided (such as its annual audit reports) and instead tailored the request to information that was not apparent from the information already received from Sage.

Response ¶ 7, at 11 (citations omitted).
The Court will not adopt Sage Hospital's proposed fact, for two reasons.  First, the El-Meligi 2d Decl. does not support Sage Hospital's assertion that the Dayish Ltr. is "an inapplicable form letter."  MSJ ¶ 7, at 8.  The portion of the El-Meligi 2d Decl. that Sage Hospital cites in support of this fact says that "IHS responded to Sage's Claim by a letter dated October 23, 2014 signed by Defendant Dayish."  El-Meligi 2d Decl. ¶ 5, at 2.  The El-Meligi 2d Decl. says nothing about the Dayish Ltr. being a form letter or it being inapplicable; that portion of Sage Hospital's proposed fact appears to be nothing more than an unnecessary rhetorical flourish.  Second, even if the record supported Sage Hospital's proposed fact, whether the Dayish Ltr. is "inapplicable" is a legal determination that the Court will, if necessary, resolve in the analysis. MSJ ¶ 7, at 8.  Although the Dayish Ltr. largely speaks for itself, in the interest of completeness, and because Sage Hospital does not dispute the Defendants' version of the proposed fact in the Reply, the Court will adopt the Defendants' version of the proposed fact as undisputed.  See Response ¶ 7, at 11.

your claim and the inadequacy of supporting documentation submitted with the claim.  In addition, the IHS would like to work cooperatively with the Navajo Health Foundation-Sage Memorial Hospital Inc. (NHF-SMH) to exchange relevant documents and discuss the claims prior to issuing its response.  In consideration of these factors and based upon the anticipated cooperation of the NHF-SMH, I will issue a final contracting officer's decision by **October 21, 2015.**

NHF-SMH can assist IHS in responding to the claim by providing additional documentation.  NHF-SMH did not submit sufficient information to provide a basis for IHS to determine the validity of the NHF-SMH's claim that it is owed additional contract support costs (CSC) funds.  Although IHS will refer to the contract documents that are in the Agency's possession to begin analyzing the claim, we have found that those documents often are insufficient to determine the amount of reasonable, allowable, and non-duplicative CSC that NHF-SMH actually incurred.  At least part of your claim appears to be based on the annual IHS CSC report to Congress, but that report is merely a budget planning tool that is not based on audited figures and, therefore, does not establish the amount of allowable CSC incurred by the NHF-SMH or the amount of any deficiency in CSC funding.  Accordingly, IHS requests that NHF-SMH submit information of actual CSC incurred in the years at issue.  Relevant documentation may include:

1)  Documents showing actual expenditures for direct costs associated with operation of the ISDEAA programs for each fiscal year at issue.

2)  Documents showing the Tribe's indirect costs for each fiscal year at issue.

3)  Documents showing the Tribe's actual capital expenditures, pass-through amounts, and other exclusions associated with the operation of the ISDEAA programs for each fiscal year at issue.

4)  Any additional documentation in the NHF-SMH's possession that will assist IHS in determining which of NHF-SMH's expenditures meet the ISDEAA definition of CSC in section 106(a)(2) and do not duplicate costs funded in the section 106(a)(l) amount.

Lastly, the IHS requests that NHF-SMH provide further explanation for the methodology used to calculate the amount of additional CSC funds it claims is owed.  For example, the "shortfall" claim appears to be based directly on the annual report to Congress.  That report is merely a budget planning tool, however, and does not demonstrate the amount of CSC incurred by NHF-SMH.  Similarly, we have no information demonstrating your expectancy damages claims.  If you

- 13 -

have detailed information demonstrating the calculation of each of these claims, IHS can review your claim more thoroughly and respond more quickly.

The requested information should be sent electronically to Alva R. Tom at alva.tom@ihs.gov or mailed in hardcopy to the following address within forty-five (45) days from the date of this letter:

> Navajo Area Indian Health Service
> Office of Indian Self Determination
> Attention: Alva R. Tom
> P.O. Box 9020
> Window Rock, AZ   86515

Should NHF-SMH need additional time to provide the requested documentation, please send notice in writing of the date by which NHF-SMH intends to respond, and a request for an additional extension of time for IHS to consider the documentation before making its decision.  If IHS does not receive any response, the Agency will consider the lack of specificity and the inadequacy of supporting documentation in making its decision.  IHS hopes that this will not be necessary and looks forward to working with NHF-SMH on a timely and expeditious resolution of its claim.

Dayish Ltr. at 1-2.[26]

---

[26]Sage Hospital asks the Court to find the following fact undisputed:

It appears IHS failed to either read or comprehend the Claim, because IHS predicated the supposed need for the extra year on its statements that the Claim is improperly based on the "shortfall report" method rather than the "incurred cost" method, that the Claim lacks sufficient accounting and financial detail, and that Sage failed to explain the way it arrived at its claimed expectancy damages.

MSJ ¶ 8 at 4 (citing Dayish Ltr. at 1-2).  The Defendants dispute this statement, arguing that

Dayish reviewed Sage's claim letter and responded in writing.  Furthermore, IHS has analyzed and extended settlement offers on over 1,200 of such claims and has settled 888 of those claims.
Defendants further dispute Sage's characterization of the response letter and reasoning for additional time to analyze the claim.  The letter speaks for itself:

At this time, the IHS has not had an opportunity to adequately review and make a final decision on your claim for a variety of reasons, including the size, complexity, age, and lack of specificity of your claim and the inadequacy of supporting documentation

submitted with the claim. In addition, the IHS would like to work cooperatively with the Navajo Health Foundation - Sage Memorial Hospital Inc. (NHF-SMH) to exchange relevant documents and discuss the claims prior to issuing its response. In consideration of these factors and based upon the anticipated cooperation of the NHF-SMH, I will issue a final contracting officer's decision by **October 21, 2015.**

As noted above, the letter also requested additional documentation that, based on its review of the information already provided, was still needed by the IHS. The letter also stated that "the IHS would like to work cooperatively with [Sage] to exchange relevant documents and discuss the claims prior to issuing its response."

Response ¶ 8, at 11-12 (bold in Dayish Ltr.)(alterations in Response but not in Dayish Ltr.).

Sage Hospital does not cite any evidence in support of its assertion that IHS "failed to either read or comprehend the Claim." MSJ ¶ 8, at 4. Again, it seems that Sage Hospital is unnecessarily trying to weave its argument into its proposed facts. Accordingly, the Court will not adopt that portion of the proposed fact as undisputed. The Court has already adopted the remainder of the proposed facts by incorporating the Dayish Ltr. in its entirety, and the Court will not repeat itself here.

Sage Hospital also asks the Court to find undisputed that the Dayish Ltr.

overlooks that (1) the Claim is expressly based on the incurred cost method for determining CSC shortfalls, and not the "shortfall report" method referred to in IHS' Letter; (2) the Claim is fully supportable by a Schedule of Attachments A and B prepared by Sage and by Sage's audited financial statements from FY 2009 through 2013; and (3) the Claim properly explains the expectancy damages claim for lost third-party revenues and the calculation thereof. The "incurred cost" approach employed by Sage is the approach favored by IHS.

MSJ ¶ 9, at 4 (citations omitted).

The Defendants respond: "The Defendants dispute that the documents provided by Sage are sufficient to support its claims or for IHS to conduct its costs-incurred analysis of the claims. Defendants further dispute that Sage's claim letter and exhibits properly explain or document the expectancy damages claim for lost third-party revenues." Response ¶ 9, at 12 (citations omitted).

The Court has already found it undisputed that: (i) the Claim is based on the incurred cost method shortfalls; (ii) Sage Hospital submitted a Schedule of Attachments A and B and Sage's audited financial statements from FY 2009-13; (iii) the Claim explains the expectancy damages claim for lost third-party revenues and the calculation thereof; and (iv) the "incurred cost" approach that Sage Hospital employed is the approach that the IHS favors. Whether the Dayish Ltr. "overlooks" those facts, and the remaining issues that the Defendants dispute are legal disputes, and not factual ones. The Court will, if necessary, address those disputes in its analysis.

Sage Hospital also asks the Court to find it undisputed that "[a]t no time during the over

_____

six months since Sage submitted its CSC claim has IHS asked for a single additional document from Sage." MSJ Reply ¶ 5, at 13 (citing Declaration of Todd McGee ¶ 4, at 15, filed March 19, 2015 (Doc. 53-2)("McGee Decl.")).  The Dayish Ltr. contradicts Sage Hospital's asserted fact:

> Accordingly, IHS <u>requests</u> that NHF-SMH submit information of actual CSC incurred in the years at issue.  Relevant documentation may include:
>
> 1) Documents showing actual expenditures for direct costs associated with operation of the ISDEAA programs for each fiscal year at issue.
>
> 2) Documents showing the Tribe's indirect costs for each fiscal year at issue.
>
> 3) Documents showing the Tribe's actual capital expenditures, pass-through amounts, and other exclusions associated with the operation of the ISDEAA programs for each fiscal year at issue.
>
> 4) Any additional documentation in the NHF-SMH's possession that will assist IHS in determining which of NHF-SMH's expenditures meet the ISDEAA definition of CSC in section 106(a)(2) and do not duplicate costs funded in the section 106(a)(l) amount.
>
> Lastly, the IHS <u>requests</u> that NHF-SMH provide further explanation for the methodology used to calculate the amount of additional CSC funds it claims is owed.  For example, the "shortfall" claim appears to be based directly on the annual report to Congress.  That report is merely a budget planning tool, however, and does not demonstrate the amount of CSC incurred by NHF-SMH.  Similarly, we have no information demonstrating your expectancy damages claims.  If you have detailed information demonstrating the calculation of each of these claims, IHS can review your claim more thoroughly and respond more quickly.
>
> The <u>requested information</u> should be sent electronically to . . . .
>
> Should NHF-SMH need additional time to provide the <u>requested documentation</u>, please send notice in writing of the date by which NHF-SMH intends to respond, and a request for an additional extension of time for IHS to consider the documentation before making its decision.

Dayish Ltr. at 1-2 (emphases added).  The Dayish Ltr. makes it clear that the IHS requested additional documentation from Sage Hospital.  Accordingly, the Court will not deem the proposed fact undisputed.

- 16 -

In an effort to treat all tribal contractors fairly, IHS made a policy decision, which has been communicated to all tribal contractors (and agreed upon by many tribal contractors whose claims were pending before the Civilian Board of Contract Appeals (CBCA)[27]), to attempt to review and resolve the claims in the order they were received; i.e., the earliest or oldest claims first, followed by the claims received more recently.

Response at 14 (setting forth this fact).  See Reply at 6-8 (not disputing this fact); Blair 1st Decl. ¶ 9, at 4.  "Sage's claims are the most recently filed CSC CDA claims in the Navajo Area IHS." Response at 14 (setting forth this fact).  See Dayish Decl. ¶ 21, at 5.[28]

"[A]ll of the tribal contractors in the Navajo Area IHS with ISDEAA contracts have filed CSC CDA claims against the IHS, and IHS's determination on the time required to respond to Sage's claims was informed by the Area's experience with resolving those other claims." Response at 14 (setting forth this fact).  See Dayish Decl. ¶¶ 8-12, at 3-4; id. ¶ 14, at 4; id. ¶ 17, at 4.[29]  "In general, it has taken approximately two years to resolve such claims with the Navajo Area ISDEAA contractors."  Response at 14 (setting forth this fact).  See Dayish Decl. ¶ 14, at 4.[30]  Dayish "informed Sage that he would issue a final decision by October 21, 2015, based on his good faith estimate of the amount of time that would reasonably be needed [to] evaluate and assess the claims, based on this prior experience in the Navajo Area and throughout IHS."

---

[27]The United States Civilian Board of Contract Appeals "resolve[s] contract disputes between government contractors and agencies under the Contract Disputes Act."  United States Civilian Board of Contract Appeals, http://www.cbca.gsa.gov/ (last visited June 13, 2015). Under the CDA, a tribal organization may appeal a CSC claim decision to: (i) the Civilian Board of Contract Appeals; or (ii) the Court of Federal Claims.  See 41 U.S.C. § 7104(a), (b)(1). Alternatively, under the ISDEAA, the tribal organization may challenge the decision in federal district court.  See 25 U.S.C. § 450m-1(a).

[28]The Court disposed of Sage Hospital's sole response to this fact in note 9, supra.

[29]The Court disposed of Sage Hospital's sole response to this fact in note 9, supra.

[30]The Court disposed of Sage Hospital's sole response to this fact in note 9, supra.

Response at 14 (setting forth this fact).  See Dayish Decl. ¶¶ 14, 17, at 4.[31]  "In addition, Sage's

claims for $62 million are larger than the majority of CSC CDA claims filed against the IHS."

Response at 14 (setting forth this fact).  See Dayish Decl. ¶ 16, at 4. [32]

_____

[31]The Court disposed of Sage Hospital's sole response to this fact in note 5, supra.

[32]The Court disposed of Sage Hospital's sole response to this fact in note 5, supra.  Sage
Hospital also asks the Court to find undisputed that

> [t]he only claim pending before Dayish is Sage's, and Dayish has had
> Sage's claim, and no other, before him for analysis since "late 2014."  In contrast
> with most IHS Area offices, the IHS Navajo Area Office has only six ISDEAA
> contractors.  See Ex. A at 8.  Of those six, it settled Tuba City's and Winslow's
> claims in September 2014, it has apparently settled and certainly analyzed Fort
> Defiance Hospital's CSC claim, and it has engaged in settlement negotiations
> with the Navajo Nation since "late 2014" and with Utah Navajo since "early to
> mid-2014."  Opp. Ex. 1 ¶¶ 8-12.  Therefore, the only claim that the Navajo Area
> Office has needed to analyze for settlement purposes, since "late 2014," is Sage's.
> See Opp. at 5 (describing IHS' settlement procedures and stating that "[a]fter IHS
> completes its analysis of the tribal contractor's claims, it notifies the tribal
> contractor of the results of the analysis or reaches out to the tribal contractor to
> discuss the claims").

MSJ Reply ¶ 7, at 19 (emphases in MSJ Reply but not in sources).  The Defendants respond:

> Without any record support, Sage states that the only claims pending
> before IHS CO Frank Dayish and awaiting a CO decision are Sage's.  See Sage
> Reply, p. 14.  That is not true, and Defendants take this opportunity to correct the
> record for the Court.  The CDA claims of Utah Navajo Health System and the
> Navajo Nation's claims are also pending before Mr. Dayish.  See Defendants'
> Opposition to Plaintiff's Motion for Summary Judgment, Exhibit 1, Declaration
> of Frank Dayish, ¶¶ 11-12.

MSJ Surreply at 4.
Sage Hospital provides no support for its contention that "[t]he only claim pending before
Dayish is Sage's, and Dayish has had Sage's claim, and no other, before him for analysis since
'late 2014.'"  MSJ Reply ¶ 7, at 19.  The remainder of the paragraph in which Sage Hospital sets
forth this fact similarly does not support it.  That Dayish has engaged in settlement negotiations
with Utah Navajo Health System and the Navajo Nation does not mean their claims are longer
pending before Dayish.  As the Defendants point out, "[t]he CDA claims of Utah Navajo Health
System and the Navajo Nation's claims are also pending before Mr. Dayish."  MSJ Surreply at 4.
In other words, those settlement negotiations are still ongoing.  That Dayish is engaged in
settlement negotiations with those organizations does not mean that they are no longer pending,

> The evaluation and assessment of Sage's CSC claims likely will take longer than for other CSC claims because of the separate (but related) issue of the significant offset and counterclaims that IHS will likely need to assert against Sage due to [the IHS's contention that Sage Hospital] significant[ly] misuse[d] and mismanage[d] IHS funds, as disclosed by the forensic audit conducted by an outside contractor, Moss Adams.[33]

Response at 14 (setting forth unmodified version this fact). <u>See</u> Dayish Decl. ¶¶ 22-23, at 5-6.[34]

---

or even that Dayish does not need to analyze them for settlement purposes. Accordingly, the Court will not deem Sage Hospital's proposed fact undisputed.

[33]As set forth in the Court's Memorandum Opinion and Order, filed April 9, 2015 (Doc. 62)("MOO"), on January 15, 2014, the Navajo Area IHS Office contracted with Moss Adams -- an accounting firm -- to conduct a forensic audit of Sage Hospital's financial records and accounting practices in response to allegations that Sage Hospital was misusing ISDEAA funds. MOO ¶¶ 49-51, at 11-12. Moss Adams' audit of Sage Hospital, among other things, formed the basis of the Defendants' decision to decline Sage Hospital's FY 2014 ISDEAA contract renewal proposal and successor annual funding agreements. <u>See</u> MOO ¶¶ 99-101, at 27-28.

[34]The Court disposed of Sage Hospital's sole response to this fact in note 5, <u>supra</u>. Sage Hospital also asks the Court to find undisputed that

> IHS' action in giving itself approximately one year and two months to decide a claim that it either did not read or comprehend violates ISDEAA's requirement that decisions on such claims be made within a reasonable time period because -- contrary to the incorrect assumption underlying IHS' Letter -- the Claim and its Exhibits provide all information necessary for IHS to decide the Claim promptly. Ex. 2; <u>cf.</u> 25 C.F.R. 900.23(a)(stating presumptive time limit of 60 days for deciding claims for more than $100,000.00). The proposed 14-month time limit for reaching a decision also violates Defendant Roubideaux's commitment to provide redress for such CSC underpayment fairly and efficiently.

MSJ ¶ 10, at 4-5.

The Defendants respond:

> Defendants dispute that IHS "either did not read or comprehend" Sage[']s CDA claims. The IHS has analyzed and extended settlement offers on over 1,200 of such claims and has settled 888 of them. The CO Mr. Dayish reviewed Sage's claim letter and responded in writing to Sage's claims. Defendants dispute that Sage's claim letter and its exhibits "provide all the information necessary" for IHS to decide the claims. The information requested by IHS was based on the Agency's experience of evaluating more than 1,200 claims and what has been needed to both complete the analysis and engage in discussions with the tribes to reach a mutually agreeable resolution.

More importantly, Defendants dispute that the date chosen for responding -- October 21, 2015 -- is not reasonable, particularly in view of the volume of CSC claims facing IHS generally and its experience in addressing those claims, both of which informed IHS's determination of the time necessary to issue a decision on Sage's CSC claims.   Over 1,600 CSC CDA claims have been presented to IHS.   To respond, IHS hired an outside financial accounting firm, Cotton & Co., additional staff in its Office of Finance and Accounting (OFA), and new attorneys in the HHS Office of the General Counsel, to assist in handling the claims.   In addition, numerous staff in IHS's twelve Area Office, thirty attorneys in the HHS Office of General Counsel, as well as numerous attorneys in the U.S. Attorney's Office are assisting in tracking, evaluating, and resolving the CSC CDA claims.

Extensive documentation is needed to evaluate the claims, and the analysis is complex.   In addition IHS is attempting to resolve the claims expeditiously and in cooperation with tribal contractors, without resorting to litigation.   Indeed, information needed is not readily apparent from financial statements and other documents and, instead, requires in-depth conversations between the financial experts for both the tribe and IHS in order for the parties to reach an understanding.   Such a collaborative process is time consuming and resource intensive, and the time required to respond to each claim is only heightened due to the complexity of each claim, the total number of claims being addressed by IHS, and the time needed to meet with and discuss the claims with tribal contractors. Based on IHS's experience with the CSC CDA claims to date, one to two years is a reasonable amount of time to allow for the necessary exchange of documentation and information to resolve the claims.   As IHS continues to make progress in resolving the claims, the majority of which have already been resolved, IHS does anticipate that the time required to reach resolution will be shortened.

In addition, in an effort to treat all tribal contractors fairly, IHS made a policy decision, which has been communicated to all tribal contractors (and agreed upon by many tribal contractors whose claims were pending before the Civilian Board of Contract Appeals (CBCA)), to attempt to review and resolve the claims in the order they were received; i.e., the earliest or oldest claims first, followed by the claims received more recently.   Sage's claims are the most recently filed CSC CDA claims in the Navajo Area IHS.

Finally, all of the tribal contractors in the Navajo Area IHS with ISDEAA contracts have filed CSC CDA claims against the IHS, and IHS's determination on the time required to respond to Sage's claims was informed by the Area's experience with resolving those other claims.   In general, it has taken approximately two years to resolve such claims with the Navajo Area ISDEAA contractors.   The CO informed Sage that he would issue a final decision by October 21, 2015, based on his good faith estimate of the amount of time that

## PROCEDURAL BACKGROUND

Sage Hospital filed this case in federal court on October 23, 2014. See Complaint, filed October 23, 2014 (Doc. 1). Sage Hospital filed the First Amended Complaint on November 24, 2014, asserting four causes of action. See Doc. 5 ("FAC"). First, Sage Hospital contends that the IHS' declination of Sage Hospital's August 22, 2013, three-year contract proposal for FY 2014 ("FY 2014 Proposal") violates 25 U.S.C. § 450f(b)(2), and 25 C.F.R. §§ 900.32 and 900.33. See FAC ¶ 55, at 23. Sage Hospital asks the Court for immediate injunctive relief to: (i) reverse the IHS' declination of the FY 2014 Proposal; (ii) compel Burwell to award and fund the FY 2014 Proposal; (iii) provide coverage for Sage Hospital and its employees under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)("FTCA");[35] (iv) restore Sage Hospital's ability to purchase pharmaceuticals and other supplies from its suppliers; and (v) cease the IHS' public disparagement of Sage Hospital. FAC ¶¶ 54-56, at 23-24. Sage Hospital points out that, because

---

would reasonably be needed to evaluate and assess the claims, based on this prior experience in the Navajo Area and throughout IHS. In addition, Sage's claims for $62 million are larger than the majority of CSC CDA claims filed against the IHS. The evaluation and assessment of Sage's CSC claims likely will take longer than for other CSC claims because of the separate (but related) issue of the significant offset and counterclaims that IHS will likely need to assert against Sage due to significant misuse and mismanagement of IHS funds, as disclosed by the forensic audit conducted by an outside contractor, Moss Adams.

Response at 12-14 (citations omitted).

As the length of the Defendants' response indicates, Sage Hospital's proposed fact is legal argument. Indeed, it is the crux of Count IV upon which Sage Hospital seeks summary judgment: that the IHS' action in taking fourteen months to rule on the Claim is unreasonable and violates the CDA and the ISDEAA. Accordingly, the Court will not adopt the proposed fact as undisputed, but will instead address the legal issues that the parties raise in its Analysis.

[35]The IHS' declination of Sage Hospital's FY 2014 Proposal "forced Sage Hospital to purchase professional liability insurance for its doctors at a cost of approximately $50,000.00 per month rather than relying on the protections of the FTCA at no cost." MOO ¶ 118, at 31.

the ISDEAA provides for both injunctive and mandamus relief, it does not need to establish the traditional equitable grounds for obtaining injunctive relief.  See FAC ¶ 56, at 24.

Sage Hospital argues that, even if had to demonstrate the traditional equitable grounds for obtaining injunctive relief, those traditional grounds are easily met here.  See FAC ¶ 57, at 24. Sage Hospital contends that the IHS' declination of the FY 2014 Proposal is causing Sage Hospital immediate and irreparable injury, because it threatens to ruin Sage Hospital's healthcare business, force it to close, and cause it to lose its patients' good will.  See FAC ¶ 57A, at 24. Sage Hospital asserts that it will likely succeed on the case's merits, because the Defendants clearly violated the ISDEAA and its implementing regulations.  See FAC ¶ 57B, at 24.  Sage Hospital points out that 25 C.F.R. § 900.33 prohibits the IHS from declining to renew Sage Hospital's ISDEAA contract based on performance concerns to the extent that there were no material and substantial changes to the scope or funding of Sage Hospital's programs and services.  See FAC ¶ 57B, at 24.  Sage Hospital asserts that 25 C.F.R. § 900.32 prohibits the IHS from declining Sage Hospital's annual funding agreement for FY 2014, because that proposed agreement was substantially the same as the one that the IHS approved for FY 2013.  See FAC ¶ 57B, at 24.  Sage Hospital says that the IHS' refusal to provide Sage Hospital with technical assistance to address the IHS' concerns is "concededly in violation of 15 U.S.C. § 450f(b)(2)." FAC ¶ 57B, at 24.  Sage Hospital argues that the balance of hardships tips in its favor, because, while an injunction will merely require the Defendants to comply with federal law, the Court's failure to order an injunction will ruin Sage Hospital's business and cause two hundred Sage Hospital employees to lose their jobs.  See FAC ¶ 57C, at 24.  Sage Hospital asserts that an injunction will also be in the public interest, because it will allow American Indians to get much-

needed and high-quality healthcare at Sage Hospital rather than obtaining lower-quality healthcare at more distant IHS facilities.  See FAC ¶ 57D, at 25.

Second, Sage Hospital contends that the IHS' declination of Sage Hospital's September 19, 2014, proposal for FY 2015 ("FY 2015 Proposal") -- to the extent that it is substantially the same as the FY 2014 Proposal -- violates 25 U.S.C. § 450f(b)(2), and 25 C.F.R. §§ 900.32 and 900.33.  See FAC ¶¶ 59-60, at 25.  Sage Hospital asks the Court for immediate injunctive relief to: (i) reverse the IHS' declination of the FY 2015 Proposal to the extent that it is substantially the same as the FY 2014 Proposal; (ii) compel Burwell to award and fund the FY 2015 Proposal to the extent that it is substantially the same as the FY 2014 Proposal; (iii) provide FTCA coverage for Sage Hospital and its employees; (iv) restore Sage Hospital's ability to purchase pharmaceuticals and other supplies from its suppliers; and (v) cease the IHS' disparagement of Sage Hospital's business.  See FAC ¶¶ 61, at 25.  Sage Hospital reiterates that, because the ISDEAA provides for both injunctive and mandamus relief to remedy violations of the ISDEAA and its implementing regulations, it does not need to prove the traditional equitable grounds for obtaining injunctive relief.  See FAC ¶ 61, at 25.

Sage Hospital argues that, even if it had to demonstrate the traditional equitable grounds for obtaining injunctive relief, those grounds are easily met.  See FAC ¶ 62, at 25-26.  Sage Hospital contends that IHS' declination of the FY 2015 Proposal is causing Sage Hospital immediate and irreparable injury, because it threatens to ruin Sage Hospital's healthcare business, to force it to close, and to cause it to lose its patients' good will.  See FAC ¶ 62A, at 26.  Sage Hospital asserts that it will likely succeed on the case's merits, because the Defendants clearly violated the ISDEAA and its implementing.  See FAC ¶ 62B, at 26.  Sage Hospital points out that 25 C.F.R. § 900.33 prohibits the IHS from declining to renew Sage Hospital's ISDEAA

contract on performance concerns where there are no material and substantial changes to the scope or funding of Sage Hospital's programs and services.  See FAC ¶ 62B, at 26.  Sage Hospital asserts that 25 C.F.R. § 900.32 prohibits IHS from declining Sage Hospital's annual funding agreement for FY 2015 to the extent that the agreement is substantially the same as those that the IHS approved in FY 2013 and 2014.  See FAC ¶ 62B, at 26.  Sage Hospital says that IHS' refusal to provide Sage Hospital with technical assistance to address the IHS' concerns is "concededly in violation of 15 U.S.C. § 450f(b)(2)."  FAC ¶ 62B, at 26.  Sage Hospital reiterates that the balance of hardships tips in its favor, because, while an injunction will merely require the Defendants to comply with federal law, the Court's failure to order an injunction will ruin Sage Hospital's business and cause two hundred Sage Hospital employees to lose their jobs.  See FAC ¶ 62C, at 26.  Sage Hospital argues that an injunction will also be in the public interest, because it will allow American Indians to get much-needed and high-quality healthcare at Sage Hospital, rather than obtaining compromised quality care at more distant IHS facilities.  See FAC ¶ 62D, at 26-27.

Third, Sage Hospital asserts that, because it is entitled to immediate injunctive relief to reverse the IHS' declination of the FY 2014 Proposal and to compel the Defendants to award and fund the FY 2014 Proposal, the Defendants are required to pay Sage Hospital the full amount requested in the FY 2014 annual funding agreement.  See FAC ¶ 64, at 27.  Sage Hospital contends that, under the ISDEAA, it is entitled to an accounting of funds that the IHS provided to Sage Hospital from October 1, 2013, to the date of judgment.  See FAC ¶ 66, at 27.

Fourth, Sage Hospital argues that IHS violated the CDA.  See FAC ¶¶ 67-72, at 27-29.  Sage Hospital explains that it submitted the Claim on August 25, 2014.  See FAC ¶ 68, at 27.  According to Sage Hospital, the Claim specifies, for each FY from 2009 to 2013, Sage

Hospital's total CSC shortfall.  See FAC ¶ 69, at 27-28.  Sage asserts that IHS responded to the Claim with "an inapplicable form letter," and that the IHS' proposed date for deciding the Claim -- October 21, 2015 -- is unreasonable, because the Claim and its exhibits provide all of the information that the IHS needs to decide the Claim.  FAC ¶¶ 70-71, at 28.  Sage Hospital argues that, consequently, the Dayish Ltr. violates the CDA.  See FAC ¶ 71, at 28.  Sage Hospital, accordingly, asks the Court to direct the IHS to issue a decision on the Claim in a specified period of time that the Court finds reasonable.  See FAC ¶ 72, at 29.

### 1.     The MSJ.

Sage Hospital filed the MSJ on January 26, 2015.  In the MSJ, Sage Hospital asks the Court to award summary judgment in its favor on Count IV -- i.e., Sage Hospital's claim that the IHS' decision to take fourteen months to approve or to deny the Claim is unreasonable under the CDA.  See MSJ at 14-20.  Sage Hospital argues that the ISDEAA favors prompt resolution of claims and the provision of necessary funds to tribal organizations.  See MSJ at 6 (citing S. Rep. No. 100-274 at 2-3 (1987)).  Sage Hospital maintains that 25 C.F.R. § 900.233(a) mandates that, "if the claim is for more than $100,000, the awarding official shall issue the decision within 60 days of the day he or she receives the claim.  If the awarding official cannot issue a decision that quickly, he or she shall tell you when the decision will be issued."  MSJ at 14 (quoting 25 C.F.R. § 900.233(a))(internal quotation marks omitted)(emphasis in MSJ but not in regulation). According to Sage Hospital, the CDA provides that contracting officers must issue decisions on claims over $100,000.00 "within a reasonable time, . . . taking into account such factors as the size and complexity of the claim and adequacy of information in support of the claim provided by the contractor."  MSJ at 14 (quoting 41 U.S.C. § 7103(f)(3))(internal quotation marks omitted).  Sage Hospital says that the CDA authorizes the Court to order the Defendants to

"issue a decision in a specified period of time . . . in the event of undue delay on the part of the contracting officer."   MSJ at 14 (quoting 41 U.S.C. § 7103(f)(4))(internal quotation marks omitted).

Sage Hospital urges that, because the Claim and its exhibits provide all of the information necessary for the IHS to decide the Claim, "IHS' action in giving itself one year and eight weeks to decide the Claim is unreasonable."   MSJ at 14.   According to Sage Hospital, the Claim consists of: (i) a three-page narrative; (ii) two attachments, which total fourteen pages; (iii) a "Schedule of Agreed Upon Procedures for Contract Support Costs for FY 2009-2013," which consists of one page; and (iv) Sage Hospital's audited financial statements for FYs 2009-13, which consist of approximately 255 pages.   MSJ at 14-15 (citation omitted).   Sage Hospital contends that the Claim is neither lengthy nor complex.   See MSJ at 15 (citing Def. Sys. Co., ABSCA No. 50534, 97-2 BCA ¶ 28,981, 1997 WL 217392 (1997)(noting that a seventy-one-million-dollar CDA claim consisting of a 162-page narrative and a volume containing forty-nine exhibits was complex)).

Sage Hospital points to Kelly-Ryan, Inc., ASBCA No. 57168, 11-1 BCA ¶ 34,629, 2010 WL 5071059 (2010), in which, according to Sage Hospital, the Civilian Board of Contract Appeals observed that "'[w]e have found no Board cases, nor have we been cited to any by the parties, that have held more than 9 months to be a reasonable period of time within which to issue a CO's final decision.'"   MSJ at 15-16 (quoting Kelly-Ryan, Inc., 2010 WL 5071059, at *1)(alterations in MSJ but not in source)(emphases in MSJ but not in source).   Sage Hospital also cites Fru-Con Construction Corp., ASBCA No. 53544, 02-1 BCA P ¶ 31,729, 2002 WL 75878 (Jan. 15, 2002).   See MSJ at 16.   In that case, according to Sage Hospital, the Board of Contract Appeals found that a contracting officer's seven-and-a-half month delay in issuing a

decision on a $35,582,600 CDA claim -- detailed in a twenty-eight-page narrative, a fifty-four-page cost-impact analysis, and a one-volume appendix -- was unreasonable.  See MSJ at 16 (citing Fru-Con Const. Corp., 2002 WL 75878, at *1; Dillingham/ABB-SUSA, ASBCA No. 51195, 98-2 BCA ¶ 29,778, 1998 WL 258456, at *1 (1998)(holding that there was "no justification at all" for contracting officer's fourteen-month delay in issuing a decision on a $4,885,556.00 CDA claim)).

Sage Hospital contends that it is entitled to summary judgment on Count IV, because there are no genuine issues of material fact.  See MSJ at 17.  Sage Hospital says that the Defendants do not dispute the Claim's content or when Sage Hospital filed the Claim.  See MSJ at 17.  Sage Hospital maintains that, similarly, the IHS' response to the Claim -- which states that the IHS will take fourteen months to issue a decision on the Claim -- is not in dispute.  See MSJ at 17.  Sage Hospital urges that whether fourteen months is a reasonable period to decide the Claim is a question of law that the Court should answer in Sage Hospital's favor.  See MSJ at 17.

The Defendants responded to the MSJ on February 26, 2015.  See MSJ Response at 1.  In the Response, the Defendants ask the Court to deny the MSJ, because Sage Hospital has failed to demonstrate that fourteen months is an unreasonably long period for deciding the Claim.  See MSJ Response at 15.  The Defendants assert that Sage Hospital has the burden of showing that fourteen months is an unreasonable delay for deciding the Claim.  See MSJ Response at 15 (citing Design One Bldg. Sys., Inc. v. Dep't of Veterans Affairs, CBCA 2423 (May 27, 2011)("Design One")).  According to the Defendants, in Design One, the tribal organization asked the Civilian Board of Contract Appeals to direct the United States Department of Veterans Affairs to issue a decision on its CDA claims sooner than the contracting officer's proposed date, which was eleven months after the tribal organization submitted the claims.  See MSJ Response

at 15 (citing <u>Design One</u>, slip op. at 2).   The Defendants explain that the Civilian Board of

Contract Appeals denied the request, stating:

> The party making a claim bears the burden of proof.  Here, Design One is the
> party asking the Board to direct the contracting officer to issue a decision earlier
> than November 15, 2011.  If CS [the VA's claims consultant] is correct in
> thinking that a consultant would need six months to evaluate the contractor's
> claims, the decision soon would be in hand if the contracting officer had, after
> receiving the claims, promptly hired a consultant.  Nevertheless, Design One has
> not provided any evidence that beginning on that date on which it filed its
> petition, the agency's estimate of time needed to perform an evaluation is
> unreasonable.  Consequently, we do not prescribe a date earlier than November
> 15, as requested by the contractor.

MSJ Response at 15-16 (quoting <u>Design One</u>, slip op. at 3)(alterations in MSJ Response but not

in <u>Design One</u>).

The Defendants urge that "'[w]hether the time a CO needs to issue a decision is

reasonable must be determined on a case by case basis.'"   MSJ Response at 17 (quoting <u>Pub.

Warehousing Co., K.S.C.</u>, ASBCA No. 56888, 09-2 BCA ¶ 34,265, 2009 WL 3183047 (Sept.

25, 2009))(alterations in Response but not in source)(citing <u>Eaton Contract Servs., Inc.</u>, ASBCA

Nos. 52686 & 52796, 00-2 BCA ¶ 31,039 (finding eight-month delay reasonable given the

volume of documentation, number of issues, and time needed to gather information because of

personnel relocation); <u>Def. Sys. Co.</u>, ASBCA No. 50534, 97-2 BCA ¶ 28,981, 1997 WL 217392

(Apr. 25, 1997)(finding nine-month delay reasonable when claimed amount exceeded seventy-

one million dollars and the claim's narrative portion alone exceeded 162 pages)).   The

Defendants argue that, "'if the claim is substantial and will require a long period of time to

address, then the contracting officer's only option is to fix a date far enough into the future to

assure complete evaluation . . . .'"   MSJ Response at 17 (quoting <u>Eaton Contract Servs., Inc.</u>, 00-

2 BCA ¶ 31,039).

The Defendants argue that Sage Hospital has failed to offer any evidence which demonstrates that fourteen months is an unreasonable period for the IHS to decide the Claim. See MSJ Response at 17. The Defendants point out that the evidence which Sage Hospital submitted does not address the Claim's complexity, the process that the IHS follows to resolve CSC claims, "or the reasonableness of October 21, 2015 as the date on which [Dayish] would issue his decision with respect to Sage's claims" in light of the complexity of the IHS' CSC claim process. MSJ Response at 17. The Defendants contend that, to the contrary, Sage Hospital's evidence "consists only of unverified blanket statements by its legal counsel." MSJ Response at 17.

The Defendants say that it has clearly shown that the IHS did not unduly delay issuing the Dayish Ltr. and that fourteen months is a reasonable period for deciding the Claim. See MSJ Response at 18. The Defendants assert that the IHS is attempting to resolve CSC claims "expeditiously, as well as consistently and in cooperation with tribal contractors, without resorting to litigation if possible." MSJ Response at 18. The Defendants argue that, as a general matter, "the process is time consuming and resource intensive," because of the complexity of CSC claims, the total number of CSC claims that the IHS must resolve, and the time that the IHS needs to discuss the claims with tribal organizations. MSJ Response at 18. The Defendants maintain that, based on the IHS' experience, one to two years is a reasonable amount of time to resolve a CSC claim. See MSJ Response at 18. The Defendants contend that the IHS' collaborative approach with tribal organizations in resolving CSC claims is consistent with Congress' intent in establishing the CDA's administrative requirements:

> The Contract Disputes Act of 1978 provides a fair, balanced, and comprehensive statutory system of legal and administrative remedies in resolving Government contract claims. The act's provisions help to induce resolution of more contract disputes by negotiation prior to litigation; equalize the bargaining

power of the parties when a dispute exists; provide alternate forums suitable to handle the different types of disputes; and ensure fair and equitable treatment to contractors and Government agencies.

MSJ Response at 19 (quoting S. Rep. No. 1118 95th Cong., 2d Sess. 1 (1978), 1978 U.S.C.C.A.N. at 5235)(internal quotation marks omitted).

Sage Hospital replied to the MSJ Response on March 19, 2015. See MSJ Reply at 1. In the MSJ Reply, Sage Hospital contends that the crux of the Defendants' argument is that the IHS needs more documentation from Sage Hospital to resolve the Claim. See MSJ Reply at 7. Sage Hospital explains that, in Tuba City Regional Health Care Corp. v. United States, No. CIV 13-0639 RC (D.D.C. Apr. 25, 2014)("Tuba City"), the tribal organization filed its first CSC claim with Dayish on September 17, 2012, and then filed five more claims on November 5, 2012. MSJ Reply at 11 (citing Tuba City, slip op. at 2). Sage Hospital states that

Dayish responded to the September 17 letter on November 16, 2012[,] stating "I anticipate that I will issue a final contracting officer's decision by March 16, 2013[,]" and responded to the November 5 letters on January 2, 2013[,] with letters requesting, inter alia, "contract support costs actually incurred by [the tribal organization] during the relevant time period." The letters stated, "If you submit sufficient information to issue a final decision on your claims as requested above, the IHS anticipates that it will issue a final decision on the claims by May 3, 2013."

On February 11, 2013, Dayish sent a letter to [the tribal organization] that "purported to grant himself a second extension of the deadline" for the first claim, to May 3, 2013. On April 26, 2013, Dayish sent another letter . . . purporting to grant himself additional extensions for all six claims, saying he "anticipated that the IHS would make a decision by October 22, 2013." [The tribal organization] then sued so that it could pursue its claims without further delay, asserting that its claims had been "deemed denied" as a matter of law by IHS' failure to decide those claims within a reasonable amount of time.

As in Sage's case, IHS argued to the district court that [the tribal organization] "ha[d] not provided the documents that it needs to evaluate the claims being made and engage in settlement discussions." The court ruled that this was irrelevant, because "[t]he CDA provides no exception to the . . . timing requirements for claims that the contracting officer later determines to be insufficiently supported by documentation."

- 30 -

Just as in Sage's case, the Government also argued that "the purpose of the CDA is to induce resolution of more contract disputes by negotiation prior to litigation." The court found IHS' invocation of that statutory purpose "particularly inapt[,]" because -- again, as in Sage's case -- "the only way settlement can occur is if the litigation proceeds; otherwise the Government cannot pay judgments out of the Judgment Fund."[36]

MSJ Reply at 11-12 (citations omitted). According to Sage Hospital, the "court ruled that [the tribal organization's] claim should be deemed denied by Dayish's self-granted extensions." MSJ Reply at 13. Sage Hospital concludes its discussion of the <u>Tuba City</u> case by noting that neither a tribal organization's failure to properly document its claims nor its failure to adhere to the IHS' preferred means of settling CSC claims provides a valid basis for the IHS to extend the timeframe for deciding a CSC claim. <u>See</u> MSJ Reply at 13.

Sage Hospital argues that, in any event, it has provided more than adequate information to support the Claim. <u>See</u> MSJ Reply at 8. Sage Hospital says that, consistent with the IHS' instructions, the Claim does not rely on the IHS' shortfall reports, but instead details its incurred CSC. <u>See</u> MSJ Reply at 9. Sage Hospital explains that the Claim consists of two parts: (i) the difference between Sage Hospital's incurred costs and CSC payments for FYs 2009-13, which total $36,258,493.00; and (ii) the third-party revenues that Sage Hospital lost because of the CSC underpayments for FYs 2009-13, which total $26,311,188.00. <u>See</u> MSJ Reply at 9-10. Sage Hospital says that the Claim is straightforward and explains its damages calculation in detail. <u>See</u> MSJ Reply at 10. Sage Hospital points out that, although the Claim "has been the only one awaiting analysis by the Navajo Area IHS," the IHS has not requested a single document from Sage Hospital "in the more than six months since Sage filed its claim." MSJ Reply at 8. Sage

---

[36]The Judgment Fund is a "permanent, indefinite appropriation" that Congress enacted to pay final judgments against the United States when, among other things, "[p]ayment may not legally be made from any other source of funds.'" 31 C.F.R § 256.1.

Hospital argues that, regardless how much time Dayish spends assessing the Claim, he must deny it -- and every other tribal organization's CSC claim -- because the IHS has no remaining appropriations to pay CSC claims.  See MSJ Reply at 7-8 (citing Letter from Yvette Roubideaux, IHS Director, to Stenson Wauneka, President of Sage Hospital's Board of Directors at 2 (dated Oct. 23, 2014), filed January 26, 2015 (Doc. 27-17)("Roubideaux Ltr.")).

Sage Hospital argues that much of the MSJ Response is irrelevant to whether Dayish's proposed fourteen-month timeframe is unreasonable.  See MSJ Reply at 13.  Sage Hospital asserts that, "without the fluff," the purported issues of fact that the Defendants assert boil down to "its assertions that Sage's claims are not supported by sufficient documentation, that Dayish specifically requested that Sage submit documentation relevant to analyzing the amount of actual CSC incurred, . . . and that Sage did not clearly explain and provide documentation for its expectancy damages claim."  MSJ Reply at 14.  Sage Hospital contends that, even assuming that the Defendants' statements are correct, they do not create genuine disputes of material fact.  See MSJ Reply at 14.  Sage Hospital maintains that, as Tuba City explains, assertions of insufficient documentation are irrelevant; rather, "'all that is required is that the contractor submit . . . a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and the amount of the claims.'"  MSJ Reply at 15 (quoting Tuba City, slip op. at 7 & n.4).

Sage Hospital says that Design One is distinguishable, because the tribal organization in that case hired a consultant to evaluate its CSC claims three months after it submitted them, did not specify a length of time by which the CO's proposed deadline should be shortened, provided no evidence to support shortening the timeframe, and waited nearly five months after receiving the CO's letter to file its petition to shorten the timeframe.  See MSJ Reply at 21 n.10 (citing Design One, slip op. at 1-2).  Sage Hospital says that, by contrast, its auditor independently

evaluated the Claim before Sage Hospital submitted it, Sage Hospital has provided ample evidence supporting its contention that fourteen months is an unreasonable timeframe, Sage Hospital asserted its claim just one month after receiving the Dayish Ltr., and Sage Hospital provided a specific deadline -- i.e., January 31, 2015 -- that Sage Hospital said was acceptable for Dayish to make his decision.  See MSJ Reply at 21.  Sage Hospital asserts that, accordingly, Design One is inapposite.  See MSJ Reply at 21.  Sage Hospital contends that, with the exception of Design One, no Civilian Board of Contract Appeals case has found that a period over nine months was reasonable for a contracting officer to decide a CDA claim.  See MSJ Reply at 21.

Sage Hospital urges that it is entitled to summary judgment, because there are no genuine disputes of material fact regarding whether fourteen months is an unreasonable delay for deciding the Claim.  See MSJ Reply at 22.  Sage Hospital says that, alternatively, the CDA requires COs to unequivocally issue a decision by a specific date without making that decision contingent upon any other factors.  See MSJ Reply at 22.  Sage Hospital asserts that, because Dayish made the October 21, 2015, deadline for deciding the Claim contingent upon Sage Hospital's provision of documents, the Court should deem the Claim denied.  See MSJ Reply at 22 (citing Tuba City, slip op. at 6 & n.2; Orbas & Assoc. v. United States, 26 Cl. Ct. 647, 650 (1992); Aerojet General Corp., ASBCA No. 48136, 95-1 BCA P ¶ 27,470, 1995 WL 44259 (Jan. 24, 1995)).

Sage Hospital says that the Claim is the only CSC claim pending before Dayish, and that Dayish "has had Sage's claim, and no other, before him for analysis since late 2014."  MSJ Reply at 19 (internal quotation marks omitted).  Sage Hospital points out that, in contrast with most IHS Area offices, the IHS Navajo Area Office only has six ISDEAA contractors.  See MSJ Reply at 19 (citing 2012 Report to Congress on Funding Needs for Contract Support Costs of

Self-Determination Awards (Based on Fiscal Year 2011 Data), filed March 19, 2015 (Doc. 53-1)). Sage Hospital says that, of those six contractors, the IHS settled Tuba City's and Winslow's CSC claims in September, 2014, has apparently settled and "certainly analyzed" Fort Defiance Hospital's CSC claim, has engaged in settlement negotiations with the Navajo Nation since "late 2014," and has engaged in settlement negotiations since "early to mid-2014." MSJ Reply at 19 (citing Dayish Decl. ¶¶ 8-12, at 3-4).

The Defendants filed a surreply on April 7, 2015. See MSJ Surreply at 1. The Defendants raise four issues in the MSJ Surreply. First, the Defendants assert that the Miller Decl., upon which Sage Hospital relies in the MSJ Reply, is "misleading and inaccurate." MSJ Surreply at 1-3. The Defendants argue that, contrary to Miller's statements, the IHS' CSC claim process demonstrates that the fourteen-month period that Dayish proposes to decide the Claim is reasonable. See MSJ Surreply at 2. The Defendants contend that Miller implies that the IHS issues decision letters on CSC claims as a routine matter, and that "little or nothing is required of [the IHS] before it issues the decisions." MSJ Surreply at 2. The Defendants assert that, to the contrary, the IHS issues a CSC claim decision only after the IHS and the tribal organization have analyzed and discussed the claim together. See MSJ Surreply at 2 (citing Second Declaration of Susan Blair ¶ 4, at 3 (dated Apr. 7, 2015), filed April 7, 2015 (Doc. 60-2)("Blair 2d Decl.")). The Defendants note that, in every case that is pending before Dayish, the claims analysis and discussions between the IHS and the tribal organization occurred before Dayish issued a decision on the CSC claims. See MSJ Surreply at 2 (citing Blair 2d Decl. ¶¶ 4, 6-7, at 3-4).

The Defendants explain that, in March, 2013, the IHS adopted two procedural options to allow the IHS and tribal organizations to discuss and analyze CSC claims before the CO issues a formal decision on the claims. See MSJ Surreply at 2. First, the IHS agreed to withdraw CO

decision letters, "when a tribal [organization] requested the withdrawal within 90 days of the letter being issued so that the parties could engage in settlement discussions." MSJ Surreply at 2 (citing Blair 2d Decl. ¶ 7, at 4). Second, the IHS agreed "not to issue new decision letters and to instead issue lengthier extensions of the time to issue a decision letter." MSJ Surreply at 2 (citing Blair 2d Decl. ¶ 7, at 4). The Defendants say that Miller and his tribal organization clients have availed themselves of these options. See MSJ Surreply at 2 (citing Blair 2d Decl. ¶ 8, at 4). The Defendants assert that the fourteen-month period that Dayish proposed to resolve the Claim "is consistent with that process and the time required to resolve claims through the process." MSJ Surreply at 2.

The Defendants contend that, only after the IHS discusses the CSC claims with the tribal organization -- or attempts to do so -- does it make a determination about whether to deny it. See MSJ Surreply at 3 (citing Blair 2d Decl. ¶ 5, at 3). The Defendants state that, while the IHS often denies CSC claims solely on the basis that it lacks sufficient appropriations, the IHS makes that determination "only after the analysis is complete and the parties have reached an understanding." MSJ Surreply at 3 (citing Blair 2d Decl. ¶ 5, at 3). The Defendants explain that, if the parties do not reach an understanding on the tribal organization's CSC claims, the IHS may ultimately deny the claims on several grounds and even assert counterclaims if the IHS believes that it overfunded the tribal organization. See MSJ Surreply at 3 (citing Blair 2d Decl. ¶ 5, at 3). In the Defendants' view, the Claim presents additional complicating factors that the IHS must take additional time to analyze, because the IHS must consider the results of "an extensive and detailed forensic audit conducted by Moss[] Adams, LLP, which disclosed significant misuse and mismanagement of IHS funding by the tribal contractor." MSJ Surreply at 3 (citing Blair 2d Decl. ¶ 11, at 5-6). The Defendants say that, accordingly, contrary to Miller's statements,

Dayish's decision on the Claim "is not a matter of simply rejecting the [Claim] based on lack of appropriations." MSJ Surreply at 4.

Second, the Defendants insist that the IHS is addressing all CSC claims nationally "based on receipt date." MSJ Surreply at 4. The Defendants contend that Sage Hospital's statement that "the only claims pending before IHS CO Frank Dayish and awaiting a CO decision are Sage's" is false. MSJ Surreply at 4. The Defendants clarify that the Utah Navajo Health System's and the Navajo Nation's CDA claims are also pending before Dayish. See MSJ Surreply at 4 (citing Dayish Decl. ¶¶ 11-12, at 4). The Defendants note that, even if the Claim were the only CSC claim before Dayish, that fact would not be dispositive. See MSJ Surreply at 4. The Defendants explain that the Navajo Area IHS Office has not hired its own financial experts to assist in analyzing its CSC claims; rather, the additional staff that the IHS has hired to assist with the influx of CSC claims are all based in the IHS' Headquarters Office of Finance and Accounting and help all of the IHS Area Offices nationwide in analyzing their CSC claims. See MSJ Surreply at 4 (citing Blair 2d Decl. ¶ 3, at 2). The Defendants urge that, accordingly, the fact that the Navajo Area IHS Office has a smaller number of ISDEAA contracts than other IHS Area Offices does not mean that the IHS can more quickly resolve those claims. See MSJ Surreply at 4 (citing Blair 2d Decl. ¶ 3, at 2). The Defendants state that, to the contrary, the IHS has made a policy decision to attempt to review and resolve the claims in the order in which the IHS received them, without regard to the IHS Area in which the tribal organization is located. See MSJ Surreply at 4 (citing Blair 1st Decl. ¶ 9, at 4).

The Defendants also contest Sage Hospital's characterization of the CSC claim resolution process as "'IHS's preferred means of settling CSC claims.'" MSJ Surreply at 5 (quoting MSJ Reply at 15). The Defendants say that, to the contrary, the IHS and tribal organizations mutually

agreed to this process, and the IHS has used the process to resolve "almost all" tribal organizations' CSC claims. MSJ Surreply at 5. The Defendants assert that Sage Hospital similarly mischaracterizes the Defendants' opposition to the MSJ as "solely based on Sage's failure to provide adequate documentation to support" the Claim. MSJ Surreply at 5. The Defendants argue that they have also focused on: (i) "the complexity of the claims"[37]; (ii) "the time needed to analyze the claims and exchange information with tribal contractors about the claims"; (iii) the Claim's size; (iv) "the potential offset and counterclaims and the forensic audit that are unique to Sage's claims"; and (v) "the enormous number of CSC CDA claims that IHS is facing nationwide." MSJ Surreply at 5-6.

Third, the Defendants say that the <u>Tuba City</u> decision supports their position and not Sage Hospital's. <u>See</u> MSJ Surreply at 6. The Defendants explain that, in <u>Tuba City</u>,

> after expiration of the initial sixty day period for responding to the claims and one initial extension expired, IHS issued additional extensions to respond to the claims. Before the additional extensions expired, Tuba City filed an appeal in district court. IHS moved to dismiss, on the grounds that Tuba City failed to exhaust its administrative remedies because neither an actual nor deemed final decision on the claims had been issued. IHS argued that additional extensions were reasonable because the claims were complex and Tuba City had failed to provide documentation to evaluate the claims. The Court held that the CO may only extend the deadline for responding to the claims once during the initial sixty day period, and once the deadline passes, the claims are constructively denied.

> The only relevance the decision has to this case is the Court's direction for dealing with complex CDA claims. . . .   Referencing 41 U.S.C. § 7103(f)(2), which provides "[f]or claims over $100,000, the CO shall issue a decision within sixty days or notify the contractor when a decision will be issued if additional time is required," the Court stated that "[t]he provision allows a contracting officer, if they wish, to pick their own deadline." "If a claim is complex, the contracting officer can, within 60 days of receipt of the claim, pick a deadline that

---

[37]When the Defendants say "the claims" in the briefing, it is unclear if the Defendants are referring solely to the Claim -- <u>i.e.</u>, Sage Hospital's CSC claim -- or all of the CSC claims before the IHS nationwide. To the extent that it is necessary to resolve this ambiguity to rule on the MSJ, the Court will do so in it Analysis.

gives him plenty of time to evaluate the claim." That is precisely what IHS did in this instance.

MSJ Surreply at 6-7 (emphases omitted)(citations omitted). The Defendants add:

> Contrary to Sage's representations, the Court did not hold that lack of documentation is irrelevant to determining a reasonable time for issuing the CO's decision. Indeed, such a holding would contravene the plain language of the CDA: "The decision of a contracting officer on submitted claims shall be issued within a reasonable time . . . taking into account such factors as the size and complexity of the claim and the adequacy of information in support of the claim provided by the contractor." 41 U.S.C. § 7103(f)(3).

MSJ Surreply at 7 (citation omitted).

The Defendants also attack Sage Hospital's contention that the Tuba City decision stands for the proposition that the CDA does not provide an exception to its timing requirements for complex claims. See MSJ Surreply at 7 (citing MSJ Reply at 2). The Defendants insist that the portion of the Tuba City decision upon which Sage Hospital relies refers only to the CO's attempt to further extend the deadline after the initial extension expired. See MSJ Surreply at 7. The Defendants quote from Tuba City, in which the Civilian Board of Contract Appeals said:

> [T]he CDA provides no exception to the § 7103(f) timing requirements for complex claims. If a claim is complex, the contracting officer can, within 60 days of receipt of the claim, pick a deadline that gives him plenty of time to evaluate the claim. Once that deadline passes, however, the claim is deemed denied, no matter how complex it is.

MSJ Surreply at 7 (quoting Tuba City, slip op. at 6)(internal quotation marks omitted). The Defendants note: "That is precisely what the IHS CO did in this case." MSJ Surreply at 7.

Fourth, the Defendants challenge Sage Hospital's argument that the Court should deem the Claim denied, because Dayish made his decision on the Claim contingent upon Sage Hospital's provision of documents. See MSJ Surreply at 7. According to the Defendants, the CDA mandates that "'[f]ailure by a contracting officer to issue a decision on a claim within the required time period is deemed to be a decision by the contracting officer denying the claim.'"

MSJ Surreply at 8 (emphasis in MSJ Surreply)(quoting 71 U.S.C. § 7103(f)(5)).  The Defendants

maintain that Dayish fully complied with the CDA by issuing a letter acknowledging the Claim

and stating a date by which he would issue a final decision on it.  See MSJ Surreply at 8 (citing

71 U.S.C. § 7103(f)(2); 25 C.F.R. § 900.223(a)).

> The Defendants argue that the cases Sage Hospital cites are all inapposite:
>
> The CO decision letters at issue in Orbas & Assoc. v. United States, 26 Cl. Ct. 647, 648 (1992)(". . . you should not expect a final decision prior to 30 June 1990"), and Appeal of Aerojet General Corp., 95-1 BCA P 27470, ABSCA No. 48136, 1995 WL 44259 (1995)("I am hereby informing you that I do not anticipate issuing a final decision on this matter until the early March 1995 timeframe."), clearly left in question when a final decision would be provided. See also Boeing Co. v. United States, 26 Cl. Ct. 257, 259 (1992)("I will endeavor to respond to you on each of them by 13 Mar 92, or if unable to respond by that time, I will advise you by 13 Mar 92 when I will respond."); Atkins Enterprises, Inc. v. United States, 27 Fed. Cl. 142, 143 (1992)(". . . you should not expect a Final Decision until November 30, 1992.  If for some reason this date cannot be met, you will be advised.  Although we acknowledge receipt and have offered a prediction date on your claim . . ."). The language in these "deemed denial" cases is not at all similar to the IHS CO's language at issue here: "I will issue a final contracting officer's decision by October 21, 2015."

MSJ Surreply at 8 (alterations in MSJ Surreply).  The Defendants contend that Sage Hospital's

suggestion that the Dayish Ltr. did not set forth a date certain, or that it created uncertainty or

confusion, is not credible.  See MSJ Surreply at 9.

Sage Hospital responded to the MSJ Surreply on April 9, 2015.  See Opposition to

Defendants' Motion to File Surreply, filed April 9, 2015 (Doc. 61)("Response to Motion to File

Surreply").[38]  While much of the Response to Motion to File Surreply focuses on the MSJ

Surreply's alleged procedural impropriety, it also sets forth a brief response to the Defendants'

---

[38]The Response to Motion to File Surreply includes Sage Hospital's response to the Motion to File Surreply and substantive argument on the MSJ Surreply.  Accordingly, the Court will detail the portion of the Response to Motion to File Surreply that addresses the MSJ Surreply in this section of the procedural history and the portion of the Response to Motion to File Surreply that addresses the Motion to File Surreply in a later section.

arguments on the <u>Tuba City</u> decision.  <u>See</u> Response to MSJ Surreply at 3-6.  Sage Hospital

contends that <u>Tuba City</u> contradicts the Defendants' position.  <u>See</u> Response to Motion to File

Surreply at 3-6.  According to Sage Hospital, <u>Tuba City</u> ruled that "the basis of Dayish's claim to

need a long period of time because of an asserted lack of documents was 'particularly inapt[,]'

because IHS will necessarily deny the claim in any event."  Response to Motion to File Surreply

at 3-6 (quoting <u>Tuba City</u>, slip op. at 8).  Sage Hospital says that, in any event, "it is hard to find

anything relevant to this case in the extended proposed surreply," and that the MSJ Surreply

deals primarily with agreements that the IHS made with other tribes and tribal organizations.

Response to Motion to File Surreply at 5.

> Sage Hospital argues that the following remains true and unrebutted:
>
> As former IHS Director Roubideaux announced in her "Dear Tribal Leader"
> letter, and as IHS' form letters all say, all CSC claims submitted to IHS will
> necessarily be denied by the contracting officers, because IHS has no money to
> pay them.  The only CSC claim pending before Dayish for analysis is Sage's.
> Dayish's plea for a 14-month [period] based on an asserted need for documents
> never even requested of Sage is "particularly inapt" under <u>Tuba City</u>, and a far
> longer period than any ever found reasonable by the Board of Contract Appeals.
> Dayish's supposed need for fourteen months is even more groundless in this case,
> where his form letter shows he did not read with any care Sage's CSC claim.

Response to Motion to File Surreply at 5-6.  Sage Hospital notes that the MSJ Surreply ends with

the statement that the Dayish Ltr. promised to "'issue a final contracting officer's decision by

October 21, 2015.'"  Response to Motion to File Surreply at 4 (quoting MSJ Surreply at 9).  Sage

Hospital clarifies that the Dayish Ltr. actually ends with this statement: "'In consideration of

these factors <u>and based upon the anticipated cooperation of the NHF - SMH</u>, I will issue a final

contracting officer's decision by October 21, 2015.'"  Response to Motion to File Surreply at 5

(quoting Dayish Ltr. at 1)(emphasis in Response to Motion to File Surreply, but not in Dayish

Ltr.).

2.      **The Motion to Vacate.**

The Defendants filed the Motion to Vacate on April 1, 2015.  See Motion to Vacate at 1. In the Motion to Vacate, the Defendants ask the Court to vacate the April 22, 2015, hearing date for the MSJ and reschedule it "for the week of May 11 or thereafter."  Motion to Vacate at 2. The Defendants explain that Sage Hospital filed the MSJ on January 26, 2015, and the parties completed briefing on the MSJ on March 19, 2015.  See Motion to Vacate ¶ 1, at 1.   The Defendants say that the CSC issue is "highly specialized" and note that the IHS' counsel -- Paula Lee -- is taking the lead on the matter under an agreement with the United States Attorney's Office for the District of New Mexico.  Motion to Vacate ¶ 4, at 1.  The Defendants explain that Ms. Lee will be unable to attend the April 22, 2015, hearing, because she broke her ankle over the weekend, is expected to be in a cast for at least four weeks, and cannot travel from her home in San Francisco, California, to Albuquerque, New Mexico, with the cast.  See Motion to Vacate ¶ 5, at 2.  The Defendants note that, based on her doctor's advice, Ms. Lee anticipates being able to travel to Albuquerque during the week of May 11, 2015.  See Motion to Vacate ¶ 5, at 2.  The Defendants state that Ms. Lee is "highly experienced in the field and by far the most knowledgeable subject-matter expert on CSC" among the Defendants' counsel.  Motion to Vacate ¶ 6, at 2.  The Defendants assert that, although they are sensitive to the Court's scheduling needs, Ms. Lee is Defendants' counsel of choice on the CSC issue and that the Court should therefore permit her to represent them at the hearing on the MSJ.  See Motion to Vacate ¶ 7, at 2.

Sage Hospital responded to the Motion to Vacate on April 1, 2015.  See Opposed Motion to Vacate and Reschedule Hearing, filed April 1, 2015 (Doc. 57)("Motion to Vacate Response"). Sage Hospital says that it submitted the Claim on August 25, 2014, and that, on October 23,

2014, the IHS told Sage Hospital that it would need another year to decide the Claim.  See Motion to Vacate Response ¶ 1, at 1.  Sage Hospital asserts that, at that point, Sage amended the Complaint to add a claim that fourteen months is an unreasonable period for the IHS to decide the Claim.  See Motion to Vacate Response ¶ 2, at 2.  Sage Hospital reiterated that the Civilian Board of Contract Appeals has never decided that a delay greater than nine months in making a CSC decision is reasonable.  See Motion to Vacate Response ¶ 2, at 2.

Sage Hospital argues that, while CSC issues, in general, may be complex, the issues in the MSJ are not.  See Motion to Vacate Response ¶ 6, at 3.  Sage Hospital points out that the IHS and the Department of Justice have many talented attorneys who can argue this matter.  See Motion to Vacate Response ¶ 6, at 3.  Sage Hospital adds that it would suffer prejudice from the delay, because the IHS' actions are jeopardizing Sage Hospital's very existence.  See Motion to Vacate Response ¶ 6, at 3.  Sage Hospital argues that the IHS' unlawful refusal to execute and fund Sage Hospital's ISDEAA contract and successor annual funding agreements are requiring Sage Hospital to operate on limited reserved earnings.  See Motion to Vacate Response ¶ 6, at 3.  Sage Hospital contends that the IHS' actions have already damaged Sage Hospital's relationships with its professional staff and the local community that it serves.  See Motion to Vacate Response ¶ 6, at 3.

### 3.    **The Motion to File Surreply.**

The Defendants filed the Motion to File Surreply on April 7, 2015.  See Motion to File Surreply at 1.  The Defendants ask the Court for leave to file a surreply in opposition to the MSJ.  See Motion to File Surreply at 1.  The Defendants argue that Sage Hospital raised a number of new issues in the MSJ Reply, including: (i) new evidence in the form of the Miller Decl.; (ii) misstatements of fact regarding the number of CSC claims pending before Dayish; and (iii) a

request for a new form of relief under a separate provision of the CDA -- specifically, Sage

Hospital asked that the Court deem the Claim denied, because Dayish made the IHS' approval of

the Claim contingent upon receiving additional information from Sage Hospital.  <u>See</u> Motion to

File Surreply ¶ 2, at 1-2.  The Defendants also point out that Sage Hospital cites a new case --

<u>Tuba City</u> -- in support of its new request for relief under a separate provision of the CDA.  <u>See</u>

Motion to File Surreply ¶ 2, at 2.

      The Defendants argue that "'[a] surreply is appropriate and should be allowed where new

arguments are raised in a reply brief.'"  Motion to File Surreply ¶ 4, at 2 (quoting <u>Walker v. THI</u>

<u>of N.M. at Hobbs Ctr.</u>, No. CIV 09-0060 JB/KBM, 2011 WL 2728344, at *1 (D.N.M. July 6,

2011)(Browning, J.)).  The Defendants say that a surreply is therefore appropriate in this case.

<u>See</u> Motion to File Surreply ¶ 4, at 2.  The Defendants add that the April 22, 2015, hearing on the

MSJ will be more efficient if both parties have fully addressed the facts before the Court.  <u>See</u>

Motion to File Surreply ¶ 5, at 2.

      Sage Hospital responded to the Motion to File Surreply on April 9, 2015.  <u>See</u> Response

to MSJ Surreply at 1.  Sage Hospital asks the Court to deny the Motion to File Surreply, because

it is "improper and unenlightening."  Motion to File Surreply Response at 3.  Sage Hospital says

that the Defendants' assertion that Sage Hospital made misstatements of fact with respect to the

number of claims pending before Dayish "is false."   Motion to File Surreply Response at 3.

Sage Hospital argues:

> The surreply itself is misleading, emphasizing that Dayish has not made decisions
> on two other claims, when Sage actually argued and demonstrated that Sage's
> claim was the only one at the Navajo Area that had not been analyzed by Dayish,
> IHS having begun negotiations with all contractors except Sage and IHS having
> stated here that such negotiations do not commence until IHS has analyzed the
> claims.

Motion to File Surreply Response at 3.   Sage Hospital adds that, while the Motion to File Surreply asserts that the Miller Decl. is "misleading and inaccurate," it does not identify any inaccurate statements and notes only that the Miller Decl.'s implications are misleading.   Motion to File Surreply Response at 3.

Turning to the Defendants' criticism that it raised the <u>Tuba City</u> decision for the first time in the MSJ Reply, Sage Hospital says that "rather than confin[ing] its surreply to that issue, IHS devotes almost seven pages of its proposed surreply to arguing other matters."   Motion to File Surreply Response at 4.   Sage Hospital argues that the MSJ Surreply deals primarily with the IHS' agreements to negotiate CSC claims with other tribes and tribal organizations, "many of which (unlike Sage) did not want prompt denials of the CSC claims," and the IHS' policy preferences, which have no effect on the CDA's mandate that COs make CSC claims decisions within a reasonable time.   Motion to File Surreply Response at 5.

### 4.   <u>The April 10, 2015, Hearing on the Motion to Vacate and the Motion to File Surreply</u>.

The Court held a hearing on the Motion to Vacate and the Motion to File Surreply on April 10, 2015.   <u>See</u> Transcript of Motion Proceedings Before the Honorable James O. Browning (taken Apr. 10, 2015), filed April 22, 2015 (Doc. 65)("Apr. 10, 2015, Tr.").   The Court kicked off the hearing by asking Sage Hospital if the Court's Memorandum Opinion and Order, filed April 9, 2015 (Doc. 62)("MOO"), which   granted   a   preliminary   injunction   requiring   the Defendants to fund Sage Hospital at preexisting levels until trial, took some of the pressure off Sage Hospital so that it would agree to vacating the April 22, 2015, hearing on the MSJ.   <u>See</u> Apr. 10, 2015, Tr. at 2:23-3:3 (Court).   Sage Hospital said that it would agree to vacate the hearing and reschedule it for a later date as soon as money starts flowing from the Defendants. <u>See</u> Apr. 10, 2015, Tr. at 3:4-10 (Frye).   The Defendants asserted that they had not yet figured

out the logistics of complying with the MOO and that they could not promise to start funding Sage Hospital before the hearing.  See Apr. 10, 2015, Tr. at 3:19-24 (Grohman).

The Court asked Ms. Lee, who was appearing by videoconference, if she was willing to appear by videoconference for the April 22, 2015, hearing, and Ms. Lee said that she would have no problem doing that.  See Apr. 10, 2015, Tr. at 4:1-5:12 (Court, Lee).  The Court told the parties that he would deny the Motion to Vacate with the expectation that Ms. Lee would appear at the hearing by videoconference, and that, if the Defendants start funding Sage Hospital before the hearing, the Court would be willing to vacate the hearing and move it back a few weeks.  See Apr. 10, 2015, Tr. at 4:16-25 (Court).  Sage Hospital agreed to the Court's proposed solution. See Apr. 10, 2015, Tr. at 6:3-5 (Court, Frye).  The Court, accordingly, denied the Motion to Vacate without prejudice to the Defendants renewing it down the road or the parties agreeing to vacate the hearing if the Defendants comply with the MOO before the hearing.  See Apr. 10, 2015, Tr. at 6:6-13 (Court).

The Court said that it was inclined to grant the Motion to File Surreply.  See Apr. 10, 2015, Tr. at 6:18-19 (Court).  The Court noted that, because there will be a hearing on the MSJ, "everyone is going to get to say what they want to say."  Apr. 10, 2015, Tr. at 6:21-23 (Court). The Court said that it would be willing to consider the Response to Motion to File Surreply, which had some substantive arguments in it, and would also permit Sage Hospital to file a response to the MSJ Surreply.  See Apr. 10, 2015, Tr. at 6:23-7:7 (Court).  Sage Hospital found the Court's proposed solution acceptable and said that it would have to take a look at the MSJ Surreply to determine whether to file a response to it.  See Apr. 10, 2015, Tr. at 7:9-12 (Frye). The Defendants also found the Court's proposed solution acceptable.  See Apr. 10, 2015, Tr. at

- 45 -

7:18-21 (Grohman, Court).  The Court, accordingly, granted the Motion to File Surreply.  See

Apr. 10, 2015, Tr. at 7:20 (Court).

         5.     **The April 22, 2015, Hearing on the MSJ**.

         The Court held a hearing on the MSJ on April 22, 2015.  See Transcript of Motion

Proceedings Before the Honorable James O. Browning (taken Apr. 22, 2015), filed May 5, 2015

(Doc. 66)("Apr. 22, 2015, Tr.").   At the hearing, Sage Hospital largely repeated the two

arguments that it made in the MSJ and in the Reply: (i) that fourteen months is an unreasonably

long period for the IHS to issue a decision on the Claim; and (ii) that the Court should deem the

Claim denied, because the IHS made the October 21, 2015, deadline for deciding the Claim

contingent upon Sage Hospital's cooperation and production of documents.  See Apr. 22, 2015,

Tr. at 16:1-28:9 (Frye).  Addressing the Defendants' argument that it failed to provide sufficient

documentation to support the Claim, Sage Hospital said that the IHS has never asked Sage

Hospital for any additional information.   See Apr. 22, 2015, Tr. at 23:17-18 (Frye).   Sage

Hospital says that, although the Dayish Ltr. describes four categories of documents that might be

relevant to resolving the Claim, it does not ask Sage Hospital to provide those documents.  See

Apr. 22, 2105, Tr. at 23:17-24:1 (Frye).   Sage Hospital adds that, in any event, it already

provided that information to the IHS -- including an explanation of Sage Hospital's actual

incurred CSC for FYs 2009-13 -- in the documents which it submitted in support of the Claim.

See Apr. 22, 2015, Tr. at 20:7-14 (Frye).

         The Court asked Sage Hospital what relief it seeks, and Sage Hospital said that the Court

can either deem the Claim denied or order the IHS to issue a decision on the Claim by a date

certain -- ideally a month after the hearing date.  See Apr. 22, 2015, Tr. at 21:6-21 (Court, Frye).

Sage Hospital said that, ultimately, it would like the IHS to issue a decision on the Claim before

the original October 21, 2015, deadline.  See Apr. 22, 2015, Tr. at 21:22-24 (Frye).  The Court

asked Sage Hospital what the practical consequences are for receiving a decision from the IHS

on the Claim this May rather than this October.  See Apr. 22, 2015, Tr. at 26:16-24 (Court).

Sage Hospital replied that waiting until October 21, 2015, for a decision adds five more months

before Sage Hospital can obtain any money from the United States on the Claim.  See Apr. 22,

2015, Tr. at 26:25-27:1 (Frye).  Sage Hospital explained that, if the IHS denies the Claim, Sage

Hospital would have to amend the Complaint to challenge the denial in federal court.  See Apr.

22, 2015, Tr. at 27:3-9 (Frye).  Sage Hospital added that it likely would not have added Count IV

to the Complaint if Dayish had set the deadline for deciding the Claim on May 22, 2015 -- i.e., a

month from the hearing -- rather than on October 21, 2015.  See Apr. 22, 2015, Tr. at 27:25-28:4

(Court, Frye).

When the Defendants took the floor, they reiterated that resolving CSC claims is a

complicated, time-consuming, and labor-intensive process.  See Apr. 22, 2015, Tr. at 28:20-29:7

(Lee).  The Court asked the Defendants if they could draw a distinction between tribes that have

sufficient resources to wait the lengthy period that it takes the IHS to decide CSC claims and

commercial tribal organizations like Sage Hospital -- which do not have the same amount of

resources available to them as large tribes -- to determine what is a reasonable period to decide a

CSC claim.  See Apr. 22, 2015, Tr. at 29:8-15 (Court).  The Defendants replied that all of the

tribal organizations are likely in a similar position to Sage Hospital, and noted that there are

much smaller tribal organizations than Sage Hospital that have filed CSC claims and do not have

the third-party revenue or the resources that Sage Hospital has at its disposal.  See Apr. 22, 2015,

Tr. at 30:10-18 (Lee).  The Defendants explained that, because of these similarities, the IHS

decided to address all of the CSC claims nationwide in the order in which the IHS received them.

See Apr. 22, 2015, Tr. at 30:19-31:4 (Lee).  The Defendants noted that the Claim is the most recent CSC claim that the IHS has received nationwide.  See Apr. 22, 2015, Tr. at 30:25-31:4 (Lee).  The Defendants reluctantly conceded, however, that "exceptions could be made" to the IHS' first-in, first-out process for commercial tribal organizations like Sage Hospital, "depending upon the circumstances."  Apr. 22, 2015, Tr. at 31:21-22 (Lee).

The Defendants said that, even if the Court orders the IHS to issue a decision on the Claim within a month, the IHS' process is going to be the same, and that forcing the IHS to make an earlier decision may delay the Claim's resolution even further.  See Apr. 22, 2015, Tr. at 32:1-10 (Lee).  The Defendants asserted that, if the IHS denies the Claim and Sage Hospital appeals the denial in federal court, the first step would be a document exchange between the IHS and Sage Hospital that must take place within the first thirty days, during which the IHS would request the same documents from Sage Hospital that it requested in the Dayish Ltr.  See Apr. 22, 2015, Tr. at 33:8-14 (Lee).  The Defendants explain that, at that point, the case management order would typically give the IHS six weeks to analyze the Claim, and then the parties must engage in settlement discussion.  See Apr. 22, 2015, Tr. at 33:12-18 (Lee).  The Defendants asserted that, if the parties are unable to reach an agreement at that point, the IHS could then issue a final decision on the Claim either "on or before" October 21, 2015.  Apr. 22, 2015, Tr. at 35:2-8 (Lee).

The Defendants next clarified that the Dayish Ltr. sets forth a date certain by which the IHS will issue a decision on the Claim and that, if the IHS fails to issue a decision by that date, the Claim will be deemed denied.  See Apr. 22, 2015, Tr. at 36:2-13 (Court, Lee).  In response to the Court's questioning, the Defendants added that the IHS has to deny all CSC claims, because it cannot pay off CSC claims from its appropriated funds.  See Apr. 22, 2015, Tr. at 36:20-37:2

(Lee).  The Defendants said that the IHS can pay CSC claims only out of the judgment fund.  See
Apr. 22, 2015, Tr. at 37:2-3 (Lee).  The Defendants agreed with the Court's statement that the
IHS would either deny the Claim by October 21, 2015, or it will be deemed denied.  See Apr. 22,
2015, Tr. at 37:9-12 (Court, Lee).  The Defendants added, however, that, if the IHS is unable to
reach an agreement with Sage Hospital on the Claim, it would issue a denial which says that the
IHS cannot pay because of lack of appropriations and would also set forth all of the IHS'
substantive reasons for the denial.  See Apr. 22, 2105, Tr. at 37:12-19 (Lee).  The Defendants
said that, in other words, it would deny the Claim on its merits.  See Apr. 22, 2015, Tr. at 37:19-
20 (Lee).

The Court asked Sage Hospital what the difference is between a denial on the merits and
a denial solely because the IHS cannot afford to pay the CSC claim out of its appropriations.  See
Apr. 22, 2015, Tr. at 37:20-25 (Court).  The Defendants responded that there was no difference
for Sage Hospital, because Sage Hospital could challenge the denial in federal court or before the
Civilian Board of Contract Appeals.  See Apr. 22, 2015, Tr. at 38:1-5 (Lee).  The Defendants
said that, if the IHS declines the Claim on the merits, it would set forth a number of substantive
reasons for the denial -- like counterclaims and statute-of-limitations defenses.  See Apr. 22,
2015, Tr. at 38:6-19 (Lee).  The Court then asked the Defendants what benefit they gain from
deciding the Claim in October, 2015, rather than in May, 2015, and the Defendants replied that
"it's the choice between going through a formal litigation process or working collaboratively,"
and that litigating the Claim in Court "seems to be a waste of resources."  Apr. 22, 2015, Tr. at
39:18-40:14 (Lee).  When the Court suggested that the IHS "might just want to go ahead and
deny" the Claim at this time, the Defendants said "[t]hat would not be our choice," because "[i]n

almost all other instances[,] the agency has worked collaboratively with tribes." Apr. 22, 2015, Tr. at 41:1-7 (Court, Lee).

The Defendants next argued that the Claim is complex, because it seeks sixty-five million dollars, the CSC Spreadsheets set forth four-thousand entries that the IHS must analyze, and the IHS must also incorporate the Moss Adams, LLP's audit of Sage Hospital into its decision. See Apr. 22, 2015, Tr. at 44:12-46:15 (Court, Lee). The Defendants reiterated that the IHS has 1,600 claims to resolve and that the IHS has done everything it can to address the claims in a timely manner. See Apr. 22, 2015, Tr. at 47:1-16 (Lee). The Defendants added that none of the cases that Sage Hospital cites "have this particular unique situation and this particular context." Apr. 22, 2015, Tr. at 47:17-19 (Lee). The Defendants and the Court then discussed the longest timeframe that Civilian Board of Contract Appeals has found reasonable for deciding a CDA claim, and the Defendants said that Design One -- which upheld an eleven-month period -- provides the outer limit for deciding CDA claims. See Apr. 22, 2015, Tr. at 49:19-23 (Court, Lee).

The Defendants said that three extraordinary circumstances exist in this case that justify taking fourteen months to review the Claim: (i) the Claim's size: it is "huge" and "complex"; (ii) Sage Hospital did not provide adequate documentation to support the Claim; and (iii) the IHS has 1,600 pending claims to analyze. Apr. 22, 2015, Tr. at 50:10-18 (Lee). The Court pushed back on the Defendants' argument, noting that the final factor exists in every case that involves the IHS and suggested that the Defendants are relying only on the Claim's complexity to justify the fourteen-month delay. See Apr. 22, 2015, Tr. at 50:23-51:2 (Court). The Court said that, moreover, it had no context to determine what is a complex or run-of-the-mill claim. See Apr. 22, 2015, Tr. at 51:1-7 (Court). The Defendants responded that Sage Hospital bears the burden

of showing that the fourteen-month delay is unreasonable and pointed out that Sage Hospital has introduced only its attorney's "unsupported statement" to demonstrate that the fourteen-month period is unreasonable.  Apr. 22, 2015, Tr. at 51:15-16 (Lee).

When Sage Hospital took the floor for its rebuttal, it reiterated the distinctions that it made in the Reply between Design One and this case, and noted that the outer limit for deciding CDA claims is eleven months rather than fourteen months.  See Apr. 22, 2015, Tr. at 53:3-24 (Court, Frye).  In response to the Court's questioning, the Defendants said that only three or four of the IHS' 1,600 pending CSC claims are currently being litigated in federal court and that the IHS has resolved the vast majority of CSC claims through negotiations.  See Apr. 22, 2015, Tr. at 55:2-21 (Court, Lee).  Sage Hospital said that it prefers to litigate the Claim in federal court rather than pursuing informal negotiations with the IHS, because the IHS has not negotiated with it in good faith or treated it fairly.  See Apr. 22, 2015, Tr. at 58:3-15 (Court, Frye).  Sage Hospital said that the issues which the Court addressed in the MOO -- i.e., the IHS' allegations that Sage Hospital is misusing federal funds -- have tainted the IHS' relationship with Sage Hospital.  See Apr. 22, 2015, Tr. at 58:19-59:22 (Court, Frye).

The Court asked the Defendants whether there are any factual disputes that would preclude summary judgment on Count IV, and the Defendants said that "the factual dispute is whether or not 14 months is a reasonable time in this context."  Apr. 22, 2015, Tr. at 61:17-23 (Court, Lee).  Sage Hospital disagreed, arguing that reasonableness is a legal issue rather than a factual one.  See Apr. 22, 2015, Tr. at 62:18-21 (Frye).  The Court asked how it would resolve Count IV if it denied the MSJ, and Sage Hospital said that, because neither party has requested a jury trial, the Court would likely rule on Count IV in a bench trial.  See Apr. 22, 2015, Tr. at 63:4-64:3 (Court, Frye).  Sage Hospital added that Count IV focuses solely on moving up the

IHS' timeline for deciding the Claim, and that, if the Court does not rule on the MSJ before October, 2015, Count IV would be moot, and it would have to move to amend the Complaint to allege that the IHS unlawfully denied the Claim.  See Apr. 22, 2015, Tr. at 65:4-18 (Court, Frye).

The Court said that it would take the MSJ under advisement, but that it would prioritize the MSJ, because it seeks something similar to injunctive relief.  See Apr. 22, 2015, Tr. at 69:17-20 (Court).  The Court noted that it was inclined to think that there is nothing in the record indicating that the Claim is particularly complex to justify the IHS taking fourteen months to rule on it.  See Apr. 22, 2015, Tr. at 70:2-7 (Court).  The Court stated that it was inclined to think that something closer to eleven or twelve months -- which would push the IHS' deadline up to August -- is reasonable.  See Apr. 22, 2015, Tr. at 70:8-21 (Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)

(emphasis in original).[39]   Once the movant meets this burden, rule 56 requires the nonmoving

party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp.

v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d

1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)

("However, the nonmoving party may not rest on its pleadings but must set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party

asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It

is not enough for the party opposing a properly supported motion for summary judgment to "rest

on mere allegations or denials of his pleadings."   Anderson v. Liberty Lobby, Inc., 477 U.S.

at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v.

United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, once a properly supported

summary judgment motion is made, the opposing party may not rest on the allegations contained

---

[39]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme
Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely
understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R.
Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued
a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment
burden of proof operates; they disagreed as to how the standard was applied to the facts of the
case.").

in his complaint, but must respond with specific facts showing the existence of a genuine factual

issue to be tried." (citation omitted)(internal quotation marks omitted)).  Nor can a party "avoid

summary judgment by repeating conclusory opinions, allegations unsupported by specific facts,

or speculation."  Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005,

at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan.,

Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion

for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion

and may not escape summary judgment in the mere hope that something will turn up at trial.'"

Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d

789, 794 (10th Cir. 1988)).

　　　　To deny a motion for summary judgment, genuine factual issues must exist that "can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either

party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will

not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v.

Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the

fact finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc.,

477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448

(1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If

the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may

be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a

rational trier of fact, considering the record as a whole, could not find for the nonmoving party,

there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote

omitted).   "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. [at] 247-248 . . . .   When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.   Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.   The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

<u>Scott v. Harris</u>, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in <u>Thomson v. Salt Lake County</u>, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."   <u>York v. City of Las Cruces</u>, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting <u>Scott [v. Harris]</u>, 550 U.S. at 380); <u>see also</u> <u>Estate of Larsen ex rel. Sturdivan v. Murr</u>, 511 F.3d 1255, 1258 (10th Cir. 2008).

<u>Thomson v. Salt Lake Cnty.</u>, 584 F.3d at 1312 (brackets omitted).   "The Tenth Circuit, in <u>Rhoads</u>

<u>v. Miller</u>, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[40]] explained that the

_____

[40]<u>Rhoads v. Miller</u> is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   <u>See</u> 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").   The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"     Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)

(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we
> take the facts "in the light most favorable to the party asserting the injury." Scott
> v. Harris, 550 U.S. 372, 377 (2007).   "[T]his usually means adopting . . . the
> plaintiff's version of the facts," id. at 378, unless that version "is so utterly
> discredited by the record that no reasonable jury could have believed him," id.
> at 380.   In Scott, the plaintiff's testimony was discredited by a videotape that
> completely contradicted his version of the events.  550 U.S. at 379.  Here, there is
> no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads'
> testimony. There is only other witnesses' testimony to oppose his version of the
> facts, and our judicial system leaves credibility determinations to the jury. And
> given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory
> problems go to the weight of his testimony, not its admissibility . . . .  Mr. Rhoads
> alleges that his injuries resulted from a beating rendered without resistance or
> provocation. If believed by the jury, the events he describes are sufficient to
> support a claim of violation of clearly established law under Graham v. Connor,
> 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

that will serve as the foundation for answering the legal question before the court," before

inquiring into whether there are genuine issues of material fact for resolution by the jury.

584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th

Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court
finds that Rhoads v. Miller has persuasive value with respect to material issues, and will assist
the Court in its preparation of this Memorandum Opinion and Order.

are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING THE ISDEAA AND CSC

The ISDEAA authorizes the DOI or the HHS Secretary[41] to enter into contracts with tribes and tribal organizations under which the tribe or tribal organization provides services to tribe members -- such as, healthcare, education, and law enforcement -- that the federal government would otherwise provide.  See 25 U.S.C. 450a(f); S. Rep. No. 100-274, at 1 (1987), reprinted in 1988 U.S.C.C.A.N. at 2620 ("1987 Senate Report").  When Congress passed the ISDEAA in 1975, it recognized that "the prolonged Federal dominion of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities," and has "denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians."  25 U.S.C. § 450(a)(1).  Congress thus enacted the ISDEAA to "permit an orderly transition of federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services."  25 U.S.C. § 450a(b).

Under an ISDEAA contract, the United States agrees to pay a tribal organization what it would have cost the federal agency to provide the services to tribal members had the agency implemented the program itself.  See 25 U.S.C. § 450j-1(a)(1).  In 1988, Congress amended the ISDEAA to also require the United States to reimburse tribal organizations for the "full amount"

---

[41]The ISDEAA defines "the Secretary" throughout 25 U.S.C. § 450, without specifying the specific department that the Secretary supervises.  25 U.S.C. § 450.  In the ISDEAA's "definition" provision, it defines "the Secretary" as "either the Secretary of Health and Human Services or the Secretary of the Interior or both."  25 U.S.C. § 450b(i).  Accordingly, in this section on the Law Regarding the ISDEAA and CSC section, when the Court refers to "the Secretary," it means "either the DOI or the HHS Secretary."

of their CSC.  25 U.S.C. § 450j-1(a)(2), (3).  See ISDEAA Amendments of 1988, Pub. L. No.

100-472, § 201, 102 Stat. 2285.  The ISDEAA explains that CSC

> consist of an amount for the reasonable costs for activities which must be carried
> on by a tribal organization as a contractor to ensure compliance with the terms of
> the contract and prudent management, but which . . . (A) normally are not carried
> on by the respective Secretary in his direct operation of the program; or (B) are
> provided by the Secretary in support of the contracted program from resources
> other than those under contract.

25 U.S.C. § 450j-1(a)(2).  Such costs include overhead administrative costs, as well as expenses

such as federally mandated audits and liability insurance.  See Cherokee Nation of Okla. v.

Leavitt, 543 U.S. at 635.

The ISDEAA also provides, however, that "[n]otwithstanding any other provision in

[ISDEAA], the provision of funds under [ISDEAA] is subject to the availability of

appropriations."  25 U.S.C. § 450j-1(b).  Forced to reconcile these competing provisions, the

Supreme Court of the United States of America has determined that, despite Congressional limits

on appropriations to federal agencies -- which covered only "between 77% and 92% of the

tribes' aggregate contract support costs" --  the agencies must still pay tribes and tribal

organizations "the full amount of [CSC] incurred . . . in performing their contracts."  Salazar v.

Ramah Navajo Chapter (RNC), 132 S. Ct. 2181, 2186, 2187 (2012).  The Supreme Court

acknowledged in Salazar v. Ramah Navajo Chapter (RNC) that its ruling left the federal agencies

that contract with tribes and tribal organizations in an impossible position:

> As the Government points out, the state of affairs resulting in this case is the
> product of two congressional decisions which the BIA has found difficult to
> reconcile.  On the one hand, Congress has obligated the Secretary to accept every
> qualifying [ISDEAA] contract, which includes a promise of "full" funding for all
> contract support costs.  On the other, Congress appropriated insufficient funds to
> pay in full each tribal contractor.  The Government's frustration is
> understandable, but the dilemma's resolution is the responsibility of Congress.

132 S. Ct. at 2195.

The ISDEAA mandates that the CDA governs CSC disputes between tribal organizations and the United States.  See 25 U.S.C. § 450m-1(a), (d).  Under the CDA, a tribal organization must first submit its CSC claim to a CO in writing.  See 41 U.S.C. § 7103(a)(1), (2).  The claim "need not be detailed, and may consist of a short written statement outlining the basis of the claim, estimating damages, and requesting a final decision."  Menominee Indian Tribe of Wisc. v. United States, 764 F.3d 51, 55 (D.C. Cir. 2014)(citing Arctic Slope Native Ass'n v. Sebelius, 583 F.3d 785, 797 (Fed. Cir. 2009)("[S]ubmissions to the contracting officer need not be elaborate.")).  If the claim is over $100,000.00, the tribal organization must certify that: (i) the claim is made in good faith; (ii) the supporting data are accurate and complete to the best of the tribal organization's knowledge and belief; (iii) the amount requested accurately reflects the contract adjustment for which the tribal organization believes the United States is liable; and (iv) the certifier is authorized to certify the claim on the tribal organization's behalf.  See 41 U.S.C. § 7103(b)(1).

Within sixty days of receiving a claim over $100,00.00, the CO must either issue a decision or tell the tribal organization "of the time within which a decision will be issued."  41 U.S.C. § 7103(f)(2).  The CDA mandates that a CO's decision on a CSC claim "shall be issued within a reasonable time, . . . taking into account such factors as the size and complexity of the claim and the adequacy of information in support of the claim provided by the contractor."  41 U.S.C. § 7103(f)(3).  If the CO fails to timely issue a decision, the claim is deemed denied.  See 41 U.S.C. § 7103(f)(4).  At that point, the tribal organization can: (i) appeal the decision to the Civilian Board of Contract Appeals or the Court of Federal Claims under the CDA, see 41 U.S.C. § 7104(a), (b)(1); or (ii) challenge the decision in federal district court under the ISDEAA.  See 25 U.S.C. § 450m-1(a).

## LAW REGARDING THE BRIEFING OF MOTIONS

The ordinary process for filing a motion in the District of New Mexico involves: (i) the movant contacting all other parties and ascertaining whether they consent to the proposed motion,[42] see D.N.M. LR-Civ. 7.1(a); (ii) the movant filing the motion and a memorandum or legal brief supporting the motion's requests,[43] see D.N.M. LR-Civ. 7.4(a); (iii) any opposing parties filing a response within fourteen days of the motion's filing,[44] see D.N.M. LR-Civ. 7.4(a); (iv) the movant filing a reply to any responses within fourteen days of the response's filing,[45] see D.N.M. LR-Civ. 7.4(a); (v) the movant filing a notice of completion of briefing, see D.N.M. LR-Civ. 7.4(e); and (vi) the Court holding a hearing, if the Court decides to do so,[46] see D.N.M. LR-

---

[42]The "[m]ovant must determine whether a motion is opposed, and a motion that omits recitation of a good-faith request for concurrence may be summarily denied." D.N.M. LR-Civ. 7.1(a). This requirement, known as the meet-and-confer requirement, does not apply to incarcerated parties who are proceeding pro se. See D.N.M. LR-Civ. 7.1(a). The Court fleshed out the obligations that the meet-and-confer requirement imposes on movants -- which are higher for some motions than for others -- in State of New Mexico ex rel. Balderas v. Valley Meat Co., LLC, No. CIV 14-1100 JB/KBM (D.N.M. May 20, 2015)(Browning, J.)(Doc. 16)(slip op.). See No. CIV 14-1100 JB/KBM, at *39-43 (Doc. 16).

[43]The movant may file his or her motion either with a separately filed memorandum of support, or as a single, comprehensive document; the Court prefers the latter approach. If the movant opts for the former approach, local rule 7.5's page limit applies to the combined length of the motion and the supporting memorandum brief. See D.N.M. LR-Civ. 7.5 ("The length of a motion or, if a separate brief is filed in support of a motion, the combined length of a motion and supporting brief, must not exceed twenty-seven (27) double-spaced pages.").

[44]"The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion." D.N.M. LR-Civ. 7.1(b).

[45]"The failure to file and serve a reply in support of a motion within the time prescribed for doing so constitutes consent that briefing on the motion is complete." D.N.M. LR-Civ. 7.1(b).

[46]The Court's general practice is to hold hearings on all opposed civil motions. See Anderson Living Trust v. WPX Energy Prod., LLC, No. CIV 12-0040 JB/LFG, 2015 WL 1321479, at 111 n.81 (D.N.M. Jan. 6, 2014)(Browning, J.). The local rules, however, provide that motions "will be decided on the briefs unless the Court sets oral argument." D.N.M. LR-Civ. 7.6(a).

Civ. 7.6.  Any of the fourteen-day time periods can be extended "by agreement of all parties" without a court order, provided that the extension does not "interfere with established case management deadlines."  D.N.M. LR-Civ. 7.4(a).  If a requested time extension is opposed or if the extension would interfere with case-management deadlines, then the requesting party may move the Court for the extension, but he or she must present "good cause" for the extension, and must file the motion within the original fourteen-day period for filing the brief.  Fed. R. Civ. P. 6(b)(1).  See D.N.M. LR-Civ. 7.4(a).

Surreplies -- briefs that a party opposing a motion files after the movant files his or her reply -- are not ordinarily part of the briefing process.  Local rule 7.4(b) provides: "The filing of a surreply requires leave of the Court."  D.N.M. LR-Civ. 7.4(b).  "A surreply is appropriate and should be allowed where new arguments are raised in a reply brief."  Walker v. THI of N.M. at Hobbs Ctr., No. CIV 09-0060 JB/KBM, 2011 WL 2728344, at *1 (D.N.M. July 6, 2011) (Browning, J.).  A party may request leave to file a surreply either before or after a hearing on the motion in question, but it is preferable that the surreply be filed before the hearing, so that the parties can come to the hearing fully informed on the issues and arguments.  See Pimentel & Sons Guitar Makers, Inc. v. Pimentel, 229 F.R.D. 201, 204 (D.N.M. 2005)(Browning, J.).  Although full-blown surreplies are the exception rather than the norm, any party may file with the court any "controlling authority" that he or she discovers after the briefing has closed -- even if the Court has already held a hearing.  D.N.M. LR-Civ. 7.8(a).  If a party files supplemental authority, he or she may accompany the authority with up to 350 words explaining the authority's applicability to the case before the Court; opposing parties may then file a 350-word response to the supplemental authority within seven days.  See D.N.M. LR-Civ. 7.8(c).

Motions are limited to twenty-seven double-spaced pages, responses to twenty-four, and replies to twelve.[47]  See D.N.M. LR-Civ. 7.5.  The Court may, at its discretion, strike or ignore -- in whole or in part -- documents that do not comply with the local rules' page-length limitations.  See D.N.M. LR-Civ. 10.3(c).  The local rules do not explicitly provide for page extensions -- and thus parties may not effectuate page extensions merely by agreeing to them -- but the Court may grant them upon motion.[48]  The Court has broad discretion to grant or deny such motions,

---

[47]Footnotes and block quotations are exempt from the double-spacing requirement.  See D.N.M. LR-Civ. 10.1.  Briefs must be filed on single-sided, eight-and-one-half-inch-by-eleven-inch pages, and the left, right, and bottom margins must be one inch or larger, while the top margin must be one-and-one-half inches or larger.  See D.N.M. LR-Civ. 10.1.  All text must be twelve-point font or larger.  See D.N.M. LR-Civ. 10.1.

[48]Because the local rules do not provide for them, there is no standard or proper form for a motion for page extension.  There are three conceivable ways that a party could file one.  First, the party could file the motion along with his or her substantive brief, where the substantive brief already exceeds the relevant page limit and has everything in it that the movant wants to say.  This form takes the "forgiveness rather than permission" approach, which is risky, because, if the Court denies the request for a page extension, then it may strike or ignore all material in excess of the page limit.  This approach effectively plays "chicken" with the Court, relying on the fact that the Court will generally not want to strike a brief that a party has already filed.

Second, the party could file a motion for page extension before filing his or her substantive brief.  This form is a safer approach than the first form, because there is no risk of the Court striking or ignoring the brief.  It also lets the party know, in advance of filing the substantive brief, the page limit with which he or she must work.  On the other hand, the Court may be the least apt to grant this form of motion, as the Court -- not having seen any attempt by the party to tailor the substantive brief to the page limit -- may wonder why the party feels the need to be preemptively excused from the local rules' page limits.

Third, the party could file the motion along with his or her substantive brief, where the substantive brief complies with the relevant page limit.  This form is safer than the first form, because, if the Court denies the page extension, the party still has a complete, intact brief upon which to stand.  With this approach, the movant could either attach a copy of the proposed additional material with his or her motion for page extension -- thus maximizing the odds that the Court will allow the extension by capitalizing on the psychological pressure it puts on the Court that the additional material has already been written -- or put off writing the additional material until the Court grants the page extension -- thus avoiding the possibility of wasted work if the Court denies the page extension.

With this judge, it is probably not going to matter what form a party chooses.  The Court is inclined to let parties have their say, within reason.  The Court wants to have arguments in writing in advance of the hearing, and, if anyone did not get all of his or her points across in the

- 63 -

provided that it does not "place[] . . . unreasonable limitation[s] on the information available to the court" to render an informed decision.  Dodge v. Cotter Corp., 328 F.3d 1212, 1228-29 (10th Cir. 2003).  See United States v. Nacchio, 555 F.3d 1234, 1250 (10th Cir. 2009)("[I]t would be an abuse of discretion for the district court to unreasonably limit the evidence upon which it based its . . . decision . . . .").  The factors that the Court will consider in ruling on motions for page extensions include, in descending order of importance: (i) whether -- or how many of -- the opposing parties consent to the motion for page extension; (ii) whether, if the brief sought to be extended is responsive to an earlier brief, the earlier brief was subject to a page extension; (iii) the likelihood that the additional material will either be outcome dispositive or will save the Court more time in researching than is lost on the additional length -- this factor largely corresponds to the complexity of the brief's subject matter; (iv) the extent to which the requesting party's initial, un-extended brief -- if one has already been filed -- adequately conveyed its argument, and the extent to which its author exercised editorial efficiency; and (v) the frequency with which the requesting party has requested page extensions throughout the case -- a practice which is often hard on the Court.  The Court encourages parties to "narrowly tailor" page extensions, taking up no more additional length than is reasonably necessary to effectuate the extension's purported purpose.

Parties may also attach exhibits -- such as affidavits or pages from deposition transcripts -- to their briefs, but such exhibits are limited to a total of fifty pages.[49]  See D.N.M.

---

briefing, then orally at the hearing.  The Court would always rather have too much information in front of it than too little when making a decision.

[49]Parties may attach exhibits to motions, responses, or replies; the page limit refers to the number of pages that a party may attach to a single brief, i.e., a movant may attach fifty pages to his or her motion and another fifty pages to his or her reply.  See D.N.M. LR-Civ. 10.5.  Parties may also attach exhibits to their pleadings, but only if the exhibit "form[s] the basis for the action or [a] defense."  D.N.M. LR-Civ. 10.4.

LR-Civ. 10.5.  Unlike the page limits for the briefs themselves, however, the parties may enlarge the page limits for exhibits by mutual agreement, without the requirement of a court order.  See D.N.M. LR-Civ. 10.5.

## LAW REGARDING GRANTING CONTINUANCES

The Tenth Circuit has articulated four factors for evaluating motions for continuance: (i) "the diligence of the party requesting the continuance"; (ii) "the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for the continuance"; (iii) "the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance"; and (iv) "the need asserted for the continuance and the harm that [the movant] might suffer as a result of the district court's denial of the continuance." United States v. West, 828 F.2d 1468, 1470 (10th Cir. 1987).  The Tenth Circuit has also said that "[n]o single factor is determinative and the weight given to any one may vary depending on the extent of the [the movant's] showing on the others."  United States v. West, 828 F.2d at 1470.  "[T]he determination whether the denial of a continuance constitutes an abuse of discretion turns largely upon the circumstances of the individual case."  Rogers v. Andrus Transp. Servs., 502 F.3d 1147, 1151 (10th Cir. 2007)(citations omitted)(internal quotation marks omitted).

In Chavez v. Board of Education, No. CIV 05-0380 JB/CG, 2008 WL 6044569 (D.N.M. Oct. 20, 2008)(Browning, J.), the Court denied the defendant New Mexico Public Education Department's motion to vacate and reschedule the trial setting.  See 2008 WL 6044569 at *8.  The defendant contended that their alleged "star" witness, Connie Dembrowsky, would be unavailable for the trial setting on November 10, 2008, because she was scheduled to undergo surgery in early November and would recover in approximately six months.  2008 WL 6044569,

at *1-3 (internal quotation marks omitted).  The Court found that the defendant did not show "a lack of diligence" from its decision not to take her deposition.  2008 WL 6044569, at *3-4.  The Court held that, although the defendant based its decision on difficult strategic and pragmatic concerns, and had interviewed the witness and produced a work-product memorandum on her potential testimony, the majority of the Tenth Circuit's factors weighed against granting the motion.  See 2008 WL 6044569, at *3-4.  First, a continuance would not necessarily achieve its stated purpose, because the defendant overstated the value of Dembrowsky's testimony and undervalued other witnesses' testimonies.  See 2008 WL 6044569, at *4.  Second, the plaintiffs would suffer prejudice by waiting at least eight months for a new setting when "this case has been in litigation for half of a decade."  2008 WL 6044569, at *6.  Last, the defendant would not suffer great harm through denial of the motion, because Dembrowsky's prior sworn testimony would accomplish the defendant's needs and because other witnesses could testify on many of the same matters as Dembrowsky.  See 2008 WL 6044569, at *7.  The Court, therefore, denied the motion.  See 2008 WL 6044569, at *8.

## ANALYSIS

The Court will grant the Motion to File Surreply, because Sage Hospital raises new arguments in the MSJ Reply to which the Defendants should be allowed to respond.  The Court will deny the Motion to Vacate, because vacating and continuing the April 22, 2015, hearing on the MSJ would prejudice Sage Hospital, and because the Defendants' sole reason for vacating and continuing the hearing -- that Ms. Lee will not be able to attend in person -- is ameliorated by allowing Ms. Lee to appear at the hearing via videoconference.  Finally, the Court will grant the MSJ on two grounds.  First, the Court will deem the Claim denied, because Dayish has not given Sage Hospital a date certain by which he will decide the Claim.  Second, even if Dayish

had given Sage Hospital a date certain by which he will decide the Claim, his proposed fourteen-month period for deciding the Claim is unreasonably long under the CDA. Accordingly, even if the Court did not deem the Claim already denied, it would order Dayish to approve or deny the Claim by July 25, 2015.

## I.     **THE COURT WILL GRANT THE MOTION TO FILE SURREPLY.**

Under local rule 7.4(b), "[t]he filing of a surreply requires leave of the Court." D.N.M.LR-Civ. 7.4(b). The Court often grants surreplies when a party raises a new argument or new evidence in a reply brief. See Walker v. THI of N.M. at Hobbs Ctr., 2011 WL 2728344, at *1 ("A surreply is appropriate and should be allowed where new arguments are raised in a reply brief." (citing Pimentel & Sons Guitar Makers, Inc. v. Pimentel, 229 F.R.D. at 204)). A surreply gives the nonmovant a chance to respond to the new information. See Walker v. THI of N.M. at Hobbs Ctr., 2011 WL 2728344, at *1.

The Court will grant the Motion to File Surreply and will consider the MSJ Surreply, because Sage Hospital raises a number of new issues and introduces new evidence in the MSJ Reply. First, Sage Hospital discusses the Tuba City decision at length, arguing that it supports Sage Hospital's proposition that a tribal organization's failure to produce sufficient documentation to support its CSC claim does not provide an exception to the CDA's timing requirements. See MSJ Reply at 6-8. Second, Sage Hospital asserts that the Court should deem the Claim denied, because Dayish made the October 21, 2015, deadline for deciding the Claim contingent upon Sage Hospital's production of documents. See MSJ Reply at 17. Third, Sage Hospital introduces eight new exhibits.

Sage Hospital does not dispute that the MSJ Reply raises a number of new issues, but instead opposes the MSJ Surreply, because it is "improper and unenlightening." Motion to File

Surreply Response at 3.  Sage Hospital adds that, rather than confining its surreply to the Tuba City decision, "IHS devotes almost seven pages of its proposed surreply to arguing other matters."  Motion to File Surreply Response at 4.  Sage Hospital fails to recognize, however, that the "other matters" that the Defendants address in the MSJ Surreply are the new evidence and the new arguments that Sage Hospital raised in its MSJ Reply.  See MSJ Surreply at 1-9.  Sage Hospital has had an opportunity to inform the Court about an additional case, a new argument, and additional evidence; the Defendants should, therefore, have an opportunity to respond to those new issues.  Particularly in a case like this one -- where there is relatively sparse precedent upon which the Court can rely -- the Court appreciates all of the guidance that it can get from the parties.

Moreover, Sage Hospital has now had three opportunities to respond to the MSJ Surreply: (i) the Response to Motion to File Surreply; (ii) the Court told Sage Hospital that it could file a formal response to the MSJ Surreply, see Apr. 10, 2015, Tr. at 6:23-7:7 (Court); and (iii) the Court said that Sage Hospital could address the Defendants' arguments from the MSJ Surreply at the April 22, 2015, hearing, see Apr. 10, 2015, Tr. at 6:23-7:7 (Court).  Because Sage Hospital has had a full opportunity to respond to the MSJ Surreply, it will not suffer any prejudice from the Court's consideration of the MSJ Surreply.  Accordingly, the Court will grant the Motion to File Surreply and will consider the MSJ Surreply.  This disposition is fair to all parties and assists the Court in its resolution of the MSJ.

## II.    **THE COURT WILL DENY THE MOTION TO VACATE.**

The Tenth Circuit has articulated four factors for evaluating motions for continuance: (i) "the diligence of the party requesting the continuance;" (ii) "the likelihood that the continuance, if granted, would accomplish the purpose underlying the party's expressed need for

the continuance;" (iii) "the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance;" and (iv) "the need asserted for the continuance and the harm that [the movant] might suffer as a result of the district court's denial of the continuance." United States v. West, 828 F.2d at 1470.  Although the Defendants were diligent in their request for a continuance and the Motion to Vacate would accomplish the purpose underlying their need for a continuance, the inconvenience to Sage Hospital and the marginal harm caused by denial of the continuance outweighs the first two of the Tenth Circuit's four factors.  The Court will, thus, deny the Motion to Vacate.

### A.   THE DEFENDANTS ACTED DILIGENTLY IN FILING THE EMERGENCY MOTION TO VACATE.

First, the Court has to resolve whether the Defendants acted diligently when they filed the Motion to Vacate.  See United States v. West, 828 F.2d at 1470.  Ms. Lee broke her ankle over the March 28, 2015, and March 29, 2015, weekend.  See Motion to Vacate ¶ 5, at 1.  The Defendants filed the Motion to Vacate on April 1, 2015.  See Motion to Vacate at 1.  It is unclear when Ms. Lee went to the doctor to have her leg examined or when she notified the rest of Defendants' counsel of her injury; even assuming that Ms. Lee was injured, went to the doctor, learned that she would be unable to travel to Albuquerque, and told Defendants' counsel about her predicament all on Saturday, March 28, 2015, the Defendants waited only three business days to file the Motion to Vacate.  It is more likely, however, that Ms. Lee either did not learn of her inability to travel or did not inform her co-counsel of that information until Monday, March 30, 2015.  In that case, the Defendants waited only two days to file the Motion to Vacate.  The Court cannot fault the Defendants for taking two or three days to determine the best course of action.  Accordingly, the Defendants acted diligently in filing the Motion to Vacate, and this factor weighs in favor of granting the motion.

### B.   GRANTING THE EMERGENCY MOTION TO VACATE WOULD ACCOMPLISH THE PURPOSE UNDERLYING THE DEFENDANTS' NEED FOR A CONTINUANCE.

Second, the Court needs to determine the likelihood that granting the Motion to Vacate will achieve the purpose underlying the Defendants' expressed need for the continuance.  See United States v. West, 828 F.2d at 1470.  The purpose of the continuance is to allow Ms. Lee -- who is taking the lead on Count IV of the FAC -- to argue the MSJ in person before the Court. See Motion to Vacate ¶ 4, at 1.  The Defendants add that Ms. Lee is "highly experienced in the field and by far the most knowledgeable subject-matter expert on CSC" among the Defendants' counsel.  Motion to Vacate ¶ 6, at 2.  While granting the Motion to Vacate would achieve this purpose, this factor does not weigh heavily in the Defendants' favor.

Ms. Lee can fully argue the MSJ before the Court through videoconferencing technology. The Court has recently updated the technology in its courtroom and now has one of the most high-tech courtrooms in the country -- complete with high-quality videoconferencing capabilities.  Although many attorneys prefer to argue motions in person, and the Court thought the same thing when it was a practicing lawyer, the Court can confidently say -- after nearly twelve years on the bench -- that it does not make much, if any, difference to the Court whether it hears arguments in person, by telephone, or via videoconference.  The Court has to resolve the issues one way or the other and does not feel more persuaded by in-person contact than hearing arguments in any other format.  See Valencia v. Colo. Cas. Ins. Co., No. CIV 06-1250 JB/RHS, 2007 WL 5720341, at *1 (D.N.M. Nov. 21, 2007)(Browning, J.)("[T]he Court is usually much more preoccupied with trying to get the decision right, looking at the materials and notes on the bench, and listening to counsel than it is with noticing who is speaking in person or who is on the telephone.").  The Court has gotten used to telling people "no" all day, and it does not matter

whether the person is in the room or not.  New Mexico is a big state and the United States is a big country, and the Court spends a lot of its time talking over the telephone to help counsel and parties avoid the expense and inconvenience of traveling to Albuquerque for hearings.  Moreover, the Defendants agreed to this solution at the April 10, 2015, hearing.  See Apr. 10, 2015, Tr. at 4:1-5:12 (Court, Lee).  Having Ms. Lee argue the MSJ by videoconference is not perfect, but the accommodation largely mitigates any prejudice to the Defendants of denying the Motion to Vacate.

### C. VACATING THE APRIL 22, 2015, HEARING AND SETTING A NEW HEARING WOULD INCONVENIENCE THE PLAINTIFFS.

Third, the Court needs to decide whether granting the Motion to Vacate will inconvenience Sage Hospital.  See United States v. West, 828 F.2d at 1470.  Sage Hospital argues that it would suffer prejudice from vacating the April 22, 2015, hearing and setting a later hearing, because the IHS' actions are jeopardizing Sage Hospital's very existence.  See Motion to Vacate Response ¶ 6, at 3.  Sage Hospital contends that the IHS' actions have already damaged Sage Hospital's relationships with its professional staff and the local community that it serves.  See Motion to Vacate Response ¶ 6, at 3.

The MSJ asks the Court to deem the Claim denied or order the Defendants to issue a decision on the Claim before October 21, 2015.  Because of the nature of the MSJ, time is of the essence.  Moving the April 22, 2015, hearing back to "the week of May 11 or thereafter," Motion to Vacate at 2, as the Defendants request, would delay the Court's resolution of the Claim, and make it more difficult for the Court to award Sage Hospital the relief it seeks in the requisite time period.  Sage Hospital has waited for its day in court.  The Court will not inconvenience Sage Hospital without adequate justification.  Forcing Sage Hospital to delay a hearing that affects its continuing viability when the Court can fully hear Ms. Lee's arguments on the original hearing

date places an unnecessary burden on Sage Hospital.  Another attorney can appear at the hearing or Ms. Lee, the Defendants' first choice, can appear by videoconference.

> **D.      THE DEFENDANTS WILL NOT SUFFER GREAT HARM FROM THE COURT'S DENIAL OF THE MOTION TO VACATE.**

Finally, the Court must determine the harm that the Defendants will suffer if it does not grant the Motion to Vacate.  See United States v. West, 828 F.2d at 1470.  The only justification that the Defendants have provided for the Motion to Vacate is their preference to have Ms. Lee argue the MSJ.  See Motion to Vacate at 1-2.  As the Court explained previously, Ms. Lee can fully argue the MSJ by appearing for the April 22, 2015, hearing via videoconference.  The Court's videoconferencing equipment is very good, and Ms. Lee will effectively be present in every meaningful way.  Accordingly, the Defendants will not suffer much, if any, prejudice if the Court denies the Motion to Vacate.  Moreover, the other factors -- that the Defendants acted diligently and that granting the Motion to Vacate would accomplish the underlying purpose of the continuance -- do not change the Court's analysis.  The prejudice to Sage Hospital and the marginal harm to the Defendants in forcing Ms. Lee to appear by videoconference rather than in person heavily outweigh the other two factors.

## III.    THE COURT WILL GRANT THE MSJ.

The Court will grant the MSJ on two grounds.  First, the Court will deem the Claim denied, because Dayish has failed to give Sage Hospital a date certain within which he will decide the Claim.  Second, even if Dayish had given Sage Hospital a date certain within which he will decide the Claim, his proposed fourteen-month period for deciding the Claim is unreasonably long under the CDA.  Accordingly, even if the Court did not deem the Claim already denied, it would order Dayish to approve or deny the Claim by July 25, 2015.

A.   **THE COURT WILL DEEM THE CLAIM DENIED, BECAUSE DAYISH HAS FAILED TO GIVE SAGE HOSPITAL A DATE CERTAIN WITHIN WHICH HE WILL DECIDE THE CLAIM.**[50]

Within sixty days of receiving a CSC claim over $100,00.00, a CO must either issue a decision or tell the tribal organization "of the time within which a decision will be issued."  41 U.S.C. § 7103(f)(2).  If the CO fails to timely issue a decision or give a date certain upon which a decision will be issued, the claim is deemed denied.  See 41 U.S.C. § 7103(f)(5).  Although the date that the CO fixes for deciding the claim can be "a fair estimate," it cannot be "an indefinite, open-ended date, sometime in the future."  Orbas & Assocs. v. United States, 26 Cl. Ct. at 650.  Put another way, the date that the CO fixes must be sufficiently specific that a tribal organization can "look at a calendar and know when the decision is late."  Orbas & Assocs. v. United States, 26 Cl. Ct. at 650.

Applying this standard, the Civilian Board of Contract Appeals has found COs' deadlines sufficiently specific where a CO's letter stated that a decision on the contractor's claim "will be issued on or before July 11, 1997."  Defense Systems Co., 1997 WL 217392, at *1.  The Civilian Board of Contract Appeals has similarly deemed CDA claims denied where the CO makes the

---

[50]The Court may consider Sage Hospital's argument that the Court should deem the Claim denied for Dayish's failure to set forth a date certain by which he will decide the Claim, despite the fact that Sage Hospital raised the argument for the first time in the MSJ Reply.  The Court has previously said that, "in resolving a summary-judgment motion, a district court need not consider new issues or arguments raised in a reply brief, but if it 'relies on new materials or new arguments in a reply brief, it may not forbid the nonmovant from responding to these new materials.'"  Plaint Oil Powered Diesel Fuel Sys., Inc., No. CIV 11-0103 JB/WPL, 2012 WL 1132527, at *15 (D.N.M. Mar. 22, 2012)(Browning, J.)(quoting Pippen v. Burlington Res. Oil & Gas Co., 440 F.3d 1186, 1192 (10th Cir. 2006)).  In Pippen v. Burlington Resources Oil & Gas Co., the Tenth Circuit held that the district court did not abuse its discretion in considering new information in the reply brief, because the non-movant "had plenty of opportunity to seek leave of the court to file a surreply but never attempted to do so."  440 F.3d at 1192.  Because the Court granted the Motion to File Surreply, held a hearing, and has considered the information and the arguments that the Defendants set forth in the MSJ Surreply, the Defendants have had a full opportunity to respond to Sage Hospital's arguments in the MSJ Reply, and the Court may consider this argument.

decision deadline "contingent upon the occurrence of a future event."  Pub. Warehousing Co.
K.S.C., ASBCA No. 58078, 13 BCA P ¶ 35,460, 2013 WL 6229356, at *1 (Nov. 12, 2013).  In
Aerojet General Corp., for example, the Civilian Board of Contract Appeals deemed a CDA
claim denied where the CO's letter stated that he did not "anticipate issuing a final decision on
this matter until the early March 1995 timeframe" and noted that he "would like it understood
that [his] ability to meet this date is contingent upon [the contractor's] cooperation."  1995 WL
44259, at *1.  Similarly, in Inter-Con Security Systems, Inc., ASBCA No. 45749, 93-3 BCA ¶
26,062, 1993 WL 171650 (May 14, 1993), the Civilian Board of Contract Appeals deemed a
CDA claim denied where the CO advised the contractor that she would render a decision "within
60 days of receipt of the audit report" that she intended to request.  1993 WL 171650, at *1.  See
Northrop Grumman Corp., ASBCA No. 52263, 00-1 BCA ¶ 30,676, 1999 WL 1116978 (Aug.
18, 1999)(deeming CDA claim denied where CO's letter stated "please be advised that a
Contracting Officer Final Decision will be made no later than 90 days after termination of the
ADR if the ADR process does not result in resolution of all issues").

    The Dayish Ltr. states, in pertinent part:

> At this time, the IHS has not had an opportunity to adequately review and
> make a final decision on your claim for a variety of reasons, including the size,
> complexity, age, and lack of specificity of your claim and the inadequacy of
> supporting documentation submitted with the claim.  In addition, the IHS would
> like to work cooperatively with the Navajo Health Foundation-Sage Memorial
> Hospital Inc. (NHF-SMH) to exchange relevant documents and discuss the claims
> prior to issuing its response.  In consideration of these factors and based upon the
> anticipated cooperation of the NHF-SMH, I will issue a final contracting officer's
> decision by October 21, 2015.

Dayish Ltr. at 1 (emphasis omitted).

    At the hearing, the Defendants clarified that the Dayish Ltr. sets forth a date certain by
which the IHS will issue a decision on the Claim and that, if the IHS fails to issue a decision by

that date, the Claim will be deemed denied.  See Apr. 22, 2015, Tr. at 36:2-13 (Court, Lee).

Contrary to the Defendants' contentions, the Dayish Ltr. does not set forth an unqualified date

certain by which Dayish would decide the Claim.  Instead, the October 21, 2015, deadline that

the Dayish Ltr. sets forth is contingent "upon the anticipated cooperation of the NHF-SMH."

Dayish Ltr. at 1.  The Dayish Ltr. is thus more similar to the CO's letter in Aerojet General

Corp., which made the CO's ability to meet the stated deadline contingent upon the contractor's

cooperation, than the CO's letter in Defense Systems Co., which gave an unqualified date certain

by which the CO would decide the CDA claim.  Because the Dayish Ltr. fails to set forth a date

certain by which Dayish will decide the Claim, but instead makes that deadline contingent upon

Sage Hospital's cooperation, the Court will deem the Claim denied.[51]

---

[51]That the Defendants now say, in retrospect, that the Dayish Ltr. sets forth a date certain by which the IHS will issue a decision on the Claim, see Apr. 22, 2015, Tr. at 36:2-13 (Court, Lee), does not dictate a different result.  The United States advanced the same argument in numerous cases in which the contractor challenged the certainty of the CO's deadline.  See, e.g., Orbas & Assocs. v. United States, 26 Cl. Ct. at 650 ("At oral argument, the government contended that the language used by the CO clearly conveyed his intention to issue a final decision on 30 June 1990."); Boeing Co. v. United States, 26 Cl. Ct. at 259 ("The Government's assertion in its briefing that 'within 60 days of receipt of Boeing's claim, the termination contracting officer chose to notify Boeing that she would issue a final decision by March 13, 1992' is simply inaccurate.").  None of those cases have determined that the United States' subsequent clarification of the CO's deadline during litigation -- in its briefing or at oral argument -- satisfied the CDA's requirement that the CO issue a date certain by which he or she would decide the claim within sixty days of receipt of the claim.  See, e.g., Orbas & Assocs. v. United States, 26 Cl. Ct. at 650 ("The CO failed to impose an outside limit on the estimated date for decision. . . .  If it can be said that the letter of March 1 is susceptible of another reading, the court would simply observe that in this context the CO bears the responsibility of needless ambiguities."); Boeing Co. v. United States, 26 Cl. Ct. at 259 ("If a contracting officer is able to keep the administrative process alive with ambiguous assurances that a final decision will be issued some time in the future, the whole issue of whether the tolling provision was invoked would create a new source of useless litigation."); Claude E. Atikins Enters., Inc. v. United States, 27 Cl. Ct. 142, 146 (1992)("Despite the defendant's assertion to the contrary, we conclude that the officer's notice suggested that he might further extend the due date after the initial sixty-day period passed.").  Accordingly, the Defendants' clarification at the hearing that the Dayish Ltr. set forth a date certain does not alter the Court's decision.  The CO has not sent out a new letter or amended his letter to take out the qualification.  Moreover, attempting to

The Defendants say that the language in the CO decision letters in the "deemed denial" cases is "not at all similar to the IHS CO's language at issue here," pointing to the portion of the Dayish Ltr., which says: "'I will issue a final contracting officer's decision by October 21, 2015.'"  MSJ Surreply at 9.  The Defendants omit the first portion of the sentence that they quote, however, in which Dayish makes the October 21, 2015, deadline contingent "upon the anticipated cooperation of the NHF-SMH."  Dayish Ltr. at 1.  The Defendants do not cite, and the Court has been unable to find, a case in which a federal court or the Civilian Board of Contract Appeals has found a CO's deadline for deciding a CDA claim sufficiently specific when it is qualified by the occurrence of a future event.  The Court sees no reason to create an exception to that general rule in this case.

Holding otherwise and adopting a flexible standard for when a qualified date certain is permissible would encourage COs to test the CDA's boundaries, in the hopes that they could push their deadlines down the road just a little further.  See Boeing Co. v. United States, 26 Cl. Ct. at 259 ("If a contracting officer is able to keep the administrative process alive with ambiguous assurances that a final decision will be issued some time in the future, the whole issue of whether the tolling provision was invoked would create a new source of useless litigation.").  Encouraging such gamesmanship would undercut the CDA's purpose of "insur[ing] fair and equitable treatment to contractors and government agencies."  S. Rep. No. 95-1118, at 1 (1978), reprinted in 1978 U.S.S.C.A.N. 5235, 5235.  Accordingly, in this area of the law, "crisp rules with sharp corners are preferable to a round-about doctrine of opaque standards."  Taylor v. Sturgell, 553 U.S. 880, 901 (2008)(citation omitted)(internal quotation marks omitted).  See

---

clarify at this point we be beyond the CDA's sixty-day deadline for issuing a date certain.  The Defendants' lawyer's attempt to clarify does not give the Court or Sage Hospital the answer that the law requires.

Antonin G. Scalia, <u>The Rule of Law as a Law of Rules</u>, 56 U. Chi. L. Rev. 1175, 1178-79 (1989)("As laws have become more numerous, and as people have become increasingly ready to punish their adversaries in the courts, we can less and less afford protracted uncertainty regarding what the law may mean.").  Companies that contract with the United States can, and should, expect an efficient and comprehensive resolution of their CDA claims.  Part of that expectation is that the United States will set and abide by concrete, specific, and unqualified deadlines.

If the Court were to decide that Dayish had set a definitive deadline, the Court and Sage Hospital would be in a difficult position if Dayish decides down the road that Sage Hospital did not provide all of the necessary information and then moved the deadline.  The Court and Sage Hospital would not be in a position to deal effectively with Dayish's hedging.  The reality is that the Claim will be denied or deemed denied -- today, in July, on October 21, 2015, or at some other date.  Dayish need not reserve a decision on the Claim on a condition -- that Sage Hospital provides more information -- which is not going to happen.  This uncertainty is unnecessary and inconsistent with the purpose underlying the CDA.

COs write their CDA decision letters.  They are familiar with their own resources and should know how long it should take them to resolve different claims.  They should therefore bear the responsibility of any ambiguity in their decision letters.  See <u>Orbas & Assocs. v. United States</u>, 26 Cl. Ct. at 650 ("If it can be said that the [CO's] letter is susceptible of another reading, the court would simply observe that in this context the CO bears the responsibility of needless ambiguities.").  It is within the United States' power to avoid this problem by simply and clearly stating when it will issue its decision, without any suggested, implied, or hinted contingencies; once it starts hedging, it runs the risk that the claim will be deemed denied.  The Court will not

allow the United States to avoid its responsibility of setting forth a concrete deadline for deciding the Claim in this case, because the problems can be easily avoided and the consequences to the Court and Sage Hospital are too great if the Court reads the ambiguity wrong.  Accordingly, the Court holds that the Claim is deemed denied because of Dayish's failure to set forth a date certain by which he will decide the Claim.

### B. EVEN IF DAYISH HAD GIVEN SAGE HOSPITAL A DATE CERTAIN BY WHICH HE WILL DECIDE THE CLAIM, HIS PROPOSED FOURTEEN-MONTH PERIOD FOR DECIDING THE CLAIM IS UNREASONABLY LONG UNDER THE CDA.

Within sixty days of receiving a claim over $100,00.00, the CO must either issue a decision or tell the tribal organization "of the time within which a decision will be issued."  41 U.S.C. § 7103(f)(2).  Sage Hospital submitted the Claim to the IHS on August 24, 2014, and Dayish responded to the Claim fifty-nine days later, on October 23, 2014.  See Dayish Ltr. at 1-2.  If Dayish had provided a date certain by which he would respond to the Claim in the Dayish Ltr., his response would be timely under the CDA.  The CDA further requires that a CO's decision on a CSC claim be issued within a reasonable time, "taking into account such factors as the size and complexity of the claim and the adequacy of information in support of the claim provided by the contractor."  41 U.S.C. § 7103(f)(3).  The United States "may not indefinitely or unreasonably delay in issuing a decision, or the failure to act will be regarded a 'deemed denial'" under the CDA.  In re Eaton Contract Servs., 2003 WL 21255946, at *1.  At issue is whether Dayish's proposed deadline for deciding the Claim -- October 21, 2015 -- is reasonable.  The Court concludes that it is not.

The Civilian Board of Contract Appeals has explained that "[w]hether the date stated by a CO for issuance of a final decision is reasonable must be determined on a case-by-case basis." Kelly-Ryan, Inc., 2010 WL 5071059, at *1.  "The party making a claim bears the burden of

proof." Design One, slip op. at 3.  Sage Hospital submitted the Claim to the IHS on August 24, 2014, seeking $62,569,681.00.  See Claim at 1.  The Claim consists of two parts: (i) the difference between Sage Hospital's incurred costs and CSC payments for FYs 2009-13, which total $36,258,493.00; and (ii) the third-party revenues that Sage Hospital lost because of the IHS' CSC underpayments for FYs 2009-13, which total $26,311,188.00.  See MSJ Reply at 9-10. Sage Hospital submitted approximately 270 pages of documents with the Claim, including Sage Hospital's audited financial statements for FYs 2009-13, the contracts and funding agreements between Sage Hospital and the IHS, and multiple spreadsheets detailing Sage Hospital's CSC shortfalls, expectancy damages, and total claim amount.  See Claim passim.  The Claim expressly states that Sage Hospital has used the method of calculating shortfall that the IHS prefers -- namely, full amount of CSC minus amount of CSC paid.  See Claim at 2; CSC Spreadsheets at 2; McGee Decl. ¶ 3, at 1.  The Claim explains the expectancy damages claim for lost third-party revenues and Sage Hospital's manner of calculating them.  See CSC Spreadsheets at 2.

The Civilian Board of Contract Appeals has set forth a number of factors to determine a CDA claim's complexity, including: (i) whether resolving the claim requires external technical analysis, see Defense Systems, Co., 1997 WL 217392, at *1; (ii) whether the contractor has performed an audit before submitting the claim, see Dillingham/ABB-SUSA, 1998 WL 258456, at *1; (iii) the number of pages of which the claim consists, see Eaton Contract Servs., Inc., 2000 WL 1049161, at *1; and (iv) whether the CO has to locate personnel familiar with the contractor's federal contracts to resolve the claim, see Eaton Contract Servs., Inc., 2000 WL 1049161, at *1.  Applying these factors, the Civilian Board of Contract Appeals has found an eight-month delay reasonable for the CO to decide a $2,159,266.00 claim that was set forth in

1,530 pages and that required the CO to track down personnel familiar with the contractor's federal contracts who had been reassigned to other positions. See Eaton Contract Servs., Inc., 2000 WL 1049161, at *1. In Public Warehousing Co., K.S.C., the Civilian Board of Contract Appeals found a five-month delay in issuing a decision on a $119,853,882.61 claim reasonable where the CO was required to evaluate three years' worth of financial data to resolve the claim. See 2009 WL 3183047, at *1. In Defense Systems Co., the Civilian Board of Contract Appeals found a nine-month delay reasonable where the claim exceeded seventy-one-million dollars and the claim's narrative portion alone exceeded 162 pages. See 1997 WL 217392, at *1.

On the other hand, the Civilian Board of Contract Appeals has found a seven-and-a-half-month delay in issuing a decision on a $35,582,600.00 claim -- which was set forth in a twenty-eight-page narrative, a fifty-four-page cost-impact analysis, and a one-volume appendix -- unreasonable. See Fru-Con Constr. Corp., 2002 WL 75878, at *1. Similarly, the Civilian Board of Contract Appeals found a fourteen-month delay unreasonable for a construction claim that was less than a million dollars and a sixteen-month delay unreasonable for an eleven-million-dollar claim. See Dillingham/ABB-SUSA, 1998 WL 258456, at *1. In Kelly-Ryan, Inc., the contractor sought $36,231,362.00 in damages for seven alleged contract breaches. See 2010 WL 5071059, at *1. Although the claim spanned 3,546 pages, and the CO contended that he lacked the information necessary to make "an intelligent, informed decision" on the claim, the Civilian Board of Contract Appeals found the CO's proposed twelve- and fourteen-month deadlines unreasonable. 2010 WL 5071059, at *1. The Civilian Board of Contract Appeals observed that "[w]e have found no Board cases, nor have we been cited to any by the parties, that have held more than 9 months to be a reasonable period of time within which to issue a CO's final decision." 2010 WL 5071059, at *1.

The Defendants have not cited a case in which the Civilian Board of Contract Appeals --
or any other court -- has found a CO's fourteen-month delay in deciding a CDA claim
reasonable.  Indeed, the Defendants have only cited one case that has upheld a delay of over nine
months: Design One.  In that case, the CO received the contractor's CDA claims "in early
December" of 2010 and committed to issue a decision on the claim by November 15, 2011.
Design One, slip op. at 1-2.  The Civilian Board of Contract Appeals found the nearly eleven-
month delay reasonable, because the contractor hired a consultant to evaluate its CDA claims
three months after it had submitted them, waited five months after receiving the CO's letter to
file its petition to shorten the timeframe for a decision, and provided no evidence to support its
request for a shorter timeframe.  See Design One, slip op. at 2.  Against this backdrop of a de
facto eleven-month limit for deciding CDA claims, the Court must determine whether Dayish's
proposed fourteen-month delay for deciding the Claim is reasonable.

The Defendants urge that three extraordinary circumstances exist in this case that justify
taking fourteen months to review the Claim: (i) the Claim's size: it is "huge" and "complex";
(ii) Sage Hospital did not provide adequate documentation to support the Claim; and (iii) the IHS
has 1,600 pending claims to analyze.  Apr. 22, 2015, Tr. at 50:10-18 (Lee).  The Court will
address each of these issues in turn.  First, there is no indication that the Claim is unusually large
or complex.  Although $62,569,681.00 -- the amount that Sage Hospital seeks from the IHS -- is
a large sum from a layman's perspective, the Court's review of Civilian Board of Contract
Appeals cases demonstrates that the amount the Claim seeks is not unusually large for a CDA
claim.  The Civilian Board of Contract Appeals has reviewed cases involving seventy-one-
million-dollar and $119,853,882.61 CDA claims, upholding three- and nine-month delays for
deciding those claims, respectively.  See Pub. Warehousing Co., K.S.C., 2009 WL 3183047, at

*1; Def. Sys. Co., 1997 WL 217392, at *1.  That the COs in those cases were able to resolve

significantly larger CDA claims -- one of which was almost twice the size of Sage Hospital's

claim -- in much less time suggests that the fourteen-month period which Dayish proposes in this

case is unreasonably long.  The Claim also does not appear to be unusually complex.  The CDA

claims at issue in Kelly-Ryan, Inc. spanned 3,546 pages and involved seven alleged contract

breaches.  See 2010 WL 5071059, at *1.  Despite that large volume of information, the Civilian

Board of Contract Appeals found the CO's twelve-month delay for resolving that claim

unreasonable.  See 2010 WL 5071059, at *1.  By contrast, the Claim is set forth in 270 pages and

involves four years of unpaid CSC.  There is no evidence indicating that resolving the claims

involves any technical expertise or requires Dayish to track down personnel familiar with Sage

Hospital's previous contracts who have been reassigned to other positions.  That Dayish has to

incorporate the Moss Adams audit's findings into his decision on the Claim cuts against the

Defendants, because Dayish had the benefit of all of that information before Sage Hospital even

submitted the Claim.  Accordingly, the Claim does not appear to be unusually large or complex,

and does not justify a fourteen-month delay.

Second, Sage Hospital's purported failure to provide sufficient documentation for the

Claim does not justify Dayish's proposed fourteen-month delay for deciding the Claim.  In Fru-

Con Construction Corp., the Civilian Board of Contract Appeals rejected the same argument that

the Defendants here advance.  See 2002 WL 75878, at *1.  There, the United States Army Corps

of Engineers argued that its seven-and-a-half-month delay in issuing a decision on a CDA claim

was reasonable, because the contractor failed to produce the relevant documents to support its

claim.  See 2002 WL 75878, at *1.  The Civilian Board of Contract Appeals said that the United

States Court of Appeals for the Federal Circuit "has made clear that a valid claim need not be

accompanied by additional supporting documentation or detailed evidence of the alleged operative facts." 2002 WL 75878, at *1. The Civilian Board of Contract Appeals explained that, accordingly, "if the contracting officer believed [the contractor's] claim to be inadequately documented, her most effective response would have been simply to issue an adverse final decision denying the claim for lack of proof." 2002 WL 75878, at *1. Likewise, it is clear that Sage Hospital will not produce additional documentation to Dayish. See Apr. 22, 2015, Tr. at 58:3-15 (Court, Frye). If Dayish believes that the Claim is inadequately documented, his most effective response is to issue an adverse final decision denying the claim for lack of proof. Particularly when Sage Hospital does not appear to be inclined to produce more information to support the Claim, Dayish does not need an additional four months -- from now until October 21, 2015 -- to determine what he already knows.

Moreover, it appears that Sage Hospital provided all of the information that Dayish requested. Dayish says that "[a]t least part of your claim appears to be based on the annual IHS CSC report to Congress," Dayish Ltr. at 1, and later notes that Sage Hospital's shortfall claim "appears to be based directly on the annual report to Congress," Dayish Ltr. at 2. In fact, Sage Hospital did not rely on the IHS' reports to Congress, and the Claim expressly states that Sage Hospital has used the method of calculating the shortfall that the IHS prefers, namely, full amount of CSC minus amount of CSC paid. See Claim at 2; CSC Spreadsheets at 2; McGee Decl. ¶ 3, at 1. Dayish then asks for information that Sage Hospital already provided him in the CSC Spreadsheets attached to the Claim: "information of actual CSC incurred in the years at issue." Dayish Ltr. at 2. See CSC Spreadsheets at 2. Dayish then notes that "[r]elevant documentation may include":

1)   Documents showing actual expenditures for direct costs associated with operation of the ISDEAA programs for each fiscal year at issue.

2)      Documents showing the Tribe's indirect costs for each fiscal year at issue.

3)      Documents showing the Tribe's actual capital expenditures, pass-through amounts, and other exclusions associated with the operation of the ISDEAA programs for each fiscal year at issue.

4)      Any additional documentation in the NHF-SMH's possession that will assist IHS in determining which of NHF-SMH's expenditures meet the ISDEAA definition of CSC in section 106(a)(2) and do not duplicate costs funded in the section 106(a)(l) amount.

Dayish Ltr. at 1-2.

Sage Hospital provided the first and second categories of information in the CSC Spreadsheets.  See CSC Spreadsheets *passim*; McGee Decl. ¶ 4, at 2 ("Documents showing actual expenditures for direct and indirect costs associated with operation of the ISDEAA program for each fiscal year at issue were provided in [the CSC Spreadsheets].").  As for the third category of information, Sage Hospital did not rely on any capital expenditures, pass-through amounts, or other exclusions associated with its operations of ISDEAA programs.  See McGee Decl. ¶ 4, at 2 ("The Claim does not include any costs related to capital expenditures, pass-through amounts, or other exclusions associated with the operation of the ISDEAA contract for any of the fiscal years at issue and therefore this item is not applicable to Sage.").  The fourth category is essentially a catch-all paragraph, and does not specify any particular documents or categories of documents that Dayish is seeking.  Although the MSJ Response points to the Blair Decl. and the Dayish Decl. in support of its contention that the "Defendants dispute that the claims are supported by the documentation submitted by Sage," MSJ Response ¶ 6, at 10 (citing Blair Decl. ¶¶ 13, at 5; id. ¶ 15, at 6; Dayish Decl. ¶¶ 18-19, at 5), the Blair Decl. does not include any information particular to Sage Hospital and the Dayish Decl. restates the information that the letter contains, see Blair Decl. ¶¶ 13, at 5; id. ¶ 15, at 6; Dayish Decl. ¶¶ 18-19, at 5.

Moreover, the MSJ Surreply says nothing about what information Dayish still needs from Sage Hospital to decide the Claim.  Having reviewed all of the information that Sage Hospital submitted with the Claim, the Court concludes that any lack of information from Sage Hospital does not justify a fourteen-month delay.

Third, and finally, the IHS' preferred method of resolving CSC claims and the influx of CSC claims since the Supreme Court of the United States' decision in Salazar v. Ramah Navajo Chapter (RNC) does not justify Dayish's fourteen-month delay.  The Defendants spend much time and energy in their briefing explaining that there are 1,600 pending CSC claims before the IHS, that the IHS prefers to resolve CSC claims through negotiations with the tribes and tribal organizations, that the IHS prefers to resolve CSC claims in the order in which they were submitted, and that this process is complicated, time-consuming, and labor-intensive.  See MSJ Response at 5-7; MSJ Surreply at 2-5; Apr. 22, 2015, Tr. at 28:20-29:7 (Lee).  To be sure, the Supreme Court of the United States' decision in Salazar v. Ramah Navajo Chapter (RNC) puts the Defendants in a difficult position:

> As the Government points out, the state of affairs resulting in this case is the product of two congressional decisions which the BIA has found difficult to reconcile.  On the one hand, Congress has obligated the Secretary to accept every qualifying [ISDEAA] contract, which includes a promise of "full" funding for all contract support costs.  On the other, Congress appropriated insufficient funds to pay in full each tribal contractor.  The Government's frustration is understandable, but the dilemma's resolution is the responsibility of Congress.

Salazar v. Ramah Navajo Chapter (RNC), 132 S. Ct. at 2195.

As the Honorable Sonia J. Sotomayor, Associate Justice of the Supreme Court of the United States' comments suggest, however, Congress created this dilemma and the IHS has to live with it until Congress fixes it.  Neither the CDA nor the Civilian Board of Contract Appeals sets forth an exception to the CDA's timing requirements for overburdened federal agencies.

Accordingly, the federal courts have neither the responsibility nor the authority to clean up the situation that Congress has created.  The Court is sympathetic to the IHS' predicament, but that the IHS lacks the resources to timely resolve CSC claims is a problem in every case, and thus cannot justify an unprecedented fourteen-month delay in this one.  Until Congress gives the IHS additional resources to handle the deluge of CSC claims or creates an exception to the CDA's reasonableness requirement for the IHS, the Court will not write such an exception into the law.

Faced with a similar argument in Fru-Con Construction Corp., the Civilian Board of Contract Appeals said that "[t]he purported scarcity of attorneys is a matter wholly and exclusively in control of the [federal agency], and in any event it is the contracting officer, not counsel, who is charged with preparing the final decision."  2002 WL 75878, at *1.  The Court agrees.  The scarcity of the IHS' resources, and its inability to handle the influx of CSC claims, are matters "wholly and exclusively" in the United States' control.  The Court sees no reason why Sage Hospital should have to bear the burden of the IHS' organizational deficiencies.

Ultimately, Sage Hospital has presented sufficient information for the Court to conclude that the Claim is relatively straightforward and not unusually complex.  The Claim is $57,284,201.60 million less than the $119,853,882.61 claim at issue in Public Warehousing Co., K.S.C., and encompasses only 270 pages -- 3,276 pages less than the claim at issue in Kelly-Ryan, Inc.  In light of the size and complexity of the claims that the Civilian Board of Contract Appeals has adjudicated, the Court has difficulty going beyond the eleven-month ceiling for deciding CDA claims that those cases establish.

The parties have gone back and forth on the meaning of the Tuba City decision.  In Tuba City, after Dayish failed to meet the deadlines that he set for himself to decide Tuba City's CSC claims, he attempted to extend them, arguing that they were unusually complex and that he

lacked sufficient information to decide them.  See Tuba City, slip op. at 5.  The Honorable

Rudolph Contreras, United States District Judge for the District of Columbia, determined that,

"once the deadlines passed, the claims were constructively denied under the plain language of

the CDA, despite Dayish's attempts to further extend the deadlines." Tuba City, slip op. at 6.  It

was in that context that Judge Contreras said that "[t]he CDA provides no exception to the

§ 7103(f) timing requirements for claims that the contracting officer later determines to be

insufficiently supported by documentation." Tuba City, slip op. at 6.  Judge Contreras said

nothing about Sage Hospital's situation, in which the CO's deadline has not passed but the tribal

organization finds the deadline itself unreasonable.  Accordingly, the Tuba City decision is of

little to no help to either party in this case.

　　　The dispute between the parties is a curious one.  The Defendants have noted that the IHS

must deny all CSC claims, because it cannot pay off CSC claims from its appropriated funds.

See Apr. 22, 2015, Tr. at 36:20-37:2-3 (Lee).  Instead, the Defendants must pay for all CSC

claims out of the Judgment Fund.  See Apr. 22, 2015, Tr. at 36:20-37:2-3 (Lee).  The Defendants

have agreed that, consequently, Dayish either will deny the Claim by October 21, 2015, or the

Claim will be deemed denied on that date.  See Apr. 22, 2015, Tr. at 37:9-12 (Court, Lee).  The

Defendants have reminded the Court on numerous occasions that the large majority of tribes and

tribal organizations have chosen to negotiate with the IHS to resolve their CSC claims rather

than litigating them in federal court.  Indeed, the Defendants noted at the hearing that only three

or four of the IHS' 1,600 pending CSC claims are currently being litigated in federal court.  See

Apr. 22, 2015, Tr. at 55:2-21 (Court, Lee).  Sage Hospital said that it prefers to litigate the Claim

in federal court rather than pursuing informal negotiations with the IHS, because the IHS has not

negotiated with it in good faith or treated it fairly.  See Apr. 22, 2015, Tr. at 58:3-15 (Court,

Frye).  Sage Hospital asserts that the issues which the Court addressed in the MOO -- i.e., the IHS' allegations that Sage Hospital is misusing federal funds -- have tainted the IHS' relationship with Sage Hospital.  See Apr. 22, 2015, Tr. at 58:19-59:22 (Court, Frye).  Sage Hospital has every right to refuse to negotiate with the IHS.  The Defendants' argument is close to saying that, because most federal cases settle, there should not be federal litigation.  Congress has provided a litigation route; Sage Hospital is entitled to take it.  That the large majority of tribes and tribal organizations choose to negotiate with the IHS rather than file claims in federal court, and that the IHS prefers tribes and tribal organizations to follow that route, does not mean that Sage Hospital is required to do so.  It may be that, as the Defendants suggest, pursuing the CSC claim in federal court will ultimately cause Sage Hospital to have to wait longer to receive a settlement from the United States.  Sage Hospital will have to live with that choice.

Ultimately, the Court is left with the Defendants asking for more time to conduct negotiations without a willing negotiating partner.  If the Defendants know that they will deny the Claim and that Sage Hospital will not negotiate with them, the Court does not understand why the Defendants do not just deny the Claim today.  The Court sees no sound reason why the Defendants should draw out this decision and delay the inevitable.  The better course is to bite the bullet and allow Sage Hospital to challenge the denial.  Accordingly, even if the Dayish Ltr. had set forth a date certain by which Dayish would decide the Claim, the Court would order Dayish to approve or deny the Claim by July 25, 2015 -- eleven months after Sage Hospital submitted the Claim.  In the Court's view, the eleven-month ceiling that the Civilian Board of Contract Appeals cases set forth is reasonable, and the Court sees no reason to go beyond it in this case.

**IT IS ORDERED** that (i) the Plaintiff's Motion for Summary Judgment on its Fourth Claim for Relief, with Memorandum of Supporting Points and Authorities, filed January 26, 2015 (Doc. 27), is granted; (ii) the Motion to Vacate and Reschedule Hearing on Plaintiff's Motion for Summary Judgment, filed April 1, 2015 (Doc. 56), is denied; and (iii) the Defendants' Motion for Leave to File Surreply, filed April 7, 2015 (Doc. 60), is granted. Plaintiff Navajo Health Foundation -- Sage Memorial Hospital's claim for Contract Support Costs for Fiscal Years 2009-13 (the "Claim"), is deemed denied under the Contract Disputes Act, 41 U.S.C. §§ 7101-09.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Paul E. Frye
Albuquerque, New Mexico

    *Attorney for the Plaintiff*

Paula R. Lee
Angela M. Belgrove
Office of the General Counsel, Region IX
United States Department of Health & Human Services
San Francisco, California

--and--

Damon P. Martinez
  United States Attorney
Karen Grohman
  Assistant United States Attorney
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

    *Attorneys for the Defendants*