# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

NAVAJO HEALTH FOUNDATION -- SAGE
MEMORIAL HOSPITAL, INC.,

        Plaintiff,

vs.                                                                                    No. CIV 14-0958 JB/GBW

SYLVIA MATHEWS BURWELL, Secretary
of the United States Department of Health and
Human Services; ROBERT MCSWAIN,[1]
Acting Director of Indian Health Services; JOHN
HUBBARD, JR., Area Director, Navajo Area
Indian Health Services; and FRANK DAYISH,
Contracting Officer, Navajo Area Indian Health
Services,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Summary

Judgment on its First Three Claims for Relief, with Memorandum of Supporting Points and

Authorities, filed June 1, 2015 (Doc. 68)("Motion").  The Court held a hearing on July 31, 2015.

The primary issues are: (i) whether the Court's conclusions of law in Navajo Health

Foundation -- Sage Memorial Hospital, Inc. v. Burwell, No. CIV 14-0958 JB/GBW, 2015 WL

1906107 (D.N.M. April 9, 2015)(Browning, J.)("Sage"),[2] bind the Court at the

---

[1]On February 10, 2015, Robert McSwain became Acting Director of Indian Health Services.  He will, therefore, be substituted for Yvette Roubideaux as a defendant in this action. See Fed. R. Civ. P. 25(d)(1) (permitting such substitutions).

[2]In the Sage opinion, the Court issued a preliminary injunction which required the Defendants to fund Sage Hospital according to the terms of: (i) the Annual Funding Agreement Between Navajo Health Foundation/Sage Memorial Hospital and the Secretary of the Department of Health and Human Services Fiscal Year 2013, filed January 13, 2015 (Doc. 21-2)("2013 AFA"); and (ii) the Indian Self–Determination Contract Between Navajo

summary-judgment stage; (ii) whether the Court should grant summary judgment in favor of Plaintiff Navajo Health Foundation -- Sage Memorial Hospital, Inc. on Count I of the Second Amended Complaint, filed June 30, 2015 (Doc. 79)("SAC"), which asks the Court to deem approved the Renewal No. 1 and Amendment No. 1 to the Indian Self-Determination Act Contract Between Navajo Health Foundation/Sage Memorial Hospital, Inc. and the Secretary of the Department of Health and Human Services, filed January 13, 2015 (Doc. 21-3)("2013 Renewal"), and the Annual Funding Agreement Between Navajo Health Foundation -- Sage Memorial Hospital, Inc., and The Secretary of the Department of Health and Human Services Fiscal Year 2014, filed January 13, 2015 (Doc. 21-3)("2014 AFA"); (iii) whether the Court should grant summary judgment in favor of Sage Hospital on Count II of the SAC, which asks the Court to deem approved Renewal No. 1 and Amendment No. 1 to the Indian Self-Determination Act Contract Between Navajo Health Foundation/Sage Memorial Hospital, Inc. and the Secretary of the Department of Health and Human Services, filed January 13, 2015 (Doc. 21-10)("2014 Renewal"), and the Annual Funding Agreement Between Navajo Health Foundation -- Sage Memorial Hospital, Inc. and the Secretary of the Department of Health and Human Services, filed January 13, 2015 (Doc. 21-10)("2015 AFA"); and (iv) whether the Court should grant summary judgment in favor of Sage Hospital on Count III of the SAC, which asks the Court for an accounting of funds that the Defendants provided Sage Hospital from October 1, 2013, to the date of judgment.  The conclusions of law in the <u>Sage</u> opinion do not bind the Court at the summary-judgment stage, and the Court is free to consider those issues anew.  The Court

---

Health Foundation/Sage Memorial Hospital and the Secretary of the Department of Health and Human Services, filed January 13, 2015 (Doc. 21-1)("2010 Contract"), until this case is resolved on the merits. <u>Sage</u>, 2015 WL 1906107, at *1.  The Court also ordered both parties to comply with the terms and conditions of the 2013 AFA and the 2010 Contract until this case is resolved on the merits.  <u>See Sage</u>, 2015 WL 1906107, at *1.

will, however, grant summary judgment in favor of Sage Hospital on Counts I, II, and III, and

determine Sage Hospital's damages on those counts at trial.[3]   Accordingly, the Court will grant

the Motion.

## FACTUAL BACKGROUND

"Sage is a Navajo tribal organization[4] for purposes of contracting with the Indian

Health Service ('IHS')[5] under the ISDEA[6] that operates a health care facility in Ganado,

---

[3]Because this Memorandum Opinion and Order disposes of Counts I through III of the SAC, only Count V remains.  The Court's reference to trial is not meant to suggest or imply a ruling on any future motion for summary judgment on Count V.  To the extent that Count V remains after the summary-judgment stage, the Court will determine Sage Hospital's damages for Counts I through III and adjudicate Count V at trial.

[4]A tribal organization is

the recognized governing body of any Indian tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities: Provided, That in any case where a contract is let or grant made to an organization to perform services benefiting more than one Indian tribe, the approval of each such Indian tribe shall be a prerequisite to the letting or making of such contract or grant . . . .

25 U.S.C. § 450b(l)(emphasis in original).

[5]The IHS is a division of the Department of Health and Human Services that is the principal health care provider for members of federally recognized American Indian tribes.  See Indian Health Service, Wikipedia.org, http://en.wikipedia.org/wiki/Indian_Health_Service (last visited Feb. 3, 2015).  The Navajo Area IHS Office ("NAIHS") is a regional IHS office that is "primarily responsible for healthcare to members of The Navajo Nation and Southern Band of San Juan Paiutes, but care to other Native Americans (Zuni, Hopi) is also provided."  Navajo Area, Indian Health Service: The Federal Health Program for American Indians and Alaska Natives, http://www.ihs.gov/navajo/ (last visited Mar. 24, 2014).  Occasionally, the parties say that the IHS declined Sage Hospital's contract proposals.  The ISDEA provides that only the HHS or DOI Secretary has the authority to decline such proposals, see 25 U.S.C. § 450f(a), but there is no evidence that Burwell was directly involved in any of the declination decisions in this case.  It is therefore more accurate to say that Defendants Robert McSwain, John Hubbard, Jr., and Frank Dayish declined those proposals on behalf of Burwell.  When citing or quoting the parties' briefing, the Court will use whichever entity or individual that the parties use.  In the

Arizona, within the exterior boundaries of the Navajo Reservation." Motion ¶ 1, at 3[7] (setting forth this fact). See Defendants' Response to Plaintiff's Motion for Summary Judgment on its First Three Claims for Relief ¶ 1, at 2, filed July 6, 2015 (Doc. 80)("Response")(not disputing this fact); First Amended Complaint ¶ 6, at 4, filed November 24, 2014 (Doc. 5)("FAC")(setting forth this fact); id. ¶ 19, at 9-10 (setting forth this fact); Answer ¶ 6, at 2, filed February 19, 2015 (Doc. 45)("Answer")(admitting this fact)[8]; id. ¶ 19, at 3 (admitting this fact). "IHS is an agency within the United States Department of Health and Human Services ('HHS') and is

---

[6] Analysis, however, the Court will use "the Defendants" to describe the group of individuals that declined Sage Hospital's ISDEA contract proposals and is legally responsible for those declination decisions, when, in fact, McSwain, Hubbard, Jr., and Dayish declined those proposals on Burwell's behalf.

[6] The ISDEA authorizes the United States of America to enter into contracts with American Indian tribes in which the tribe agrees to supply federally funded services that a federal agency normally would provide. See 25 U.S.C. § 450f(a).

[7] Because many of the parties' exhibits either do not have their own internal pagination, or use inconsistent pagination conventions, the Court will use CM/ECF's pagination -- i.e., the number in the upper-right hand corner of each document -- for pincites to the parties' briefing and exhibits, unless the Court notes otherwise.

[8] In setting forth its proposed undisputed facts, the Motion cites the FAC and the Answer. On June 30, 2015 -- 29 days after filing the Motion -- Sage Hospital filed the Notice of Filing Second Amended Complaint (Doc. 78)("SAC Notice"), and the Second Amended Complaint (Doc. 79)("SAC"). The SAC Notice states that the Defendants "have given their written consent to the filing of the Second Amended Complaint, stating, however, that such consent does not signify that defendants concur in the new allegations." SAC Notice at 1. Seventeen days later, the Defendants filed the Answer to the Second Amended Complaint and Counterclaim (Doc. 84)("SAC Answer"). Neither party has suggested that the Court use the SAC and the SAC Answer in resolving the Motion. For the sake of thoroughness, however, the Court has reviewed the FAC, the Answer, the SAC, and the SAC Answer, and has concluded that the allegations in the FAC upon which the Motion relies for its undisputed facts -- and the corresponding admissions and denials of those facts in the Answer -- are identical to those set forth in the SAC and the SAC Answer, respectively. As far as the Court can tell, there are only two substantive difference between the FAC and the SAC: (i) the SAC adds a fifth claim against the Defendants entitled "Damages for Unlawful Denial of Sage's Contract Support Cost," SAC ¶¶ 73-80, at 32-33; and (ii) the SAC adds an eighth prayer for relief, which asks the Court to "revers[e] the deemed denial of Sage's Contract Support Costs Claim and awarding damages and other relief based on said Claim as requested in paragraph E above," SAC ¶ G at 34-35.

responsible for providing federal health services to American Indians and Alaska Natives."
Motion ¶ 2, at 4 (setting forth this fact).  See Response ¶ 2, at 2 (not disputing this fact); About
IHS, filed December 29, 2014 (Doc. 17-1).   "Defendant [Sylvia Mathews ]Burwell is the
Secretary of HHS and has ultimate responsibility for carrying out all the functions, authorities,
and duties of HHS including contracting on behalf of the United States with Indian tribal
organizations under the ISDEA to provide health care to Native Americans."   Motion ¶ 3, at 4
(setting forth this fact).   See Response ¶ 3, at 2 (not disputing this fact); FAC ¶ 7, at 4 (setting
forth this fact); Answer ¶ 7, at 2 (admitting this fact).

> Defendant [Robert] McSwain, substituted for Defendant [Yvette] Roubideaux
> under Fed. R. Civ. P. 25(d), is the Acting Director of the IHS and has the overall
> responsibility for carrying out all the functions, authorities, and duties of the IHS
> within HHS regarding contracting with Indian tribal organizations under the
> ISDEA to provide health care to Native Americans.

Motion ¶ 4, at 4 (setting forth this fact).  See Response ¶ 4, at 2 (not disputing this fact); FAC
¶ 8, at 4 (setting forth this fact); Answer ¶ 8, at 2 (admitting this fact).

> Defendant [John] Hubbard is the Area Director of the Navajo Area IHS
> ("NAIHS") and has the responsibility for carrying out all the functions,
> authorities, and duties of the IHS within the Navajo Nation, including such
> functions, authorities, and duties delegated to him regarding contracting with
> Indian tribal organizations under the ISDEA.

Motion ¶ 5, at 4 (setting forth this fact).  See Response ¶ 5, at 2 (not disputing this fact); FAC
¶ 9, at 4 (setting forth this fact); Answer ¶ 9, at 2 (admitting this fact).  "Defendant [Frank]
Dayish is the Contracting Officer for the NAIHS and is responsible for ISDEA contracts and
funding agreements for IHS programs, functions, services, and activities ('PFSAs') undertaken
by ISDEA contractors within the Navajo Area IHS, including Sage."  Motion ¶ 6, at 5 (setting
forth this fact).  See Response ¶ 6, at 2 (not disputing this fact); FAC ¶ 10, at 4-5 (setting forth
this fact); Answer ¶ 10, at 2 (admitting this fact).   "Dayish has the authority to sign ISDEA

contracts and funding agreements with Sage for such IHS programs and to award funds pursuant

to those agreements."  Motion ¶ 6, at 5 (setting forth this fact).  <u>See</u> Response ¶ 6, at 2 (not

disputing this fact); FAC ¶ 10, at 4-5 (setting forth this fact); Answer ¶ 10, at 2 (admitting this

fact).

       1.    <u>**Sage Hospital's ISDEA Contract with the IHS.**</u>

"Effective in 2009[,] Sage contracted with IHS under the ISDEA."  Motion ¶ 7, at 5

(setting forth this fact).  <u>See</u> Response ¶ 7, at 2 (not disputing this fact); FAC ¶ 19, at 9-10

(setting forth this fact); Answer ¶ 19, at 3 (admitting this fact).

> The 2009 contract included the following PFSAs: (1) Inpatient Services,
> (2) General Ambulatory and Special[]ty Care Services, (3) Emergency
> Department, (4) Emergency Medical Transport, (5) Dental Clinic, (6) Podiatry
> Clinic, (7) Optometry Clinic, (8) Behavioral Health Services, (9) Radiology,
> (10) Pharmacy, (11) Laboratory, (12) Physical Therapy, (13) Public Health
> Nursing, (14) Employee Health Services, (15) Health Education,
> (16) Transportation Services, (17) School Based Services, (18) Diabetes Program,
> and (19) Traditional Medicine.

Motion ¶ 8, at 5 (setting forth this fact).  <u>See</u> Response ¶ 8, at 2 (not disputing this fact); FAC

¶ 20, at 10 (setting forth this fact); Answer ¶ 20, at 3 (admitting this fact).  "Sage and IHS

extended the 2009 Contract without interruption for successive years, through September 30,

2013."  Motion ¶ 9, at 5 (setting forth this fact).  <u>See</u> Response ¶ 9, at 2 (not disputing this fact);

FAC ¶ 21, at 10 (setting forth this fact); Answer ¶ 21, at 3 (admitting this fact); Indian Self-

Determination Contract Between Navajo Health Foundation/Sage Memorial Hospital and the

Secretary of the Department of Health and Human Services, filed January 13, 2015 (Doc. 21-

1)("2010 Contract"); Annual Funding Agreement Between Navajo Health Foundation/Sage

Memorial Hospital and the Secretary of the Department of Health and Human Services Fiscal

Year 2013, filed January 13, 2015 (Doc. 21-2)("2013 AFA"); Declaration of Christi El-Meligi

¶ 4, at 1 (dated May 28, 2015), filed June 1, 2015 (Doc. 68-1)("El-Meligi 2d Decl.").

"Sage proposed a three-year ISDEA contract renewal and [Annual Funding Agreement ('AFA')] for fiscal year ('FY') 2014 to IHS by letter dated August 22, 2013."  Motion ¶ 11, at 6 (setting forth this fact).  See Response ¶ 11, at 2 (not disputing this fact); FAC ¶ 21, at 11-12 (setting forth this fact); Answer ¶ 21, at 3 (admitting this fact); Letter from Ahmad R. Razaghi, Chief Executive Officer of Navajo Health Foundation -- Sage Memorial Hospital, Inc., to Alva Tom, Acting Director of the Office of Indian Self-Determination at the Navajo Area Indian Health Service (dated Aug. 22, 2013), filed January 13, 2015 (Doc. 21-3)("Aug. 22, 2013, Ltr."); 2013 Renewal; 2014 AFA; El-Meligi 2d Decl. ¶ 4, at 1.[9]  "Sage proposed [funding] for FY 2014

---

[9]Sage Hospital asks the Court to find the following fact undisputed:

Sage's proposed three-year contract for the period ending September 30, 2016 is substantially the same as its immediately prior contract.  Compare Lodging (Dkt. 21) at 14-24, with id. at 68-69 (noting amendments to conform agreement to ISDEAA, change the term of the agreement, and correct misspellings and typographical errors); see Sage, 2015 WL 1906107, at *4 ¶¶ 32-33, at *53.

Motion ¶ 13, at 6.  The Defendants respond: "Sage's Proposed Fact No. 13 is a legal, not a factual, conclusion, as evidenced by its reliance on the analysis section of this Court's April 9, 2015, opinion.  On that ground, Defendants dispute it."  Response ¶ 13, at 3.  The Court agrees with the Defendants.  Whether the Defendants properly applied 25 U.S.C. § 450f(a)(2)'s declination criteria to the 2013 Renewal turns on whether "Sage's proposed three-year contract for the period ending September 30, 2016 is substantially the same as its immediately prior contract."  Motion ¶ 13, at 6.  If the 2013 Renewal was substantially the same as its predecessor, 25 C.F.R. § 900.33 precluded the Defendants from applying § 450f(a)(2)'s declination criteria to that proposal.  See 25 C.F.R. § 900.33.  On the other hand, if the 2013 Renewal was not substantially the same as its predecessor, § 900.33 permitted the Defendants to apply § 450f(a)(2)'s declination criteria to that proposal.  See 25 C.F.R. § 900.33.  Accordingly, Sage Hospital's proposed fact is a legal conclusion and not a fact.  The Court will therefore not adopt Sage Hospital's proposed fact, but will instead address the issue in its Analysis.
Sage also asks the Court to find undisputed that "[t]he funding provided to Sage by IHS for FY 2013 under the ISDEA contract was $20,116,437, exclusive of any grant funding."  Motion ¶ 14, at 6 (citing El-Meligi Decl. ¶ 6, at 2).  The Defendants respond: "Defendants dispute Sage's Proposed Fact No. 14.  Defendants provided Sage $18,259,828 for FY2013, an amount slightly less than the number cited by Sage due to Congressional cuts."  Response ¶ 14, at 3 (citing Declaration of Floyd Thompson ¶¶ 12-13, at 2-3 (dated July 6, 2015), filed July 6, 2015  (Doc. 80-1)("Thompson Decl.")).    Both parties accurately quote their respective

of $20,738,846 . . . ."  Motion ¶ 15, at 6 (setting forth unmodified version of this fact).  See Aug.

22, 2013, Ltr. at 3.[10]  "IHS did not approve or disapprove Sage's proposed three-year contract

_____

declarations.  Accordingly, the Defendants have specifically controverted Sage Hospital's
proposed fact.  The Court will therefore deem that fact disputed.

   [10]Sage Hospital asks the Court to find undisputed that "Sage proposed a budget for FY
2014 of $20,738,846, Lodging (Dkt. 21) at 66, a modest increase over the prior year's, see Sage,
2015 WL 1906107 at *5 ¶ 35."  Motion ¶ 15, at 6.  The Defendants reply:

        Defendants do not dispute that Sage requested funding for Fiscal Year 2014 in the
        amount of $20,738,846.  The record does not support, however, Sage's
        characterization of the request for funding as a "budget," or its characterization of
        the request as a "modest" increase from the prior year.  See Doc. 21-3 at 3 (using
        neither the word "budget" nor "modest").  Defendants therefore dispute those
        characterizations.

Response ¶ 15, at 3.  The Court agrees with the Defendants for two reasons.  First, the Aug. 22,
2013, Ltr. -- the first source upon which Sage Hospital relies for its stated assertion -- does not
characterize Sage Hospital's funding request as either a "budget" or "modest."  Aug. 22, 2013,
Ltr. at 3.  Second, although the Court has previously characterized the increase in Sage
Hospital's funding request from the 2013 AFA to the 2014 AFA as "modest," Sage, 2015 WL
1906107, at *5, that opinion made findings of fact for the purposes of issuing a preliminary
injunction, which do not bind the Court at the summary judgment stage.  The Honorable Shira A.
Scheindlin, United States District Judge for the Southern District of New York, has explained:

        the Court's findings of fact and conclusions of law made on a motion for
        preliminary injunction are not binding on the Court when deciding a motion for
        summary judgment.  This is because the "parties are held to different standards of
        proof in preliminary injunction hearings than in motions for summary judgment
        and because findings of fact at the preliminary injunction stage are not as fully
        fleshed out as at the summary judgment stage . . . ."

Malletier v. Dooney & Bourke, Inc., 561 F. Supp. 2d 368, 382 (quoting DeSmeth v. Samsung
Am., No. CIV 92-3710 SAS, 1998 WL 315469, at *2 (S.D.N.Y. June 16, 1998)).  See Univ. of
Tex. v. Camenisch, 451 U.S. 390, 395 (1981)(explaining that a court's findings of fact and
conclusions of law issues at preliminary injunction stage are not binding in later proceedings).
Accordingly, the Court will omit Sage Hospital's characterizations of its funding request as
"modest" and the word "budget" from its proposed fact and deem the remainder of Sage
Hospital's proposed fact undisputed.
   Sage Hospital also asks the Court to find undisputed that "Sage's proposed 2014 AFA is
substantially the same as the approved 2013 AFA, having identical PFSAs."  Motion ¶ 15, at 6.
The Defendants respond:  "The first sentence of Sage's Proposed Fact No. 15 is a legal, not a
factual, conclusion."  Response ¶ 15, at 3.  The Court agrees with the Defendants.

renewal under the ISDEA [until September 26, 2014]. IHS opted instead to provide Sage funding on a monthly basis during the conduct of an IHS Performance Monitoring Review ('Review') and a forensic audit ('Audit') conducted by Moss Adams LLP." Motion ¶ 16, at 7 (setting forth unmodified version of this fact). See FAC ¶ 22, at 11 (setting forth this fact); Answer ¶ 22, at 3 (admitting this fact).[11]

"As of September 19, 2014, IHS and Sage had extended the FY 2011-2013 ISDEA contract and FY 2013 AFA through September 30, 2014." Motion ¶ 17, at 7. See Response ¶ 17, at 3 (not disputing this fact); El-Meligi 2d Decl. ¶ 5, at 2; Letter from Floyd Thompson, Executive Officer of the Navajo Area Indian Health Service to Ahmad Razaghi, Chief Executive

---

Whether the Defendants properly applied 25 U.S.C. § 450f(a)(2)'s declination criteria to the 2014 AFA turns on whether it "is substantially the same as the approved 2013 AFA." Motion ¶ 15, at 6. If the 2014 AFA was substantially the same as its predecessor, 25 C.F.R. § 900.32 precluded the Defendants from applying § 450f(a)(2)'s declination criteria to that proposal. See 25 C.F.R. § 900.32. On the other hand, if the 2014 AFA was not substantially the same as its predecessor, § 900.32 permitted the Defendants to apply § 450f(a)(2)'s declination criteria to it. See 25 C.F.R. § 900.32. Accordingly, Sage Hospital's proposed fact is a legal conclusion and not a fact. The Court will therefore not adopt Sage Hospital's proposed fact, but will instead address the issue in its Analysis.

[11]The Defendants

dispute the first sentence of Sage's Proposed Fact No. 16 because the Indian Health Service (IHS) disapproved Sage's proposed three-year contract renewal when it issued the declination letter of September 26, 2014. Doc. 62 ¶ 99. To the extent Sage's "fact" is intended to convey its position as to the legality of this disapproval under applicable law, it is a legal conclusion, not an undisputed material "fact." The second sentence of Sage's Proposed Fact No. 16 is undisputed.

Response ¶ 16, at 3. Unlike the Defendants, the Court construes Sage Hospital's proposed fact as asserting that the Defendants did not approve or disapprove Sage Hospital's proposal at that time -- or, put another way -- the Defendants did not approve or disapprove the proposal until September 26, 2014. Moreover, Sage Hospital's proposed fact does not appear to convey its position that the disapproval was unlawful. Accordingly, the Court will adopt Sage Hospital's proposed fact, but modify it to reflect that the Defendants did not approve or disapprove the 2013 Renewal until September 26, 2014.

Officer of Navajo Health Foundation -- Sage Memorial Hospital, Inc. (dated Sept. 17, 2013), filed June 1, 2015 (Doc. 68-1)("Sept. 17, 2013, Ltr."). "With the end of fiscal year 2014 looming and without an indication from IHS as to IHS' plans regarding Sage, Sage was unsure as to the status and acceptability to IHS of its proposed three-year contract renewal proposal for the period ending September 30, 2016." Motion ¶ 17, at 7 (setting forth this fact). See El-Meligi 2d Decl. ¶ 7, at 2-3.[12] "Thus, to avoid any gap in the contract period, Sage submitted a second proposed three-year contract renewal ending September 30, 2017 and proposed FY 2015 AFA to IHS via letter dated September 19, 2014." Motion ¶ 18, at 7 (setting forth this fact). See 2014 Renewal; 2015 AFA; El-Meligi 2d Decl. ¶ 4, at 1-2.[13]

_____

[12]The Defendants assert that, although they do not dispute this fact, they

> disagree that it is "material." What Sage knew or did not know about "IHS's plans regarding Sage' has no bearing on the lawfulness of IHS's declination. As the Court has remarked (and Sage's counsel agreed), Sage's allegations are "colorful," but what IHS did before the declination decision "really doesn't have any legal effect."

Response ¶ 17, at 3-4 (quoting Transcript of Hearing (taken Feb. 12, 2015) at 8:24-9:12 (Court), filed February 27, 2015 (Doc. 49)).
    The Court has previously explained that "[a]rguments and concerns about the materiality and relevance of a fact do not dispute [it]." Walton v. N.M. State Land Office, 49 F. Supp. 3d 920, 924 n.2 (D.N.M 2014)(Browning, J.)(citing O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n.1 (D.N.M. 2012)(Browning, J.)("[The defendant's] argument that the facts underlying the state criminal case are immaterial does not specifically controvert those facts, and the Court will therefore deem those facts admitted.")). Accordingly, the Court will deem the proposed fact undisputed and will address the fact's materiality, if necessary, in its Analysis.

[13]The Court disposed of the Defendants' sole response to this fact in note 9, supra. Sage Hospital also asks the Court to find the following purported fact undisputed:

> Sage's proposed three-year contract renewal for the period ending September 30, 2017 is substantially the same as both the previously approved ISDEA agreement ending September 30, 2013 and Sage's proposed three-year contract renewal for the period ending September 30, 2016. Compare Lodging (Dkt. 21) at 14-24 (approved agreement through September 30, 2013) and id. at 68-69 (proposing limited edits to approved agreement) with id. at 256-57 (proposing similar limited edits).

"Sage proposed an increase in funding for FY 2015 from [its requested amount of] $20,116,437 [in the 2013 AFA] . . . and $20,738,846 (in the proposed FY 2014 AFA) to $32,614,916 for FY 2015." Motion ¶ 22, at 8 (setting forth unmodified version of this fact). See El-Meligi Decl. ¶¶ 6-7, at 2-3; 2015 AFA at 3-4.[14] "Sage explained its reasons for the increased

---

Motion ¶ 20, at 8. The Defendants assert that "Sage's Proposed Fact No. 20 is a legal, not a factual, conclusion. Defendants therefore dispute it." Response ¶ 20, at 4.

The Court agrees with the Defendants. Whether the Defendants properly applied 25 U.S.C. § 450f(a)(2)'s declination criteria to the 2014 Renewal turns on whether the 2014 Renewal is "substantially the same" as the 2010 Contract. Motion ¶ 20, at 8. If the 2014 Renewal was substantially the same as the 2010 Contract, 25 C.F.R. § 900.33 precluded the Defendants from applying § 450f(a)(2)'s declination criteria to that proposal. See 25 C.F.R. § 900.33. On the other hand, if the 2014 Renewal was not substantially the same as the 2010 Contract, § 900.33 permitted the Defendants to apply § 450f(a)(2)'s declination criteria to that proposal. Accordingly, Sage Hospital's proposed fact is a legal conclusion and not a fact. See 25 C.F.R. § 900.33. The Court will therefore not adopt Sage Hospital's proposed fact, but will instead address the issue in its Analysis.

Sage Hospital asks the Court to find it undisputed that "Sage's proposed 2015 AFA is substantially the same as the approved 2013 AFA and the proposed 2014 AFA, having identical PFSAs." Motion ¶ 21, at 8. The Defendants respond: "Sage's Proposed Fact No. 21 is a legal, not a factual, conclusion. Defendants therefore dispute it." Response ¶ 21, at 4.

The Court agrees with the Defendants. Whether the Defendants properly applied 25 U.S.C. § 450f(a)(2)'s declination criteria to the 2015 AFA turns on whether it is "substantially the same as the approved 2013 AFA and the proposed 2014 AFA." Motion ¶ 21, at 8. Accordingly, Sage Hospital's proposed fact is a legal conclusion and not a fact. The Court will therefore not adopt Sage Hospital's proposed fact, but will instead address the issue in its Analysis.

[14]Sage Hospital asks the Court to find undisputed that "Sage proposed an increase in funding for FY 2015 from $20,116,437 (provided by IHS under the approved FY 2013 AFA), see supra ¶ 14, and $20,738,846 (in the proposed FY 2014 AFA) to $32,614,916 for FY 2015." Motion ¶ 22, at 8 (footnote omitted)(citing 2015 AFA at 252-53). The Defendants dispute a portion of this fact, stating that they "did not provide Sage with $20,116,437 in actual funding in Fiscal Year 2013." Response ¶ 22, at 4 (citing Thompson Decl. ¶¶ 12-13, at 3-4). They do not dispute, however, "that Sage requested $20,738,846 in Fiscal Year 2014 and $32,614,916 for Fiscal Year 2015." Response ¶ 22, at 4.

Sage Hospital has provided no support for its assertion that Sage Hospital received $20,738,846 in funding from the IHS for FY 2013. The portion of the Thompson Decl. that the Defendants cite specifically controverts Sage Hospital's proposed fact. See Thompson Decl. ¶ 13, at 3 ("As a result, the actual total disbursed [to Sage Hospital] was $18,259,828.").

funding proposal at pages 3-4 of its September 19, 2014 letter to IHS."  Motion ¶ 23, at 8 (setting

forth this fact)(citation omitted).  See Letter from Christi-El-Meligi, Chief Executive Officer of

Sage Hospital to Alva Tom, Acting Director of the Office of Indian Self-Determination (Sept.

19, 2014) at 2-3, filed January 13, 2015 (Doc. 21-10)("Sept. 19, 2014, Ltr.");  El-Meligi 2d Decl.

¶ 7, at 2-3.[15]  "In addition, the proposed increase in Contract Support Costs ('CSC') funding was

based on use of the incurred cost method adopted by IHS rather than amounts agreed to in FY

2013 and earlier, which had substantially underfunded Sage's CSC."  Motion ¶ 23, at 8 (setting

forth this fact).  See El-Meligi 2d Decl. ¶ 7, at 2-3.[16]

**2.      The IHS' Declinations of Sage Hospital's Contract Proposals.**

"One day before the end of FY 2014, on September 29, 2014, IHS hand-delivered a letter

dated September 26, 2014 (the 'Declination') to Sage.  The Declination relied on and included as

attachments the July 25, 2014 Moss Adams Audit and the September 15, 2014 IHS Review."

Motion ¶ 24, at 9 (setting forth these facts).  See Response ¶ 24, at 4 (not disputing these facts);

FAC ¶ 26, at 12 (setting forth these facts); Answer ¶ 26, at 3 (admitting these facts); Letter from

---

Accordingly, the Court will deem that portion disputed, deem the remainder of Sage Hospital's proposed fact undisputed, and modify the proposed fact accordingly.

[15]The Defendants purport to dispute this fact, stating: "Sage's letter of September 19, 2014, is a record document that speaks for itself."  Response ¶ 23, at 4.  The Defendants' fail to comply with the local rules, which state:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Because the Response does not specifically controvert the proposed fact, the Court will deem it undisputed.

[16]The Court disposed of Sage Hospital's sole response to this fact in note 12, supra.

the Department of Health and Human Services to Stenson Wauneka, President of the Board of Directors of the Navajo Health Foundation (dated Sept. 26, 2014), filed January 13, 2015 (Doc. 21-12)("1st Declination").[17]  "The [1st] Declination declined to approve Sage's proposed three-year ISDEA contract renewal through December 30, 2016."  Motion ¶ 25, at 9 (setting forth this fact).  See Response ¶ 25, at 4 (not disputing this fact); FAC ¶ 1 at 1 (setting forth this fact); Answer ¶ 1, at 1 (admitting this fact); Declination at 1.  "The [1st] Declination concluded that IHS should 'sever[]' the IHS/Sage contractual relationship."  Motion ¶ 26, at 9 (setting forth this fact)(quoting 1st Declination at 32).  See Response ¶ 26, at 4 (not disputing this fact); Declination at 32.

"IHS then formally declined Sage's second three-year contract renewal proposal and FY 2015 AFA, by letter dated December 12, 2014."  Motion ¶ 27, at 9 (setting forth this fact).  See Response ¶ 27, at 4 (not disputing this fact); Letter from the Department of Health and Human Services to Stenson Wauneka, President of the Board of Directors of the Navajo Health Foundation (dated Dec. 12, 2014), filed December 22, 2014 (Doc. 17-1)("2d Declination")[18]; El-Meligi 2d Decl. ¶ 4, at 1-2.  "IHS declined to approve the proposed second three-year contract renewal and FY 2015 AFA for the same reasons that it had declined the first contract renewal proposal (through September 30, 2016) and Sage's proposed 2014 AFA."  Motion ¶ 27, at 9 (setting forth this fact).  See Response ¶ 27, at 4 (not disputing this fact); 2d Declination at 11.  "IHS expressly acknowledged it was statutorily required to offer technical assistance to Sage to

[17]Because the Declination spans numerous document numbers on CM/ECF, the Court will use the Declination's internal pagination -- i.e., the higher set of black numbers in the center of the bottom of each page -- rather than CM/ECF's -- i.e., the blue numbers in the upper right-hand corner of each page -- or Sage Hospital's -- i.e., the lower set of black numbers in the center of the bottom of each page.

[18]The Court will use CM/ECF's pagination -- i.e., the blue numbers in the upper right-hand corner of each page -- to cite the 2d Declination.

overcome the stated grounds for the declinations but IHS expressly declined to do so."  Motion ¶ 28, at 9 (setting forth this fact).  See 1st Declination at 9-10; 2d Declination at 11-12.[19]

### 3.    The 1st and 2d Declinations' Repercussions.

"On or about September 29, 2014, IHS instructed the Gallup Regional Service and Supply Center ('GRSSC') to cease delivering pharmaceuticals to Sage, at a substantial cost to Sage."  Motion ¶ 29, at 10 (citations omitted).  See Declaration of Christi El-Meligi ¶ 10, at 7 (dated Dec. 22, 2014), filed December 22, 2014 (Doc. 17-1)("El-Meligi 1st Decl."); FAC ¶ 44, at 20 (setting forth this fact); Answer ¶ 44, at 6 (admitting this fact).[20]  "The Declination left Sage without Federal Tort Claims Act coverage for malpractice claims as of October 1, 2014 at additional cost to Sage."  Motion ¶ 30, at 10 (setting forth this fact).  See El-Meligi 1st Decl. ¶ 11, at 7.[21]  "The Declination caused at least one of Sage's employees to lose certain federal loan repayment benefits and, as a result, that employee left employment with Sage, causing additional cost to Sage."  Motion ¶ 31, at 10 (setting forth this fact).  See El-Meligi 1st Decl. ¶ 13, at 8; Electronic Mail Transmission from Benjamin Ward to Christi El-Meligi and Human Resources (dated Dec. 11, 2014), filed December 22, 2014 (Doc. 17-1)("Dec. 11, 2014, e-mail").[22]  "The Declination caused Sage to lose a federal grant and other grant opportunities."

---

[19]The Defendants state that "[t]he declination letter is a record document that speaks for itself" and then quote the relevant portion of the 1st Declination without mentioning the 2d Declination.  Response ¶ 28, at 4-5.  The portion of the 1st Declination which the Defendants cite does not, however, controvert Sage Hospital's proposed fact.  Because the Defendants' response does not specifically controvert the proposed fact, the Court will deem it undisputed.

[20]The Court disposed of Sage Hospital's sole response to this fact in note 12, supra.

[21]The Court disposed of Sage Hospital's sole response to this fact in note 12, supra.

[22]The Court disposed of Sage Hospital's sole response to this fact in note 12, supra.

Motion ¶ 32, at 10 (setting forth this fact).  See El-Meligi 2d Decl. ¶ 8, at 3.[23]  "The Declination has caused Sage to incur other consequential and intangible damages, including significant out of pocket costs and expenses and damage to Sage's business reputation and good will."  Motion ¶ 33, at 10 (setting forth this fact).  See El-Meligi 2d Decl. ¶ 8, at 3.[24]

## PROCEDURAL BACKGROUND

Sage Hospital filed suit on October 23, 2014, see Complaint, filed October 23, 2014 (Doc. 1), and filed the SAC on June 30, 2015.  Sage Hospital asserts five causes of action.  First, Sage Hospital contends that the IHS' declination of the 2013 Renewal violates 25 U.S.C. § 450f(b)(2), and 25 C.F.R. §§ 900.32 and 900.33.  See SAC ¶¶ 52-55, at 24-25.  Sage Hospital asks the Court for immediate injunctive relief to: (i) reverse the IHS' declination of the 2013 Renewal; (ii) compel Burwell to award and fund the 2013 Renewal; (iii) provide coverage for Sage Hospital and its employees under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)("FTCA"); (iv) restore Sage Hospital's ability to purchase pharmaceuticals and other supplies from its suppliers; and (v) cease the IHS' public disparagement of Sage Hospital.  SAC ¶¶ 56, at 25-26.  Sage Hospital points out that, because the ISDEA provides for both injunctive and mandamus relief, it does not need to establish the traditional equitable grounds for obtaining injunctive relief.  See SAC ¶ 56, at 25-26.

Sage Hospital argues that, even if has to demonstrate the traditional equitable grounds for obtaining injunctive relief, those traditional grounds are easily met.  See SAC ¶ 57, at 26-27. Sage Hospital contends that the IHS' declination of the 2013 Renewal is causing Sage Hospital immediate and irreparable injury, because it threatens to ruin Sage Hospital's healthcare

---

[23]The Court disposed of Sage Hospital's sole response to this fact in note 12, supra.

[24]The Court disposed of Sage Hospital's sole response to this fact in note 12, supra.

business, force it to close, and cause it to lose its patients' good will.  See SAC ¶ 57A, at 26.

Sage Hospital asserts that it will likely succeed on the case's merits, because the Defendants

clearly violated the ISDEA and its implementing regulations.  See SAC ¶ 57B, at 26.  Sage

Hospital points out that 25 C.F.R. § 900.33 prohibits the IHS from declining to renew Sage

Hospital's ISDEA contract based on performance concerns to the extent that there were no

material and substantial changes to the scope or funding of Sage Hospital's programs and

services.  See SAC ¶ 57B, at 26.  Sage Hospital asserts that 25 C.F.R. § 900.32 prohibits the IHS

from declining Sage Hospital's proposed 2014 AFA, because that proposed agreement is

substantially the same as the 2013 AFA.  See SAC ¶ 57B, at 26.  Sage Hospital says that the

IHS' refusal to provide Sage Hospital with technical assistance to address the IHS' concerns is

"concededly in violation of 15 U.S.C. § 450f(b)(2)."  SAC ¶ 57B, at 26.  Sage Hospital argues

that the balance of hardships tips in its favor, because, while an injunction will merely require the

Defendants to comply with federal law, the Court's failure to order an injunction will ruin Sage

Hospital's business and cause two hundred Sage Hospital employees to lose their jobs.  See SAC

¶ 57C, at 27.  Sage Hospital asserts that an injunction will also be in the public interest, because

it will allow American Indians to get much-needed and high-quality healthcare at Sage Hospital

rather than obtaining lower-quality healthcare at more distant IHS facilities.  See SAC ¶ 57D, at

27.

    Second, Sage Hospital contends that the IHS' declination of the 2014 Renewal -- to the

extent that it is substantially the same as the 2013 Renewal -- violates 25 U.S.C. § 450f(b)(2),

and 25 C.F.R. §§ 900.32 and 900.33.  See SAC ¶¶ 59-60, at 27.  Sage Hospital asks the Court for

immediate injunctive relief to: (i) reverse the IHS' declination of the 2014 Renewal to the extent

that it is substantially the same as the 2013 Renewal; (ii) compel Burwell to award and fund the

2014 Renewal to the extent that it is substantially the same as the 2013 Renewal; (iii) provide FTCA coverage for Sage Hospital and its employees; (iv) restore Sage Hospital's ability to purchase pharmaceuticals and other supplies from its suppliers; and (v) cease the IHS' disparagement of Sage Hospital's business.  See SAC ¶ 61, at 27-28.  Sage Hospital reiterates that, because the ISDEA provides for both injunctive and mandamus relief to remedy violations of the ISDEA and its implementing regulations, it does not need to prove the traditional equitable grounds for obtaining injunctive relief.  See FAC ¶ 61, at 27-28.  Sage Hospital argues that, even if it has to demonstrate the traditional equitable grounds for obtaining injunctive relief, those grounds are easily met for the 2014 Renewal for the same reasons that they are met for the 2013 Renewal.  See SAC ¶ 62, at 28-29.

Third, Sage Hospital asserts that, because it is entitled to immediate injunctive relief to reverse the IHS' declination of the 2014 Renewal, and to compel the Defendants to award and fund that proposal, the Defendants are required to pay Sage Hospital the full amount which the 2014 AFA requests.  See SAC ¶ 64, at 29.  Sage Hospital contends that, under the ISDEA, it is entitled to an accounting of funds that the IHS provided to Sage Hospital from October 1, 2013, to the date of judgment.  See SAC ¶ 66, at 30.

Fourth, Sage Hospital argues that IHS violated the Contract Disputes Act, 41 U.S.C. §§ 7101-09 ("CDA").  See SAC ¶¶ 67-72, at 30-32.  Sage Hospital explains that it submitted its Contract Support Costs claim on August 25, 2014 (the "Claim").  SAC ¶ 68, at 30.  According to Sage Hospital, its claim specifies, for each FY from 2009 to 2013, Sage Hospital's total CSC shortfall.  See FAC ¶ 69, at 30.  Sage Hospital asserts that IHS responded to the Claim with "an inapplicable form letter," and that the IHS' proposed date for deciding the Claim -- October 21, 2015 -- is unreasonable, because the Claim and its exhibits provide all of the information that the

IHS needs to decide the Claim.   SAC ¶¶ 70-71, at 30-31.   Sage Hospital argues that, consequently, the letter violates the CDA.  See SAC ¶ 71, at 31.  Sage Hospital, accordingly, asks the Court to direct the IHS to issue a decision on the Claim in a specified period of time that the Court finds reasonable.  See SAC ¶ 72, at 31-32.

Fifth, and finally, Sage Hospital asserts that the Defendants violated the ISDEA by failing to pay the full amount of Sage Hospital's CSC for FY 2009 through FY 2013.  See SAC ¶ 76, at 32.  Sage Hospital contends that the Defendants owe Sage Hospital $36,258,493 in CSC and $26,311,188 in lost third-party revenues -- totaling $62,569,681 plus interest.  See SAC ¶¶ 76-79, at 32-33.  Sage Hospital says that, in a Memorandum Opinion and Order, filed June 17, 2015 (Doc. 73)("MOO"), the Court deemed the Claim denied, because of Dayish's failure to set forth a date certain by which he would decide the claim.  SAC ¶ 79, at 33.

### 1.    The Motion.

Sage Hospital filed the Motion on June 10, 2015, seeking summary judgment on Counts I through III of the SAC.  The Motion addresses five issues.  First, Sage Hospital says that, under the law-of-the-case doctrine, the Court's holdings in Sage "'govern the same issues in subsequent phases of the same case.'"  Motion at 17 (quoting Mocek v. City of Albuquerque, 3 F. Supp. 1002, 1046 (D.N.M. 2014)(Browning, J.)).  Sage Hospital notes that, among other things, the Court decided several legal issues of significance to the Motion:

> First, the Court determined that Defendants may not lawfully decline a proposed contract renewal "'where no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the . . . tribal organization'" and that Defendants may not lawfully decline a proposed successor AFA if it is "'substantially the same' as its predecessor." Id. at *34 (quoting 25 C.F.R. §§ 900.33, 900.32).  Second, this Court ruled that a determination of whether a proposed contract renewal has any material and substantial changes and whether a proposed successor AFA is substantially the same as the prior AFA must be determined within the "four corners" of the contracts and AFAs.  Id. at *51, *54; see id. at *50 (whether Secretary may apply

declination criteria to proposed successor AFA "turns on the proposal's contents rather than on a holistic assessment of the . . . tribal organization's performance of the existing AFA . . ."); *54 (IHS authority to decline contract renewal proposal is "strictly limited to the contract renewal proposal's contents").  Third, if the Secretary can decline only a portion of a contract proposal, she must approve all other severable portions of the proposal.  Id. at *34 (citing 25 C.F.R. § 900.25). Fourth, the prior decision found that, even assuming *arguendo* that the Declination Criteria applied, neither the Moss Adams Audit nor the IHS Performance Monitoring report provided any evidence to establish that Sage violated any federal regulations regarding program compliance necessary to support either of the two criteria invoked by IHS in its Declination.  This Court reiterated that the Secretary bears the burden to show the propriety of any declination by clear and convincing evidence.  Id. at *60.

Motion at 20-21.

Second, Sage Hospital argues that the ISDEA requires Burwell to approve and fully fund the 2013 Renewal and the 2014 AFA.  See Motion at 16-19.  Sage Hospital explains that the HHS Secretary must fully fund a contract renewal proposal if "'no material and substantial change to the scope or funding of a program, function, services, or activities [PFSAs] has been proposed by the tribal organization.'"  Motion at 16 (alterations in Motion but not in quoted source)(quoting 25 C.F.R. § 900.33)(citing Sage, 2015 WL 1906107, at *34, *54 (holding that the HHS Secretary's authority to decline a contract proposal is "strictly limited to the contract renewal proposal's contents")).  Sage Hospital says that, because the 2013 Renewal proposes no changes to Sage Hospital's PFSAs or budget, Burwell is legally required to award and fully fund it.  See Motion at 22 (citing Sage, 2015 WL 1096107, at *53 ("The 2013 Renewal proposes only minor amendments to update the 2013 Renewal for a new three-year term and to fix a few typographical errors.  The 2013 Renewal offers no modifications to the provisions of the 2010 Contract that speak to the scope and funding of Sage Hospital's PFSAs.")).

Sage Hospital argues that, similarly, the HHS Secretary must approve and fully fund a proposed successor AFA that is "'substantially the same'" as its predecessor.  Motion at 22

(quoting 25 C.F.R. § 900.32)(citing <u>Sage</u>, 2015 WL 1906107, at \*34, \*51 (holding that the HHS Secretary should determine if the declination criteria apply based on the information within the "four corners" of the AFA documents)).  Sage Hospital explains that the 2013 AFA "was automatically amended, without an additional writing, to reflect any additional funding." Motion at 23.  Sage Hospital asserts that, because the 2014 AFA is substantially the same as the 2013 AFA, the ISDEA requires Burwell to provide \$20,116,437 in funding to Sage Hospital for FY 2014. <u>See</u> Motion at 24.

Third, Sage Hospital maintains that the ISDEA requires Burwell to approve and fully fund the 2014 Renewal and the 2015 AFA.  <u>See</u> Motion at 25.  Sage Hospital asserts that its second proposed three-year contract renewal -- under which the Defendants would fund Sage Hospital through September 30, 2017 -- proposes no changes to Sage Hospital's PFSAs.  <u>See</u> Motion at 25.  Sage Hospital contends that, accordingly, Burwell must approve and fully fund it. <u>See</u> Motion at 25 (citing 25 C.F.R. § 900.33; <u>Sage</u>, 2015 WL 1906107, at \*54 (explaining that the HHS Secretary's authority to decline a contract proposal is "strictly limited to the contract proposal's contents")).  Sage Hospital then turns to the 2015 AFA and says that, although the Defendants "have not argued that Sage's proposed 2015 AFA is not substantially the same as the prior 2014 or 2013 AFA," the Court observed in the <u>Sage</u> opinion that the proposed 2015 AFA was 55% more than the funding specified in the 2013 AFA -- which, in the Court's view, "suggests that the 2015 AFA is not substantially the same as the 2013 AFA.'"  Motion at 26-27 (quoting <u>Sage</u>, 2015 WL 1906107, at \*39).

Sage Hospital contends that, even if the proposed 2015 AFA is not substantially the same as the 2013 AFA and Burwell could apply the ISDEA's Declination criteria to it, Burwell "must invoke the particular criterion or criteria that she can justify with clear and convincing evidence."

Motion at 27 (citing <u>Cheyenne River Sioux Tribe v. Kempthorne</u>, 496 F. Supp. 2d 1059, 1068 (D.S.D. 2007)("Simply reciting the declination criteria is absolutely insufficient. The law requires a detailed explanation of the Secretary's rationale for his decision and a disclosure of the facts or documents on which he relied for his decision.")). Sage Hospital asserts that the IHS declined to enter into the proposed 2015 AFA, "'for the same reasons IHS declined [Sage's] August 23, 2013 Proposal, as articulated in IHS's [1st Declination].'" Motion at 27 (first alteration in Motion but not in quoted source)(quoting 2d Declination at 11). Sage Hospital explains that the 1st Declination, in turn, invoked two of the ISDEA's Declination criteria: (i) "'the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory'"; and (ii) "'the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract.'" Motion at 28 (quoting 1st Declination at 3-4). Sage Hospital contends that the IHS "did not even mention the only declination criterion that could arguably support its present litigation position": that the "'amount of funds proposed under the contract is in excess of the applicable funding level for the contract.'" Motion at 28 (quoting 25 U.S.C. § 450f(a)(2)).

Sage Hospital maintains that the ISDEA's regulations prescribe the steps which the HHS Secretary must take to properly decline a proposed AFA:

> The procedures in subpart E require the Secretary to make her declination within 90 days of her receipt of the proposal, 25 C.F.R. § 900.21; advise the tribal organization in writing of the Secretary's objections and include a specific finding that clearly demonstrates that the basis for declination exists in that 90-day period, and provide any documents relied on in making that decision, 25 C.F.R. § 900.29; and offer technical assistance to the tribal organization to overcome the stated objection, 25 C.F.R. § 900.30.

Motion at 28-29. Sage Hospital asserts that Burwell "did none of this" in declining the proposed 2015 AFA. Motion at 29. Sage Hospital argues that the Court should therefore reverse the 2d

Declination, and compel Burwell to accept the 2015 AFA and to "add to the contract the full amount proposed, i.e., $32,614,916." Motion at 29.

Fourth, Sage Hospital argues that both the 1st Declination and the 2d Declination "are illegal for IHS' failure to provide technical assistance." Motion at 29 (capitalization and bolding omitted for readability). Sage Hospital says that this violation "provides an independent ground for reversing the declinations" of the 2013 Renewal, the 2014 AFA, the 2014 Renewal, and the 2015 AFA. Motion at 30 (citing Sage, 2015 WL 1906107, at *34 (stating that, if the HHS Secretary declines a contract proposal, he or she must "provide assistance to the . . . tribal organization to overcome the stated objections"); Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d at 1068; 25 C.F.R. § 900.33). Sage Hospital asserts that "this basis for invalidating the Secretary's actions does not depend on whether the Secretary could substantiate any such objections and prove them by clear and convincing evidence." Motion at 30.

Fifth, and finally, Sage Hospital asks the Court to schedule a hearing on damages. See Motion at 30. Sage Hospital points out that the preliminary injunction which is currently in place provides only prospective relief to Sage Hospital. See Motion at 30. Sage Hospital asserts that the ISDEA provides a remedy in "'money damages'" for Sage Hospital's lost revenue. Motion at 31 (quoting Sage, 2015 WL 1906107, at *36). Sage Hospital also notes that it has incurred other damages which the Defendants' unlawful declination decisions caused, "including additional insurance costs, costs for pharmaceutical supplies, and employee turnover." Motion at 31 (citations omitted). Sage Hospital says that the ISDEA permits the award of consequential damages, "including lost third-party reimbursements and intangible damages." Motion at 31 (citing Ramah Navajo Sch. Bd., Inc. v. Leavitt, No. CIV 07-0289 MV/SMV, Memorandum Opinion and Order at 61-72, filed May 9, 2013 (D.N.M.)(Vazquez, J.)(Doc. 143)). Sage

Hospital says that the Court should therefore set a hearing on the issue of damages.  See Motion at 31.

> ### 2. __The Response__.

The Defendants responded to the Motion on July 6, 2015.  See Defendants' Response to Plaintiff's Motion for Summary Judgment on Its First Three Claims for Relief, filed July 6, 2015 (Doc. 80)("Response").  The Response attacks the Motion on five grounds.  First, the Defendants contend that Sage Hospital incorrectly argues that the Court's holdings in the Sage opinion govern the Court's resolution of the Motion.  See Response at 7 (citing Motion at 12).  The Defendants argue that the "'district courts generally remain free to reconsider their earlier interlocutory orders.  In fact, in the Tenth Circuit, law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another.'"   Response at 7 (quoting Mocek v. City of Albuquerque, 3 F. Supp. 3d at 1046)(emphasis omitted).

Second, the Defendants contend that, in the Sage opinion, the Court improperly held that the canon of construction under which courts interpret ambiguous statutes and regulations in favor of American Indian tribes and tribal organizations trumped the deference typically afforded to an agency's interpretation of its own regulations under Auer v. Robbins, 519 U.S. 452 (1997)("Auer").  Response at 7-8 (citing Sage, 2015 WL 1906107, at *36, *48).  According to the Defendants, the Court then improperly held that Burwell's interpretation of 25 C.F.R. §§ 900.32 and 900.33 -- which allowed the Defendants to look beyond the four corners of Sage Hospital's contract proposals to determine whether they were "substantially the same" as their predecessors -- was not persuasive.  Response at 7-9 (citing Mashantucket Pequot Tribal Nation v. IHS, DHHS Departmental Appeals Board, Appellate Division, No. A-06-60, Decision No.

2028, 2006 WL 1337419 (May 3, 2006)("Pequot")).  The Defendants assert that the canon of

Indian deference "'is inapplicable when the competing interests at stake both involve Native

Americans.'"   Response at 8 (quoting Cherokee Nation of Okla. v. Norton, 241 F. Supp. 2d

1374, 1380 (N.D. Okla. 2002)(citing United States v. Jicarilla Apache Nation, 131 S. Ct. 2313,

2328 (2011)("The Government may also face conflicting obligations to different tribes or

individual Indians."); N. Cheyenne Tribe v. Hollowbreast, 425 U.S. 649, 655 n.7 (1976))("[This]

canon has no application here; the contesting parties are an Indian tribe and a class of individuals

consisting primarily of tribal members."); Chugach Alaska Corp. v. Lujan, 915 F.2d 454, 457 n.4

(9th Cir. 1990)("[T]he question here is not whether to favor Native Americans but which Native

Americans to favor.")).

> The Defendants explain that,

>> as the Court has found, investigation of Sage's finances by the Navajo Area
>> Indian Health Service (NAIHS) came about due to concerns within the Navajo
>> Nation that Sage was misusing funding meant to protect its citizens' health.  As a
>> news article reported, "the Ganado Chapter of the Navajo Nation passed a
>> resolution requesting that 'Mr. Ahman [sic] Razaghi, Chief Executive Officer of
>> Sage Memorial Hospital be terminated and immediately escorted off the Navajo
>> Nation land.'"   This resolution was, according to the article, spurred by
>> complaints of former Navajo employees of Sage who discovered financial
>> discrepancies and voiced concerns that Sage was diverting money that should
>> otherwise have been applied toward patient care.  As this Court found, "[o]n
>> October 16, 2013, Jonathan Hale -- the Chairman of the Health, Education and
>> Human Services Committee of the Navajo Nation Council -- wrote a letter to the
>> former HHS Secretary -- Kathleen Sebelius -- voicing a number of concerns about
>> Sage Hospital."  Specifically, Mr. Hale was concerned "that, without a thorough
>> investigation, 'the Navajo Nation cannot be assured that funds designated for the
>> health of its people are being properly managed.'"   Accordingly, Mr. Hale
>> requested NAIHS to conduct a performance monitoring review of Sage, which
>> ultimately led to the declination decisions at issue in this case.

Response at 8-9 (citations omitted).  The Defendants argue that, because the interests of the

Navajo nation and its members are at stake in this case, resolving it "is not a simple matter of

deferring to a tribal organization's litigation position over a federal agency's interpretation of its

own regulation."  Response at 9.  The Defendants assert that the canon of Indian deference thus

does not apply, and that Burwell's interpretation of §§ 900.32 and 900.33 should control "unless

it is plainly erroneous or inconsistent with the regulation."  Response at 9 (citing <u>Utah v. Babbitt</u>,

53 F.3d 1145, 1150 (10th Cir. 1995); <u>Auer</u>, 519 U.S. at 461).

       Third, the Defendants ask the Court to revisit its holding in the <u>Sage</u> opinion that the

IHS' "offer of technical assistance in the second declination letter was an 'empty gesture.'"

Response at 10 (quoting <u>Sage</u>, 2015 WL 1906017, at *15 n.19).  The Defendants contend that the

language in the 2d Declination is standard and "used by IHS in most declinations."  Response at

10.  The Defendants add that, although the Court faulted IHS for putting "'the onus on Sage

Hospital to identify what assistance it needed,' the ISDEAA and its regulations in fact <u>do</u> place

the onus on the tribal organization to identify what assistance is needed."  Response at 10

(emphasis in original).  According to the Defendants, the ISDEA required them to provide

technical assistance to Sage Hospital only "'upon the request of any tribal organization and

subject to the availability of appropriations.'"  Response at 10 (quoting 25 U.S.C.

§ 450h(d)(3))(citing 25 C.F.R. § 900.28 (describing the HHS Secretary's duty as providing "any

necessary requested technical assistance" to avoid declination); 25 C.F.R. § 900.30 (same)).  The

Defendants assert that "IHS will provide Sage with technical assistance at Sage's request," which

complies fully with the ISDEA.  Response at 11.

       Fourth, the Defendants argue that, even if the declinations violated the ISDEA, the Court

should not deem Sage Hospital's contract proposals accepted.  <u>See</u> Response at 11.  According to

the Defendants, the ISDEA provides that, upon receiving a contract proposal, the HHS Secretary

"'shall approve the proposal and award the contract,' unless she issues a declination letter within

90 days of [receiving] the proposal."  Response at 11 (quoting 25 U.S.C. § 450f(a)(2)).  The

Defendants assert that the ISDEA "is therefore very specific that the Secretary must decline a proposal within 90 days; if she does not, the contract must be awarded." Response at 11. The Defendants contend that similar language "is decidedly absent from the other provisions of law that Sage Hospital claims were violated in this case" -- for example, the requirement to provide technical assistance and the ISDEA's prohibition of applying the Declination criteria to contract proposals which are substantially the same as their predecessors. Response at 11 (citing 25 U.S.C. § 450f(b)(2); 25 C.F.R. §§ 900.32-.33). The Defendants assert that "[t]his absence is telling" and that, "[p]articularly where the consequences are so severe (i.e., deemed approval of a contract), this Court should not read such penalties into the ISDEAA." Response at 11-12.

Fifth, the Defendants challenge Sage Hospital's assertion that the ISDEA requires them to fully fund Sage Hospital's contract proposals. See Response at 11. The Defendants point out that, when a contract proposal is deemed approved under the ISDEA, the HHS Secretary must "'add to the contract the full amount of funds pursuant to section 106(a) of the Act.'" Response at 12 (quoting 25 C.F.R. § 900.18). The Defendants say that § 106, in turn, provides that the amount of funds under an ISDEA contact "'shall not be less than the appropriate Secretary otherwise would have provided for the operation of the programs or portions thereof for the period covered by the contract'" -- i.e., the Secretarial amount. Response at 12 (quoting 25 U.S.C. § 450j-1(a)(1)). The Defendants assert that Sage Hospital's contract proposals "do not necessarily reflect that amount; the Secretary still has to review the proposal and determine the appropriate level of funding." Response at 12. The Defendants contend:

> Thus, the remedy for violating the provisions in 25 C.F.R. §§ 900.32 and 900.33 should not be that Sage's proposals are deemed accepted. The most Sage is entitled to on the strength of the Court's April 9 findings is an order requiring the Secretary to review Sage's proposals and fund them according to ISDEAA Section 106(a) within 90 days of the date of the order. The Court could also order the parties to return to the negotiating table and attempt to reach an agreement on

the amount of funding Sage receives under Section 106(a).  Likewise, the remedy
for violating the technical assistance requirement should be an order requiring the
Secretary to comply with the statute, i.e., provide Sage with technical assistance
to overcome the stated objections.

Response at 12.  The Defendants add that the ISDEA does not require the HHS Secretary to

provide Sage Hospital the higher funding levels set forth in the proposed 2015 AFA.  See

Response at 13.  The Defendants assert that Sage Hospital's request for a permanent injunction

ordering them to fully fund the proposed 2015 AFA "is akin to a request for mandamus, which is

only available if there is a clear statutory command to perform a certain action."  Response at 13

(citing Carpet, Linoleum & Resilient Tile Layers v. Brown, 656 F.2d 564, 566 (10th Cir. 1982)).

The Defendants contend that, although the Sage opinion "arguably found that there is a statutory

command" to enter into a contract with Sage Hospital, "there is no parallel command to fund the

contract to the full extent requested by Sage."  Response at 13.  The Defendants also note that, if

Sage Hospital wins summary judgment on Count I -- which seeks to impose a three-year contract

that expires in 2016 -- then Count II -- which seeks to impose a three-year contract that expires in

2017 -- is moot, because granting both requests would result in overlapping contracts.  See

Response at 13.

        Sixth, the Defendants argue that, if the Court deems all of Sage Hospital's contract

proposals approved, it should not order the Defendants to fund the 2015 AFA to the full extent

requested.  See Response at 14.  The Defendants say that, as the Court has noted, the 2015 AFA

asks for substantially more funding than either the 2013 AFA or the 2014 AFA.  See Response at

14.  The Defendants argue that an AFA is not substantially the same as its predecessor when it

contains a "'different proposed funding amount.'"  Response at 14 (quoting 25 C.F.R. § 900.32).

The Defendants assert that, accordingly, the portion of the 2015 AFA that requests funding in

excess of the 2013 AFA is subject to the ISDEA's Declination criteria.  See Response at 14.

- 27 -

In response to Sage Hospital's argument that Burwell "'failed to predicate the declination of the proposed 2015 AFA on the basis that it sought a different funding amount,'" the Defendants argue that Sage Hospital "confuses the regulations, which explain when declination criteria may be invoked, with the declination criteria themselves."  Response at 14-15 (quoting Motion at 29).  The Defendants assert that

> § 900.29 requires the Secretary "[t]o advise the Indian tribe or tribal organization in writing of the Secretary's objections, including a specific finding that clearly demonstrates that (or that is supported by a controlling legal authority that) one of the conditions set forth in § 900.22 exists."  Section 900.22, in turn, is the list of substantive declination criteria; it is not the limitations on using those criteria set forth in 25 C.F.R. § 900.32.  The fact that the declination letter did not cite § 900.32 is therefore irrelevant.

Response at 15.

The Defendants contend that Sage Hospital's argument that the Court must approve the 2015 AFA, because Burwell did not furnish a decision on it within ninety days of receiving it, is "factually untrue."  Response at 15.  The Defendants point out that Sage Hospital submitted the proposed 2015 AFA on September 19, 2014, and the IHS issued the 2d Declination on December 12, 2014 -- eighty-four days later.  See Response at 15.  The Defendants also attack Sage Hospital's argument that the 2d Declination violated the ISDEA because it did not "invoke valid, applicable declination criteria, and did not offer technical assistance."  Response at 15.  The Defendants assert that the sole basis for this argument is the Sage opinion, which consisted of preliminary findings only and listed a number of categories of evidence that the Defendants could present which might change the Court's mind on those preliminary findings.  See Response at 15 (citing Sage, 2015 WL 1906017, at *58-60).  The Defendants argue that they would present that evidence "in a full hearing on the merits of its declination proposal after completion of discovery."  Response at 15 (citing Sage, 2015 WL 1906017, at *40 (describing in

- 28 -

detail the typical procedure in these cases -- for example, holding a series of hearings and a six-day trial); Declaration of Angela M. Belgrove (dated July 6, 2015) ¶¶ 18-19, at 6, filed July 6, 2015 (Doc. 80-2)("Belgrove Decl.")).

The Defendants contend that an assumption underlying Sage Hospital's argument "seems to be that the Secretary not only had to explain her declination decision and set forth reasons, but also . . . support that decision by clear and convincing evidence." Response at 16 (internal quotation marks omitted). The Defendants assert that the ISDEA "disproves that assumption," because it requires only that a declination letter "'contain[] a specific finding that clearly demonstrates that' one or more declination criteria are applicable." Response at 17 (alterations in Response but not quoted source)(quoting 25 U.S.C. § 450f(a)(2)). The Defendants maintain that the 2d Declination contains "highly specific findings invoking applicable criteria"; it was not also required to demonstrate those findings with clear and convincing evidence. Response at 17. The Defendants urge that the ISDEA imposes the clear and convincing evidence standard "in the course of subsequent litigation, not the declination process." Response at 17. The Defendants argue that Burwell is entitled to take discovery and justify her declination decision with evidence at a full hearing. See Response at 17. The Defendants contend that the Motion is therefore premature and the Court should either deny it or defer ruling on it until after discovery and trial. See Response at 17.

Seventh, and finally, the Defendants say that they do not oppose Sage Hospital's request for a hearing on the issue of damages so long as it occurs after the completion of discovery and "after the entry of final judgment on the declination decision." Response at 17. The Defendants argue that, at this point, Sage Hospital's purported damages "are supported by conclusory, untested affidavits." Response at 17. The Defendants maintain that they are entitled to take the

affiants' depositions and request all relevant documents. See Response at 17. They add that delaying a decision on damages until the current trial date -- which is in early April 2015 -- would not prejudice Sage Hospital, because it will continue to receive roughly $1.5 million in funding per month until trial. See Response at 17.

  **3.**  **The Reply.**

  Sage Hospital replied to the Response on July 20, 2015. See Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Summary Judgment on its First Three Claims for Relief, filed July 20, 2015 (Doc. 85)("Reply"). Sage Hospital reiterates that the Sage opinion resolved many of the legal disputes that the Defendants raise in the Response. See Reply at 7. Sage Hospital contends that the law-of-the-case doctrine posits that, "'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" Reply at 9 (quoting United States v. Monsisvais, 946 F.2d 114, 115 (10th Cir. 1991)). Sage Hospital argues that the Defendants have not provided any proper justification for the Court to revise its rulings in the Sage opinion. See Reply at 9.

  Sage Hospital says that the Defendants' main argument -- which is that the canon of Indian deference does not apply in this case and that the Court should instead defer to the HHS' interpretation of the ISDEA's regulations -- is "erroneous." Reply at 10. Sage Hospital explains that this dispute is between the IHS and Sage Hospital, and no other tribal interests are involved. See Reply at 5. According to Sage Hospital, the IHS "satisfied the request of Navajo Nation Council delegate Hale to investigate Sage's finances, and there is no indication that the Navajo Nation has lingering concerns." Reply at 5 (citing Declaration of Alton Joe Shepherd (dated Feb. 6, 2015), filed February 11, 2015 (Doc. 41-4)("Shepherd Decl."); Declaration of Kee Allen Begay, Jr. (dated Feb. 6, 2015), filed February 11, 2015 (Doc. 41-4)("Begay Decl."); Declaration

of Lee Jack, Sr. (dated Feb. 6, 2015), filed February 11, 2015 (Doc. 41-4)("Jack Decl."); Declaration of Raymond Smith Jr. (dated Feb. 6, 2015), filed February 11, 2015 (Doc. 41-4)("Smith Decl.")).   Sage Hospital contends that IHS "essentially posits that any dispute over money involving a tribal organization that is not universally esteemed or any dispute with IHS that threatens a reduction of funding for other tribal organizations pits Indian against Indian."   Reply at 10 (citing Response at 8-9).   Sage Hospital argues that, if the Defendants were correct, the canon of Indian deference would be "rendered largely nugatory" in declination disputes with the IHS, contrary to Congress' intent and Tenth Circuit law.   Reply at 10 (citing Sage, 2015 WL 1906107, at *36-37).

Sage argues that the Court's interpretation of §§ 900.32 and 900.33 in the Sage opinion not only properly applied the canon of Indian deference, but was also consistent with the ISDEA, the ISDEA's implementing regulations, and Sage Hospital's ISDEA contract.   See Reply at 10 (citing 25 U.S.C. § 450*l*(c)("Each provision of the Indian Self-Determination and Education Assistance Act . . . and each provision of this Contract shall be liberally construed for the benefit of the Contractor to transfer the funding and the following related functions, services, activities, and programs . . . ."); 2010 Contract at 14 (providing a similar provision); 25 C.F.R. § 900.3(a)(5)("Congress has further declared that each provision of the Act and each provision of contracts entered into thereunder shall be liberally construed for the benefit of the tribes or tribal organizations to transfer the funding and the related functions, services, activities, and programs . . . ."); 25 C.F.R. § 900.3(b)(11)).   Sage Hospital says that "[t]here is simply no basis for IHS' contention that th[e] Court erred in not deferring to . . . an unpublished administrative decision in a case distinguishable in several major respects."   Reply at 11 (citing Sage, 2015 WL 1906107, at *46-52 & n.26).

Next, Sage Hospital challenges the Defendants' assertion that ordering the Defendants to approve and fund the 2013 Renewal and the 2014 AFA moots Sage Hospital's request that the Court order the Defendants to approve and fund the 2014 Renewal and the 2015 AFA.  See Reply at 11.  According to Sage Hospital, "[s]tandard principles of contract law . . . dictate otherwise."  Reply at 12 (citation omitted)(internal quotation marks omitted).  Sage argues that, "'[w]hen two parties execute a second contract that deals with the same subject matter as the first, the two contracts must be interpreted together; insofar as the contracts are inconsistent, the later one prevails.'"  Reply at 12 (quoting K & V Sci. Co., Inc. v. BMW, 164 F. Supp. 2d 1260, 1263 (D.N.M. 2011)(Black, J.), rev'd on other grounds, 314 F.3d 494 (10th Cir. 2002)).  Sage Hospital says that, in New Mexico, this concept is known as the merger doctrine.  See Reply at 12 (citing K & V Sci. Co., Inc. v. BMW, 164 F. Supp. 2d at 1263 n.2).  Sage Hospital asserts that, accordingly, if the Court orders the Defendants "to execute the first contract renewal, that contract will be merged into the second renewal proposal, with the net effect of extending the contract an additional year (through September 30, 2017) and establishing the funding for FY 2015 at $32,614,916."  Reply at 12 (citing Mobil Oil Expl. & Producing S.E., Inc. v. United States, 530 U.S. 604, 607-08 (2000)(explaining that, when the United States enters into contracts, the law applicable to contracts between private individuals generally governs the United States' rights and duties)).

Sage Hospital reiterates that Burwell did not validly decline the proposed 2014 Renewal and the 2015 AFA within ninety days of its submission.  See Reply at 12-13.  Sage Hospital says that, once it filed the 2014 Renewal and the 2015 AFA, Burwell had ninety days to decline them "to the extent the proposed funding is 'in excess of the applicable funding level for the contract'" as determined under § 450j-1(a) of the ISDEA.  Reply at 14 (citations omitted)(quoting 25

U.S.C. § 450f(a)(2)(D)).   Sage Hospital argues that Burwell did not cite that criterion for

declining the proposals, but instead invoked the same inapposite reasons for declining the 2014

Renewal and the 2015 AFA as it did for the 2013 Renewal and the 2014 AFA.  See Reply at 14

(citing 2d Declination at 13-16; Sage, 2015 WL 1906107, at *54).  Sage Hospital asserts that, if

Burwell believes that the amount of funds that Sage Hospital seeks is excessive, she has the

ability and the duty to invoke -- within the ninety-day period which the ISDEA prescribes -- the

one declination criterion that would apply: Sage Hospital's contract proposal is in excess of the

applicable funding level.  See Reply at 14 (citing Seneca Nation of Indians v. HHS, 945 F. Supp.

2d 135, 150 (D.D.C. 2013)).  Sage Hospital contends that, in Seneca Nation of Indians v. HHS,

the

> Seneca Nation had proposed an increase of $3,774,392 over the $7,802,211 that it
> had been awarded the year before, a 48% increase.  945 F. Supp. 2d at 137-39.
> Much as IHS argues here, IHS argued in Seneca that the tribe does not get a
> "windfall" due to a "procedural technicality," id. at 150; that such "windfall"
> would come at the expense of other tribal organizations, id. at 151; that the court
> should get into the weeds on the validity of the tribe's calculations, id. at 151-52;
> and that the court should "evaluate the bargain the parties have struck through
> their Contract and operation of law," id. at 151-52.  The Seneca court rejected all
> of those arguments, ruling that the propriety of the tribe's increased funding
> request "is a matter properly addressed through contract negotiations or through
> declination of the proposed amendment pursuant to 25 U.S.C. § 450f(a)(2) if the
> Secretary truly believed the amount was unsupported." Id. at 152.  In ruling the
> tribe's contract approved at the higher funding level as proposed, the court
> rejected the "Secretary's argument that she was not obligated to give a timely
> response of the precise type of response articulated by the statute," i.e., the one
> declination criterion specifically addressed to the funding level.   Id. at 150
> (emphasis added).

Reply at 14-15.  Sage Hospital says that other decisions are in accord.  See Reply at 15 (citing

Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d at 1068; Maniilaq Ass'n v.

Burwell, No. CIV 13-0380 TFH, 2014 WL 5558336, at *9-10 (D.D.C. Nov. 3, 2014); Yurok

Tribe v. Dep't of the Interior, 785 F.3d 1405, 1408 (Fed. Cir. 2015); Crownpoint Inst. of Tech. v.

Norton, No. CIV 04-0531 JP/DJS, Findings of Fact and Conclusions of Law, filed Sept. 16, 2005

(D.N.M.)(Parker, J.)(Doc. 86)("Crownpoint")).

Sage Hospital argues that the ISDEA and its regulations reflect Congress' intent that

tribal organizations have potent rights and effective remedies for the IHS' unlawful declination

decisions.  See Reply at 16 (citing Sage, 2015 WL 1906107, at *51-52).  Sage Hospital contends

that, although the Defendants argue that the ISDEA does not establish an enforceable duty to

fund Sage Hospital's contract proposals, the ISDEA

> itself . . . stat[es] that the Court may "compel an officer or employee of the United
> States, or any agency thereof, to perform a duty provided under this subchapter or
> regulations promulgated hereunder (including immediate injunctive relief to
> reverse a declination finding . . . or to compel the Secretary to award and fund an
> approved self-determination contract)."

Reply at 17 (alterations in Reply but not in quoted source)(quoting 25 U.S.C. § 450m-1(a)).

Sage Hospital maintains that it is therefore entitled to such relief.  See Reply at 17.

Sage Hospital reiterates that the IHS violated § 900.30 by refusing to provide Sage

Hospital technical assistance before declining Sage Hospital's contract proposals.  See Reply at

17.  Sage Hospital states that, contrary to the Defendants' contentions, "the requirement for IHS

to provide technical assistance does not require a request from the tribal contractor."  Reply at

17.  Instead, Sage Hospital argues, the applicable regulation states:

> **When the Secretary declines all or a portion of a proposal, is the
> Secretary required to provide an Indian tribe or tribal organization with
> technical assistance?**
>
> Yes.   The Secretary shall provide additional technical assistance to
> overcome the stated objections, in accordance with section 102(b) of the Act, *and*
> shall provide any necessary *requested* technical assistance to develop any
> modifications to overcome the Secretary's stated objections.

Reply at 17 (bold in original; italics in Reply but not in original)(quoting 25 C.F.R. § 900.30).

Sage Hospital asserts that the Defendants omitted the first half of this regulation when they

quoted it in the Response.  <u>See</u> Reply at 17.  Sage Hospital asserts that the Defendants are not entitled to obtain evidence on this issue through discovery, because, "if there is any evidence that IHS offered technical assistance before December 12, 2014 (or at any time thereafter) it would be in IHS' possession!"  Reply at 13.

Sage Hospital says that the Defendants' argument that summary judgment is premature at this stage of the case "ignores the Court's prior rulings on the applicable law and does not satisfy the requirements of Fed. R. Civ. P. 56(d)."  Reply at 19.  Sage Hospital contends that, under rule 56(d), the Defendants must: (i) file an affidavit; (ii) identify the probable facts not available, their relevance, and what steps have been taken to obtain those facts; (iii) explain why facts precluding summary judgment cannot be presented; and (iv) state with specificity how the desired time would enable the nonmoving party to meet its burden in opposing summary judgment.  <u>See</u> Reply at 19-20.  Sage Hospital argues that the Belgrove Decl. has not satisfied these requirements, noting that "[i]t is not enough for IHS to say that facts necessary to oppose summary judgment are unavailable or are in Sage's exclusive control."  Reply at 20-21.  Sage Hospital asserts that one of the issues mentioned in the Belgrove Decl. is relevant to whether the contents of Sage Hospital's contract proposals "significantly differ from that of their predecessors or show how discovery would justify either the retroactive use of a declination criterion not invoked when IHS rejected [the 2015 AFA] or validate the use of the two criteria that IHS did invoke."  Reply at 23.  Sage Hospital says that, because the Court has confined its inquiry in resolving the Motion to the "four corners" of Sage Hospital's contract proposals, "discovery by IHS into other issues is unnecessary."  Reply at 20.  Sage Hospital concedes, however, that the IHS is entitled to discovery limited to the issue of damages, and clarifies that it

- 35 -

is not seeking an injunction ordering the IHS to cease its disparagement of Sage.   See Reply at

23.

      **4.**    **<u>The Hearing</u>.**

      The Court held a hearing on July 31, 2015.   <u>See</u> Transcript of Hearing (taken July 31,

2015), filed August 12, 2015 (Doc. 94)("Tr.").   The hearing was relatively short, with the parties

largely sticking to their briefing.   The parties raised a few new issues, however.   First, Sage

Hospital explained that the Defendants have not served it with any discovery requests.   <u>See</u> Tr. at

8:15-19 (Frye).   The Defendants said that they have not requested any discovery, because they

believe that the Court can resolve three issues at the summary-judgment stage: (i) whether the

2014 AFA and the 2013 Renewal were substantially the same as the 2010 Contract and the 2013

AFA; (ii) whether Sage Hospital's claim that the Defendants unlawfully declined the 2014

Renewal and the 2015 AFA are moot if the Court grants Sage Hospital the requested relief

regarding the 2013 Renewal and the 2014 AFA; and (iii) if Sage Hospital's claims regarding the

2014 Renewal and the 2015 AFA are not moot, whether those proposals are substantially the

same as the 2010 Contract and the 2013 AFA.   <u>See</u> Tr. at 32:22-25 (Grohman).   The Defendants

explained that, if the Court holds that Sage Hospital's claims regarding the 2014 Renewal and

2015 AFA are not moot, but determines that those proposals are not substantially the same as the

2010 Contract and the 2013 AFA, there is a remaining fourth issue: whether the Defendants

properly applied the Declination criteria to the 2014 Renewal and 2015 AFA.   <u>See</u> Tr. at

33:10-18 (Grohman).   The Defendants said that, because they "don't have endless resources,"

they did not want to attempt to obtain discovery on the fourth issue before litigating the Motion

if the Court's resolution of the Motion would make discovery on the fourth issue irrelevant.   Tr.

at 34:11-16 (Grohman).   The Defendants noted, however, that if the Court holds that Sage

Hospital's claims regarding the 2014 Renewal and 2015 AFA are not moot, but determines that those proposals are not substantially the same as the 2010 Contract and the 2013 AFA, it should allow the Defendants to obtain discovery and proceed to trial on the whether they properly applied the Declination criteria to the 2014 Renewal and 2015 AFA.  See Tr. at 33:20-34:3 (Grohman).

        Second, the parties and the Court took up what the Defendants asserted was "the biggest mistake or error that [the Court] made in the [Sage] opinion" -- which is that the canon of Indian deference trumps Auer deference.  Tr. at 18:1-3 (Court).  The Defendants reiterated the argument from the Response that, when American Indians' interests are pitted against each other in a case, the canon of Indian deference does not apply.  See Tr. at 19:23-20:7 (Grohman).  Although the Defendants initially said that Auer deference applies to agencies' interpretations of regulations stated in legal briefs filed at the district court level, see Tr. at 21:2-22:10 (Grohman)(citing Qwest Corp. v. Colo. Pub. Utils. Comm'n, 656 F.3d 1093 (10th Cir. 2011)), they later clarified that they are not "asking [the Court] to defer to the brief [, but are instead] asking for deference for the Secretary's interpretation, as expressed in an administrative decision, and the same consistent interpretation expressed in legal briefs in this case," Tr. at 44:1-6 (Court, Grohman).  Sage Hospital countered that it "can't see the Indians on the other side of our case.  I see the Indian Health Service, . . . a federal agency[, but] I don't see any other Indians."  Tr. at 38:20-23 (Frye).  Sage Hospital reiterated that the ISDEA, its regulations, Sage Hospital's ISDEA contract, and Tenth Circuit authority require the Court to apply the canon of Indian deference. See Tr. at 40:20-23 (Frye).

        The Defendants replied that Sage Hospital's contractual argument is erroneous, because the parties "don't have a contract," and the Court is not being asked to interpret a provision of an

existing contract between the parties.  Tr. at 44:19 (Grohman).  The Defendants assert that the

ISDEA's regulations are similarly inapposite, because "[i]f a tribe and a tribal organization are at

odds, there is not a clear-cut picture of who to defer to."  Tr. at 44:24-45:1 (Grohman).  The

Defendants explain:

> The fact that the Navajo Nation's internal politics are complicated, I think, only
> underscores that it would be very difficult to determine who should be deferred to
> here.  Is it individual council members?  Is it the Ganado Chapter that passed a
> resolution asking Sage to leave?  It's -- you know, this is not the business of
> federal courts.  And this is what the Tenth Circuit is saying; that when you have
> internal disputes, the Canon of Deference simply has no role to play.

Tr. at 45:2-11 (Grohman).  With the final word on the matter, Sage Hospital asserted that, even if

the Court concludes that the Indian canon of deference does not trump <u>Auer</u> deference, the HHS'

interpretation of § 900.32 in the <u>Pequot</u> decision is "plainly inconsistent with the plain language

of the regulations."  Tr. at 45:20-24 (Frye).

Third, addressing Sage Hospital's merger argument -- that the Court can essentially

combine the 2013 Renewal, the 2014 Renewal, the 2014 AFA, and the 2015 AFA -- the

Defendants state that the merger doctrine applies only when parties execute two contracts and

requires courts to read those two contracts together.  <u>See</u> Tr. at 50:8-10 (Grohman).  The

Defendants contend that the merger doctrine is irrelevant, because "[n]o contracts have been

executed," and "IHS's intent is not to enter into a contract."  Tr. at 50:11-13.  The Defendants

said that the issue is: "[I]f IHS and Sage are deemed to have a contract running from 2013 to

2016, should they also be deemed to have this contract for an overlapping term from 2014 to

2017?"  Tr. at 50:14-17 (Grohman).  The Defendants contend that Sage Hospital improperly

proposed the 2015 AFA when they were no longer under contract with the IHS.  <u>See</u> Tr. at

50:20-51:11 (Grohman).  Sage Hospital clarified that it was still under contract with the IHS

when they proposed the 2015 AFA, because it was "getting . . . monthly letters from the IHS that

are in the record saying, [w]e are going to extend your contract through this period."  Tr. at

51:21-52:6 (Frye).  At the end of the hearing, the Court said that it would try to issue an opinion

on the Motion by mid-September.  See Tr. at 67:13-16 (Court).

**5.     The Notice.**

Sage Hospital filed the Supplemental Authorities on Issue of Deference on August 10,

2015 (Doc. 93)("Notice").  In the Notice, Sage Hospital clarified a few issues from the hearing.

First, Sage Hospital addressed the Defendants' argument that the Court should defer to the HHS'

interpretation of ISDEA regulations set forth in their briefing.  See Notice at 2.

> Sage cites Investment Co. Inst. v. Camp, 401 U.S. 617 (1971), as supplemental
> authority on this issue.  The Supreme Court stated that "counsel for the
> Comptroller in the course of this litigation and specifically in his briefs and oral
> argument in this Court, has rationalized the basis of Regulation 9 with great
> professional competence.  But this is hardly tantamount to an administrative
> interpretation of §§ 16 and 21 [of the Glass-Steagall Act, 48 Stat. 162]. . . .
> Congress has delegated to the administrative official and not to appellate counsel
> the responsibility for elaborating and enforcing statutory commands." Id. at 627-
> 28; accord, e.g., Pitzak v. Office of Personnel Management, 710 F.2d 1476, 1479
> n.2 (10th Cir. 1983)(argument made in a brief by counsel for agency is not an
> official interpretation by the agency and not entitled to deference as such); Church
> of Scientology of Calif. v. I.R.S., 792 F.2d 153, 162 n.4 (D.C. Cir. 1986)(en banc)
> ("There is some question, to begin with, whether an interpretive theory put forth
> only by agency counsel in litigation, which explains agency action that could be
> explained on different theories, constitutes an 'agency position' for purposes of
> Chevron. . . .  Whatever position counsel was taking, one thing is clear: it is
> impossible to find here the sort of clear and consistent agency view (even as
> purportedly expressed by counsel) that must be given deference.")(Scalia, J.);
> Doc. 41-5 at 3 of 4 (DOI/IHS Internal Agency Procedures Handbook, providing,
> contrary to Defendants' gloss on the Pequot administrative decision, that the tribal
> organization's "performance under the existing contract shall have no effect on
> the contract renewal process except as stated in 25 C.F.R. § 900.33. . . .  Note in
> particular that renewal of term contracts with the IHS and the BIA where there are
> nomaterial and substantial changes proposed will not be reviewed under the
> declination criteria.")(emphases added).  Sage "proposed" no material and
> substantial changes in its contract renewal applications.

Notice at 2-3 (alterations in Notice but not in quoted sources)(emphases in Notice but not in

quoted source).

Second, Sage Hospital clarifies that, although the Defendants said at the hearing that, when Sage Hospital submitted the 2014 Renewal and 2015 AFA, "no contracts had been executed," two of Sage Hospital's exhibits suggest otherwise.   Notice at 3 (brackets omitted)(citing 2014 Renewal; Letter from Floyd Thompson, Executive Officer of the Navajo Area Indian Health Service to Ahmad Razaghi, Chief Executive Officer of Navajo Health Foundation -- Sage Memorial Hospital, Inc. (dated July 11, 2014) at 26, filed June 1, 2015 (Doc. 68-1)("July 11, 2014, Ltr.")).   Third, and finally, Sage Hospital notes that, although the Defendants stated at the hearing that they have funding Sage Hospital from "January to October" of 2015 pursuant to the <u>Sage</u> opinion, the Court issued that opinion on April 9, 2015, and the Defendants have provided prospective funding to Sage Hospital only from that date.   Notice at 3-4 (citations omitted)(internal quotation marks omitted).

## <u>LAW REGARDING SUMMARY JUDGMENT</u>

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"   <u>Herrera v. Santa Fe Pub. Sch.</u>, 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (Browning, J.)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991)).   <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).   "If the <u>moving</u> party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."   <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 331 (Brennan, J., dissenting)

(emphasis in original).[25]   Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained

---

[25]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

       To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party,

there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain

principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of

ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court

must "bear in mind the actual quantum and quality of proof necessary to support liability."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable

inferences and doubts in favor of the nonmoving party, and construe all evidence in the light

most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999);

Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot

decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's

version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In

Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was

appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.

550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most
> favorable to the nonmoving party only if there is a "genuine" dispute as to those
> facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving
> party has carried its burden under Rule 56(c), its opponent must do more than
> simply show that there is some metaphysical doubt as to the material facts . . . .
> Where the record taken as a whole could not lead a rational trier of fact to find for
> the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec.
> Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote

omitted).   "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .   When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."   York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted).  "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[26]] explained that the

_____

[26]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"     Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)

(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

that will serve as the foundation for answering the legal question before the court," before

inquiring into whether there are genuine issues of material fact for resolution by the jury.

584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th

Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING THE ISDEA

The ISDEA authorizes American Indian tribes and tribal organizations to contract with either the DOI or the HHS Secretary[27] to provide their members federally funded services that a federal agency would otherwise provide directly. See 25 U.S.C. 450a(f); S. Rep. No. 100-274, at 1 (1987), reprinted in 1988 U.S.C.C.A.N. at 2620 ("1987 Senate Report"); Seneca Nation of Indians v. HHS, 945 F. Supp. 2d at 143 ("[S]elf-determination contracts essentially allow Indian tribes to step into the shoes of certain United States government agencies in providing certain services to their members."). When Congress passed the ISDEA in 1975, it recognized that "the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities," and has "denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians." 25 U.S.C. § 450(a)(1). Congress thus enacted the ISDEA to "permit an orderly transition of federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." 25 U.S.C. § 450a(b).

An ISDEA contract proposal typically consists of two parts: (i) a multi-year agreement that satisfies 25 U.S.C. § 450*l*(c); and (ii) an AFA. See 25 U.S.C. § 450j(c). The AFA must contain: (i) "terms that identify the programs, services, functions, and activities to be performed

---

[27]The ISDEA defines "the Secretary" throughout 25 U.S.C. § 450, without specifying the specific department that the Secretary supervises. 25 U.S.C. § 450. In the ISDEA's "definition" provision, it defines "the Secretary" as "either the Secretary of Health and Human Services or the Secretary of the Interior or both." 25 U.S.C. § 450b(i). Accordingly, in this Law Regarding the ISDEA section, when the Court refers to "the Secretary" it means "either the DOI or the HHS Secretary." 25 U.S.C. § 450b(i).

or administered, the general budget category assigned, the funds to be provided, and the time and method of payment"; and (ii) "such other provisions, including a brief description of the programs, services, functions, and activities to be performed (including those supported by financial resources other than those provided by the Secretary), to which the parties agree."  25 U.S.C. § 250*l*(c).

### 1.   The Declination Process.

The ISDEA contracting process begins when a tribe or tribal organization submits a contract proposal to the Secretary. See 25 U.S.C. § 450a(2).  Unless the tribe or tribal organization agrees to an extension, the Secretary must approve or decline the proposal within ninety days.  See 25 U.S.C. § 450a(2)(A); 25 C.F.R. §§ 900.16, 900.17.  Otherwise, the proposal is deemed approved.  See 25 U.S.C. 450j-1(a); 25 C.F.R. § 900.18.

Should the Secretary decide to decline the proposal in part or in its entirety, he or she must do so based on one of these five reasons:

> **(A)**   the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;
>
> **(B)**   adequate protection of trust resources is not assured;
>
> **(C)**   the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;
>
> **(D)**   the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title; or
>
> **(E)**   the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities, . . . because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 450f(a)(2).  See 25 C.F.R. § 900.22 (setting forth the same declination criteria).

There are a number of limitations on the Secretary's authority to apply § 450f(a)(2)'s declination criteria.  The Secretary cannot decline a contract renewal proposal "where no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the Indian tribe or tribal organization."  25 C.F.R. § 900.33.  Similarly, the Secretary cannot decline a successor AFA proposal that is "substantially the same" as its predecessor.  25 C.F.R. § 900.32.  The Secretary also cannot decline any proposal based on any objections "that will be overcome through the contract."  25 C.F.R. § 900.33.  Moreover, if the Secretary can decline only a portion of a contract proposal, he or she must approve all other severable portions of the proposal.  See 25 C.F.R. § 900.25.

After the Secretary declines a proposal, he or she must: (i) state any objections in writing to the tribe or tribal organization; (ii) provide assistance to the tribe or tribal organization to overcome the stated objections; and (iii) provide the tribe or tribal organization with a hearing on the record with the right to engage in full discovery on any issue raised in the matter, and the opportunity to appeal the Secretary's objections.  See 25 U.S.C. § 450f(b).  The tribe or tribal organization may, in lieu of filing an appeal, initiate an action in federal district court.  See 25 U.S.C. §§ 450f(b)(3), 450m-1.  In any hearing, appeal, or action in federal court regarding a contract declination, the Secretary bears "the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)."  25 U.S.C. § 450f(e)(1).  Courts faced with ISDEA declination claims have thus required the Secretary to establish "by clear and convincing evidence" the validity of the grounds of his or her declination decision.  S. Ute Indian Tribe v. Leavitt, 497 F. Supp. 2d 1245, 1252 (D.N.M. 2007)(Johnson, J.).  See Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d at 1068.

2.      **The Reassumption Process**.

The Secretary also has the authority to reassume ISDEA contracts.  See 25 U.S.C.

§ 450m.  Reassumption means "rescission, in whole or in part, of a contract and assuming or

resuming control or operation of the contracted program . . . without consent of the Indian tribe

or tribal organization."  25 C.F.R. § 900.246.  A federal agency within the HHS or the DOI may

unilaterally reassume a contract on either an emergency or non-emergency basis.  See 25 C.F.R.

§ 900.246.  An emergency reassumption is permitted when a tribe or tribal organization fails to

fulfill the ISDEA contract's requirements, and that failure poses either: (i) an immediate threat of

imminent harm to any person's safety, or (ii) an imminent substantial and irreparable harm to

trust funds, trust lands, or interest in such lands.  See 25 C.F.R. § 900.247.  A non-emergency

reassumption is permitted when there has been either: (i) a violation of the rights, or

endangerment of the health, safety, or welfare of any person, or (ii) gross negligence or

mismanagement in the handling or use of contract funds, trust funds, trust lands, or interest in

trust lands under the contract.  See 25 C.F.R. § 900.247.

In an emergency reassumption, the Secretary must: (i) immediately rescind, in whole or

in part, the contract; (ii) assume control or operation of all or part of the program; and (iii) give

written notice of the rescission to the tribe or tribal organization, and to the community that the

contract serves.  See 25 C.F.R. § 900.252.  The written notice must include: (i) a detailed

statement of the findings that support the Secretary's decision; (ii) a statement explaining the

tribe or tribal organization's right to a hearing on the record within ten days of the reassumption,

or such later date as the tribe or tribal organization may approve; (iii) an explanation that the

tribe or tribal organization may be reimbursed for actual and reasonable "wind up costs" incurred

after the effective date of the reassumption; and (iv) a request for the return of property, if any. 25 C.F.R. § 900.253.

In a non-emergency reassumption, the Secretary must: (i) notify the tribe or tribal organization in writing of the deficiencies in contract performance; (ii) ask the tribe or tribal organization to take specific corrective action within a reasonable period of time, which cannot be less than forty-five days; and (iii) offer and provide, if requested, the necessary technical assistance and advice to help the tribe or tribal organization overcome the deficiencies.  See 25 C.F.R. § 900.248.  If the tribal organization fails to ameliorate the deficiencies, the Secretary shall provide a second written notice to the tribe or tribal organization that the Secretary will reassume the contract, in whole or in part.  See 25 C.F.R. § 900.249.  The second written notice shall include: (i) the intended effective date of the reassumption; (ii) the details and facts supporting the intended reassumption; and (iii) an explanation of the tribe or tribal organization's right to a formal hearing within thirty days of receiving the notice.  See 25 C.F.R. § 900.250. The Secretary cannot reassume the contract before the issuance of a final decision in any administrative hearing or appeal.  See 25 C.F.R. § 900.251.

### 3.    Relief Available Under the ISDEA.

The ISDEA provides a comprehensive range of remedies for a tribe or tribal organization whose contract the Secretary unlawfully terminates.  See 25 U.S.C. § 450m-1(a).  In any action brought under the ISDEA, the district court "may order appropriate relief," including

> money damages, injunctive relief against any action by an officer of the United
> States or any agency thereof contrary to this subchapter or regulations
> promulgated thereunder, or mandamus to compel an officer or employee of the
> United States, or any agency thereof, to perform a duty provided under this
> subchapter or regulations promulgated hereunder (including immediate injunctive
> relief to reverse a declination finding under section 450f(a)(2) of this title or to
> compel the Secretary to award and fund an approved self-determination contract).

25 U.S.C. § 450m-1(a).

Applying § 450m-1(a) to the DOI Secretary's contract declination decision in Crownpoint, Judge Parker said that "[t]he specific mandamus relief authorized by the ISDA relieves [the plaintiff] of proving the usual equitable elements including irreparable injury and absence of an adequate remedy at law." Crownpoint at 26 (citations omitted). Other federal district courts have similarly concluded that a tribe or tribal organization does not need to demonstrate the traditional grounds for equitable relief to obtain injunctive or mandamus relief under the ISDEA. See, e.g., Pyramid Lake Paiute Tribe v. Burwell, No. CIV 13-1771 CRC, 2014 WL 5013206, at *7 (D.D.C. Oct. 7, 2014)("Because the IDEAA specifically provides for both injunctive and mandamus relief to remedy violations of the Act, 25 U.S.C. § 450m-1(a), however, the Tribe need not demonstrate the traditional equitable grounds for obtaining the relief it seeks."); Red Lake Band of Chippewa Indians v. Dep't of the Interior, 624 F. Supp. 2d 1, 25 (D.D.C. 2009)(granting specific performance on an ISDEA contract without considering the ordinary grounds for such relief, because the statute provides for injunctive relief); Susanville Indian Rancheria v. Leavitt, No. CIV 07-259 GEB/DAD, 2008 WL 58951, at *10-11 (E.D. Cal. Jan. 3, 2008)(holding that a plaintiff seeking injunctive relief under the ISDEA need not satisfy the traditional equitable requirements); Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d at 1068 (ordering a writ of mandamus where the plaintiffs had not established the traditional equitable requirements, but had established that the DOI Secretary's contract declination decision violated the ISDEA).

### 4. The Rules for Interpreting Ambiguous ISDEA Provisions.

When faced with an ambiguous federal statute, federal courts typically defer to the administering agency's interpretation. See Chevron U.S.A. v. Natural Res. Def. Council, 467

U.S. 837, 842-45 (1984).  In cases involving American Indians, however, the Tenth Circuit has "taken a different approach to statutory interpretation," holding that the "normal rules of construction do not apply when Indian treaty rights, or even non-treaty matters involving Indians, are at issue."  Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1461 (10th Cir. 1997)(quoting EEOC v. Cherokee Nation, 871 F.2d 937, 939 (10th Cir. 1989))(internal quotation marks omitted).  Consequently, the Tenth Circuit has held that federal statutes "are to be construed liberally in favor of Native Americans, with ambiguous provisions interpreted to their benefit."  EEOC v. Cherokee Nation, 871 F.2d at 939 (citation omitted)(internal quotation marks omitted).

The ISDEA is designed to "circumscribe as tightly as possible the discretion of the Secretary."  Ramah Navajo Sch. Bd. v. Babbitt, 87 F.3d at 1344.  The ISDEA instructs that "[e]ach provision of [the ISDEA] and each provision of contracts entered into thereunder shall be liberally construed for the benefit of the tribes or tribal organizations . . . ."  25 C.F.R. § 900.3(a)(5).  The Tenth Circuit has confirmed that the canon of construction favoring American Indian tribes applies to ISDEA claims, noting that "it would be entirely inconsistent with the purpose of the [ISDEA], as well as with the federal policy of Native American self-determination in general, to allow the canon favoring Native Americans to be trumped in this case."  Ramah Navajo Chapter v. Lujan, 112 F.3d at 1462.  The Tenth Circuit has explained that this canon of construction "controls over more general rules of deference to an agency's interpretation of an ambiguous statute."  S. Ute Indian Tribe v. Sebelius, 657 F.3d at 1078.  Consequently, in the Tenth Circuit, federal courts must not afford Chevron deference to the HHS' or the DOI's interpretation of the ISDEA's ambiguous provisions.

Only a few federal district courts have addressed whether the "arbitrary and capricious standard" of the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA"), applies to ISDEA claims.  The majority of district courts have concluded that ISDEA's text, its legislative history, and the general presumption favoring Indian tribes dictates a de novo review of ISDEA claims.  See, e.g., Pyramid Lake Paiute Tribe v. Burwell, 70 F. Supp. 3d at 542; Seneca Nation of Indians v. Dep't of Health and Human Servs., 945 F. Supp. 2d at 141-42 & n.5; Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d at 1066-67; Cherokee Nation of Okla. v. United States, 190 F. Supp. 2d 1248, 1258 (E.D. Okla. 2001), rev'd on other grounds by, 543 U.S. 631 (2005); Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala, 988 F. Supp. at 1318.  A minority of district court cases -- three of which are unpublished -- used the APA's arbitrary-and-capricious standard to review ISDEA claims.  See, e.g., Citizen Potawatomi Nation v. Salazar, 624 F. Supp. 2d 103, 108 (D.D.C. 2009); Suquamish Tribe v. Deer, No. CIV 96-5468 (W.D. Wash. Sept. 2, 1997); Cal. Rural Indian Health Bd., Inc. v. Shalala, No. CIV 96-3526 (N.D. Cal. Apr. 24, 1997); Yukon-Kuskokwim Health Corp. v. Shalala, No. CIV 96-155 (D. Alaska April 15, 1997).  Those courts have reasoned that, because the ISDEA does not provide a standard of review, courts must use the APA's arbitrary-and-capricious standard.  See Citizen Potawatomi Nation v. Salazar, 624 F. Supp. 2d at 108 ("Both the Supreme Court and [the D.C. Circuit] Court of Appeals have declared that, where a statute does not provide a standard of review, as is true of the ISD[E]A, courts must look to the APA standard.").

## ANALYSIS

The Court will grant the Motion.  The conclusions of law in the Sage opinion do not bind the Court at the summary-judgment stage, and the Court is free to consider those issues anew.

The Court will, however, grant summary judgment in favor of Sage Hospital on Counts I, II, and III, and will determine Sage Hospital's damages on those counts at trial.

## I.   THE CONCLUSIONS OF LAW IN THE <u>SAGE</u> OPINION DO NOT BIND THE COURT AT THE SUMMARY-JUDGMENT STAGE.

Sage Hospital asserts that the law-of-the-case doctrine dictates that the Court's conclusions of law in the <u>Sage</u> opinion "continue to govern the same issues in subsequent stages in the same case."  Reply at 9 (citations omitted)(internal quotation marks omitted).  The Court disagrees.  The Supreme Court of the United States has explained that a preliminary injunction is intended to serve the limited purpose of preserving "the relative positions of the parties until a trial on the merits can be held."  <u>Univ. of Tex. v. Camenisch</u>, 451 U.S. at 395.

> Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.  A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

<u>Univ. of Tex. v. Camenisch</u>, 451 U.S. at 395.  If the Court's findings of fact and conclusions of law for a preliminary injunction are not binding at trial, the Court sees no reason why they would bind the Court at the summary-judgment stage.  <u>See</u> <u>aaiPharma, Inc. v. Thompson</u>, 296 F.3d 227, 234 (4th Cir. 2002)("[A] party addressing only issues of preliminary relief should not ordinarily be bound by its abbreviated and only partially informed presentation of the merits."); <u>Hamilton Watch Co. v. Benrus Watch Co.</u>, 206 F.2d 738, 742 (2d Cir. 1953)("[A] preliminary injunction . . . is, by its very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by its for-the-time-beingness."); 11A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2950, at 270-71 (3d ed. 2004)("Based, as they usually are, on incomplete evidence and a relatively hurried consideration

of the issues, [a court's] provisional decisions [in issuing a preliminary injunction] should not be used outside the context in which they originally were rendered."). That the Court gave inclinations in the <u>Sage</u> opinion on Sage Hospital's likelihood of success on the merits of its claims therefore has no bearing on the Court's resolution of those issues in this Memorandum Opinion and Order.

## II.   THE COURT WILL GRANT SUMMARY JUDGMENT FOR SAGE HOSPITAL ON COUNT I.

Section 900.32 prohibits the HHS Secretary from declining a successor AFA proposal that is "substantially the same" as its predecessor. 25 C.F.R. § 900.32. The text of the 2014 AFA is substantively identical to the text of the 2013 AFA. <u>Compare</u> 2014 AFA *passim*, <u>with</u> 2013 AFA *passim*. Section 900.32 affords no discretion to the HHS Secretary to decline or approve such a proposal. When faced with such a proposal, the Secretary's duty is clear: he or she "shall approve and add to the contract the full amount of funds to which the contractor is entitled, and may not decline, any portion of a successor annual funding agreement." 25 C.F.R. § 900.32. Because the 2014 AFA's contents are substantially the same as the 2013 AFA's contents, the Defendants improperly applied the ISDEA's Declination criteria to the 2014 AFA.

The Defendants do not challenge Sage Hospital's argument that the 2014 AFA's text is substantially the same as its predecessor's. Instead, they argue that the 2014 AFA is not substantially the same as the 2013 AFA, because an internal audit uncovered information about Sage Hospital's operations of which they were not previously aware. The Defendants rely only on <u>Pequot</u> -- an unpublished administrative decision -- to support their position.

The Court provided a detailed description of the <u>Pequot</u> decision in the <u>Sage</u> opinion:

> In that case, a tribal organization sought, as part of a proposed successor AFA with the HHS, authorization to sell pharmaceuticals to non-Indian employees of one of its casinos. <u>See</u> <u>Pequot</u>, 2006 WL 1337439, at *1. The AFA

for the previous year included the following language: "The Nation agrees to provide all medically necessary pharmacy services for the Mashantucket Pequot Tribe, beneficiaries of the Tribe's health benefit plans, other tribe[s] that have a government to government relationship and their health benefit plans." Pequot, 2006 WL 1337439, at *3 (citation omitted)(internal quotation marks omitted). The predecessor AFA also stated that the "Tribal Council has taken into account the health care and service needs of its membership, community and employees, and has determined that the provisions for such care and services will not result in a denial or diminution of health services to eligible Indians." Pequot, 2006 WL 1337439, at *3 (citation omitted)(internal quotation marks omitted). The tribal organization's proposed successor AFA's text was substantially similar to its predecessor's. See Pequot, 2006 WL 1337439, at *3.

After the tribal organization submitted the proposed successor AFA, the OIG issued a report from an audit of the tribal organization's healthcare services, which uncovered that the tribal organization "had extended eligibility for federally discounted drugs to its non-Indian employees without making the required determination that reasonable alternative drug services were not available to these employees." Pequot, 2006 WL 1337439, at *4. Donna E. Shalala, then-HHS Secretary -- who was apparently unaware that the tribal organization had been providing pharmaceutical services to non-Indians -- declined the proposed successor AFA on the ground that it included "activities that cannot lawfully be carried out by the contractor." Pequot, 2006 WL 1337439, at *1. The tribal organization appealed the decision to an Administrative Law Judge, who found that the declination was unlawful and reversed Shalala's decision. See Pequot, 2006 WL 1337439, at *1.

Thereafter, the DAB reversed the ALJ's decision and upheld the declination for four reasons. See Pequot, 2006 WL 1337439, at *4-17. First, the DAB concluded that Shalala could not lawfully contract with the tribal organization to provide healthcare services to non-Indians under the ISDEA. See Pequot, 2006 WL 1337439, at *4-7. Second, the DAB determined that the tribal organization failed to comply with the Indian Health Care Improvement Act, 25 U.S.C. § 1680c(b)("IHCIA"), which required the organization to determine that there were no reasonable alternative services available to meet the non-Indians pharmaceutical needs. See Pequot, 2006 WL 1337439, at *8-11. Third, the DAB held that no reasonable person could have concluded that alternative services were unavailable to meet the non-Indians pharmaceutical needs. See Pequot, 2006 WL 1337439, at *11-15. Thus, even if the tribal organization had conducted the requisite alternative-services analysis and determined that no alternative services existed, such a conclusion would have been unreasonable. See Pequot, 2006 WL 1337439, at *11-15. Fourth, and finally, the DAB determined that § 900.32 could not supply an independent basis for requiring Shalala to approve that portion of the proposed AFA, because that regulation is limited to programs that the HHS had previously funded. See Pequot, 2006 WL 1337439, at *15-17. In other words, the DAB concluded that, because the HHS had never funded the

pharmaceutical program for non-Indians, § 900.32 did not apply.  See Pequot, 2006 WL 1337439, at *15-17.

> At the end of the decision, the DAB noted:
>
> > [T]he successor AFA here was not "substantially the same" as the prior year AFA.  As discussed earlier [the IHCIA] requires that a tribe's governing body make a contemporaneous decision that no reasonable alternative services are available.  Thus, each proposal can be viewed as substantively different from the prior proposal since each is necessarily based on a different decision.  Moreover, the OIG report raised legal issues concerning the proposal which might not have been apparent to IHS when it approved the FY 1999 AFA.
>
> Pequot, 2006 WL 1337439, at *17.

Sage, 2015 WL 1906107, at *46-48 (citations omitted).  The Court explained that the final sentence of the block-quoted paragraph from the Pequot opinion -- "which states that 'the OIG report raised legal issues concerning the proposal which might not have been apparent to IHS when it approved the FY 1999 AFA' -- is the only line in the decision that can be construed as supporting the Defendants' argument."  Sage, 2015 WL 1906107, at *48 (quoting Pequot, 2006 WL 1337439, at *17).  The Court said that, arguably, that line "suggests that the [HHS Secretary] may consider information beyond the proposed AFA's text -- like the Moss Adams Report and the NAIHS Report's findings -- in determining whether the [AFA] proposal is 'substantially the same' as its predecessor."  Sage, 2015 WL 1906107, at *48 (quoting 25 C.F.R. § 900.32).

To the extent that § 900.32 is ambiguous, the Court will not afford Auer deference to Burwell's interpretation of § 900.32 in the Pequot decision, because the Indian canon of deference trumps Auer deference in this case.  Even if the Court afforded Burwell's interpretation of § 900.32 Auer deference, that deference would not dictate a different outcome, because Burwell's interpretation is "plainly erroneous or inconsistent with the regulation."  Auer,

519 U.S. at 461.  The Court will therefore award summary judgment in favor of Sage Hospital on

Count I.

### A.    THE INDIAN CANON OF DEFERENCE TRUMPS <u>AUER</u> DEFERENCE.

When an agency interprets its own regulations -- to, for example, adjudicate whether a

regulated party was in compliance with them -- courts typically afford its interpretation <u>Auer</u>

deference.  Under <u>Auer</u> deference, the Court accepts the agency's interpretation of its ambiguous

regulation unless the regulation is "plainly erroneous or inconsistent with the regulation."  <u>Auer</u>,

519 U.S. at 461. [28]  In cases involving Native Americans, however, the Tenth Circuit has "taken

------

[28]A number of the current Justices on the Supreme Court have challenged <u>Auer</u>'s logical underpinnings as being on much shakier grounds than those of <u>Chevron</u> deference.  Justice Scalia, after years of applying the doctrine followed by years of gradually beginning to question its soundness, finally denounced <u>Auer</u> deference in his dissent in <u>Decker v. Northwest Environmental Defense Center</u>, 133 S. Ct. 1326 (2013).  The Court cannot describe the reasons for Justice Scalia's abandonment of the doctrine better than the Justice did:

> For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations."  <u>Talk America, Inc. v. Michigan Bell Telephone Co.</u>, 131 S. Ct. 2254, 2265 (2011)(Scalia, J., concurring).  This is generally called <u>Seminole Rock</u> or <u>Auer</u> deference.

> The canonical formulation of <u>Auer</u> deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation."  But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation.  Obviously, that is not enough, or there would be nothing for <u>Auer</u> to do.  In practice, <u>Auer</u> deference is <u>Chevron</u> deference applied to regulations rather than statutes.  The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.

> Our cases have not put forward a persuasive justification for <u>Auer</u> deference.  The first case to apply it, <u>Seminole Rock</u>, offered no justification whatever -- just the *ipse dixit* that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."  Our later cases provide two principal explanations, neither of which has much to be said for it.  First, some cases say that the agency, as the drafter of

the rule, will have some special insight into its intent when enacting it.  The implied premise of this argument -- that what we are looking for is the agency's intent in adopting the rule -- is false.  There is true of regulations what is true of statutes.  As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means."  Whether governing rules are made by the national legislature or an administrative agency, we are bound by what they say, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'"  That is true enough, and it leads to the conclusion that agencies and not courts should make regulations.  But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective.  Making regulatory programs effective is the purpose of rulemaking, in which the agency uses its "special expertise" to formulate the best rule.  But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is."  Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience.  Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation will be given effect if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors.  If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for <u>Auer</u> deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that Congress enacted, as we do per <u>Chevron</u>, it is a fortiori reasonable to defer to them regarding the meaning of regulations that they themselves crafted.  To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all.  The theory of <u>Chevron</u> (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute.  While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations.  For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands.  "When the legislative and

executive powers are united in the same person . . . there can be no liberty;
because apprehensions may arise, lest the same monarch or senate should enact
tyrannical laws, to execute them in a tyrannical manner."  Montesquieu, Spirit of
the Laws bk. XI, at 151-152 (O. Piest ed., T. Nugent transl. 1949).  Congress
cannot enlarge its own power through Chevron -- whatever it leaves vague in the
statute will be worked out by someone else.  Chevron represents a presumption
about who, as between the Executive and the Judiciary, that someone else will be.
(The Executive, by the way -- the competing political branch -- is the less
congenial repository of the power as far as Congress is concerned.)    So
Congress's incentive is to speak as clearly as possible on the matters it regards as
important.

But when an agency interprets its own rules -- that is something else.
Then the power to prescribe is augmented by the power to interpret; and the
incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will
enable "clarification" with retroactive effect.  "It is perfectly understandable" for
an agency to "issue vague regulations" if doing so will "maximiz[e] agency
power."  Combining the power to prescribe with the power to interpret is not a
new evil: Blackstone condemned the practice of resolving doubts about "the
construction of the Roman laws" by "stat[ing] the case to the emperor in writing,
and tak[ing] his opinion upon it."  1 Wm. Blackstone, Commentaries on the Laws
of England 58 (1765).  And our Constitution did not mirror the British practice of
using the House of Lords as a court of last resort, due in part to the fear that he
who has "agency in passing bad laws" might operate in the "same spirit" in their
interpretation.  The Federalist No. 81, at 543-544 (Alexander Hamilton)(J. Cooke
ed. 1961).    Auer deference encourages agencies to be "vague in framing
regulations, with the plan of issuing 'interpretations' to create the intended new
law without observance of notice and comment procedures."  Auer is not a logical
corollary to Chevron but a dangerous permission slip for the arrogation of power.

It is true enough that Auer deference has the same beneficial pragmatic
effect as Chevron deference: The country need not endure the uncertainty
produced by divergent views of numerous district courts and courts of appeals as
to what is the fairest reading of the regulation, until a definitive answer is finally
provided, years later, by this Court.  The agency's view can be relied upon, unless
it is, so to speak, beyond the pale.  But the duration of the uncertainty produced
by a vague regulation need not be as long as the uncertainty produced by a vague
statute.  For as soon as an interpretation uncongenial to the agency is pronounced
by a district court, the agency can begin the process of amending the regulation to
make its meaning entirely clear.  The circumstances of this case demonstrate the
point.    While these cases were being briefed before us, EPA issued a rule
designed to respond to the Court of Appeals judgment we are reviewing.  It did so
(by the standards of such things) relatively quickly: The decision below was
handed down in May 2011, and in December 2012 the EPA published an
amended rule setting forth in unmistakable terms the position it argues here.  And

a different approach to statutory interpretation, holding that normal rules of construction do not

apply when Indian treaty rights, or even non-treaty matters involving Indians, are at issue."

Ramah Navajo Chapter v. Lujan, 112 F.3d at 1461 (internal quotation marks omitted).  Although

the Tenth Circuit has not decided whether Indian deference trumps Auer deference, it has said

that Indian deference trumps Chevron deference -- at least when it comes to interpreting the

ISDEA's ambiguous provisions.  See Ramah Navajo Chapter v. Lujan, 112 F.3d at 1462 ("[T]he

canon of construction favoring Native Americans controls over the more general rule of

deference to agency interpretations of ambiguous statutes."); id. ("If the [ISDEA] can reasonably

be construed as the Tribe would have it construed, it must be construed that way.").  Relying on

the ISDEA's legislative history, the Tenth Circuit determined that its purpose was "to assure

maximum participation by Indian tribes in the planning and administration of federal services,

programs and activities for Indian communities."  112 F.3d at 1461 (citations omitted)(internal

quotation marks omitted).  The Tenth Circuit concluded that "it would be entirely inconsistent

---

there is another respect in which a lack of Chevron-type deference has less severe pragmatic consequences for rules than for statutes.  In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute.  That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from Auer deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. at (Scalia, J., dissenting).  Justice Scalia's attack on Auer was in a dissent, but two other Justices, the Honorable John G. Roberts and Samuel A. Alito, joined in a concurring opinion stating that "[i]t may be appropriate to reconsider [Auer deference] in an appropriate case.  But this is not that case."  133 S. Ct. at 1338 (Roberts, C.J., concurring).  Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.  Accordingly, were this case brought under another statute rather than the ISDEA, the Court would have to accord Auer deference to the HHS Secretary's interpretation of § 900.32.

with the purpose of the [ISDEA], as well as with the federal policy of Native American self-determination in general, to allow the canon favoring Native Americans to be trumped [by Chevron deference] in this case."  112 F.3d at 1462.  Given that Auer deference "is applied in the same manner as Chevron deference and is substantively identical," Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Servs., No. CIV 12-0069 JB/JKM, 2015 WL 711044, at *31 (D.N.M. Feb. 9, 2015)(Browning, J.), the Tenth Circuit's holding in Ramah Navajo Chapter v. Lujan suggests that Indian deference trumps Auer deference in this case.

        The Defendants ask the Court to depart from this closely analogous authority and to instead rely on a series of cases which hold that Indian deference "is inapplicable when the competing interests at stake both involve Native Americans."  Response at 8 (quoting Cherokee Nation of Okla. v. Norton, 241 F. Supp. 2d at 1380)(citing United States v. Jicarilla Apache Nation, 131 S. Ct. at 2328; N. Cheyenne Tribe v. Hollowbreast, 425 U.S. at 655 n.7; Chugach Alaska Corp. v. Lujan, 915 F.2d at 457 n.4)(internal quotation marks omitted).  There is no evidence, however, that there are American Indian interests on both sides of this case.  First, unlike in Northern Cheyenne Tribe v. Hollowbreast, Utah v. Babbitt, and Cherokee Nation of Oklahoma v. Norton, neither the Navajo Nation nor any individual Navajos have intervened as a defendant in this case.  See Northern Cheyenne Tribe v. Hollowbreast, 425 U.S. at 666 n.7 ("[T]he contesting parties [we]re an Indian tribe and a class of individuals consisting primarily of tribal members."); Utah v. Babbitt, 53 F.3d at 1147 (listing the Board of Trustees of the Utah Navajo Trust Fund, among others, as Plaintiffs-Appellees; the DOI, among others, as Defendants-Appellants; and the Navajo Nation as an Intervenor-Appellant); Cherokee Nation of Okla. v. Norton, 241 F. Supp. 2d at 1375 (listing the Cherokee Nation of Oklahoma as the plaintiff and the Delaware Tribe of Indians, among others, as a defendant).  Second, unlike in

- 62 -

Chugach Alaska Corp. v. Lujan, there is no evidence that this case involves a finite amount of land or money, or that awarding Sage Hospital ISDEA funds would automatically lead to a decrease in ISDEA funding for other tribes or tribal organizations.  See Chugach Alaska Corp. v. Lujan, 915 F.2d at 457 n.4 ("Only a limited amount of land will be given away; giving land to the Grouse Creek group diminishes the land available for other Native groups.  Thus, the issue is not whether Native Americans will receive land, but which Native Americans will receive it." (emphases omitted)(citation omitted)).[29]  Even assuming that Congress appropriates a set amount for ISDEA claims, and that awarding Sage Hospital ISDEA funding would lead to a smaller pot of money for other tribes and tribal organizations, that factor is presumably present in every ISDEA case.  If that factor alone were enough to establish competing Indian interests, it would render the ISDEA's instruction to defer to tribal organizations meaningless.

Third, the Defendants have presented no evidence that the American Indian interests which gave rise to their investigation of Sage Hospital are ongoing.  The Defendants say that two pieces of evidence demonstrate that they are representing American Indian interests: (i) a resolution that the Ganado Chapter of the Navajo Nation passed at an October 8, 2013, meeting, which asked Sage Hospital to terminate its then-CEO, Ahmad Razaghi, on the basis of allegations that he and his staff were misusing ISDEA funds; and (ii) a letter that Jonathan Hale -- the Chairman of the Health, Education, Education and Human Services Committee of the Navajo Nation Council -- wrote to then-HHS Secretary Kathleen Sebelius, which asked the

---

[29]The Defendants also quote a single line from United States v. Jicarilla Apache Nation in support of their argument.  See Response at 8 (quoting United States v. Jicarilla Apache Nation, 131 S. Ct. at 2318 ("The Government may also face conflicting obligations to different tribes or individual Indians.")).  Although the Defendants' quotation is accurate, the case from which it is taken says nothing about Chevron, Auer, or Indian deference, and says nothing about interpreting ambiguous statutes or regulations.  Accordingly, the Defendants' cherry-picked quotation from United States v. Jicarilla Apache Nation does not lead to a different result in this case.

Defendants to investigate allegations that Sage Hospital was misusing ISDEA funds.   See

Response at 8 (citing Letter from Jonathan Hale, Chairman of the Health, Education and Human

Services Committee of the Navajo Nation Council,  to Kathleen Sebelius, Secretary of the U.S.

Department of Health and Human Services at 11 (Oct. 16, 2013), filed February 5, 2015 (Doc.

36-1)("Oct. 16, 2013, Ltr."); Arlyssa Becanti, Ganado Officials Want Razaghi Out, The Gallup

Independent (Oct. 9, 2013), filed December 22, 2014 (Doc. 17-1)("Becanti Article")).   As an

initial matter, Razaghi is no longer Sage Hospital's CEO; Christi El-Meligi replaced him at some

point after the declination decisions.   See El-Meligi 2d Decl. ¶ 2, at 1.   Moreover, based on the

evidence in the record, it appears that neither the resolution nor the Oct. 16, 2013, Ltr. asked for

the Defendants to decline Sage Hospital's ISDEA contract proposals.   The Defendants have

likewise presented no evidence -- declarations, affidavits, or depositions from current or former

Navajo Nation delegates -- that the concerns expressed almost two years ago in the resolution

and in the Oct. 16, 2013, Ltr. are ongoing.   Indeed, the only evidence in the record suggests the

opposite: Sage Hospital has presented the declarations of four current and one former Navajo

Nation Council delegates which state that the Defendants' decision not to renew Sage Hospital's

ISDEA contracts "is decidedly not in the best interest of the Navajo nation or the Navajo people

who rely on Sage Hospital for their health care."   Shepherd Decl. ¶ 7, at 21.   See Begay Decl.

¶ 6, at 23-24 ("IHS' decision not to renew Sage's Self-Determination Act contract and not to

work with Sage Hospital to address IHS' perceived problems at that hospital is decidedly not in

the best interest of the Navajo nation or my constituents who rely on Sage Hospital for their

healthcare."); Butler Decl. ¶ 7, at 30 ("IHS' decision not to renew Sage's Self-Determination Act

contract and not to work with Sage Hospital to address IHS' perceived problems at that hospital

is decidedly not in the best interest of the Navajo nation or the Navajo people."); Jack Decl. ¶ 6,

at 25-26 (including a similar statement); Smith Decl. ¶ 6, at 27-28 (including a similar statement).  None of these declarations note that the Navajo Nation has lingering concerns about Sage Hospital.  Any potential negative ramifications for other tribes or tribal organizations from this case are thus speculative, and the Court cannot conclude that "the competing interests at stake [in this case] both involve Native Americans."  Response at 8 (internal quotation marks omitted).

In essence, the Defendants ask the Court to hold that any dispute over ISDEA funding which involves a tribe or tribal organization that Indians have criticized at any point in time for misusing ISDEA funds pits Indian against Indian.  If that were correct, the Indian canon of deference would be largely nullified in declination disputes with the IHS, contrary to Congress' intent and Tenth Circuit law.  See 25 C.F.R. § 900.3(a)(5) ("Congress has further declared that each provision of the [ISDEA] and each provision of contracts entered into thereunder shall be liberally construed for the benefit of the tribes or tribal organizations . . . ."); 25 C.F.R. § 900.3(b)(11) ("The Secretary's commitment to Indian self-determination requires that [ISDEA] regulations be liberally construed for the benefit of Indian tribes and tribal organizations . . . ."); Ramah Navajo Chapter v. Lujan, 112 F.3d at 1462 ("If the [ISDEA] can reasonably be construed as the Tribe would have it construed, it must be construed that way.").   In theory, the IHS could point to some American Indian interest implicated in every case to argue that Indian deference does not apply.  As the Court detailed in the Sage opinion, the ISDEA's legislative history is replete with references to agency malfeasance in the ISDEA contracting process.  See Sage, 2015 WL 1906107, at *50-52.  Congress has amended the ISDEA multiple times to counteract the DOI's and the HHS' institutional inclination to unlawfully withhold ISDEA funding from tribes and tribal organizations.  See Sage, 2015 WL 1906107, at *51 ("[N]early every significant

amendment that Congress has made to the ISDEA since its inception reflects a desire to curtail the DOI and HHS Secretaries' authority to administer ISDEA contracts, and to expand tribes and tribal organizations' authority to administer those contracts themselves."). Given this history, the Court is reluctant to simply take the Defendants at their word that they are protecting Navajo interests in this case.

A better approach is one that requires the United States to present some evidence that there are American Indian interests on both sides of a case for the Indian canon of deference to not apply. For example, American Indian tribes, organizations, or individuals can intervene as defendants, or they can present depositions, declarations, or affidavits explaining that they seek or oppose the requested relief. Without something more, however, the Defendants' lip service to Indian interests is insufficient for the Court to go far afield and apply a line of distinguishable precedent when Ramah Navajo Chapter v. Lujan is so closely analogous. To the extent that the phrase "substantially the same" in § 900.32 is ambiguous, the Indian canon of deference dictates that the Court interpret it in favor of Sage Hospital. The Court thus concludes that § 900.32 does not allow the HHS Secretary to consider information beyond a contract renewal proposal's four corners in determining whether it is "substantially the same" as its predecessor. 25 C.F.R. § 900.32. Accordingly, the Defendants unlawfully applied the Declination criteria to the 2014 AFA.[30]

---

[30]The Supreme Court has also said that Auer deference is "unwarranted when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question." Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2166 (2012)(citation omitted)(internal quotation marks omitted). The Secretary's interpretation of § 900.32 was set forth at the end of an administrative hearing decision:

[T]he successor AFA here was not "substantially the same" as the prior year AFA. As discussed earlier [the IHCIA] requires that a tribe's governing body make a contemporaneous decision that no reasonable alternative services are

**B.     EVEN IF THE COURT APPLIED <u>AUER</u> DEFERENCE, BURWELL'S INTERPRETATION OF § 900.32 IS PLAINLY ERRONEOUS OR INCONSISTENT WITH THE ISDEA.**

<u>Pequot</u>'s expansive interpretation of § 900.32 is plainly erroneous or inconsistent with the

ISDEA.  Section 900.32 states:

> **Can the Secretary decline an Indian tribe or tribal organization's proposed successor annual funding agreement?**
>
> No.  If it is substantially the same as the prior annual funding agreement . . . and the contract is with DHHS or the BIA, the Secretary shall approve and add to the contract the full amount of funds to which the contractor is entitled, and may not decline, any portion of a successor annual funding agreement. Any portion of an annual funding agreement proposal which is not substantially the same as that which was funded previously (<u>e.g.</u>, a redesign proposal; waiver proposal; different proposed funding amount; or different program, service, function, or activity), or any annual funding agreement proposal which pertains to a contract with an agency of DOI other than the BIA, is subject to the declination criteria and procedures in [§450f(a)(2)].

25 C.F.R. § 900.32 (bold in original).  Section 900.32 makes clear that whether the HHS

Secretary may apply the Declination criteria to a proposed successor AFA turns on the

proposal's contents, rather than on a holistic assessment of the tribe or tribal organization's

performance of the existing AFA that incorporates information from outside sources.  Section

900.6 underscores this interpretation by defining an AFA narrowly as "<u>a document</u> that

represents the negotiated agreement of the Secretary to fund, on an annual basis, the programs,

---

available.  Thus, each proposal can be viewed as substantively different from the prior proposal since each is necessarily based on a different decision.  <u>Moreover, the OIG report raised legal issues concerning the proposal which might not have been apparent to IHS when it approved the FY 1999 AFA.</u>

<u>Pequot</u>, 2006 WL 1337439, at \*17 (emphasis added).  Given that the purported interpretation of § 900.32 is set forth in a single sentence which cites no authority and does not expressly state that the HHS can look beyond a successor AFA's four corners in determining whether it is substantially the same as its predecessor, the Court is reluctant to conclude that it "reflect[s] the [HHS'] fair and considered judgment on the matter in question."  <u>Christopher v. SmithKline Beecham Corp.</u>, 132 S. Ct. at 2166.

services, activities and functions transferred to an Indian tribe or tribal organization under the

Act."  25 C.F.R. § 900.6 (emphasis added).  See 25 C.F.R. § 900.12 (detailing the requirements

for a proposed successor AFA, and stating that "[t]he proposal shall provide funding information

in the same detail and format as the original proposal and may also identify any significant

proposed changes" (emphasis added)).  In other words, the HHS Secretary's authority to apply

the Declination criteria is limited to situations in which the "document," 25 C.F.R. § 900.6 -- i.e.,

the proposed successor AFA -- is not "substantially the same" as its predecessor, 25 C.F.R.

§ 900.30.  Burwell's interpretation of § 900.32 is thus plainly erroneous and inconsistent with the

regulation.

        Second, the ISDEA already provides a remedy for the HHS Secretary in these situations.

Where the Secretary can establish that the tribe or tribal organization is violating its patients'

rights, endangering its patients' health or safety, or committing gross negligence or

mismanagement in handling ISDEA funds -- i.e., exactly what the Defendants allege that Sage

Hospital is doing -- it can cancel the ISDEA contract.  The ISDEA authorizes the Secretary to

reassume unilaterally a contract on either an emergency or a non-emergency basis.  See 25

C.F.R. § 900.246.  An emergency reassumption is permitted when a tribe or tribal organization

fails to fulfill the ISDEA contract's requirements and that failure poses: (i) an immediate threat

of imminent harm to any person's safety; or (ii) an imminent substantial and irreparable harm to

trust funds, trust lands, or interest in such lands.  See 25 C.F.R. § 900.247.  A non-emergency

reassumption is permitted when there has been: (i) a violation of the rights, or endangerment of

the health, safety, or welfare, of any person; or (ii) gross negligence or mismanagement in the

handling or use of contract funds, trust funds, trust lands, or interest in trust lands under the

contract.  See 25 C.F.R. § 900.247.[31]   That the ISDEA provides a specific procedure for rescinding a contract where a tribe or tribal organization commits the malfeasance that the Defendants have accused Sage Hospital of committing underscores that HHS' interpretation of § 900.32 is plainly inconsistent with the ISDEA.  The Court will therefore not adopt that interpretation.[32]

---

[31]The Defendants have also argued that the Court's interpretation of § 900.32 would prevent them from applying the Declination criteria's "enforcement mechanism for violations of the financial-management, procurement-management, and property-management requirements set forth at 25 C.F.R. §§ 900.33-60."  Response at 9 n.2.  The Court disagrees.  The Court's interpretation of § 900.32 would prevent the application of the Declination criteria only where the proposed successor AFA's contents are substantially the same as its predecessor's; the Defendants are free to apply that "enforcement mechanism" whenever a tribe or tribal organization has proposed a material change in funding or PFSAs.  That the contract rescission process allows the Defendants to cancel an ISDEA contract in more extreme situations -- even when the contract proposal is "substantially the same" as its predecessor -- suggests that the Declination criteria is limited to situations when the proposal's contents are not substantially the same as its predecessor's.  Otherwise, there would be no reason for the ISDEA's Reassumption and Rescission process, because the ISDEA's Declination criteria sets forth a lower threshold for declining a contract.

Defendants assert the Court's interpretation of § 900.32 would "lead to absurd results in other contexts as well."  Response at 10 n.2.  The Defendants state:

> For example, suppose IHS awarded a contract to a tribal organization to operate a hospital, and IHS learns that the tribal program is not operating three of the four programs for which it had been funded.  Under Sage's reasoning, the IHS would be precluded from issuing a partial declination as long as, in the subsequent year, the tribal organization submitted a renewal proposal that was substantially the same on its face.

Response at 10 n.2.  The Defendants' concern is unfounded, because such a situation would likely implicate the ISDEA's non-emergency reassumption provision -- which allows the Defendants to cancel the ISDEA contract if the tribe or tribal organization commits gross negligence or mismanagement in the handling or use of contract funds, trust funds, trust lands, or interest in trust lands under the contract.  See 25 C.F.R. § 900.47.  That the ISDEA sets forth a separate procedure for canceling contracts in such circumstances underscores that whether a proposed AFA is "substantially the same" as its predecessor under § 900.32 turns on the proposal's contents rather than a holistic assessment of the tribal organization's performance of the ISDEA contract.

[32]The Supreme Court has instructed that, when Auer deference is unwarranted, Court's should instead apply Skidmore v. Swift & Co., 323 U.S. 134 (1944)("Skidmore"), deference.

## C.     THE DEFENDANTS UNLAWFULLY DECLINED THE 2013 RENEWAL.

Section 900.33 prohibited the Defendants from declining the 2013 Renewal, because the 2013 Renewal did not contain a "material and substantial change to the scope or funding" of Sage Hospital's PFSAs.  25 C.F.R. § 900.33.  Section 900.33 says that proposals for term contract renewals are not subject to § 450f(a)(2)'s declination criteria "where no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the Indian tribe or tribal organization."  25 C.F.R. § 900.33.  The 2013 Renewal proposed the following amendments to the 2010 Contract -- the added sections are underlined and the deleted sections are crossed out:

Article I, Section 2(B):

> **(B) In General.**  Each provision of the ISDA and each provision of this Contract shall be liberally construed for the benefit of Sage to transfer <u>the funding and</u> certain programs, functions, services, and activities (hereinafter "PFSAs"), or portions thereof, and associated resources, that are otherwise contractible under section 102(a) of the ISDA (25 U.S.C. § 450f(a)), including all related administrative functions, from the Secretary to Sage.

---

See Christopher v. SmithKline Beecham Corp., 132 S. Ct. at 2169.  Under Skidmore deference, the Court must give Burwell's interpretation a measure of deference proportional to the "'thoroughly evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'"  United States v. Mead Corp., 533 U.S. 218, 228 (2001)(quoting Skidmore, 323 U.S. at 140).  The concerns which led the Court to conclude that Burwell's interpretation of § 900.32 is plainly erroneous and inconsistent with the regulation apply with equal force under Skidmore deference.  Moreover, the interpretation does not appear to be thoroughly considered.  It was set forth in one sentence -- which does not cite any authority -- in a fourth alternative holding in an administrative hearing decision.  The decision itself also does not explicitly say that the IHS can consider information beyond a proposal's four corners in determining whether it is "substantially the same" as its predecessor, 25 C.F.R. § 900.32.  Instead, it merely implies that interpretation by suggesting that the OIG report made the proposal not substantially the same.  Although the HHS Secretary has advanced her interpretation in the legal briefs in this case, she has not offered any arguments suggesting that the interpretation of § 900.32 in the Pequot decision was thoroughly considered.  There are also no other factors which "give [that interpretation] the power to persuade."  United States v. Mead Corp., 533 U.S. at 228 (internal quotation marks omitted)(citation omitted).

Article II, Section 1:

> **SECTION 1 - TERM.** Pursuant to section 105(c)(1) of the ISDA (25 U.S.C. § 450j(c)(1)), the original term of this Contract shall be 3 years, from October 1, 2010 through September 30, 2013. <u>Pursuant to 25 U.S.C. §§ 450f(a)(2) and 450j(c)(1), 25 C.F.R. §§ 900.12 and 900.8(h), the Navajo Nation Council's Resolution CJN-35-05 passed on June 3, 2005 ("Resolution") attached as Attachment 1 to the Contract, and Article V, Section 2(A) of the Contract, the Contract is amended as stated in this Renewal and Amendment and renewed for a three-year term from October 1, 2013 through September 30, 2016.</u>

Article II, Section 7(D):

> **(D)  Confidentiality Standards.**  Sage will maintain confidentiality in accordance with applicable Federal, Arizona, ~~Navajo Nation~~ and <u>Navajo Nation</u> statutes and regulations, including without limitation the Health Insurance Portability and Accountability Act of 1996.

2013 Renewal at 5-6.

The 2013 Renewal proposes only minor amendments to update the 2013 Renewal for a new three-year term and to fix a few typographical errors.  The 2013 Renewal offers no modifications to the provisions of the 2010 Contract that speak to the scope and funding of Sage Hospital's PFSAs.  <u>Compare</u> 2013 Renewal at 5-6, <u>with</u> 2010 Contract *passim*.  Because the 2013 Renewal did not propose a substantial and material change to Sage Hospital's PFSAs in the 2010 Contract, § 900.33 precluded the Defendants from applying § 450f(a)(2)'s declination criteria to it.  Accordingly, the Defendants violated § 900.33 when it declined the 2013 Renewal.

To the extent that the Defendants argue that <u>Pequot</u>'s interpretation of the phrase "substantially the same" in § 900.32 applies with equal force to § 900.33, the Court rejects Burwell's interpretation of § 900.33 for the same reasons that it rejected her interpretation of § 900.32.  First, if there is any ambiguity in § 900.33's language, Indian deference trumps <u>Auer</u>

deference and the Court must read the ambiguity in favor of Sage Hospital.  Second, even if Auer deference trumps Indian deference, Burwell's interpretation of § 900.33 is plainly erroneous and inconsistent with the regulation.

Section 900.33 reads:

> **Are all proposals to renew term contracts subject to the declination criteria?**
>
> Department of Health and Human Services and the Bureau of Indian Affairs will not review the renewal of a term contract for declination issues where no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the Indian tribe or tribal organization.

25 C.F.R. § 900.33 (bold in original).  By using the words "has been proposed by," § 900.33 indicates that the Defendants' authority to decline a contract renewal proposal turns on the proposal's contents rather than on information that an outside report uncovers about the tribal organization's performance of the existing contract.  25 C.F.R. § 900.33.  If § 900.33 provided the Defendants authority to consider such outside information in determining whether to apply § 450f(a)(2)'s declination criteria, it would read as follows:

> **Are all proposals to renew term contracts subject to the declination criteria?**
>
> Department of Health and Human Services and the Bureau of Indian Affairs will not review the renewal of a term contract for declination issues where there is no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the Indian tribe or tribal organization.

25 C.F.R. § 900.33.  That § 900.33 contains no such language or deletions shows that whether a contract proposal is "substantially the same" as its predecessor turns only on the contract renewal proposal's contents.  25 C.F.R. § 900.33  The Court therefore concludes that the Defendants unlawfully declined the 2013 Renewal.

**D.** **THE COURT WILL DEEM THE 2013 RENEWAL AND 2014 AFA APPROVED, AND ORDER THE DEFENDANTS TO FULLY FUND THOSE PROPOSALS.**

The Court will deem the 2013 Renewal and the 2014 AFA approved.  The Defendants argue that the Court should not deem Sage Hospital's contract proposals approved, but should instead order Burwell "to review Sage's proposals and fund them according to ISDEAA Section 106(a) within 90 days of the date of the order."  Response at 12.  The Defendants point out that, when a contract proposal is deemed approved under the ISDEA, the HHS Secretary must "'add to the contract the full amount of funds pursuant to section 106(a) of the Act.'"  Response at 12 (quoting 25 C.F.R. § 900.18).  The Defendants say that § 106, in turn, provides that the amount of funds under an ISDEA contact "'shall not be less than the appropriate Secretary otherwise would have provided for the operation of the programs or portions thereof for the period covered by the contract'" -- i.e., the Secretarial amount.  Response at 12 (quoting 25 U.S.C. § 450j-1(a)(1)).  The Defendants assert that Sage Hospital's contract proposals "do not necessarily reflect that amount; the Secretary still has to review the proposal and determine the appropriate level of funding."  Response at 12.

The Honorable Rosemary M. Collyer, United States District Judge for the District of Columbia, rejected similar arguments in Seneca Nation of Indians v. Department of Health and Human Services.   Seneca Nation had proposed an increase of $3,774,392.00 over the $7,802,211.00 that it had been awarded the year before -- a 48% increase.  See 945 F. Supp. 2d at 137-39.  The HHS argued -- much as the Defendants argue here -- that the tribe should not get a "windfall" because of a "procedural technicality," 945 F. Supp. 2d at 150; that such "windfall" would come at the expense of other tribal organizations, 945 F. Supp. 2d at 151; that Judge Collyer should not get into the weeds on the validity of the tribe's calculations, see 945 F. Supp.

2d at 151-52; and that Judge Collyer should instead "evaluate the bargain the parties have struck

through their Contract and operation of law," 945 F. Supp. 2d at 151-52.  Judge Collyer rejected

those arguments, stating:

> The Nation's proposed amendment sought the Secretary's agreement to <u>increase</u>
> the amount of funds it received under 25 U.S.C. § 450j-1(a) -- that is, its "Section
> 106(a)" or "Secretarial" amount.  As noted above, the ISDEAA does not state that
> the Secretarial amount becomes immutable once agreed upon for a given year;
> instead, it explicitly contemplates that self-determination contract funds "may, at
> the request of the tribal organization, be increased by the Secretary if necessary to
> carry out [the ISDEAA]."  25 U.S.C. § 450j-1(b)(5).

945 F. Supp. at 150 (alterations in opinion but not in quoted statute)(quoting 25 U.S.C. § 450j-

1(b)(5)).  Judge Collyer thus concluded that, when the HHS Secretary fails to comply with her

contractual duties under the ISDEA, the tribe's or tribal organization's contract proposal

"automatically becomes part of the parties' Contract."  945 F. Supp. at 152.  <u>See</u> <u>Yurok Tribe v.</u>

<u>Dep't of the Interior</u>, 785 F.3d at 1408 ("In effect, if the Secretary does not timely respond to a[n

ISDEA] proposal, the proposal is deemed approved and the Secretary is directed to award a

contract <u>based on the terms of the proposal</u>."   (emphasis added)); <u>Crownpoint</u>, slip op. at 25

(deeming approved three ISDEA contract proposals).

   The Court agrees with and will adopt Judge Collyer's approach.  The Court would add

only that the policy underlying the ISDEA supports her holding.  When Congress enacted the

ISDEA, it recognized that "the prolonged Federal domination of Indian service programs has

served to retard rather than enhance the progress of Indian people and their communities by

depriving Indians of the full opportunity to develop leadership skills crucial to the realization of

self-government."  25 U.S.C. § 450(a)(1).  The Defendants' proposed approach would hinder

tribes and tribal organizations rather than help them.  Without requiring federal agencies to fully

fund the tribe's or tribal organization's contract proposal, the ISDEA would have no teeth.  If

federal agencies knew that they could unlawfully decline or fail to timely respond to a contract proposal, and that the only repercussion would be maintaining the prior year's funding level -- or forcing a tribe or tribal organization back to the negotiating table yet again -- there would be no reason for the agencies to ever approve a successor contract proposal.  Tribes and tribal organizations would thus be forced to go through endless rounds of negotiations over the appropriate funding amounts with no way of enforcing their proposals, thus nullifying the streamlined ninety-day contract-approval process that the ISDEA sets forth.  The Court will not force tribes and tribal organizations to participate in such a fruitless exercise.  The ISDEA's text and its legislative history demonstrate that the Court's sole remedy when a federal agency unlawfully declines contract proposal is to order the agency to fully fund the proposal.

## III.   THE COURT WILL GRANT SUMMARY JUDGMENT FOR SAGE HOSPITAL ON COUNT II.

Granting summary judgment in Sage Hospital's favor on Count I does not moot Count II. Although the 2015 AFA is not substantially the same as the 2013 AFA, the Defendants have not presented any evidence to show a genuine dispute of material fact whether they properly applied the Declination criteria to the 2015 AFA.  Moreover, the Defendants violated the ISDEA when they declined the 2014 Renewal, because it is substantially the same as the 2010 Contract. Finally, even if the Defendants properly declined the 2014 Renewal and the 2015 AFA, the Defendants violated § 900.30 of the ISDEA when they failed to offer Sage Hospital technical assistance in the 2d Declination.  Accordingly, the Court will grant summary judgment in Sage Hospital's favor on Count II, and deem both the 2014 Renewal and the 2015 AFA approved.

A.     **GRANTING SUMMARY JUDGMENT IN SAGE HOSPITAL'S FAVOR
       ON COUNT I DOES NOT MOOT COUNT II.**

The Defendants argue that granting summary judgment in Sage Hospital's favor on Count I moots its claims under Count II.  See Response at 13.  The Defendants point out that the 2013 Renewal imposes a three-year contract expiring in 2016 and the 2014 Renewal imposes another three-year contract expiring in 2017 -- thus leaving overlapping contracts for two years. See Response at 13.  The Defendants argue that granting both requests for relief would create confusion as to which contract governs and when another contract proposal would be needed in the future.  The Court disagrees.

"When two parties execute a second contract that deals with the same subject matter as the first, the two contracts must be interpreted together; insofar as the contracts are inconsistent, the latter one prevails."  K & V Sci. Co. v. BMW, 164 F. Supp. 2d at 1263.

> The new agreement may make no reference to the previous contract or claim; and yet it may operate as a substituted contract.  If the new agreement contains terms that are clearly inconsistent with the previously existing contract or claim, the fact of inconsistency is itself a sufficient indication of intention to abrogate the old and substitute the new.  The inconsistency may exist as to the whole of the former contract or claim or only as to a part.  It operates as a discharge by substitution only so far as the inconsistency extends.

K & V Sci. Co. v. BMW, 164 F. Supp. 2d at 1263 (quoting 6 Arthur L. Corbin, Corbin on Contracts, §§ 1293 and 1296 (1962))(internal quotation marks omitted).

Deeming both the 2013 Renewal and the 2014 Renewal approved leads to neither "overlapping contracts" nor "confusion as to which contract governs," because, if the Court approves both contract proposals, it may read the 2014 Renewal and the 2013 Renewal together. Insofar as the 2014 Renewal is inconsistent with the 2013 Renewal, the 2014 Renewal prevails. Thus, if the Court approves both proposals, the 2013 Renewal would be in place from October 1,

2013, to September 30, 2014, and the 2014 Renewal would be in place from October 1, 2014, to

September 30, 2017.

        **B.**     **A PORTION OF THE 2015 AFA IS NOT SUBSTANTIALLY THE SAME AS THE 2013 AFA, BUT THE DEFENDANTS HAVE NOT PRESENTED ANY EVIDENCE TO CREATE A GENUINE DISPUTE OF MATERIAL FACT AS TO WHETHER THEY PROPERLY APPLIED THE DECLINATION CRITERIA TO THE 2015 AFA.**

The 2d Declination explains that the Defendants declined the 2015 AFA for the same

reasons that they declined the 2014 AFA.  See 2d Declination *passim*.  The text of the 2015 AFA

appears substantively identical to the text of the 2013 AFA.  Compare 2015 AFA *passim*, with

2013 AFA *passim*.  The cover letter for the 2014 AFA, however, explains that the 2015 AFA

requests that the IHS fund Sage Hospital at a total amount of $32,614,916.00, with

$19,995,900.00 in base funding, and $12,619,016.00 for direct and indirect contract support

costs.[33]  See El-Meligi Ltr. at 2-3.  This figure represents a fifty-five percent increase in funding

from the 2013 AFA.  See 2013 AFA at 22, 30 (providing that the IHS would fund Sage Hospital

at a total amount of $18,044,042.00, with $11,481,661.00 in base funding and $6,562,381.00 for

contract support costs).  The Court is reluctant to conclude that an AFA that provides for a fifty-

five percent increase in funding is "substantially the same" as its predecessor.  25 C.F.R.

§ 900.32.  Section 900.33 of the ISDEA states that "[a]ny portion of an annual funding

agreement proposal which is not substantially the same as that which was funded previously

(e.g., a redesign proposal; waiver proposal; different proposed funding amount; or different

program, service, function, or activity), . . . is subject to the declination criteria . . . ."  25 C.F.R.

§ 900.33.  Section 900.33 thus permitted the Defendants to apply the ISDEA's Declination

---

        [33]The funding amounts in the 2015 AFA appear to be provided in detail in Attachment B to the 2015 AFA, which neither party has provided the Court.

criteria to the portion of the 2015 AFA's funding request beyond the 2013 AFA's funding level of $18,044,042.00 -- i.e., $14,570,874.00.

Upon satisfying § 900.33's threshold requirements, the HHS Secretary may decline a contract proposal only based on one of these five reasons:

**(A)**  the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;

**(B)**  adequate protection of trust resources is not assured;

**(C)**  the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;

**(D)**  the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title; or

**(E)**  the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities, . . . because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 450f(a)(2).  See 25 C.F.R. § 900.22 (setting forth the same declination criteria).  The Secretary must justify his or her contract declination decision "by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)."   25 U.S.C. § 450f(e)(1).

The 2d Declination declined the 2015 AFA on two grounds: (i) "the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory," 25 U.S.C. § 450f(a)(2)(A); and (ii) "the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract," 25 U.S.C. § 450f(a)(2)(C).  The Defendants have failed to create a genuine dispute of material fact under either (i) or (ii).  Consequently, the Court will grant summary judgment in favor of Sage Hospital on Count II.

In the <u>Sage</u> opinion, the Court explained the deficiencies with the evidence which the Defendants submitted in support of the 2d Declination and what evidence the Defendants needed to present survive summary judgment:

> First, the Defendants will likely fail to "clearly demonstrat[e]," 25 U.S.C. § 450f(e)(1), that the quality of Sage Hospital's healthcare services "will not be satisfactory," 25 U.S.C. § 450f(a)(2)(A). Fifteen of the 1st Declination's nineteen adverse findings focus exclusively on criticisms of Sage Hospital's internal financial controls -- or lack thereof -- and are thus inapplicable here. <u>See</u> 1st Declination at 1-7. Another finding discusses Sage Hospital's "potential" OSHA violations, which "affect the safety of employees, visitors, and patients":

> > During the performance monitoring review, serious potential Occupational Health and Safety Administration (OSHA) violations were identified which affect the safety of employees, visitors, and patients. These potential OSHA violations involved the condition of the building housing the water system; elements of the water system including lack of backflow prevention; no safe secondary water source; disconnection of the centralized boiler system; multiple blocked electric panels; multiple unguarded electronic circuit breakers; and multiple power strips (surge protectors) which had been interconnected.

> 1st Declination at 8. As this paragraph mentions nothing about Sage Hospital's ability to provide satisfactory care to its patients, it is also inapplicable. Only three of the 1st Declination's nineteen adverse findings mention the quality of Sage Hospital's healthcare services:

> > During the course of the contract, services have been eliminated (ophthalmology, general surgery, Sanders Dental Clinic, obstetrical care, pediatrics, and podiatry), which has negatively impacted the delivery of health care to Indian beneficiaries.

> > The Board has allowed the Purchased/Referred Care program to operate in violate of federally mandated regulations regarding program requirements. The failure of the program to have a plan that describes the process for accessing such care, the medical priorities, the annual budget for referred care, the appeals process, and a system for tracking deferred services disadvantages patients who seek such care.

> > The Board has failed to authorize sufficient funds to maintain a functional health information system for electronic

> health records to meet patient care information requirements.  This
> failure contributes to the loss of potential revenue and impedes the
> delivery of satisfactory health care services to patients.

1st Declination at 8.

As an initial matter, the NAIHS has offered no evidence to support the first paragraph's implication that Sage Hospital eliminated those services during its performance of the 2010 Contract.  To the contrary, the evidence suggests that Sage Hospital eliminated those services before 2007.  The 1st Declination is taken almost verbatim from the NAIHS Report, but omits the NAIHS Report's qualification that Sage Hospital has eliminated those services "since the first [Sage Hospital] contract was awarded in 2003."  NAIHS Report at 14.  Razaghi states that, "[p]rior to January 2007, Sage was forced to terminate general surgery (including orthopedics and opthalmology [sic]) and obstetrical care for lack of adequate facilities and/or qualified staff."  Razaghi's 2nd Decl. ¶ 7 at 23.  Moreover, Razaghi explains:

> As of FY 2008, Sage contracted with IHS to perform only
> (1) contract health services, and (2) dispensing of medical supplies.
> The [2010 Contract] greatly expanded the scope of services under
> the ISDEAA relationship, which consisted of the following
> programs, functions, services and activities (called "PFSAs"):
> Inpatient Services, General Ambulatory and Specialty Care
> Services, Emergency Department, Emergency Medical Transport,
> Optometry Clinic, . . .  Dental Clinic, and Podiatry Clinic.  The
> [2010 Contract] did not include surgery, obstetrics ophthalmology,
> or inpatient pediatrics.  The PFSAs also included podiatry, and,
> after Sage determined that there was insufficient demand for an on-
> staff podiatrist, Sage has satisfied that PFSA through its "contract
> health" dollars, as permitted under the [2010 Contract] and the
> ISDEAA.  Finally, Sage was providing dental services for another
> health care organization . . . at a facility at Sanders, AZ, but that
> facility was dilapidated and unsanitary . . . .  Sage, with IHS'
> agreement, provided those dental services both at Sage's Ganado
> facility . . . and at a satellite facility at Greasewood, AZ.

Razaghi 2nd Decl. ¶ 12 at 24-25.  It appears that Sage Hospital reinstated its dental and podiatry services with the 2010 Contract, and has continued to provide those services ever since then.  See 2013 AFA at 9 (listing podiatry and dental care among Sage Hospital's PFSAs).  The Defendants have offered no evidence to the contrary.

Sage Hospital has not provided the other services -- general surgery, obstetric care, ophthalmology, and pediatrics -- since 2007.  Neither the 2013 Renewal nor the 2014 AFA, however, include those services in Sage Hospital's

- 80 -

PFSAs.  A tribe or tribal organization's elimination of services that are not a part of its ISDEA proposal can cut one of two ways.  It may demonstrate that the tribe or tribal organization is falling apart and that the problems that plagued the eliminated services will likely soon spread to the proposed PFSAs.  On the other hand, it may allow the tribe or tribal organization to divert more resources to the contracted PFSAs to improve patient care in those areas.  The evidence in the record shows that Sage Hospital's elimination of services fell into the latter category: it was a key component of Sage Hospital's turnaround effort and allowed the hospital to stabilize and ultimately improve the quality of patient care for its contracted PFSAs.  See Razaghi 2nd Decl. ¶ 9, at 23.  In light of Sage Hospital's success in the intervening years since eliminating those services, and the lack of evidence suggesting that the elimination of those services would affect its contracted PFSAs in the 2013 Renewal and the 2014 AFA, the first paragraph does not demonstrate that "the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory."  25 U.S.C. § 450f(a)(2)(A).

        The second and third paragraphs suffer from a different flaw.  Each pairs a fact that the NAIHS Report or Moss Adams Report supports -- e.g., "the Board has failed to authorize sufficient funds to maintain a functional health information system for electronic health records" -- with a conclusory statement about that fact's impact on the quality of Sage Hospital's healthcare services.  As far as the Court can tell, there is no evidence in the record to support these statements.  The 1st Declination does not point to any evidence in support of these conclusory statements.  The Moss Adams Report says nothing about the quality of Sage Hospital's patient services.  Only three sentences in the forty-two-page NAIHS Report imply that Sage Hospital's healthcare services are unsatisfactory: "Several concerns were expressed regarding the delivery of patient care.  Patients feel they were unable to get access to some services as in the past.  There were also concerns that a lot of good doctors have left [Sage Hospital] employment."  NAIHS Report at 24.   The NAIHS Report states that these sentences are summaries of the NAIHS' interviews of two "community members representing the Ganado and Cornfields Chapters," who apparently "requested to be interviewed."  NAIHS Report at 24.  Aside from these three sentences, the NAIHS has not offered -- and the Court has been unable to find -- any other evidence to indicate that Sage Hospital provides unsatisfactory healthcare services to its patients.

        These findings are insufficient to "clearly demonstrat[e]," 25 U.S.C. §450f(e)(1), at the summary judgment stage or at trial that "the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory," 25 U.S.C. § 450f(a)(2).  The Court is reluctant to rely on the NAIHS' unsworn summary of its interviews with two "community members" who are relaying third- or fourth-hand information from purported patients of Sage Hospital.  At a minimum, the NAIHS should provide this information in the form of reliable evidence -- e.g., sworn affidavits or

witness testimony -- from the patients themselves.  Additionally, it is hard for the Court to determine whether Sage Hospital's healthcare services "will be satisfactory," 25 U.S.C. § 450f(a)(2), without some indication of how Sage Hospital stacks up against its peers.  The NAIHS should provide, for example, evidence that a state or federal agency recently refused to certify Sage Hospital for providing substandard care; testimony or sworn affidavits from expert witnesses explaining the standard for patient care in hospitals in general -- or among hospitals that serve American Indian tribes in particular -- and why Sage Hospital's care falls below that standard; or testimony or sworn affidavits from patients comparing their recent experiences receiving treatment at Sage Hospital to experiences at other hospitals.  Simply put, the Court would need more than bare conclusory allegations about the quality of Sage Hospital's healthcare services to uphold the NAIHS' declination decisions under § 450f(a)(2).

. . . .

[Second,] the Defendants likely will not be able to establish that "the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract." 25 U.S.C. § 450f(a)(2)(C).  Although the 1st Declination is filled with allegations that Sage Hospital has allowed its programs to operate "in violation of federally mandated regulations regarding program requirements," may have committed "potential" OSHA violations, and may have violated the ISDEA's financial management system requirements, the Defendants have failed to offer any evidence to establish that Sage Hospital has actually committed any of those violations.  1st Declination at 9.  The Moss Adams Report focuses exclusively on allegations that Sage Hospital has violated its own Articles of Incorporation, Code of Conduct, and Policies and Procedures. See Moss Adams Report *passim*.  It contains no findings that Sage Hospital violated federal law.  Although the NAIHS Report mentions that the Board "has allowed the Purchased Referred Care program to operate in violation of federally mandated regulations regarding program requirements," it does not point to a single regulation and offers no evidence of these alleged violations.  NAIHS Report at 16.  Even Thompson, who ran Moss Adams' audit of Sage Hospital did not offer any information to suggest that Sage Hospital violated any federal laws or ISDEA financial management guidelines.  See Thompson Decl. *passim*.

As the Court has mentioned previously, the Defendants bear "the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)."  25 U.S.C. § 450f(e)(1).  Bare conclusory allegations that Sage Hospital violated federal law will not suffice.  Instead, the Defendants must come forward with evidence -- in the form of witness testimony, sworn affidavits, or documents -- that clearly establishes those violations.  Without more than the bare record before the Court, the Defendants likely will not be able to establish that "the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract." 25 U.S.C. § 450f(a)(2)(C).

- 82 -

Sage, 2015 WL 1906107, at *55-60.

The Sage opinion thus spelled out the forms of proof that could help the Defendants survive summary judgment.  Rather than heeding the Court's roadmap and warnings, however, the Defendants have presented no evidence -- affidavits, deposition transcripts, or expert reports -- to support the 2d Declination.  Nor have they served any discovery requests on Sage Hospital or offered any undisputed facts to support the 2d Declination.  Instead, the Defendants have said that, because they "don't have endless resources," they are "not going to do discovery on an issue [which the Court has] already made findings on."  Tr. at 34:12-16 (Grohman).  The Defendants have the burden of proof to "clearly demonstrat[e] the validity of the grounds for declining the contract proposal (or portion thereof)."  25 U.S.C. § 450f(e)(1).  The Court agrees with the Defendants that the ISDEA imposes this burden on the HHS Secretary "in the course of subsequent litigation, not the declination process," Response at 17, but the parties are now in "subsequent litigation" and the Defendants must at least show a genuine dispute of material fact whether they properly applied the Declination criteria to the 2015 AFA to survive summary judgment.  Because the Defendants have not offered any undisputed facts or competent evidence to support the 2d Declination, they have not met their burden and summary judgment is warranted on Count II.

The Defendants reference rule 56(d) in passing and have submitted a declaration from Angela Belgrove, one of their attorneys.  To be sure, rule 56(d) allows the Court to defer consideration of a motion for summary judgment, deny such a motion, or allow a party time to obtain affidavits or take other discovery.  See Fed. R. Civ. P. 56(d).  The Belgrove Decl. fails to satisfy, however, the requirements that the Tenth Circuit has placed on rule 56(d) affidavits.  A rule 56(d) affidavit or declaration must "explain why facts precluding summary judgment cannot

be presented," which includes: (i) "identifying the facts not available and what steps have been taken to obtain these facts"; and (ii) explaining "how additional time will enable him to rebut movant's allegations of no genuine issue of fact." Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783. The Defendants have neither identified unavailable facts nor explained how additional time would help them rebut the Motion.

The Belgrove Decl. contains a number of block quotations from the Sage opinion without providing any explanation why the Defendants have not served any discovery requests on Sage Hospital or any additional time is necessary. The only statement in the Belgrove Decl. which purports to explain the Defendants' inability to obtain the necessary discovery is that the Defendants "have not had an opportunity to fully develop this evidence, because they have not been entitled to take any discovery in this case yet." Belgrove Decl. ¶ 12, at 5. The Belgrove Decl. says nothing, however, about any discovery requests that it has served on Sage Hospital or any information that it has tried -- but been unable to -- obtain. Moreover, the Defendants contradicted this statement at the hearing. When the Court pressed the Defendants on why they had not served any discovery requests on Sage Hospital, the Defendants said that they "don't have endless resources" and were "not going to do discovery on an issue that we recognize [the Court] has already made findings on." Tr. at 34:13-16 (Grohman). The Defendants said nothing about not having enough time to conduct the requisite discovery or what information they expected to obtain through a longer discovery period. Ultimately, it seems that the Defendants expected to lose the Motion regardless, and did not want to take the time, energy, and money to conduct the requisite discovery to get past the summary-judgment stage. Of course, the Defendants have every right to decide how to litigate their case. The Court will not give them another bite at the apple, however, when they made the strategic decision to not present the

requisite evidence to show a genuine dispute of material fact on Count II.[34]  The Court will thus

deem the 2015 AFA approved.

> **C.    THE 2014 RENEWAL IS SUBSTANTIALLY THE SAME AS THE 2010 CONTRACT.**

The 2d Declination explains that the Defendants declined the 2014 Renewal for the same

reasons that it declined the 2013 Renewal.  See 2d Declination *passim*.  The 2014 Renewal

appears to offer no modifications to the provisions of the 2010 Contract that speak to the scope

and funding of Sage Hospital's PFSAs.  Compare 2014 Renewal at 7-9, with 2010 Contract

*passim*.  As the HHS Secretary cannot decline a contract renewal proposal "where no material

and substantial change to the scope or funding of a program, functions, services, or activities has

been proposed by the Indian tribe or tribal organization,"  25 C.F.R. § 900.33, the Defendants

violated § 900.33 when it declined the 2014 Renewal.  The Court will therefore deem the 2014

Renewal approved.

> **D.    EVEN IF THE DEFENDANTS PROPERLY DECLINED THE 2014 RENEWAL AND THE 2015 AFA, THE DEFENDANTS VIOLATED § 900.30 OF THE ISDEA WHEN THEY FAILED TO OFFER SAGE HOSPITAL TECHNICAL ASSISTANCE IN THE 2d DECLINATION.**

The Defendants contend that the language in the 2d Declination is standard and "used by

IHS in most declinations."  Response at 10.  The Defendants add that, although the Court faulted

the IHS for putting "'the onus on Sage Hospital to identify what assistance it needed,' the

ISDEAA and its regulations in fact do place the onus on the tribal organization to identify what

---

[34]The Defendants' argument that the 2015 AFA "cannot be accepted because it was not proposed under a governing [self-determination] contract," Response at 13, is similarly unpersuasive.  In the July 11, 2014, Ltr., Floyd Thompson, the NAIHS' Executive Officer, and Wauneka agreed to extend Sage Hospital's "current contract term" through September 30, 2014. July 11, 2014, Ltr. at 18.  Sage Hospital proposed the 2015 AFA on September 19, 2014.  See Sept. 19, 2014, Ltr. at 1. Accordingly, Sage Hospital proposed the 2015 AFA under the extended self-determination contract pursuant to the July 11, 2014, Ltr.

assistance is needed."  Response at 10 (emphasis in original).  According to the Defendants, the

ISDEA required them to provide technical assistance to Sage Hospital only "'upon the request of

any tribal organization and subject to the availability of appropriations.'"  Response at 10

(quoting 25 U.S.C. § 450h(d)(3))(citing 25 C.F.R. § 900.28 (describing the HHS Secretary's duty

as providing "any necessary requested technical assistance" to avoid declination); 25 C.F.R.

§ 900.30 (same)).  The Court disagrees.

Section 900.30's plain language requires the Defendants to offer technical assistance to

overcome the stated objections in the 2d Declination.  Section 900.30 states:

> **When the Secretary declines all or a portion of a proposal, is the Secretary required to provide an Indian tribe or tribal organization with technical assistance?**
>
> Yes.  The Secretary shall provide additional technical assistance to overcome the stated objections, in accordance with section 102(b) of the Act, <u>and</u> shall provide any necessary <u>requested</u> technical assistance to develop any modifications to overcome the Secretary's stated objections.

25 C.F.R. § 900.30 (bold in original)(emphasis added).  If the Defendants only had to provide

technical assistance upon request, there would be no reason to specify in the second half of the

regulation that they must also provide any "necessary requested technical assistance."  25 C.F.R.

§ 900.30.  The ISDEA thus required the Defendants to offer to provide Sage Hospital technical

assistance to overcome the stated objections.

The 2d Declination states, in pertinent part:

> Given the nature and seriousness of IHS's concerns about [Sage Hospital]'s ability to manage ISDEAA funds properly, IHS does not believe that technical assistance could be provided at this time that would allow [Sage Hospital] to overcome the objections stated in this letter.  However, if [Sage Hospital] would like to discuss assistance it believes IHS could provide that would eliminate the reasons for this declination, please call the area office.

2d Declination at 11-12.  Although the second sentence in this passage could be construed as an offer to provide technical assistance, the offer is undercut by the first sentence.  To pass muster under the ISDEA, an offer to provide technical assistance should be unqualified rather than making it a foregone conclusion that such assistance will be futile.  Accordingly, the Defendants violated the ISDEA when they failed to provide an unqualified offer of technical assistance to Sage Hospital.  Cf. Navajo Health Foundation - Sage Memorial Hospital v. Burwell, No. CIV 14-0958 JB/GBW, 2015 WL 3862952, at *37 (D.N.M. June 17, 2015)(Browning, J.)("[I]n this area of the law, crisp rules with sharp corners are preferable to a round-about doctrine of opaque standards."  (internal quotation marks omitted)).  The Court is reluctant to deem the 2014 Renewal and the 2015 AFA approved based solely on the Defendants' failure to offer technical assistance to Sage Hospital in the 2d Declination.  If the Court had not already deemed those contract proposals approved and the issue was before the Court at an earlier stage -- where allowing Sage Hospital to obtain technical assistance could overcome the Defendants objections that led to the 2d Declination -- the Court would be inclined to order the Defendants to offer technical assistance.  At this late stage in the case, however -- and because the Court has already deemed those contract proposals approved -- that order would have no effect.  Accordingly, the Defendants' failure to offer technical assistance in the 2d Declination does not lead to any additional relief for Sage Hospital beyond what has already obtained.

## IV.  THE COURT WILL GRANT SUMMARY JUDGMENT FOR SAGE HOSPITAL ON COUNT III AND DETERMINE SAGE HOSPITAL'S DAMAGES ON COUNTS I-III AT TRIAL.

Count III of the SAC states, in its entirety:

> 63.    Sage realleges and incorporates by reference the allegations of paragraphs 1-62 above, as if fully set forth herein.

64.     Because Sage is entitled to immediate injunctive relief to reverse the Declination and to compel the Secretary to award and fund the three-year FY 2014 self-determination contract, Defendants were required to pay Sage the full amount requested in the AFA for FY 2014.

65.     Defendants failed to do so, significantly underpaying Sage from October 1, 2013 to the present.

66.     Pursuant to 25 U.S.C. § 450m-1(a), Sage is entitled to an accounting of funds provided by IHS from October 1, 2013 to the date of judgment.

SAC ¶¶ 63-66, at 29-30.

The Defendants do not appear to contest Count III.  The Defendants do not mention Count III in their briefing and did not say anything about it at the hearing.  The only mention of Count III in Sage Hospital's briefing suggests that the only relief which Sage Hospital seeks on that count is a damages hearing.  See Motion at 6-7 ("The third claim seeks an accounting of and damages for IHS' underpayment of amounts due under the proposed 2014 AFA . . . .").  The parties agree that Sage Hospital is entitled to a hearing on damages once discovery is complete.  See Response at 17; Reply at 23.  Both parties are entitled to request all relevant discovery pertaining to damages, but the Court is unsure what, if any, additional "accounting of funds" Sage Hospital seeks or which party would conduct an accounting of funds.  Section 450m-1(a) says nothing about an "accounting of funds," and neither party has defined that phrase for the Court.  25 U.S.C. § 450m-1(a).  Sage Hospital has asked the Court to schedule a hearing on damages for Counts I through III; the Defendants do not dispute that request, but have requested that the Court schedule the hearing after the conclusion of discovery in January, 2016.  The Court will thus receive evidence on, among other issues, Sage Hospital's damages, and any additional "accounting of funds" which Sage Hospital seeks, at trial -- which is currently set for

April, 2016, on the Court's trailing docket.  Beyond that, the Court cannot order any additional

"accounting of funds," because the Court is unsure exactly what relief Sage Hospital seeks.

## V.     THE COURT WILL DEEM THE 2013 RENEWAL, THE 2014 AFA, THE 2014 RENEWAL, AND THE 2015 AFA APPROVED.

The Court will read the 2013 Renewal and the 2014 Renewal together rather than

enacting two overlapping contracts.  "When two parties execute a second contract that deals with

the same subject matter as the first, the two contracts must be interpreted together; insofar as the

contracts are inconsistent, the latter one prevails." K & V Sci. Co. v. BMW, 164 F. Supp. 2d at

1263.  It appears that the 2014 Renewal includes the following provisions that the 2013 Renewal

does not have:

> **Section 2.**  Article II, Section  1 of the Contract is amended to read as follows, and the Contract is hereby renewed in accordance with such amendment:
>
> > **SECTION 1 - TERM.**  Pursuant to section 105(c)(l) of the ISDA (25 U.S.C.  § 450j(c)(l)), the original term of this Contract shall be 3 years, from October 1, 2010 through  September 30, 2013.  The parties to the Contract have previously agreed to extend the term of the Contract through September 30, 2014. Pursuant to 25 U.S.C. §§ 450f(a)(2) and 450j(c)(l), 25 C.P.R. §§ 900.12 and 900.8(h), the Navajo Nation Council's Resolution CJN-35-05 passed on June 3, 2005 ("Resolution") attached as Attachment 1 to the Contract, and Article V, Section 2(A) of the Contract, the Contract is amended as stated in this Renewal and Amendment and renewed for a three-year term from October 1, 2014 through September  30,2017.
>
> **Section 3.**  Article II, Section 3 of the Contract is amended to read as follows by deleting two commas in the first sentence and adding a new, final sentence:
>
> > **SECTION 3 - PROGRAM STANDARDS.**  Sage is committed to and will strive to provide quality health services and agrees to administer the PFSAs (or portions thereof) identified in the AFA in conformity with applicable standards, including applicable Arizona licensing requirements and applicable Centers for Medicare and Medicaid Services Conditions for Participation.  Sage is not required to seek or obtain accreditation by The Joint Commission but may do so in its own sole discretion.

**Section 4.**  Article II, Section 7(C) of the Contract is amended to read in
part as follows by deleting the word "annual" and tracking the language in 25
U.S.C. § 450l(c)(b)(7)(C), which is part of the Model Agreement in the ISDA:

> With respect to the monitoring activities of the Secretary, the
> routine monitoring visits shall be limited to not more than one
> performance monitoring visit for this Contract by the head of each
> operating division, departmental bureau, or departmental agency,
> or duly authorized representative of such head unless --

2014 Renewal at 7-8.  Accordingly, these provisions are inconsistent with the 2013 Renewal and

control Sage Hospital's contractual relationship with the Defendants after September 30, 2014.

The 2013 Renewal is thus in effect from October 1, 2013, to September 30, 2014, and the 2014

Renewal is in effect from  October 1, 2014, through September 30, 2017.

   **IT IS ORDERED** that the Plaintiff's Motion for Summary Judgment on its First Three

Claims for Relief, with Memorandum of Supporting Points and Authorities, filed June 1, 2015

(Doc. 68), is granted.   The Renewal No. 1 and Amendment No. 1 to the Indian Self-

Determination Act Contract Between Navajo Health Foundation/Sage Memorial Hospital, Inc.

and the Secretary of the Department of Health and Human Services, filed January 13, 2015

(Doc. 21-3), is in effect from October 1, 2013, to September 30, 2014.  The Renewal No. 1 and

Amendment No. 1 to the Indian Self-Determination Act Contract Between Navajo Health

Foundation/Sage Memorial Hospital, Inc. and the Secretary of the Department of Health and

Human Services, filed January 13, 2015 (Doc. 21-10), is in effect from October 1, 2014, through

September 30, 2017.  The Annual Funding Agreement Between Navajo Health Foundation --

Sage Memorial Hospital, Inc., and The Secretary of the Department of Health and Human

Services Fiscal Year 2014, filed January 13, 2015 (Doc. 21-3), was in effect from October 1,

2013, through September 30, 2014.  The Annual Funding Agreement Between Navajo Health

Foundation -- Sage Memorial Hospital, Inc. and the Secretary of the Department of Health and

Human Services, filed January 13, 2015 (Doc. 21-10), is in effect from October 1, 2014, through

September 30, 2015.  The Court will also determine Sage Hospital's damages for Counts I to III

of the Second Amended Complaint, filed June 30, 2015 (Doc. 79), on the trial date.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Paul E. Frye
Albuquerque, New Mexico

  *Attorney for the Plaintiff*

Paula R. Lee
Angela M. Belgrove
Office of the General Counsel, Region IX
United States Department of Health & Human Services
San Francisco, California

--and--

Damon P. Martinez
 United States Attorney
Karen Grohman
 Assistant United States Attorney
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

  *Attorneys for the Defendants*