IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| NAVAJO HEALTH FOUNDATION - | ) | |
| SAGE MEMORIAL HOSPITAL, INC. | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SYLVIA MATHEWS BURWELL, SECRETARY | ) | NO. 1:14-cv-958-JB-GBW |
| OF THE UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES; | ) | |
| ROBERT McSWAIN, ACTING DIRECTOR | ) | |
| OF INDIAN HEALTH SERVICE; | ) | |
| JOHN HUBBARD, JR., AREA DIRECTOR, | ) | |
| NAVAJO AREA INDIAN HEALTH SERVICE; | ) | |
| and FRANK DAYISH, CONTRACTING | ) | |
| OFFICER, NAVAJO AREA INDIAN HEALTH | ) | |
| SERVICE, | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |

**OPPOSITION TO DEFENDANTS' MOTION
TO EXTEND DEADLINES BY FOUR MONTHS;
REQUEST FOR EXPEDITED CONSIDERATION**

Plaintiff Navajo Health Foundation - Sage Memorial Hospital, Inc. ("Sage") opposes

the last minute motion of the Defendants (collectively, the Indian Health Service, or "IHS")

to extend discovery and other deadlines by four months and to set a new trial date (the

"Motion"), Doc. 135.  In the Scheduling Order dated June 23, 2015 (Doc. 76), this Court set

the termination date for fact discovery for January 13, 2016; required the Parties to

supplement discovery responses by January 4, 2016, and to file pretrial motions by February

12, 2016; directed the Parties to file a consolidated final Pretrial Order with the Court by March 31, 2016; set the Pretrial Conference for April 1, 2016; and set the matter for a Bench Trial on a trailing docket beginning April 11, 2016.  The Scheduling Order provided that its deadlines shall not be modified except by an order of the Court upon a showing of good cause.  *Id*. at 1.  In an agreed-upon Order dated October 30, 2015 (Doc. 112), this Court extended the deadline for IHS to make its expert disclosures to December 13, 2015,[1] and provided that "[a]ll other deadlines in the Scheduling Order of June 23, 2015 (Doc. 76) will remain the same."[2]

At the hearing on November 17, 2015, IHS stated that it intended to seek more time to provide its expert disclosures, due December 14, 2015, and Sage indicated that it would oppose that motion.  *See* Doc. 133, Tr. (Nov. 17, 2015) at 64-68.  IHS then waited until Thursday night, December 10, 2015 – one business day before the deadline – to seek that extension.

---

[1] Because December 13, 2015 is a Sunday, the actual date for Defendants' expert disclosures is Monday December 14, 2015.

[2] The deadline for Sage to make its disclosures was extended in the October 30, 2015 Order because Defendants required extra time to produce documents needed by Sage's experts.  When the documents were initially produced by Defendants, they were not produced in a reasonably retrievable form.  *See* Ex. A.  Contrary to Defendants' statement, Motion at 13 n.9, Sage's expert who analyzed the CSC claim did indeed review the documents haphazardly provided by Defendants and he found them to be useless.  Bleakman Report at 4 ("The documents provided did not identify which costs were considered ineligible or the rationale for considering them ineligible.") (Ex. H).

Defendants' last-minute motion to delay this case for months should be denied.  The Motion is based on several false premises, and Defendants have not shown good cause for the extraordinary delay it seeks.

## I.   DESCRIPTION OF THE CLAIMS; PRIOR SUMMARY JUDGMENT RULINGS

The first three claims in Sage's Second Amended Complaint, Doc. 79, allege that IHS unlawfully declined to approve and fully fund Sage's three-year contract renewals (the first for Fiscal Years ["FY"] 2014-2016 and the second for FY 2015-2017) and Sage's proposed successor Annual Funding Agreements ("AFAs") for FY 2014 and FY 2015 submitted under the Indian Self-Determination and Education Assistance Act ("ISDEAA"), and a related accounting claim.  Sage's fourth claim alleges that, because of IHS' failure to commit to a reasonable date certain for making a decision on Sage's demand for unpaid Contract Support Costs ("CSC") and related expectancy damages (in this case, lost third-party revenues) for FY 2009 through FY 2013, such demand should be deemed denied and Sage allowed to litigate its merits in this Court.  After the Court held that Sage was entitled to summary judgment on this claim, *see* Doc. 73, Sage added a fifth claim for relief, seeking approximately $62 million for unpaid CSC and related expectancy damages (Sage's "CSC Claim").  Doc. 79 at 32-33.  On July 17, 2015, Defendants counterclaimed, contending that Sage owes the IHS $4,218,357 for overpaid indirect CSC.  Doc. 84.  The Parties await the Court's decision on whether it has subject matter jurisdiction over Defendants' Counterclaim.

*See* Doc. 133, Tr. (Nov. 17, 2015) at 62-63 (Court took matter under advisement).

This Court has decided, among other things, that IHS violated federal law in declining to approve Sage's proposed three-year contract renewals and proposed successor FY 2014 and FY 2015 AFAs. *See generally* Amended Memorandum Op. and Order (October 26, 2015) (Doc. 109) ("Summary Judgment Order"). Of particular significance, the Court ruled that Sage is entitled to funding for FY 2015 in the amount of $32,614,916. Summary Judgment Order at 85, 91 ("The Annual Funding Agreement Between Navajo Health Foundation – Sage Memorial Hospital, Inc. and the Secretary of the Department of Health and Human Services, filed January 13, 2015 (Doc. 21-10), *is in effect from October 1, 2014, through September 30, 2015.*" (emphasis added)). The Summary Judgment Order recited Sage's assertions of the harms caused by Defendants' unlawful declinations, including Sage's exclusion from the federal pharmaceutical supply program, loss of Federal Tort Claims Act ("FTCA") protection and the resulting additional cost of insurance, employee turnover, loss of grant opportunities, and other consequential and intangible damages, including significant out of pocket costs and expenses and damage to Sage's business reputation and good will. Summary Judgment Order at 14-15, 23. Notwithstanding the Summary Judgment Order, Defendants have not paid to Sage the amount owed to it under the FY 2015 AFA, shorting Sage by approximately $23.8 million for that year alone. Ex. B ¶ 4; Motion at 7-8.

4

## II.     DEFENDANTS' MOTION IS BASED ON FALSE PREMISES.

The "primary reason" for Defendants' Motion is the "set of entirely new issues" that Sage allegedly first introduced in its expert reports.  Motion at 1, 6 (concerning Sage's lost business opportunities, IHS states that it "require[s] a reasonable amount of time to conduct discovery on this *new aspect* of Sage's claim") (emphasis added).  That theme is repeated throughout the Motion.[3]  As further discussed below, the Defendants' central premise – that Sage's expert reports introduce new issues – is false.

Sage has consistently asserted claims for money damages caused by Defendants' unlawful declinations from the day it filed the Complaint on October 23, 2014, as reflected in the Summary Judgment Order, at 14-15, 23.  The expert report from Miriam Jorgensen, Ph.D., does not assert any new claim; it simply quantifies those damages.  Further, Sage's position on contract support costs ("CSC") has been consistently stated since Sage first presented it to Defendant Dayish in August 2014, and, after this Court deemed that claim denied by Dayish, since Sage filed its Second Amended Complaint on June 30, 2015.

Defendants rely on a second erroneous premise – that Sage was required to have

---

[3] Motion at 3 (Sage's damages are "derived from *entirely new* elements of Sage's claim that Sage has neither included in its pleadings nor ever presented to defendants for consideration") (emphasis in original), 6 (Sage's assertion of damages for its inability to execute on its plan to build a new medical center, a lost business opportunity, "has not [been] previously mentioned" and is a "new . . . aspect" of Sage's claim), 7 (same), 12 (referring to "the new issues raised by Sage's expert reports"), 13 (referring to Sage's "new $135 million demand").

presented these supposedly "new issues" to IHS Contracting Officer Dayish as a part of Sage's CSC claim.   And Defendants also base the *ad hominem* attacks punctuating their Motion on this erroneous premise.   *See,* e.g., Motion at 3 & n.1 (complaining that Sage has not presented the purportedly new elements of its claim "to defendants for consideration" and that the apparent failure of Sage to do so "implicates the jurisdictional boundaries set by the Contract Disputes Act"), *id.* (contending that undersigned counsel for Sage misled the Court by stating that Sage's claim "was still approximately $62 million, even though counsel must have known that amount had already risen to $135 million" and referring to the November 17, 2015 transcript where Sage's counsel said that the "difference between the value of defendants' counterclaim and Sage's claim was $66 million").   That premise is also faulty.

The Defendants' argument is based on a simple but crucial failure to distinguish between (1) Sage's claim for unpaid CSC during five years when Sage and IHS contracted without controversy, and (2) Sage's claim for money damages caused by IHS's unlawful declination to contract thereafter.   Sage's *CSC* claim was the matter being discussed at the hearing on November 17, 2015, *see* Tr. at 4-7 (discussing Sage's fourth and fifth claims for relief relating solely to unpaid CSC and Dayish's "final decision" attached to IHS's Counterclaim and expressly limited to indirect CSC).   Sage's CSC claim remains at approximately $62 million and the difference between Sage's CSC claim and IHS' Counterclaim remains at approximately $66 million.

6

The supposedly new elements of damages to which Defendants refer are the "money damages" owed to Sage for Defendants' *unlawful declinations* under 25 U.S.C. § 450m-1(a), not unpaid CSC subject to the Contract Disputes Act.  Because of IHS's abuse of its contracting powers, Congress provided tribal organizations like Sage with potent remedies under ISDEAA for wrongful declinations, including "money damages," for such unlawful declinations.  25 U.S.C. § 450m-1(a); *see, e.g., Ramah Navajo School Bd. v. Babbitt*, 87 F.3d 1338, 1344 (D.C. Cir. 1996); *Southern Ute Indian Tribe v. Sebelius*, 657 F.3d 1071, 1075 (10th Cir. 2011), *cert. denied*, 133 S. Ct. 24 (2012).  All of the supposedly "new" elements of damages to which Defendants refer are the "money damages" owed to Sage for Defendants' *unlawful declinations* under 25 U.S.C. § 450m-1(a), not the unpaid CSC that are subject to the Contract Disputes Act.  Sage has been forthcoming about all of those categories of damages, as recognized by this Court's decisions and, indeed, by Defendants themselves.  *See, e.g.*, Summary Judgment Order at 14-15, 23; Motion at 5 n.3.

Implicit in Defendants' Motion is a third proposition, that Defendants have been under no obligation to conduct discovery to learn the amounts of damages Sage seeks for each category of damages that Sage identified many times before – in its complaint, in the June 11, 2015 Joint Status Report and Provisional Discovery Plan ("JSR"), Doc. 72, at pp. 6-7, in sworn declarations, and in other submissions.  *See* Motion at 6 (Sage never mentioned the issue of its lost business opportunity "in any conversations with [IHS] counsel").  That, also,

is an erroneous premise.  As discussed below, Defendants have been on notice since entry

of the Scheduling Order on June 23, 2015 that fact discovery would end on January 13, 2016,

and Defendants' deliberate decision *not* to engage in any discovery until November 12, 2015,

*see* Doc. 118, negates its claim of surprise.  On November 12, 2015, Sage timely provided

to Defendants those amounts and the manner of deriving them in its expert report by Miriam

Jorgensen, Ph.D.  The fact that IHS counsel finally got around to reading that report on

*December 3*, 2015, *see* Ex. G,[4] provides no good cause for the requested four-month

extensions, either.

## II.   DEFENDANTS HAVE NOT SHOWN GOOD CAUSE TO ALTER THE COURT'S SCHEDULING ORDER.

### A.   Introduction

With respect to the non-CSC categories of damages, Defendants' Motion is predicated

on the representation that the damages calculated or estimated in Dr. Jorgensen's expert

report are "entirely new."  Motion at 1, 3 (emphasis deleted).  To the contrary, throughout

this litigation, Sage has been forthcoming about all categories of damages that it will assert,

and Defendants have had more than ample time to discover and evaluate all of Sage's

---

[4] After a phone call when undersigned counsel for Sage corrected counsel Wolak's erroneous view that Sage's claim was for $62 million, Wolak wrote on December 3, 2015: "I looked briefly at the expert reports to see the details about the new $135M total you mentioned, and I see it."  Ex. G.  Defendants' contention that Sage "has not quantified those damages," Motion at 5 n.3, is incorrect; Sage quantified them in Dr. Jorgensen's report itself. *See* Ex. D (Jorgensen Figures 17 and 18).

asserted damages.

Sage's claim for unpaid CSC is virtually unchanged since Sage submitted it to IHS over a year and three months ago, although Sage's experts fine-tuned some of the calculations, as permitted under the Contract Disputes Act.  IHS's experts have been analyzing that claim for at least eight months, and no additional time is warranted.

**B.      Sage Has Revealed All Categories of Damages It Seeks Since the Outset of the Litigation.**

**1.      Damages Caused by the Unlawful Declinations**

Separate and apart from its claim of unpaid CSC and related damages, Sage seeks recovery of the amounts owed under the deemed approved FY 2014 and FY 2015 AFAs, expectancy damages (lost third-party revenues) caused by Defendants' underfunding of Sage's contracts, and consequential and intangible damages.  From the earliest days of this litigation, Sage has been forthcoming in describing all of the types of damages it would seek. *See, e.g*, Complaint (Doc. 1) at 22 ¶¶ 44-45, 29-30 (Prayer for Relief) (concerning money damages from wrongful declinations); Declaration of Christi El-Meligi (Dec. 22, 2014), Doc. 17-1 ¶¶ 10-14; Declaration of Christi El-Meligi (May 28, 2015), Doc. 68-1 ¶ 8; Plaintiff's Motion for Summary Judgment on its First Three Claims for Relief filed June 1, 2015 (Doc. 68) at 10 ¶¶ 29-33; Second Amended Complaint (Doc. 79) at 34 (prayer for relief).

In the Joint Status Report and Provisional Discovery Plan ("JSR") filed June 11, 2015, Sage notified Defendants that Sage might or would call particular witnesses to testify about

additional costs of insurance, pharmaceutical supplies, employee turnover, forgone third-party revenues, lost business opportunities and other consequential and intangible damages, including "an expert witness or witnesses to testify about damages caused by Defendants' declinations, including without limitation intangible damages as in *Ramah Navajo School Bd. v. Sebelius*, No. 07 CIV 0289 MV (D.N.M.). *See id.* Memorandum Op. and Order (May 9, 2013), Dkt. 143 at 65-72)."). Doc. 72 at pp. 6-7 of 11. The Summary Judgment Order itself recited many of Sage's asserted damages caused by the unlawful declinations. Summary Judgment Order at 14-15, 23. There is no good reason for Defendants to need additional time to address any of those damages.

Sage provided its expert reports by hand-delivery to counsel Karen Grohman on November 12, 2015, with additional courtesy copies sent by Federal Express to Defendants' Washington counsel. Sage provided two reports addressed to damages. One of those, from Bruce Bleakman, C.P.A., of REDW addresses unpaid CSC, discussed further below. The second report is by Miriam Jorgensen, Ph.D.[5] Dr. Jorgensen was the expert who testified in

---

[5] Defendants incorrectly state that Sage "disclosed five expert reports to defendants on November 12, 2015." Motion at 2. There were only four such reports, and only two of them address Sage's affirmative case for damages, the Bleakman and Jorgensen reports. Because IHS has not decided on whether it will rely on the Moss Adams report in light of the Summary Judgment Order, Sage also provided the report of Craig Greene, C.P.A., of McGovern & Greene, who critiqued the Moss Adams report on which IHS relied in its unlawful declinations, and the report of Luis Argueso of HealthCare Appraisers, Inc., who assessed the fair market value of the services provided by the management company hired by Sage and its principal Ahmad Razaghi, and the reasonableness of stipends and

the *Ramah Navajo School Board* case to which Sage referred in the June 11, 2015 JSR, Doc. 72 at p. 7 of 11.  Her report addresses the amount of Defendants' underfunding of the FY 2014 and FY 2015 AFAs, expectancy damages from Sage's loss of third-party revenues, the lost business opportunity, and intangible damages – all of which were presaged by Sage in the JSR.

The amounts owed under the FY 2014 and FY 2015 AFAs are a matter of simple arithmetic, and that computation of those damages and the related expectancy damages requires no additional time for Defendants to evaluate.  *See* Ex. B, C (letter to Defendants' counsel quantifying those amounts as of September 11, 2015 and noting that IHS' failure to pay Sage "will likely increase significantly the damages that Sage will prove at the April 2016 hearing, ultimately causing an unnecessary depletion of IHS funds").  Defendants concede those facts.  Motion at 8 (also acknowledging that the sum of those damages is approximately $41.8 million).

The other large component of damages quantified by Dr. Jorgensen is the cost to Sage of the lost business opportunity (the deferral of construction of the Ganado Outpatient Medical Center) of approximately $30.0 million.  Motion at 5-6; Ex. D (Jorgensen Figure 18, summarizing damages attributable to IHS's wrongful declinations, but not including damages

---

reimbursements paid to the Sage Board of Directors, both of which were discussed in the Moss Adams report.

from, *e.g.*, loss of FTCA coverage and loss of federal pharmaceutical supplies, the proof of which will be provided by fact witnesses).  Sage disclosed in the June 11, 2015 JSR that it would or might provide proof of "lost business opportunities" and call an expert witness to testify about damages caused by Defendants' declinations, including consequential and intangible damages.  JSR, Doc. 72 at pp. 6-7 of 11.[6]  The report of Dr. Jorgensen, the expert in the *Ramah* case, addresses the very types of damages Sage said it would pursue, including (at pages 44-51) the lost business opportunity relating to the deferral of construction of the Ganado Outpatient Medical Center.  As discussed below, Defendants could have readily discovered and analyzed these assertions of damages had they acted diligently.

### 2.    Unpaid CSC and Related Expectancy Damages

Sage specified the amount of underfunded CSC and related expectancy damages ($36,258,493 for unpaid CSC and $26,311,188 in related expectancy damages, totaling $62,569,681) and explained the way it calculated those figures in its claim letter dated August 25, <u>2014</u>.  Doc. 27-1 *et seq*.; Motion at 4.  That same method is used in Sage's calculation of expectancy damages caused by Defendants' failure to fully fund the FY 2014 and FY 2015 AFAs.  Defendants concede that no additional time is needed to analyze these

---

[6] Compare Defendants' statements of what their witnesses would testify at trial.  In each case, except for a possible Moss Adams witness, the witness' testimony is described as follows: "[witness name] may testify about the subject matter of the complaint."  JSR. Doc. 72 at pp. 8-9 of 11.

expectancy damages.   Motion at 8 n.5.   Sage's experts fine-tuned the calculations, determining that Sage is entitled to $37,220,627 for its CSC claim and $26,935,706 in expectancy damages (a total of $64,156,333), indicating that Sage *understated* its claim to Dayish by over a million dollars.   *See* Ex. D (Jorgensen Figure 17).   Such adjustments in a claim are permitted under the Contract Disputes Act.   *See Tecom, Inc. v. United States*, 732 F.2d 935, 937 (Fed. Cir. 1984); *J.F. Shea Co., Inc. v. United States*, 4 Cl. Ct. 46, 54 (1983). IHS concedes this point.   Motion at 5.

### C.   Defendants Have Had Since August *2014* to Evaluate Sage's CSC Claim, Assembled a Team to Do so by May 2015, and Purported to Have Evaluated the Claim in July 2015.

The largest component of Sage's asserted damages consists of unpaid CSC and related expectancy damages for FY 2009 through FY 2013, approximately $64 million.   That claim (again, Sage's "CSC Claim") was submitted to Defendants on August 25, *2014*.   Long ago, Defendants assembled a group of people to evaluate that claim, including people employed by IHS, experts at Cotton & Company, and other professionals.   Defendants' Privilege Log, Ex. E, reveals that IHS had involved the following persons in that effort no later than April 9, 2015:

1.     Sam Hadley[7] - Partner, Cotton & Company, LLP, IHS' expert in CSC

_____

[7] Hadley's name is actually Sandra A. Handley.  *See Kellogg Brown & Root Services, Inc. v. United States*, 107 Fed. Cl. 16, 27 (2012), *aff'd*, 728 F.3d 1348 (Fed. Cir. 2013), *op. corrected on denial of rehearing*, 563 Fed. Apps. 769 (Fed. Cir.), *cert. denied*, 135 S. Ct. 167

negotiations and disputes

2.  Andrew Busson - Forensic auditor with twenty-five years' experience with complex Federal government audits and Federal investigations

3.  Melissa Jamison - Attorney, DHHS Office of General Counsel ("OGC")

4.  Susan Blair - IHS Auditor, Rockville, MD

5.  Duff Pfanner - Healthcare Management Consultant, Anchorage, AK.[8]

Defendants' Privilege Log, Ex. E, at 2-3, ¶ 5.

By mid-May, 2015, Defendants' team evaluating Sage's claim was expanded to include:

6.  Jason Boberg - Supervisory Senior, Cotton & Company, Alexandria, VA

7.  Geoffrey Smith - IHS Auditor, Rockville, MD

8.  Lainy Cano, C.P.A. - Forensic Accountant/Fraud Manager, Cotton & Company, LLP

9.  Christopher Smith - IHS, Rockville, MD

10.  Ann Church - IHS Management Analyst, Rockville MD

11.  Victor Sellami - Auditor/Analyst

12.  Roselyn Tso - IHS "CSC Lead," Rockville, MD

13.  Paula Lee - IHS Attorney (who appeared in this litigation)

_____

(2014).

[8] Defendants' Privilege Log identifies Pfanner as "the Navajo Area Office's chief negotiator for CSC negotiations with tribes and tribal organizations." Ex. E at 3 ¶ 8.

14.   Julianna Kittelson - Senior Attorney, DHHS (who appeared in this litigation)

15.   Jamie Whitelock - Attorney, OGC (misspelled "Whitlock" on Defendants' Privilege Log)

16.   Angela Petrova - General Attorney, DHHS

17.   Joscelyn Morgan - Cotton & Company

*Id.* at 2-3; *see* Composite Ex. F (identifying those above whose positions are not stated in the Defendants' Privilege Log or who have not appeared as counsel for Defendants in this litigation).

By July 16, 2015, IHS had performed sufficient analysis to come up with a precise figure on Sage's indirect CSC Claim, *i.e.*, that Sage *owed IHS* $4,218,357.  Letter from Frank Dayish to Stenson Wauneka (Doc. 84-1) at 1, 6.[9]  Defendants' counsel apparently determined that this precise figure had sufficient support in fact and law under Rule 11 to assert in their Counterclaim against Sage.  *See* Doc. 84 at 11-16; Doc. 84-1.  Defendants and their expert team have had more than ample time to evaluate Sage's CSC and related lost third-party revenue claim.  The fine-tuning by Mr. Bleakman of the unpaid CSC was fully explained in

---

[9] If Defendants asserted the $4,218,357 figure simply as a negotiating ploy or to convince Sage that they were serious, they would have abused their authority under the Contract Disputes Act.  *See Gulf Group Gen. Enter. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 329 (2013); *Daewoo Eng'g and Constr. Co. v. United States*, 557 F.3d 1332, 1339 (Fed. Cir.), *cert. denied*, 558 U.S. 990 (2009).  No presumption of good faith attaches to a Contracting Officer's decision.  *Universal Shelters of Am., Inc. v. United States*, 87 Fed. Cl. 127, 145 (2009).

his report on November 12, 2015.  IHS understands the basis of these adjustments, *see* Motion at 7-10, and they provide no justification for any additional time for IHS's expert to issue her report.

### D.      Defendants Have Not Demonstrated Good Cause to Extend the Deadlines.

To extend court-ordered deadlines, Defendants must demonstrate good cause.  *Fed. R. Civ. P.* 16(b)(4); Scheduling Order (Doc. 76) at 1.  In affirming the District Court's refusal to grant an extension of time for an expert report, the court in *Dale K. Barker Co., P.C. v. Valley Plaza*, 541 Fed. Appx. 810 (10th Cir. 2013), addressed basic requirements for showing such good cause, as follows:

> The district court denied the request and effectively excluded Mr. Kaplan [a proposed expert witness] from the case after concluding that Mr. Barker had failed to show good cause for an extension of time because he hadn't identified when he had retained Mr. Kaplan, what (if any) work Mr. Kaplan had done up to that point, or even what Mr. Kaplan's opinions would be.  Extending the filing deadline [for the proposed expert report by Kaplan], the court also found, would require postponing the trial.  On these essentially undisputed facts we fail to see any abuse of discretion in the district court's chosen course.

*Id.* at 815.  Defendants' Motion does not address even these basic matters.  Indeed, IHS has not even hired the new experts it claims to need, Motion at 7 n.4, 11, and asserts that unidentified "scheduling conflicts" prevent its existing expert from timely completing her report, *id*. at 12.

The governing law concerning motions to extend pretrial deadlines is set forth in *Montoya v. Sheldon*, 286 F.R.D. 602, 616-18 (D.N.M. 2010) (Browning, J.).  In sum,

although the Court has broad discretion in pre-trial matters, modifying a scheduling order requires a showing of good cause.  The Rule 16(b) good cause inquiry focuses on the diligence of the party seeking to amend the scheduling order.  "Good cause" requires at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice.  *Id.*  The question boils down to whether, despite the diligence of the party seeking the extension, the court's schedule could not reasonably be met.  *See Advanced Optics Electronics, Inc. v. Robins*, 769 F.Supp. 2d 1285, 1313 (D.N.M. 2010) (Browning, J.) (quoting Advisory Committee Notes to Rule 16).  Where, as here, it was foreseeable that expert testimony would be required and a party does not comply with the deadline for expert witness disclosures, the party cannot be said to have acted with the requisite diligence.  *Montoya*, 286 F.R.D. at 618.  Carelessness, such as the failure to conduct discovery and the failure of IHS counsel to read the Jorgensen report until stimulated to do so by Sage's counsel on December 3, 2015, is incompatible with a finding of diligence.  *Pulsecard, Inc. v. Discover Card Services, Inc.*, 168 F.R.D. 295, 301 (D. Kan. 1996).

   None of the reasons advanced at the last minute by Defendants for their inability to comply with longstanding deadlines constitutes good cause, as required by Rule 16 and this Court's Scheduling Order.  IHS cannot properly claim surprise – the asserted basis for needing two additional experts –  because it made a deliberate choice not to pursue any

discovery into damages that Sage identified from the outset of the litigation. *See Mann v. Fernandez*, 615 F.Supp. 2d 1277, 1288 (D.N.M. 2009) (Browning, J.); Summary Judgment Order at 84-85; Tr. (July 31, 2015) at 34:11-13 (Defendants "don't have endless resources" for discovery); Ex. G (Defendants have "now . . . gotten into gear" on discovery). The "scheduling conflicts" asserted for the IHS expert who has been working on this case since May 2015 (at the latest) also fail to establish good cause. *Vondrak v. City of Las Cruces*, No. 05-0172 JB/LAM, 2009 WL 2951027 at *12 (D.N.M. Aug. 14, 2009) ("Having other things going on is not, on its own, good cause for delaying in seeking discovery until well after the deadlines"); *Scull v. Management Training Corp.*, No. CIV 11-0207 JB/RHS, 2013 WL 1897808 at *4 (D.N.M. Apr. 12, 2013) (Browning, J.) ("family and medical emergencies" did not justify request for extension of time to respond to summary judgment motion).

Furthermore, as in *N.T. v. Espanola Public Schools*, No. Civ. 04-0415 MCA/DJS, 2005 WL 5840479 (D.N.M. May 20, 2005), Defendants' proposal to extend *all* pretrial deadlines would be unfairly prejudicial to Sage, given the pending trial date and Sage's need to obtain the contract funding that Congress intended it to get and that this Court has ruled Sage is owed. *See id.*, 2005 WL 5840479 at *4.

The fact that Sage understated (by about 2%) its CSC claim to Defendant Dayish does not justify the extraordinary delay sought by IHS. A contractor such as Sage may permissibly increase the amount of its claim in litigation after a Contracting Officer's decision. *Tecom,*

18

*Inc. v. United States*, 732 F.2d 935, 937 (Fed. Cir. 1984); *J.F. Shea Co., Inc. v. United States*, 4 Cl. Ct. 46, 54 (1983).  IHS concedes this point.  Motion at 5.

The notion that Defendants need more time to evaluate a possible fraud counterclaim is untenable for several reasons.  First, the August 17, 2015 deadline for Defendants to move to amend the pleadings in the Scheduling Order (Doc. 76 at 1) has long passed; indeed, it passed several months after IHS's 17-member team began reviewing Sage's CSC claim.  Second, it now appears that Sage *understated* its CSC claim to Dayish by more than a million dollars.  That fact, together with Sage's care in preparing that claim and complying with the IHS "Dear Tribal Leader" letter direction to use actual "incurred costs," *see, e.g.*, Ex. I at 1-2; *accord* Doc. 27-17 at p. 5 of 11, negate any possible intent by Sage to deceive the Government as needed to show a violation of the Contract Disputes Act.  *See, e.g., Gulf Group*, 114 Fed. Cl. at 327-36.  And, in any event, civil fraud and contract-based claims would fail because of the special ISDEAA 365-day limitations period.  *See* 25 U.S.C. § 450j-1(f) ("Any right of action or other remedy (other than those relating to a criminal offense) relating to any disallowance of costs shall be barred unless the Secretary has given notice of any such disallowance within three hundred and sixty-five days of receiving any required annual single agency audit report . . ."); *United States v. Menominee Tribal Enter.*, No. 07-C-316, 2009 WL 1373952 at *3-*5 (E.D. Wis. May 15, 2009).

Finally, referring to a previous Sage motion seeking a routine, agreed-upon extension

of two weeks for its expert reports, Defendants contend that Sage should be judicially estopped from objecting to a last-minute request for an additional four months for Defendants to provide their expert reports and conduct discovery and to postpone the trial by at least that much time.  Motion at 12-13.  The circumstances are not even remotely similar, and the doctrine is inapplicable.  *See Vehicle Market Research, Inc. v. Mitchell Int'l, Inc.*, 767 F.3d 987, 989, 993 (10th Cir. 2014).

## III.   CONCLUSION; REQUEST FOR EXPEDITED CONSIDERATION

This Court has ruled that Sage is entitled to full funding from Defendants for FY 2014 and FY 2015, but Defendants have not provided it, now owing Sage over $23 million for FY 2015 alone.  With regard to the damages asserted by Sage in its CSC Claim, Defendants have had over 15 months to evaluate that claim, assembled a large team to do so by May 2015, and purported to have actually evaluated it in the Dayish decision of July 16, 2015 that forms the basis of Defendants' July 17, 2015 Counterclaim.  From the commencement of this suit, Sage has identified and quantified specific types of damages caused by Defendants' unlawful conduct.  Defendants have been on notice since the June 11, 2015 JSR that Sage would present evidence on lost business opportunities and on consequential, expectancy and intangible damages just as Dr. Jorgensen did in the *Ramah* case, but Defendants have not been diligent in discovering the extent and manner of determining such damages.

Defendants seek a four-month do-over, but Defendants have not shown good cause

to extend the deadlines set by the Court and relied upon by Sage, and their last-minute attempt to put off settlement discussions and trial by four months should therefore be denied.

By filing the Motion one business day before the deadline for making their expert disclosures, Defendants apparently presumed that the Court would grant them some relief. That presumption may or may not prove correct.  In light of the uncertainty introduced by the Defendants' Motion, Sage respectfully requests expedited consideration of that Motion.

Respectfully submitted,

FRYE LAW FIRM, P.C.


By: _____ s/ Paul E. Frye _____
          Paul E. Frye
          10400 Academy Rd. NE., Suite 310
          Albuquerque, NM 87111
          Tel: (505) 296-9400
          Fax: (505) 296-9401

Attorneys for Plaintiff Sage

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed through the United States District Court CM/ECF system, causing it to be served by electronic means on all counsel of record, this 14th day of December, 2015.


_____ s/ Paul E. Frye _____
          Paul E. Frye

21