# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

NAVAJO HEALTH FOUNDATION --
SAGE MEMORIAL HOSPITAL, INC.,

      Plaintiff,

vs.                                                    No. CIV 14-0958 JB/GBW

SYLVIA MATTHEWS BURWELL, SECRETARY
OF THE UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
ROBERT McSWAIN, ACTING DIRECTOR
OF INDIAN HEALTH SERVICE;
JOHN HUBBARD, JR., AREA DIRECTOR,
NAVAJO AREA INDIAN HEALTH SERVICE;
and FRANK DAYISH, CONTRACTING
OFFICER, NAVAJO AREA INDIAN HEALTH
SERVICE,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion to Dismiss

Counterclaim, filed August 7, 2015 (Doc. 92)("MTD").  The Court held a hearing on November

17, 2015.  The primary issues are: (i) whether the Court lacks subject-matter jurisdiction over the

Defendants' Counterclaim, see Answer to Second Amended Complaint and Counterclaim, filed

July 17, 2015 (Doc. 84)("Counterclaim"), because Defendant Frank Dayish, contracting officer

("CO") for the Navajo Area HIS, lacked the authority to make his purported July 16, 2015, final

decision because Plaintiff Navajo Health Foundation -- Sage Memorial Hospital Inc.'s Contract

Support Cost ("CSC") claim was already being litigated in this Court; and (ii) whether the Court

lacks subject-matter jurisdiction over the Defendants' Counterclaim, because Dayish's July 16,

2015, letter, see Letter from Frank Dayish, Chief Contracting Officer, to Stenson D. Wauneka,

Board Chairman, Sage Memorial Hospital, Inc. (dated July 16, 2015), filed July 17, 2015 (Doc. 84-1)("July 16, 2015 Dayish Letter"), was not sufficiently detailed under the Contract Disputes Act ("CDA") in that it provided several bases for liability, yet specified only one damages figure. The Court concludes that it has subject-matter jurisdiction over the Defendants' Counterclaim, because: (i) Dayish retained the authority to issue a final decision on the Defendants' claim for indirect contract support costs funding that Sage Hospital did not expend on CSC-eligible activities in fiscal years 2009-2013; and (ii) the July 16, 2015, letter was sufficiently detailed under the CDA, even though it provided several basis for liability, yet specified only one damages figure.  The Court therefore denies the MTD.

## FACTUAL BACKGROUND

The Court takes this factual background from the facts that it concluded were undisputed in Navajo Health Foundation -- Sage Memorial Hospital, Inc. v. Burwell, No. CIV 14-0958 JB/GBW, 2015 WL 3862952 (D.N.M. June 17, 2015)(Browning, J.)("Sage").[1]  The Court provides this factual background to give a summary how the case began and to tell a coherent story.

"Sage is a health care facility in Ganado, Arizona, within the exterior boundaries of the Navajo Reservation."  2015 WL 3862952, at *1.  "Sage is a Navajo tribal organization for the purpose[] of contracting with IHS under the [Indian Self-Determination Education Assistance Act ("ISDEAA")]."  2015 WL 3862952, at *1.  "IHS is an agency within the Department of

---

[1] In the Court's Sage opinion, its factual background section consisted primarily of material quoted directly from the parties' briefing and documents that the parties submitted to the Court.  See 2015 WL 3862952.  Here, the Court lifts the factual background section from that opinion, as shown by the quotation marks, but otherwise omitting any internal quotation marks it might need to add and the citations to individual court documents, unless otherwise noted.

Health and Human Services and is responsible for providing federal health services to American Indians and Alaska Natives." 2015 WL 3862952, at *1.

"Since 2004, Sage has contracted with IHS under the ISDEAA to provide health services to a largely Navajo patient population." 2015 WL 3862952, at *2. "Defendant [Frank] Dayish is the Contracting Officer for the Navajo Area IHS." 2015 WL 3862952, at *2. "Dayish is responsible for ISDEAA contracts and funding agreements for IHS programs, functions, services and activities undertaken by ISDEAA contractors within the Navajo Area of IHS, including Sage." 2015 WL 3862952, at *2. "Dayish has exercised the authority to sign ISDEAA contracts and funding agreements with Sage for such IHS programs and to award funds pursuant to those agreements." 2015 WL 3862952, at *2. "As Contracting Officer, Dayish has exercised the authority to decide initially disputes arising under ISDEAA contracts." 2015 WL 3862952, at *2.

### 1.   The IHS' Process for Resolving CSC Claims.

"Over 1,600 CSC CDA claims have been presented to IHS." 2015 WL 3862952, at *2. "Upon receipt of a [CSC] claim, the IHS CO sends a letter acknowledging the claims, request[ing] additional documentation and explanation of the claims that are not available to IHS and are necessary to complete its analysis, and sets forth a date for responding to those claims." 2015 WL 3862952, at *2. "Due to the complexity of the CSC claims, as well as IHS's goal to ensure consistency in the analysis of all claims, the claims are then analyzed by an IHS team that includes financial analysts and staff from the appropriate IHS Area Office, including the CO." 2015 WL 3862952, at *2. "IHS hired an outside financial accounting firm, Cotton & Co., additional staff in its Office of Finance and Accounting (OFA), and new attorneys in the HHS Office of the General Counsel, to assist in handling the claims." 2015 WL 3862952, at *2. "In

addition, numerous staff in IHS's twelve Area Offices, thirty attorneys in the HHS Office of General Counsel, as well as numerous attorneys in the U.S. Attorney's Office, are assisting in tracking, evaluating, and resolving the CSC CDA claims."   2015 WL 3862952, at *2. "Extensive documentation is needed to evaluate the claims, and the analysis is complex."  2015 WL 3862952, at *2.

"After IHS completes its analysis of the tribal contractor's claims, it notifies the tribal contractor of the results of the analysis or reaches out to the tribal contractor and typically its legal counsel and financial expert to discuss the claims."  2015 WL 3862952, at *3.  "The IHS's legal counsel, financial experts, and frequently IHS Area Office staff participate in these meetings."  2015 WL 3862952, at *3.  "IHS is attempting to resolve the claims expeditiously and in cooperation with tribal contractors, without resorting to litigation."  2015 WL 3862952, at *3. "[I]nformation needed is not readily apparent from financial documents and, instead, requires in-depth conversations between the financial experts for both the tribe and IHS in order for the parties to reach an understanding."  2015 WL 3862952, at *3.

> Most of the time, IHS and the tribal contractor are able to reach an understanding about the eligible costs actually incurred by the tribal contractor but not paid by the IHS as CSC under the tribal contractor's ISDEAA contract and annual funding agreement, allowing the parties to quickly settle the claims at the next step of the CDA process.

2015 WL 3862952, at *3.  "[I]t is the IHS's goal to work cooperatively with tribal contractors to exchange relevant documents and discuss the claims prior to issuing its final decision."  2015 WL 3862952, at *3.  This process "is time consuming and resource intensive, and the time required to respond to each claim is heightened due to the complexity of each claim, the total number of claims being addressed by IHS, and the time needed to meet with and discuss the claims with tribal contractors."  2015 WL 3862952, at *3.  "As IHS continues to make progress

in resolving the claims, the majority of which have already been resolved, IHS does anticipate that the time required to reach resolution will be shortened."  2015 WL 3862952, at *3.

### 2.     Sage Hospital's CSC Claim.

"By letter dated August 25, 2014 to Defendant Dayish, Sage submitted to IHS a CSC claim for FY 2009 through FY 2013 for a total of $62,569,681."  2015 WL 3862952, at *3. "Sage submitted approximately 270 pages of documents with its CDA claims letter for $62,569,681, including Sage's audited financial statements for (FYs) 2009-2013."  2015 WL 3862952, at *3.  Sage Hospital also submitted "contracts and funding agreements between Sage and IHS in the custody of IHS, a Schedule of Attachments A and B prepared by Sage showing details of the CSC shortfalls, expectancy damages, and total claim . . . ."  2015 WL 3862952, at *3.

"Sage did not rely on IHS' reports to Congress, and Sage's claim expressly states that Sage has used the method of calculating the shortfall preferred by IHS, namely, full amount of CSC minus amount of CSC paid."  2015 WL 3862952, at *4.  "The Claim specifies, [for fiscal years 2009-13,] the CSC shortfall based on the full amount of CSC incurred by Sage minus the amount of CSC paid by IHS, the expectancy damages from lost billings, and the total claim for each such year."  2015 WL 3862952, at *4.  "The Claim . . . explains the expectancy damages claim for lost third-party revenues and the manner of calculating them."  2015 WL 3862952, at *4.

### 3.     Dayish's Response to the Claim.

Dayish responded to the Claim with a letter "based on a template designed to ensure consistent responses to all tribes with CSC claims" that was dated October 23, 2014.  2015 WL 3862952, at *4.  The Dayish Letter states in pertinent part:

On August 27, 2014, I received your letter dated August 25, 2014. The letter makes a claim under the Contract Disputes Act and the Tribe's Indian Self-Determination and Education Assistance Act (ISDEAA) contract for fiscal year 2009, alleging "damages arising out of the failure of [IHS] to pay full contract support costs (including indirect costs and direct contract supports)."

Because your claim exceeds $100,000, the CDA requires that the Indian Health Service (IHS) either issue a decision on the claim within 60 days of the date of receipt or notify the contractor when it will issue the decision. 41 U.S.C. § 7103(f)(2); 25 C.P.R. § 900.223(a). At this time, the IHS has not had an opportunity to adequately review and make a final decision on your claim for a variety of reasons, including the size, complexity, age, and lack of specificity of your claim and the inadequacy of supporting documentation submitted with the claim. In addition, the IHS would like to work cooperatively with the Navajo Health Foundation-Sage Memorial Hospital Inc. (NHF-SMH) to exchange relevant documents and discuss the claims prior to issuing its response. In consideration of these factors and based upon the anticipated cooperation of the NHF-SMH, I will issue a final contracting officer's decision by **October 21, 2015.**

NHF-SMH can assist IHS in responding to the claim by providing additional documentation. NHF-SMH did not submit sufficient information to provide a basis for IHS to determine the validity of the NHF-SMH's claim that it is owed additional contract support costs (CSC) funds. Although IHS will refer to the contract documents that are in the Agency's possession to begin analyzing the claim, we have found that those documents often are insufficient to determine the amount of reasonable, allowable, and non-duplicative CSC that NHF-SMH actually incurred. At least part of your claim appears to be based on the annual IHS CSC report to Congress, but that report is merely a budget planning tool that is not based on audited figures and, therefore, does not establish the amount of allowable CSC incurred by the NHF-SMH or the amount of any deficiency in CSC funding. Accordingly, IHS requests that NHF-SMH submit information of actual CSC incurred in the years at issue. Relevant documentation may include:

    1)    Documents showing actual expenditures for direct costs associated with operation of the ISDEAA programs for each fiscal year at issue.

    2)    Documents showing the Tribe's indirect costs for each fiscal year at issue.

    3)    Documents showing the Tribe's actual capital expenditures, pass-through amounts, and other exclusions associated with the operation of the ISDEAA programs for each fiscal year at issue.

- 6 -

    4)    Any additional documentation in the NHF-SMH's possession that will assist IHS in determining which of NHF-SMH's expenditures meet the ISDEAA definition of CSC in section 106(a)(2) and do not duplicate costs funded in the section 106(a)(l) amount.

Lastly, the IHS requests that NHF-SMH provide further explanation for the methodology used to calculate the amount of additional CSC funds it claims is owed. For example, the "shortfall" claim appears to be based directly on the annual report to Congress. That report is merely a budget planning tool, however, and does not demonstrate the amount of CSC incurred by NHF-SMH. Similarly, we have no information demonstrating your expectancy damages claims. If you have detailed information demonstrating the calculation of each of these claims, IHS can review your claim more thoroughly and respond more quickly.

The requested information should be sent electronically to Alva R. Tom at alva.tom@ihs.gov or mailed in hardcopy to the following address within forty-five (45) days from the date of this letter:

        Navajo Area Indian Health Service
        Office of Indian Self Determination
        Attention: Alva R. Tom
        P.O. Box 9020
        Window Rock, AZ   86515

Should NHF-SMH need additional time to provide the requested documentation, please send notice in writing of the date by which NHF-SMH intends to respond, and a request for an additional extension of time for IHS to consider the documentation before making its decision. If IHS does not receive any response, the Agency will consider the lack of specificity and the inadequacy of supporting documentation in making its decision. IHS hopes that this will not be necessary and looks forward to working with NHF-SMH on a timely and expeditious resolution of its claim.

2015 WL 3862952, at *4-6.

In an effort to treat all tribal contractors fairly, IHS made a policy decision, which has been communicated to all tribal contractors (and agreed upon by many tribal contractors whose claims were pending before the Civilian Board of Contract Appeals (CBCA)), to attempt to review and resolve the claims in the order they were received; i.e., the earliest or oldest claims first, followed by the claims received more recently.

2015 WL 3862952, at *6. "Sage's claims are the most recently filed CSC CDA claims in the

Navajo Area IHS." 2015 WL 3862952, at *6.

"[A]ll of the tribal contractors in the Navajo Area IHS with ISDEAA contracts have filed CSC CDA claims against the IHS, and IHS's determination on the time required to respond to Sage's claims was informed by the Area's experience with resolving those other claims."  2015 WL 3862952, at *6.  "In general, it has taken approximately two years to resolve such claims with the Navajo Area ISDEAA contractors."  2015 WL 3862952, at *6.  Dayish "informed Sage that he would issue a final decision by October 21, 2015, based on his good faith estimate of the amount of time that would reasonably be needed [to] evaluate and assess the claims, based on this prior experience in the Navajo Area and throughout IHS."  2015 WL 3862952, at *6.  "In addition, Sage's claims for $62 million are larger than the majority of CSC CDA claims filed against the IHS."  2015 WL 3862952, at *6.

> The evaluation and assessment of Sage's CSC claims likely will take longer than for other CSC claims because of the separate (but related) issue of the significant offset and counterclaims that IHS will likely need to assert against Sage due to [the IHS's contention that Sage Hospital] significant[ly] misuse[d] and mismanage[d] IHS funds, as disclosed by the forensic audit conducted by an outside contractor, Moss Adams.

2015 WL 3862952, at *6.

## PROCEDURAL BACKGROUND

Sage Hospital filed this case in federal court on October 23, 2014.  See Complaint, filed October 23, 2014 (Doc. 1).  Sage Hospital filed its First Amended Complaint on November 24, 2014.  See Amended Complaint, filed November 24, 2014 (Doc. 5)("FAC").  Sage Hospital makes four claims in its FAC: (i) a request for immediate injunctive relief, because the IHS' declination of Sage Hospital's August 22, 2013 three-year contract proposal for FY 2014 ("FY 2014 Proposal") violates 25 U.S.C. § 450f(b)(2), and 25 C.F.R. §§ 900.32 and 900.33, FAC ¶¶ 52-57, at 22-25; (ii) a request for immediate injunctive relief, because the IHS' declination of Sage Hospital's September 19, 2014, proposal for FY 2015 ("FY 2015 Proposal") -- to the extent

that it is substantially the same as the FY 2014 Proposal -- violates 25 U.S.C. § 450f(b)(2), and 25 C.F.R. §§ 900.32 and 900.33, FAC ¶ 58, at 25-27; (iii) a claim that Sage Hospital is entitled to an accounting of funds that IHS provided from October 1, 2013, to the date of the judgment, pursuant to 25 U.S.C. § 450m-1(a), FAC ¶¶ 63-66, at 27; and (iv) a claim that the IHS violated the CDA, 41 U.S.C. §§ 7101-7109, see FAC ¶¶ 67-72, at 27-29.

On January 27, 2015, Sage Hospital moved for summary judgment on its fourth claim for relief -- that the IHS violated the CDA -- seeking the Court's judgment that Dayish's letter, dated October 23, 2014, did not comply with his obligation to provide a reasonable date certain for issuing his decision.  See Plaintiff's Motion for Summary Judgment on its Fourth Claim for Relief, with Memorandum of Supporting Points and Authorities, filed January 26, 2015 (Doc. 27).  The Court granted summary judgment in favor of Sage Hospital, holding that Sage Hospital's "claim for Contract Support Costs for Fiscal Years 2009-13 (the 'Claim') is deemed denied under the Contracts Disputes Act, 41 U.S.C. §[§] 7101-09."  Sage, 2015 WL 3862952, at *44.  On June 30, 2015, Sage Hospital filed its Second Amended Complaint, adding a fifth claim for relief, which alleges that the deemed denial of Sage Hospital's CSC Claim for Fiscal Years 2009-2013 was unlawful and requests the full amount of its Claim, expressly including its claim for underpaid CSC in the amount of $36,258,493.00.  See Second Amended Complaint, filed June 30, 2015 (Doc. 79)("SAC").

Shortly thereafter, on July 16, 2015, Dayish sent a letter to Sage Hospital concerning "Contract Disputes Act Claims for Excess Contract Support Costs Funding" for "Fiscal Years 2009-2013."  July 16, 2015 Dayish Letter at 1.  In the letter, Dayish "assert[s] claims against [Sage Hospital] for indirect contract support costs (CSC) funding that [Sage Hospital] did not expend on CSC-eligible activities for fiscal years (FY or FYs) 2009-2013," demanded repayment

from Sage Hospital in the amount of $4,218,357.00 for indirect CSC payments, and promised a subsequent decision devoted to the other category of CSC -- direct CSC.  July 16, 2015 Dayish Letter at 1.  The July 16, 2015 Dayish Letter contains two sections of particular importance to the MTD: "Findings of Fact;" and "Decision."  See July 16, 2015 Dayish Letter at 5.  In the Findings of Fact section, Dayish sets forth: (i) the amount of indirect CSC and other indirect cost amounts that IHS paid from 2009 to 2013; and (ii) the amounts eligible for indirect funding, as the ISDEAA authorizes, because they were reasonable, necessary, and non-duplicative costs incurred for activities taken to operate a federal program.  See July 16, 2015 Dayish Letter at 5.  Moreover, according to the letter, "[t]he Foundation and the IHS agreed that only the actual costs incurred by the Foundation, and not the estimated amounts, are eligible for CSC funding."  July 16, 2015 Dayish Letter at 6.  After examining the actual costs that Sage Hospital identified and the actual costs determined ineligible for indirect CSC funding, Dayish concludes:

> Comparing this determination to the IHS indirect funding and other indirect cost payments (Table 2), the Foundation owes $4,218,357 for indirect CSC funding paid by the IHS that the Foundation did not expend on activities eligible for CSC funding.  Please refund $4,218,357 by check or money order made payable to the Department of Health and Human Services.

July 16, 2015 Dayish Letter at 6.

One day later, IHS filed its Counterclaim, asserting that the July 16, 2015 Dayish Letter constituted a "Contracting Officer's Final Decision" on Sage Hospital's Indirect CSC funding, complaining that Sage Hospital "has not paid any of the amounts sought by the contracting officer's final decision," and requesting judgment in the amount of $4,218,357.00 plus interest for the allegedly overpaid indirect CSC.   Answer to Second Amended Complaint and Counterclaim, filed July 17, 2015 (Doc. 84)("Counterclaim").

1.      **The Motion to Dismiss**.

On August 7, 2015, Sage Hospital moved to dismiss the Counterclaim.  <u>See</u> MTD at 1.
Sage Hospital first explains that "IHS has the burden to establish this Court's subject matter
jurisdiction over its CDA counterclaim."  MTD at 4 (citing <u>Blinderman Const. Co. v. United
States</u>, 39 Fed. Cl. 529, 557 (1997)).  Sage Hospital contends that, for the Court to have subject-
matter jurisdiction over the Counterclaim, there must be a valid decision by a CO and that
Dayish's decision -- the basis for the Counterclaim -- is not a valid decision, for two reasons.
First, Sage Hospital asserts that Dayish did not have the authority to issue a final decision
concerning "indirect contract support costs (CSC) funding that [Sage Hospital] did not expend
on CSC-eligible activities for fiscal years (FY or FYs) 2009-2013."  Sage Hospital explains:

> When Sage filed its Second Amended Complaint, the CSC claim was in
> litigation.  The filing of suit on a claim under the CDA divests the CO of authority
> to issue a final decision on that claim.  *Sharman Co., Inc. v. United States*, 2 F.3d
> 1564, 1571-72 (Fed. Cir. 1993), *overruled on other grounds*, *Reflectone, Inc. v.
> Dalton*, 60 F.3d 1572 (Fed. Cir. 1995)(*en banc*); *Durable Metal Prods., Inc. v.
> United States*, 21 Cl. Ct. 41, 46 (1990)(CO divested of authority to make decision
> after contractor's claim was deemed denied and contractor filed suit).  A decision
> reached by a CO after the related claim is in litigation is a "nullity" and provides
> "no jurisdictional basis for the government's counterclaim."  *Sharman*, 2 F.3d at
> 1572; *Advanced Materials, Inc. v. United States*, 34 Fed. Cl. 480, 482 n.2
> (1995)(CO's purported decision after suit filed was "void"); *Johnson Controls
> World Services, Inc. v. United States*, 43 Fed. Cl. 506, 513-14 (1999)(sustaining
> jurisdictional challenge to Government's CDA counterclaim).

MTD at 5.

Second, Sage Hospital asserts that the Court lacks subject-matter jurisdiction over the
Counterclaim, because "an invalid CO decision may not serve as the basis for a CDA action,"
and that, even if Dayish had authority to make his "final decision," his letter "does not qualify as
a valid CDA claim because it provides several purported bases for liability, yet specifies only
one aggregate damages figure."  MTD at 5 (citing <u>Volmar Const., Inc. v. United States</u>, 32 Fed.

Cl. 746, 758 (1995)).  According to Sage Hospital, in <u>Volmar Const., Inc. v. United States</u>, the United States Court of Federal Claims held that a CO's letter did not qualify as a valid CO claim, because it provided several bases for liability yet specified only one aggregated damages figure. Sage Hospital maintains that the Court of Claims in <u>Volmar Const., Inc. v. United States</u> recognized that the CDA requires that COs "set forth in any claim the specific basis of liability and the amount corresponding to each basis."  MTD at 6 (quoting <u>Volmar Const., Inc. v. United States</u>, 32 Fed. Cl. at 752).

In light of these two challenges to the Court's subject-matter jurisdiction over the Counterclaim, Sage Hospital concludes:

> Mr. Dayish had no authority to issue his "final decision," it is a nullity, and it provides no jurisdictional basis for IHS' counterclaim.  Even if Dayish was authorized to make a decision, the one he made was not a valid one.  In either event, this Court lacks subject matter jurisdiction over HIS' counterclaim, and it should be dismissed.

MTD at 6.

### 2.    <u>The Response</u>.

The Defendants responded to the MTD on September 8, 2015.  <u>See</u> Response to Plaintiff's Motion to Dismiss Counterclaim, filed September 8, 2015 (Doc. 98)("Response"). The Defendants contend that the Court has subject-matter jurisdiction over its Counterclaim and that the Court should deny the MTD.  <u>See</u> Response at 1-2.  In the Defendants' view, "[t]he Court should not endorse a result that allows a contractor to litigate its claim in federal court while precluding the government from asserting its related counterclaim."  Response at 2.  The Defendants first address Sage Hospital's contention that the CO in this case lacked the authority to issue a final decision.  <u>See</u> Response at 2-5.  The Defendants concede that, "once a CDA claim is in litigation, the contracting officer is divested of his or her previous authority over the claim."

- 12 -

Response at 3 (citing <u>Sharman Co., Inc. v. United States</u>, 2 F.3d at 1571-72).  The Defendants

contend, however, that

> their counterclaim is distinct from Sage's claim because, although it seeks the
> return of monies paid as contract support costs, the claim is asserted by a different
> party, and basis of the entitlement is different.  Accordingly, because these are
> different claims, authority over the defendants' claims never shifted to the
> Department of Justice when Sage filed its complaint, and the Court should deny
> Sage's motion.

Response at 4.

Further, the Defendants argue that, even if Sage Hospital is correct that the defendants'

counterclaim is actually the same claim that Sage is already pursuing in this litigation (albeit one

pursued by the opponent of the party that first came to court), then Sage Hospital already

satisfied the jurisdictional prerequisite by submitting the claim to Dayish and obtaining a ruling

from this Court that the claim is deemed-denied.  <u>See</u> Response at 4.  In support of this second

argument, the Defendants cite to <u>Sharman Co., Inc. v. United States</u>, 2 F.3d at 1564, where,

according to the Defendants, the United States Court of Appeals for the Federal Circuit,

recognized the "mirror-image rule."  Response at 4 n.3.  The Defendants write:

> The Court of Federal Claims has recognized this as the "mirror-image"
> rule.  In *Sharman*, the Federal Circuit suggested that the assertion of a "mirror
> image" claim (one half of opposing claims held by the contracting parties) by one
> party satisfies the CDA exhaustion requirement for both.  *See Sharman*, 2 F.2d at
> 1566, 1570.  The Court of Federal Claims has applied this to establish jurisdiction
> over opposing claims arising out of the same facts and circumstances that seek
> entitlement (either in whole or in part) to the same dollars.  *Kit-San-Azusa, J.V. v.
> United States*, 32 Fed. Cl. 647 (1995)(applying the mirror-image rule); *but see
> Blinderman Constr. Co. v. United States*, 39 Fed. Cl. 529, 588 (1997)(declining to
> apply the mirror-image rule upon the basis that there was no evidence that the
> contracting officer had considered the counterclaim).

Response at 4-5 n.3.  The Defendants argue that, therefore, "[t]he Court should not dismiss the

defendants' counterclaim and proceed upon only half of the dispute; rather, it should allow the

counterclaim to proceed and resolve the parties' entire dispute."  Response at 4-5.

The Defendants next attack Sage Hospital's assertion that Dayish's letter "was not the proper form of a 'final decision' that will satisfy the CDA's jurisdictional requirement." Response at 5.  The Defendants argue that Sage Hospital relies exclusively on Volmar Const., Inc. v. United States, 32 Fed. Cl. at 746, and that it "misapprehends the law."  Response at 5. Moreover, the Defendants cite to Placeway Construction Corp. v. United States, 920 F.2d 903 (Fed. Cir. 1990), for the proposition that "the Federal Circuit held that form [sic] rules applicable to a contractor's claim against the government do not necessarily apply to a government claim against the contractor."  Response at 5-6.  According to the Defendants, "the focus is upon whether the surrounding facts and circumstances would inform the reasonably prudent contractor that the government is asserting a right to the funds that are the subject of the counterclaim." Response at 6.  The Defendants maintain:

> As the case relied upon by Sage notes, the CDA does not specify in any detail the requirements for a government claim against a contractor; it provides only that the claim must be the subject of a decision by the contracting officer. *Volmar Const., Inc. v. United States*, 32 Fed. Cl. 746, 752 (1995)(citing 41 U.S.C. § 605(a)).  *Volmar* drew from this circumstance the conclusion that the requirements for a government claim should be the "reciprocal" twin of the requirements of a claim submitted by a contractor against the government.  *Id.* This conclusion, however, is not a necessary one, and it is inconsistent with the canon of statutory construction stipulating that, if Congress does not address the specific requirements for one thing, but does provide specific instructions for a related but distinguishable thing, the difference is intentional.  *Bates v. United States*, 522 U.S. 23, 29-30 (1997)("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  (alteration omitted)).  This principle is also consistent with the *Placeway* rule, which is that the government need not comply with certain requirements of the Act applicable to contractors as long as a contracting officer issues an "effective" final decision.  *Placeway*, 920 F.2d at 905-07 (excusing the failure of the CO's letter to include "the label 'final decision'" and "the notice of appeal rights").

Response at 6.

The Defendants further argue that, the <u>Volmar Const., Inc. v. United States</u> decision is neither mandatory authority for the Court, nor persuasive on its own terms.  <u>See</u> Response at 7.  According to the Defendants, even if the requirements for the United States' claims and contractor claims should be "reciprocal," <u>Volmar Const., Inc. v. United States</u> incorrectly concludes that the CDA requires the United States to set forth the specific bases of liability in any claim.  <u>See</u> Response at 7.  The Defendants contend that, under Federal Circuit precedent, "there is no requirement in the Disputes Act that a 'claim' must be submitted in any particular form or use any particular wording," and that "[a]ll that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim."  Response at 7 (quoting <u>Contract Cleaning Maint., Inc. v. United States</u>, 811 F.2d 586, 592 (Fed. Cir. 1987)).  The Defendants maintain that, under the Federal Circuit's interpretation of the requirement, "a contractor satisfies the CDA by giving 'clear notice of a purported breach,' even if the contractor ends up proposing 'slightly different legal theories' throughout the course of the dispute."  Response at 7 (quoting <u>Scott Timber Co. v. United States</u>, 333 F.3d 1358, 1366 (Fed. Cir. 2003)).  The Defendants argue that, combining these general principles with the statutory requirement that judicial review of a CDA claim is conducted de novo, <u>see</u> 41 U.S.C. § 7104 (b), leads to the conclusion that the "real inquiry concerning the administrative exhaustion of a government claim is whether the contractor -- who is the only contracting party that can come to court in the first instance -- should be aware of the basis of the government's claim."  Response at 7-8 (footnote omitted).  The Defendants ask the Court to deny the MTD.

      **3.**     **<u>Sage Hospital's Reply</u>.**

     Sage Hospital replied to the Defendants' response on September 16, 2015.  <u>See</u> Plaintiff's Reply to Defendants' Response to Plaintiff's Motion to Dismiss Counterclaim, filed September 16, 2015 (Doc. 102)("Reply").  Sage Hospital begins by emphasizing the two bases for its MTD. First, according to Sage Hospital, after the Court deemed denied Sage Hospital's CSC claim for FY 2009 through FY 2013 and Sage Hospital amended its Complaint to challenge that denial, "under the Contract Disputes Act . . . Dayish as Contracting Officer ('CO') was divested of any authority to act on that claim."  Reply at 1-2.  Sage Hospital thus argues that Dayish's purported "final decision" dated July 16, 2015, addressing that same claim "was a nullity and Defendants' Counterclaim (filed July 17, 2015) based on that 'final decision' has no jurisdictional basis." Reply at 2 (citing <u>Durable Metal Prods., Inc. v. United States</u>, 21 Cl. Ct. at 46).  Second, Sage Hospital contends that "Dayish's purported decision violated CDA's specificity requirement, as construed by the Court of Federal Claims, because it stated four separate grounds for his decision but did not inform Sage Hospital of which of those bases applied to any part of the disallowed costs."  Reply at 2 (citing <u>Volmar Constr., Inc. v. United States</u>, 32 Fed. Cl. at 752, 758).

     Sage Hospital next attacks the Defendants' argument that the "'claim' purportedly decided by Dayish is a different claim, because it is made by IHS and not Sage," contending that "the cases interpreting the CDA make no such distinction."  Reply at 2-3 (citing <u>Durable Metal Prods., Inc. v. United States</u>, 21 Cl. Ct. at 46; <u>Sharman Co., Inc. v. United States</u>, 2 F.3d at 1564).  Sage Hospital then counters several of the Defendants' arguments from the Response's footnotes.  First, Sage Hospital addresses the Defendants' argument that the United States Attorney by letter conferred authority for Dayish to issue a CO's final decision under the CDA. Sage Hospital states:

> Not even the Attorney General, much less a United States Attorney, has the power
> to so delegate.  Although the Attorney General might delegate "authority" to an
> agency official to make computations in furtherance of the Government's position
> in litigation, no United States Attorney can lawfully confer on an agency official
> the jurisdiction to issue a final CO decision when that authority is not explicitly
> and clearly conferred by a federal statute, *see* 28 U.S.C. § 516, and when this
> Court has effectively divested that same official of such authority by deeming the
> underlying claim denied by him.

Reply at 3-4 (citing Cincinnati Electronics Corp. v. United States, 32 Fed. Cl. 496, 500 (1994)).

Sage Hospital argues that the Defendants' argument is effectively that, even after a federal court

has deemed denied a CDA claim because a CO has unreasonably delayed in making a decision

on that claim, "a United States Attorney may ignore the court ruling and give that same CO an

indefinite period of additional time to make the decision that he had already unlawfully delayed."

Reply at 4-5.

Sage Hospital next attacks the Defendants' argument that the "mirror image rule"

supports the Defendants in this case.  Reply at 5.  According to Sage Hospital, the mirror image

rule "supports Sage here because Dayish did not issue a written decision on Sage's CSC claim

before it was deemed denied and therefore could not have considered the Government's

counterclaim then."  Reply at 5 (citing Blinderman Constr. Co., Inc. v. United States, 39 Fed. Cl.

at 558-60).  Sage Hospital also argues that, even if the Court dismisses the Counterclaim, any

resulting inefficiency in terms of this matter being resolved in future litigation "will have been

caused by Defendants' attempt to circumvent this Court's ruling granting Sage Hospital

summary judgment on its Fourth Claim for Relief . . . ."  Reply at 6.  Further, Sage Hospital

counters the Defendants' mention of the United States' general right of setoff by asserting that

"this right is circumscribed in the specific context of Self-Determination contracting."  Reply at

6 (citing 25 U.S.C. § 450j-1(f)).  Finally, Sage Hospital argues that the "Defendants do not

dispute Sage's reading of *Volmar*" and contends that Dayish's purported July 16, 2015, "final

- 17 -

decision" does not provide the reader with sufficient information regarding how much of the alleged overpayments are attributable to any of the "four distinct bases for his belated claim that HIS overpaid Sage" and "which of Sage's expenditures were deemed improper by Dayish." Reply at 6-7.  Sage Hospital therefore asks the Court to dismiss the Counterclaim for lack of jurisdiction.  See Reply at 7.

## LAW REGARDING RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."  Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citations omitted).  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence.").  Rule 12(b)(1) allows a party to raise the defense of the court's "lack of jurisdiction over the subject matter" by motion.  Fed. R. Civ. P. 12(b)(1).  The Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based."  Ruiz v. McDonnell, 299 F .3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true.  See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981).  But when the attack is aimed at the jurisdictional facts themselves, a district court may not presume the truthfulness of those allegations.  A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1).  In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

Hill v. Vanderbilt Capital Advisors, LLC, No. CIV 10-0133 JB/KBM, 2011 WL 6013025, at *8

(D.N.M. Sept. 30, 2011)(Browning, J.)(quoting Alto Eldorado Partners v. City of Santa Fe, 2009

WL 1312856, at *8-9).  The Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P.
> 56.  Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction --
> its very power to hear the case -- there is substantial authority that the trial court is
> free to weigh the evidence and satisfy itself as to the existence of its power to hear
> the case.  In short, no presumptive truthfulness attaches to plaintiff's allegations,
> and the existence of disputed material facts will not preclude the trial court from
> evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed.

Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the

complaint to challenge the facts upon which jurisdiction depends, and may do so by relying on

affidavits or other evidence properly before the court.  See New Mexicans for Bill Richardson v.

Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th

Cir. 1995).  In those instances, a court's reference to evidence outside the pleadings does not

necessarily convert the motion to a rule 56 motion for summary judgment.  See Holt v. United

States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).

Where, however, the court determines that jurisdictional issues raised in a rule 12(b)(1) motion

are intertwined with the case's merits, the court should resolve the motion under either rule

12(b)(6) of the Federal Rules of Civil Procedure or rule 56 of the Federal Rules of Civil

Procedure.  See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999);

Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997).  "When deciding whether

jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether

resolution of the jurisdictional question requires resolution of an aspect of the substantive

claim.'"  <u>Davis ex rel. Davis v. United States</u>, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting

<u>Sizova v. Nat'l Inst. of Standards & Tech.</u>, 282 F.3d 1320, 1324 (10th Cir. 2002)).

<u>**LAW REGARDING RULE 12(b)(6)**</u>

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon

which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion

tests the sufficiency of the allegations within the four corners of the complaint after taking those

allegations as true."  <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency

of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must

accept as true all well-pled factual allegations in the complaint, view those allegations in the light

most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's

favor.  <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007)("[O]nly if a

reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would

the defendant prevail on a motion to dismiss.");  <u>Smith v. United States</u>, 561 F.3d 1090, 1098

(10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all

well-pled factual allegations in a complaint and view these allegations in the light most favorable

to the plaintiff."  (citing <u>Moore v. Guthrie</u>, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers

labels and conclusions or a formulaic recitation of the elements of a cause of action" is

insufficient.  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678 (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S.

at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678.  "Factual allegations must be

enough to raise a right to relief above the speculative level, on the assumption that all the

- 20 -

allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550

U.S. at 555 (citation omitted).

      To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that,

if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v.

Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has

facial plausibility when the pleaded factual content allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S.

at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical

possibility that some plaintiff could prove some set of facts in support of the pleaded claims is

insufficient; the complainant must give the court reason to believe that this plaintiff has a

reasonable likelihood of mustering factual support for these claims."  Ridge at Red Hawk, LLC

v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct,
> much of it innocent, then the plaintiffs "have not nudged their claims across the
> line from conceivable to plausible."  The allegations must be enough that, if
> assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for
> relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl.

Corp. v. Twombly, 550 U.S. at 570).

      Although affirmative defenses must generally be pled in the defendant's answer, not

argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the

defendant asserts an immunity defense -- the courts handle these cases differently than other

motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M.

2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009); Robbins v. Oklahoma,

519 F.3d at 1242); and (ii) where the facts establishing the affirmative defense are apparent on

the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.  If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").  The defense of limitations is the affirmative defense that is most likely to be established by the uncontroverted facts in the complaint.  See 5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure: Civil § 1277, at 643 (3d ed. 2004).  If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).  See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).  The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.  Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense).  It appears, from case law in several circuits, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, No. CIV 08-0140 W, 2008 WL 3833472 (W.D. Okla.

Aug. 15, 2008)(West, J.), and, although the Tenth Circuit has not squarely addressed this practice, the Court has permitted it, see Anderson Living Trust v. WPX Energy Prod., LLC, No. CIV 12-0040 JB/KBM, 2014 WL 2750652, at *17, *37-39 (D.N.M. May 16, 2014)(Browning, J.).

### RELEVANT FEDERAL CONTRACTING LAW

**1.    A CO's Authority to Make Final Decisions Where There is Pending Litigation.**

In the Federal Circuit, Sharman Co. v. United States, 2 F.3d at 1564, provides the foundational analysis of the "effect of pending litigation on a CDA claim presented to a contracting officer."  Kellog Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. 46, 51 (2014).  The key language in Sharman Co. v. United States states: "Once a claim is in litigation, the Department of Justice gains exclusive authority to act in the pending litigation.  That exclusive authority divests the contracting officer of his authority to issue a final decision on the claim."  Kellog Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. at 51 (quoting Sharman Co. v. United States, 2 F.3d at 1571-72).  While the Federal Circuit did not provide the legal rationale for this doctrine beyond in Sharman Co. v. United States, it did cite to 28 U.S.C. § 516 (1988), which states: "Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General."  28 U.S.C. §§ 516-20 (1988).  The Federal Circuit also cited to two prior decisions of the United States Court of Federal Claims in support of the Sharman doctrine: Hughes Aircraft Co. v. United States, 534 F.2d 889 (1976), and Durable Metal Prods., Inc. v. United States, 21 Ct. Cl. at 46.  In Hughes Aircraft Co. v. United States, the United States Court of Federal Claims stated:

We also can find no merit in the Justice Department's final reason for contesting the validity of the Reed clause, i.e., that the Defense Department lacked authority to act for the Government after the Hughes litigation had already been commenced.  Certainly, there can be no dispute that, unless otherwise provided by law, the Attorney General is charged by statute with exclusive and plenary power to supervise and conduct all litigation to which the U.S. is a party. Indeed it was on the basis of this power that the Department of Justice denied the request of the Department of the Air Force to appear as amicus curiae in this case. This power, however, because so broadly inclusive, must be narrowly construed. In our view it is limited to the conduct of pending litigation against the Government, and does not encompass exclusive control of other matters which, albeit related, are not yet so pending.

534 F.2d at 901 (citations omitted).  The Federal Circuit in Sharman Co. v. United States, however, appears to have drawn more heavily from Durable Metal Prods., Inc. v. United States, where the United States Court of Federal Claims explained:

It is well settled that the attorney General of the United States has exclusive authority to conduct suits in the United States Claims Court.  Indeed, 28 U.S.C. § 516 provides that "the conduct of litigation in which the United States . . . is a party . . . is reserved to officers of the Department of Justice, under the direction of the Attorney General."  This power necessarily includes the power to determine all decisions concerning whether to defend an action, and, if so, in which manner to defend it.  Thus, the Department of Justice attorneys in this case have the sole authority and control over the conduct of this action on behalf of defendant.  Likewise, when the CO fails to issue a decision within the statutorily prescribed time period and the contractor chooses to deem its claim denied, it may file suit in the United States Claims Court.  In that event, under the CDA, the CO is divested of his authority over plaintiff's claim unless the Claims Court, in its discretion, concludes to stay the action and remand it to the contracting officer pursuant to 41 U.S.C. § 605(c)(5).

21 Ct. Cl. at 45-46 (citations omitted)(emphasis added).  In any event, it is clear that, relying upon 28 U.S.C. § 516, Hughes Aircraft Co. v. United States, 534 F.2d at 889, and Durable Metal Prods., Inc. v. United States, 21 Ct. Cl. at 46, the Federal Circuit in Sharman Co. v. United States established that once a claim is in litigation, the contracting officer is divested of his authority to issue a final decision on that claim.  The United States Court of Federal Claims explained in Kellog Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. at 51:

> Thus, a suit predicated on the final decision of such a claim submitted to a contracting officer, or the deemed denial of such a claim presented to a contracting officer, is not properly before this court because the contracting officer's final decision or deemed denial of the claim would be a "nullity." *Id.* 1572; *see Case, Inc. v. United States*, 88 F.3d 1004, 1009 (Fed. Cir. 1996)(stating that "when a contracting officer lacks authority to issue a final decision on a claim, there can be no valid deemed denial of the claim so as to confer CDA jurisdiction" on this Court).

115 Fed. Cl. at 51-2 (footnote omitted).

Subsequent opinions addressing the Sharman Co. v. United States jurisdictional bar have not questioned the legal underpinning of the doctrine, but rather, have focused on determining whether the doctrine applies to the case at hand.  According to the United States Court of Federal Claims, "for the *Sharman* jurisdictional bar to apply, the claim in the pending litigation must be the 'same claim' or 'effectively the same claim' as the claim submitted to the contracting officer."  Kellog Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. at 52.  The crucial question in the Federal Circuit, therefore, is whether two claims are the "same claim" for Sharman Co. v. United States purposes.  See, e.g., Kellog Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. at 52.

Sharman Co. v. United States and its progeny in the Federal Circuit and the United States Court of Federal Claims, including Case, Inc. v. United States, 88 F.3d at 1004, and Scott Timber Co. v. United States, 333 F.3d at 1358, recognize that claims which "arise from the same operative facts [and] claim essentially the same relief" are the "same claim" for Sharman purposes.  Scott Timber Co. v. United States, 333 F.3d at 1365.  Although Sharman Co. v. United States itself "provides no explicit guidance as to the breadth or narrowness of the terms 'same claim' or 'effectively the same claim,'" Kellog Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. at 53, the Federal Circuit, there, noted that the claims at issue in the dispute were "the same," because they "allege entitlement to the same money based on the same partial

performance, only under a different legal label." <u>Sharman Co., Inc. v. United States</u>, 2 F.3d at

1571.   Moreover, other decisions from the Federal Circuit also support the view that, in a

<u>Sharman Co., Inc. v. United States</u> analysis, "the proper focus is on operative facts and the relief

sought so as to determine whether a CDA claim is the same as another." <u>Kellog Brown & Root</u>

<u>Servs., Inc. v. United States</u>, 115 Fed. Cl. at 52.

> The need to determine whether a CDA claim is the same as another arises in a variety of contexts.  It is not necessary for the purposes of this opinion to examine those contexts in detail.  The court notes, simply, that the inquiry commonly focuses on whether the operative facts are the same in two or more CDA claims.
>
> For example, in determining whether claims were distinct and separate, or unitary (all part of the same claim), the Federal Circuit stated:
>
> > Because the Claims Court did not base its analysis on whether the claims presented to the CO arose from a common or related set of operative facts, and the government has not cited support in the record that only a unitary claim exists, we remand for the Claims Court to conduct fact finding consistent with this opinion.
>
> *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 908 (Fed. Cir. 1990).  In another context, to determine whether a CDA claim has been improperly split and the second CDA claim is barred by res judicata principles, this court must examine whether "[t]he two claims plainly are based on a single set of operative facts." *Phillips/May Corp. v. United States*, 524 F.3d 1264, 1272-73 (Fed. Cir. 2008).  In yet another context, a claim was determined to be new, not the same, because "a profound alteration occurred in the scope of th[e] claim," expanding the focus on operative facts from three change orders to a "multiplicity of change orders." *Santa Fe Eng'rs, Inc. v. United States*, 818 F.2d 856, 859 (Fed. Cir. 1987).   All these cases show the Federal Circuit's consistent approach in determining whether one CDA claim is the same as another.

<u>Kellog Brown & Root Servs., Inc. v. United States</u>, 115 Fed. Cl. at 53-54.

### 2.      <u>The Sufficiency of Information Provided in a CO's Final Decision.</u>

The CDA does not provide much information about what constitutes a CO's final

decision.  It states only that: "Each claim by the Federal Government against a contractor relating

to a contract shall be the subject of a written decision by the contracting officer."  41 U.S.C. §

605(a).  It further states:

> **(d) Issuance of decision.** -- The contracting officer shall issue a decision
> in writing and shall mail or otherwise furnish a copy of the decision to the
> contractor.
>
> **(e) Contents of decision.** -- The contracting officer's decision shall state
> the reasons for the decision reached and shall inform the contractor of the
> contractor's rights as provided in this chapter.  Specific findings of fact are not
> required.  If made, specific findings of fact are not binding in any subsequent
> proceeding.

41 U.S.C. § 605(d)-(e).  In Placeway Const. Corp. v. United States, however, the Federal Circuit

addressed the issue whether a CO had rendered a final decision on a government claim within the

meaning of 41 U.S.C. § 605.  See 920 F.2d at 903.  The United States Court of Federal Claims

accurately summarized the Placeway Const. Corp. v. United States decision in Volmar Const.,

Inc. v. United States:

> The contractor had submitted an uncertified claim for the balance due under the
> contract, additional work costs, extended overhead expenses, and an adjustment
> of the contract performance time to allow for delay.  Within approximately three
> months, the contracting officer dispatched a letter denying the contractor's request
> for the balance due, citing contractor delay as the basis for the withholding. The
> contracting officer also implied that the amount of the asserted setoff may be
> redetermined at a future date.
>
> Although the setoff amount was subject to possible modification, the appeals
> court in *Placeway* held "that the CO [contracting officer] *effectively* made a final
> decision on the government claim. . . ."  920 F.2d at 906 (emphasis added).  In
> support of its holding with respect to finality, the court noted that "issues of
> liability and of damages should . . . be resolved before judicial review is sought. . .
> ."  *Id.* (citation omitted).  The court then ruled that the contracting officer's
> decision complied with these prerequisites because the contracting officer had
> determined that the basis of liability was delayed performance and that the
> damages constituted the contract balance.

32 Fed. Cl. at 752 (emphasis in original).  Moreover, under Federal Circuit case law, Placeway

Const. Corp. v. United States has been interpreted to mean that a CO must provide adequate

notice of the basis and amount of liability in the written decision.  See, e.g., Volmar Const., Inc. v. United States, 32 Fed. Cl. at 752.

In Volmar Const., Inc. v. United States, however, the United States Court of Federal Claims took the Federal Circuit's decision in Placeway Const. Corp. v. United States one step further, concluding that, where the United States asserts multiple unique setoffs as federal claims, to comply with Placeway Const. Corp. v. United States, the CO's decision must state the basis of liability with respect to each unique setoff and the amount of liability corresponding to each basis.  32 Fed. Cl. at 752.  The Court of Federal Claims explained:

> Placeway involved only one basis for liability and accordingly one damages amount.  The contracting officer cited contractor delay as the basis for liability and the contract balance as the amount of damages assessed.  In this case the Government asserts six different setoffs, each involving a different sum of money. This court interprets Placeway and Contract Cleaning and the latter's progeny as requiring the Government to set forth in any claim the specific basis of liability and the amount corresponding to each basis.  Thus, if the Government asserts six unique setoffs as government claims, the Government must set forth the basis of liability with respect to each setoff and include the amount of liability corresponding to that particular setoff.  Absent this information, the Government has not asserted a valid claim under the CDA.

32 Fed. Cl. at 752.

## ANALYSIS

First, the Court concludes that, where a CO and the Department of Justice are in not in conflict, once a contractor's claim is in litigation, the CO is not deprived of his or her authority to make a final decision, at least as to the United States' CDA claims.  That the Court deemed denied Sage Hospital's CSC claim for FY 2009 through FY 2013 and that Sage Hospital amended its Complaint to challenge that denial, did not deprive Dayish as CO of his authority to issue a final decision on the Defendants' claim for indirect CSC funding for fiscal years 2009-

2013. Second, the July 16, 2015 Dayish Letter provided adequate notice of the basis and amount of liability.

I.      **DAYISH HAD THE AUTHORITY TO ISSUE A FINAL DECISION ON THE DEFENDANTS' CLAIM FOR INDIRECT CSC FUNDING FOR FISCAL YEARS 2009-2013.**

Sage Hospital asserts that Dayish did not have authority to issue a final decision concerning "indirect contract support costs (CSC) funding that [Sage Hospital] did not expend on CSC-eligible activities for fiscal years (FY or FYs) 2009-2013," because after the Court deemed denied Sage Hospital's CSC claim for FY 2009 through FY 2013 and Sage Hospital amended its Complaint to challenge that denial, Dayish as CO was divested of the authority to issue a final decision on that claim under the CDA. MTD at 5. The Court disagrees and concludes that Dayish had the authority to make a final decision on HIS' claim that Sage Hospital owed it indirect contract support costs. The Court first notes that decisions of the Federal Circuit and the United States Court of Federal Claims are not binding upon the Court; rather, they are persuasive to the extent that the Court finds their reasoning compelling.

As noted above, the basis for the Federal Circuit's doctrine that, once a claim is in litigation, the Department of Justice's exclusive authority divests the CO of his or her authority to issue a final decision on that claim is Sharman Co. v. United States, 2 F.3d at 1564. The Court concludes that the Federal Circuit's analysis in Sharman Co. v. United States is unnecessary for situations such as the one before the Court. The Federal Circuit, there, relied on 28 U.S.C. §§ 516-20 (1988), and two United States Court of Federal Claims cases: Hughes Aircraft Co. v. United States, 534 F.2d at 889, and Durable Metal Prods., Inc. v. United States, 21 Ct. Cl. at 46. Section 516 of Title 28 of the United States Code states: "Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is

interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General."  28 U.S.C. §§ 516-20 (1988).  The Court agrees with the Federal Circuit that the DOJ has exclusive jurisdiction over the conduct of litigation. There needs to be clarity and a bright-line rule on the Executive Branch's side who controls litigation and claims of money, and Congress has sensibly made that delegation to the DOJ. Where a rogue CO issues a decision after litigation has commenced on a claim that undermines or contravenes the DOJ's litigation strategy or approach to the settlement process, that decision will be invalid under 28 U.S.C. §§ 516-20 (1988).  The Court, does not think, however, that the Sharman Co. v. United States doctrine should apply where the CO and the DOJ are cooperating and working in tandem.

This interpretation of 28 U.S.C. §§ 516-20 (1988)'s interaction with the CDA is consistent with the United States Court of Federal Claim's decision in Durable Metal Prods., Inc. v. United States, 21 Ct. Cl. at 46.  While the Federal Circuit in Sharman Co. v. United States did not provide a detailed legal explanation for its creation of a jurisdictional bar on the ability of COs to make final decisions after litigation has commenced, it cited to and relied upon Durable Metal Prods., Inc. v. United States.  There, after the plaintiff filed suit in the United States Court of Federal Claims under the CDA and the CO issued a decision, which found in part for the plaintiff with respect to his claim arising out of Modification A000003 of the contract.  See 21 Ct. Cl. at 43.  The plaintiff asked the Court of Federal Claims to accept the CO's partial finding, determine the amount of monetary damages due plaintiff on that claim, and order an immediate payment to the plaintiff of that amount.  See 21 Ct. Cl. at 43.  The Court of Federal Claims concluded that, under 28 U.S.C. §§ 516-20, the Attorney General has exclusive authority, and that the CO had been divested of his authority over the plaintiff's claims when the lawsuit was

filed in the Court of Federal Claims.  21 Ct. Cl. at 45-46.  According to the Court of Federal Claims, "the Department of Justice attorneys in this case ha[d] the sole authority and control over the conduct of this action on behalf of defendant."  21 Ct. Cl. at 46.

The Court agrees that 18 U.S.C. §§ 516-20 establishes the sole authority of the DOJ over the course of litigation.  There can be only one master.  It appears that the problem in <u>Durable Metal Prods., Inc. v. United States</u>, however, was that the CO was undermining the DOJ's litigation strategy and settlement position.  The Court agrees that, if a contractor files suit on a claim and the DOJ does not want to settle the case, 18 U.S.C. §§ 516-20 would prevent the CO from issuing a decision that contravenes the DOJ's position and would render the CO's decision a nullity.  Put simply, if one has to decide between a CO and the DOJ, the DOJ wins.  Here, however, there is no indication that Dayish is undercutting the DOJ's litigation or settlement strategy.  Instead, Dayish and the DOJ seem to be working very well together.  The DOJ apparently sent a letter to Dayish asking him to do what he did, so that it could bring its Counterclaim.  The day after Dayish issued his decision, the DOJ brought the Counterclaim.  Section 516-20 thus has little relevance where the DOJ is asking and wanting Dayish to do exactly what he is doing.  It makes little sense for Sage Hospital to be able to read §§ 516-20 to interfere with what the Executive is doing to get its claim ready, filed, and litigated.  A team does not get to pick its opponent's quarterback.  Sage Hospital should have no say in how the Defendants come up with their Counterclaim.  The Court therefore concludes that Dayish had the authority to issue a final decision on the Defendants' claim, even after Sage Hospital had filed suit on its claim after the Court deemed Sage Hospital's claim denied, because 18 U.S.C. §§ 516-20 are not implicated where a CO and the DOJ are cooperating.

As stated, the Court has concerns about the limits that the Federal Circuit in Sharman Co. v. United States placed upon a CO's power to issue final decisions after litigation has commenced. In any event, even if the Court believed that some kind of jurisdictional bar should exist, the Federal Circuit went too far in Sharman Co. v. United States. The Court understands Sharman Co. v. United States as barring a CO from issuing final decisions where "the claim in the pending litigation [is] the 'same claim' or 'effectively the same claim' as the claim submitted to the contracting officer." Kellog Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. at 52. Sharman Co. v. United States and its progeny in the Federal Circuit and the United States Court of Federal Claims recognize that claims which "'arise from the same operative facts [and] claim essentially the same relief'" are the "same claim" for Sharman purposes." Scott Timber Co. v. United States, 333 F.3d at 1365. The Court concludes that this definition of "same claim" is too broad and that, if there is to be a Sharman Co. v. United States bar, the phrase "same claim" does not include claims asserted by opposing parties. It makes sense to say that, once a party -- the United States or a contractor -- asserts a claim in federal court or after the federal court deems a contractor's claim denied, the CO's authority to touch these claims is restricted. Talking about the CO not being able to touch certain "claims" makes sense. But to define a "claim" the same as the same operative facts that underlie the entire case or controversy is to twist words beyond their normal meaning and, by so broadly defining "claim," too broadly removing the CO's power. It makes no sense to talk about the Defendants and a contractor having the same "claim." The Defendants' "claim" arises out of the same nucleus of operative facts as Sage Hospital's, but it makes no sense to talk about it being the same claim. They are different, and the CO's power over the different claims may also be different. In other words, although Sage Hospital's claim was being litigated in the Court when Dayish made his final

decision on the Defendants' claim for indirect CSC funding for fiscal years 2009-2013, Sage Hospital's claim is not the "same claim" as the Defendants' claim.

Similarly, while Sage Hospital purposely and intentionally styles its motion as one under rule 12(b)(1) -- not under rule 12(b)(6) -- it does not make sense to talk about the dispute in terms of federal jurisdiction. While exhaustion is sometimes jurisdictional, but not always, see Arbaugh v. Y&H Corp, 546 U.S. 500 (2006); Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service, 61 F. Supp. 3d 1013 (D.N.M. 2014)(Browning, J.), here, the federal court indisputably has jurisdiction over Sage Hospital's claims, and rule 13 -- of the Federal Rules of Civil Procedure -- which governs counterclaims -- should control whether the United States can bring a counterclaim, not some judge-made doctrine meant to protect DOJ's power to litigate. At this stage, the Federal Rules, not Sharman Co. v. United States -- should control what the Court hears and whether a counterclaim can or should be entertained is not a jurisdictional issue.

This approach will also advance Congress's goal in enacting the CDA of making the existing disputes process less cumbersome and expensive. See Rebecca E. Pearson, Should Congress Squeeze the Sharman?, 28 PUB. CONT. L.J. 597 (1999). Rebecca E. Pearson, former attorney in the United States Air Force's Commercial Litigation Division and now a Partner at Venable LLP in Washington, DC, has explained:

> Sharman has many unintended consequences. For example, it creates collateral litigation. Arguing over whether Sharman precludes a claim is wasteful, especially when the facts underlying a subsequent claim are already at issue. Also, it is inequitable that one party is able to prevent another from bringing an otherwise valid claim merely by getting to the courthouse first. In addition Sharman can leave a litigant in a no man's land when the litigant's claim is the "same" as one in litigation but has a different legal basis than the claim the litigant originally submitted to the CO.

See Rebecca E. Pearson, supra at 609. There is no sound reason to extend Sharman Co. v. United States here. It is wasteful to have the Court hear all of the Defendants' evidence in an

effort to mitigate Sage Hospital's claims, but then forgo determining the Defendants' claim.[2] The Defendants have to wait until another case to get a judgment. It handicaps the Defendants for no good reason, except that Sage Hospital aggressively files suits first. In sum, the Court concludes that a CO retains authority over the United States' claims after a contractor has filed suit, at least where the CO and the United States are cooperating and working in tandem.

## II.   THE CO'S FINAL DECISION WAS SUFFICIENTLY DETAILED UNDER THE CDA.

Having concluded that Dayish had the authority to issue his July 16, 2015 final decision, the Court must determine whether the July 16, 2015 Dayish Letter, is sufficiently detailed under the CDA. Sage Hospital asserts that the letter does not meet the CDA's requirements, because it "provides several purported bases for liability, yet specifies only one aggregate damages figure." MTD at 5-6. See Reply at 2 ("Dayish's purported decision violated the CDA's specificity requirement, as construed by the Court of Federal Claims, because it stated four separate grounds for his decision but did not inform Sage of which of those bases applied to any part of the disallowed costs."). The Court again notes that Federal Circuit and United States Court of Federal Claims decisions do not bind it; rather, such decisions are persuasive to the extent that the Court concludes their reasoning is sound. Moreover, the Court agrees with the Defendants that Dayish's letter was sufficiently detailed and qualifies as a final decision under the CDA.

As stated above, the CDA does not provide much information about what constitutes a CO's valid and final decision. It states only: "Each claim by the Federal Government against a contractor relating to a contract shall be the subject of a written decision by the contracting officer." 41 U.S.C. § 605(a). It further states:

_____

[2]The parties conceded at the November 17, 2015, hearing that all of the Defendants' evidence would be admissible for purposes of mitigation at trial.

> **(d) Issuance of decision.** -- The contracting officer shall issue a decision in writing and shall mail or otherwise furnish a copy of the decision to the contractor.
>
> **(e) Contents of decision.** -- The contracting officer's decision shall state the reasons for the decision reached and shall inform the contractor of the contractor's rights as provided in this chapter.  Specific findings of fact are not required.  If made, specific findings of fact are not binding in any subsequent proceeding.

41 U.S.C. § 605(d)-(e).  In Placeway Const. Corp. v. United States, however, the Federal Circuit addressed the issue whether a CO had rendered a final decision on a United States claim within the meaning of 41 U.S.C. § 605.  See 920 F.2d at 903.  The United States Court of Federal Claims accurately summarized the Placeway Const. Corp. v. United States decision in Volmar Const., Inc. v. United States, 32 Fed. Cl. at 746:

> The contractor had submitted an uncertified claim for the balance due under the contract, additional work costs, extended overhead expenses, and an adjustment of the contract performance time to allow for delay.  Within approximately three months, the contracting officer dispatched a letter denying the contractor's request for the balance due, citing contractor delay as the basis for the withholding. The contracting officer also implied that the amount of the asserted setoff may be redetermined at a future date.
>
> Although the setoff amount was subject to possible modification, the appeals court in *Placeway* held "that the CO [contracting officer] *effectively* made a final decision on the government claim. . . ."  920 F.2d at 906 (emphasis added).  In support of its holding with respect to finality, the court noted that "issues of liability and of damages should . . . be resolved before judicial review is sought. . . ."  *Id.* (citation omitted).  The court then ruled that the contracting officer's decision complied with these prerequisites because the contracting officer had determined that the basis of liability was delayed performance and that the damages constituted the contract balance.

32 Fed. Cl. at 752 (emphasis in original).  Moreover, under Federal Circuit case law, Placeway Const. Corp. v. United States has been interpreted to mean that a CO must provide adequate notice of the basis and amount of liability in the written decision.  See, e.g., Volmar Const., Inc. v. United States, 32 Fed. Cl. at 752.  The Court agrees with the reasoning of Placeway Const. Corp. v. United States and its progeny.  That a CO must provide notice of the basis and amount

of liability in a written decision is consistent with the CDA's requirement that the CO issue a written decision that "state[s] the reasons for the decision reached. . . . Specific findings of fact are not required.   If made, specific findings of fact are not binding in any subsequent proceeding."  41 U.S.C. § 605(a)-(e).  A CO should be required to provide a basic level of notice to a contractor about the basis and amount of liability of its decision on a United States claim.

        The Court disagrees, however, with the result that the United States Court of Federal Claims reached in <u>Volmar Const., Inc. v. United States</u>, 32 Fed. Cl. at 746.  There, the United States Court of Federal Claims took the Federal Circuit's decision in <u>Placeway Const. Corp. v. United States</u> further, concluding that, where the United States asserts multiple unique setoffs as government claims, to comply with <u>Placeway Const. Corp. v. United States</u>, the CO's decision must state the basis of liability with respect to each unique setoff and the amount of liability corresponding to each basis.   32 Fed. Cl. at 752.   While a greater degree of notice and information might be required of a contractor seeking money from the government, given that taxpayer dollars are at stake, a CO's decision does not present similar considerations.  A CO is an official authorized to expend the United States' funds, and it must consider how public funds are going to be used.  When a contractor demands payment from the United States, the CO requires detailed information to comply with its duty to taxpayers.  By contrast, when the United States demands payment from a contractor, the CO does not have a similar obligation to the public that requires him or her to delineate all of the line items being claimed against the contractor.  This is especially true in this case, given that all the claims are already in dispute. While the Court, by sheer judicial fiat, could require more in the letter, there is no sound reason to do so; federal discovery is about to overtake and overshadow any notice and information the letter gives.  Sage Hospital now has the powerful tools of the Federal Rules of Civil Procedure

related to discovery.  It will soon get everything it could possibly need or could want in the letter, and much more.  The Court concludes that a CO's decision is sufficiently detailed and complies with the requirements of the CDA if it sets forth generally the basis and amount of liability. Beyond that baseline, the contractor can obtain more information in discovery and during the development of the issues in this case.

Here, the Court concludes that Dayish complied with these principles and the CDA by setting forth the basis and amount of liability.  The July 16, 2015 Dayish Letter contains two sections of particular importance to the MTD: "Findings of Fact;" and "Decision."  <u>See</u> July 16, 2015 Dayish Letter at 5.  In the Findings of Fact section, Dayish sets forth: (i) the amount of indirect CSC and other indirect cost amounts that IHS paid from 2009 to 2013; and (ii) the amounts eligible for indirect funding, as the ISDEAA authorizes, because they were reasonable, necessary, and non-duplicative costs incurred for activities taken to operate a federal program. <u>See</u> July 16, 2015 Dayish Letter at 5.  After examining the actual costs that Sage Hospital identified and the actual costs determined ineligible for indirect CSC funding, Dayish concludes in a section entitled "Decision":

> The Foundation did not expend all of the indirect CSC funding paid by the HIS on CSC-eligible activities in FYs 2009-2013.  As set out in the contracts and AFAs, during negotiations the parties agreed upon lump-sum estimates of reasonable costs for activities required of the Foundation for contract compliance and prudent management in carrying out the Federal program and that are also not duplicative of activities/costs funded in the Foundation's Secretarial amount.   The negotiations therefore established the activities that the parties agreed were eligible for CSC funding.  In addition, the estimated costs for those activities were negotiated based on information available to the parties at the time of the contract negotiation, which was in advance of contract performance.  The Foundation and the IHS agreed that only the actual costs incurred by the Foundation, and not the estimated amounts, are eligible for CSC funding.  *See, e.g., Navajo Health Found. -- Sage Mem'l Hosp. v. Burwell*, No. 14-958, slip op. at 10 n.26 (D.N.M. June 17, 2015).

The IHS has reviewed the Foundation's actual costs for the activities that the parties previously agreed were eligible for CSC funding.  The Agency's analysis considered whether, as required by the ISDEAA, the activities and related costs were: (a) reasonable; (b) related to activities necessary for contract compliance and prudent management; (c) incurred for operation of the Federal program; and (d) related to activities not already funded in the Secretarial amount.

. . . .

Comparing this determination to the IHS indirect funding and other indirect cost payments (Table 2), the Foundation owes $4,218,357 for indirect CSC funding paid by the IHS that the Foundation did not expend on activities eligible for CSC funding.  Please refund $4,218,357 by check or money order made payable to the Department of Health and Human Services.

July 16, 2015 Dayish Letter at 5-6.[3]  In sum, the Court concludes that the July 16, 2015 Dayish

Letter is sufficiently detailed under the CDA, providing the basis and amount of liability.

**IT IS ORDERED** that the Plaintiff's Motion to Dismiss Counterclaim, filed August 7,

2015 (Doc. 92)("MTD"), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Lloyd B. Miller
Sonosky, Chambers, Sachse, Miller & Munson, LLP
Anchorage, AK

--and--

Paul E. Frye
Frye Law Firm PC
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

_____

[3]In total, the July 16, 2015 Dayish Letter is seven pages long.  The "Decision" section of the letter also contains a detailed table outlining Sage Hospital's actual costs for activities eligible for indirect funding compared to actual costs determined ineligible for indirect CSC funding.  See July 16, 2015 Dayish Letter at 6.  Further, preceding the "Decision" section, the letter contains several pages of calculations and tables, as well as findings of fact.  See July 16, 2015 Dayish Letter at 1-5.

Damon P. Martinez
   United States Attorney
Karen Grohman
   Assistant United States Attorney
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

--and--

Devin A. Wolak
Russell J. Upton
United States Department of Justice
Washington, DC

     *Attorneys for the Defendants*