IN THE UNITED STATE DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NAVAJO HEALTH FOUNDATION -- SAGE
MEMORIAL HOSPITAL, INC,

        Plaintiff,

vs.                                                                          No. CIV 14-958 JB/GBW

SYLVIA MATHEWS BURWELL, Secretary of
the United States Department of Health and
Human Services; ROBERT MCSWAIN, Acting
Director of Indian Health Services; JOHN
HUBBARD, JR., Area Director, Navajo Area
Indian Health Services; and FRANK DAYISH,
Contracting Officer, Navajo Area Indian Health
Services,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion to Extend Discovery Deadlines and to Establish a New Trial Date, filed February 3, 2016 (Doc. 135)("Motion"). The Court held a hearing on December 17, 2015. The primary issues are: (i) whether discovery deadlines will be extended beyond the dates set in the Scheduling Order, filed June 23, 2015 (Doc. 76) and (ii) whether the bench trial date set in the Sentencing Order will be postponed. The Court extends the discovery deadline from January 13, 2016, to May 2, 2016, and postpones the bench trial date from April 11, 2016, to August 15, 2016, because the interjection of new issues into the case presents good cause for deadline extension and trial postponement under Rule 16(b)(4) of the Federal Rules of Civil Procedure and under the Scheduling Order.

## FACTUAL BACKGROUND

Sage Memorial Hospital is a Navajo tribal organization for the purposes of contracting with the Indian Health Service ("IHS").  It operates a health care facility in Ganado, Arizona, within the Navajo Reservation.  The IHS is an agency within the United States Department of Health and Human Services ("HHS") that is responsible for providing federal health services to American Indians and Alaska Natives.

Defendant Sylvia Mathews Burwell is the Secretary of HHS and is responsible for contracting on the United States of America's behalf with Indian tribal organizations to provide health care to Native Americans.  Defendant Robert McSwain is the Acting Director of the IHS and is responsible for carrying out IHS contracts with Indian tribal organizations to provide health care to Native Americans.  Defendant John Hubbard is the Area Director of the Navajo Area IHS, and is responsible for carrying out all of the IHS functions, authorities, and duties within the Navajo Nation, including those regarding IHS contracts with Indian tribal organizations.  Defendant Frank Dayish is the Contracting Officer for the Navajo Area IHS and is responsible for Indian Self-Determination and Education Assistance Act ("ISDEAA") contracts and funding agreements for IHS programs within the Navajo Area IHS, including for Sage Hospital, and has the authority to initially decide disputes arising under ISDEAA contracts.

In 2009, Sage Hospital contracted with IHS to provide the following: (i) inpatient services; (ii) general ambulatory care and specialty care services; (iii) an emergency department; (iv) emergency medical transport; (v) dental, podiatry, and optometry clinics; (vi) behavioral health services; (vii) radiology; (viii) a pharmacy; (ix) a laboratory; (x) physical therapy; (xi) public health nursing: (xii) employee health services; (xiii) health education; (xiv) transportation services; (xv) school-based services; (xvi) a diabetes program; and (xvii) traditional medicine.

Sage Hospital and IHS extended the 2009 contract without interruption until September 30, 2013.  Five weeks before the end of the contract period, on August 22, 2013, Sage Hospital proposed another three-year contract renewal with funding set at $20,738,846.00 for fiscal year ("FY") 2014.  IHS neither declined nor accepted the contract renewal, opting instead to provide Sage Hospital funding on a monthly basis during an IHS Performance Monitoring Review ("Review") and a forensic audit ("Audit") that accounting firm Moss Adams LLP conducted.

 As the end of FY 2014 neared, Sage Hospital was still unsure about the status and acceptability to IHS of its proposed three-year contract renewal proposal for the period ending September 30, 2016.  To avoid any gap in the contract period, Sage Hospital therefore submitted a second proposed three-year contract renewal ending September 30, 2017, and proposed FY 2015 Annual Funding Agreement ("AFA") to IHS via letter dated September 19, 2014.  Therein, Sage Hospital proposed to increase funding for FY 2015 from $20,738,846.00 in the proposed FY 2014 AFA to $32,614,916.00 for FY 2015.

On September 29, 2014, via hand-delivered letter, IHS declined to renew Sage Hospital's proposed three-year FY 2014 contract renewal under the ISDEAA, 25 U.S.C. § 450, thereby severing the IHS/Sage Hospital contractual relationship.  IHS concomitantly instructed the Gallup Regional Service and Supply Center to cease delivering pharmaceuticals to Sage Hospital, leaving Sage Hospital as of October 1, 2014, without coverage under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, for malpractice claims.  The declination further caused Sage Hospital to lose a federal grant, miss other grant opportunities, and incur other consequential and intangible damages.

## PROCEDURAL BACKGROUND

Sage Hospital filed this case in federal court on October 23, 2014.  See Complaint, filed October 23, 2014 (Doc. 1).  Sage Hospital filed its First Amended Complaint on November 24, 2014.  See Amended Complaint, filed November 24, 2014 (Doc. 5)("FAC").   Sage Hospital made four claims in its FAC: (i) a request for immediate injunctive relief, because the IHS' declination of Sage Hospital's August 22, 2013, three-year contract proposal for FY 2014 ("FY 2014 Proposal") violates 25 U.S.C. § 450f(b)(2), and 25 C.F.R. §§ 900.32 and 900.33, FAC ¶¶ 52-57, at 22-25; (ii) a request for immediate injunctive relief, because the IHS' declination of Sage Hospital's September 19, 2014, proposal for FY 2015 ("FY 2015 Proposal") -- to the extent that it is substantially the same as the FY 2014 Proposal -- violates 25 U.S.C. § 450f(b)(2), and 25 C.F.R. §§ 900.32 and 900.33, FAC ¶ 58, at 25-27; (iii) a claim that Sage Hospital is entitled to an accounting of funds that IHS provided from October 1, 2013, to the date of the judgment, pursuant to 25 U.S.C. § 450m-1(a), FAC ¶¶ 63-66, at 27; and (iv) a claim that the IHS violated the CDA, 41 U.S.C. §§ 7101-7109, see FAC ¶¶ 67-72, at 27-29.

On January 27, 2015, Sage Hospital moved for summary judgment on its fourth claim for relief -- that the IHS violated the CDA -- seeking the Court's judgment that Dayish's letter, dated October 23, 2014, did not comply with his obligation to provide a reasonable date certain for issuing his decision.  See Plaintiff's Motion for Summary Judgment on its Fourth Claim for Relief, with Memorandum of Supporting Points and Authorities, filed January 26, 2015 (Doc. 27).  The Court granted summary judgment in favor of Sage Hospital, holding that Sage Hospital's "claim for Contract Support Costs for Fiscal Years 2009-13 (the 'Claim') is deemed denied under the Contracts Disputes Act, 41 U.S.C. §[§] 7101-09."  Sage, 2015 WL 3862952, at *44.

On April 9, 2015, the Court granted Sage Hospital a preliminary injunction, see Memorandum Opinion and Order, filed April 9, 2015 (Doc. 62), that ordered Defendants Sylvia Matthews Burwell, Yvette Roubideaux, John Hubbard, Jr., and Frank Dayish to fund Sage Hospital according to the terms of: (i) the Annual Funding Agreement Between Navajo Health Foundation/Sage Memorial Hospital and the Secretary of the Department of Health and Human Services Fiscal Year 2013, dated May 17, 2012, filed January 13, 2015 (Doc. 21-2); and (ii) the Indian Self-Determination Contract Between Navajo Health Foundation/Sage Memorial Hospital and the Secretary of the Department of Health and Human Services, dated August, 22, 2013, filed January 13, 2015 (Doc. 21-2), going forward until the resolution of this case on its merits.

On June 30, 2015, Sage Hospital filed its Second Amended Complaint, filed June 30, 2015 (Doc. 79), adding a fifth claim for relief, which alleged that the deemed denial of Sage Hospital's contract support costs ("CSC") Claim for Fiscal Years 2009-2013 was unlawful and requested the full amount of its Claim, expressly including its claim for underpaid CSC in the amount of $36,258,493.00.[1]  See Second Amended Complaint ¶¶ 76-79.

Shortly thereafter, on July 16, 2015, Dayish sent a letter to Sage Hospital concerning "Contract Disputes Act Claims for Excess Contract Support Costs Funding" for "Fiscal Years

---

[1] Under the ISDEAA, direct contract support costs include, but are not limited to: (i) unemployment taxes on direct program salaries; (ii) workers compensation insurance on direct program salaries; (iii) cost of retirement for converted civil service and United States Public Health Service Commissioned Corps Officer salaries; (iv) insurance; (v) facilities support costs to the extent not already made available; (vi) training required to maintain certification of direct program personnel; and (vii) any other item of cost that meets the definition of CSC at Section 106(a)(2), but is not included in the awardee's indirect cost pool or covered by ISDEAA § 106(a)(1). See INDIAN HEALTH SERVICE, INDIAN HEALTH Manual § 6-3.2(D), https://www.ihs .gov/IHM/index.cfm?module=dsp_ihm_pc_p6c3#6-3.5 (last accessed Sept. 15, 2016).  Indirect contract support costs fall into three categories: (i) management and administration; (ii) facilities and facilities equipment; and (iii) general services and expenses. See INDIAN HEALTH SERVICE, INDIAN HEALTH Manual § 6-3.2(E)(2).

2009-2013." July 16, 2015 Dayish Letter at 1. In the letter, Dayish "assert[ed] claims against [Sage Hospital] for indirect CSC funding that [Sage Hospital] did not expend on CSC-eligible activities for fiscal years (FY or FYs) 2009-2013," demanded repayment from Sage Hospital in the amount of $4,218,357.00 for indirect CSC payments, and promised a subsequent decision devoted to the other category of CSC -- direct CSC. July 16, 2015 Dayish Letter at 1. The July 16, 2015 Dayish Letter contains two sections of particular importance to the Motion to Dismiss: "Findings of Fact;" and "Decision." See July 16, 2015 Dayish Letter at 5. In the Findings of Fact section, Dayish sets forth: (i) the amount of indirect CSC and other indirect cost amounts that IHS paid from 2009 to 2013; and (ii) the amounts eligible for indirect funding, as the ISDEAA authorizes, because they were reasonable, necessary, and non-duplicative costs incurred for activities taken to operate a federal program. See July 16, 2015 Dayish Letter at 5. Moreover, according to the letter, "[t]he Foundation and the IHS agreed that only the actual costs incurred by the Foundation, and not the estimated amounts, are eligible for CSC funding." July 16, 2015 Dayish Letter at 6. After examining the actual costs that Sage Hospital identified and the actual costs determined ineligible for indirect CSC funding, Dayish concluded:

> Comparing this determination to the IHS indirect funding and other indirect cost payments (Table 2), the Foundation owes $4,218,357 for indirect CSC funding paid by the IHS that the Foundation did not expend on activities eligible for CSC funding. Please refund $4,218,357 by check or money order made payable to the Department of Health and Human Services.

July 16, 2015 Dayish Letter at 6.

One day later, IHS filed its Answer to Second Amended Complaint and Counterclaim, filed July 17, 2015 (Doc. 84)("Counterclaim"), asserting that the July 16, 2015 Dayish Letter constituted a "Contracting Officer's Final Decision" on Sage Hospital's Indirect CSC funding, complaining that: (i) Sage Hospital "has not paid any of the amounts sought by the contracting

officer's final decision," and requesting judgment in the amount of $4,218,357.00 plus interest for the allegedly overpaid indirect CSC.

In the Scheduling Order filed June 23, 2015, the Court set a termination date for fact discovery of January 13, 2016.  See Scheduling Order of June 23, 2015 ("Scheduling Order")(Doc. 76), at 1.  The Scheduling Order further set a bench trial for April 11, 2016, at 9:00 a.m. on a trailing docket.  See Scheduling Order at 3.  Pursuant to Title 28 U.S.C. § 473(a)(1), the Court indicated that these deadlines would not be modified except by an order of the Court upon a showing of good cause.  See Scheduling Order at 1.  The Court made one such deadline modification in an agreed-upon Order, in which it extended the deadline for IHS to make its expert disclosures, but reaffirmed that "all other deadlines in the Scheduling Order of June 23, 2015 (Doc. 76) will remain the same."  Order Granting Unopposed Motion for Extensions of Time to Make Expert Disclosures (Doc. 112), filed October 30, 2015, at 1.

At a hearing on November 17, 2015, the Defendants stated they intended to seek more time to provide its expert disclosures, due December 14, 2015, but Sage Hospital indicated that it would oppose that motion.  After the Defendants in fact filed a Motion to Extend Discovery Deadlines and Establish a New Trial Date on December 10, 2015 (Doc 135), Sage Hospital indeed filed a response opposing the deadline extension four days later. (Doc. 136).   The Defendants replied to the opposition motion on December 16, 2015. (Doc. 143).

1.  **The Motion to Extend Discovery Deadlines and to Establish a New Trial Date.**

The Defendants move to extend discovery deadlines by approximately four months and to establish a new trial date.  To satisfy rule 16(b)(4) and the Scheduling Order, the Defendants argue that they have two good causes for seeking the extension.  First, the Defendants contend

that Sage Hospital has increased the scope of the case.  Second, the Defendants contend that this increase in scope has increased the time needed for expert analysis.

a. Increased Scope of Damages Sought.

The Defendants assert that Sage Hospital has significantly increased the scope of this litigation, in terms of both degree and kind of damages sought.  Sage Hospital initially sought a total of $62,569,681 in damages.  See First Amended Complaint (Doc. 5) ¶68, at 27.  The Defendants assert that this amount recently has more than doubled to $135,994,679.[2]  See Motion at 5.  The Defendants maintain that a decisive driver behind the increased amount sought is a set of "*entirely new* elements . . . that Sage [Hospital] neither included in its pleadings nor ever presented to [the D]efendants for consideration."  Motion at 3.  Among these allegedly new elements are:

(i)   five million dollars in "construction-delay damages," i.e. damages resulting from a delay in the construction of Sage Hospital's new medical facility, Motion at 6;

(ii)   between $24.5 million and $40.9 million in "patient-flow damages," i.e. presumed lost revenue from Sage Hospital's inability to provide medical services to the patients it presumes would have been serviced by the planned facility, see Motion at 6;

(iii)   $2,216,167.00 in "start-up costs" that Sage Hospital allegedly had requested of the United States in 2008 and 2009 but did not request in its August 25, 2014 claim to Mr. Dayish, see Motion at 7;

---

[2] Defendants indicate on page 2 of their Motion that the amount sought has more than tripled: "an increase of the amount in controversy of 216 percent." This appears to have been a calculation error, and the Defendants correct the error in the remainder of the Motion.

(iv)     $41,829,312.00  from the balance on its 2014 an 2015 proposals for contract renewals and annual funding agreements plus the third-party billing expectancy damages that would flow from that funding, <u>see</u> Motion at 8;

(v)     $2,378,277.00 in direct contract support costs, calculated using a new methodology, <u>see</u> Motion at 10; and

(vi)     $624,518.00 in expectancy damages attributable to third-party billings. <u>see</u> Motion at 11.

b. <u>Corresponding Increase in Time Requirements for Expert Analysis</u>.

The Defendants argue that their experts will need additional time to analyze, investigate, and assess these allegedly new claims.  They say that a construction-delay claim is a "complicated issue to litigate" that requires "extensive fact and expert discovery" which normally would stretch over a six-to-twelve-month period even under the best of circumstances.  <u>See</u> Motion at 6. They assert that the projected lost revenue claim likewise requires intensive inquiry and study, requiring IHS to hire an economist to estimate patient-flow damages.  <u>See</u> Motion at 6.  The Defendants contend that their accountant also will need additional time to acquire new documents to assess Sage's "start-up costs" and to reconcile differences in calculating contract support costs.  <u>See</u> Motion at 7 & 9.

The Defendants respond that their experts have advised that they cannot complete the newly required analyses that the Sentencing Order imposes before the discovery deadline of December 14, 2015.  <u>See</u> Motion at 12.

2.   **The Response**.

Sage Hospital responded to the Defendants' Motion on December 14, 2015. (Doc. 136)("Response").  In that filing, Sage Hospital argues that the Court should reject the Motion to

extend discovery deadlines for two reasons that mirror the reasons that the Motion asserts. First, Sage Hospital contends that the scope of litigation has not changed. See Response at 3. Second, Sage Hospital asserts that the Defendants have failed to show good cause for the desired delay, as rule 16(b)(4) and the Scheduling Order require. See Response at 3.

a. The Scope.

Sage Hospital insists that the Defendants' central premise that Sage Hospital's experts have introduced new issues into the case is false. See Response at 5. Sage Hospital asserts that, rather than new claims, its new expert reports merely (i) quantify damages already claimed and (ii) repeat positions that they have consistently stated since the start of litigation. See Response at 5. Sage Hospital speculates that the Defendants err in their analysis because of a failure to distinguish between (i) Sage Hospital's claim for unpaid contract support costs during five years when Sage Hospital and IHS contracted without controversy; and (ii) Sage Hospital's claim for money damages caused by IHS's unlawful declination to contract thereafter. See Response at 6. Sage maintains that, once this distinction is recognized, its CSC claim remains at approximately sixty-two million dollars, adjusted slightly to account for more finely tuned calculations. See Response at 6.

Nor does Sage Hospital believe that the scope of this litigation has increased in the categories of damages sought. Sage Hospital insists that it has been forthcoming in describing all the damages that it seeks from the earliest days. See Response at 9 (citing Complaint ¶¶ 44-45, 29-30, at 22). In the Joint Status Report and Provisional Discovery Plan ("JSR") filed June 11, 2015 (Doc. 72), Sage Hospital notified the Defendants that it might or would call particular witnesses to testify about additional costs of insurance, pharmaceutical supplies, employee

turnover, forgone third-party revenues, lost business opportunities and other consequential and intangible damages.  See Joint Status Report and Provisional Discovery Plan (Doc. 72), at 6.

b. Good Cause.

Sage Hospital contests the Defendants' assertion that they require more time to conduct discovery because of forces beyond their control.  Sage instead contends that the Defendants have had "more than ample time to discover and evaluate all of Sage's asserted damages;" Sage Hospital calculates that period to have lasted for at least eight months.  Response at 8-9.

First, Sage Hospital characterizes the amounts owed under the FY 2014 and FY 2015 AFAs as a "matter of simple arithmetic," and says that the Defendants should require no additional time to evaluate related expectancy damages.  Response at 11.  Second, Sage Hospital indicates that it disclosed in the June 11, 2015 JSR that it would or might provide proof of lost business opportunities, including consequential and intangible damages.  See Response at 12. Third, Sage Hospital says that it explained the way it calculated expectancy damages related to unpaid CSC in its claim letter dated August 25, 2014.  See Response at 12 (citing both Motion for Summary Judgment On Its Fourth Claim For Relief By Navajo Health Foundation -- Sage Memorial Hospital, Inc. (Doc. 27-1), filed January 26, 2015, and Motion at 4).  Sage Hospital maintains that the Contract Disputes Act, 41 U.S.C. § 601, permits any adjustments made since then.  See Response at 13 (citing Tecom, Inc. v. United States, 732 F.2d 935, 937 (Fed. Cir. 1984) and J.F. Shea Co., Inc. v. United States, 4 Cl. Ct. 46, 54 (1983)).

Sage Hospital insists that the Defendants have had seventeen experts employed since at least April 9, 2015, evaluating its claim for unpaid CSC and related expectancy damages.  See Response at 13-15.  Sage Hospital contends that these experts had performed sufficient analysis, by July 16, 2015, to precisely calculate Sage's indirect CSC claim.  See Response at 16.

- 11 -

Based on these attestations, Sage Hospital asserts that the Defendants' need for additional time, if any, stems from their lack of "diligen[ce] in discovering the extent and manner of determining . . . damages."  Response at 20.  Sage Hospital contends that this purported lack of diligence on the Defendants' part does not qualify as demonstrating "good cause" for the purposes of rule 16(b)(4) or the Scheduling Order.  See Response 16-20.

### 3.      The Defendants' Reply.

The Defendants replied to the Response on December 16, 2015.  See Reply in Support of the Defendants' Motion to Extend Discovery Deadlines and to Establish a New Trial Date, filed December 16, 2015 (Doc. 143)("Reply").  They reiterate their assertion that Sage Hospital's November 12, 2015, expert disclosures include claims of entitlement to between thirty and forty-five million dollars based upon facts that Sage Hospital has not previously disclosed.  See Reply at 1.  The Defendants further reassert that this alleged increase in the case's scope requires not only additional factual discovery, but also unanticipated expert testimony to put together an effective defense.  See Reply at 1-2.

The Defendants reject Sage Hospital's contention that the litigation's scope has not changed.  They again identify and enumerate three aspects of Sage's claim that they contend are new and that they identified in their original Motion:

(i) The thirty to forty-five million dollars for breach damages, or, as Sage Hospital characterizes them, declination damages, arise out of Sage Hospital's alleged inability to execute on its plant to build a new medical center, see Motion at 6-7;

(ii) The $2.2 million claim to "start-up costs" that Sage Hospital requested of IHS in 2008 and 2009, but did not request in its claims to the contracting officer, and

has not mentioned in any pleading, filing, or any other submission during these proceedings, see Motion at 7; and

(iii) The forty-one million dollar difference between what Sage Hospital currently receives from the United States under the preliminary injunction and what the Court approved in its August 31, 2015 order for FY 2014 and FY 2015 funding, see Motion at 7-8.

Going a step beyond the Motion's assertions, the Defendants allege that Sage Hospital knowingly hid its intention to seek the additional thirty to forty-five million dollars both from them and from the Court up to this point in the litigation behind the euphemistic phrase of "lost business opportunities."   Reply at 5.   Equating Sage Hospital's taciturnity in divulging this information to a game of twenty questions, the Defendants insist that Sage Hospital failed to abide by rule 26's requirement that the claiming party disclose "a computation of each category of damages claimed by the disclosing party."   Reply at 5 (quoting Fed. R. Civ. P. 26(a)(iii)).

The Defendants contend that the diligence that rule 16(b)(4) and the Scheduling Order require does not extend to a requirement to tease this information out of Sage Hospital.   Rather, the Defendants insist that they have been diligent in pursuing discovery to date upon the issues of which they have been put into notice.   See Reply at 6.   As proof of this diligence, the Defendants adduce evidence of their compliance with other deadlines that the Scheduling Order establishes, including a certificate of service for the Defendants' Rule 26(a) disclosures (Doc. 70), filed November 12, 2015, for the Defendants' First Set Of Requests For Production of Documents (Doc. 118), filed November 12, 2015, for the Defendants' First Set Of Interrogatories (Doc. 123), filed November 20, 2015, and for the Defendants' Expert Disclosures (Doc. 139), filed December 14, 2015.   See Reply at 7.   Indeed, the Defendants say that this very due diligence, on

the part of their accounting expert, has caused some of the unanticipated delays that the Defendants maintain warrant a deadline extension.  See Reply at 8.

Admittedly reaching beyond their original motion, the Defendants note that both they and Sage Hospital intend to conduct "almost twenty depositions, with deponents spread out over at least four locations in the western United States."  Reply at 9.  The Defendants speculate that it is unlikely that both parties will be able to take and defend all of these depositions before the current discovery deadline of January 13, 2016, and that this probability lends further weight to the argument for a deadline extension.

The Defendants briefly touch upon two final topics at the end of their Reply.  First, they expand upon the discussion in their Motion about how the litigation's increased scope has triggered an automatic fraud review that magnifies the Defendants' need for an extension of time for discovery.  See Reply at 10.  This increases the workload of the Defendants' trial counsel even if no fraud has occurred.  See Reply at 10.  Second, the Defendants dismiss Sage Hospital's contention that extending the discovery deadline would be prejudicial toward Sage Hospital.  See Reply at 10.  Rather, the Defendants suggest that their requested schedule adjustment might facilitate a potential settlement by narrowing the issues for trial.  See Reply at 11.

   **4. The Hearing.**

The Court held a hearing on December 17, 2015.  See Transcript of Hearing (taken December 17, 2015), filed December 30, 2015 (Doc. 151)("Tr.").  The parties largely stuck to their briefing.

a. <u>The Defendants</u>.

The Defendants first discussed the time that their experts will need to complete discovery, indicating that their previously identified expert[3] has done most of the work but "would still prefer more time to repeat her analysis," Tr. at 4:12-13 (Wolak), and that they are still at the search or contracting phase with a new construction/scheduling expert and a new economist.  <u>See</u> Tr. at 4:16-25 (Wolak).

In response to the Court's question about the source of its concerns about a deadline extension, Sage Hospital insisted that it needs to speedily resolve the case, because, "although we are staying afloat with the preliminary injunction, we have other things we need to do," Tr. at 5:16-18 (Frye), including ceasing wasteful retrofitting of its current medical campus, <u>see</u> Tr. at 5:18-25 (Frye).  Then drawing a contrast with the Defendants, Sage noted that it has been "meticulous in making sure that [it] meet[s] all deadlines," including "revised deadlines for [its] expert reports."  Tr. at 6:2-4 (Frye).  Nevertheless, Sage Hospital conceded that it would find it reasonable to extend "the deadline for completion of depositions till the end of January . . . ." Tr. at 6:12-13 (Frye).  In response to the Court's request for clarification, Sage Hospital suggested that the extension should encompass only depositions, i.e., not "interrogatories, requests for production, et cetera . . . ."  Tr. at 6:25 – 7:1 (Frye).

Pivoting back to the Defendants, the Court asked them how much of the purported need for extra time actually was the need for its new trial counsel, Wolak, to learn the case.  While conceding that this education process was a minor consideration, the Defendants estimated that "95 percent" of the extra time was needed to evaluate "new material."  Tr. at 7:16 (Wolak).  By

---

[3] Although this expert was not specifically named during the hearing, it is Sam (Sandra A.) Hadley.  She is the only defense expert identified on December 13-14, 2015.  <u>See</u> Doc. 139, filed December 14, 2015.

way of example, the Defendants discussed how "very hurried" the Defendants were trying to schedule depositions that were "spread throughout the southwest."   Tr. at 7:20–8:4 (Wolak). The Defendants then reemphasized that the material introduced in Sage Hospital's expert reports was new and that Sage Hospital had been cagey in releasing it earlier in the course of litigation. See Tr. at 8:7–9:7 (Wolak).

The Defendants then take issue with Sage Hospital's assertion that the reports did not, in fact, introduce new numbers.  See Tr. at 9:11-12 (Wolak).  To the contrary, the Defendants contend that Sage Hospital introduced between thirty and forty-five million dollars in new declination damages derived from construction delay and start-up costs.  See Tr. at 9:17-10:11 (Wolak).  The Defendants further allege that these claims are not only new, but also are inadequately documented to assess whether costs even were incurred.  See Tr. at 10:2-7 (Wolak). The Defendants contend that they have been provided with no documents related to the purported construction delay costs aside from Jorgensen's report, see Tr. at 10:2-4 (Wolak), and have received "no invoices, no canceled checks, nothing to indicate" that they incurred startup costs, Tr. at 10:15-16 (Wolak).

Responding to a question from the Court, see Tr. at 18-19 (Court), the Defendants revealed that they already have conducted a significant amount of discovery, including document production and interrogatories, and are working with Sage Hospital to schedule depositions.  See Tr. at 10:25-11:3 (Wolak).

The Defendants then approached the podium to present their argument more formally. They reiterated that "[t]here are significant-dollar new issues that are introduced by [Sage Hospital's] expert reports, that nobody but Sage [Hospital] has known about until November." Tr. at 12:3-5 (Wolak).  After an aside alleging "compartmentalized" fraud in Sage Hospital's

claims, Tr. at 12:17-21 (Wolak), the Defendants returned to the argument that the claims are new, "astronomical[ly]" large, and poorly documented.  Tr. at 12:22ff (Wolak).

As a first example of such new, large, and poorly documented claims, the Defendants specifically zeroed in on Sage Hospital's planned medical facility.  The Defendants acknowledged that Sage Hospital had provided them, via Jorgensen's report, with some of the plans to build the facility.  See Tr. at 13:11-13 (Wolak).  Yet the Defendants insisted that they require much more information to evaluate Sage Hospital's construction delay claim, including: (i) acquisition planning documents; (ii) requests for proposals that have been sent to contractors; (iii) any awards that have been made; (iv) notes associated with project development, community outreach, and market research; (v) related emails and paper correspondence; and (vi) the schedules for building the new medical center.  See Tr. at 13:15-14:14 (Wolak).

As a second example of such new, large, and poorly documented claims, the Defendants focused on Sage Hospital's claim for between $24.6 million and $40.9 million in patient-flow damages.  See Tr. at 15:1-4 (Wolak).  Questioning how a new facility could generate revenues of twenty-five to forty million dollars over six months -- and thereby undergird a five million dollar delay claim -- the Defendants indicated that they needed to hire a healthcare economist to assess whether there was untapped local demand for healthcare services and to what degree the new facility would simply crowd out existing demand serviced elsewhere.  See Tr. at 15:6-18 (Wolak).

As a third example of such new, large, and poorly documented claims, the Defendants spotlighted Sage Hospital's $2.2 million demand for startup costs.  See Tr. at 16:3-4 (Wolak).  Although the Defendants granted that this demand was small and that an expert whom they already had retained under contract could handle the demand, see Tr. at 16:3-8 (Wolak), they

maintained that they still will need to conduct additional written and deposition discovery of Sage Hospital and its personnel to calculate the startup costs, see Tr. at 16:9-13 (Wolak).

Switching to a new line of argument, the Defendants then asserted that they also require a discovery deadline extension because their current expert has "had some unexpected difficulties in doing some of her due diligence."  Tr. at 18:3-5 (Wolak).  Such difficulties include holding repeated conversations with others who have worked on this case and are now retired.  See Tr. at 18:5-12 (Wolak).

Reverting then to their first argument, the Defendants presented direct CSC as a fourth example of a new, large, and poorly documented claim that they say weighs in favor of a discovery deadline extension.  The Defendants first praised Sage Hospital for historically having computed its direct CSC claim in terms of actual costs incurred rather than in terms of costs reported to Congress.[4]  See Tr. at 18:14-19:10 (Wolak).  The Defendants then noted, however, that Sage Hospital's new expert report suddenly diverges from that computational methodology, thereby increasing the size of the claim from $425,000.00 to over two million dollars.  See Tr. at 19:15-21 (Wolak).  The Defendants contend that their expert will need additional time to discern why Sage Hospital changed its methodology.  See Tr. at 19:23-25 (Wolak).

As a fifth example of a new, large, and poorly documented claim, the Defendants then turned to indirect CSC.  See Tr. at 20:2 (Wolak).  The Defendants noted, as opposed to its direct CSC claim, Sage Hospital had not changed its methodology for calculating these costs, and

---

[4] Any organization that receives funding through the Indian Health Service must submit to Congress a historical record of funds negotiated and awarded in each of the following categories: (i) direct program funds; (ii) startup costs; (iii) direct contract support funds; (iv) indirect cost funding; (v) indirect-type cost funding; (vi) indirect cost rates; (vii) types of bases; (viii) pass throughs and exclusions; (ix) total IDC base (direct cost base); (x) direct CSC requirements; and (xi) indirect CSC requirements.  See Indian Health Manual §§ 6-3.1(A)(4), -3.4(E)(4) & -3.5, https://www.ihs.gov/IHM/index.cfm?module =dsp_ihm_pc_p6c3 (last accessed September 15, 2016).

conceded that Sage Hospital had reduced the amount it is claiming by a couple million dollars. See Tr. at 20:3-6 (Wolak).  Yet the Defendants insist that they counterintuitively still need extra time to evaluate the reduced claim, as their expert will need to recalculate her numbers to match those now claimed.  See Tr. at 20:8-15 (Wolak).

Fleshing out a third line of argument to which the Defendants earlier had alluded, see Tr. at 12:17-21 (Wolak), the Defendants suggested that they need to extend the discovery deadline in order to investigate potential fraud in Sage Hospital's enlarged damages claim.  See Tr. at 20:18-21:6 (Wolak).  Should investigators then find some evidence of fraud, the Defendants will need to go up the chain of authority at the United State Department of Justice ("DOJ") -- up to the level of Deputy Assistance Attorney General -- to decide whether a fraud counterclaim would be appropriate.  See Tr. at 21:12-22 (Wolak).

Ending with a fourth line of argument for a discovery deadline extension, the Defendants indicated that the enlarged size of the claim in this case means that a Deputy Assistant Attorney General, or perhaps even an Assistant Attorney General, at the DOJ will have to approve any potential settlement.  See Tr. at 22:8-20 (Wolak).  According to the Defendants, for there to be any chance that there will be a settlement at that level, the Defendants will need to conduct more discovery than will be possible before the current deadline.  See Tr. at 22:21-23:12 (Wolak).

b. Sage Hospital.

Sage Hospital insisted that it has not changed its claim.  It notes that, on the day of its initial disclosure, June 9, 2014, it said that damages (i) continued to accrue; (ii) could not be computed with certainty at that time; and (iii) would include "costs attendant to lost granted business opportunities and other consequential, including intangible damages."  Tr. at 23:22-24:2 (Frye)(internal quotation marks removed).  Sage Hospital further notes that, just two days later, it

identified by name the experts who would testify about these damages categories.  See Tr. at 24:12-25 (Frye).

Moving to particulars, Sage Hospital contested the Defendants' framing of supposedly new claims that need extensive new discovery.  "Construction delay costs," Sage Hospital insisted, are no more than compliance costs for its existing facility.  See Tr. at 25:10-16 (Frye).  According to Sage Hospital, estimates of patient flow for the new hospital facility and of startup costs require much less evaluation than the Defendants suggest.  See Tr. at 25:4-26:3 (Frye).  The Defendants' experts may need less time than the Defendants maintain; after all, one IHS expert speedily submitted a polished evaluation despite the Defendants' assertion that she stood no chance submitting it before the existing discovery deadline.[5]  Tr. at 26:4-11 (Frye).

Sage Hospital concluded that, absent any new and complicated claims, any need that the Defendants have for a deadline extension is because of their own failure to be duly diligent, see Tr. at 27:1-15 (Frye), or because of a changeover in the Defendants' personnel, see Tr. at 27:14-16 (Frye).  According to Sage Hospital, neither a lack of diligence nor a changeover of personnel satisfies the good-cause requirement for delaying deadlines under rule 16(b)(4) or  under the Scheduling Order.  See Tr. at 27:12-16, 28:2-3 (Frye).

Under the Court's questioning, Sage Hospital indicated that it had decided, as of September 3, 2015, that construction of the new hospital building was going to be part of the damages it claimed.  See Tr. at 28:7-15 (Frye).  Sage Hospital then clarified that additional construction on the planned hospital did not constitute the entirety of the $135 million it is seeking from the Defendants.  See Tr. at 28:20 (Frye).  Rather, Sage Hospital asserted that it can

---

[5] Sage Hospital did not identify this expert by name. It is Sam (Sandra A.) Hadley, a partner at Cotton & Company, LLP, who is the IHS' expert in CSC negotiations and disputes.  See Certificate of Service (Doc. 139), filed December 14, 2015.

disaggregate the claim into five separate buckets: (i) $23.8 million for unpaid money that the Defendants owe Sage Hospital for fiscal year 2015 under the summary judgment, see Tr. at 28:21-23 (Frye); (ii) seventeen million dollars for expectancy damages for third-party revenues lost because the aforementioned $23.8 million skewed Sage Hospital's ratio between IHS money and "third party payor money," Tr. at 29:6 (Frye); (iii) approximately sixty-five million dollars for CSC, see Tr. at 29:8-9 (Frye); (iv) five million dollars for costs that Sage Hospital has incurred because it was unable to build the new medical center when it expected to build it,  see Tr. at 29:11-15 (Frye); and (v) thirty million dollars for lost revenues that the new medical center would have generated had it opened on time,  see Tr. at 29:15-18 (Frye).  Sage Hospital then asserted that the Defendants had known, since at least September 11, 2014, that Sage Hospital's claim had risen to $135 million, see Tr. at 30:2-15 (Frye), and that any failure to complete discovery on that amount was a consequence of the Defendants' failure to be duly diligent, see Tr. at 30:21-31:3 (Frye).

The hearing then shifted in another direction, as the Court asked Sage Hospital what it stood to lose if the Court were to grant the Defendants' the delay for which they have moved. See Tr. at 31:4-5 (Court).  Sage Hospital replied that the Court needed to quickly move the case forward to prod the Defendants into paying Sage Hospital what the Defendants already owe it under the summary judgment (Doc. 73), filed June 17, 2015.  See Tr. at 31:6-25 (Frye).

Sage Hospital then concluded its argument, repeating its earlier assertions (i) that it has been forthcoming since the start of litigation about the damages it is seeking, see Tr. at 32:15-18 (Frye); and (ii) that the Defendants have failed to pursue discovery diligently, see Tr. at 32:20-33:3 (Frye).

c. <u>The Defendants' Reply</u>.

The Defendants first replied to Sage Hospital's contention that its claim had not changed. They conceded that Sage Hospital had correctly quoted from the Initial Disclosures when it stated that damages continued to accrue and could not be computed with certainty at that time. <u>See</u> Tr. at 33:25-34:4 (Wolak).  The Defendants also conceded that Sage Hospital had correctly quoted from the Initial Disclosures when it stated that it would claim damages for "foregone third party revenues, lost grant and business opportunities, et cetera."  Tr. at 34:6-7 (Wolak). The Defendants asserted, however, that Sage Hospital had failed to mention in its response that it had given current estimates of many other categories of damages.  <u>See</u> Tr. at 34:8-11 (Wolak).

In response to the Court's request for examples of these estimates, the Defendants shared a copy of the Initial Disclosure with the Court.  <u>See</u> Tr. at 34:12-20.  The Court questioned the Defendants about where it could find the sixty-two million dollar figure for damages, and the Defendants indicated that there "is a whole separate document with respect to that" and then pointed out where the amount theoretically would be included in the Initial Disclosure.  Tr. at 35:13--17 (Wolak).  Another defense counsel then immediately sought to correct Wolak's statement, indicating that the sixty-two million for CSC was not yet a part of the case at the time of the initial disclosure.  <u>See</u> Tr. at 35:18-22 (Grohman).  Wolak then concurred that this was the case and that he previously had erred.  <u>See</u> Tr. at 35:23-25 (Wolak).

The Court then asked the Defendants to clarify what document contained its original claim to sixty-two million dollars in CSC.   <u>See</u> Tr. at 36:11-12 (Court).  The Defendants indicated that the amount is in Count 5 of its Complaint, which had been "amended after initial disclosures were exchanged, because of [the Court's] memorandum and opinion deeming the administrative claim denied."  Tr. at 36:15-17.

Seeking to segue to its original line of argument in this section of the hearing, the Defendants recollected one concrete example of a current estimate from another category of damages: a line item for increased pharmaceutical costs in the $400,000.00 to $600,000.00 range.  See Tr. at 36:22-37:1 (Wolak).  Completing the segue and bringing their argument full circle, the Defendants noted that, in contrast to line-item specification for other expenses, Sage Hospital had made no effort to quantify extra damages related to the planned hospital center. See Tr. at 37:13-38:3 (Wolak).

The Defendants then veered into a narrow discussion about the existence of a construction delay claim.  See Tr. at 40:8-17 (Wolak).  They signposted the process through which Sage Hospital would need to go to prove (i) that they were on-track to build the new facility and (ii) that the United States is responsible for whatever delay there is.  See Tr. at 40:18-41:1 (Wolak).  The Defendants asserted that attempting to prove these points would result in litigation sufficiently complex and "document intensive" that the Defendants normally would ask for a nine-month discovery period for it.  Tr. at 41:2-8 (Wolak).

Turning then to address the second argument in Sage Hospital's response, the Defendants rejected the notion that they had failed to exercise due diligence during the discovery period. They suggested that there is no requirement compelling them to depose Jorgensen or any other professional associated with Sage Hospital before Sage Hospital actually disclosed them as experts.  See Tr. at 41:13-42:9 (Wolak).

### LAW REGARDING MODIFICATION OF SCHEDULING ORDERS

District Courts have wide discretion in its regulation of pretrial matters.  See  Sil-Flo, Inc. v. SFHC, Inc., 917 F.2d 1507, 1514 (10th Cir. 1990); see also Oklahoma ex rel. Doak v. Acrisure Bus. Outsourcing Servs., LLC, 529 Fed. Appx. 886 (10th Cir. 2013) (holding that the District

Court for the Western District of Oklahoma did not abuse its discretion  when it refused to delay a discovery deadline on the grounds that the movant had failed to show good cause).  Scheduling orders, however, "may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  Accord Street v. Curry Bd. of Cty. Comm'rs, No. CIV 06-0776 JB/KBM, 2008 U.S. Dist. LEXIS 42131, 2008 WL 2397671, at *6 (D.N.M. Jan. 30, 2008)(Browning, J.).  The advisory committee notes to rule 16 observe:

> [T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension. Since the scheduling order is entered early in the litigation, this standard seems more appropriate than a "manifest injustice" or "substantial hardship" test. Otherwise, a fear that extensions will not be granted may encourage counsel to request the longest possible periods for completing pleading, joinder, and discovery.

Fed. R. Civ. P. 16(b)(4) advisory committee's note to 1983 amendment.

The Tenth Circuit has held that the concepts of good cause, excusable neglect, and diligence are related. "The Tenth Circuit . . . has recognized the interrelation between 'excusable neglect' and "good cause.'"  Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. 295, 301 (D. Kan. 1996)(Rushfelt, J.)(citing In re Kirkland, 86 F.3d 172, 175 (10th Cir. 1996)). "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts."  Street v. Curry Bd. of Cty. Comm'rs, 2008 U.S. Dist. LEXIS 42131, 2008 WL 2397671, at *6.  See Advanced Optics Electronics, Inc. v. Robins, 769 F. Supp. 2d 1285, 1313 (D.N.M. 2010)(Browning, J.)(noting that the "rule 16(b) good-cause inquiry focuses on the diligence of the party seeking [to] amend the scheduling order.").  In In re Kirkland, the Tenth Circuit dealt with the definition of "good cause" in the context of a predecessor to modern rule 4(m)[6] of the Federal Rules of Civil Procedure,[7] and noted:

---

[6] Rule 4(m) provides:

> [W]ithout attempting a rigid or all-encompassing definition of "good cause," it would appear to require at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice, and some showing of "good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified" is normally required.

86 F.3d at 175 (emphasis in original)(quoting Putnam v. Morris, 833 F.2d 903, 905 (10th Cir. 1987))(internal quotation marks omitted).  The Tenth Circuit explained that Putnam v. Morris "thus recognized that the two standards, although interrelated, are not identical and that 'good cause' requires a greater showing than 'excusable neglect.'" In re Kirkland, 86 F.3d at 175.

Where a party is diligent in its discovery efforts and nevertheless cannot comply with the scheduling order, the Court has found good cause to modify the scheduling order if the requesting party timely brings forward its request.  For example, in Advanced Optics Electronics, Inc. v. Robins, the Court concluded that, where the defendant did not conduct discovery or make any good-faith discovery requests, and where the defendant did not make efforts "diligent or otherwise" to conduct discovery, the defendant did not, therefore, show good cause to modify the scheduling order.  769 F. Supp. 2d at 1313 n.8.  In contrast, in Street v. Curry Board Of County Commissioners, the Court concluded that the plaintiff had "shown good cause for a delay in seeking leave to amend," because she "was diligent in pursuing discovery . . . [and] brought to the Court's attention her identification of an additional claim in a timely manner," where she

---

 If a defendant is not served within 120 days after the complaint is filed, the court -- on motion or on its own after notice to the plaintiff -- must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

[7] The Tenth Circuit in In re Kirkland interpreted rule 4(j), which was substantially identical. See 86 F.3d at 174 ("Rule 4(j) requires the court to dismiss a proceeding if service has not been made upon the defendant within 120 days after filing and the party responsible for service cannot show good cause why it was not made.").

discovered the claim through "documents provided in discovery."   2008 U.S. Dist. LEXIS 42131, 2008 WL 2397671, at *11. More recently, in Trujillo v. Rio Arriba Cnty. ex rel. Rio Arriba Cnty. Sheriff's Dep't, the Court concluded that the plaintiff had shown good cause to seek extension of the discovery deadline when he "diligently endeavored to comply with the Court's Scheduling Order by attempting to schedule a time to take . . . depositions nearly a month before the discovery deadline" but Defendants made themselves unavailable until after the deadline." 2016 U.S. Dist. LEXIS 96797 (D.N.M. June 15, 2016)(Browning, J.), at *33-34.

The Court arrived at a similar determination in Abraham v. WPX Production, LLC, 2016 U.S. Dist. LEXIS 16650, 2016 WL 548251 (D.N.M. Jan. 25, 2016)(Browning, J.).  There, the Court found good cause to amend a pleading when the plaintiffs had a very short amount of time to amend the pleadings, "even though discovery had only just begun."  2016 U.S. Dist. LEXIS 16650, 2016 WL 548251, at *20.  "The Plaintiffs may not have obtained or reviewed all of the documents that might reveal their conspiracy claim's existence before the deadline to amend passed."  2016 U.S. Dist. LEXIS 16650, 2016 WL 548251, at *20. Furthermore, the delay was minimal and would not prejudice the defendants.  2016 U.S. Dist. LEXIS 16650, 2016 WL 548251, at *20.

Overall, good cause requires diligence and a conscientious attempt to comply with the Court's scheduling order.  When parties have not done so, the Court has not found good cause. In Montoya v. Sheldon, 286 F.R.D. 602, 2012 WL 5353493 (D.N.M. 2012)(Browning, J.), the Court did not find good cause to modify the scheduling order and reopen discovery where the plaintiffs' excuse for not disclosing their expert before the close of discovery was that they thought that the case would settle and they would thus not require expert testimony.  See 286 F.R.D. 602, 2012 WL 5353493, at *14.  The Court noted:

The [plaintiffs] filed this case on April 15, 2010. Because [plaintiff] D. Montoya had seen the physician before that date, the fact that the [plaintiffs] are only now bringing the physician forward as a newly identified expert witness, over two years later, and over one and a half years after the deadline to disclose expert witnesses, does not evidence circumstances in which the Court can find excusable neglect nor good cause.

286 F.R.D. 602, 2012 WL 5353493, at *14.

Similarly, in Scull v. Management & Training Corp., 2012 U.S. Dist. LEXIS 63742, 2012 WL 1596962 (D.N.M. May 2, 2012)(Browning, J.), the Court denied a plaintiff's request for an extension of time to name an expert witness against a defendant. The plaintiff asserted that he had waited to name an expert witness until a second defendant joined the case, but a scheduling order was in effect before the second defendant entered the case. The Court found that the plaintiff should have known that he would need to name an expert witness against the defendant already in the case. See 2012 U.S. Dist. LEXIS 63742, at 2012 WL 1596962, at *8. The Court determined that the plaintiff was seeking "relief from his own disregard" for the deadline. 2012 U.S. Dist. LEXIS 63742, at 2012 WL 1596962, at *8. "Despite his knowledge that [Defendant] PNA had yet to enter the case, [Plaintiff] Scull chose to allow the deadline to pass without naming expert witnesses against [Defendant] MTC." 2012 U.S. Dist. LEXIS 63742, at 2012 WL 1596962, at *8. Regarding the defendant who entered the case at a later date, however, the Court allowed the plaintiff an extension of time to name an expert witness, because it "was not unreasonable for Scull to expect a new deadline to name expert witnesses upon PNA's entrance into the case because he had not yet had the opportunity to engage in discovery against PNA as he had against MTC." 2012 U.S. Dist. LEXIS 63742, 2012 WL 1596962, at *9. The Court also noted that not naming an expert witness "is a high price to pay for missing a deadline that was arguably unrealistic when it was set," as Scull could not have

determined the need for an expert witness until after PNA entered the case.  2012 U.S. Dist. LEXIS 63742, at 2012 WL 1596962, at *9.

When serious and unforeseen events prevent a party from complying with the Court's scheduling order, however, the Court has found good cause.  In Stark-Romero v. National Railroad Passenger Co. (AMTRAK), 275 F.R.D. 544 (D.N.M. 2011)(Browning, J.), the Court found that a lawyer had shown excusable neglect when he missed a scheduling deadline because, soon after his son's wedding, his father-in-law developed a tumor in his chest, the lawyer arranged his father-in-law's medical care, and, only after the lawyer returned to his work did he realize that a deadline passed.  See 275 F.R.D. at 549-50.  The Court noted that the lawyer could have avoided missing the deadline had he not left his work until the last minute, just before his son's wedding, but found that the lawyer had demonstrated good faith and missed the deadline because of "life crises," and not because of his inadvertence.  275 F.R.D. at 549-50.  In West v. New Mexico Taxation and Revenue Department, No. CIV 09-0631 JB/CEG, 2010 U.S. Dist. LEXIS 89605, 2010 WL 3834341 (D.N.M. July 29, 2010)(Browning, J.), the Court allowed a plaintiff extended time to file a response to a defendant's motion for summary judgment, in part because of the difficulty the plaintiff's counsel experienced attempting to obtain depositions with certain defense witnesses, and thus it was not her fault, and in part because cross-motions on summary judgment are particularly helpful for the Court.  See 2010 U.S. Dist. LEXIS 89605, at 2010 WL 3834341, at *4-5.  On the other hand, in Liles v. Washington Tru Solutions, LLC, No. CIV 06-854 JB/CEG, 2007 U.S. Dist. LEXIS 56491, 2007 WL 2298440 (D.N.M. June 13, 2007)(Browning, J.), the Court denied a plaintiff's request for additional time to respond to a defendant's motion for summary judgment, when the only rationale that the plaintiff provided

was that his counsel's "family and medical emergencies" precluded the plaintiff from timely responding.  2007 U.S. Dist. LEXIS 56491, at 2007 WL 2298440, at *2.

ANALYSIS

The Court grants the Defendants' Motion to Extend Discovery Deadlines and to Establish a New Trial Date.  The Court is not convinced that, as the Defendants assert, Sage Hospital hid costs earlier in the course of litigation.  Nevertheless, the Court concludes that new information became apparent in the days leading up to the discovery deadline the Scheduling Order set, and that the Defendants have satisfied the good-cause requirement of rule 16(b)(4) for a discovery deadline extension.

## I.      THE COURT WILL EXTEND DISCOVERY DEADLINES.

The Court will grant the Defendants' Motion to Extend Discovery Deadlines.  Sage Hospital initially sought a total of $62,569,681.00 in damages from the Defendants.  See First Amended Complaint ¶ 68, at 27.  The damages sought have now increased to $135,994,679.00. See Motion at 5.  A decisive driver behind the increase is a set of new elements that Sage Hospital neither itemized nor quantified until days before the discovery deadline. See Response at 5, Tr. at 37:13-38:3 (Wolak).

The Defendants estimate that these new elements will require them to conduct almost twenty new depositions across four locations in the western United States.  See Reply at 9.  New claims for construction delay, lost revenue, and start-up costs will require extensive fact and expert discovery, and even the reduced claim for direct CSC will require time to evaluate and reconcile experts' differing sums.  The Defendants lack sufficient time before the discovery deadline to complete all these tasks.

The lack of time is not a consequence of a dilatory behavior on the Defendants' part. The Defendants, rather, have shown due diligence in discovery throughout the course of litigation.

As Sage Hospital itself notes in its Response, the Defendants have employed seventeen experts since at least April 9, 2015, to evaluate Sage Hospital's claim for CSC and related expectancy damages alone.  See Response at 13-15.  The Defendants have complied with other Scheduling Order deadlines, including for (i) rule 26(a) disclosures, filed November 12, 2015; (ii) Production of Documents, filed November 12, 2015; (iii) Interrogatories, filed November 20, 2015; and (iv) Expert Disclosures, filed December 14, 2015.

Under the Tenth Circuit and the Court's previous rulings, rule 16(b)(4) permits a district court wide discretion to modify a litigation schedule if the moving party demonstrates "good cause," meaning that it cannot meet scheduling deadlines despite diligent effort.  See Sil-Flo, Inc., 917 F.2d 1507, 1514; see Street, 2008 U.S. Dist. LEXIS 42131, at *6.  The Court concludes that the Defendants have met the bar for good cause and, therefore, invokes the Court's discretion to modify the discovery deadlines.

## II.     THE COURT WILL ESTABLISH A NEW TRIAL DATE.

The Court's discovery deadline extension compresses the remainder of the litigation timeline as currently set in the Scheduling Order. The Defendants have moved to postpone the trial date to approximately August 15, 2016.  See Motion at 14.  The preliminary injunction in this case, filed April 9, 2015 (Doc. 62), protects Sage Hospital from adverse financial effects of a delay in the trial. The Court, therefore, also will grant the Defendants' Motion to establish August 15, 2015, as the new trial date.

**IT IS ORDERED** that the Defendants' Motion to Extend Discovery Deadlines and to Establish a New Trial Date, filed December 10, 2015 (Doc. 135) is granted.  The Court will: (i) extend the Defendant's expert disclosure deadline to April 1, 2016; (ii) extend the fact and expert discovery deadline to May 2, 2016; (iii) extend the deadline for all discovery motions to May 23,

2016; (iv) extend the deadline for all pretrial motions to June 1, 2016; and (v) extend the deadline for the Pretrial Order from the Plaintiff to July 28, 2016, and the Pretrial Order from the Defendants to August 4, 2016. Furthermore, the Court will schedule: (i) a motion hearing on July 8, 2016, at 9:00 a.m.; and (ii) a bench trial on a trailing docket for August 15, 2016, at 9:00 a.m.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Lloyd B. Miller
Sonosky, Chambers, Sachse, Miller & Munson, LLP
Anchorage, Alaska

--and--

Paul E. Frye
Frye Law Firm, PC
Albuquerque, New Mexico

 *Attorneys for the Plaintiffs*

Damon P. Martinez
 United States Attorney
Karen F. Grohman
 Assistant United States Attorney
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

--and--

Devin A. Wolak
Russell J. Upton
United States Department of Justice
Washington, D.C.

 *Attorneys for the Defendants*