## IN THE UNITED STATE DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

NAVAJO HEALTH FOUNDATION -- SAGE
MEMORIAL HOSPITAL, INC,

        Plaintiff,

vs.                                      No. CIV 14-0958 JB/GBW

SYLVIA MATHEWS BURWELL,
SECRETARY OF THE UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; MARY SMITH, ACTING
DIRECTOR OF INDIAN HEALTH
SERVICES; DOUGLAS GENE PETER., M.D.,
ACTING AREA DIRECTOR, NAVAJO AREA
INDIAN HEALTH SERVICE; and
MARGARET SHIRLEY-DAMON,
CONTRACTING OFFICER, NAVAJO AREA
INDIAN HEALTH SERVICE,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiff's Motion for Partial

Summary Judgment on the Issues of Allocation, filed August 1, 2016 (Doc. 199)("Allocation

MSJ"); and (ii) the Plaintiff's Motion for Partial Summary Judgment on the Issue of Duplication,

filed August 1, 2016 (Doc. 200)("Duplication MSJ").  The Court held a hearing on September

16, 2016.  The primary issues are: (i) whether funding that third parties provide is considered

part of federal programming for the purposes of reimbursement under the Indian Self-

Determination and Education Assistance Act, 25 U.S.C. § 450 et seq ("ISDEAA"); (ii) whether

the Indian Health Service ("IHS") only is responsible for that portion of Sage Hospital's PFSAs

funded with appropriated dollars; and (iii) whether the ISDEAA duplication provision prohibits

IHS from providing any CSC funding for activities funded in the Secretarial amount.

**FACTUAL BACKGROUND**

"Sage is a Navajo tribal organizational for purposes of contracting with the Indian Health Service under the ISDEAA that operates a health care facility in Ganado, Arizona, within the exterior boundaries of the Navajo Reservation."  MSJ[1] ¶ 1, at 3 (stating this fact).  See Combined Response to Plaintiff's Motions for Summary Judgment on the Issues of Duplication and Allocation ¶ 1, at 5, filed August 25, 2016 (Doc. 222)("Response")(not disputing this fact).  "IHS is an agency within the United States Department of Health and Human Services (HHS) and is responsible for providing federal health services to American Indians and Alaska Natives."  MSJ ¶ 2, at 3 (stating this fact).  See Response ¶ 2, at 5 (not disputing this fact).  "Since fiscal year 2005, Sage [Hospital] has contracted with IHS under the ISDEAA to provide health services to a largely Navajo patient population."  MSJ ¶ 3, at 3 (stating this fact)(bracketed material added).  See Response ¶ 3, at 5 (not disputing this fact).   "Defendant Burwell is the HHS Secretary and has responsibility for carrying out all the functions, authorities, and duties of HHS including contracting on behalf of the United States with Indian tribal organizations under the ISDEAA to provide health care to Native Americans."  Allocation MSJ ¶ 4, at 3 (stating this fact).[2]  See Response ¶ 4, at 5 (not disputing this fact).

---

[1]Sage Hospital filed two partial motions for summary judgment: one on allocation and another on duplication, with Sage Hospital's factual section nearly identical in both.  See Allocation MSJ at 2-11; Duplication MSJ at 2-7.  Where the two factual sections are identical, the Court will refer to both collectively as "MSJ," referring the reader to the page number in Sage Hospital's Motion for Partial Summary Judgment on Allocation.  For any paragraph in which the two factual sections differ materially, the Court will refer to "Allocation MSJ" or "Duplication MSJ" and discuss the differences between the two paragraphs in a footnote.  For any paragraph numbered differently in the Allocation MSJ and the Duplication MSJ but otherwise identical, the Court will cite to the paragraph in the Allocation MSJ but retain the citing convention of "MSJ."

[2]Sage Hospital's Duplication MSJ adds one word to the text from its Allocation MSJ, indicating that Burwell "has ultimate responsibility for carrying out all the functions, authorities,

"Defendant Smith is the Principal Deputy Director of the IHS and had the overall responsibility for carrying out all the functions, authorities, and duties of the IHS within HHS regarding contracting with Indian tribal organizations under the ISDEAA to provide health care to Native Americans."  MSJ ¶ 5, at 3-4 (stating this fact).  See Response ¶ 5, at 5 (not disputing this fact).  "Defendant Shirley-Damon is the Contracting Officer for the Navajo Area IHS and is responsible for ISDEAA contracts and funding agreements for IHS programs, functions, services, and activities (PFSAs) undertaken by ISDEAA contractors within the Navajo Area IHS, including Sage."  MSJ ¶ 6, at 4 (stating this fact).  See Response ¶ 6, at 5 (not disputing this fact).  "Shirley-Damon has the authority to sign ISDEAA contracts and funding agreements with Sage for such IHS programs and to award funds pursuant to those agreements." MSJ ¶ 6, at 4 (stating this fact).  See Response ¶ 6, at 5 (not disputing this fact).[3]

"In 2009 Sage contracted with IHS under the ISDEAA. . . .  Sage and IHS were parties to successive ISDEAA contracts and AFAs [Annual Funding Agreements] for FY 2009 through FY 2013, without interruption."  MSJ ¶ 7, at 4 (stating this fact)(bracketed material added).[4]  See

---

and duties of HHS . . . ."  MSJ on Duplication ¶ 4, at 3(emphasis added).  The Court concludes that the adjective "ultimate" was implied in the Allocation MSJ's text, as it is unreasonable to believe that the HHS Secretary directly carries out "all the functions, authorities, and duties of HHS" at each IHS hospital and clinic nationwide, or directly oversees every contract entered into between them and HHS.

[3]From this point forward, the Court will refer to the Defendants collectively as "the United States" or as "United States." The Court will make an exception to this naming convention in direct quotes.

[4]The relevant paragraph in Sage Hospital's Allocation MSJ and Duplication MSJ read slightly differently.  See Allocation MSJ ¶ 7, at 4; Duplication MSJ ¶ 7, at 4.  The Court's text quotes the Allocation MSJ.  The MSJ on Duplication drops the word "successive" and the closing phrase "without interruption," and adds a parenthetical phrase "(collectively, the '2009-2013 Contracts')."  Compare Allocation MSJ ¶ 7, at 4, with Duplication MSJ ¶ 7, at 4.  The Court believes that there is no material difference between the two phrases, as each conveys the same information in lexicologically different ways.

Response ¶ 7, at 5 (not disputing this fact).

> The 2009 contract included the following PFSAs: Inpatient Services, General Ambulatory and Specialty Care Services, Emergency Department, Emergency Medical Transport, Optometry Clinic, Behavioral Health Services, Radiology, Pharmacy, Laboratory, Physical Therapy, Public Health Nursing, Employee Health Services, Health Education, Transportation Services, School Based Services, Diabetes Program, Traditional Medicine, Dental Clinic, and Podiatry Clinic.

MSJ ¶ 8, at 4 (stating this fact).[5]  See Response ¶ 8, at 5 (not disputing this fact).  The 2009

through 2013 contracts also state:

> In addition to general descriptions of services provided above, NHF/Sage [Sage Hospital or Sage] will provide the following services, among other related services, in operating and administering the PFSAs under the ISDEAA Contract and providing health care services for eligible beneficiaries . . .
>
> 5.      Business Functions: Including, but not limited to, billing and collecting third party reimbursements, conducting utilization review, compliance activities, insurance verification, and collection activities.

MSJ ¶ 9, at 5 (stating this fact)(bracketed material added in the MSJ).  See Response ¶ 9, at 5

(not disputing this fact).

> The IHS Contracts stated "[e]ach provision of the [ISDEAA] and each provision of this Contract shall be liberally construed for the benefit of Sage to transfer certain programs, functions, services, and activities (hereinafter 'PFSAs'), or portions thereof, and associated resources, that are otherwise contractible under section 102(a) of the [ISDEAA] (25 U.S.C. § 450(f)(a)), including all related administrative functions, from the Secretary to Sage."

MSJ ¶ 11, at 5-6 (stating this fact)( bracketed material and single quotation marks around PFSAs

---

[5]In its Response, the United States does not dispute this fact, but clarify that "the Fiscal Year (FY) 2009 Annual Funding Agreement (AFA) (FY 2009 AFA), also included other PFSAs such as Administrative Services, Financial Management, Human Resources, Property and Supply, Housekeeping, and Laundry.  Defendants respectfully refer the Court to the AFA for the full list [of] PFSAs."  Response ¶ 8, at 5.  Since the United States agrees that the FY 2009 AFA included all the services that Sage Hospital lists, the Court finds that the United States' clarification does not raise a genuine issue of fact for trial under Federal Rule of Civil Procedure 56(c)(1).

in the MSJ).[6]  See Response ¶ 11, at 5 (not disputing this fact).

> The IHS Contracts provided that "[a]ll program income collected by Sage shall be treated as additional supplemental funding to that negotiated in the AFA and Sage may retain all such income pursuant to section 106(m) of the [ISDEAA] (25 U.S.C. § 450j-1(m)) to be used to further the general purposes of the Contract. Such program income shall not result in any off-set or reduction in the negotiated amount of the current or successor AFAs.

MSJ ¶ 12, at 6 (stating this fact)(bracketed material in the original).  See Response ¶ 12, at 6 (not

disputing this fact).

> Sage's Annual Funding Agreements (AFAs) for each year provided that, "[f]or PFSAs provided under this AFA, Sage shall exercise its right pursuant to Section 405 of the Indian Health Care Improvement Act, as amended by P.L. 106-417, to submit claims directly to and recover directly from Medicare and Medicaid.  All funds recovered from Medicare and Medicaid shall be used as allowed by law."

MSJ ¶ 13, at 6 (stating this fact)(bracketed material in the original).  See Response ¶ 13, at 6 (not

disputing this fact).

> The AFAs also stated that "[a]ny funds recovered by Sage through filing, litigating, or settling a claim against a third party to pay for services previously provided to IHS-eligible beneficiaries by Sage, or for such services previously provided by the IHS through PFSA now operated by Sage, shall be considered program income to be utilized by Sage in support of the PFSAs contracted herein."

MSJ ¶ 14, at 7 (stating this fact)(bracketed material in the original).[7]  See Response ¶ 14, at 6

---

[6]Sage Hospital's Allocation MSJ, in its second reference to the statute, refers to the Indian Self-Determination and Education Assistance Act of 1975 as the "ISDEAA."  Allocation MSJ ¶ 11, at 6.  In Sage Hospital's Duplication MSJ, in its second reference to the statute, it refers to the statute as the "ISDA."  Duplication MSJ ¶ 11, at 5.  The citation to the United States Code immediately after each acronym is the same; therefore, the Court finds that these two acronyms reference the same legislation: the Indian Self-Determination and Education Assistance Act of 1975, 88 Stat. 2203.

[7]In its Response, the United States does not dispute that the expert report includes the following note "'IHS identified costs and/or activities (and by extension, the activities' associated costs) including in Sage [Hospital]'s claim that it considered to be duplicative, unreasonable, unallowable, or unsupported.  IHS headquarters reviewed Sage [Hospital]'s

(not disputing this fact).  "The funding tables in each AFA noted 'third party resources' as part of

the Area Office direct operations budget."[8]  MSJ ¶ 15, at 7 (stating this fact).  See Response ¶ 15.

at 6 (not disputing this fact).  "By letter dated August 25, 2014 to then-Contracting Officer

Dayish, Sage submitted to IHS a CSC claim for FY 2009 through 2013 for a total of

$62,569,681."  MSJ ¶ 16, at 7 (stating this fact).  See Response ¶ 16, at 6 (not disputing

this fact).

> By letter dated July 16, 2015, IHS asserted a counterclaim against Plaintiff for FY
> 2009 through 2013 in the amount of $4,218,357 . . . . This counterclaim was
> based on IHS's assertions that "Plaintiff did not expend the indirect CSC funding
> on activities that the parties agreed were eligible for indirect CSC funding (i.e.,
> reasonable, necessary, non-duplicative costs incurred for activities carried on to
> operate the Federal program. . . . This counterclaim was later dismissed."

MPSJ ¶ 17, at 7-8 (stating this fact).  See Response ¶ 17, at 6 (not disputing this fact).  "Despite

the fact that Defendants dismissed their counterclaim, their expert continues to reduce her

calculations of Sage's damages because 'Sage claimed all actual costs without applying a

---

claimed costs and activities and highlighted those that did not meet the CSC definition for one or
more of these reasons and that IHS therefore believes are not eligible to be considered for CSC
funding.'"  Response ¶ 14, at 4 (bracketed material added).

> [8]In its Response, the United States does not dispute the fact but explains that

>  "third party resources" refers not to third party collections but to staff that: "(1)
> [e]stablishes liaison and coordinates Medicare/Medicaid activities with State
> agencies; (2) plans and coordinates the third-party activities of [Navajo Area
> Indian Health Service (NAIHS)] facilities, develops policy pertaining to third-
> party activities, and coordinates and develops overall policy and plans for the
> implementation of Title IV, Public Law (Pub. L.) 94-437, Indian Health Care
> Improvement Act; and (3) provides technical assistance and guidance to service
> unit third-party staff."

Response ¶ 15, at 6 (bracketed material in the Response).  Since Sage Hospital and the United
States both agree that the quoted language exists in each AFA's funding tables, the Court finds
that the United States' clarification does not raise a genuine issue of fact for trial under Federal
Rule of Civil Procedure 56(c)(1).

funding ratio to prorate the indirect costs between IHS and third-party funding.'" MSJ ¶ 18, at 8

(stating this fact).[9]  See Response ¶ 18, at 6 (not disputing this fact).

> IHS asserts that "CSC . . . is only generated by the Secretarial amount, not additional amounts a tribal contractor may choose to contribute to its ISDEAA programs from other sources. . . . [T]he purpose of CSC funding is to ensure that tribal contractors are not required to reduce the program, as operated by the Secretary, to cover their additional costs necessary for contract compliance when the program is transferred from federal to tribal operation."

MSJ ¶ 19, at 8 (stating this fact).[10]  See Response ¶ 19, at 6 (not disputing this fact).

> IHS also maintains that "CSC funding is authorized only for support of the federal program, and not for expanded programs funded with other resources.  *See* 25 U.S.C. § 450j-1(a)(2)-(3).  Accordingly, the determination of CSC funding must ensure that it is limited only to those activities that support the federal program. IHS accomplishes this through application of a ratio, based on either revenues or expenditures that demonstrates which costs are related to the federal program as compared to expanded programs, etc.  In years when there were shortfalls due to Congressionally-capped appropriations for CSC (up to and including fiscal year 2013), IHS divides the contract amount, plus an amount that recognizes a potential shortfall, by the actual revenues/expenditures. . . .  The use of the ratio ensures that CSC funding is not being awarded for non-federal programs."

MSJ ¶ 20, at 8-9 (stating this fact).[11]  See Response ¶ 20, 6 (not disputing this fact).

The United States' expert asserts that

> Sage based its claim for indirect CSC for FYs 2009 through 2013 on

---

[9]Because the United States does not otherwise respond to Sage Hospital's asserted fact, see Response ¶ 18, at 6, the Court deems the asserted fact undisputed.  See D.N.M. Local R. Civ. P. 56.1(a)("All material facts set forth . . . will be deemed undisputed unless specifically controverted.").

[10]Because the United States does not otherwise respond to Sage Hospital's asserted fact, see Response ¶ 19, at 6, the Court deems the asserted fact undisputed.  See D.N.M. Local R. Civ. P. 56.1(a)("All material facts set forth . . . will be deemed undisputed unless specifically controverted.").

[11]Because the United States does not otherwise respond to Sage Hospital's asserted fact, see Response ¶ 20, at 6, the Court deems the asserted fact undisputed.  See D.N.M. Local R. Civ. P. 56.1(a)("All material facts set forth . . . will be deemed undisputed unless specifically controverted.").

actual, historical cost data; however it . . . [i]s requesting that IHS pay 100 percent of Sage's claimed indirect CSC, rather than the reasonable estimate of IHS'[] prorated share of the eligible indirect CSC that Sage calculated during the original contract negotiation.

MSJ ¶ 21, at 9 (stating this fact).[12]  See Response ¶ 21, at 6 (not disputing this fact).

As part of her analysis, Defendants' expert subtracted costs in Sage's claim that IHS "considered to be duplicative," explaining:

IHS determined that some claimed amounts or activities are duplicative of activities funded in the Secretarial amount. . . . Those activities that are already funded in the Secretarial amount cannot also be funded as CSC. For example, Sage is claiming costs associated with linens and cleaning supplies as indirect costs.  Linens and hospital housekeeping would be part of direct hospital operations (i.e., direct program funds) and would be funded in the secretarial amount.  Other examples of specific cost areas that appear duplicative include activities related to "Dietary," "Wellness," "Med Rec," "Utilities," and "Grounds." As these are direct functions of hospital operations that were funded within the core Secretarial funding.

MSJ ¶ 22, at 9 (stating this fact).[13]  See Response ¶ 22, at 6 (not disputing this fact).

As part of her analysis, Defendants' expert made an adjustment to [CSC][14] because Sage [Hospital] had not "allocate[ed] [sic] indirect costs to the significant amount of third-party revenue received annually and used to fund hospital operations."  According to the Defendants' expert:

---

[12]Because the United States does not otherwise respond to Sage Hospital's asserted fact, see Response ¶ 21, at 6, the Court deems the asserted fact undisputed.  See D.N.M. Local R. Civ. P. 56.1(a)("All material facts set forth . . . will be deemed undisputed unless specifically controverted.").

[13]Because the United States does not otherwise respond to Sage Hospital's asserted fact, see Response ¶ 22, at 6, the Court deems the asserted fact undisputed.  See D.N.M. Local R. Civ. P. 56.1(a)("All material facts set forth . . . will be deemed undisputed unless specifically controverted.").  At the hearing, however, Sage Hospital withdrew this paragraph as irrelevant. See Tr. at 95:5-19 (Miller).

[14]In its MSJ, Sage Hospital apparently skips a word in this paragraph, with the original text reading ungrammatically and ambiguously as "made an adjustment to because Sage . . . ." MSJ ¶ 23, at 9.  Sage Hospital speaks repeatedly and exclusively to CSC funding in its subsequent block quotation supporting this fact.  See MSJ ¶ 23, at 9.  The Court thus imputes an intention to insert the word "CSC" in between the words "to" and "because" in the original quote.

> Due to its obligation not to fund CSC related to third-party funding, IHS has consistently negotiated with tribes and tribal organizations by allocating the program's indirect costs to their various funding sources. The manner in which IHS allocates CSC can vary depending on the documentation available.  With Sage [Hospital], IHS calculated revenues related to the IHS-funded portion of the program as a percentage of Sage [Hospital]'s overall revenues.

MSJ ¶ 23, at 9-10 (stating this fact).[15]  See Response ¶ 23, at 6 (not disputing this fact).

"Plaintiff itself repeatedly proposed that its CSC be calculated using ratios to allocate its administrative costs, consistent with Office of Amendment and Budget (OMB) cost principles." Response at 7 (stating this fact).[16]  See Plaintiff's Reply Memorandum in Support of Motion for Partial Summary Judgment on the Issue of Allocation 1, filed September 12, 2016 (Doc. 235)("Allocation Reply")(not disputing this fact).   "On average, IHS funding accounts for approximately 55% of Sage's health revenue each year."  Reply at 1 (stating this fact).[17]

---

[15]In its Response, the United States does not dispute "that the expert report contains the quoted language."  Response ¶ 23, at 6.

[16]Because Sage Hospital does not respond to the United States' asserted fact in its Reply other than with a clarification, the Court deems the asserted fact undisputed.  See D.N.M. Local R. Civ. P. 56.1(a)("All material facts set forth . . . will be deemed undisputed unless specifically controverted.").

[17]The United States and Sage Hospital are in dispute on this issue.  In the Response, the United States asserts that "[o]n average, IHS funding accounts for approximately 55% of Sage's health expenditures in each year." Response at 7 (emphasis added).  In the Reply, Sage Hospital contends that the accounting terminology the United States uses is wrong, and that the fact should read as follows: "On average, IHS funding accounts for approximately 55% of Sage's health revenue in each year." Reply at 2 (emphasis added).

The Second Amended Complaint with Supplemental Claim, filed May 3, 2016 (Doc. 180) ("Complaint") says that the contested word should be "revenue" rather than "expenditures." Complaint ¶ 31, at 16.  In their Answer to Second Amended Complaint with Supplemental Claim, filed May 17, 2016 (Doc. 184)("Answer"), the United States does not deny this fact, indicating that they "lack knowledge or information sufficient to form a belief about the truth of the allegations . . . ."  Answer ¶ 31, at 4.  Because the United States did not dispute the word

The ISDEAA contracts include the following provision:

> SECTION 5 -- LIMITATION OF COSTS.  Sage shall not be obligated to continue performance that requires an expenditure of funds in excess of the amount of funds awarded under the Contract.  If, at any time, Sage has reason to believe that the total amount required for performance of this Contract would be greater than the amount of funds awarded under this Contract, Sage shall provide reasonable notice to the Secretary of HHS.  If the Secretary does not take such action as may be necessary to increase the amount of funds awarded under the Contract, Sage may suspend performance of the Contract until such time as additional funds are awarded.

Response at 7 (stating this fact).[18]

## PROCEDURAL BACKGROUND

Sage Hospital made two motions for summary judgment.  Sage Hospital's first motion for summary judgment, the Allocation MSJ, asks the Court to grant it partial summary judgment that expenditures made with third-party revenues in support of the programs under contract with the IHS are spent on the federal program and are therefore eligible to be reimbursed as CSC.  See Allocation MSJ at 3.  Sage Hospital's second motion for summary judgment, the Duplication MSJ, asks the Court to grant it partial summary judgment that the ISDEAA requires a duplication offset in CSC only for the dollars that IHS actually pays to Sage Hospital as part of the Secretarial amount for a given type of cost.  See Duplication MSJ at 2.

1.      **Allocation MSJ.**

Sage Hospital filed the Allocation MSJ on August 1, 2016.  See Allocation MSJ. According to Sage Hospital, IHS funds only a proportion of Sage Hospital's CSC equal to the

_____

choice in the Answer and the factual assertion in the Response rests on the Complaint, the Court deems the asserted fact using the term "revenue" to be true and accurate and not to raise a genuine issue of fact for trial under Federal Rule of Civil Procedure 56(c)(1).

[18]Because Sage Hospital does not respond to the United States' asserted fact in its Reply, the Court deems the asserted fact undisputed.  See D.N.M. Local R. Civ. P. 56.1(a)("All material facts set forth . . . will be deemed undisputed unless specifically controverted.").

proportion of Sage Hospital's total programmatic funding that IHS provides.[19]  See Allocation MSJ at 18-20.  Sage Hospital alleges that the ISDEAA obligates IHS to fund Sage Hospital's entire CSC, even though Sage Hospital derives a portion of its programmatic revenues from third parties.  See Allocation MSJ at 20-24.  Sage Hospital therefore moves the Court to judge as a matter of law that third-party revenues Sage Hospital spends on the ISDEAA "federal program" are eligible for CSC.  See Allocation MSJ at 17.

According to Sage Hospital, the ISDEAA requires IHS to pay any Tribe that enters into a self-determination contract with it both program funds and CSC.  See Allocation MSJ at 15-17.  Program funds, Sage Hospital says, consist of the amount of money that IHS would have spent running the contracted program itself.  See Allocation MSJ at 15-17.  CSC, Sage Hospital says, consists of reasonable costs for activities necessary to ensure contract compliance and prudent management -- such as payroll, legal expenses, audits, insurance, and general overhead.  See Allocation MSJ at 15-17.  Sage Hospital asserts that IHS failed to pay the full amount of its CSC claim for each fiscal year 2009-2013 on the grounds that a portion of the CSC covered services that were funded by third-party revenues and that IHS would not have provided had it been running the program.  See Allocation MSJ at 18-19.

Sage Hospital argues that IHS' failure to pay the entirety of its CSC claim conflicts with the ISDEAA, which states that "program income earned by a tribal organization in the course of carrying out a self-determination contract . . . shall not be a basis for reducing the amount of funds otherwise obligated to the contract."[20]  Allocation MSJ at 20 (quoting 25 U.S.C. §450j-

---

[19]This proportion was 52.66% of Sage Hospital's total CSC claim in 2009, 75.46% of it in 2010, 68.99% of it in 2011, 60.43% of it in 2012, and 52.01% of it in 2013.  See Allocation MSJ at 18-20.

[20]The text of this provision in the code, which Sage Hospital fully and correctly quotes in

1(m).  IHS' allocation ratio, Sage Hospital maintains, de facto reduces the amount of funds otherwise obligated in the contract and therefore ipso facto violates the ISDEAA.  See Allocation MSJ at 20-21.

Unpacking this argument further lest it appear pat, Sage Hospital contends that IHS' allocation ratio ignores the ISDEAA's definition of the programmatic (a.k.a. "Secretarial") amount.  See Allocation MSJ at 20-21.  This ISDEAA, according to Sage Hospital, does not cleave self-determination programs into separate portions, one funded with appropriated funds and another funded by third-party revenues. See Allocation MSJ at 20-21.  Rather, Sage Hospital notes, the ISDEAA defines the programmatic amount broadly and simply as

> the amount that the HHS Secretary otherwise would have provided for the operation of the programs or portions thereof for the period covered by the contract, without regard to any organizational level within the Department of the Interior or the Department of Health and Human Services, as appropriate, at which the program, function, service, or activity or portion thereof, including supportive administrative functions that are otherwise contractable, is operated.

Allocation MSJ at 21 (quoting 25 U.S.C. § 450j-1(a)(1)).  Sage Hospital reads this definition to include third-party revenues in the Secretarial amount, provided that these revenues fund the federal program.  See Allocation MSJ at 21.  According to Sage Hospital, the subsequent ISDEAA subsection then mandates IHS to add CSC to the Secretarial amount as defined in 25 U.S.C. § 450j-1(a)(1) -- not just to the part of the federal program funded with appropriated funds. See Allocation MSJ at 21 (citing 25 U.S.C. § 450j-1(a)(2)).

Sage Hospital points to IHS' own internal practices to demonstrate the accuracy and reasonableness of its own ISDEAA interpretation, observing that IHS regularly supplements its

---

the Motion, see Motion at 20, reads as follows: "The program income earned by a tribal organization in the course of carrying out a self-determination contract (1) shall be used by the tribal organization to further the general purposes of the contract; and (2) shall not be a basis for reducing the amount of funds otherwise obligated to the contract." 25 U.S.C. § 450j-1(m).

own programmatic appropriations with third-party revenues, supporting these programs with a single administrative structure that does not distinguish between portions of programs it funds with appropriations and those portions of programs that it funds with third-party revenues.  See Allocation MSJ at 22.  Sage Hospital believes that IHS acts rightly in taking this approach, as it conforms to statutory directives.  See Allocation MSJ at 22 (citing the Indian Health Care Improvement Act and 25 U.S.C. § 1641(c)(1)(A) to -(B)).

Sage Hospital then reasons that every program that it operates can retrocede[21] to IHS, in which case IHS would receive all appropriated funds and all third-party revenues that those programs generate.  See Allocation MSJ 22-23.  Following its standard procedures, Sage Hospital argues, IHS then would provide the same administrative support services to all parts of the retroceded programs, regardless of their original funding source.  See Allocation MSJ at 22-23.  Since CSC is just such administrative support services when a Tribe provides them, Sage Hospital says, then consistency demands that programs that are not retroceded be able to apply CSC to all parts of those programs as well, regardless of their original funding source.  See Allocation MSJ at 22-23.

Sage Hospital concludes its motion by cataloguing a menagerie of assorted allegations. See Allocation MSJ at 23-24.  According to Sage Hospital, IHS' exclusion of program activities funded with third-party revenues from CSC funding conflicts with the ISDEAA's contracting mandate.  See Allocation MSJ at 23.  Sage Hospital alleges that its contracts with IHS acknowledge that Sage Hospital will collect third-party revenues, and that IHS agrees that the federal program includes billing and collection expenses.  See Allocation MSJ at 23.  Closing

---

[21]"Retrocede" is a term of art when used in the context of American Indian self-determination contracts that means that a Tribe can return any program that it operates under a self-determination contract to IHS for any reason before the expiration of the term of the compact or funding agreement.  See 42 CFR 137.245.

with an a fortiori argument, Sage Hospital says that required spending on health programs must qualify as federal programs if billing and collection expenses do.  See Allocation MSJ at 23-24.

### 2. **Duplication MSJ.**

Sage Hospital filed the Duplication MSJ on August 1, 2016.  See Duplication MSJ. According to Sage Hospital, Congress added an amendment to the ISDEAA in 1994 that prohibits Tribes that operate programs under a self-determination contract from being paid twice for the same costs.  See Duplication MSJ at 14 (citing 25 U.S.C. § 450j-1(a)(3)(A)).  Sage Hospital characterizes the amendment as striking a moderate position, mandating a dollar-for-dollar funding offset to avoid such duplicated costs but ensuring that IHS pay contractors the full amount which they need for activities to prudently manage the contract.  See Duplication MSJ at 14-15.

Sage Hospital says that IHS distances itself from Congress' moderate position by seeking a CSC duplication offset for the full amount which Sage Hospital incurred on any activity that the IHS theoretically would have funded under the Secretarial amount, even if Sage Hospital never received any Secretarial funding for that activity.  See Duplication MSJ at 15-17. Sage Hospital asserts that IHS' position defies legislative intent behind the ISDEAA, which Sage Hospital says was to use CSC to cover administrative costs so that Tribes could maximize healthcare availability for their members.  See Duplication MSJ at 17.  Sage Hospital argues that IHS seeks to turn this legislative intent on its head -- forcing the hospital to gut its programs to cover overhead costs.   See Duplication MSJ at 20.   According to Sage Hospital, IHS' interpretation of the ISDEAA duplication provision is so "extreme" and "absurd" that it brazenly even contradicts IHS' own CSC Manual.  Duplication MSJ at 17-21.  The CSC Manual, Sage Hospital asserts, repeatedly states that certain costs are eligible for CSC funding even though the

related activity may have received some funding in the Secretarial amount.  See Duplication MSJ at 21.

### 3.  **Response.**

Because both of Sage Hospital's motions concern a claim for increased CSC, the United States submits a combined response.   See Combined Response to Plaintiff's Motions for Summary Judgment on the Issues of Duplication and Allocation 1, filed August 25, 2016 (Doc. 222)("Response").   The United States quickly dismisses the arguments in Sage Hospital's motions as a baleful assembly of straw men, and argue that their reading of the ISDEAA is correct.  See Response at 2.  They invoke prior proceedings in this case, indicating that those proceedings already establish that IHS must pay Sage Hospital two categories of funding -- a Secretarial amount and CSC -- which are distinct forms of compensation and perfectly distinguishable by the categories of activities that they are intended to cover.  See Response at 2. According to the United States, Sage Hospital erroneously seeks to erase this distinction despite the ISDEAA's language and structure.  See Response at 2-3.

Once IHS enters into a self-determination contract with a Tribe, the United States reiterates, IHS must pay the Tribe a Secretarial amount and CSC under 25 U.S.C. § 450j-1(a) so that the scope of services does not diminish after the transfer.  See Response at 8.  The United States draws the Court's attention to the United States Code for a definition of "Secretarial amount," noting:

> The amount of funds provided under the terms of self-determination contracts entered into . . . [that] shall not be less than the appropriate Secretary would have otherwise provided for the operation of programs or portions thereof for the period covered by the contract, without regard to any organizational level within the Department of the Interior or the Department of Health and Human Services, as appropriate, at which the program, function, service, or activity or portion thereof, including supportive administrative functions that are otherwise contractable, is operated.

Response at 9 (quoting 25 U.S.C. § 450j-1(a)(1))(internal quotation marks removed). The way that the United States sees it, this definition tightly circumscribes IHS' payment obligation; unless IHS otherwise would have used appropriated funds for the operation of the PFSAs, IHS incurs no obligation to pay for them under the Secretarial amount. See Response at 9-10. The United States admits that this does not fully limit their repayment obligations towards Sage Hospital. See Response at 10. Under a 1988 amendment to the ISDEAA, the United States posits, IHS also must add to the Secretarial amount

> contract support costs which shall consist of the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which (A) normally are not carried on by the respective Secretary in his direct operation of the program; or (B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

Response at 10-11 (quoting 25 U.S.C. § 450j-1(a)(2). Under a separate 1994 amendment to the ISDEAA, IHS also must add to the Secretarial amount funding for administrative functions -- such as mail, telephone, and printing costs -- rendered in support of transferred PFSAs. See Response at 12 (citing 108 Stat. 4257-59).

According to the United States, Congress left 25 U.S.C. § 450j-1(a)(2)(B) largely intact under the 1994 amendment, with the notable exception of a new subsection that read as follows:

> (3)(A) The contract support costs that are eligible for the purposes of receiving funding under this subchapter shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of --
>
> > (i) direct program expenses for the operation of the Federal program that is the subject of the contract, and
> >
> > (ii) any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract,
>
> Except that such funding shall not duplicate any funding provided under subsection (a)(1)

of this section.

Response at 12-13 (25 U.S.C. §450j-1(a)(3)).   The United States maintains that this new

subsection, alongside an ISDEAA "model contract" that Congress included in the amendment,

clarifies that CSC can include both direct and indirect costs, but that these still are distinct

expense categories.  Response at 12-13 (referencing model contract at Pub. L. No. 103-413, tit. I,

§ 103, 108 Stat. at 4262, codified at 25 U.S.C. § 4501(c)).

Completing its cavalcade of code provisions, the United States mentions that Congress

amended the IDSDEAA one final time in 1997, which resulted in the addition of § 450j-2,

which provides:

> Before, on, and after October 21, 1998, and notwithstanding any other provision
> of law, funds available to the Indian Health Service in this Act or any other Act
> for Indian self-determination or self-governance contract or grant support costs
> may be expended only for costs directly attributable to contracts, grants, and
> compacts pursuant to the Indian Self-Determination Act [25 U.S.C.A. § 450f et
> seq.] and no funds appropriated by this or any other Act shall be available for any
> contract support costs or indirect costs associated with any contract, grant,
> cooperative agreement, self-governance compact, or funding agreement entered
> into between an Indian tribe or tribal organization and any entity other than the
> Indian Health Service.

Response at 14 (25 U.S.C. § 450j-2)(bracketed material in the Response).  The United States

reads this statutory provision to indicate that IHS' CSC obligation extends only to the eligible

costs for programs that IHS previously transferred to Sage Hospital, and not to PFSAs "for any

entity other than the [IHS]."  Response at 14 (bracketed material in the original)(quoting H.R.

Rep. No. 105-609, at 110 (1998)).

Aware that its argument's main thrust may have been lost amid the flurry of statutory

provisions, the United States then summarizes it.  See Response at 15.  Under the ISDEAA's

plain language, the United States asserts, Sage Hospital is entitled to two forms of payment -- (i)

a Secretarial amount, which IHS must pay from the IHS appropriation and which covers the

amount that IHS would have used to operate the transferred programs; and (ii) CSC, which covers both direct and indirect costs. See Response at 15. To facilitate these payments and conform to the ISDEAA, the United States maintains, Sage Hospital must de-duplicate its claimed CSC to eliminate all of the activities funded with the Secretarial amount and properly allocate cost responsibility among all sources of revenue so that IHS does not support administrative costs for programs that vastly exceed the federal PFSAs. See Response at 15.

      **a.**    **Duplication.**

Building off of the foregoing statutory framework, the United States reverses the order of filings in the case to first address Sage Hospital's Duplication MSJ. See Response at 15-26. The United States reminds the Court that the ISDEAA authorizes CSC funding to cover only the reasonable costs of activities that both (i) "must be carried on . . . to ensure compliance with the terms of the contract and prudent management" of the federal PFSAs; and (ii) must be activities that IHS does not normally operate using the Secretarial amount. See Response at 15-16 (quoting 25 U.S.C. § 450j-1(a)(2)(A)-(B)). Fixating on the statute's repeated use of the word "must" and what they call "the fact that level of effort required to perform . . . Federal PFSAs is coterminous with the Secretarial amount," the United States argues that any expenditures which Sage Hospital incurred above the Secretarial amount are discretionary and not eligible for CSC. Response at 17. The United States insists that, read together with the subsection that follows it, 25 U.S.C. § 450j-1(a)(2) also reinforces yet again the distinction between the Secretarial amount and CSC, and forbids funding duplication. See Response at 18.

Seemingly still smarting at the harsh language in Sage Hospital's MSJ, see Duplication MSJ at 17-21, the United States turns the tables and attacks Sage Hospital's approach to duplication as unreasonable and implausible. See Response at 18-19. It accuses Sage Hospital

of "selectively quoting" and ignoring "large swaths of the relevant statutory text" to arrive at its contorted interpretation that "duplication" is avoided when the agency is given full credit for the amount of dollars it provided in the Secretarial amount for any particular function. Response at 18-19 (referring to Duplication MSJ at 17). The United States argues that Sage Hospital seeks to expand the Secretarial amount by craftily classifying all of its incremental expenditures on Secretarial-amount activities as CSC. See Response at 20. Had Sage Hospital found IHS funding insufficient to cover the PFSAs under the Secretarial amount, the United States asserts, Sage Hospital had statutory authority to discontinue services once the Secretarial amount had been exhausted. See Response at 21. Instead, the United States maintains, Sage Hospital continued to provide services after the Secretarial amount had been depleted and now seeks to befog the crystal clear text of 25 U.S.C. § 450j-1(a)(1) to suggest that IHS should use CSC to fill the gap. See Response at 22.

According to the United States, neither snippets of legislative history nor the canon of Indian deference can rescue Sage Hospital's interpretation when it so manifestly defies the statutory text's plain meaning.[22] See Response at 22. The United States contends that this general principle of interpretation especially is true with respect to the MSJ, as the legislative history upon which Sage Hospital relies is unrepresentative and unattached to the version of the ISDEAA that eventually passed Congress. See Response at 23-24 (indicating that Sage Hospital cites to S. Rep. No. 103-374 but that Congress passed the House version of the bill). The United States contends that a fuller legislative history shows that Congress expressly contemplated the

_____

[22]The canon of Indian deference, otherwise known as the "Indian canon," requires that courts liberally construe treaties, agreements, statutes, and executive orders in favor of American Indians. See Montana v. Blackfeet Tribe, 471 U.S. 759, 766 (1985). See generally Philip P. Frickey, Marshalling Past and Present: Colonialism, Constitutionalism, and Interpretation in Federal Indian Law, 107 Harv. L. Rev. 381 (1993)(offering a scholarly commentary on the Indian canon). For a fuller treatment of the Indian canon, see pp. 56-57 infra.

types of activities that CSC should cover and expressed concern that the Secretarial amount and not CSC should fund PFSAs which IHS does.  See Response at 24-25.

The United States finally shifts topic, if not tone, insisting that all of Sage Hospital's assertions that IHS took actions inconsistent with the language of the ISDEAA are off base.  See Response at 25.  IHS CSC Policy, according to the United States, is replete with guidance consistent with the plain language of the statute, whether the guidance covers evaluation of direct costs for duplication or identification of activities that are funded in the Secretarial amount and therefore are not eligible for CSC funding.  See Response at 25.

   b.   **Allocation.**

Because the ISDEAA, according to the United States, authorizes CSC funding only to cover the reasonable costs of unique activities that the Secretarial amount does not cover, and that must be done for contract compliance and prudent management of the Federal PFSAs, this distinction means that costs must be allocated proportionally among the various revenue streams that supply a tribe or tribal organization's operating budget so that IHS is not saddled with all the overhead costs attached to the ISDEAA contract while third parties free ride.  See Response at 27.  The United States avers that this cost allocation inheres to the statutory definition of CSC, see Response at 27, and that the United States District Court for the District of Columbia confirmed this inherency when it decided Tunica-Biloxi Tribe of La. v. United States, 577 F. Supp. 2d 382 (D.D.C. 2008)(Walton, J.), in which it held that the ISDEAA "prevents the IHS from paying more than its *pro rata* share of the indirect costs incurred by contracting tribes and tribal organizations,"  Response at 28 (quoting Tunica-Biloxi Tribe of La. v. United States, 577 F. Supp. 2d at 418).

The United States argues that the court's reasoning in Tunica-Biloxi Tribe of La. V.

United States applies to this case even though the fact pattern is slightly different, and that the Court also should come to the same conclusion that 25 U.S.C. § 450j-2 "requires an equitable distribution of a contractor's administrative costs and bars shifting costs to IHS that are not allocable to the Federal PFSAs funded by the Secretarial amount." Response at 28.  The United States recounts how Sage Hospital repeatedly in the past proposed that IHS calculate Sage Hospital's CSC using ratios to allocate its administrative costs, consistent with OMB cost principles.[23]  See Response at 29 (referencing OMB Circular A-87, which the United States appends to the Response at A48-49).

According to the United States, Sage Hospital's change of heart on the issue is inconsistent with the ISDEAA definition of "Secretarial amount" in three ways.  Response at 31-36.  First, according to Sage Hospital, 25 U.S.C. § 450j-1(a)(1)'s plain language limits the Secretarial amount to appropriated funds; that is to say, according to Sage Hospital, the ISDEAA does not require that the funding which Sage Hospital receives will fund the level of services that the Tribe wishes to provide.  See Response at 33.  Second, according to Sage Hospital, Sage Hospital's contract with IHS nowhere contains a provision compelling IHS to pay for third-party collections as part of the Secretarial amount.  See Response at 34.  Third, according to Sage Hospital, IHS' practice of sometimes supplementing CSC based on third-party revenues is

---

[23]OMB Circular A-87 establishes principles and standards for determining costs for Federal awards carried out through grants, cost reimbursement contracts, and other agreements with state and local governments, and federally-recognized Indian tribal governments.  See OMB Circular A-87, at 1.  The Circular is part of an effort to streamline grants government-wide by making rules used to award federal grants simpler and more consistent.  See OMB Circular A-87, at 1.  The Circular "establishes principles and standards to provide a uniform approach for determining costs and to promote effective program delivery, efficiency, and better relationships between governmental units and the Federal Government.  The principles are for determining allowable costs only.  They are not intended to identify the circumstances or to dictate the extent of Federal and governmental unit participation in the financing of a particular Federal award." OMB Circular A-87, at 1.

because of its obligations under the IHCIA, 90 Stat. 1400, and the Social Security Act, 49 Stat. 620, not under the ISDEAA. See Response at 35.

The United States concludes its Response with an assertion that Pyramid Lake Paiute Tribe v. Burwell, 70 F. Supp. 3d 534 (D.D.C.)("Pyramid Lake") -- which Sage Hospital says rejected IHS' position concerning whether the ISDEAA's reach extends to programs that third-party revenues support -- is not dispositive. See Response at 36. According to the United States, Pyramid Lake was distinguishable from the present case in many ways. See Response at 37-38. Pyramid Lake involved the transfer of a program to a Tribe that, the United States says, "in its operation of the program, IHS partially funded with third-party revenues IHS collected from the operation of a *separate* program that was not the subject of the transfer." Response at 37. Pyramid Lake, the United States asserts, also centered on resources available to IHS, whereas this case revolves around funds that Sage Hospital generated from its own efforts to collect from third-party payers. See Response at 37. Last, the United States gingerly insists that the District Court for the District of Columbia confused the issues in the case before it, conflating two separate assertions the United States had made and then compounding this error by focusing on the less-developed one. See Response at 37.

> **4. Reply on the Issue of Allocation.**

Sage Hospital indicates that it wishes to "return to basics" in its Reply to the Allocation MSJ. Plaintiff's Reply Memorandum in Support of Motion for Partial Summary Judgment on the Issue of Allocation at 1, filed September 12, 2016 (Doc. 235)("Allocation Reply"). Sage Hospital first insists that all IHS programs are contractible under the ISDEAA, because they benefit American Indians qua American Indians. See Allocation Reply at 2 (citing 25 U.S.C. § 450f(a)(1)(E)). Whenever a Tribe contracts with IHS, Sage Hospital maintains, the ISDEAA

obliges it to transfer to the Tribe the Secretarial amount, i.e., "an amount of funds that is 'not . . . less than [the amount] the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof' being contracted."  Allocation Reply at 2 (quoting 25 U.S.C. § 450j-1(a)(1) and adding the bracketed material).  On the ISDEAA's face, Sage Hospital insists, the source of funding that IHS uses to operate its programs -- or otherwise would have used to provide them -- is irrelevant.  See Allocation Reply at 2.

According to Sage Hospital, the United States' entire opposition in its Response boils down to an assertion that the "only monies the Secretary 'otherwise provide[s]' to operate the agency's programs, and thus the only monies she must therefore transfer to a contracting Tribe, are 'appropriated' funds."  Allocation Reply at 2-3 (quoting 25 U.S.C. § 450j-1(a)(1)).  Sage Hospital argues that this assertion flies in the face of both HHS practice and the ISDEAA.  See Allocation Reply at 2-3.  For one thing, Sage Hospital maintains, the HHS Secretary routinely collects and spends third-party revenues to operate IHS programs.  See Allocation Reply at 3.  For another thing, Sage Hospital contends, 25 U.S.C. § 450j-1(a)(1) says that IHS funding "shall not be less than the appropriate Secretary would have otherwise provided for the operation of the program . . . ."  See Allocation Reply at 3 (quoting 25 U.S.C. § 450j-1(a)(1)).  Sage Hospital notes that the statute does not say that IHS funding "shall not be less than the appropriate Secretary would have otherwise provided from appropriated funds for the operation of the programs . . . ."  See Allocation Reply at 3 (emphasis in original).  Nor, Sage Hospital maintains, does the ISDEAA's contracting section refer to the Secretary contracting "programs or portions thereof funded with appropriated dollars."  See Allocation Reply at 3 (citing 25 U.S.C. § 450f(a)(1)(emphasis in original).  Sage Hospital argues that nothing whatsoever in the ISDEAA support's the government's assertions that (i) it does not cover programs funded with both

appropriated and non-appropriated dollars; or that (ii) it is not required to pay CSC for the portion of a contractor's program that is funded with third-party revenues.  See Allocation Reply at 3-4.

Sage Hospital says that the United States scours case law in a vain attempt to buttress their feeble statutory arguments.  See Allocation Reply at 4-6.  According to Sage Hospital, the court in Ramah Navajo Sch. Bd., Inc. v. Babbitt, 50 F. Supp. 2d 1091 (D.N.M. 1999)(Hansen, J.) never even addressed the statutory status of appropriated dollars vs. non-appropriated dollars. See Allocation Reply at 4.  The court in Ramah Navajo Chapter v. Lujan, 112 F.3d 1455 (10th Cir. 1997), Sage Hospital asserts, the United States Court of Appeals for the Tenth Circuit dealt with whether IHS could be compelled to fund indirect cost associated with a separate agency's operations, i.e., costs not associated with IHS programs.  See Allocation Reply at 5.  The court in Tunica-Biloxi Tribe of La. V., United States, 577 F. Supp. 2d 382 (D.D.C. 2008), Sage Hospital maintains, concluded that the Tunica rate adjustment claim against IHS was barred because 25 U.S.C. § 450j-2 "explicitly prohibits the funding of indirect costs 'associated with' non-IHS entities."  Allocation Reply at 5-6 (quoting Tunica-Biloxi Tribe of La. v., United States at 418).

Sage Hospital finds it baffling that the United States even would marshal such cases to support its argument.  See Allocation Reply at 5-7.  Even cast into their most positive light, Sage Hospital insists that the cases are irrelevant.  See Allocation Reply at 6.  Looked at more critically, Sage Hospital contends that Ramah Navajo Chapter v. Lujan sabotages the United States' own argument. After all, Sage Hospital notes, in that case the Tenth Circuit did spare HHS from any responsibility to pay for indirect costs associated with another agency's operations, but it also disserted on the HHS Secretary's responsibility to pay the full indirect costs associated with operating her own agency's contracts.  See Allocation Reply at 5-7.

Nor can Sage Hospital comprehend how the United States believes that its other arguments hold water.  See Allocation Reply at 7-8.  Sage Hospital admits that it previously used IHS' preferred allocation algorithm, but only on what it asserts was an erroneous instruction from IHS to use it.  See Allocation Reply at 7.  Sage Hospital does not have an indirect cost rate, so Sage Hospital maintains that the United States barks up the wrong tree when it insists that rules controlling the issuance of indirect costs rates require an allocation among funding sources.  See Allocation Reply at 8.  Sage Hospital's position might appear "not reasonable" to the United States, but Sage Hospital reiterates that it merely adheres to the ISDEAA's plain language.  See Allocation Reply at 8.  Sage Hospital collected funding from third-party payers itself rather than routing the third-party funding through IHS, but that observation, Sage Hospital insists, misses the point, which is that CSC is due for the reasonable and necessary costs of carrying out Sage Hospital's contract with IHS.  See Allocation Reply at 9.  Statutes other than the ISDEAA certainly address program income in the form of third-party revenue, Sage Hospital readily concedes, but the question before the Court is what the ISDEAA -- not sundry other laws -- demands of IHS.  See Allocation Reply at 10.

Last, Sage Hospital resists the United States' attempts to marginalize Pyramid Lake.  Sage Hospital is shocked at the alleged impudence the United States shows when it suggests that the lawyers in Pyramid Lake poorly briefed it and that the United States District Court for the District of Columbia poorly understood it.  See Allocation Reply at 11.  In reality, Sage Hospital argues, the United States is the one who misunderstands Pyramid Lake.  See Allocation Reply at 11.  That case, as Sage Hospital sees it, clearly "concerned the contractibility of an IHS program funded with non-appropriated dollars."  Allocation Reply at 11.  Similar to the situation in this case, Sage Hospital contends, IHS argues in Pyramid Lake that the funds' status as non-

appropriated funds placed these funds outside the ISDEAA's scope.  See Allocation Reply at 11.

Judge Cooper, according to Sage Hospital, properly rejected that assertion, holding that:

> the applicable funding level for a contract proposal under sections 450f(a)(2)(D) and 450j[-]1(a)(1) is determined based on what the Secretary otherwise would have spent, *not on the source of the funds the Secretary uses*.  If the Secretary chooses to augment its spending on a program with other funds available to her, nothing in the Act permits her to deduct those amounts from the tribe's funding under an otherwise acceptable ISDEAA contract.

Allocation Reply at 11-12 (quoting Pyramid Lake, 70 F. Supp. 3d at 544)(bracketed material and emphasis added in the Allocation Reply).  Far from some benighted ruling from the bench, Sage Hospital maintains, Judge Cooper's opinion skillfully spotlights the very issues at question in this case.  See Allocation MSJ at 11-12.

### 5.    Reply on the Issue of Duplication.

Sage Hospital sallies forth against the United States' arguments without so much as an initial stutter-step in its Reply to the Duplication MSJ.  See Plaintiff's Reply Memorandum in Support of Motion for Partial Summary Judgment on the Issue of Duplication at 1, filed September 12, 2016 (Doc. 236)("Duplication Reply").   According to Sage Hospital, IHS' litigating position can be distilled into an assertion that CSC funding and Secretarial amount funding are "primarily distinguishable by the types of activities that they are intended to cover," and that the two categories of activities do not overlap at all.  Duplication Reply at 1 (quoting Response at 2).  The way that Sage Hospital sees it, three examples from IHS' own CSC Manual lay waste to this assertion.  See Duplication Reply at 1-2.

First, Sage Hospital maintains, IHS itself incurs retirement costs, health insurance costs, facility costs, and training costs when it operates a given healthcare program.  See Duplication Reply at 2.  Depending on the program being contracted, all of these costs, according to Sage Hospital, may be contained in the Secretarial amount when IHS transfers the program to a tribal

contractor.  See Duplication Reply at 2 (citing Indian Health Manual ("I.H.M."), Part 6, Ch. 3, at 5-6).  Yet, according to the I.H.M., Sage Hospital says, each of these costs also is eligible to be funded as "direct" CSC to a tribal contractor so long as there is no double payment of costs that are already being paid to the contractor as part of the Secretarial amount.  Duplication Reply at 2 (citing I.H.M. 3-4).  Until this litigation, Sage Hospital asserts, IHS' longstanding position clearly was that "[t]o the extent the budgeted Tribal costs are determined to be reasonable and necessary and these costs exceed the amounts the Agency provides for these costs in the Section 106(a)(1) [Secretarial] amount, the difference is allowed as a DCSC [direct contract support cost] requirement for the [programs] transferred."  Duplication Reply at 2 (quoting I.H.M. 7)(bracketed material in Duplication Reply).  Sage Hospital states that it is obvious that the CSC costs could not "exceed" the costs in the Secretarial amount if by law CSC is not available to pay for any category of cost contained in the Secretarial amount or to supplement any category of Secretarial amount funding.  See Duplication Reply at 2.

Second, Sage Hospital maintains, IHS incurs costs at the central, regional, and local levels for personnel, financial, records, and property management whenever it runs a health clinic.  See Duplication Reply at 3.  Likewise, according to Sage Hospital, IHS also incurs costs for data processing, rent, utilities, housekeeping, repairs, maintenance, and equipment.  See Duplication Reply at 3.  Because these costs are ones which IHS incurs in operating a program, Sage Hospital contends, the Secretarial amount often contains all of these costs when IHS turns over its program to a tribal contractor, yet all of these cost categories are allowable under indirect CSC costs.  See Duplication Reply at 3.

Third, Sage Hospital argues, the I.H.M. provides a convenient formula for calculating a credit adjustment to the CSC that IHS will pay for overhead costs associated with IHS Area and

Headquarters funds that are part of the Secretarial amount.   See Duplication Reply at 3. According to Sage Hospital, the formula states that when the Area and central Headquarters overhead activities are transferred to a tribal contractor, twenty percent of the Area and Headquarters funding will be applied as a credit against the amount of indirect CSC funding the Tribe will receive.  See Duplication Reply at 3.  Sage Hospital asserts that there would be no occasion for a credit adjustment from the Secretarial amount if the CSC funding were not covering some of the same cost categories that IHS funds with Secretarial amount dollars.  See Duplication Reply at 4.

Were the foregoing examples insufficient to demonstrate how "extreme" IHS' positions are, Sage Hospital contends, the ISDEAA would erase all doubt.  Duplication Reply at 4.  Even though the ISDEAA specifically commands that the Secretarial amount shall include "supportive administrative functions," Sage Hospital insists that those very same categories of overhead also are identified in the ISDEAA's CSC provisions.  Duplication Reply at 4 (quoting 25 U.S.C. § 450j-1(a)).  According to Sage Hospital, the two central funding provisions of the ISDEAA, one for the Secretarial amount and one for CSC, largely describe the same cost categories, not different cost categories.  See Duplication Reply at 4-5.  Sage Hospital contends that the ISDEAA is particularly directive when it comes to indirect CSC, commanding that "[n]othing in this subsection shall be construed to authorize the Secretary to fund less than the full amount of need for indirect costs associated with a self-determination contract."  Duplication Reply at 5 (quoting 25 U.S.C. § 450j-1(d)(2)).  No additional ISDEAA language, Sage Hospital maintains, adds exceptions to the subsection's commands.  See Duplication Reply at 5.  Indeed, as Sage Hospital sees it, it is precisely because the two types of funding overlap that the ISDEAA "no duplication" provision is even necessary, as it guards against any double payment by assuring

that when computing the contractor's CSC requirement, the government receives a dollar-for-dollar credit for amounts already being paid as part of the Secretarial amount.  <u>See</u> Duplication Reply at 5.

Sage Hospital then again purports to summarize the United States' argument, albeit in a way different than it did a few pages earlier.  <u>Compare</u> Duplication Reply at 5, <u>with</u> Duplication Reply at 1.  At this point in the Duplication Reply, Sage Hospital says that the United States really cares about eligibility for CSC funding as opposed to duplication of costs.  <u>See</u> Duplication Reply at 5. In other words, as Sage Hospital puts it, "if a type of cost is included in the Secretarial amount, the government says, it is 'no longer eligible for CSC.'"  Duplication Reply at 5 (quoting Response at 12).  According to Sage Hospital, this cramped view of 25 U.S.C. § 450j-1(a)(2) largely ignores subsection (a)(3)(A) and the relevant legislative history behind it.  <u>See</u> Duplication Reply at 5-6.

Sage Hospital insists that subsection (a)(3)(A) hamstrings the United States, because it is that provision, not subsection (a)(2), which actually defines eligible CSC.  <u>See</u> Duplication Reply at 6.  According to Sage Hospital, the United States "concoct[s]" a story that Congress enacted the 1994 ISDEAA amendments, including subsection (a)(3)(A), simply to clarify that CSC can be accounted for as either direct or indirect costs, leaving subsection (a)(2) as the only relevant provision for determining the kinds of CSC costs that are due.  Duplication Reply at 6.  The fuller history of the amendment, according to Sage Hospital, is more complicated.  <u>See</u> Duplication Reply at 6.  After the 1988 ISDEAA amendments, as Sage Hospital recounts it, the only way a Tribe could secure funding for administrative functions housed in regional Area or centralized Headquarters offices was through CSC.  <u>See</u> Duplication Reply at 6.  According to Sage Hospital, once Congress in 1994 expanded the categories of costs that the HHS Secretary

was required to turn over as a part of the Secretarial program amount -- by amending subsection (a)(1) to include supportive administrative functions --  this automatically raised the question whether the expansion of the Secretarial amount meant that administrative functions no longer would be eligible to be funded as CSC.  See Duplication Reply at 7.  Congress answered the question in the negative, according to Sage Hospital, adding subsection (a)(3)(A) precisely to make clear that administrative and other overhead would continue to be funded as eligible CSC even if the same category of costs was included in the Secretarial amount.  See Duplication Reply at 7.  Sage Hospital urges the Court not to let the United States persuade it to ignore such legislative history.  See Duplication Reply at 8-9.

Sage Hospital brings the Reply to a close by summarizing what it says is the ISDEAA's plain meaning, viz. that "a given type of cost may be reimbursed by a combination of Secretarial funds *and* CSC funds, so long as no double payment occurs."  Duplication Reply at 9 (emphasis in original).  If the Court doubts that this truly is the statute's plain meaning, Sage Hospital argues, the ISDEAA's legislative history ought to put such doubt to flight.  See Duplication Reply at 9-10.  If even an inkling of doubt yet remains, the Court, Sage Hospital argues, ought to turn to the canon of Indian deference as the Tenth Circuit recently phrased it in Ramah Navajo Chapter v. Salazar, 644 F.3d 1054 (10th Cir. 2011): "if the [Act] can reasonably be construed as the Tribe would have it construed, it must be construed that way."  644 F.3d at 1062 (quoting Ramah Navajo Chapter v. Lujan, 112 F.3d at 1462).

**6.**      **The Hearing.**

The Court held a hearing on September 16, 2016.  See Transcript of Hearing (taken September 16, 2016)("Tr.").[24]   The parties discussed the two motions for partial summary

_____

[24]The Court's citation to the transcript of the hearing refers to the court reporter's

judgment in the reverse order in which they were filed, i.e. first discussing the Duplication MSJ and then the Allocation MSJ. The parties otherwise largely stuck to their briefing.

### a.       The Duplication MSJ.

After Sage Hospital and the United States had argued other motions, the Court jumpstarted arguments over the Allocation MSJ and Duplication MSJ by asking Sage Hospital why it had split the issues into two separate motions. See Tr. at 24:9-13 (Court). Sage Hospital contended that the two motions raise different issues, with the allocation motion concerning proration and the duplication motion concerning offsets. See Tr. at 24:14-25:1 (Miller). Sage Hospital then walked through the fundamental differences between the two issues. See Tr. at 25:5-29:3 (Miller). Starting with the ISDEAA's passage, Sage Hospital noted that the statute originally did not even speak about CSC. See Tr. at 25:8-13 (Miller). According to Sage Hospital, Congress revisited the ISDEAA in 1987, because the lack of CSC to pay overhead costs was penalizing Tribes that undertook their own healthcare programs by taking a bite out of their programmatic budget. See Tr. at 25:13-26:17 (Miller). The ISDEAA amendments enacted the following year, Sage Hospital maintained, sought to lift the unintended penalty by adding CSC to the Secretarial amount. See Tr. at 26:17-24 (Miller).

For six "long" and "unfortunate" years of negotiated rulemaking following the 1988 ISDEAA amendments, according to Sage Hospital, IHS failed to apprehend that Congress intended for it to interpret CSC liberally and pay full CSC. Tr. at 27:6-17 (Miller). Accordingly, in 1994, as Sage Hospital recounts it, Congress "c[a]me back with a vengeance," issuing the HHS Secretary two instructions. Tr. at 27:25-28:1 (Miller). First, according to Sage Hospital, Congress instructed HHS that the Secretarial amount should include everything that is not an

---

original, unedited version. Any final version may have slightly different page and/or line numbers.

inherently federal function, including all administrative functions that IHS handles at the regional or headquarters level  See Tr. at 27:25-30:15 (Miller).  The instruction presented some computational difficulties at the regional and headquarters levels, Sage Hospital said, because the same buckets of money at those levels funded multiple Tribes.  See Tr. at 28:13-29.1 (Miller). Sage Hospital indicated, however, that "people of goodwill figure[d] it out," and added those amounts to Tribes' local operational and programmatic budgets under the Secretarial amount. Tr. at 28:13-29.1 (Miller).  Second, according to Sage Hospital, Congress instructed HHS that CSC should include "the cost of reimbursing each tribal contractor for reasonable and allowable costs, for direct program expenses for the operation of the federal program, and any additional administrative or other expense related" to it.  Tr. at 31:25-32:16 (Miller).

Sage Hospital noted that the 1994 amendments created an apparent tension, expanding the CSC definition to cover administrative costs but simultaneously ordering that the HHS Secretary include administrative costs in the Secretarial amount.  See Tr. at 32:17-33:4 (Miller). The superficial tension, Sage Hospital said, is resolved under the non-duplication provision in the amended ISDEAA.  See Tr. at 33:4-7 (Miller).  As an illustration of the non-duplication provision in action, Sage Hospital noted that most Tribes have administrative costs about a quarter as large as their programmatic costs.  See Tr. at 33:13-15 (Miller).  Sage Hospital explained that, if a given Tribe with this ratio receives ten million dollars from IHS for administrative costs, but still chooses to rely on the IHS regional office or headquarters for all its administrative functions, IHS gets a $2.5 million credit against that Tribe's funding.  See Tr. at 33:16-34:12 (Miller).

Sage Hospital contrasted the foregoing illustration with how it purports that the United States read the ISDEAA.  See Tr. at 34:13-35:4 (Miller).  According to Sage Hospital, the

ISDEAA says nothing about the category of costs involved.  See Tr. at 34:13-16 (Miller).  For instance, Sage Hospital offers, if (i) the regional IHS office supplements a contract for ten million dollars in programmatic expenses with $500,000.00 in CSC for administrative expenses; (ii) but if both the Tribe and IHS later realize that $600,000.00 for administrative expenses is reasonable and prudent for management of the contract, the United States' reading of the ISDEAA would prohibit IHS from disbursing the additional $100,000.00.  See Tr. at 34:16-35:3 (Miller).

Sage Hospital maintained that this reading of the ISDEAA is new at IHS, invented whole cloth in the wake of the 2012 Supreme Court decision in Ramah Navajo Chapter v. Lujan.  See Tr. at 35:4-11 (Miller).  As proof of the recent change, Sage Hospital reached back into the version of the I.H.M. current before Ramah Navajo Chapter v. Lujan and noted that the I.H.M. said that Tribes were eligible to receive all management costs without categorical limitations.  See Tr. at 35:7-19 (Miller).  Sage Hospital drew two examples from the I.H.M. to support this point.  See Tr. at 35:19-22 (Miller).

The first example is IHS' 80/20 formula, which assumes that the IHS regional offices spend eighty percent of their budgets on program costs and twenty percent of their budgets on administrative costs.  See Tr. at 35:22-36:24 (Miller).  For instance, IHS assumes that a regional office with a million-dollar budget spends $200,000.00 on administrative expenses.  See Tr. at 36:19-24 (Miller).  According to Sage Hospital, any administrative costs that a contracting Tribe incurs are offset, dollar for dollar, off of the $200,000.00.  See Tr. at 37:1-11 (Miller).  When applying the offset, Sage Hospital implies,[25] IHS does not ask the contracting Tribe what

---

[25]Sage Hospital used a number of pronouns ambiguously when arguing this point at the hearing.  See Tr. at 36:24-37:6 (Miller).  Because the transcript text's plain meaning is ambiguous, the Court borrows the statutory canon of construction noscitur a sociis to interpret

categories of administrative costs the $200,000.00 is covering.  See Tr. 36:24-37:6 (Miller).

The second example that Sage Hospital said supports its point on the lack of categorical limitations on CSC in the I.H.M. is the cost that Tribes incur for their employees' fringe benefits, such as workers' compensation or health insurance.  See Tr. at 37:22-38:6 (Miller).  When Tribes present their fringe benefit costs to IHS, IHS offsets, dollar for dollar, however much those same fringe benefits would have cost IHS if it had provided them directly.  See Tr. at 38:8-15 (Miller). For instance, if it cost a Tribe $100,000.00 to provide fringe benefits that IHS could have provided for $80,000.00, then IHS imposes an $80,000.00 credit on the Tribe.  See Tr. at 38:8-15 (Miller).

If nothing else, Sage Hospital argued, such examples raise doubts about the ISDEAA text's meaning.  See Tr. at 39:3-15 (Miller).  Sage Hospital said that such ambiguity requires application of the Indian canon, which instructs the courts to interpret ambiguous provisions liberally in favor of American Indians.  See Tr. at 39:5-11 (Miller).[26]  Even stronger, Sage Hospital contends, is the Indian canon that Congress bound to the ISDEAA, which says that every provision -- not only every ambiguous provision -- must be liberally construed in favor of Tribal contractors.  See Tr. at 39:11-15 (Miller).  After momentarily gathering its thoughts, see

---

the pronouns in light of the surrounding words.  Cf. Yates v. United States, 135 S. Ct. 1074 (2015)("[W]e rely on the principle of *noscitur a sociis* -- a word is known by the company it keeps -- to avoid ascribing tone word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.")  In the lines both immediately preceding and immediately succeeding the ambiguous lines, it is clear that Sage Hospital is referring to IHS examining Tribal contractors' budgets.  See Tr. at 36:19-24, 37:6-8 (Miller).

[26]Sage Hospital indicated during the hearing that the Indian canon requires courts to "interpret ambiguous provisions liberally in favor of the tribal contractor."   Tr. at 39:9-11 (Miller).  The Indian canon covers much more than just contractors, requiring "statutes to be construed liberally in favor of Indians with ambiguous provisions interpreted to their benefit." E.g., Chickasaw Nation v. United States, 534 U.S. 84, 93 (2001).

Tr. at 39:25-40:2 (Miller)(Court), Sage Hospital pointed the Court in the direction of another statutory provision of 25 U.S.C. § 450j-1, which indicates that "[n]othing in this subsection shall be construed to authorize the Secretary to fund less than the full amount needed for indirect costs associated with a self-determination contract,"  Tr. at 40:9-16 (Miller)(quoting 25 U.S.C. § 450j-1(d)(2)).

Briefly turning to another argument while completing its argument on the Duplication MSJ, Sage Hospital noted that it would have no problem if IHS were demanding a credit for proven duplicate services.  See Tr. at 41:1-8 (Miller).  In this case, however, according to Sage Hospital, IHS posits "fantasy duplication" for activity that the HHS Secretary typically would have transferred as part of the Secretarial amount -- even though those dollars never were transferred.  Tr. at 41:8-18 (Miller).

The Court recessed briefly to allow the court reporter to go to the doctor for a spider bite. See Tr. at 42:25-43:10 (Court).[27]  Immediately after the recess, the Court allowed the United

---

[27]Numerous poisonous or toxic spiders are endemic to New Mexico, including black widows; brown widows; several species of violin spiders, including the brown recluse spider; and various jumping spiders.  See New Mexico State University, College of Agricultural, Consumer and Environmental Sciences, The Spider of the Arid Southwest: Toxic Spiders, http://aces.nmsu.edu/academics/spiders/venomous-spiders.html (last visited Oct. 27, 2016).  Not all spiders in New Mexico, however, are poisonous or toxic.  See  Richard A. Bradley & Steve Buchanan, Common Spiders of North America at 53, 85, 108, 120, 125, 127, 132, 155-56, 158, 168, 174, 177, 198-99, 212, 214, 241 & 243-44,  (2012)(listing spiders endemic to New Mexico). The Occupational Safety and Health Administration ("OSHA") recommends that employees bitten by any of several spiders seek medical attention.  See, e.g., OSHA, OSHA Fact Sheet: Brown Recluse Spider, https://www.osha.gov/OshDoc/data_Hurricane_Facts/brown_recluse _spider.pdf (last visited Oct. 27, 2016); OSHA, OSHA Fact Sheet: Black Widow Spider, https://www.osha.gov/OshDoc/data_Hurricane_Facts/black_widow_spider.pdf (last visited Oct. 27, 2016).  Because the court reporter had been unable to catch the spider that bit her, the Court applied the precautionary principle, and recessed to allow the court reporter to seek medical attention.  Cf. United Nations Educational, Scientific, and Cultural Organization, The Precautionary Principle 14 (March 2005), available at http://unesdoc.unesco.org/images/0013 /001395/139578e.pdf (last visited Oct. 27, 2016)(discussing the international consensus that "actions shall be taken to avoid or diminish . . . harm . . . that is threatening to human life or

States to respond on the issue of the Duplication MSJ.  See Tr. at 43:11-12 (Court).  Starting off,

the United States acknowledged that it had nearly no disagreements with the statutory history

that Sage Hospital had presented on the ISDEAA and the 1988 and 1994 amendments to it.  See

Tr. at 43:17-19 (Wolak).  The United States noted that it did take exception to the conclusions

that Sage Hospital's drew from the 1994 amendments.  See Tr. at 43:19-22 (Wolak).

The United States argued that ISDEAA subsection (a)(2) clearly deals with costs for

activities, which means that there is an activity-based distinction between the Secretarial amount

and CSC.  See Tr. at 44:2-11 (Wolak).  If IHS funds an activity under the Secretarial amount,

according to the United States, then a Tribal contractor cannot claim funds for the same activity

under CSC.  See Tr. at 44:9-13 (Wolak).  The United States insisted that this bar holds even if

the Secretarial amount proves to be inadequate for meeting the activities' costs; the United States

may not simply reclassify the cost overruns as CSC and submit them to IHS for payment in that

form.  See Tr. at 44:20-45:1 (Wolak).

At this point, the Court interjected with a question, asking the United States on what

statutory language it could rely to support its argument that Tribal contractors cannot reclassify

expenses as CSC.  See Tr. at 45:4-6 (Court).  The United States diffidently admitted that it could

not point to any direct statutory provision to support that argument.  See Tr. at 45:7-9 (Wolak).

The Court suggested that the United States might be arguing from the ISDEAA's structure or

from the underlying principle of good governance.  See Tr. at 45:10-13 (Court).  Choosing to

unpack an alternate theory, the United States turned to four words of subsection (a)(1):

"therefore should be added."  Tr. at 45:14-46:4 (Wolak).  The Court suggested that subsection is

not germane, to which the United States agreed.  See Tr. at 45:25-46:4 (Court, Wolak).  The

health . . . .").

United States immediately returned to the words, however, to explain that the phrase "therefore should be added" meant that the amount of money disbursed for administration initially must be separate from the Secretarial amount.  See Tr. at 46:4-23 (Wolak).  The United States postulated that the separation arose out of economic considerations over time, linked to the marginal efficiencies that IHS enjoys vis-à-vis Tribal contractors because of IHS' economies of scale.  See Tr. at 46:23-47:4 (Wolak).  The United States then surmised that Sage Hospital appears to seek to categorize its entire operating expense at CSC to add to the Secretarial amount, a move that -- if successful -- would destroy the ISDEAA's distinction between the Secretarial amount and CSC, and convert subsection (a)(3) into mere surplusage.  See Tr. 47:5-48:3 (Wolak).

The Court then pressed the United States on whether it was saying that Sage Hospital cannot recover reasonable costs for activities which Tribal contractors must do if the Secretarial amount already funded the activities.  See Tr. at 48:4-8 (Court).  The United States answered that its argument was narrower; namely, that Sage Hospital cannot recover these expenses as CSC. See Tr. at 48:9-11 (Wolak).  Whether the Secretarial amount could be increased to cover the expenses, the United States said, is an open question and one not at issue in this case.  See Tr. at 48:11-14 (Wolak).

The United States then switched counsel to speak more in-depth about IHS practices. See Tr. at 48:17-49:2 (Wolak, Court, Jamison).  The United States immediately turned the Court's attention to pages A44 and A45 in their Response, which contain examples of IHS policy that specifically incorporates language from 24 U.S.C. § 450j-1(a)(2) about CSC not being eligible or available for activities that the HHS Secretary normally does not do or provide under contract.  See Tr. at 49:3-11 (Jamison).  Drug supplies and vehicle leasing are two examples of this limitation, according to the United States, and IHS generally has not allowed money for

them under direct CSC funding since it considers them duplicative.  See Tr. 49:11-23 (Jamison).

The United States then turned to counter the two examples that Sage Hospital had introduced from the I.H.M., namely, the 80/20 formula and IHS' fringe benefits policy.  See Tr. at 50:4-6 (Jamison).[28]  According to the United States, the 80/20 formula applies to groups of costs that include both activities that IHS normally would perform and activities that it normally would not perform.  See Tr. at 50:4-9 (Jamison).  Because these activities sometimes are hard to parse, the United States said, IHS has developed an approach to address them as a group instead of trying to parse them.  See Tr. at 50:9-12 (Jamison).  IHS, according to the United States, has chosen this approach for costs such as workers' compensation and unemployment insurance as a simplifying heuristic; it is much easier for everyone involved to negotiate an offset than to ask each contracting entity to break out its fringe benefit costs by subcategory, and then subdivide these even further into costs that fall under the Secretarial amount versus those that fall under CSC.  See Tr. at 50:12-51:4 (Jamison).

The Court then surfaced its concern that IHS seems to have repeatedly misinterpreted the ISDEAA's scope over the years and that Congress repeatedly has needed to enact corrective amendments.  See Tr. at 51:25-52:4 (Court).  The Court asked the United States how it, when choosing between two competing ISDEAA interpretations, could justify choosing the narrower interpretation that the United States prefer when the HHS Secretary's interpretations of the ISDEAA's scope consistently have been wrong.  See Tr. at 52:4-14 (Court).  The United States sought to salvage its position by recasting what the pertinent inquiry is in this case.  See Tr. at

---

[28]The draft transcript indicates that another person, a "Mr. Twohig" began speaking at this point in the hearing.  Tr. at 50:4 (Twohig).  No counsel with such a name was introduced at the beginning of the hearing, and there is no indication of a transition in the rest of the text.  See Tr. at 1:13-2:25 (Court, Hoffman, Miller, Wolak). Nor does any counsel with that name appear later in the transcript text.  The Court therefore here diverges from what appears to a transcription error.

52:15-18 (Wolak).  The United States' erroneous interpretations of the ISDEAA scope in the past notwithstanding, the United States proposed that the open questions in this case are what CSC is, what a tribal contractor is entitled to receive, and what IHS is obligated to pay.  See Tr. at 52:15-18 (Wolak).  According to the United States, not adopting its position would lay waste to any distinction between the Secretarial amount and CSC, a reading of the statute that creates surplusage in the statute and thereby violates conventional canons of statutory construction.  See Tr. at 53:9-20 (Wolak).

The Court intervened at this juncture to press the United States about the actual distinction between the Secretarial amount and CSC.  See Tr. at 53:21-54:3 (Court).  It asked the United States whether, if it could come up with a definition that distinguished Secretarial account amounts from CSC amounts, it would create a surplusage just under subsection (a)(2).  See Tr. at 53:24-54:3 (Court).  The United States speculated that the surplusage most immediately would come to the fore in subsections (A) and (B) unless there is a distinction between the cost categories that IHS funds under the Secretarial amount and CSC.  See Tr. at 54:12-55:4 (Wolak).

The Court asked the United States where in the ISDEAA text it found support for this position.  See Tr. at 55:5-11 (Court).  In response, the United States reverted to discussion about subsections (a)(1) and (a)(2).  See Tr. at 55:12-14 (Wolak).  According to the United States, subsection (a)(1) focuses on funds that IHS provides to tribal contractors to fund PFSAs,  see Tr. at 55:14-15 (Wolak), while subsection (a)(2) focuses on activities and reasonable costs,  see Tr. at 55:15-17 (Wolak).  The Court interjected at this point to note that it had asked the United States about separate activities for which CSC had provided, and that the United States had responded with an argument about reasonableness, necessity, and prudence.  See Tr. at 55:17-20 (Court).  The United States quickly clarified that it had been listing other necessary conditions

for activities to be eligible for CSC; namely, that, in addition to being activities separate from those that IHS normally performs under the Secretarial amount, the activities must be necessary for the prudent management of the contract.  See Tr. at 55:21-56:6 (Wolak).

The Court returned to Sage Hospital to ask it how the Court could write an opinion in its favor that avoids making anything under subsection (a)(2) duplicative of anything under subsection (a)(1).  See Tr. at 56:13-15 (Court).  Sage Hospital indicated that subsection (a)(2) is for management and contract compliance costs.  See Tr. at 56:21-25 (Miller).  Accordingly, Sage Hospital said, any costs associated with expanding the Tribal program, such as hiring an additional dentist, would not fall into subsection (a)(2).  See Tr. at 56:25-57:8 (Miller).  This distinction alone, as Sage Hospital saw it, is a sufficiently strong "guardrail" to "wall off" the Secretarial amount from CSC.  Tr. at 57:8-9 (Miller).  For its part, Sage Hospital asserted, CSC satisfies the two necessary conditions that the United States had just required.  See Tr. at 57:15-18 (Miller).  Unless subsection (a)(3) is meaningless, Sage Hospital maintained, CSC is necessary and prudent.  See Tr. at 57:15-21 (Miller).

Hopscotching square over rejoinders to other arguments and onto an entirely new point, the United States contended that it did not matter if Sage Hospital and the United States exchanged illustrations from the I.H.M. all day.  See Tr. at 58:1-22 (Miller).  The ISDEAA's 1994 amendments' legislative history, according to Sage Hospital, makes clear that the United States has no delegated authority to write regulations pertaining to it.  See Tr. at 58:7-22 (Miller)(explaining that this lack of delegated authority is why CFRs do not discuss CSC).  Thus, Sage Hospital argued, the I.H.M. can illustrate how IHS currently applies ISDEAA provisions, but it does little to say how they must be applied.  See Tr. at 59:3-6 (Miller).

Briefly branching from illustrative examples of how IHS applies the ISDEAA, Sage

Hospital's counsel noted that he works with another IHS Tribal contractor that has its own human resources department.  See Tr. at 59:6-11 (Miller).  If that Tribal contractor hires two human resources ("HR") employees and IHS details an additional employee to work in the Tribe's HR department, Sage Hospital explained, IHS pays the Tribe for two HR employees rather than for three.  See Tr. at 59:11-22 (Miller).  In the real world, Sage Hospital insisted, IHS makes distinctions based on activities and not on dollars spent.  See Tr. at 59:21-23 (Miller).

Steering Sage Hospital back to the question it had asked, the Court asked again how it might write an opinion that would avoid duplications across subsections (a)(2) and (a)(3).  See Tr. at 60:2-4 (Court).  Sage Hospital responded that a Tribal contractor is entitled to whatever CSC is necessary, reasonable, and prudent.  See Tr. at 60:5-23 (Miller).  Sage Hospital, therefore, proposed that the Court write that the Tribe is entitled to all CSC that meets these criteria, provided that the Tribe gives IHS credit for any amounts that IHS says it paid toward those activities.  See Tr. at 60:22-61:3 (Miller).

The Court asked the United States whether Sage Hospital's proposed reconciliation of subsections (a)(2) and (a)(3) would avoid the duplication about which it is concerned.  See Tr. at 61:9-12, 15-18 (Court).  The question initially befuddled the United States, which was uncertain whether it had understood Sage Hospital's proposed opinion.  See Tr. at 61:19-62:25 (Wolak, Court).  Sage Hospital intervened, explaining that Tribal contractors need to undertake sundry tasks that IHS does not have to do if it operates a program.  See Tr. at 63:1-3 (Miller).  Examples of such tasks, according to Sage Hospital, include background checks and legal compliance -- tasks that IHS can outsource to other government agencies but that Tribal contractors have to organize on their own.  See Tr. at 63:1-10 (Miller).  If Sage Hospital needed to hire two employees to cover these tasks, Sage Hospital said, its proposed opinion text would allow Sage

Hospital to receive additional CSC to cover those two personnel.  See Tr. at 63:7-11 (Miller).

The Court then asked the United States whether it had a better test for how to avoid duplication under subsections (a)(2) and (a)(3).  See Tr. at 63:12 (Court).  Now on steadier footing, the United States indicated that a better test would be whether the activity involved is an activity that IHS normally does not provide or whether it merely adds activities that IHS normally provides.  See Tr. at 63:13-64:1 (Wolak).  Wishing for the parties to propose in more detail the test to avoid duplication that they proposed, the Court stood in recess to allow the parties time to write one.  See Tr. at 64:2-19 (Court).

When the Court reconvened, the United States orally presented its proposed test, because it was uncertain whether it was allowed to submit anything to the Court in writing without approval from senior United States Department of Justice officials.  See Tr. at 64:20-65:14 (Wolak).  First, the United States said, the test would indicate that duplicate funds are those cost categories that Sage Hospital claims but that IHS funds through the Secretarial amount.  See Tr. at 66:1-7 (Wolak).  According to the United States, this categorical approach should completely avoid duplication.  See Tr. at 66:7-11 (Wolak).  The United States indicated that it would go further, though, adding a second part to their test that excludes from CSC all costs that are not necessary for contract compliance.  See Tr. at 66:15-22 (Wolak).  As a third part of its test, the United States proposed that remaining costs be analyzed to determine whether they were necessary for prudent management of the related PFSA.  See Tr. at 67:4-16 (Wolak).  A fourth and final part of its test, the United States proposed, would evaluate a CSC claim for reasonableness, benchmarking prices against prevailing market rates so that IHS is not paying, for example, twenty-five dollars for a needle.  See Tr. at 67:19-23 (Wolak).[29]

---

[29]The Defendants did not present the prevailing market price for medical needles so that

The United States switched counsel to continue its arguments about Sage Hospital's proposed language.  See Tr. at 68:2-5 (Wolak, Court).  That proposed language, according to the United States, is unworkable, because it is not known what is in the current Secretarial amount. See Tr. at 68:6-23 (Grohman).  The United States said that it and Sage Hospital, therefore, cannot simply go line-by-line through cost categories to identify what the Secretarial amount funds and what thus needs to be subtracted from CSC.  See Tr. at 68:11-13 (Grohman).

The Court asked the United States how their proposed test would avoid running into the same problem.  See Tr. at 69:1-2 (Court).  The United States switched counsel to answer the question, see Tr. at 69:6 (Wolak), with the United States then drawing the Court's attention to subsection (a)(1)'s statutory language, see Tr. at 69:7-9 (Wolak).  The United States did not directly answer the question, see Tr. at 69:11-21 (Wolak), so the Court rephrased the question, asking how IHS decides what is in the Secretarial amount when litigation is not involved, see Tr. at 69:21-70:2 (Court).  The United States responded that what normally happens is that there is a negotiation that the contracting tribe initiates when it submits a proposal and that eventually both IHS and the contractor sit at a table and resolve the details.  See Tr. at 70:3-7 (Wolak).

The Court noted that such negotiations might be current IHS practice, but that the statute nowhere prescribes them.  See Tr. at 70:8-10 (Court).  The Court also was curious how IHS and the contracting Tribes can even negotiate funding sources when, according to what the United States had said earlier, no one seems to know what is in the Secretarial amount.  See Tr. at 70:10-

_____

the Court could ballpark what a standard and reasonable price might be in such an example. Medical supply companies that ship to New Mexico appear to charge approximately fourteen cents per high-quality hypodermic needle if these needles are bought in lots of at least one hundred needles, with price-per-needle dropping to under a dime for larger lots.  See, e.g., East Coast Medical Supply, Hypodermic Needles, http://www.eastcoastmedicalsupply.com /needlesmultiplesizes.aspx (last visited Oct. 26, 2016)($13.99 for one hundred needles); East Coast Medical Supply, Bulk Hypodermic Needles, http://www.eastcoastmedicalsupply.com /bulkhypodermicneedles.aspx (last visited Oct. 26, 2016)($189.99 for two thousand needles).

- 43 -

15 (Court).  The United States indicated that it perceived two separate issues in the Court's question, but did not immediately develop an argument with regard to either of the perceived issues.  See Tr. at 70-16-20 (Wolak).  With United States' counsel indicating that he lacked subject-area expertise to answer the Court's question, Sage Hospital stepped to the plate.  See Tr. at 70:24-71:3 (Wolak, Miller).  Sage Hospital indicated that, under the ISDEAA, CSC is not subject to negotiation; rather, a Tribe makes a proposal, and IHS either accepts it or declines it.  See Tr. at 70:24-71:2 (Miller).  According to Sage Hospital, however, IHS practice deviates from the statute.  See Tr. at 71:4-6 (Miller).

The United States again switched counsel to answer the Court's question, see Tr. at 71:10-11 (Wolak, Court), invoking 25 U.S.C. § 450j-1(a)(3)(B) to walk the Court through the negotiation process, see Tr. at 71:12-72:10 (Jamison).  When a Tribe wants to contract a service that IHS has provided, according to the United States, the Tribe submits a proposal, IHS reviews the proposal, and then IHS and the Tribe negotiate funding amounts.  See Tr. at 71:18-72:4 (Jamison).  In this specific case, the United States said, the negotiations produced the contracts between IHS and Sage Hospital for the fiscal years 2006 through 2013, with contractual amounts for the Secretarial amount and CSC.  See Tr. at 72:8-10 (Jamison).

The Court noted that subsection (a)(3)(B) says that Tribes have an option to negotiate, but that nothing in the subsection establishes a mechanism for negotiations.  See Tr. at 72:11-17 (Court).  The United States clarified that this omission is true upfront, but that in the year after a tribe takes over a program, it has the option to enter into negotiations for a different amount the subsequent year.  See Tr. at 72:17-24 (Jamison).  The colloquy between the Court and the United States then detoured into what proved to be a dead end about the extent to which IHS knows what is in the Secretarial amount.  See Tr. at 73:14-20 (Court, Jamison).  Backtracking from its

previous statements, the United States indicated that the United States knows the negotiated Secretarial amount and negotiated CSC for the contract claims at issue in this case.  See Tr. at 73:16-74:22 (Jamison)(Court).

When the United States had completed its argument on the proposed opinion text, the Court turned to Sage Hospital to hear the opinion text that it was proposing.  See Tr. at 74:23 (Court).  Sage Hospital read its proposed text into the record, because it could not print the text out from a jump drive.[30]  See Tr. at 74:24-75:4 (Miller, Court).  Sage Hospital asserted that the operative standard for CSC is that those costs are necessary for contract compliance and prudent management of contracted programs.  See Tr. at 75:5-9 (Miller).  The limiting principle, according to Sage Hospital, is that CSC is not available simply to expand a contracted program -- such as by adding doctors or nurses -- regardless how urgent the need for an expansion might be.  See Tr. at 75:9-13 (Miller).  CSC is not limited, however, Sage Hospital said, by activities that the HHS Secretary never funds at all.  See Tr. at 75:13-17 (Miller).

While Sage Hospital was emailing the proposed text to the Court so that the Court could print it out and give a copy to the United States, see Tr. at 75:20-76:1 (Miller, Court), Sage Hospital brought up two of the United States' minor points that it wished to challenge.  See Tr. 76:1-79:5 (Miller).  First, Sage Hospital bearded the United States' earlier assertion that it is Sage Hospital's burden to prove which of its costs fall under the Secretarial amount.  See Tr. at

---

[30]A jump drive, also referred to as a "thumb drive," or more commonly as a "flash drive" or a "USB drive," is an external hard disk drive or optical disk drive that plugs into the universal serial bus port built into almost every personal computer as of 2016.  See PC Magazine Encyclopedia, USB Drive, http://www.pcmag.com/encyclopedia/term/53532/usb-drive (last visited Oct. 27, 2016).  As of 2016, it is extremely popular for backup as well as data transfer from one computer to another.  See PC Magazine Encyclopedia supra.  As of autumn 2016, jump drives with wireless Internet transmission capability exist and allow users to print documents remotely.  See, e.g., SanDisk Connect[TM] Wireless Stick, https://www.sandisk.com/connect (last accessed Oct. 27, 2016).  Sage Hospital, though, did not have access to the printers installed on the courthouse's wireless intranet and so could not print its proposed text during the short recess.

76:1-22 (Miller, Court).   According to Sage Hospital, the United States has the burden of showing the existence of any duplication offset that might exist.   See Tr. at 77:11-19 (Miller). After all, Sage Hospital said, it cannot prove definitively that something does not exist.   See Tr. at 77:18-19 (Miller).   Second, Sage Hospital said that the United States had incorrectly and pejoratively asserted that Sage Hospital had increased CSC.   See Tr. at 78:3-6 (Miller).   The history behind the enlarged CSC amount, according to Sage Hospital, is that IHS has knowingly and deliberately failed to fully pay CSC for decades.   See Tr. at 78:6-14 (Miller).

With Sage Hospital's proposed opinion text now in hand, the United States critiqued it for what it said was its incompleteness.   See Tr. at 79:23-24 (Wolak).   The United States indicated that it would change Sage Hospital's proposed text to recognize that the ISDEAA does not call for what effectively would be cost reimbursement contracts under that text.   See Tr. at 79:25-82:12 (Wolak).   The ISDEAA, the United States reiterated, sets out two compensation categories, defining each according to the activities that it covers, and not according to the dollars being spent.   See Tr. at 82:12-16 (Wolak).   The United States argued that Sage Hospital's proposed text would paper over the distinctions between the two categories, and all Sage Hospital needs to do is aggregate its operating costs, label them as CSC, and then double charge IHS.   See Tr. at 82:17-83:14 (Wolak).

The Court gave Sage Hospital the last word on its Duplication MSJ. See Tr. at 83:15-17 (Court). Sage Hospital repeated its earlier assertion that subsection (3) says that CSC is supposed to be funded on a cost-reimbursement basis.   See Tr. at 83:18-84:7 (Miller). Sage Hospital then indicated that it had completed its argument on the Duplication MSJ.   See Tr. at 84:8-9 (Miller).

### b.   **The Allocation MSJ.**

Sage Hospital said that it seeks a ruling that its CSC are not to be allocated between IHS

- 46 -

appropriated funds and third-party collections.[31]   See Tr. at 86:17-22 (Miller).   Collections, according to Sage Hospital, are a part of its IHS contract, contracts that indicate that collections shall be treated as additional supplemental funding to that IHS and the Tribe negotiated in the AFA.   See Tr. at 88:3-6 (Miller).   Sage Hospital maintained that the AFAs also say that Sage Hospital may retain such income pursuant to the ISDEAA to further the contract's purposes, see Tr. at 88:11-23 (Miller), and not that it should serve as a basis for IHS to reduce the amount of funds otherwise obligated to the contract, see Tr. at 89:1-8 (Miller).   Sage Hospital explained that Congress added such language, because Tribes want to be sure that any bills they send to Medicare or Medicaid will not reduce their IHS contract income.   See Tr. at 89:6-23 (Miller).

Sage Hospital provided the Court with an illustration to accompany its next point.   See Tr. at 90:3-11 (Miller)(Court).   Walking the Court through the illustration, Sage Hospital explained that CSC normally amount to approximately a quarter as much money as the Secretarial amount before third-party collections.   See Tr. at 90:12-17 (Miller).   If Sage Hospital were to raise as much in third-party collections as it receives from the Secretarial amount, it could double its programmatic budget without meaningful new overhead.   See Tr. at 90:17-25 (Miller).   According to Sage Hospital, however, IHS' favored interpretation of the ISDEAA would lead the agency to cut CSC in half, because half of Sage Hospital's total revenue would then come from third parties.[32]   See Tr. at 91:1-19 (Miller).   Sage Hospital said that this halving

---

[31]Sage Hospital noted in detail that it uses the terms "third-party revenue," "third-party collections," "program income," "Medicare," and "Medicaid interchangeably in its Allocation MSJ and Allocation Reply.   See Tr. at 86:23-87:6 (Miller).   It also stated that that it would continue to use the terms interchangeably during the hearing.   See 86:23-87:6 (Miller).

[32]Sage Hospital chose to illustrate this point visually.   See Tr. at 90:3-91:8 (Miller).   The Court finds it easier and more straightforward to attach numbers to the hypothetical.   The example assumes that Sage Hospital receives $100.00 from the Secretarial amount for programmatic purposes on January 1, 2017.   IHS would provide Sage Hospital with another $25.00 for CSC on January 1, 2017.   The example then assumes that Sage Hospital raises

of the CSC funding clearly would violate the ISDEAA, which says that additional program income that a contractor earns in the course of performing a contract shall not be a basis for reducing funds otherwise obligated to the contract.  See Tr. at 91:19-25 (Miller).  This example is not purely academic and hypothetical, Sage Hospital asserted.  See Tr. at 91:24-92:6 (Miller).  The United States' expert, Sam Hadley, according to Sage Hospital, has shaved forty-five percent off of Sage Hospital's CSC claim in a recent year using such an allocation algorithm.  See Tr. at 91:24-92:6 (Miller).

Sage Hospital again noted, as it had earlier in the hearing, that the United States' assertion that Sage Hospital had proposed an allocation is true, but omitted an important fact.  See Tr. at 94:15-16 (Miller).  Sage Hospital said that it had proposed allocation only at IHS' instruction that it should do so.  See Tr. 94:16-19 (Miller).  With that observation, Sage Hospital reserved the rest of its time for its reply on the Allocation MSJ.  See Tr. at 94:20-23 (Miller).

The United States immediately asked Sage Hospital to clarify whether its illustration means to convey that Sage Hospital believes its CSC to be fixed.  See Tr. at 96:1-4 (Wolak).  Sage Hospital said that its position was different, namely, that IHS needs to pay the full contracted CSC amount regardless how much Sage Hospital is able to expand its programmatic budget via third-party collections.[33]  See Tr. at 96:14-25 (Miller).  Still seemingly a bit puzzled

---

another $100.00 in program revenue from January 1, 2017, to December 31, 2017.  It thus has $200.00 in program revenue even though it still only has $25.00 in CSC.  Under IHS' interpretation of the ISDEAA, according to Sage Hospital, IHS would notice that half of Sage Hospital's programmatic revenue comes from third parties and would require Sage Hospital to credit back half of its awarded CSC, i.e., $12.50.  This credit would leave Sage Hospital with $12.50 in CSC instead of its original award of $25.00 in CSC.

[33]If the Court recasts this argument using the numerical example found in note 31 supra, then Sage Hospital says that its position is that IHS should receive $25.00 for CSC whether Sage Hospital only has a $100.00 programmatic budget from the Secretarial amount or a $200.00 programmatic budget from adding $100.00 in third-party revenues to the $100.00 Secretarial amount.

by the illustration, see Tr. at 97:2-98:5 (Wolak), the United States revisited its earlier points that IHS needs to allocate CSC based on all of Sage Hospital's revenue streams, see Tr. at 97:22-98:6 (Wolak).  The United States also struck a new note in accord with the rest of their argument, noting that nothing prevents Sage Hospital from allocating part of its third-party revenues to overhead.  See Tr. at 98:20-99:2 (Wolak).  For instance, the United States said that, if Sage Hospital collects a dollar in third-party revenue for bandages, Sage Hospital can spend eighty-five cents of the dollar on bandages and the remaining fifteen cents of that dollar on overhead to provide bandaging services.  See Tr. at 98:20-99:2 (Wolak).  Allowing Sage Hospital or any other Tribal contractor to expand contractual CSC in a given year based on its third-party fundraising prowess would leave taxpayers with no commentary on or veto over the expansion. See Tr. at 99:3-9 (Wolak).  The Court pressed the United States on their approach to allocation, indicating that the ISDEAA nowhere calls for such an allocation of CSC.  See Tr. at 99:10-14 (Court).  The United States resisted by directing the Court to subsection J-1(A)(2), which the United States said defines CSC in part as reasonable costs for activities that must be performed to ensure compliance with the contract's terms.  See Tr. at 99:21-100:1 (Wolak).

Taking advantage of the time it previously had reserved for a reply, Sage Hospital briefly made three final points on the Allocation MSJ.  See Tr. at 101:14-103:16 (Miller).  First, Sage Hospital said that, contrary to the United States' assertions, Sage Hospital must raise third-party revenues since the passage of Patient Protection and Affordable Care Act, Pub. L. 111-148 (2010), 124 Stat. 119-1025 ("Obamacare"), because it is only allowed to spend IHS money after it has "tabbed" Medicare, Medicaid, or private insurance.[34]  Tr. at 101:15-102:6 (Miller).

---

[34]Sage Hospital appears to reference Obamacare's Subtitle K, which reads, "Health programs operated by the Indian Health Service, Indian tribes, tribal organizations, and Urban Indian organizations . . . shall be the payer of last resort for services provided by such Service,

Second, Sage Hospital argued that ISDEAA subsection 450j-1(3)(a)(ii) means that CSC should cover revenues which third-party revenue from Medicaid, Medicare, and private insurance provides.  See Tr. at 102:12-25 (Miller).  Third, Sage Hospital insisted one final time that the Court needed to apply the ISDEAA's words.  See Tr. at 103:2-25 (Miller).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment."  Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Norway ASA, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.) (emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party

---

tribes, or organizations to individuals eligible for services through such programs, notwithstanding any Federal, State, or local law to the contrary."  Obamacare Subtitle K, § 2901.  More generally, Congress incorporated the Indian Health Care Improvement Act into the Patient Protection and Affordable Care Act in 2010.  See Obamacare (twenty-five scattered sections throughout).

must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[35]   Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).   Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).   It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at

---

[35]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States of America, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.")(citation and internal quotation marks omitted).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may

be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than

simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[36]] explained that the

---

[36]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning,

J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury."  Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . .  Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the United States Court of Appeals for the Tenth Circuit, stated

that courts must focus first on the legal question of qualified immunity and "determine whether

plaintiff's factual allegations are sufficiently grounded in the record such that they may

permissibly comprise the universe of facts that will serve as the foundation for answering the

legal question before the court," before inquiring into whether there are genuine issues of

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009), and United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

material fact for resolution by the jury.  584 F.3d at 1326-27 (Holmes, J., concurring)(citing

Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that,

even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis

because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING THE INDIAN CANON

The Indian canon of construction requires that courts liberally construe treaties,

agreements, statutes, and executive orders in favor of American Indians.  See Montana v.

Blackfeet Tribe, 471 U.S. at 766.  See generally Philip P. Frickey, Marshalling Past and Present:

Colonialism, Constitutionalism, and Interpretation in Federal Indian Law, 107 Harv. L. Rev. 381

(1993)(offering a scholarly commentary on the Indian canon).  Courts are to construe treaties and

other agreements as the American Indians who entered into the treaties or agreements would

have understood them.  See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S.

172, 196 (1999)("[W]e interpret Indian treaties to give effect to the terms as the Indians

themselves would have understood them.")  Any ambiguity in an agreement is to be resolved in

favor of American Indians.  See, e.g., Carpenter v. Shaw, 280 U.S. 363, 367 (1930).[37]

The Indian canon sometimes can come into conflict with other canons of statutory

interpretation.  When canons clash, the Indian canon usually trumps competing canons.  See 1-2

Cohen's Handbook of Federal Indian Law (Nell Jessup Newton et al. eds., 2015 LEXIS ed.), at

2.02[3].  The United States Court of Appeals for the District of Columbia has held that the Indian

canon also supersedes deference to agency interpretations under Chevron v. Natural Resources

---

[37]This case is old, but two United States Courts of Appeals recently have held that this
principle still applies.  See Gila River Indian Cmty. v. United States, 729 F.3d 1139, 1148 (9th
Cir. 2013)("Ambiguous statutes are to be construed in favor of Indians."); Cal. Valley Miwok
Tribe v. United States, 515 F.3d 1262, 1266 n. 7 (D.C. Cir. 2008)(statutes are "to be construed
liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit").

Defense Council, Inc., 467 U.S. 837 (1984)("Chevron").  The D.C. Circuit explained in Cobell v.

Norton, 240 F.3d 1081 (D.C. Cir. 2001), in an opinion that Judge David Bryan Sentelle wrote

and Judges Stephen Fain Williams and Judith Ann Wilson Rogers joined,

> This departure from the *Chevron* norm arise from the fact that the rule of liberally construing statutes to the benefit of the Indians arises not from ordinary exegesis, but "from principles of equitable obligations and normative rules of behavior," applicable to the trust relationship between the United States and the Native American people.

240 F.3d at 1102.  The Tenth Circuit at least twice has rejected agencies' statutory interpretations

that are contrary to the Indian canon.  See Governor of Kansas v. Kempthorne, 516 F.3d 833

(10th Cir. 2008)(Indian canon trumps Chevron deference even though Chevron was not

applicable in a case with competing Tribal interests)(dicta); Ramah Navajo Chapter v. Lujan,

112 F.3d 1455, 1461-62 (10th Cir. 1997)("Ramah").

## THE ISDEAA'S LEGISLATIVE HISTORY

If possible, the Court interprets statutes according to the statutory text's plain meaning

and structure.  When the text's meaning and structure leave ambiguities, however -- something

which the Allocation and Duplication MSJs, the Response, the Replies, and the Hearing suggest

may be true in this case -- even the ardent textualist "routinely takes purpose into account, but in

its concrete manifestations as deduced from close reading of the text." Antonin Scalia & Bryan

A. Garner, Reading Law: The Interpretation of Legal Texts 20 (2012).  In this spirit, the Court

here assembles a legislative history of the ISDEAA and subsequent amendments to help shed

light on the disputed sections' meaning.  The Court gives special interpretive weight to

committee reports,[38] which congressional staffers consider the most reliable sources of

---

[38]Congress defines Committee Reports as follows:

one set of documents among the variety of document types produced by the

congressional intent.  <u>See</u> Abbe R. Gluck & Lisa Schultz Bressman, Statutory Interpretation from the Inside -- An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 977 fig.8 (2013).  Given the central role that the Executive Branch played in ISDEAA history, the Court also examines related presidential signing statements.[39]  Historical background is woven throughout the discussion as needed to knit a process that transpired over a quarter century into a coherent narrative.

### 1.    <u>Indian Self-Determination and Education Assistance Act of 1975</u>.

The ISDEAA became law in 1975.  <u>See</u> Pub. L. No. 93-638 (1975).  It did not emerge out of a vacuum, rather representing in some respects a continuation of and in other respects a break with nearly two centuries of federal policy regarding American Indian healthcare.   In this section, the Court first examines the historical background behind the ISDEAA.  It then looks to

---

House and Senate committees that address legislative and other policy issues, investigations, and internal committee matters.  Committee reports usually are one of these types: (1) reports that accompany a legislative measure when it is reported for chamber action; (2) reports resulting from oversight or investigative activities; (3) reports of conference committees; and (4) committee activity reports, published at the conclusions of a Congress.

United States Congress, https://www.congress.gov/congressional-reports/about (last visited Oct. 24, 2016).

[39]The Congressional Research Service defines Presidential signing statements as follows:

official pronouncements issued by the President contemporaneously to the signing of a bill into law that, in addition to commenting on the law generally, have been used to forward the President's interpretation of the statutory language; to assert constitutional objections to the provisions contained therein; and, concordantly, to announce that the provisions of the law will be administered in a manner that comports with the administration's conception of the President's constitutional prerogatives.

Todd Garvey, Congressional Research Service, Presidential Signing Statements: Constitutional and Institutional Implications, http://fas.org/sgp/crs/natsec/RL33667.pdf (last visited Oct. 24, 2016).

the House and Senate Committee reports and President Ford's signing statement to uncover legislative intent and help triangulate the proper interpretation of ISDEAA terms and provisions at issue in the present motions for summary judgment.

      a.    **Background.**

The United States has provided medical care to American Indians since at least 1802, when Army physicians began treating American Indians for smallpox.  <u>See</u> U.S. Public Health Service, Health Services for American Indians 86 (1957)("U.S. Health Service").  Congress appropriated money for more extensive American Indian healthcare in 1819, routing the money through missionaries and philanthropic organizations.  <u>See</u> U.S. Health Service at 86.  In 1832, Congress passed the first measure specifically targeted to American Indian health, authorizing Indian agents to purchase smallpox vaccine and to appoint army physicians to administer the vaccines.  <u>See</u> Act of May 5, 1832, 4 Stat. 514.

Starting in the 1830s, the United States entered into numerous treaties with Tribes that included promises of physicians, medical supplies, and hospitals, first for the Cherokees and other Tribes forced westward, <u>see</u>, <u>e.g.</u>, Treaty with the Cherokee, art. 8, 7 Stat. 478 (1835), and later for western Tribes in a quid pro quo for land cessions, <u>see</u>, <u>e.g.</u>, Treaty with the Yakima, art. 5, 12 Stat. 951 (1855).[40]  Subsequent crowding of American Indians onto reservations led to

---

[40]John Marshall, the fourth Chief Justice of the United States, put the exchange poetically in <u>Cherokee Nation v. Georgia</u>, 30 U.S. (5 Pet.) 1 (1831):

> A people once numerous, powerful, and truly independent, found by our ancestors in the quiet and uncontrolled possession of an ample domain, gradually sinking beneath our superior policy, our arts and our arms, have yielded their lands by successive treaties, each of which contains a solemn guarantee of the residue, until they retain no more of their formerly extensive territory than is deemed necessary to their comfortable subsistence . . . .

30 U.S. (5 Pet.) 15 (1831).  In exchange, Marshall waxed, the American Indians "look to our

epidemics and unsanitary conditions that outstripped federal healthcare capacity, especially after

Congress transferred Indian affairs from the War Department to the Department of the Interior.

See U.S. Health Service at 87.  Even in the few reservations that received promised hospitals, the

standard of care usually was very low.  See S. Rep. No. 83-1530 (1954).

In 1910, Congress made the first general appropriation for Indian healthcare.  See Act of

Apr. 4, 1920, 36 Stat. 269 (appropriating $40,000.00 to provide for healthcare, and to prevent

infectious and contagious disease).  In 1921, some Congress members began to chafe at such

appropriations and block Interior Department funding.  See, e.g., H.R. Rep. No. 275, 67th Cong.

(1921); S. Rep. No.294, 67th Cong. (1921).  A congressional majority, however, wished for the

funding to continue and passed the Snyder Act, 25 U.S.C. § 13, to give the Bureau of Indian

Affairs broad discretion to direct programs that would benefit American Indians' health:

> The Bureau of Indian Affairs, under the supervision of the Secretary of the
> Interior, shall direct, supervise, and expend such moneys as Congress may from
> time to time appropriate, for the benefit, care, and assistance of the Indians
> throughout the United States for the following purposes: . . . .  For the relief of
> distress and conservation of health.

25 U.S.C. § 13.

Given the Tribes' difficulties attracting and retaining qualified medical staff in the first

half of the twentieth century, the Bureau of Indian Affairs called in 1953 for the transfer of

medical services among American Indians living on reservations to the United States Public

Health Service.  See Indian Health Unit Asks Doctor Shift, N.Y. Times, May 30, 1953 at A17.

The following year, Congress found that this persistent human capital shortage demanded such a

shift, see S. Rep. No. 83-1530 at 3-4 (1954), and Congress fully federalized Indian healthcare

with the support of the American Medical Association and state departments of health in every

---

government for protection; rely upon its kindness and its power; appeal to it for relief to their
wants; and address the president as their great father."  30 U.S. (5 Pet.) 17 (1831).

state with a significant American Indian population,  see Transfer Act of 1954, 42 U.S.C. § 2001;

S. Rep. No. 83-1530 at 2 (listing these and other medical organizations, departments, and boards

supporting the transfer).

The 1960s, a decade that unmoored so many other longstanding federal policies, barely

left a ripple in federal policies related to American Indian healthcare.  Shortly after his Senate

confirmation in 1961, Stewart Udall, President John F. Kennedy's Interior Secretary, assembled

a taskforce to study the issue of American Indian self-determination.  See Udall Tells of Plan for

Reorganization, N.Y. Times, Jan. 29, 1961 at A32.  Yet the task force accomplished little of

practical value, more replete with grandiloquence than grand strategy.  See Bureau of Indian

Affairs, Report of Task Force on Indian Affairs 2-7 (Feb. 9, 1961)("1961 Report of Task

Force").  In a stunning rebuke of the very concept of self-determination even at the ideational

stage, Udall paternalistically told task force members that "test[ing] our thinking against the

thinking of the wisest Indians and their friends did not mean that we are going to let, as someone

put it, the Indian people decide what the policy should be."  1961 Report of Task Force at 2.  For

the remainder of the Kennedy and Lyndon B. Johnson Administrations, neither the White House

nor Congress paid much attention to American Indians.  See Thomas Francis Clarkin, The New

Trail and the Great Society: Federal Indian Policy During the Kennedy-Johnson Administrations

(May 1998)(unpublished Ph.D. dissertation, University of Texas at Austin)(on file with ProQuest

Dissertations & Theses Global).

Beginning in the 1960s, IHS also faced problems along many fronts, including

congressional attempts to control its budget.  See Leah Kalm-Freeman, The Community Health

Representative Program: Early Voices and Program History 115-18 (June 2009)(unpublished

Ph.D. dissertation, Johns Hopkins University)(on file with ProQuest Dissertations & Theses

Global)(providing an easily digestible summary of IHS finances and budgetary concerns from the late 1950s until the passage of the ISDEAA).  For their part, Tribal leaders nationwide began to agitate for a greater say in healthcare services on their reservations.  See, e.g., Indians of North America, Declaration of Indian Purpose: The Voice of the American Indian 9-10 (1961)(coauthored by leaders of sixty-seven American Indian Tribes).  Tribes also began to undertake small federally funded local projects through Indian Community Action Programs established under President Johnson's War on Poverty, spurring greater American Indian for self-determination in general.  See Sar Levitan & Barbara Hetrick, Big Brother's Indian Programs, With Reservations 90 (1971).

During his presidential campaign in 1968, Richard M. Nixon issued a statement to the National Congress of American Indians in Omaha, Nebraska in which he seconded Tribes' calls for greater self-determination.  See Richard Nixon and the American Indian: The Movement to Self-Determination (Smithsonian National Museum of the American Indian broadcast Nov. 15, 2012) at 20:14-:30, available at https://www.nixonfoundation.org/2012/11 /nixon-and-the-american-indian-the-movement-to-self-determination/ (last visited Oct. 26, 2016) ("Smithsonian Video").

Nixon did not forget this support for greater American Indian self-determination after the election.[41]  On October 8, 1969, Nixon sent Vice President Spiro Agnew to Albuquerque, New Mexico, to deliver a speech on the topic to lay the groundwork for American Indian legislation

---

[41]According to a White House domestic policy staffer who oversaw much of the push behind the ISDEAA, the issue was extremely important to Nixon, in part because his former football coach, an American Indian, had taught the teenage Nixon how to be confident and self-reliant.  See Smithsonian Video at 22:55-:59.  Nixon believed that attitudes prevailing in the 1960s that American Indians were less able to perform or manage projects than white Americans were benighted and bigoted, and that federal resistance to allowing American Indians to run IHS projects was "destructive, discriminatory, and debilitating."  Smithsonian Video at 2:05-:14.

Nixon's domestic policy advisers were drafting.  See Smithsonian Video at 24:15-25:21.  The legislative proposal was ready by the following summer, and Nixon proposed to Congress what eventually would become the ISDEAA at the start of July 1970.  See Richard Nixon, Special Message to the Congress on Indian Affairs, July 8, 1970, available at http://www.presidency .ucsb.edu/ws/?pid=2573 (last visited Oct. 26, 2016)("Nixon's Special Message to Congress").[42]

Decrying the disorientation and excessive dependency that federal hegemony over American Indian healthcare had spawned as "morally and legally unacceptable," Nixon challenged Congress (i) to assure Tribes that the federal government would continue to perform its treaty and trusteeship obligations;[43] and (ii) to guarantee that, "whenever Indian groups decided to assume control or responsibility for government service programs, they could do so and still receive adequate Federal financial support."  Nixon's Special Message to Congress § 1. The second assurance, according to Nixon, was a very important rejection of suffocating paternalism and bureaucratic inefficiency in favor of American Indian self-determination.  See Nixon's Special Message to Congress §1.

Nixon told Congress that the assumption prevailing at the time was that American Indian programs could not exist without Federal administration.  See Nixon's Special Message to Congress § 1.  Nixon said that he believed this assumption was incorrect, and that there was no reason that Congress should deprive American Indians of the privilege of self-determination

---

[42]Nixon's Special Message to Congress, as available online, is not paginated.  Most of the message, however, is broken into enumerated sections.  To direct readers as precisely as possible to supporting text, citations to Nixon's Special Message to Congress will include the section number wherever applicable.

[43]The concept of a federal trust responsibility to the American Indians arose early in Supreme Court of the United States jurisprudence with Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1 (1831). The Supreme Court more recently recognized it in County of Oneida v. Oneida Indian Nation.  See County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 247 (1985).

merely because they receive monetary support from the federal government.   <u>See</u> Nixon's Special Message to Congress § 2.   In Nixon's opinion, it "should be up to the Indian tribe to determine whether it is willing and able to assume administrative responsibility for a service program which is presently administered by a Federal agency." Nixon's Special Message to Congress § 3.   He therefore proposed legislation that would "empower a tribe or a group of tribes or any other Indian community to take over the control or operation of Federally-funded and administered programs in the Department of the Interior and the Department of Health, Education and Welfare whenever the tribal council or comparable community governing group voted to do so."  Nixon's Special Message to Congress § 3.[44]

Nixon proposed that discretion to take on a program or to not take on a program should lie completely with American Indians; it would not be necessary for the federal agency administering a program to approve the transfer of responsibility to a Tribe or Tribal organization, nor could a Tribe or Tribal organization be compelled into a transfer it did not want.  <u>See</u> Nixon's Special Message to Congress § 3.   Tribes or Tribal organizations also would, under Nixon's proposal, retain the "right of retrocession," by which he meant that an American Indian group could elect to administer a program and then later decide to give it back to the federal government.  <u>See</u> Nixon's Special Message to Congress § 3.  Nixon wanted appropriate technical assistance to help local organizations successfully operate programs they took over,

---

[44]The Department of Education Organization Act, 93 Stat. 695, abolished the United States Department of Health, Education and Welfare ("HEW") on October 17, 1979.   <u>See</u> National Archives, General Records of the Department of Health, Education and Welfare, available at https://www.archives.gov/research/guide-fed-records/groups/235.html (last visited Oct. 27, 2016).  The United States Department of Health and Human Services, of which Burwell is the Secretary, is the successor to HEW for all Indian healthcare programs. <u>See</u> United States Department of Health and Human Services, HHS Historical Highlights, http://www.hhs.gov /about/historical-highlights/index.html# (last visited Oct. 24, 2016).

and for locally-administered programs to be funded on equal terms with services that federal agencies continued to administer.  See Nixon's Special Message to Congress § 3.

Nixon said that his proposed legislation would triply benefit American Indians.  See Nixon's Special Message to Congress § 3.  First, Nixon wrote, contracting programs out to Tribes or Tribal organizations would directly channel more money into American Indian communities, because American Indians -- not federal bureaucrats -- would be administering the programs and drawing salaries.  See Nixon's Special Message to Congress § 3.  Second, Nixon contended, contracting programs out to Tribes or Tribal organizations would "help build greater pride and resourcefulness within the Indian community."  Nixon's Special Message to Congress § 3.  Third, Nixon asserted, American Indians would get better and more efficacious programs if the people whom the programs most directly affected were responsible for creating them.  See Nixon's Special Message to Congress § 9.

Nixon insisted that, "[a]s we move ahead in this important work, it is essential that the Indian people continue to lead the way by participating in policy development to the greatest possible degree."  Nixon's Special Message to Congress § 9.  According to Nixon, the federal government had not always realized that it needed American Indian energy and leadership if its assistance were to be effective in improving the conditions of American Indian life.  See Nixon's Special Message to Congress § 9.  Nixon concluded that his proposed legislation would turn a new page, however, striking a "new and balanced relationship between the United States government and the first Americans . . . ."  Nixon's Special Message to Congress § 9.

During 1970 and 1971, Nixon Administration officials met with Tribal leaders at ten regional conferences and discussed the President's proposed legislation with them.  See generally Smithsonian Video.  The ISDEAA's first version was introduced in the Senate as 92 S.

3157 on February 9, 1972, and was reported to the Senate on July 27, 1972.  Indian Self-

Determination Act of 1972, S. 3157, 92d Cong. (1972)("1972 ISDEEA").  It was referred to the

House Committee on Interior and Insular Affairs on August 3, 1972, see 1972 ISDEAA, but it

died there as Washington became embroiled in the Watergate scandal and the related conviction

of some of Nixon's White House aides, see Bob Woodward & Carl Bernstein, The Final Days

14-17 (2005)(providing a detailed chronology of the last two years of Nixon's presidency).

Undaunted, Nixon called for greater American Indian self-determination in his fourth

State of the Union Address in 1973.[45]  In that Address, Nixon indicated that his Administration

would continue to advance opportunities for American Indian self-determination.  See Richard

Nixon, State of the Union Message to the Congress on Human Resources, 61 Public Papers of

the Presidents of the United States 143-44 (John Woolley & Gerhard Peters eds. 2005)("1973

Address").  Expounding in more depth on the same issue, Nixon said:

> Just as it is essential to put more decision-making in the hands of the State and
> local governments, I continue to believe that Indian tribal governments should
> assume greater responsibility for programs of the Bureau of Indian Affairs and the
> Department of Health, Education, and Welfare which operate on their
> reservations.  *As I first proposed in 1970, I recommend that the Congress enact
> the necessary legislation to facilitate this take-over of responsibility.*

----

[45]Article II, Section 3 of the United States Constitution requires Presidents of the United States to deliver a "State of the Union Address" to Congress "from time to time."  U.S. Const. art. II, § 3.  Until 1973, every President of the United States except for George Washington had interpreted "from time to time" to mean at most once per calendar year.  See George Washington, First Annual Message to Congress on the State of the Union, January 8, 1790, reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), available at http://www.presidency.ucsb.edu/ws/index.php?pid=29431 (last visited Oct. 27, 2016); George Washington, Second Annual Message, December 8, 1790,   reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), available at http://www.presidency.ucsb.edu/ws/index.php?pid=29432 (last visited Oct. 27, 2016).  In 1973, in a break from tradition, Nixon gave six State of the Union addresses -- the first an overview and the following five each focused on one specific policy theme.  See State of the Union Addresses and Messages, The   American   Presidency   Project,   http://www.presidency.ucsb.edu/sou.php#nixon1973 (explaining that Nixon gave six addresses and linking to each)(last visited Oct. 27, 2016).

1973 Address at 144 (emphasis in the original).  Nixon continued:

> Meanwhile the new statutory provisions for Indian tribal governments under
> General Revenue Sharing will assist responsible tribal governments in allocating
> extra resources with greater flexibility.  *I shall also propose new legislation to*
> *foster local Indian self-determination by developing an Interior Department*
> *program of bloc[k] grants to Federally recognized tribes as a replacement for a*
> *number of existing economic and resource development programs.*  The primary
> purpose of these grants would be to provide tribal governments with funds which
> they could use at their own discretion to promote development of their
> reservations.

1973 Address at 144 (emphasis in the original).  Nixon concluded his remarks on American

Indians with an expression of exasperation with Congress for having failed to pass the version of

the ISDEAA that he had proposed in his 1970 Message and said that, "[t]o accelerate

organizational reform, I have directed the Secretary of the Interior to transfer day to day

operational activities of the Bureau of Indian Affairs out of Washington to its field offices."

1973 Address at 144.

The Senate was increasingly preoccupied with Watergate and declined to pursue the

ISDEAA with the urgency that Nixon demanded in the 1973 Address.  The bill languished in

committee for nearly a year before Nixon drove home the pressing need for it in his 1974 State

of the Union Address.  See Richard Nixon, Annual Message to the Congress on the State of the

Union, 26 Public Papers of the Presidents of the United States 56 (2005)("1974 Address").

Perhaps sensing that this would be his final opportunity to advocate for American Indian self-

determination in a State of the Union Address, Nixon spoke passionately:

> For too many years the American Indians -- the first Americans -- have been the
> last Americans to receive the rights and opportunities to which they are entitled.
> This Administration has taken the initiative to change this picture.  For its part,
> the Federal Government must put behind it the role of autocratic manager of
> Indian reservations.   We shall continue to encourage Indians and their tribal
> governments to play an increasing role in determining their own future.

1974 Address at 75.  Nixon noted that "[o]ne measure of our attempt to foster a better, more humane policy is the level of Federal funding benefitting American Indians -- over twice what it was five years ago or about $1.6 billion."  1974 Address at 76.  Nixon chided Congress for not having acted on his proposals "to permit turning over to Indian tribal governments the management and control of Indian programs" and "to provide greater local control over federally assisted reservation programs through a program of tribal grants."  1974 Address at 76.  Nixon then closed his discussion of American Indian self-determination with a final promise to American Indians that had first taken embryonic form in his 1968 campaign speech in Omaha: "I shall ask that the Bureau of Indian Affairs make specific plans to accelerate the transfer of significant portions of its programs to Indian tribal management, although I repeat my assurance that, while accelerated, these transfers will not be forced on Indian tribes not willing to accept them."  1974 Address at 76.

Even as the long shadows of possible impeachment over Watergate began to darken the Oval Office in the spring of 1974, Nixon pressed forward with his efforts to pressure the Senate into passing the ISDEAA.  Resurrecting his strategy of sending out surrogates with speeches that he first had tried with Vice President Agnew's Albuquerque speech in 1969, Nixon dispatched his special counsel and the executive assistant to his special counsel to Albuquerque in March 1974 to deliver two more speeches advocating for the ISDEAA and American Indian self-determination.  See Leonard Garment, Speech to Indian Law Students Association, Albuquerque, New Mexico (Mar. 14, 1974)(available for scan or photocopy at the Nixon Presidential Library); Bradley H. Patterson, Albuquerque Speech.  After having sat on the bill for nearly a year, the Senate reported it out from the Committee on Interior and Insular Affairs two weeks later, on March 28, 1974.  See S. Rep. No. 93-682.

b.      **Senate Report No. 93-682.**

The section of the Senate Committee Report dedicated to congressional findings left no

doubt that Congress had followed Nixon's lead in advocating for "a definitive break from the

past."  Smithsonian Video at 19:40.  After careful review of the federal government's historical

and special legal relationship with American Indians and of federal responsibilities that result

from it, the Senate Committee found that:

> (1) the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government, and has denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities; and

> (2) the Indian people will never surrender their desire to control their relationships both among themselves and with non-Indian governments, organizations, and persons.

S. Rep. No. 93-682, at 1 (1974).  The Senate Committee further recognized

> the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities.

S. Rep. No. 93-682, at 2.  Furthermore, the Senate Committee declared that its

> commitment to the maintenance of the Federal Government's unique and continuing relationship with and responsibility to the Indian people through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from Federal domination of programs for and services to Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.

S. Rep. No. 93-682, at 2.  After diving into the bill's text, section by section, see S. Rep. No. 93-

682, at 3-11, the Senate Committee wrote at length about the purpose behind and the need for the

bill that it had just christened the "Indian Self-Determination and Educational Reform Act."  S. Rep. No. 93-682, at 1, 12-14.

Priming fellow senators for the discussion about the ISDEAA's purpose, the Senate Committee chronicled the history of federal relations with American Indians.  See S. Rep. No. 93-682, at 12-13.  The Supreme Court of the United States, the Senate Committee said, first recognized Tribal sovereignty in 1832.  See S. Rep. No. 93-682, at 12 (citing Worcester v. Georgia, 31 U.S (6 Pet.) 515, 519 (1832)).  Expanding on this point by quoting from a leading Indian law treatise's commentary on that case, the Senate Committee remarked that

> From the earliest years of the Republic, the Indian tribes have been recognized as distinct, independent, political communities and as such, qualified to exercise powers of self-government, not by virtue of any delegation of powers from the Federal government, but rather by reason of their original Tribal sovereignty. Thus treaties and statutes of Congress have been looked to by the Courts as limitations upon original tribal powers, or, at most, evidences of recognition of such powers rather than as the direct source of tribal powers.

S. Rep. No. 93-682, at 12 (quoting Cohen's Handbook of Federal Indian Law)(internal citations and quotation marks removed).  The Senate Committee declared that the extent to which the semi-independent Tribes are able to function depends on the degree to which Congress exercises its derived plenary power.  See S. Rep. No. 93-682, at 12.  The Senate Committee noted what it saw as a trend in both statutory and case law over the previous forty years to put greater emphasis on American Indian sovereignty and greater limitations on federal oversight of American Indians.  See S. Rep. No. 93-682, at 12-13 (referencing the Indian Reorganization Act of June 18, 1934, 48 Stat. 984; the Indian Bill of Rights of 1968, 82 Stat. 77; and Begay v. Miller, 70 Ariz. 380, 222 P.2d 624, 627 (1950)).

The ISDEAA, the Senate Committee indicated, would be the next stage in this progression, being "in essence an effort to provide tribes with the means to implement tribal self-

governing power by providing finances and procedures to achieve progressive development of tribal resources and institutions."  S. Rep. No. 93-682, at 13.  Lest the bill's purpose not yet be clear enough, the Senate Committee continued, "The purpose of S. 1017 [the ISDEAA] is to implement a policy of self-determination whereby Indian tribes are given a greater measure of control over the programs and services provided to them by the Federal government." S. Rep. No. 93-862, at 13.[46]

Having discussed the ISDEAA's purpose, the Senate Committee then turned to discussing the need for the bill.  See S. Rep. No. 93-682, at 13.  In the recent past, the Senate Committee said, federal Indian policy had experienced a dramatic shift with respect to the delivery of programs and services that the Bureau of Indian Affairs and the IHS formerly had administered.  See S. Rep. No. 93-682, at 13 (citing four different statutes).  The Senate Committee noted, however, that the policy changes had been made on very shaky authority, through a "mixture of broad interpretation and unrelated statutes . . . ."  S. Rep. No. 93-682, at 13.  Such policy potpourri, the Senate Committee said, had created "numerous administrative and management problems," such as "the inability of the Federal government to exempt tribal contracts from Federal Procurement Regulations and to authorize payments in advance of tribal performance on such contracts."  S. Rep. No. 93-682, at 13, 14.  The ISDEAA, according to the Senate Committee, was designed to alleviate such problems by providing direct statutory authority for American Indians' federal contracting.  See S. Rep. No. 93-682, at 14.

---

[46]The Senate Committee listed another purpose related to American Indian education, a subject that dominated the ISDEAA -- at least in terms of column-inches -- but that is not directly relevant to this case.  See S. Rep. No 93-682, at 13.

c.      **House Report No. 93-1600**.

The House Committee on Interior and Insular Affairs ("1974 House Committee")

reported S. 1017 to the House floor on December 16, 1974.  H.R. Rep. No. 93-1600 (1974).  In

the preamble to its report, the 1974 House Committee indicated that one of the bill's goals was to

"provide for the full participation of Indian tribes in programs and services conducted by the

Federal Government for Indians . . . ."  1974 U.S.C.C.A.N. 7775.  The bill, according to the 1974

House Committee, therefore "authorizes and directs the Secretary of the Interior and the

Secretary of Health, Education, and Welfare to contract with Indian tribes or tribal organizations

for the operation of programs provided by the Bureau of Indian Affairs and the Indian Health

Service under guidelines and criteria established by the bill . . . ." 1974 U.S.C.C.A.N. 7775.

Providing fellow House members with a quick rationale to support the bill, the 1974

House Committee indicated that S. 1017 provides "flexible authority to efficiently and

realistically permit contracting of Bureau of Indian Affairs and Indian Health Service programs

to the Indian tribes while maintaining the integrity of the programs and services funded by

Federal appropriations."  1974 U.S.C.C.A.N. 7782.  According to the 1974 House Committee, S.

1017 simultaneously would expand the Interior Secretary's authority and the HEW Secretary's

authority to enter into negotiated contracts with Indian Tribes and Tribal organizations under

clear guidelines and contract requirements.  See 1974 U.S.C.C.A.N. 7782.

The 1974 House Committee also explained, mostly at the Interior Department's and the

General Accounting Office's recommendation, that it had adopted several major amendments to

S. 1017 which the Senate passed.   See 1974 U.S.C.C.A.N. 7782.  First, the 1974 House

Committee adopted three new sections in S. 1017's preliminary provisions  that it meant to

tighten up the ISDEAA's contract requirements in the areas of auditing and reporting, criminal

penalties for the misuse of contract funds, applicability of the Davis-Bacon Act, 46 Stat. 1494, to contracts under the ISDEAA, and preferences for Indians and Indian subcontractors.  See 1974 U.S.C.C.A.N. 7782.  Second, the 1974 House Committee expanded the grant provisions in section 104 to facilitate contracting by Tribes and Tribal organizations under the ISDEAA's terms.  See 1974 U.S.C.C.A.N. 7782-83.  Third, the 1974 House Committee adopted amendments which would:

> (1) permit tribes and tribal contractors to be eligible for grants from the Civil Service Commission under the Intergovernmental Personnel Act to strengthen personnel administration of the contractors; (2) permit Federal employees transferring to tribal employment under such contracts to retain various fringe benefits of Federal employment; and (3) exempt such transferring employees from the conflict-of-interest provisions of section 205 and 207 of title 18 U.S.C., which would be inappropriate to the circumstances of such contracts.

1974 U.S.C.C.A.N. 7783.  Just as important, the 1974 House Committee indicated that it had deleted four parts of the Senate bill authorizing new programs, based on the Interior Department's advice, because the Interior Department believed that such programs would be duplicative of existing programs.  See 1974 U.S.C.C.A.N. 7783.

Something that the House Committee did not explicitly mention is something central to this case.  The Senate ISDEAA bill had made no explicit mention in section 106 whether the HEW Secretary could reduce the amount of funding a Tribe or Tribal organization received if the Tribe or Tribal organization took control of administration of a program.  The House Committee added subsection 106(h) that addressed this issue.  It provided that

> the amount of any funds provided to a contractor under a contract shall not be less than the amount the Secretary would have expended had the United States performed the service itself.  It also provides that savings, if any, realized by the tribal contractor would be available for additional services and benefits.

1974 U.S.C.C.A.N. 7779.  This subsection that made it into the enacted ISDEAA retained the sense but neither the House Committee version's sentence structure nor wording, reading as follows:

> The amount of funds provided under the terms of contracts entered into pursuant to sections 102 nad [sic] 103 shall not be less than the appropriate Secretary would have otherwise provided for his direct operation of the programs or portions thereof for the period covered by the contract: Provided, that any savings in operation under such contracts shall be utilized to provide additional services or benefits under the contract.

88 Stat 2204.

### d.    President Ford's Signing Statement.

Nixon resigned the Presidency approximately four months before Congress passed the ISDEAA.  See Richard Nixon, Letter to Henry Kissinger Resigning the Office of President of the United States, 246 Public Papers of the Presidents of the United States (John Woolley & Gerhard Peters eds. 2005), available at http://www.presidency.ucsb.edu/ws/index.php?pid=4326&st =resignation&st1= (last visited Oct. 26, 2016).  Gerald Ford succeeded Nixon as President on August 9, 1974.  See Gerald Ford, Remarks on Taking the Oath of Office, 1 Public Papers of the Presidents of the United States, available at http://www.presidency.ucsb.edu/ws/index.php?pid =4409&st=resignation&st1= (last visited Oct. 26, 2016).  On January 4, 1975, Ford signed the ISDEAA.  See 10 Public Papers of the Presidents of the United States, available at http://www .presidency.ucsb.edu/ws/index.php?pid=4739 (last visited Oct. 26, 2016)("1975 Signing Statement").

In his signing statement, Ford indicated that his Administration "is committed to furthering the self-determination of Indian communities without terminating the special relationships between the Federal government and the Indian people.  The Congress is to be

congratulated for its passage of the legislation.  It will enhance our efforts to implement the

policy of Indian self-determination."  1975 Signing Statement.  Ford continued

> Title I of this act gives the permanence and stature of law to the objective of my
> Administration of allowing -- indeed encouraging -- Indian tribes to operate
> programs serving them under contract to the Federal Government.  Furthermore,
> with the passage of this act Indian communities and their leaders now share with
> the Federal Government the responsibility for the full realization of this objective.
> It will be through the initiatives of Indian communities that the authorities
> provided in this act will be implemented.  I urge these communities to make the
> fullest possible use of them and pledge the support of this Administration.

1975 Signing Statement.  Ford concluded his discussion of American Indian self-determination

on a practical note: "In addition to making this kind of contracting a right, the act does much to

make it feasible and practical. . . . The granting authority in this act can also be used to

strengthen tribal governments and tribally-funded programs."  1975 Signing Statement.

    2.    **1988 Amendments.**

ISDEAA implementation did not go completely smoothly in the years after 1975.  See S.

Rep. No 100-274, at 6-7 (1988).    As evident in the 1974 Senate Committee and House

Committee Reports, Congress had aimed to encourage Tribes to contract for the administration

of programs that IHS and the Bureau of Indian Affairs ("BIA") previously had administered.

See supra at 69-74.  In the years after ISDEAA enactment, however, Tribes encountered many

problems in their contracts with the federal agencies.    See, e.g., 1987 Senate Committee

Hearing, 156-58 (prepared statement on behalf of Standing Rock Sioux Tribes, North and South

Dakota et al.)("Standing Rock").  Tribes complained that federal contracting requirements and

bureaucratic regulations were too rigid and too burdensome, preventing the Tribes from being

able to implement their own priorities and agenda for Tribal self-determination.  See, e.g.,

Second 1987 Senate Hearing at 24 (statement of Suzan Shown Harjo, Executive Director,

National Congress of American Indians). Moreover, many Tribes contended that they were

paying a financial penalty for the right to contract for the administration of federal programs, as federal agencies did not cover many costs associated with the performance of the contracts, and these costs therefore had to come out of Tribes' coffers.   See, e.g., 1987 Senate Committee Hearing at 93-97 (prepared statement of Edward Loke Fight).

Federal agencies such as IHS recognized that many of these "contract support costs" -- first defined in the 1988 amendments and including costs associated with audits, insurance, legal fees, and accounting fees --  were ones that the agencies would not have incurred themselves had they still been administering the same programs.   See S. Rep. No. 100-393 (1987), at 4.   In an effort to cover such costs for the Tribes, the BIA started to use a special line item in its Congressional Budget Requests that called for such CSC.   See S. Rep. No. 100-393 (1987), at 4.   The House and Senate Appropriation Committees, however, requested BIA to merge CSC with other program funds.   See H.R. Rep. No. 99-761 (1986), at 4.   Starting in 1985, BIA decided to cover CSC in another way, grandfathering the costs on a one time basis in one lump sum in existing contracts at one hundred percent of the level of need in the previous year.   See H.R. Rep. No. 99-761 (1986), at 4-5.   BIA, however, never requested the additional CSC funding from Congress and never received sufficient funds to fully cover CSC that Tribes were incurring.   See S. Rep. No. 100-393 (1987), at 4.   Because many Tribes lacked sufficient resources to continue operating programs without CSC, many threatened to invoke their right to retrocede contracts to federal agencies under the ISDEAA.   See H.R. Rep. No. 99-761 (1986), at 5.   Wishing to prevent a mass termination of Tribal contracts, the House of Representatives began to consider ISDEAA amendments in February 1987 that would (i) guarantee Tribes an adequate level of funding for CSC; and (ii) give Tribes a stronger voice in determining policies affecting the various federal programs they were contracting.   See S. Rep. No. 100-393 (1987), at 4.

### a.   House Report No. 103-653.

On October 26, 1987, the House Committee on Interior and Insular Affairs reported

proposed ISDEAA amendments out to the floor.  See H.R. Rep. No. 100-393 (1987).     The

House Committee found:

> The Indian Self-Determination and Education Assistance Act . . . has furthered
> the development of local self-government and education opportunities for Indian
> tribes, but its goal and progress have been impeded by lack of clarity and
> direction on the part of Federal agencies regarding their role in implementing the
> Federal policy of Indian self-determination.

H.R. Rep. No. 100-393, at 1 (1987).  The House Committee further found that the "Federal

responsibility for the welfare of Indian tribes demands effective self-government by Indian tribal

communities," and that "additional legislation is necessary to assure that Indian tribes have an

effective voice in the planning and implementation of programs for the benefit of Indians."  H.R.

Rep. No. 100-393, at 1 (1987).

The House Committee therefore proposed multiple ISDEAA amendments pertinent to

this case.  H.R. Rep. No. 100-393, at 2-3.  It recommended amending ISDEAA § 4 to define

"contract support costs" as

> the reasonable costs for activities which must be carried on by a tribal
> organization as a contractor to ensure compliance with the terms of the contract
> and prudent management, but which --
>
> (1) normally are not carried on by the respective Secretary in his direct
> operation of the program; or
>
> (2) are provided by the Secretary in support of the contracted program
> from resources other than those under contract

H.R. Rep. No. 100-393, at 2 (1987).  The House Committee then tackled the issue of CSC

funding levels, proposing that the ISDEAA § 106(h) be amended to read as follows:

> (1) The amount of funds provided under the terms of contracts entered into
> pursuant to this Act shall be no less than the appropriate Secretary would have

otherwise provided for his operation of the programs or portion thereof for the period covered by the contract.

(2) To the amount available under subsection (h)(1) of this section shall be added the negotiated contract support costs.

. . . .

(4) Costs incurred by the contracting agency in monitoring contracts shall not be subtracted from the amount of funds provided under subsection (h)(1).

(5) Contract support costs shall be awarded for all programs for which a tribal organization has contracted pursuant to sections 102 and 103 of this Act.

(6) Except for general assistance grants, once contract and grant obligations are negotiated, the contract or grant amount may be decreased only with the consent of the contractor or grantee or to reflect a reduction in congressional appropriations from the previous fiscal year as reflected in the appropriation line item from which the contract or grant funds are derived.

(7) Any savings realized by the contractor or grantee in the operation or administration of such contract or grant shall be used to provide additional services or benefits under the contract or grant and shall be carried over to the succeeding fiscal years without any reduction in the funding to which the contractor or grantee is otherwise entitled.

(8) The appropriate Secretary shall provide supplemental reports to the Congress on or before March 15 of each year identifying any deficiency of funds needed to provide required contract support costs and indirect costs to all contractors for that fiscal year.

(9) The appropriate Secretary shall advise the Congress in annual budget requests of the amount of funds which should have been appropriated in the preceding fiscal year in order to have funded at the full amount the indirect costs and contract support costs negotiated by tribal organizations pursuant to this Act. The appropriate Secretary shall also provide the Congress with an estimate of the indirect costs and contract support costs that will be needed for new contracts in the fiscal year covered by the budget request.

(10) At the request of any Indian tribe, the appropriate Secretary shall disclose to such tribe the current amount of funds allocated, obligated, and expended for any program, or portion thereof, administered for the benefit of such tribe.

H.R. Rep. No. 100-393, at 2-3 (1987). The House Committee recommended more than just

amendments to existing ISDEAA sections; it also proposed that entirely new sections be added

to the ISDEAA.  See H.R. Rep. No. 100-393, at 3 (1987).  A new ISDEAA § 112 would read as follows:

> (a) Whenever an indirect cost rate is negotiated annually between a tribe or tribal organization and the cognizant federal agency, that rate shall be applicable to all contracts and grants made with such tribe or tribal organization pursuant to Sections 102, 103, and 104 of this Act.

> (b) Where a contractor's allowable indirect cost recoveries are below the level of indirect costs that the contractor should have received for any given year pursuant to its approved indirect cost rate, and such shortfall is the result of lack of full indirect cost funding by any Federal, state, or other agency, such shortfall shall not form the basis for any theoretical under or over-recovery or other adverse adjustment to any future years' indirect cost rate or amount for such contractor, nor shall any agency seek to collect such short fall from the contractor.

> (c) Indian tribal governments shall not be held liable for amounts of indebtedness attributable to theoretical or actual under-recoveries or over-recoveries of indirect costs, as defined in Office of Management and Budget Circular A-87, incurred for fiscal years prior to fiscal year 1988.

H.R. Rep. No. 100-393, at 3 (1987).

### b.    Senate Report No. 100-274.

On April 22, 1987, in response to multiple complaints from American Indian tribes about problems associated with ISDEAA implementation, the Senate Indian Affairs Committee conducted an oversight hearing.  See First Session on Recommendations for Strengthening the Indian Self-Determination Act: Hearing Before the S. Comm. on Indian Affairs, 100th Cong. (1987)("1987 Senate Committee Hearing").  At that hearing, Tribal witnesses described the ISDEAA as a constructive public policy that had, among other things, resulted in American Indians using healthcare facilities more frequently.  E.g., 1987 Senate Committee Hearing at 30 (statement of Ron Allen, Chairman, Jamestown Klallam Tribe, Sequim, Washington).  At the same time, Tribal witnesses told the Senate Committee that inappropriate application of labyrinthine federal procurement law and federal acquisition regulations to self-determination

contracts had resulted in excessive paperwork and unduly burdensome reporting requirements. See 1987 Senate Committee Hearing, 156-58 (prepared statement on behalf of Standing Rock Sioux Tribes, North and South Dakota et al.)("Standing Rock").

Perhaps the single most serious problem with ISDEAA implementation, however, according to the Tribal witnesses at the hearing, was BIA's and IHS' failure to provide full funding for the indirect costs associated with self-determination contracts. See, e.g., 1987 Senate Committee Hearing 172 (prepared statement of United South & Eastern Tribes, Inc.)("It is very difficult not to believe that the BIA has been playing the budget cutting game largely at the expense of tribes. For a number of years in its [budget] justification the Bureau under-estimated . . . tribal administrative needs . . . and funded tribes for only a percentage of the indirect costs that were due them."). The Tribal witnesses said that the agencies' consistent failure to fully fund Tribal indirect costs had resulted in financial management problems for Tribes as they struggled to pay for federally mandated annual single-agency audits, liability insurance, financial management systems, personnel systems, property management and procurement systems, and other administrative requirements. See, e.g., 1987 Senate Committee Hearing at 93-97 (prepared statement of Edward Loke Fight)(showing indirect CSC calculations and incomplete federal reimbursement for them). Tribal witnesses indicated that their Tribes had diverted trust resources needed for community and economic development to cover these CSC. See Standing Rock at 150.

The Senate Committee took note of these Tribal concerns and held another hearing featuring American Indian tribal leaders on September 21, 1987 -- this one to discuss proposed ISDEAA amendments. See First Session on S. 1703 to Amend the Indian Self-Determination and Education Act: Hearing Before the S. Select Comm. on Indian Affairs, 100th Cong.

(1987)("Second 1987 Senate Hearing").[47]  After eight months of working together with Tribal

leaders, according to Committee Chairman Daniel K. Inouye, United States Senator from

Hawaii, the Committee produced a draft bill meant to address many Tribal concerns, including:

> the need for the Bureau of Indian Affairs and the Indian Health Service to fully
> fund tribal indirect costs for self-determination contracts; the need for year-to-
> year stability of contract funding levels in order to improve planning and
> management of programs; clarifying that Federal acquisition regulations do not
> apply to self-determination contracts; . . . reducing the paperwork and reporting
> requirements for mature contracts; alleviating problems associated with over-
> recovery and under-recovery of indirect costs from Federal agencies other than
> the BIA and IHS . . . .

Second 1987 Hearing at 1-2 (1987)(statement of Hon. Daniel K. Inouye).  Senator Daniel Evans

of Washington, the Vice Chairman of the Senate Committee, further shared with witnesses:

> It is certainly my hope -- and I know that of the chairman and the members of the
> committee -- to attempt to move strongly in this field during this congress to try to
> open up new opportunities to finally fulfill, as closely as we can, the real concepts
> of self-determination that have been the goal of so many years.

Second 1987 Hearing at 2 (statement of Hon. Daniel Evans).  Tribal leaders, for the most part,

praised the Senate Committee for the progress it had made to address these concerns over the

previous few months, but still insisted there were structural problems with the ISDEAA's

approach to CSC that needed to be remedied.  See, e.g., Second 1987 Senate Hearing at 24

(statement of Suzan Shown Harjo, Executive Director, National Congress of American Indians).

Most particularly, the Tribal leaders indicated that they preferred the language of the House bill

amending the ISDEAA as it related to CSC recovery:

> The second recommended change to accomplish is full recovery of costs and
> funding allocations.  The House bill language amending the P.L. 93-638 [the

---

[47]The Senate Committee held four hearings from April 22, 1987, to February 18, 1988, confusingly giving the title of "First Session" to the first three of them.  See First Session on Recommendations for Strengthening the Indian Self-Determination Act: Hearing Before the S. Comm. on Indian Affairs, 100th Cong. (1987).  The Court modifies this naming convention in the short forms to help the reader distinguish the three hearings from each other.

ISDEAA], defining contract support costs and requiring full allocation of contract support costs, provides a more complete description of what contract funding allocations should be based upon. We would like to see that language given full consideration. . . . By including this proposed language, Tribes would receive a fair allocation of funds, irrespective of their indirect cost rates.

Second 1987 Senate Hearing at 78 (statement of Joseph B. DeLaCruz, President, Affiliated Tribes of Northwest Indians). Unless Tribes could rely on such strong statutory protection for recovery of full CSC, Tribal leaders maintained, BIA and IHS would continue to fail to provide sufficient funds to cover CSC. See Second 1987 Senate Hearing at 83 (statement of Clarence W. Skye, United Sioux Tribes of South Dakota Development Cooperation).

Taking such critiques to heart, the Senate Committee went to work on the amendments, and scheduled a third hearing on them for the following month. See First Session on S. 1703 to Amend the Indian Self-Determination and Education Assistance Act: Hearing Before the S. Select Comm. On Indian Affairs, 100th Cong. (1987)("Third 1987 Senate Hearing"). The third hearing, unlike the first two, provided BIA and IHS witnesses with significant time to present their view of the amendments. See Third 1987 Senate Hearing 25-52. The Vice Chairman of the Senate Committee grilled the Assistant Secretary for Indian Affairs, with the latter noting that the agency had veered very far from Nixon's clear intent in his July 8, 1970 Message, and had gotten "bound up in conflicting and probably unnecessary regulations[.]" Third 1987 Senate Hearing at 34 (statement of Hon. Daniel Evans). Responding to a question about CSC from Senator John McCain, the Assistant Secretary indicated that Tribes which found themselves short of CSC to cover overhead could simply dip into their program costs to pay for it. See Third 1987 Senate Hearing at 37 (statement of Ross Swimmer, Assistant Secretary for Indian Affairs, U.S. Dep't of the Interior). Responding to a question from Senator Evans, the IHS Director indicated that inadequate appropriations for CSC at the overall agency level meant that there was

- 82 -

a chronic CSC shortfall spread around at the Tribal contractor level as well, but that there was no better solution, because funding excess CSC for one tribe from a finite pot of money meant that IHS would need to shortchange other Tribes by the equivalent amount.  <u>See</u> Third 1987 Senate Hearing 47-48 (statement of Everett Rhoades, Director, Indian Health Services).

Tribal leaders at the hearing took issue with the Assistant Secretary's and the IHS Director's statements about CSC. <u>See</u> Third 1978 Senate Hearing 53-61.  They rejected the suggestion that excess CSC should be funded out of the Secretarial amount.  <u>See</u>, <u>e.g.</u>, Third 1978 Senate Hearing 53-54 (statement of William Ron Allen, Chairman, Jamestown Klallam Tribe, Sequim, Washington).  Tribes also rejected any proposal that CSC should be funded using a flat fee or some other simplified approach, arguing that "any kind of approach of a flat rate is just not workable within the system of addressing the true costs of the recovery of those costs by the tribes administering BIA/IHS contracts and grants."  Third 1978 Senate Hearing 54 (statement of William Ron Allen, Chairman, Jamestown Klallam Tribe, Sequim, Washington).

After a little more than two months following the Third 1978 Senate Hearing, the Senate Committee had considered and marked up CSC amendments, reporting them to the full Senate on December 22, 1987.  <u>See</u> S. Rep. No. 100-274, at 1 (1987).  The Senate Committee called for a "comprehensive reexamination" of the ISDEAA "to increase tribal participation in the management of Federal Indian programs," and to "remove many of the administrative and practical barriers that seem to persist" under the ISDEAA.  S. Rep. No. 100-274, at 2.

The Senate Committee also commended ISDEAA's enactment twelve years earlier as the "the major reason for assumption by Indian tribes of responsibility for Federal Indian programs."  S. Rep. No. 100-274, at 2-3.  The transfer of responsibility had been a boon to American Indians, the Senate Committee said:

In addition to operating health services, human services, and basic governmental services such as law enforcement, water systems and community fire protection, tribes have developed the expertise to manage natural resources and to engage in sophisticated economic and community development. All of these achievements have taken place during a time when tribes have also developed sophisticated systems to manage and account for financial, personnel and physical resources. . . . Compared to state, county and municipal governments of similar demographic and geographic characteristics, the level of development attained by tribal governments over the past twelve years is remarkable.

S. Rep. No. 100-274, at 4. The Senate Committee further found:

Improvements in tribal financial, personnel, property, and procurement systems have enabled tribes to manage increasingly complex matters. In response to both federal and tribal demands for accountability, most Indian tribes that operate programs now have annual single-agency audits of tribal finances. The Department of Interior Office of Inspector General has reported an increase in tribal assumption of responsibility for tribal financial management.

S. Rep. No. 100-274, at 4. The Senate Committee noted many more of the improvements that the ISDEAA had induced in American Indian communities, including custodial care placements for children, outreach to isolated American Indian families through community health workers, increased health facility utilization, and the construction of safe water and sanitation systems. See S. Rep. No. 100-274, at 5. The common thread among all these successes, according to the Senate Committee, was that the ISDEAA had given Tribal communities an opportunity to "plan and deliver services appropriate to their diverse demographic, geographic, economic, and institutional needs" -- whether in the Navajo Nation, the largest Tribe in the United States, or on isolated rancherias in California with a few dozen residents. [48] S. Rep. No. 100-274, at 5.

---

[48]It is unclear from the Senate Committee Report text how the Senate Committee came to identify the Navajo Nation as the largest Tribe in the United States, as the Court's search of United States Census Bureau archives finds only a population count of population by reservation in the 1980 Census, i.e., no summed totals by Tribal affiliation. See 1 United States Bureau of the Census, 1980 Census of Population, Social Characteristics for American Indian Persons on Reservations and Alaska Native Villages: 1980 tbl.251 at 451-56, available at http://www2 .census.gov/prod2/decennial/documents/1980a_usC.zip (PDF document 1980a_usC-07 in the zip file)(last visited Oct. 19, 2016)("1980 Census"). According to the 1980 Census, however, the

The Senate Committee also found that IHS' actions attempting to implement the ISDEAA largely had been praiseworthy.  See S. Rep. No. 100-274, at 6.  As of 1987, the Senate Committee said, IHS directly operated forty-five hospitals, seventy-one health centers, and several hundred smaller health stations and satellite clinics. See S. Rep. No. 100-274, at 6 (citing Indian Health Service, Fiscal Year 1988 Budget Request).  Nevertheless, the Senate Committee noted with concern that many Tribes had reported that IHS had refused to negotiate for the transfer of central office funds and had exhibited an overall resistance to Tribal efforts to redesign programs, and to reallocate resources and personnel in support of Tribal self-determination.  See S. Rep. No 100-274, at 6.  The Senate Committee therefore provided:

> [T]he [HHS] Secretary shall negotiate annual funding agreements with each Indian tribe.  These agreements authorize the tribe to plan, conduct, consolidate, and administer programs, services, functions, and activities to Indian tribes or Indians.  Pursuant to the terms of the agreement and at the request of the tribe, the Secretary shall provide funds to carry out the agreement in a [sic] amount equal to the amount that the Indian tribe would have been eligible for under Self-Determination Act contracts and grants.  The bill also provides that the Secretary shall interpret each Federal low [sic] in a manner that will facilitate inclusion of programs or activities under the agreement.

---

Navajo Reservation had by far the largest population of any reservation or Alaskan native village in the United States, with 110,606 persons.  See 1980 Census tbl.251 at 452.  It appears that the reference to the California rancherias with a few dozen residents refers to reservations such as Bridgeport Colony, California (population 48) and Middletown Rancheria, California (population 37).  See 1980 Census tbl.251 at 451-52.  Other California rancherias had as few as six residents. See 1980 Census tbl.251 at 451 (Cedarville Rancheria, California).

As of the 2010 Census, the largest Tribe in the United States is either the Navajo or the Cherokee, depending on whether one counts individuals who identify as multiracial or as members of more than one Tribe.  Among those who identify exclusively as a member of a single Tribe, the Navajo are slightly more populous than the Cherokee -- 286,731 Navajo compared to 284,247 Cherokee.  See United States Census Bureau, The American Indian and Alaska Native Population: 2010 tbl.7, at 17 (2012), available at http://www.census.gov/prod /cen2010/briefs/c2010br-10.pdf (last visited Oct. 27, 2016)("2010 Census").  Including those who identify as multiracial or as members of more than one Tribe, Cherokees are almost three times as populous as any other Tribe in the country -- 819,105 Cherokee compared to 332,129 Navajo.  See 2010 Census at 17.

S. Rep. No. 100-274, at 8.  The Senate Committee then adopted an amendment in the nature of a substitute that made several modifications to language in H.R 3508 as introduced.  See S. Rep. No. 100-274, at 8-13.  Touching for the first time on the duplication issue that forms the pith of Sage Hospital's second MSJ, the Senate Committee stated that it was concerned that "if an Indian tribe is participating as part of a consortium that tribe should not be able to contract for any of the programs or activities which are already part of the consortium's self-governance agreement."  S. Rep. No. 100-274, at 8.  The Senate Committee noted further that the amendments that it proposed would "prevent this type of duplication of services and programs. The Senate Committee also adopted language which instructed the HHS Secretary to "interpret each Federal law and regulation in a manner that will facilitate the inclusion of programs and services and the implementation of agreements . . . ."  S. Rep. No. 100-274 at 15.

A more noticeable change to the ISDEAA that the Senate Committee proposed, however, was to add a sixth title to the statute focused squarely on Tribal self-governance.  See S. Rep. No 100-274 at 14, 17-21.  Section 403(g)(3) within that proposed sixth title stated that, subject to exclusions for community colleges, public primary and secondary schools, the Flathead Agency Irrigation Division, and the Flathead Agency Power Division,

> the HHS Secretary shall provide funds to the tribe for one or more programs, services, functions, or activities in an amount equal to the amount that the tribe would have been eligible to receive under contracts and grants under this Act, including amounts for direct programs and contract support costs and amounts for those activities that are specifically or functionally related, but not part of the service delivery program, without regard to the organizational level within the Department where such functions are carried out.

S. Rep. No. 100-274 at 20.  Furthermore, the Senate Committee clarified in a proposed Section 406(a): "Nothing in this title shall be construed to limit or reduce in any way the services,

contracts, or funds that any other Indian tribe or tribal organization is eligible to receive under section 102 or any other applicable Federal law." S. Rep. No. 100-274 at 21.

For the purposes of this case, however, the most important change to the ISDEAA that the Senate Committee proposed was to add Section 106 to clarify provisions for funding self-determination contracts, including direct costs. See S. Rep. No. 100-274 at 30. The Senate Committee walked slowly through each subsection to explain its import. See S. Rep. No. 100-274 at 30-34. Starting off with its proposed Subsection 106(a), the Senate Committee said:

> It is apparent from the wording of the new section 106(a) that the Committee is strongly committed to the principle of assisting tribes to succeed in their efforts to plan, manage and operate programs and services under self-determination contracts. . . . The intent of these amendments is to protect and stabilize tribal programs from inappropriate administrative reduction by Federal agencies.

S. Rep. No. 100-274 at 30. The Senate Committee alleged that the BIA had made many such reductions over the years in direct contravention of Tribal funding priorities, see S, Rep. No. 100-274 at 30-31, and threw up Subsection 106(a)(5) as a barricade to prevent any such chicanery in the future:

> Section 106(a)(5) would prevent the [HHS] Secretary from reducing funds for a self-determination contract, except in response to a reduction in appropriations enacted by the Congress. Such a reduction should be a proportional, across-the-board reduction. . . . These amendments are intended to prevent Federal agencies from passing on the entire amount, or a disproportionate amount, of a reduction in Congressional appropriations, to tribal contracts in order to protect the base for Federally-operated functions.

S. Rep. No. 100-274 at 31. The Senate Committee accused the BIA of cutting Tribal self-determination budgets to free up money for pay increases for BIA personnel, of financial mismanagement, and of over-aggressively reducing Tribal programmatic budgets under the guise of congressional-imposed sequestrations, see S. Rep. No. 100-274 at 31-32, adding with

comparative sangfroid that "the intent of these amendments is to prevent such administrative reductions of tribal contract funds," S. Rep. No. 100-274 at 31.

The Senate Committee briefly discussed its proposed Subsections 106(b)-(f), which are not directly relevant to this case, before turning to its proposed Subsection 106(g). See S. Rep. No. 100-274 at 33. That Subsection, according to the Senate Committee, would "require the [HHS] Secretary to add indirect costs to the amount of funds provided for direct program costs associated with self-determination contracts for the initial year of tribal program operation, upon the request of the tribal contractor." S. Rep. No. 100-274 at 33. The intent behind this provision, according to the Senate Committee, is

> to require the [HHS] Secretary to provide indirect costs for each contract year in addition to the program funding which would have been available to the Secretary to operate a contracted program and to prohibit the practice which requires tribal contractors to absorb all or part of such indirect costs within the program level of funding, thus reducing the amount available to provide services to Indians as a direct consequence of contracting.

S. Rep. No. 100-274 at 33. The Senate Committee then added:

> The combined amount of direct and indirect costs shall then be available for each subsequent year that the program remains continuously under contract. While the Committee has concerns about the changes to the methods of budgeting for and allocating indirect costs funds, whether those methods be the so-called "grandfather" approach,[49] the single line-item indirect cost fund, or some other

---

[49]On November 3, 1983, the DOI Inspector General wrote a letter to the Office of Management and Budget in which he reported the BIA's decision to "grandfather" indirect cost dollars into a Tribe's recurring Secretarial amount, so that, after the first year of a self-determination contract, indirect costs would be paid off of the top of the total contract amount. S. Bobo Dean & Joseph H. Webster, Contract Support Funding and the Federal Policy of Indian Tribal Self-Determination, 36 Tulsa L.J. 349, 356 (quoting Letter from Richard Mulberry, DOI Inspector General, to Deputy Director, OMB (Nov. 3, 1983)("1983 OMB Letter")). The DOI Inspector General expected that this "grandfather" approach would encourage Tribes to develop more efficient administrative systems, but he also indicated that there was a risk that the heavy and inconsistent requirements of the federal bureaucracy were jeopardizing Tribes' ability to handle federal programs. S. Bobo Dean & Joseph H. Webster, Contract Support Funding and the Federal Policy of Indian Tribal Self-Determination at 356 (quoting 1983 OMB Letter).

method, the Committee does not believe that it should determine the method of distribution. The "grandfather" approach and the "single fund" approach both have advantages and disadvantages from the perspective of Federal agency budgets and from the perspective of individual tribal contracts. It is the Committee's hope that the Department of the Interior Office of Inspector General, the Bureau of Indian Affairs, and the Indian Health Service will coordinate their efforts with the tribes to develop the most effective method of distributing indirect cost funds. The Committee amendment will insure that, whatever method is used, the tribal contractor will realize the full amount of direct program costs and indirect costs to which the contractor is entitled.

S. Rep. No. 100-274 at 33-34. The Senate Committee then turned to its proposed Subsection 106(h), a Subsection that Sage Hospital and the United States also contest in this case. See S. Rep. No. 100-274 at 34. The Senate Committee's commentary on the Subsection is not germane to the case, however, as the Senate Committee specifically addressed only construction contracts in the discussion. See S. Rep. No. 100-274 at 34.

### c.   President Reagan's Signing Statement.

In his first Statement on Indian Policy, issued January 24, 1983, Reagan extended his general philosophical preference for programmatic decentralization to American Indian Tribes. See Ronald Reagan, Statement on Indian Policy, 40 Public Papers of the Presidents of the United States, available at http://www.presidency.ucsb.edu/ws/index.php?pid=41665&st=&st1= (last visited Oct. 26, 2016)("Reagan Statement on Indian Policy").[50] Reagan praised Nixon's policy of Tribal self-determination from Nixon's 1970 Message and noted how the 1975 ISDEAA had captured Nixon's vision. See Reagan Statement on Indian Policy at 1. Reagan believed, however, that the ISDEAA had not gone far enough, having been "more rhetoric than action."

---

[50]Reagan's published diary entry from September 20, 1982, indicates that he already held a Cabinet meeting on this topic on that day. See Ronald Reagan, 1 The Reagan Diaries 155 (Douglas Brinkley ed. 2009)("A Cabinet meeting -- main subject our relations with Am. Indians. We are going to put our relationship with tribes on a govt. to govt. basis."). These early discussions notwithstanding, Reagan did not issue any public presidential statement about American Indians before his January 24, 1983 Statement on Indian Policy.

Reagan Statement on Indian Policy at 796.  Instead of fostering and encouraging Tribal self-government, Reagan said, "Federal policies have by and large inhibited the political and economic development of the tribes.  Excessive regulation and self-perpetuating bureaucracy have stifled local decision-making, thwarted, Indian control of Indian resources, and promoted dependency rather than self-sufficiency."  Reagan Statement on Indian Policy at 796.  Reagan established that his Administration intended to

> reverse this trend by removing the obstacles to self-government and by creating a more favorable environment for the development of healthy reservation economies.  Tribal governments, the Federal Government, and the private sector will all have a role.  This administration will take a flexible approach which recognizes the diversity among tribes and the right of each tribe to set its own priorities and goals.

Reagan Statement on Indian Policy at 796-97.  Reagan acknowledged that "[c]hange will not happen overnight," but he was determined to "honor the commitment this nation made in 1970 and 1975 to strengthen tribal governments and lessen Federal control over tribal governmental affairs."  Reagan Statement on Indian Policy at 797.  Delving into specifics, Reagan noted:

> Tribal governments, like State and local governments, are more aware of the needs and desires of their citizens than is the Federal Government and should, therefore, have the primary responsibility for meeting those needs.  The only effective way for Indian reservations to develop is through tribal governments which are responsive and accountable to their members.

Reagan State on Indian Policy at 797.  For generations, according to Reagan, federal employees had performed functions on American Indians' behalf.  See Reagan State on Indian Policy at 797-98.  Despite ISDEAA passage, Reagan continued, "major tribal government functions -- enforcing tribal laws, developing and managing tribal resources, providing health and social services, educating children -- are frequently still carried on by Federal employees."  Reagan State on Indian Policy at 797.

- 90 -

Reagan asked Tribes to reduce their dependence on Federal funds by providing a greater percentage of the cost of their self-government, and pledged to "assist tribes in strengthening their governments by removing the Federal impediments to tribal self-government and tribal resource development." Reagan State on Indian Policy at 797. At the same time, Reagan would not simply make Tribes fly before they were fully fledged, ensuring that "[n]ecessary Federal funds" would remain available for all Tribes, and developing a Small Tribes Initiative to provide financial support smaller Tribes needed to develop basic Tribal administrative and management capabilities. Reagan State on Indian Policy at 797.

Speaking directly to the issue of American Indian healthcare services the following year, Reagan pocket vetoed the Indian Health Care Amendments of 1984 on October 22, 1984.[51] See United States Senate, S. 2166 - Indian Health Care Amendments of 1984, https://www.congress .gov/bill/98th-congress/senate-bill/2166/all-actions (last visited Oct. 26, 2016)(listing all actions, including the pocket veto, taken on the bill). His reasoning behind the veto, Reagan said in an accompanying memorandum, was that he believed the bill to be seriously deficient in fulfilling the goals of the Indian Health Care Improvement Act, Pub. L. 94-437 (1976)("IHCIA"). See Ronald Reagan, Memorandum Returning Without Approval the Indian Health Care Amendments of 1984, 40 Public Papers of the Presidents of the United States 1584 (1984), available at http://www.presidency.ucsb.edu/ws/index.php?pid=39292&st=&st1= (last visited Oct. 26, 2016) ("1984 Reagan Memorandum"). What Reagan identified as especially

---

[51]Under Article 1, Section 7 of the United States Constitution, "[i]f any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law." U.S. Const. art. 1, § 7, cl. 2. A "pocket veto" refers to the situation when a congressional adjournment prevents the President from returning the bill. See generally Wright v. United States, 302 U.S. 583, 594-98 (1938) (discussing what constitutes an adjournment for pocket veto purposes).

troublesome in the bill was a provision that would reduce access to health services for American Indians.  See 1984 Reagan Memorandum at 1584.  The provision in question, Reagan said, "would set a precedent for potentially changing the fundamental relationship of the Indian Health Service to State and local entities, as well as depriving eligible Indians of benefits that should be due them by virtue of their citizenship in the State." 1984 Reagan Memorandum at 1584.  "As a matter of both principle and precedent," Reagan asserted, "I cannot accept this provision."  1984 Reagan Memorandum at 1584.

Reagan's interest in American Indian issues seemed to wane during his second term, being expressed only in a trio of ceremonial proclamations in the three years leading up to the ISDEAA amendment of 1988.[52]  In Reagan's 1986 and 1988 proclamations marking National American Indian Heritage Week, however, Reagan revisited his theme of increased Tribal self-sufficiency.  See Ronald Reagan, Proclamation 5577 -- American Indian Week, 1986, 101 Stat. 2041 (1986); Ronald Reagan, Proclamation 5868 -- National American Indian Heritage Week, 1988, 102 Stat. 5068 (1988).  In the 1986 proclamation, Reagan noted:

> Indians make contributions in every area of endeavor and American life, and our literature and all our arts draw upon Indian themes and wisdom. . . . We look to the future with the expectation of even stronger tribal governments and lessened Federal control over tribal government affairs.  We look to a future of development of economic independence and self-sufficiency, and an enhanced government-to-government relationship that will allow greater Indian control of Indian resources.

101 Stat. 2041.  Two years later and just one week before Congress sent him the ISDEAA amendments of 1988, Reagan repeated this self-determination theme in his 1988 proclamation:

> Despite past periods of conflict and changes in Indian affairs policies, the government-to-government relationship between the United States and Indian

---

[52]American Indian issues did not make a single appearance in Reagan's personal diary during the period of time that Congress was considering the 1988 ISDEAA amendments.  See Ronald Reagan, 1 The Reagan Diaries 692-819 (Douglas Brinkley ed. 2009)

tribes has endured.  The Constitution, treaties, laws, and court decisions have consistently recognized a unique political relationship between tribal elected governments and the United States.  We look to a future of increasing economic independence and self-sufficiency on Indian reservations, and we support efforts to foster greater Indian control of Indian resources.

102 Stat. 5068.  Read in light of Reagan's refrain about Tribal self-sufficiency over the five years preceding the ISDEAA amendments of 1988, it is difficult to miss the same tones in his signing statement to the bill on October 5, 1988.  See Ronald Reagan, Statement on Signing the Indian Self-Determination and Education Assistance Act Amendments of 1988, 40 Public Papers of the Presidents of the United States 1284, available at http://www.presidency.ucsb.edu/ws/index .php?pid=34969&st=&st1= (last visited Oct. 26, 2016)("Reagan Signing Statement").

Reagan started the signing statement on a general note: "This Act will assist in furthering Administration efforts to transfer the development and operation of programs from the Federal Government to Indian tribes.  Tribal self-governance allows tribes more freedom to design programs to serve the specific needs of their members."  Reagan Signing Statement at 1284.  He immediately thereafter turned, however, to a rejection of one of the provisions in the bill added to the proposed new ISDEAA § 106.  See Reagan Signing Statement at 1284.  Reagan wrote: "A provision in section 205 of the Act stated that the Secretaries of the Interior and Health and Human Services shall reduce funding to Indian tribes if so directed by a statement from a Member of Congress that accompanies a conference report."  Reagan Signing Statement at 1284.[53]  Reagan asserted that the provision purported to authorize a process altering Executive

_____

[53]The object of the rejection is not entirely clear from the signing statement's text. Subsection (a)'s relevant portion reads as follows: "The amount of funds provided under the terms of self-determination contracts entered into pursuant to this Act shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract."  102 Stat. 2292.  Subsection (a)'s relevant portion reads as follows: "The amount of funds provided under the terms of self-

branch officials' legal duties without both Congressional houses and the President's participation, thus violating the requirements for presentment and bicameralism that the Supreme Court five years earlier had enunciated in Immigration and Naturalization Service v. Chadha, 462 U.S. 919 (1983).   Aside from this objection and two others focused on reporting requirements, Reagan did not voice any objections to any provisions in the 1988 ISDEAA amendments.  See Reagan Signing Statement at 1284.

     **3.**     **1994 Amendments.**

Under the 1988 ISDEAA amendments' terms, HHS and DOI were supposed to work with Tribes to reach agreement on draft regulations to cover self-determination contracts within ten months of bill enactment.  Pub. L. 100-472 § 207(b)(3)-(4).[54] Approximately two years after the statutory deadline -- and without first consulting Tribes -- IHS developed new policy guidelines governing the award of CSC.  See Indian Self-Determination Memorandum No 92-2 (Feb. 27, 1992)("1994 IHS Memorandum").  The new guidelines provided for the use of CSC to pay for all negotiated indirect costs, and IHS distributed available funds to contractors based on an annually negotiated rate.  1994 IHS Memorandum at 1.  The guidelines, however, also authorized IHS to use CSC to pay for direct costs under ISDEAA § 106(a)(2).  See 1994 IHS Memorandum at 1.

_____

determination contracts entered into pursuant to this Act shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract."  102 Stat. 2292.

[54]Congress split this requirement across two statutory Subsections.  The first Subsection read as follows: "Within seven months from the date of enactment of the Indian Self-Determination and Education Assistance Act Amendments of 1988, the Secretary shall publish proposed regulations in the Federal Register for the purpose of receiving comments from tribes and other interested parties." Pub. L. 100-472 § 207(b)(3).  The second Subsection read as follows: "Within ten months from the date of enactment of the Indian Self-Determination and Education Assistance Act Amendments of 1988, the Secretary shall promulgate regulations to implement the provisions of such Act." Pub. L. 100-472 § 207(b)(4).

Oftentimes such payments never materialized, at least not in full.  See United States General Accounting Office, Indian Self Determination Act: Shortfalls in Indian Contract Support Costs Need to be Addressed, GAORCED 99-150 at 6 (June 1999), available at http://www.gao.gov/assets/230/227485.pdf)(last visited Oct. 26, 2016)("GAO Report"). Although CSC funding had been incommensurate with Tribal needs since the ISDEAA's enactment in 1975, the shortfalls started to become acute at the end of the 1980s and the beginning of the 1990s, because of Congress' failure to anticipate the increased Tribal demand for self-determination contracts that arose after the 1988 ISDEAA amendments.  See GAO Report at 25-28.  From 1989 to 1994, these CSC shortfalls ranged from seventy million dollars to over one hundred million dollars per year.  See GAO Report at 32 fig.2.5.

Nearly five years after the statutory deadline and still without having meaningfully consulted with Tribes, the DOI and HHS published eighty pages of proposed regulations conforming to the 1988 ISDEAA amendments in the Federal Register.[55]  See Indian Self-Determination and Education Act Amendments; Proposed Rule, 59 Fed. Reg. 3166 (January 20, 1994)(codified at 25 CFR pt. 900).  Tribal reaction to the proposed regulations was overwhelmingly negative, because of both their content and their length.  See First Session on Oversight Hearing to Establish a Detailed Timeframe for the Swift Development of New Implementing Regulations with Close Tribal Participation: Hearing Before the S. Comm. on

---

[55]The DOI and HHS admitted in the notice of proposed rulemaking:

[A] major area of concern for the current Administration relates to the adequacy of outreach to, and participation in the drafting process by, tribes and tribal organizations during the post-August 1990 period.  The DOI's concern is heightened by the fact that the September 1990 draft (which did reflect tribal input) was significantly modified during the more than two-year period in which the two Departments worked on the draft without tribal participation.

59 Fed. Reg. 3166.

Indian Affairs, 103d Cong., at 1-2 (1993)("1993 Senate Hearing")(statement of Hon. Daniel K. Inouye, Chairman).  In response, HHS and DOI began to hold regional meetings with Tribal leaders in a de facto inversion of usual notice and comment rulemaking.[56]  See 1993 Senate Hearing at 34 (statement of Eddie F. Brown, Assistant Secretary, Indian Affairs, Department of the Interior).

### a.   House Report 103-653.

On August 3, 1994, the House Committee on Natural Resources reported to the full House on another set of ISDEAA amendments.  See H.R. Rep. No. 103-653 (1994).  In its report's preamble, the House Committee indicated that the bill's purpose was "to amend the Indian Self-Determination and Education Assistance [A]ct to permanently establish Tribal Self-Governance in the Department of the Interior."  H.R. Rep. No. 103-653 at 5.  The House Committee commended IHS for having entered into self-determination contracts with fourteen American Indian tribes during the previous two-and-a-half years, see H.R. Rep. No. 103-653 at 6, but it also revealed that it was

> very concerned about reports from many of the Self-Governance tribes that officials of the Indian Health Service have refused to negotiate for the transfer of central office funds and have exhibited an overall resistance to tribal efforts to redesign programs and reallocate resources and personnel under the authority of Tribal Self-Governance.

---

[56]In notice and comment rulemaking, also known as "informal rulemaking," the Administrative Procedure Act, 5 U.S.C. § 551-84, generally requires that agencies publish a notice of proposed rulemaking in the Federal Register. Maeve P. Carey, Congressional Research Service, The Federal Rulemaking Process: An Overview 5-6 (June 17, 2013)("Federal Rulemaking Process").  The notice must contain (i) a statement of the public rulemaking proceedings' time, place, and nature; (ii) reference to the legal authority under which the rule is proposed; and (iii) either the proposed rule's terms or substance, or a description of the subjects and of the issues involved.  See Federal Rulemaking Process at 6.  After considering public comments, the agency may then publish the final rule, incorporating a general statement of its basis and purpose.  See Federal Rulemaking Process at 6.  Agencies commonly allow at least thirty days for public comment.  See Federal Rulemaking Process at 6.

H.R. Rep. No. 103-653 at 6.  The House Committee diagnosed the cause of such resistance within IHS to be "a misapprehension that Tribal Self-Governance is a temporary project."  H.R. Rep. No. 103-653 at 6.  To the contrary, the House Committee said, Tribal self-determination was to be a permanent policy, and IHS must take steps to "begin to plan for and implement changes that will result in reductions in the Federal bureaucracy which correspond to the transfer of program funds, resources, and responsibilities to Self-Governance tribes."  H.R. Rep. No. 103-653 at 6.

Although the House Committee proposed adding an entire ISDEAA section dedicated exclusively to AFAs, the House Committee had surprisingly little to say about issues directly relevant to the Allocation MSJ or the Duplication MSJ. In one Subsection, however, it packed a punch far above its weight, instructing HHS to interpret not just the ISDEAA, but rather "each Federal law and regulation," except where otherwise provided by law, in a manner that would facilitate "the inclusion of programs, service, functions, and activities in the agreements entered into under" Tribal self-determination contracts.  H.R. Rep. No. 103-653 at 20.

**b.      Senate Committee Report.**

On April 20, 1994, Senators McCain and Inouye introduced a Senate version of the 1994 ISDEAA amendments, and the bill was referred to the Senate Committee on Indian Affairs.  See S. Rep. No. 103-374 at 4 (1994).  On August 10, 1994, the Senate Committee reported the bill to the full Senate. See S. Rep. No 103-374 at 1.  According to the Senate Committee, the major impetus for the bill was HHS and DOI's incorrigibility; Congress mandated in 1988 to quickly promulgate simple regulations to govern Tribal self-determination contracts, but the agencies had

done the opposite for six years.[57]   See S. Rep. No. 103-374 at 14.   The Senate Committee

keelhauled the agencies:

> This action is a direct result of the failure of the Secretaries to respond promptly and appropriately to the comprehensive amendments developed by this Committee six years ago.   The recently promulgated proposed regulations severely undercut Congress' intent in the original Act and those [1988] amendments to liberalize the contracting process and to put these programs firmly in the hands of the tribes.   The proposed regulations erect a myriad of new barriers and restrictions upon contractors rather than simplifying the contracting process and freeing tribes from the yoke of excessive federal oversight and control.

S. Rep. No. 103-374 at 14.   The Senate Committee explained that, because of the agencies'

recalcitrance, its proposed 1994 ISDEAA amendments would cabin their rulemaking authority

even more than the original ISDEAA and the 1988 ISDEAA amendments had.   See S. Rep. No.

103-374 at 14:

> Section 5(1) delegates to the Secretary the authority only to promulgate implementing regulations in certain limited subject matter areas. . . .   A second key limitation on the delegation of rulemaking authority is provided in the twelve month limitation on the Secretaries' authority to promulgate the regulations.   This limit is necessary to prevent another regulation drafting process that goes on for years without satisfactory or final resolution.

S. Rep. No. 103-374 at 14.   Because of the agencies' obduracy in refusing to follow

congressional instructions to consult Tribes before proposing regulations,[58] the Senate

---

[57]Such caustic congressional condemnation of the BIA was common during the 1980s and early 1990s.   See George Pierre Castile, Taking Charge: Native American Self-Determination and Federal Indian Policy, 1975-1993, at 49-110 (2006).   The Senate Special Committee on Investigations found massive failure of the BIA to serve American Indians in 1989 and noted "at least 42 congressional investigations have recommended federal reorganization, restructuring, retinkering.   And in one nine year period alone, the BIA was actually reorganized ten times."   United States Senate, A Report of the Special Committee on Investigations of the Select Committee on Indian Affairs 15, 101st Cong., 1st Sess. (Nov. 20, 1989).

[58]It appears that the Senate Committee may have been somewhat hyperbolic when haranguing HHS and DOI for completely "disregarding" American Indian input.   S. Rep. No.

Committee explained, its proposed 1994 ISDEAA amendments also would require HHS and DOI to employ the negotiated rulemaking process, publishing a proposed rule within six months of the amendments' enactment.  See S. Rep. No. 103-374 at 14.

Having ground its ax, the Senate Committee also delved deeply into amendments that it proposed for ISDEAA § 106, which Congress had added to the ISDEAA in 1988.  See S. Rep. No. 103-374 at 8-14.  The Senate Committee proposed to amend Sections 106(a)(2) and (3) to more fully define the meaning of the term "contract support costs" to "include both funds required for administrative and other overhead expenses and 'direct' type expenses of program operation."  S. Rep. No. 103-374 at 8-9.  The Senate Committee said that, in the event that the Secretarial amount for a particular function proves to be insufficient in light of a contractor's needs for prudent management, "contract support costs are to be available to supplement such sums."  S. Rep. No. 103-374 at 9.  The Senate Committee proposed retaining the ISDEAA's process for negotiations between the agencies and Tribes for indirect cost agreements, see S. Rep. No. 103-374 at 9, but still smarting from the agencies' impenitent disregard for its earlier instructions, the Senate Committee drew a line in the sand even on these negotiations:

> Throughout this section the Committee's objective has been to assure that there is no diminution in program resources when programs, services, functions or activities are transferred to tribal operation. . . .  [If] a tribe would be compelled to divert program funds to prudently manage the contract, [it is] a result Congress has consistently sought to avoid.

---

103-374 at 14.  On at least one occasion, on September 29, 1990, President George Bush's Interior Secretary, Michael Lujan, met with nearly seven hundred Tribal leaders.  See Seth Mydans, Old Angers Still Fresh As Indians Meet Lujan, N.Y. Times, Sept. 30, 1990, available at http://www.nytimes.com/1990/09/30/us/old-angers-still-fresh-as-indians-meet-lujan.html   (last visited Oct. 21, 2016)("Old Angers").  Even at this meeting, however, DOI effectively presented the Tribal leaders with a regulatory fait accompli, eliciting strong resentment from the Tribal leaders present. Old Angers at 1 (quoting, among others, Wayne Ducheneaux, president of the National Congress of American Indians, as challenging Lujan: "You say you want consultation with the Indian tribes, but I don't think you truly want it.").

S. Rep. No. 103-374 at 9.  The Senate Committee micromanaged even further, sidestepping HHS and DOI and directing the Office of Management and Budget ("OMB") to develop new cost principles unique to Tribal organizations for HHS and DOI to apply to self-determination contracts.  See S. Rep. No. 103-374 at 10.

The Senate Committee also proposed two new ISDEAA subsections that would codify existing practice and policy, and two new subsections that would reverse existing practice.  See S. Rep. No. 103-374 at 10-12.  The first new subsection would codify "the current policy and practice regarding program income earned by a tribal organization during the course of administering a contract (such as third party income paid by insurance companies insuring persons served by a tribal organization's health program)."  S. Rep. No. 103-374 at 10.  The second new subsection would

> incorporate[] the longstanding canon of statutory interpretation that laws enacted for the benefit of Indians are to be liberally construed in their favor, and further to clarify that all functions, services, activities or programs or portions thereof, as well as all administrative functions, are contractible, as clearly provided in the Act.

S. Rep. No. 103-374 at 11.  The third new subsection would make it clear that Tribal contractors operating under self-determination contracts are "not subject to [HHS or DOI] manuals, guidelines, regulations or unpublished requirements unless expressly authorized under the [ISDEAA] or agreed to by the Contractor."  S. Rep. No. 103-374 at 12.  The fourth new subsection would permit "a unilateral modification of [a self-determination] contract when that modification only adds supplemental funding for programs or other functions that are already included in the annual funding agreement."  S. Rep. No. 103-374 at 13.

###### c.  **President Clinton's American Indian Policy**.

President William J. Clinton issued more than fifty percent more signing statements than any other President in history.  See Congressional Research Service, Presidential Signing Statements: Constitutional and Institutional Implications 5-7 (Jan. 4, 2012), available at http://fas.org/sgp/crs/natsec/RL33667.pdf (last visited Oct. 26, 2016).  His choice not to issue one on the ISDEAA amendments is therefore as notable as a dog that does not bark,[59] especially given that he wrote four other signing statements on other bills the same day that he signed the ISDEAA amendments of 1994.  See Presidential Signing Statements -- 1994, http://www .presidency.ucsb.edu/signingstatements.php?year=1994&Submit=DISPLAY    (providing    a chronological listing of every presidential signing statement from 1994).

Clinton had not been silent about American Indian self-determination, however, during the months when the 1994 ISDEAA amendments were coursing through Congress; six months before the ISDEAA amendments reached his desk, Clinton had summoned the leaders of all 547 federally recognized Tribes to the meeting on the White House lawn.  See Douglas Jehl, Clinton Meets Indians, Citing a New Respect, N.Y. Times, Apr. 30, 1994.  In his welcoming remarks to the Tribal leaders, Clinton said:

> All governments must work better.  We must simply be more responsive to the people we serve and to each other.  It's the only way we'll be able to do good things with the resources we have.  I know that you agree with that.  More and more of you are moving to assume fuller control of your governments.  Many are moving to take responsibility for operating your own programs.  Each year the

---

[59]The "dog didn't bark" canon derives from a short story from Sir Arthur Conan Doyle, in which Sherlock Holmes deduces the identity of the villain after realizing that the dog of the house did not bark when the individual came to the house.  See Sir Arthur Conan Doyle, The Adventure of Silver Blaze, The Complete Sherlock Holmes 347 (A.C. Doyle Memorial ed. 1960).   The Supreme Court repeatedly has invoked this unofficial canon of statutory construction.  See, e.g., Zuni Pub. Sch. Dist. No. 89 v. Dep't of Ed., 550 U.S. 81, 88 (2007); Scheidler v. National Organization of Women, 547 U.S. 9, 20 (2006).

> Bureau of Indian Affairs is providing more technical services and fewer direct services.
>
> One avenue for greater tribal control is through self-governance contracts. There are about 30 self-compacting tribes today. We're working with Congress to raise that number by 20 tribes every year. We'd like self-governance to become a permanent program. But we must ensure services will still be provided to the smaller tribes that do not choose to participate.

William J. Clinton, Remarks to Native American and Native Alaskan Tribal Leaders, 42 Public Papers of the Presidents of the United States PP (Apr. 29, 1994), available at http://www .presidency.ucsb.edu/ws/index.php?pid=50070&st=&st1= (last visited Oct. 26, 2016). In the memorandum that Clinton ceremoniously signed immediately after his welcoming remarks, Clinton went further: "Each executive department and agency shall take appropriate steps to remove any procedural impediments to working directly and effectively with tribal governments on activities that affect the trust property and/or governmental rights of the tribes." William J. Clinton, Memorandum on Government-to-Government Relations With Native American Tribal Governments, 42 Public Papers of the Presidents of the United States PP (Apr. 29, 1994), available at http://www.presidency.ucsb.edu/ws/index.php?pid=50064&st=&st1= (last visited Oct. 26, 2016).

At Clinton's instruction, the Departments of Justice, Interior, and Housing and Urban Development followed up on the White House meeting with a joint "National American Indian Listening Conference" in Albuquerque. Louis Sahagun, Tribal Leaders Meet, Voice Sovereignty Concerns, Los Angeles Times, at 12 (May 6, 1994)("Tribal Leaders Meet"). At that meeting, ninety federal officials, including Attorney General Janet Reno and Secretaries Bruce Babbitt and Henry Cisneros, fielded questions from more than 200 Tribal leaders to discuss how Tribes could develop their economies and social services free of the interference of federal agencies. See Tribal Leaders Meet at 12. Reno indicated that the goal of the conference was to make a

first "step toward doing away with the old, closed way of doing business."  See Tribal Leaders

Meet at 12.

## THE CURRENT ISDEAA TEXT

Although Sage Hospital and IHS entered into the disputed AFAs from FY 2009 to FY

2013, civil cases do not fall under the Ex Post Facto Clause.[60]  See Beazell v. Ohio, 269 U.S. 167

(1925).  The Court therefore applies the current ISDEAA § 450 text.  That text states as follows:

> ### §450. Congressional statement of findings
> #### (a) Findings respecting historical and special legal relationship, and resultant responsibilities
> The Congress, after careful review of the Federal Government's historical and special legal relationship with, and resulting responsibilities to, American Indian people, finds that --
>> (1) the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of

---

[60]In Beazell v. Ohio, the Supreme Court summarized the meaning of the Ex Post Facto Clause as follows:

> It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto.

269 U.S. at 169-70. The Supreme Court recently reaffirmed the limited scope of the Ex Post Facto Clause from Beazell in Collins v. Youngblood, 497 U.S. 37 (1990), where Chief Justice Rehnquist indicated:

> Although the Latin phrase "ex post facto" literally encompasses any law passed "after the fact," it has long been recognized by this Court that the constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them. . . .  The Beazell formulation is faithful to our best knowledge of the original understanding of the Ex Post Facto Clause.

497 U.S. at 41-43 (citing the Federalist Papers, the Records of the Federal Convention of 1787, Blackstone's Commentaries, and state constitutions that predated the United States Constitution).

self-government, and has denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities; and

(2) the Indian people will never surrender their desire to control their relationships both among themselves and with non-Indian governments, organizations, and persons.

**(b) Further findings**

The Congress further finds that --

(1) true self-determination in any society of people is dependent upon an educational process which will insure the development of qualified people to fulfill meaningful leadership roles;

(2) the Federal responsibility for and assistance to education of Indian children has not effected the desired level of educational achievement or created the diverse opportunities and personal satisfaction which education can and should provide; and

(3) parental and community control of the educational process is of crucial importance to the Indian people.

## §450a. Congressional declaration of policy

**(a) Recognition of obligation of United States**

The Congress hereby recognizes the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities.

**(b) Declaration of commitment**

The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.  In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities.

**(c) Declaration of national goal**

The Congress declares that a major national goal of the United States is to provide the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life areas of their choice, and to achieve the

measure of self-determination essential to their social and economic well-being.

### §450b. Definitions

For purposes of this subchapter, the term --

(a) "construction programs" means programs for the planning, design, construction, repair, improvement, and expansion of buildings or facilities, including, but not limited to, housing, law enforcement and detention facilities, sanitation and water systems, roads, schools, administration and health facilities, irrigation and agricultural work, and water conservation, flood control, or port facilities;

(b) "contract funding base" means the base level from which contract funding needs are determined, including all contract costs;

(c) "direct program costs" means costs that can be identified specifically with a particular contract objective;

(d) "Indian" means a person who is a member of an Indian tribe;

(e) "Indian tribe" means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688) [43 U.S.C. 1601 et seq.], which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians;

(f) "indirect costs" means costs incurred for a common or joint purpose benefiting more than one contract objective, or which are not readily assignable to the contract objectives specifically benefited without effort disproportionate to the results achieved;

(g) "indirect cost rate" means the rate arrived at through negotiation between an Indian tribe or tribal organization and the appropriate Federal agency;

(h) "mature contract" means a self-determination contract that has been continuously operated by a tribal organization for three or more years, and for which there are no significant and material audit exceptions in the annual financial audit of the tribal organization: *Provided*, That upon the request of a tribal organization or the tribal organization's Indian tribe for purposes of section 450f(a) of this title, a contract of the tribal organization which meets this definition shall be considered to be a mature contract;

(i) "Secretary", unless otherwise designated, means either the Secretary of Health and Human Services or the Secretary of the Interior or both;

(j) "self-determination contract" means a contract (or grant or cooperative agreement utilized under section 450e–1 of this title) entered into under part A of this subchapter between a tribal organization and the appropriate Secretary for the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law: *Provided*, That except as provided the last proviso in section 450j(a) of this title, no contract (or grant or cooperative

agreement utilized under section 450e–1 of this title) entered into under part A of this subchapter shall be construed to be a procurement contract;

(k) "State education agency" means the State board of education or other agency or officer primarily responsible for supervision by the State of public elementary and secondary schools, or, if there is no such officer or agency, an officer or agency designated by the Governor or by State law;

(l) "tribal organization" means the recognized governing body of any Indian tribe; any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum participation of Indians in all phases of its activities: *Provided*, That in any case where a contract is let or grant made to an organization to perform services benefiting more than one Indian tribe, the approval of each such Indian tribe shall be a prerequisite to the letting or making of such contract or grant; and

(m) "construction contract" means a fixed-price or cost-reimbursement self-determination contract for a construction project, except that such term does not include any contract --

>    (1) that is limited to providing planning services and construction management services (or a combination of such services);
>
>    (2) for the Housing Improvement Program or roads maintenance program of the Bureau of Indian Affairs administered by the Secretary of the Interior; or
>
>    (3) for the health facility maintenance and improvement program administered by the Secretary of Health and Human Services.

. . . .

### §450f. Self-determination contracts

**(a) Request by tribe; authorized programs**

>    (1) The Secretary is directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof, including construction programs --
>
> >    (A) provided for in the Act of April 16, 1934 (48 Stat. 596), as amended [25 U.S.C. 452 et seq.];
> >
> >    (B) which the Secretary is authorized to administer for the benefit of Indians under the Act of November 2, 1921 (42 Stat. 208) [25 U.S.C. 13], and any Act subsequent thereto;
> >
> >    (C) provided by the Secretary of Health and Human Services under the Act of August 5, 1954 (68 Stat. 674), as amended [42 U.S.C. 2001 et seq.];
> >
> >    (D) administered by the Secretary for the benefit of Indians for which appropriations are made to agencies other than

the Department of Health and Human Services or the Department of the Interior; and

(E) for the benefit of Indians because of their status as Indians without regard to the agency or office of the Department of Health and Human Services or the Department of the Interior within which it is performed.

The programs, functions, services, or activities that are contracted under this paragraph shall include administrative functions of the Department of the Interior and the Department of Health and Human Services (whichever is applicable) that support the delivery of services to Indians, including those administrative activities supportive of, but not included as part of, the service delivery programs described in this paragraph that are otherwise contractable. The administrative functions referred to in the preceding sentence shall be contractable without regard to the organizational level within the Department that carries out such functions.

(2) If so authorized by an Indian tribe under paragraph (1) of this subsection, a tribal organization may submit a proposal for a self-determination contract, or a proposal to amend or renew a self-determination contract, to the Secretary for review. Subject to the provisions of paragraph (4), the Secretary shall, within ninety days after receipt of the proposal, approve the proposal and award the contract unless the Secretary provides written notification to the applicant that contains a specific finding that clearly demonstrates that, or that is supported by a controlling legal authority that --

(A) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;

(B) adequate protection of trust resources is not assured;

(C) the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;

(D) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j–1(a) of this title; or

(E) the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities covered under paragraph (1) because the proposal includes activities that cannot lawfully be carried out by the contractor.

Notwithstanding any other provision of law, the Secretary may extend or otherwise alter the 90-day period specified in the second sentence of this subsection, if before the expiration of such period, the Secretary obtains the

- 107 -

voluntary and express written consent of the tribe or tribal organization to extend or otherwise alter such period. The contractor shall include in the proposal of the contractor the standards under which the tribal organization will operate the contracted program, service, function, or activity, including in the area of construction, provisions regarding the use of licensed and qualified architects, applicable health and safety standards, adherence to applicable Federal, State, local, or tribal building codes and engineering standards. The standards referred to in the preceding sentence shall ensure structural integrity, accountability of funds, adequate competition for subcontracting under tribal or other applicable law, the commencement, performance, and completion of the contract, adherence to project plans and specifications (including any applicable Federal construction guidelines and manuals), the use of proper materials and workmanship, necessary inspection and testing, and changes, modifications, stop work, and termination of the work when warranted.

(3) Upon the request of a tribal organization that operates two or more mature self-determination contracts, those contracts may be consolidated into one single contract.

(4) The Secretary shall approve any severable portion of a contract proposal that does not support a declination finding described in paragraph (2). If the Secretary determines under such paragraph that a contract proposal --

    (A) proposes in part to plan, conduct, or administer a program, function, service, or activity that is beyond the scope of programs covered under paragraph (1), or

    (B) proposes a level of funding that is in excess of the applicable level determined under section 450j–1(a) of this title, subject to any alteration in the scope of the proposal that the Secretary and the tribal organization agree to, the Secretary shall, as appropriate, approve such portion of the program, function, service, or activity as is authorized under paragraph (1) or approve a level of funding authorized under section 450j–1(a) of this title. If a tribal organization elects to carry out a severable portion of a contract proposal pursuant to this paragraph, subsection (b) shall only apply to the portion of the contract that is declined by the Secretary pursuant to this subsection.

**(b) Procedure upon refusal of request to contract**

Whenever the Secretary declines to enter into a self-determination contract or contracts pursuant to subsection (a) of this section, the Secretary shall --

(1) state any objections in writing to the tribal organization,

(2) provide assistance to the tribal organization to overcome the stated objections, and

(3) provide the tribal organization with a hearing on the record with the right to engage in full discovery relevant to any issue raised in the matter and the opportunity for appeal on the objections raised, under such rules and regulations as the Secretary may promulgate, except that the tribe or tribal organization may, in lieu of filing such appeal, exercise the option to initiate an action in a Federal district court and proceed directly to such court pursuant to section 450m-1(a) of this title.

**(c) Liability insurance; waiver of defense**

(1) Beginning in 1990, the Secretary shall be responsible for obtaining or providing liability insurance or equivalent coverage, on the most cost-effective basis, for Indian tribes, tribal organizations, and tribal contractors carrying out contracts, grant agreements and cooperative agreements pursuant to this subchapter. In obtaining or providing such coverage, the Secretary shall take into consideration the extent to which liability under such contracts or agreements are covered by the Federal Tort Claims Act.

(2) In obtaining or providing such coverage, the Secretary shall, to the greatest extent practicable, give a preference to coverage underwritten by Indian-owned economic enterprises as defined in section 1452 of this title, except that, for the purposes of this subsection, such enterprises may include non-profit corporations.

(3)

(A) Any policy of insurance obtained or provided by the Secretary pursuant to this subsection shall contain a provision that the insurance carrier shall waive any right it may have to raise as a defense the sovereign immunity of an Indian tribe from suit, but that such waiver shall extend only to claims the amount and nature of which are within the coverage and limits of the policy and shall not authorize or empower such insurance carrier to waive or otherwise limit the tribe's sovereign immunity outside or beyond the coverage or limits of the policy of insurance.

(B) No waiver of the sovereign immunity of an Indian tribe pursuant to this paragraph shall include a waiver to the extent of any potential liability for interest prior to judgment or for punitive damages or for any other limitation on liability imposed by the law of the State in which the alleged injury occurs.

**(d) Tribal organizations and Indian contractors deemed part of Public Health Service**

For purposes of section 233 of title 42, with respect to claims by any person, initially filed on or after December 22, 1987, whether or not such person is an Indian or Alaska Native or is served on a fee basis or under other circumstances as permitted by Federal law or regulations for personal injury, including death, resulting from the performance prior to, including, or after December 22, 1987, of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigations, or for purposes of section 2679, title 28, with respect to claims by any such person, on or after November 29, 1990, for personal injury, including death, resulting from the operation of an emergency motor vehicle, an Indian tribe, a tribal organization or Indian contractor carrying out a contract, grant agreement, or cooperative agreement under sections 450f or 450h of this title is deemed to be part of the Public Health Service in the Department of Health and Human Services while carrying out any such contract or agreement and its employees (including those acting on behalf of the organization or contractor as provided in section 2671 of title 28 and including an individual who provides health care services pursuant to a personal services contract with a tribal organization for the provision of services in any facility owned, operated, or constructed under the jurisdiction of the Indian Health Service) are deemed employees of the Service while acting within the scope of their employment in carrying out the contract or agreement: *Provided*, That such employees shall be deemed to be acting within the scope of their employment in carrying out such contract or agreement when they are required, by reason of such employment, to perform medical, surgical, dental or related functions at a facility other than the facility operated pursuant to such contract or agreement, but only if such employees are not compensated for the performance of such functions by a person or entity other than such Indian tribe, tribal organization or Indian contractor.

**(e) Burden of proof at hearing or appeal declining contract; final agency action**

(1) With respect to any hearing or appeal conducted pursuant to subsection (b)(3) or any civil action conducted pursuant to section 450m-1(a) of this title, the Secretary shall have the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof).

(2) Notwithstanding any other provision of law, a decision by an official of the Department of the Interior or the Department of Health and Human Services, as appropriate (referred to in this paragraph as the "Department") that constitutes final agency action and that relates to an appeal within the Department that is conducted under subsection (b)(3) shall be made either --

(A) by an official of the Department who holds a position at a higher organizational level within the Department than the level of the departmental agency (such as the Indian Health Service or the Bureau of Indian Affairs) in which the decision that is the subject of the appeal was made; or

(B) by an administrative judge.

. . . .

## §450h. Grants to tribal organizations or tribes

**(a) Request by tribe for contract or grant by Secretary of the Interior for improving, etc., tribal governmental, contracting, and program planning activities**

The Secretary of the Interior is authorized, upon the request of any Indian tribe (from funds appropriated for the benefit of Indians pursuant to section 13 of this title, and any Act subsequent thereto) to contract with or make a grant or grants to any tribal organization for --

(1) the strengthening or improvement of tribal government (including, but not limited to, the development, improvement, and administration of planning, financial management, or merit personnel systems; the improvement of tribally funded programs or activities; or the development, construction, improvement, maintenance, preservation, or operation of tribal facilities or resources);

(2) the planning, training, evaluation of other activities designed to improve the capacity of a tribal organization to enter into a contract or contracts pursuant to section 450f of this title and the additional costs associated with the initial years of operation under such a contract or contracts; or

(3) the acquisition of land in connection with items (1) and (2) above: *Provided*, That in the case of land within Indian country (as defined in chapter 53 of title 18) or which adjoins on at least two sides lands held in trust by the United States for the tribe or for individual Indians, the Secretary of Interior may (upon request of the tribe) acquire such land in trust for the tribe.

**(b) Grants by Secretary of Health and Human Services for development, maintenance, etc., of health facilities or services and improvement of contract capabilities implementing hospital and health facility functions**

The Secretary of Health and Human Services may, in accordance with regulations adopted pursuant to section 450k of this title, make grants to any Indian tribe or tribal organization for --

(1) the development, construction, operation, provision, or maintenance of adequate health facilities or services including the training of personnel for such work, from funds appropriated to the

Indian Health Service for Indian health services or Indian health facilities; or

(2) planning, training, evaluation or other activities designed to improve the capacity of a tribal organization to enter into a contract or contracts pursuant to section 450g of this title.

**(c) Use as matching shares for other similar Federal grant programs**

The provisions of any other Act notwithstanding, any funds made available to a tribal organization under grants pursuant to this section may be used as matching shares for any other Federal grant programs which contribute to the purposes for which grants under this section are made.

**(d) Technical assistance**

The Secretary is directed, upon the request of any tribal organization and subject to the availability of appropriations, to provide technical assistance on a nonreimbursable basis to such tribal organization --

(1) to develop any new self-determination contract authorized pursuant to this subchapter;

(2) to provide for the assumption by such tribal organization of any program, or portion thereof, provided for in section 450f(a)(1) of this title; or

(3) to develop modifications to any proposal for a self-determination contract which the Secretary has declined to approve pursuant to section 450f of this title.

**(e) Grants for technical assistance and for planning, etc., Federal programs for tribe**

The Secretary is authorized, upon the request of an Indian tribe, to make a grant to any tribal organization for --

(1) obtaining technical assistance from providers designated by the tribal organization, including tribal organizations that operate mature contracts, for the purposes of program planning and evaluation, including the development of any management systems necessary for contract management, and the development of cost allocation plans for indirect cost rates; and

(2) the planning, designing, monitoring, and evaluating of Federal programs serving the tribe, including Federal administrative functions.

. . . .

**§450j. Contract or grant provisions and administration**

**(a) Applicability of Federal contracting laws and regulations; waiver of requirements**

(1) Notwithstanding any other provision of law, subject to paragraph (3), the contracts and cooperative agreements entered into with tribal organizations pursuant to section 450f of this title shall not be subject to Federal contracting or cooperative

agreement laws (including any regulations), except to the extent that such laws expressly apply to Indian tribes.

(2) Program standards applicable to a nonconstruction self-determination contract shall be set forth in the contract proposal and the final contract of the tribe or tribal organization.

(3)

    (A) With respect to a construction contract (or a subcontract of such a construction contract), the provisions of division B (except sections 1123, 2303, 2304, and 2313) of subtitle I of title 41 and the regulations relating to acquisitions promulgated under division B (except sections 1123, 2303, 2304, and 2313) of subtitle I of title 41 shall apply only to the extent that the application of such provision to the construction contract (or subcontract) is --

        (i) necessary to ensure that the contract may be carried out in a satisfactory manner;

        (ii) directly related to the construction activity; and

        (iii) not inconsistent with this subchapter.

    (B) A list of the Federal requirements that meet the requirements of clauses (i) through (iii) of subparagraph (A) shall be included in an attachment to the contract pursuant to negotiations between the Secretary and the tribal organization.

    (C)

        (i) Except as provided in subparagraph (B), no Federal law listed in clause (ii) or any other provision of Federal law (including an Executive order) relating to acquisition by the Federal Government shall apply to a construction contract that a tribe or tribal organization enters into under this subchapter, unless expressly provided in such law.

        (ii) The laws listed in this paragraph are as follows:

            (I) Chapters 1 to 11 of title 40 and division C (except sections 3302, 3307(e), 3501(b), 3509, 3906, 4710, and 4711) of subtitle I of title 41.

            (II) Section 6101 of title 41.

            (III) Section 9(c) of the Act of Aug. 2, 1946 (60 Stat. 809, chapter 744).

            (IV) Division C (except sections 3302, 3307(e), 3501(b), 3509, 3906, 4710, and 4711) of subtitle I of title 41.

            (V) Section 13 of the Act of Oct. 3, 1944 (58 Stat. 770; chapter 479).

(VI) Chapters 21, 25, 27, 29, and 31 of title 44.

(VII) Section 3145 of title 40.

(VIII) Chapter 65 of title 41.

(IX) Chapter 67 of title 41.

(X) The Small Business Act (15 U.S.C. 631 et seq.).

(XI) Executive Order Nos. 12138, 11246, 11701 and 11758.

**(b) Payments; transfer of funds by Treasury for disbursement by tribal organization; accountability for interest accrued prior to disbursement**

Payments of any grants or under any contracts pursuant to sections 450f and 450h of this title may be made in advance or by way of reimbursement and in such installments and on such conditions as the appropriate Secretary deems necessary to carry out the purposes of this part. The transfer of funds shall be scheduled consistent with program requirements and applicable Treasury regulations, so as to minimize the time elapsing between the transfer of such funds from the United States Treasury and the disbursement thereof by the tribal organization, whether such disbursement occurs prior to or subsequent to such transfer of funds. Tribal organizations shall not be held accountable for interest earned on such funds, pending their disbursement by such organization.

**(c) Term of self-determination contracts; annual renegotiation**

(1) A self-determination contract shall be --

(A) for a term not to exceed three years in the case of other than a mature contract, unless the appropriate Secretary and the tribe agree that a longer term would be advisable, and

(B) for a definite or an indefinite term, as requested by the tribe (or, to the extent not limited by tribal resolution, by the tribal organization), in the case of a mature contract. The amounts of such contracts shall be subject to the availability of appropriations.

(2) The amounts of such contracts may be renegotiated annually to reflect changed circumstances and factors, including, but not limited to, cost increases beyond the control of the tribal organization.

**(d) Calendar year basis for contracts**

(1) Beginning in fiscal year 1990, upon the election of a tribal organization, the Secretary shall use the calendar year as the basis for any contracts or agreements under this subchapter, unless the Secretary and the Indian tribe or tribal organization agree on a different period.

(2) The Secretary shall, on or before April 1 of each year beginning in 1992, submit a report to the Congress on the amounts of any additional obligation authority needed to implement this subsection in the next following fiscal year.

` **(e) Effective date for retrocession of contract**

If an Indian tribe, or a tribal organization authorized by a tribe, requests retrocession of the appropriate Secretary for any contract or portion of a contract entered into pursuant to this subchapter, unless the tribe or tribal organization rescinds the request for retrocession, such retrocession shall become effective on --

(1) the earlier of --

(A) the date that is 1 year after the date the Indian tribe or tribal organization submits such request; or

(B) the date on which the contract expires; or

(2) such date as may be mutually agreed by the Secretary and the Indian tribe.

**(f) Use of existing school buildings, hospitals, and other facilities and equipment therein; acquisition and donation of excess or surplus Government personal property**

In connection with any self-determination contract or grant made pursuant to section 450f or 450h of this title, the appropriate Secretary may --

(1) permit an Indian tribe or tribal organization in carrying out such contract or grant, to utilize existing school buildings, hospitals, and other facilities and all equipment therein or appertaining thereto and other personal property owned by the Government within the Secretary's jurisdiction under such terms and conditions as may be agreed upon for their use and maintenance;

(2) donate to an Indian tribe or tribal organization title to any personal or real property found to be excess to the needs of the Bureau of Indian Affairs, the Indian Health Service, or the General Services Administration, except that --

(A) subject to the provisions of subparagraph (B), title to property and equipment furnished by the Federal Government for use in the performance of the contract or purchased with funds under any self-determination contract or grant agreement shall, unless otherwise requested by the tribe or tribal organization, vest in the appropriate tribe or tribal organization;

(B) if property described in subparagraph (A) has a value in excess of $5,000 at the time of the retrocession, rescission, or termination of the self-determination contract or grant agreement, at the option of the Secretary, upon the retrocession, rescission, or termination, title to such property and equipment shall revert to the Department of

- 115 -

the Interior or the Department of Health and Human Services, as appropriate; and

(C) all property referred to in subparagraph (A) shall remain eligible for replacement on the same basis as if title to such property were vested in the United States; and

(3) acquire excess or surplus Government personal or real property for donation to an Indian tribe or tribal organization if the Secretary determines the property is appropriate for use by the tribe or tribal organization for a purpose for which a self-determination contract or grant agreement is authorized under this subchapter.

**(g) Performance of personal services**

The contracts authorized under section 450f of this title and grants pursuant to section 450h of this title may include provisions for the performance of personal services which would otherwise be performed by Federal employees including, but in no way limited to, functions such as determination of eligibility of applicants for assistance, benefits, or services, and the extent or amount of such assistance, benefits, or services to be provided and the provisions of such assistance, benefits, or services, all in accordance with the terms of the contract or grant and applicable rules and regulations of the appropriate Secretary: *Provided*, That the Secretary shall not make any contract which would impair his ability to discharge his trust responsibilities to any Indian tribe or individuals.

**(h) Fair and uniform provision by tribal organization of services and assistance to covered Indians**

Contracts and grants with tribal organizations pursuant to sections 450f and 450h of this title shall include provisions to assure the fair and uniform provision by such tribal organizations of the services and assistance they provide to Indians under such contracts and grants.

**(i) Division of administration of program**

(1) If a self-determination contract requires the Secretary to divide the administration of a program that has previously been administered for the benefit of a greater number of tribes than are represented by the tribal organization that is a party to the contract, the Secretary shall take such action as may be necessary to ensure that services are provided to the tribes not served by a self-determination contract, including program redesign in consultation with the tribal organization and all affected tribes.

(2) Nothing in this part shall be construed to limit or reduce in any way the funding for any program, project, or activity serving a tribe under this or other applicable Federal law. Any tribe or tribal organization that alleges that a self-determination contract is in violation of this section may apply the provisions of section 450m–1 of this title.

- 116 -

**(j) Proposal to redesign program, activity, function, or service**

    Upon providing notice to the Secretary, a tribal organization that carries out a nonconstruction self-determination contract may propose a redesign of a program, activity, function, or service carried out by the tribal organization under the contract, including any nonstatutory program standard, in such manner as to best meet the local geographic, demographic, economic, cultural, health, and institutional needs of the Indian people and tribes served under the contract.  The Secretary shall evaluate any proposal to redesign any program, activity, function, or service provided under the contract.   With respect to declining to approve a redesigned program, activity, function, or service under this subsection, the Secretary shall apply the criteria and procedures set forth in section 450f of this title.

**(k) Access to Federal sources of supply**

    For purposes of section 501 of title 40 (relating to Federal sources of supply, including lodging providers, airlines and other transportation providers), a tribal organization carrying out a contract, grant, or cooperative agreement under this subchapter shall be deemed an executive agency and part of the Indian Health Service when carrying out such contract, grant, or agreement and the employees of the tribal organization shall be eligible to have access to such sources of supply on the same basis as employees of an executive agency have such access.  For purposes of carrying out such contract, grant, or agreement, the Secretary shall, at the request of an Indian tribe, enter into an agreement for the acquisition, on behalf of the Indian tribe, of any goods, services, or supplies available to the Secretary from the General Services Administration or other Federal agencies that are not directly available to the Indian tribe under this section or under any other Federal law, including acquisitions from prime vendors.  All such acquisitions shall be undertaken through the most efficient and speedy means practicable, including electronic ordering arrangements.

**(*l*) Lease of facility used for administration and delivery of services**

    (1) Upon the request of an Indian tribe or tribal organization, the Secretary shall enter into a lease with the Indian tribe or tribal organization that holds title to, a leasehold interest in, or a trust interest in, a facility used by the Indian tribe or tribal organization for the administration and delivery of services under this subchapter.

    (2) The Secretary shall compensate each Indian tribe or tribal organization that enters into a lease under paragraph (1) for the use of the facility leased for the purposes specified in such paragraph. Such compensation may include rent, depreciation based on the useful life of the facility, principal and interest paid or accrued,

operation and maintenance expenses, and such other reasonable expenses that the Secretary determines, by regulation, to be allowable.

**(m)  Statutory requirements; technical assistance; precontract negotiation phase; fixed price construction contract**

(1)  Each construction contract requested, approved, or awarded under this subchapter, shall be subject to --

(A) except as otherwise provided in this subchapter, the provisions of this subchapter, other than sections 450f(a)(2), 450j–1(l), 450l and 450m of this title; and

(B) section 314 of the Department of the Interior and Related Agencies Appropriations Act, 1991 (104 Stat. 1959).

(2)  In providing technical assistance to tribes and tribal organizations in the development of construction contract proposals, the Secretary shall provide, not later than 30 days after receiving a request from a tribe or tribal organization, all information available to the Secretary regarding the construction project, including construction drawings, maps, engineering reports, design reports, plans of requirements, cost estimates, environmental assessments or environmental impact reports, and archaeological reports.

(3) Prior to finalizing a construction contract proposal pursuant to section 450f(a) of this title, and upon request of the tribe or tribal organization that submits the proposal, the Secretary shall provide for a precontract negotiation phase in the development of a contract proposal.  Such phase shall include, at a minimum, the following elements:

(A) The provision of technical assistance pursuant to section 450h of this title and paragraph (2).

(B) A joint scoping session between the Secretary and the tribe or tribal organization to review all plans, specifications, engineering reports, cost estimates, and other information available to the parties, for the purpose of identifying all areas of agreement and disagreement.

(C) An opportunity for the Secretary to revise the plans, designs, or cost estimates of the Secretary in response to concerns raised, or information provided by, the tribe or tribal organization.

(D) A negotiation session during which the Secretary and the tribe or tribal organization shall seek to develop a mutually agreeable contract proposal.

(E) Upon the request of the tribe or tribal organization, the use of an alternative dispute resolution mechanism to seek resolution of all remaining areas of disagreement pursuant

to the dispute resolution provisions under subchapter IV of chapter 5 of title 5.

(F) The submission to the Secretary by the tribe or tribal organization of a final contract proposal pursuant to section 450f(a) of this title.

(4)

(A) Subject to subparagraph (B), in funding a fixed-price construction contract pursuant to section 450j-1(a) of this title, the Secretary shall provide for the following:

> (i) The reasonable costs to the tribe or tribal organization for general administration incurred in connection with the project that is the subject of the contract.

> (ii) The ability of the contractor that carries out the construction contract to make a reasonable profit, taking into consideration the risks associated with carrying out the contract and other relevant considerations.

(B) In establishing a contract budget for a construction project, the Secretary shall not be required to separately identify the components described in clauses (i) and (ii) of subparagraph (A).

(C) The total amount awarded under a construction contract shall reflect an overall fair and reasonable price to the parties, including the following costs:

> (i) The reasonable costs to the tribal organization of performing the contract, taking into consideration the terms of the contract and the requirements of this subchapter and any other applicable law.

> (ii) The costs of preparing the contract proposal and supporting cost data.

> (iii) The costs associated with auditing the general and administrative costs of the tribal organization associated with the management of the construction contract.

> (iv) In the case of a fixed-price contract, a fair profit determined by taking into consideration the relevant risks and local market conditions.

> (v) If the Secretary and the tribe or tribal organization are unable to develop a mutually agreeable construction contract proposal pursuant to the procedures set forth in this subsection, the tribe or tribal organization may submit a final contract proposal to the Secretary.  Not later than 30 days after receiving such final contract proposal, the Secretary shall approve the contract proposal and

award the contract, unless, during such period the Secretary declines the proposal pursuant to subsections (a)(2) and (b) of section 450f of this title (including providing opportunity for an appeal pursuant to section 450f(b) of this title).

**(n) Rental rates for housing for Government employees in Alaska**
Notwithstanding any other provision of law, the rental rates for housing provided to an employee by the Federal Government in Alaska pursuant to a self-determination contract shall be determined on the basis of --

(1) the reasonable value of the quarters and facilities (as such terms are defined under section 5911 of title 5) to such employee, and

(2) the circumstances under which such quarters and facilities are provided to such employee, as based on the cost of comparable private rental housing in the nearest established community with a year-round population of 1,500 or more individuals.

. . . .

### § 450j-1.  Contract funding and indirect costs.

(a) Amount of funds provided

(1) The amount of funds provided under the terms of self-determination contracts entered into pursuant to this subchapter shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract, without regard to any organizational level within the Department of the Interior or the Department of Health and Human Services, as appropriate, at which the program, function, service, or activity or portion thereof, including supportive administrative functions that are otherwise contractable, is operated.

(2) There shall be added to the amount required by paragraph (1) contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which --

(A) normally are not carried on by the respective Secretary in his direct operation of the program; or

(B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

(3)

(A) The contract support costs that are eligible costs for the purposes of receiving funding under this subchapter shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of --

(i) direct program expenses for the operation of the

- 120 -

Federal program that is the subject of the contract, and

(ii) any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract, except that such funding shall not duplicate any funding provided under subsection (a)(1).

(B) On an annual basis, during such period as a tribe or tribal organization operates a Federal program, function, service, or activity pursuant to a contract entered into under this subchapter, the tribe or tribal organization shall have the option to negotiate with the Secretary the amount of funds that the tribe or tribal organization is entitled to receive under such contract pursuant to this paragraph.

(4) For each fiscal year during which a self-determination contract is in effect, any savings attributable to the operation of a Federal program, function, service, or activity under a self-determination contract by a tribe or tribal organization (including a cost reimbursement construction contract) shall --

(A) be used to provide additional services or benefits under the contract; or

(B) be expended by the tribe or tribal organization in the succeeding fiscal year, as provided in section 13a of this title.

(5) Subject to paragraph (6), during the initial year that a self-determination contract is in effect, the amount required to be paid under paragraph (2) shall include startup costs consisting of the reasonable costs that have been incurred or will be incurred on a one-time basis pursuant to the contract necessary --

(A) to plan, prepare for, and assume operation of the program, function, service, or activity that is the subject of the contract; and

(B) to ensure compliance with the terms of the contract and prudent management.

(6) Costs incurred before the initial year that a self-determination contract is in effect may not be included in the amount required to be paid under paragraph (2) if the Secretary does not receive a written notification of the nature and extent of the costs prior to the date on which such costs are incurred.

(b) Reductions and increases in amount of funds provided.  The amount of funds required by subsection (a) --

(1) shall not be reduced to make funding available for contract monitoring or administration by the Secretary;

(2) shall not be reduced by the Secretary in subsequent years

except pursuant to --

    (A) a reduction in appropriations from the previous fiscal year for the program or function to be contracted;

    (B) a directive in the statement of the managers accompanying a conference report on an appropriation bill or continuing resolution;

    (C) a tribal authorization;

    (D) a change in the amount of pass-through funds needed under a contract; or

    (E) completion of a contracted project, activity, or program;

(3) shall not be reduced by the Secretary to pay for Federal functions, including, but not limited to, Federal pay costs, Federal employee retirement benefits, automated data processing, contract technical assistance or contract monitoring;

(4) shall not be reduced by the Secretary to pay for the costs of Federal personnel displaced by a self-determination contract; and

(5) may, at the request of the tribal organization, be increased by the Secretary if necessary to carry out this subchapter or as provided in section 450j(c) of this title.

Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

25 U.S.C. § 450.

## ANALYSIS

    The Court grants the allocation summary judgment.  The Court concludes that no genuine dispute of material fact exists between Sage Hospital and the United States on the allocation issue, and that Sage Hospital is entitled to judgment on the allocation issue as a matter of law.  See Fed. R. Civ. P. 56(c)(1).  The Court further concludes that the ISDEAA's text and the legislative history, when read together with contract provisions in the FY 2009-2013 AFAs, provide that expenditures made with third-party revenues in support of programs administered under a self-determination contract are spent on the federal program and are therefore eligible to be reimbursed as CSC without use of an allocation ratio.

The Court also grants Sage Hospital's duplication motion.  The Court concludes that no genuine dispute of material fact exists between Sage Hospital and the United States on the duplication issue and that Sage Hospital is entitled to judgment on the duplication issue as a matter of law.  See Fed. R. Civ. P. 56(c)(1).  The Court further concludes that the ISDEAA's text and legislative history requires a duplication offset in CSC only for dollars that IHS pays to Sage Hospital as part of the Secretarial amount for a given type of cost.

## I.   THE COURT GRANTS SAGE HOSPITAL SUMMARY JUDGMENT ON THE ALLOCATION ISSUE.

Rule 56(a) of the Federal Rules of Civil Procedure permits a court to grant a motion for summary judgment only if two criteria are met.  See Fed. R. Civ. P. 56(a).  First, the movant must show that there is no genuine dispute as to any material fact.  See Fed. R. Civ. P. 56(a).  Second, the movant must be entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a).

### A.   NO GENUINE DISPUTE EXISTS AS TO ANY MATERIAL FACT ON THE ALLOCATION ISSUE.

As the movant, who is also the party who will bear the burden of persuasion at trial, Sage Hospital bears the burden of showing that no genuine dispute exists as to any material fact on the allocation issue.  See Celotex Corp. v. Catrett, 477 U.S. at 331 (1986)(Brennan, J., dissenting).  As discussed in pages 2-10 supra, Sage Hospital lays out twenty-three statements of fact in its Allocation MSJ that the United States does not dispute in its Response.[61]  See Allocation MSJ at 2-11; Response at 5-7.  The United States asserts three additional facts in its Response that Sage Hospital does not dispute in its Reply.  See Response at 7-8; Reply at 1.  Because Sage Hospital does not otherwise respond to these three asserted facts, the Court deems the asserted facts undisputed.  See D.N.M. Local R. Civ. P. 56.1(a)("All material facts set forth . . . will be deemed

---

[61]Sage Hospital withdrew a twenty-fourth statement of fact -- one for which a dispute did exist -- during the hearing.  See Tr. at 95:5-19 (Miller).

undisputed unless specifically controverted.").   The Court therefore concludes that no genuine

dispute exists as to any material fact on the allocation issue.

### B.   SAGE HOSPITAL IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE ISSUE OF ALLOCATION.

Congress repeatedly has amended the ISDEAA statutory text since its enactment in 1975.

Sometimes amendment has taken place through bills focused exclusively on ISDEAA

amendments, as in 1988, 1994, and 1996.[62]   Other times amendment has taken place through

sections in related bills, as in 1988, 1990, 1991, and 1992.[63]   Yet other times, amendment has

taken place through sections of an omnibus bill, as in 1996 and 2000.[64]   The Court therefore

must engage in an analysis of interlocking statutes to assess whether funding that third parties

provide is considered part of federal programming for the purposes of reimbursement under the

ISDEAA, a necessary condition for Sage Hospital to be entitled to judgment as a matter of law

on the issue of allocation.

### 1.   Step #1: The HHS Secretary Would Not Be Required to Reduce Funding for Another Tribe if She Pays Sage Hospital the Additional CSC That It Requests.

The first step in the Court's analysis must address whether Sage Hospital's request for

additional CSC would reduce the funding for programs, projects, or activities serving another

---

[62]For the sake of clarity in this and the subsequent two footnotes, the Court includes citations for these amendments by way of a footnote rather through its typical practice of in-line citations.   For ISDEAA amendments in bills focused exclusively on the ISDEAA, see Indian Self-Determination Act Amendments of 1988, 102 Stat. 2285 (1988); Indian Self-Determination Act Amendments of 1994, 108 Stat. 4250 (1994); and Indian Self-Determination and Education Assistance Act Amendment, 110 Stat. 1320 (1996).

[63]For ISDEAA amendments in related bills, see Indian Reorganization Act Amendments, 102 Stat. 2938 (1988); Indian Law Miscellaneous Revisions, 104 Stat. 4662 (1990); Tribal Self-Governance Demonstration Project Act, 105 Stat. 1278 (1991); and Indian Health Amendments of 1992, 106 Stat. 4526 (1992).

[64]For ISDEAA amendments omnibus bills, see Omnibus Consolidated Appropriations Act, 1997, 110 Stat. 3009 (1996); and Omnibus Indian Advancement Act, 114 Stat. 2868 (2000).

Tribe or Tribal organization.   Under 25 U.S.C. § 450j-1(b)(5), such a reduction would immediately nix any other statutory requirement for IHS to fund the additional CSC for Sage Hospital: "Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter."  25 U.S.C. § 450j-1(b)(5).  In a zero-sum budgeting world, a new credit to one tribe would require an equally sized debit from another tribe.  The United States, in a footnote in its Response, suggests that such a zero-sum budgeting world exists, arguing, "IHS cannot be required to arbitrarily increase the Secretarial amount for one tribe since doing so would necessarily reduce the resources available to serve other tribes . . . to perform the transferred PFSAs . . . ."  Response at 34 n. 15.

The Supreme Court and the Tenth Circuit disagree, holding that IHS American Indian self-determination contract budgeting is not zero-sum.  In Salazar v. Ramah Navajo Chapter, 132 S. Ct. at 2184, the Supreme Court held that 25 U.S.C. § 450j-1(b)(5) underscores the HHS Secretary's discretion to allocate funds among Tribes, but that it does not alter the United States' legal obligation to reimburse Tribes for CSC they incurred in providing PFSAs, because Congress had made a lump-sum appropriation sufficient to pay any individual contractor's CSC. See 132 S. Ct. 2181, 2184 (2012).  Speaking even more clearly on this issue, the Tenth Circuit indicated in Ramah Navajo Chapter v. Salazar, 644 F.3d 1054, (10th Cir. 2011), that, even when the amount of Congress' lump-sum appropriation for CSC is insufficient to fund all ISDEAA contracts, 25 U.S.C. § 450j-1(b)(5)'s "subject to availability of appropriations" clause does not come into effect as long as IHS has sufficient funds to pay CSC on any individual contract.  644 F.3d 1054, 1073.  Affirming a case coming out of the Federal Circuit, the Supreme Court

perhaps spoke most clearly on the scope and applicability of 25 U.S.C. § 450j-1(b)(5) in 2003 when it indicated that the HHS Secretary was not excused from meeting his contractual obligation to pay a Tribal contractor for its full CSC when left-over appropriations were sufficient to pay the full CSC.  See Thompson v. Cherokee Nation of Oklahoma, 334 F.3d 1075 (Fed. Cir. 2003), affirmed and remanded 543 U.S. 631, 647 (2005).

Following the Supreme Court and Tenth Circuit's lead, the Court holds that the HHS Secretary would not be required to reduce funding for another Tribe if she pays Sage Hospital the additional CSC that it requests.  Given that no third-party funding reduction would take place, 25 U.S.C. § 450j-1(b)(5) does not come into play in this case.  The Court therefore can proceed to step two in its analysis as to whether Sage Hospital is entitled judgment as a matter of law on the issue of allocation.

> **2.      Third-party funding is part of federal programming for the purposes of reimbursement under the ISDEAA.**

Under the ISDEAA, a Tribe or Tribal organization is eligible to an IHS reimbursement of CSC only if the CSC is reasonable and supports "direct program expenses for the operation of the Federal program that is the subject of the contract."  25 U.S.C. § 450j-1(a)(3)(A).  A central point of contention with respect to the Allocation MSJ is whether funding that third parties such as Medicare, Medicaid, and private insurers provide is considered part of federal programming for the purposes of reimbursement under the ISDEAA.  The Court holds that they are part of federal programming under the terms of the FY 2009-2013 AFAs.

> **a.      The FY 2009-2013 AFAs place third-party funding within the scope of the federal program.**

Each of Sage Hospital's FY 2009-2013 AFAs with IHS uses the same language to describe the specific PFSAs that it authorizes, indicating: "Pursuant to the terms of this

Agreement, Sage is authorized to plan, conduct, operate, and administer the programs, functions, services, and activities (PFSAs) identified in Section 3 below."[65]  2009 AFA § 1; 2010 AFA § 1; 2011 AFA § 1; 2012 AFA § 1; and 2013 AFA § 1.

Section 3 in each of the FY 2009-2013 AFAs refers the reader to Appendix A, in which the contract lists nineteen different PFSAs included in each year's contract: Inpatient Services, General Ambulatory and Specialty Care Services, Emergency Department, Emergency Medical Transport, Optometry Clinic, Behavioral Health Services, Radiology, Pharmacy, Laboratory, Physical Therapy, Public Health Nursing, Employee Health Services, Health Education, Transportation Services, School Based Services, Diabetes Program, Traditional Medicine, Dental Clinic, and Podiatry Clinic.  See MSJ ¶ 8, at 4 (stating this fact).[66]  See Response ¶ 8, at 5 (not disputing this fact).  The 2009 through 2013 contracts also state:

> In addition to general descriptions of services provided above, NHF/Sage [Sage Hospital or Sage] will provide the following services, among other related services, in operating and administering the PFSAs under the ISDEAA Contract and providing health care services for eligible beneficiaries . . .
>
> 5.      Business Functions: Including, but not limited to, billing and collecting third party reimbursements, conducting utilization review, compliance activities, insurance verification, and collection activities.

Allocation MSJ ¶ 9, at 5 (stating this fact)(bracketed material added in the Allocation MSJ).  See Response ¶ 9, at 5 (not disputing this fact).

Each of the PFSAs that the FY 2009-2013 AFAs mention, as one would expect, fall

---

[65]The FY 2013 AFA reads: "Pursuant to the terms of this AFA," 2013 AFA § 1 (emphasis added), using the emphasized acronym for the Annual Funding Agreement but leaving the remainder of the text unchanged from previous years' AFAs.

[66]In its Response, the United States does not dispute this fact, but clarify that "the Fiscal Year (FY) 2009 Annual Funding Agreement (AFA) (FY 2009 AFA), also included other PFSAs such as Administrative Services, Financial Management, Human Resources, Property and Supply, Housekeeping, and Laundry.  Defendants respectfully refer the Court to the AFA for the full list [of] PFSAs."  Response ¶ 8, at 5.  Because the United States agrees that the FY 2009 AFA includes all the services that Sage Hospital lists, the Court concludes that the United States' clarification does not demonstrate a genuine issue of fact for trial under rule 56(c)(1).

under the category of American Indian healthcare services.  Each of Sage Hospital's third-party

payors -- Medicare, Medicaid, and health insurance companies[67] -- provides funding for just such

American Indian healthcare services.  Congress implicitly recognized this fact with respect to

Medicare and Medicaid when it required Tribes operating self-determination contracts to submit

claims directly to and recover directly from Medicare and Medicaid for PFSAs.  See Indian

Health Care Improvement Act § 405 ("IHCIA").   More recently, Congress reaffirmed this

position, indicating in 2010: "Health programs operated by the Indian Health Service, Indian

tribes, tribal organizations, and Urban Indian organizations . . . shall be the payer of last resort

for services provided by such Service, tribes, or organizations to individuals eligible for services

through such programs, notwithstanding any Federal, State, or local law to the contrary."

Obamacare Subtitle K, § 2901, codified at 25 U.S.C. § 1623(b).  Using the canon of statutory

construction in pari materia, which says that statutes on the same matter or subject are to be

construed together, the Court holds that the congressional intent to include Medicare and

Medicaid funding under PFSAs in the IHCIA and Obamacare suggests that Congress intended to

include them within PFSAs' scope under the ISDEAA as well.

### b.      The Indian Canon places third-party funding within the scope of the federal program.

The Indian canon provides further reason to interpret "federal programs" broadly and in

Sage Hospital's favor.  This canon requires courts to liberally construe agreements in favor of

American Indians.  See Montana v. Blackfeet Tribe, 471 U.S. 759, 766 (1985).  See generally

Philip P. Frickey at 381.  Courts are to construe treaties and other agreements as the American

---

[67]Sage Hospital noted in detail that it uses the terms "third-party revenue," "third-party collections," "program income," "Medicare," and "Medicaid interchangeably in its Allocation MSJ and Allocation Reply.  Tr. at 86:23-87:6 (Miller).  It also stated that that it would continue to use the terms interchangeably during the hearing.  See Tr. at 86:23-87:6 (Miller).

Indians who entered into the treaties or agreements would have understood them.  See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 196 (1999)("[W]e interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them.")  Any ambiguity in an agreement is to be resolved in American Indians' favor.  See, e.g., Carpenter v. Shaw, 280 U.S. 363, 367 (1930).

Normally when a court interprets a statute, it defers to an agency's interpretation of ambiguous phrases under Chevron.  Yet the Indian canon trumps Chevron deference when the two come into conflict.  See 1-2 Cohen's Handbook of Federal Indian Law (Nell Jessup Newton et al. eds., 2015 LEXIS ed.), at 2.02[3].  As the D.C. Circuit explained in Cobell v. Norton, 240 F.3d 1081 (D.C. Cir. 2001), in an opinion that Judge David Bryan Sentelle wrote and Judges Stephen Fain Williams and Judith Ann Wilson Rogers joined,

> This departure from the *Chevron* norm arise from the fact that the rule of liberally construing statutes to the benefit of the Indians arises not from ordinary exegesis, but "from principles of equitable obligations and normative rules of behavior," applicable to the trust relationship between the United States and the Native American people.

240 F.3d at 1102.  The Tenth Circuit at least twice has rejected agencies' statutory interpretations that are contrary to the Indian canon.  See Governor of Kansas v. Kempthorne, 516 F.3d 833(10th Cir. 2008)(dicta)(Indian canon trumps Chevron deference even though Chevron was not applicable in a case with competing Tribal interests); Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1461-62 (10th Cir. 1997)("Ramah").

### C.     CSC RELATED TO CONTRACTED PFSAS CANNOT BE REDUCED.

Under the ISDEAA,

> There shall be added to the amount required by paragraph (1) [for PFSAs] contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to

ensure compliance with the terms of the contract and prudent management but which --

    (A) normally are not carried on by the respective Secretary in the direct operation of the program; or

    (B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

25 U.S.C. § 450j-1(a)(2).  The ISDEAA interprets CSCs broadly, indicating that eligible costs for the purposes of reimbursement under a Tribal self-determination contract include not only "direct program expenses for the operation of the Federal program that is the subject of the contract," 25 U.S.C. § 450j-1(a)(3)(A)(i), but also "any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract," 25 U.S.C. § 450j-1(a)(3)(A)(ii).

The ISDEAA's text indicates that CSC funding shall not be reduced except in some extraordinary situations, none of which applies to this case.  See 25 U.S.C. § 450j-1(b).  The statutory text also specifically notes that the "program income earned by a tribal organization in the course of carrying out a self-determination contract . . . shall not be a basis for reducing the amount of funds otherwise obligated in the contract."  25 U.S.C. § 450j-1(m).  The legislative history of the ISDEAA's 1988 amendments, which first defined the term "contract support costs," shows that Congress was determined to counter IHS' persistent failure to provide full funding for the indirect costs associated with self-determination contracts.  During Senate committee hearings on the ISDEAA amendments, numerous Tribal leaders alleged that IHS had been shortchanging them on indirect costs.  See, e.g., 1987 Senate Committee Hearing 172 (prepared statement of United South & Eastern Tribes, Inc.)("It is very difficult not to believe that the BIA has been playing the budget cutting game largely at the expense of tribes.  For a number of years in its [budget] justification the Bureau under-estimated . . . tribal administrative

needs . . . and funded tribes for only a percentage of the indirect costs that were due them."). The Tribal witnesses said that the agencies' consistent failure to fully fund Tribal indirect costs had resulted in financial management problems for Tribes as they struggled to pay for federally mandated annual single-agency audits, liability insurance, financial management systems, personnel systems, property management and procurement systems, and other administrative requirements.  See, e.g., 1987 Senate Committee Hearing at 93-97 (prepared statement of Edward Loke Fight)(showing indirect CSC calculations and incomplete federal reimbursement for them).  Tribal witnesses indicated that their Tribes had diverted trust resources needed for community and economic development to cover these CSC.  See Standing Rock at 150.

The Senate Committee took note of these Tribal concerns and held another hearing featuring American Indian tribal leaders on September 21, 1987 -- this one to discuss proposed ISDEAA amendments.  See First Session on S. 1703 to Amend the Indian Self-Determination and Education Act: Hearing Before the S. Select Comm. on Indian Affairs, 100th Cong. (1987)("Second 1987 Senate Hearing").[68]  After eight months of working together with Tribal leaders, according to Committee Chairman Daniel K. Inouye, United States Senator from Hawaii, the Committee produced a draft bill meant to address many Tribal concerns, including:

> the need for the Bureau of Indian Affairs and the Indian Health Service to fully fund tribal indirect costs for self-determination contracts; the need for year-to-year stability of contract funding levels in order to improve planning and management of programs; clarifying that Federal acquisition regulations do not apply to self-determination contracts; . . . reducing the paperwork and reporting requirements for mature contracts; alleviating problems associated with over-recovery and under-recovery of indirect costs from Federal agencies other than the BIA and IHS . . . .

---

[68]The Senate Committee held four hearings from April 22, 1987, to Feb. 18, 1988, confusingly giving the title of "First Session" to the first three of them.  See First Session on Recommendations for Strengthening the Indian Self-Determination Act: Hearing Before the S. Comm. on Indian Affairs, 100th Cong. (1987).  The Court modifies this naming convention in the short forms to help the reader distinguish the three hearings from each other.

Second 1987 Hearing at 1-2 (1987)(statement of Hon. Daniel K. Inouye)(emphasis added). Tribal leaders indicated at that hearing that they still preferred the language of the House bill amending the ISDEAA as it related to CSC recovery:

> The second recommended change to accomplish is full recovery of costs and funding allocations. The House bill language amending the P.L. 93-638 [the ISDEAA], defining contract support costs and requiring full allocation of contract support costs, provides a more complete description of what contract funding allocations should be based upon. We would like to see that language given full consideration. . . . By including this proposed language, Tribes would receive a fair allocation of funds, irrespective of their indirect cost rates.

Second 1987 Senate Hearing at 78 (statement of Joseph B. DeLaCruz, President, Affiliated Tribes of Northwest Indians). Unless Tribes could rely on such strong statutory protection for recovery of full CSC, Tribal leaders maintained, BIA and IHS would continue to fail to provide sufficient funds to cover CSC. See Second 1987 Senate Hearing at 83 (statement of Clarence W. Skye, United Sioux Tribes of South Dakota Development Cooperation).

Taking such critiques to heart, the Senate Committee revised the amendment text yet again to be even more capacious and give greater assurances that IHS would cover Tribes' full amount of CSC and then held yet another hearing to assess whether the text then met Tribal contractors' needs. See First Session on S. 1703 to Amend the Indian Self-Determination and Education Assistance Act: Hearing Before the S. Select Comm. On Indian Affairs, 100th Cong. (1987)("Third 1987 Senate Hearing"). Both the House text and the repeated revisions to the Senate text, with each revision offering stronger protections for Tribal CSC, convinces the Court that congressional intent aligned with the ISDEAA's plain meaning rejecting IHS reductions of Tribal CSC except under very limited circumstances.

Both Sage Hospital and the Defendants agree that application of IHS' current allocation ratio for CSC would result in Sage Hospital receiving less than its total incurred CSC. Given

that the Court finds that (i) Sage Hospital's third-party funding falls within the scope of federal programming for purposes of reimbursement under the ISDEAA; and that (ii) the ISDEAA disallows CSC reductions except under a narrow set of inapplicable circumstances, the Court also finds that IHS' use of the allocation ratio violates the ISDEAA. The Court therefore grants Sage Hospital's motion for partial summary judgment on the issue of allocation.

## II.   THE COURT GRANTS SUMMARY JUDGMENT ON THE DUPLICATION ISSUE.

Rule 56(a) of the Federal Rules of Civil Procedure permits a court to grant a motion for summary judgment only if two criteria are met.  First, the movant must show that there is no genuine dispute as to any material fact.  See Fed. R. Civ. P. 56(a).  Second, the movant must be entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(a).

### A.   NO GENUINE DISPUTE EXISTS AS TO ANY MATERIAL FACT ON THE DUPLICATION ISSUE.

As the movant, who is also the party that would bear the burden of persuasion at trial, Sage Hospital bears the burden of showing that no genuine dispute exists as to any material fact on the issue of allocation.  See Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986)(Brennan, J., dissenting).[69]  Sage Hospital lays out eighteen statements of fact in its Duplication MSJ that the Defendants do not dispute in the Response.[70]  See Duplication MSJ at 2-7; Response at 3-5.  The United States asserted three additional facts in its Response that Sage Hospital does not dispute

---

[69]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States of America, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

[70]Sage Hospital withdrew a twenty-fourth statement of fact -- one for which a dispute did exist -- during the hearing.  See Tr. at 95:5-19 (Miller).

in its Reply.  See Response at 7-8; Reply at 1.  In accordance with local rules, the Court deems

the asserted facts undisputed.  See D.N.M. Local R. Civ. P. 56.1(a)("All material facts set forth .

. . will be deemed undisputed unless specifically controverted.").  The Court therefore concludes

that no genuine dispute exists as to any material fact on the duplication issue.

> **B.**     **SAGE HOSPITAL IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE DUPLICATION ISSUE.**

Congress wrote and rewrote the definitions for the Secretarial amount and CSC three

times over the course of the 1975 ISDEAA and the ISDEAA amendments in 1988 and 1994.  In

the ISDEAA's current form, the two terms are defined in 25 U.S.C. § 450j-1(a)(1)-(3).  The

Secretarial amount is:

> The amount of funds provided under the terms of self-determination contracts entered into pursuant to this subchapter [that] shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract, without regard to any organizational level within the Department of the Interior or the Department of Health and Human Services, as appropriate, at which the program, function, service, or activity or portion thereof, including supportive administrative functions that are otherwise contractable, is operated.

25 U.S.C. § 450j-1(a)(1).  Contract support costs are "added to the amount required in paragraph

(1) and:

> (2) . . . shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—
>> (A) normally are not carried on by the respective Secretary in his direct operation of the program; or
>> (B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

25 U.S.C. § 450j-1(a)(2).  The CSC that is eligible for the purposes of receiving funding under

Tribal self-determination contracts such as those that Sage Hospital and IHS entered into from

FY2009 through FY 2013

shall include the costs of reimbursing each tribal contractor for reasonable and
allowable costs of --

> (i) direct program expenses for the operation of the Federal program that is
> the subject of the contract, and
>
> (ii) any additional administrative or other expense related to the overhead
> incurred by the tribal contractor in connection with the operation of the
> Federal program, function, service, or activity pursuant to the contract,
> except that such funding shall not duplicate any funding provided under
> subsection (a)(1).

25 U.S.C. § 450j-1(a)(3).

### 1.    Three Ways Exists to Resolve the Tension Between Subsections (a)(1) and (a)(2).

Like both Sage Hospital and the Defendants, the Court recognizes that a tension can seem
to arise between subsection (a)(1) and subsection (a)(2).  Subsection (a)(1) seems to place
"supportive administrative functions that are otherwise contractable" squarely within the
Secretarial amount.  25 U.S.C. § 450j-1(a)(1).  Subsection (a)(2) indicates that "activities which
must be carried on by a tribal organization as a contractor to ensure compliance with the terms of
the contract and prudent management," also largely administrative functions, fall squarely within
CSC.  25 U.S.C. § 450j-1(a)(2).  Whether, and which, administrative functions fall into the
Secretarial amount versus CSC is a vital question with regard to the issue of duplication.

### a.    Sage Hospital proposes that the tension arises out of historical artifact and can be resolved by statutory archeology.

Sage Hospital suggests that the apparent tension between subsection (a)(1) and
subsection (a)(2) arises out of historical artifact.  See Tr. at 31:1-34:12 (Miller).  When Congress
passed the ISDEAA in 1975, subsection (a)(1) was substantially shorter than it is today, reading
as follows:

> The amount of funds provided under the terms of contracts entered into pursuant
> to sections 102 nad [sic] 103 [Tribal self-determination contracts with the
> Department of the Interior and the Department of Health, Education, and Welfare,
> respectively] shall not be less than the appropriate Secretary would have

> otherwise provided for his direct operation of the programs or portions thereof for the period covered by the contract . . . .

Pub. L. No. 93-638 § 106(h), 88 Stat. 2211-12 (1975).  When it amended the ISDEAA in 1988,

Congress added subsection (a)(2), which read as follows:

> There shall be added to the amount required by paragraph (1) contract support costs which shall consist of the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which --
>
> > (A) normally are not carried on by the respective Secretary in his direct operation of the program; or
> >
> > (B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

Pub. L. No. 100-472 § 205(2), 102 Stat. 2292 (1988).  It was not until Congress again amended

the ISDEAA in 1994 that it added the remainder of subsection (a)(1):

> The Indian Self Determination and Education Assistance Act . . . is amended . . . . in paragraph (1), by inserting before the period at the end the following: ", without regard to any organizational level within the Department of the Interior or the Department of Health and Human Services, as appropriate, at which the program, function, service, or activity or portion thereof, including supportive administrative functions that are otherwise contractable, is operated" . . . .

Pub. L. 103-413 § 102(14)(A), 108 Stat. 4257 (1994).  At the same time, Congress modified

subsection (a)(2) as well: "The Indian Self Determination and Education Assistance Act . . . is

amended . . . . in paragraph (2), by inserting after 'consist of' the following: 'an amount for . . .

.'"  Pub. L. No. 103-413 § 102(14)(B), 108 Stat. 4257 (1994).  The 1994 ISDEAA amendments

also added the current subsection (a)(3), to read as follows:

> The contract support costs that are eligible costs for the purposes of receiving funding under this Act shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of --
>
> (i) direct program expenses for the operation of the Federal program that is the subject of the contract, and

(ii) any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract, except that such funding shall not duplicate any funding provided under section 106(a)(1) [25 U.S.C. § 450j-1(a)(1).

Pub. L. No. 103-413 § 102(14)(C), 108 Stat. 4257-58 (1994).

Sage Hospital argues that Congress, by way of the 1988 ISDEAA amendments, meant for the top half of subsection (a)(1) and subsection (a)(2) to be read together.  See Tr. at 31:16-21 (Miller).  If these subsections are read together, Sage Hospital asserts, "subsection one says [to HHS] you turn over your programs . . . and subsection two says that you have to add all these overhead costs."  Tr. at 31:21-24 (Miller).  Sage Hospital further asserts that in 1994 Congress meant to pair together the second half of subsection (a)(1) and subsection (a)(3).  See Tr. at 31:25-32:2 (Miller).  Sage Hospital argues that the 1994 Congress, fully aware of extensive earlier litigation over CSC, conjoined these two new provisions to expand the CSC's definition to include "the cost of reimbursing each tribal contractor for reasonable and allowable costs, for direct program expenses for the operation of the federal program, and any additional administrative or other expense."  Tr. at 32:3-16 (Miller).

Sage Hospital maintains that it was apparent to Congress that there is an overlap in subsection (a)(1) and subsection (a)(2) with respect to administrative functions, but that Congress wanted to be doubly sure that DOI and HHS would cover all of the Tribes' administrative costs related to self-determination contracts.  See Tr. at 32:21-25 (Miller).  According to Sage Hospital, the 1994 Congress therefore erred on the side of redundancy, adding administrative costs to both the Secretarial amount under subsection (a)(1) and CSC under subsection (a)(2), tacking on new subsection (a)(3)(ii) to ensure that DOI and HHS did not

duplicate funding for the same administrative costs under both the Secretarial amount and CSC vis-à-vis any specific self-determination contract.  See Tr. at 32:21-34:12 (Miller).

Sage Hospital finds evidence for the existence of such overlap in Deputy Director Fowler's statement that the Secretarial amount and CSC "each include[] amounts for both 'direct' and 'indirect' costs . . . ."  Duplication MSJ at 20.  Moreover, Sage Hospital argues that the mere existence of the "non-duplication provision" in subsection (a)(3)(ii) is proof that administrative expenses can fall either under the Secretarial amount or under CSC, as duplication by definition could not even happen if there were such no such overlap.  Duplication Reply at 5.

> **b.**  **The United States proposes that the tension arises out of historical artifact and can be resolved by recognizing implied structural funding silos.**

The United States does not simply dismiss Sage Hospital's contention that there is some overlap between the Secretarial amount and CSC, but it says that this overlap extends only to the congressional intent behind creating each:

> Each of those amounts are [sic] defined in the ISDEAA itself, and they are generally intended to ensure that a tribal contractor will be able to assume responsibility for the Federal programs, functions, services, and activities (PFSAs) the Federal Government would have otherwise provided, without putting the tribe at a financial risk or diminishing the scope of the programs after tribal assumption.

Response at 2.  According to the United States, proper interpretation of subsections (a)(1)-(3) shows that the Secretarial amount and CSC remain "distinct forms of compensation, primarily distinguishable by the types of activities that they are intended to cover."  Response at 2.

The United States therefore proposes its own theory as to how the Court can resolve the apparent tension over administrative costs in subsection (a)(1) and subsection (a)(2).  According to the United States, the Secretarial amount in subsection (a)(1) is the only type of funding for ISDEAA contractors that Congress set forth in 1975.  See Response at 10 (citing Pub. L. No. 93-

638 § 106(h), 88 Stat. 2203, 2211-12 (1975)).  The United States asserts that agency and Tribal experience within

> the first several years of the ISDEAA contracting regime revealed that the Secretarial amount was not sufficient to meet Congress' original intent, which was to "require[] the Federal agencies to make available the same amount of funding to operate a program under contract as would have been available if the Federal Government were operating the program."

Response at 10 (quoting S. Rep. No. 100-274, at 8-9 (1988)).  In particular, the United States argues, Congress noticed that the Secretarial amount alone was proving insufficient to cover costs for certain activities that agencies do not normally perform themselves but that a Tribal contractor needed to perform for compliance and management purposes.  See Response at 10 (citing S. Rep. No. 100-274, at 9 (1988)).  It was for this reason, as the United States read legislative history, that Congress authorized a new and distinct funding category in 1988, the provision for CSC currently codified in subsection (a)(2).  See Response at 10.

The United States says that Congress intended in subsections (a)(1) and (a)(2) to erect an adamantine wall between the Secretarial amount and CSC.  See Response at 11. Under the plain meaning of the two subsections as they existed after enactment of the 1988 ISDEAA amendments, the United States argues, CSC is supplemental, "added to" the Secretarial amount. Response at 11.  The United States says that the 1994 ISDEAA amendments reinforced this distinction yet further, "strengthening the requirement that the Secretarial amount include the Government's resources for all activities it carried on in its operation of the PFSAs" even though IHS had been funding them under CSC for years.  Response at 11-12.  Moreover, the United States asserts, Congress' decision to add the second half of subsection (a)(1) in the 1994 ISDEAA amendments was meant to "disabuse any misconception that the Secretarial amount

was synonymous with direct-type costs and CSC was synonymous with indirect costs," not as Sage Hospital suggests, to muddy the distinction between the two categories.  Response at 13.

The United States proposes that the best way to understand the distinction between the Secretarial amount and CSC that Congress intended to express in the wording of subsection (a)(1) and subsection (a)(2) is to look at the activities that each category encompasses.  See Response at 13.  As the Court understands the United States' argument, foreshadowed in the Response but laid out somewhat more clearly in the hearing, the United States asserts that all activities related to a self-determination contract can be slotted into the following 2x2 grid:

|  | Normally done internally by HHS when providing services to American Indians | Not normally done internally by HHS when providing services to American Indians |
|---|---|---|
| **Direct costs, i.e. programmatic** | Secretarial amount | CSC |
| **Indirect costs, i.e. administrative, managerial, or administrative** | Secretarial amount | CSC |

**Figure 1.  United States' proposal for how to distinguish the Secretarial amount from CSC.**

Those activities that HHS normally performs internally when it administers programs benefitting American Indians always fall under the Secretarial amount, regardless whether those activities are direct (programmatic) or indirect (administrative, managerial, or administrative).   See Response at 14-15.  Meanwhile, those activities that HHS normally does not perform when it administers programs benefitting American Indians always fall under CSC, regardless of whether those activities are directly programmatic or indirectly support the PFSAs.  See Response at 15.

This "activity-based" distinction in subsection (a)(1) and subsection (a)(2) between the Secretarial amount and CSC, according to the United States, is the best possible resolution of the tension between the two subsections based on two established canons of statutory construction.

First, the Whole Act Rule canon says that when a certain term or phrase is used multiple times throughout a statute, the term should be interpreted in a consistent manner, because courts should assume that legislatures draft statutes in a way that is "internally consistent in its use of language and in the way that its provisions work together."  William N. Eskridge, Jr., Philip P. Frickey & Elizabeth Garrett, Cases and Materials on Legislation: Statutes and the Creation of Public Policy 830 (3d. ed. 2001)("Eskridge").  The United States argues that the term "contract support costs" is used multiple times throughout the ISDEAA as amended and that every use of the term except in subsection (a)(2) clearly distinguishes CSC from the Secretarial amount based on the activity involved.  Response at 16.  Second, the Rule to Avoid Surplusage is based on the principle that each word or phrase in the statute is meaningful and useful, and that a court should avoid any interpretation that would render a word or phrase redundant or meaningless.  See Eskridge at 833.  If Congress meant for the distinction between the Secretarial amount and CSC to be squishy or inconsistent, the United States argues, every ISDEAA header or section that refers to CSC would be surplus.  See Tr. at 53:13-20 (Court)(Wolak).

> **c.**   **The Court uncovers a third theory that proposes that the tension arose out of historical artifact and can be resolved through canons of statutory construction, reference to legislative history, and the theory of universals.**

A third way to resolve the apparent tension between subsection (a)(1) and subsection (a)(2), as the Court sees it, borrows from both Sage Hospital and the United States' positions and rests in between them.  This third theory accepts, as the United States' proposes, that there is a meaningful distinction between the Secretarial amount and CSC as captured in the United States' 2x2 matrix in figure 1 supra.  Even accepting this starting point, however, this theory comes to Sage Hospital's conclusion that in certain cases the same administrative functions legitimately can fall into either the Secretarial amount or CSC because of (i) the ISDEAA's use of the word

"normally" in subsection (a)(2)(A); and (ii) the difference between categorical and individual activities.

### i.  Congress Used the Word "Normally" When It Defined CSC.

According to the United States, subsection (a)(1) and subsection (a)(2) deal exclusively with the Secretarial amount and CSC, respectively.  See Response at 10-11.   If this observation is true, then the word "normally" in subsection (a)(2)(A) suddenly assumes great importance:

> There shall be added to the amount required by [subsection (a)(1)] contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which --
>
> > (A) normally are not carried on by the respective Secretary in his direct operation of the program . . . .

25 U.S.C. § 450j-1(a)(2) (emphasis added).  The Court sees two intents that Congress may have had for using the word "normally" in this subsection.

The first possible intent is retrospective; Congress may have recognized and intended to endorse a preexisting tendency at DOI of making the categories of the Secretarial amount and CSC porous when this redounded to Tribal contractors' benefit.  This interpretation would seem to conform to the praise that DOI received in the 1988 Senate Committee Report for such a practice between 1975 and 1988, when DOI supported CSC through a budget line item even in the absence of explicit congressional authorization.  See S. Rep. No. 100-393 (1987), at 4.  The second possible intent is prospective; Congress may have intended to preserve agency discretion to keep a door in the wall between the Secretarial amount and CSC, allowing some activities to be added to the Secretarial program either over time or in specific circumstances.   Either interpretation of the word "normally" suggests that the wall between the Secretarial amount and

CSC is not as solid as the United States suggests, even if the Court accepts the United States' starting point.

                **ii.     Congress Likely Used the Word "Activity" to Refer to Individuations of Each Activity Rather Than Categorical Activities.**

Congress used the word "activity" in subsection (a)(1) and subsection (a)(3), while it used the plural form "activities" in subsection (a)(2).  25 U.S.C. §§ 450j-1(a)(1)-(3).  Some might dismiss this difference, but the Court first must apply the canon of meaningful variation to assess if there are any plausible grounds for the alternation between the singular and the plural. See, e.g., United States House of Representatives, House Legislative Counsel's Manual on Drafting Style (1995) § 201, at 9-10, available at legcounsel.house.gov/HOLC/Drafting _Legislation/draftstyle.pdf (last visited November 1, 2016).[71]  The canon that every word is to be given effect -- verba cum effectu sunt accipienda -- likewise counsels the Court to examine Congress' lexical choices in these provisions.  See Antonin Scalia & Bryan A. Garner, Reading Law at 174.   The concept of individuation not only provides plausible grounds for the alternation, but also conforms to legislative history and avoids surplusage.

In mainstream Western philosophy, objects have both form and individuation.  See, e.g., Plato, Theaetetus 184-86 (M.J. Levett trans., Hackett Classics ed. 1992); Aristotle, 6 Metaphysics 1016b31-2 (Hugh Tredennick trans., Loeb Classical Library ed. 1933); Immanuel

---

[71]Section 201 of the House Manual cites the "doctrine that variations within a law are designed to convey meaning"-- a way of phrasing the canons of consistent usage and meaningful variation -- as the reason to employ a uniform drafting style.  House Manual § 201, at 9-10. More bluntly, Section 105 of the Senate Manual states that "[a] court presumes that different words have different meanings" and "that every word is there for a reason."  Senate Legislative Drafting Manual, § 105, at 6.   See generally BJ Ard, Comment, Interpreting by the Book: Legislative Drafting Manuals and Statutory Interpretation, 120 Yale L.J. 185, 200 (2010) ("Drafting manuals provide the shared stylistic framework that OLC and Hill staffers employ to draft a bill, making the manuals particularly credible for establishing the context in which a statute should be read.")

Kant, Critique of Pure Reason 66 (Norman Kemp Smith trans., 2d ed. 2007).  The form allows people to place many individual and slightly different items into a categorical universal.  For example, there can be a category of objects called "chairs" even though individual chairs are crafted out of many different materials, are many different colors, and assume many different shapes.  The greatest value of the universal is that it serves as a cognitive and linguistic heuristic, allowing a person to impose order upon and simplify the external world and then communicate efficiently with others, all while retaining an ability to point out individual members of a group when this task is required.

The Court finds evidence that Congress was striking at this difference between the categorical and the individual when it alternated between the plural and the singular in subsections (a)(1)-(3).  When Congress passed the ISDEAA in 1975, legislative intent was to actualize the paradigm shift first enunciated in Nixon's 1970 Message to Congress, shifting entire activity and program categories from IHS to Tribes in pursuit of a general policy of American Indian self-determination.  See S. Rep. No. 93-682, at 1-2; Nixon's Special Message to Congress § 3.  When Congress discovered before the 1988 ISDEAA amendments that this general policy was failing to achieve its potential because individual activities needed to support each larger categorical activity were not being paid, Congress added subsection (a)(2) to extend reimbursement coverage for all such individual supportive activities under CSC.  See S. Rep. No. 100-274 at 33-34.  When Congress later added subsection (a)(3) and the second half of subsection (a)(1) in 1994, it reverted to the singular in both subsections, the first of which describes the Secretarial amount and the second of which ties CSC to the Secretarial amount.  See Pub. L. No. 103-413 §102(14), 108 Stat. 4257-58 (1994), codified at 25 U.S.C. § 450j-1(a)(1) & (a)(3).

The implications of such a linguistic shift are clear.  If Congress made such a distinction between form and individuation in subsections (a)(1)-(3), then CSC simply consists of all activities that, when combined as a category, support a general program activity that a Tribe's self-determination contract with IHS places under a specific program category.  This interpretation leaves the differences between the Secretarial amount and CSC intact, but not divided as starkly as the United States proposes.  Between 1988 and 1994, IHS' interpretation that Congress intended the Secretarial amount and CSC to be completely separate may have been viable.  Since Congress added subsection (a)(3)(A)(ii) in 1994, however, IHS' interpretation seems no longer to reflect either the statute's language or legislative intent as reflected in the legislative history.

This distinction between form and individuation of activities for purposes of the duplication provision reconciles subsection (a)(1) and subsection (a)(2) without violence to the statute's plain language, avoids surplusage, eliminates statutory ambiguity, satisfies the canon of meaningful variation, and conforms to the weight of legislative history.  Moreover, the distinction seems to conform to IHS' usual stance when Tribal contracts are not brought to litigation.  When IHS applies its 80/20 rule to determine duplication offsets, it does not use a categorical approach, but instead looks at specific activities that are duplicated.  Furthermore, the United States admitted during the hearing that no one knows what individual activities the Secretarial amount covers, suggesting either that subsection (a)(1) is categorical, or that the wall between the Secretarial amount and CSC is porous.  See Tr. at 68:6-23 (Grohman).  Last, the United States enters into contract negotiations with Tribal contractors to resolve what expenses

will fall into the Secretarial amount versus CSC, again implying that the two expense categories are not as siloed as the United States argues they are.  See Tr. at 70:3-7 (Wolak).[72]

Combined with Congress' use of the word "normally" in subsection (a)(2)(A), the Court concludes that this distinction provides an opening for the same administrative functions to fall within either the Secretarial amount or CSC.  Accordingly, it resolves the tension between subsection (a)(1) and subsection (a)(2) more satisfactorily than the resolutions that Sage Hospital and the United States propose.  The Court adopts this third way of resolving the tension.

### 2.    Sage Hospital's Interpretation of Duplication Under 25 U.S.C. § 450j-1(a)(3)(a)(ii) Conforms to the Statutory Text and Legislative Intent.

Congress added the ISDEAA's non-duplication provision in 1994.  See Indian Self-Determination Act Amendments of 1994 § 102(14), Pub. L. 103-413, 108 Stat. 4257-58 (1994), codified at 25 U.S.C. § 450j-1(a)(3)(A).  The provision indicates:

> The contract support costs that are eligible costs for the purposes of receiving funding under this subchapter shall include the costs of reimbursing each tribal contractor for reasonable and allowable costs of -- . . . (ii) any additional administrative or other expenses related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract, except that such funding shall not duplicate any funding provided under subsection (a)(1) of this section.

25 U.S.C. § 450j-1(a)(3)(A).

Sage Hospital argues that 25 U.S.C. § 450j-1(a)(3)(A)(ii) calls for dollar-for-dollar offsets when a Tribe submits reimbursements for the same activities under both CSC and the Secretarial amount.  See Duplication MSJ at 15.  The United States makes a more detailed

---

[72]At the end of the hearing, the United States partially backtracked on its prior repeated admission that IHS does not know what expenses fall into the Secretarial amount versus into CSC.  See Tr. at 73:16-74:22 (Jamison).  It is not clear to the Court how IHS would happen to the subdivision in this specific case now that it has reached litigation when it (i) did not know the subdivision at the time when the contracts were entered; and (ii) does not know the subdivision in Tribal self-determination contracts in general.  The United States did not unravel this paradox at the hearing.

argument, proposing a four-part test for determining which of Sage Hospital's submitted CSC expenses duplicate expenses already funded under the Secretarial amount.  See Tr. at 66:1-67:23 (Wolak).  First, the United States says, the duplication test would indicate that duplicate funds are those cost categories that Sage Hospital claims but that IHS normally funds through the Secretarial amount.  See Tr. at 66:1-7 (Wolak).  According to the United States, this categorical approach should completely avoid duplication.  See Tr. at 66:7-11 (Wolak).  Second, the United States says, the duplication test would exclude from CSC all costs that are not necessary for contract compliance.  See Tr. at 66:15-22 (Wolak).  Third, the United States says, remaining costs would be analyzed to determine whether they are necessary for prudent management of the related PFSA.  See Tr. at 67:4-16 (Wolak).  Fourth, the United States says, any CSC claim that made it through the first three sieves would be evaluated for reasonableness, benchmarking prices against prevailing market rates so that IHS is not paying, for example, twenty-five dollars for a needle.  See Tr. at 67:19-23 (Wolak).

Sage Hospital rejects the United States' interpretation of the ISDEAA duplication provision, maintaining that such an interpretation allows for "fantasy duplication," in which IHS can deny Sage Hospital's CSC claims merely because IHS "normally" funds such costs under the Secretarial amount.  Tr. at 41:8-18 (Miller). In other words, Sage Hospital argues, the United States' interpretation of the duplication provision would allow IHS to deny any CSC claim that it theoretically might have funded under the Secretarial amount even if IHS never funded it.  See Tr. at 41:8-18 (Miller).

The Court concludes that the ISDEAA's plain language allows for either Sage Hospital's or the United States' interpretation of the short duplication provision in subsection (a)(3)(A)(ii). The Court also concludes, however, that neither Sage Hospital's proposal nor the United States'

interpretation matches the legislative intent behind the duplication provision.  In 1988 and 1994, Congress repeatedly emphasized that it wished to expand CSC, and to make it easier for Tribes to claim and be awarded CSC, rejecting IHS' practice of so narrowly construing CSC that Tribes oftentimes had to dig into their programmatic funding to defray administrative expenses that IHS failed to pay.  See, e.g., S. Rep. No. 103-374, at 9 (1994), Cf. 25 U.S.C. § 450k(a)(prohibiting the HHS Secretary from promulgating any regulation or imposing any nonregulatory requirement on a Tribal self-determination contract outside of narrow exceptions).  At the same time, however, both Congresses acknowledged a need to ensure that budgetary controls were in place to prevent Tribes from submitting the same expenses for reimbursement twice under the Secretarial amount and CSC.  See S. Rep. No. 103-374, at 8 (1994).

One canon of statutory construction calls upon courts to interpret a given statutory provision in light of how Congress has amended it or failed to amend it in response to existing administrative interpretations of that provision.  See William N. Eskridge, Jr., Interpreting Legislative Inaction, 87 Mich. L. Rev. 67, 67 (1988).  Applying that canon to the 1994 ISDEAA amendments that added the duplication provision to the ISDEAA, the Court recognizes that Congress was rejecting IHS' existing narrow construction of CSC in favor of increasing Tribal access to CSC.  The Court finds Sage Hospital's argument convincing that allowing IHS to claim duplication offsets exclusively on a theory that the relevant expenses hypothetically could have been paid under the Secretarial amount is incongruous with such demonstrated legislative intent and has no basis in the statutory text.  The United States' repeated admission during the hearing that it does not know what costs fall into the Secretarial amount fortifies the Court's conclusion on this point, because this lack of knowledge would leave no check on IHS' ability to claim without proof that any specific CSC claim duplicates a cost within the Secretarial amount's black

box.  The Indian canon likewise strengthens the Court's confidence in this conclusion, as that canon -- as adopted in the ISDEAA as a provision in the self-determination model contract -- requires courts to interpret all ISDEAA provisions in the light most favorable to Tribal contractors.  See 25 U.S.C. § 450*l*(c).

The Court also concludes, however, that the second through fourth steps of the duplication analysis that the United States proposes conform to the ISDEAA's plain language. Any CSC claim that is not necessary for contract compliance or for prudent management of the self-determination contract or that is unreasonable is not reimbursable under subsection (a)(2)'s plain meaning: "There shall be added to the amount required by paragraph (1) contract support costs which shall consist of an amount for the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management . . . ."  25 U.S.C. § 450j-1(a)(2)(emphases added).  Sage Hospital does not disagree with the United States and the Court that such parameters impose legitimate limits on CSC claim reimbursement.  See Tr. at 56: 21-57:14 (Miller).

**IT IS ORDERED** that: (i) the Plaintiff's Motion for Partial Summary Judgment on the Issue of Allocation, filed August 1, 2016 (Doc. 199) is granted; and (ii) the Plaintiff's Motion for Partial Summary Judgment on the Issue of Duplication, filed August 1, 2016 (Doc. 200) is granted.  The Court holds that expenditures made with third-party revenues in support of programs administered under a Tribal self-determination contract are spent on the federal program, and therefore the Court orders IHS to reimburse Sage Hospital, without application of an allocation ratio, for Sage Hospital's claimed CSC that consists of reasonable costs for activities Sage Hospital must carry on as a contractor to ensure compliance with the terms of the 2009-2013 AFAs and prudent management.  The Court further orders that IHS reimburse Sage

Hospital for all CSC activities that are reasonable costs for activities Sage Hospital must carry on as a contractor to ensure compliance with the terms of the 2009-2013 AFAs and prudent management without applying a duplication offset for any individual activity unless IHS already paid for that specific, individuated activity under the Secretarial amount.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Paul E. Frye
Frye Law Firm
Albuquerque, New Mexico

-- and --

Stephen D. Hoffman
Lewis Brisbois Bisgarrd & Smith, LLP
Phoenix, Arizona

-- and --

Lloyd B. Miller
Sonosky, Chambers, Sachse,
   Miller, & Munson, LLP
Anchorage, Alaska

   *Attorneys for the Plaintiff*

Damon P. Martinez
   United States Attorney
Karen F. Grohman
   Assistant United States Attorney
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

-- and --

Benjamin C. Mizer
  Principal Deputy Assistant Attorney General
Robert E. Kirshman, Jr.
  Director
Steven J. Gillingham
  Assistant Director
Devin Wolak
Russell J. Upton
  Trial Attorneys
United States Department of Justice
Washington, D.C.

*Attorneys for the Defendants*