### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEW MEXICO

NAVAJO HEALTH FOUNDATION -- SAGE
MEMORIAL HOSPITAL, INC,

       Plaintiff,

vs.                                          No. CIV 14-0958 JB/GBW

SYLVIA MATHEWS BURWELL,
SECRETARY OF THE UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; MARY SMITH, ACTING
DIRECTOR OF INDIAN HEALTH
SERVICES; DOUGLAS GENE PETER., M.D.,
ACTING AREA DIRECTOR, NAVAJO AREA
INDIAN HEALTH SERVICE; and
MARGARET SHIRLEY-DAMON,
CONTRACTING OFFICER, NAVAJO AREA
INDIAN HEALTH SERVICE,

       Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Summary Judgment on the Issue of Liability on Its Sixth Claim for Relief (Unlawful Declination of Proposed FY 2016 AFA), filed July 29, 2016 (Doc. 196)(" MSJ"). The Court held a hearing on September 16, 2016. The primary issues are: (i) whether the Defendants (collectively the "United States") unlawfully declined to approve Plaintiff Navajo Health Foundation -- Sage Memorial Hospital's proposed successor fiscal year ("FY") 2016 Annual Funding Agreement ("AFA"); and (ii) whether, if IHS unlawfully declined the FY 2016 AFA, the Court should order the United States to pay Sage Hospital the funds IHS allegedly owes it under the FY 2016 AFA.

## FACTUAL BACKGROUND

"Sage is a Navajo tribal organization for purposes of contracting with the Indian Health Service (IHS) under the Indian Self-Determination and Education Assistance Act (ISDEA), 25 U.S.C. §§ 450, 450a *et seq*., that operates a health care facility in Ganado, Arizona, within the exterior boundaries of the Navajo Reservation." MSJ ¶ 1, at 3 (stating this fact)(internal quotation marks omitted).  See Response to Plaintiff's Motion for Summary Judgment on the Issue of Liability on Its Sixth Claim for Relief (Unlawful Declination of Proposed FY 2016 AFA) ¶ 1, at 1, filed August 15, 2016 (Doc. 210)("Response")(not disputing this fact).  "IHS is an agency within the United States Department of Health and Human Services ("HHS") and is responsible for providing federal health services to American Indians and Alaska Natives."  MSJ ¶ 2, at 4 (stating this fact).  See Response ¶ 2, at 1 (not disputing this fact).  "Defendant Burwell is the Secretary of HHS and has ultimate responsibility for carrying out all the functions, authorities, and duties of HHS including contracting on behalf of the United States with Indian tribal organizations under the ISDEA to provide health care to Native Americans."  MSJ ¶ 3, at 4 (stating this fact).  See Response ¶ 3, at 1 (not disputing this fact).

> Defendant Smith, substituted for Defendant [Yvette] Roubideaux under Fed. R. Civ. P. 25(d), is the Acting Director of the IHS and has the overall responsibility for carrying out all the functions, authorities, and duties of the IHS within HHS regarding contracting with Indian tribal organizations under the ISDEA to provide health care to Native Americans.

MSJ ¶ 4, at 4 (stating this fact).  See Response ¶ 4, at 1 (not disputing this fact).[1]

---

[1] The United States does not dispute this fact, but it clarifies that Mary Smith is the IHS Principal Deputy Director and that the position of IHS Director "is currently vacant."  Response ¶ 4, at 4-5.  Smith serves as IHS Principal Deputy Director as of November 19, 2016.  See Indian Health Service: Key Leaders, https://www.ihs.gov/aboutihs/keyleaders/ (last visited November 19, 2016).  Because the United States lists a different job title but does not dispute the scope of Smith's authorities, the Court concludes that the United States' clarification does not raise a genuine issue of fact for trial under rule 56(c)(1) of the Federal Rules of Civil Procedure.

Defendant Peter, substituted for Defendant Hubbard under *Fed. R. Civ. P.* 25(d), is the Acting Area Director of the Navajo Area IHS ("NAIHS") and has the responsibility for carrying out all the functions, authorities, and duties of the IHS within the Navajo Nation, including such functions, authorities, and duties delegated to him regarding contracting with Indian tribal organizations under the ISDEA.

MSJ ¶ 5, at 4-5 (stating this fact).  <u>See</u> Response ¶ 5, at 2 (not disputing this fact).[2]

Defendant Shirley-Damon, substituted for Defendant Dayish under *Fed. R. Civ. P.* 25(d), is the Contracting Officer for the NAIHS and is responsible for ISDEA contracts and funding agreements for IHS programs, functions, services, and activities ("PFSAs") undertaken by ISDEA contractors within the Navajo Area IHS, including Sage.  Dayish has the authority to sign ISDEA contracts and funding agreements with Sage for such IHS programs and to award funds pursuant to those agreements.

[2]The United States does not dispute this fact, but it notes that "the current Acting Area Director for the Navajo Area Indian Health Service is Mr. Floyd Thompson."  Response ¶ 5, at 2. Leadership Directories and Thompson's LinkedIn page indicate that Thompson's current title is either "Executive Director" of the Navajo Area IHS or "Executive Officer" of the Navajo Area IHS.   Floyd  Thompson,  https://www.linkedin.com/in/floyd-thompson-4540843b (last visited November 19, 2016); Leadership Directories, http://www.leadershipdirectories.com/profiles /Floyd-Thompson-Executive-Officer-Navajo-Area-Indian-Health-S.htm (last visited November 19, 2016) ("Leadership Directories").  Leadership Directories' job entry last was updated on June 29, 2016, suggesting that Thompson held the title "Executive Director" before Sage Hospital filed the MSJ exactly one month later.  <u>See</u> Leadership Directories.  Both Sage Hospital and the United States, therefore, appear to apply an erroneous job title to Thompson, but neither disputes the duties attached to the position.  The Court therefore concludes that the United States' clarification does not raise a genuine issue of fact for trial under rule 56(c)(1) of the Federal Rules of Civil Procedure.

Sage Hospital identifies Dr. Douglas Gene Peter as the Acting Area Director of the Navajo Area.  <u>See</u> MSJ ¶ 5, at 4.  The United States identifies Thompson as the Acting Area Director of the Navajo Area.  <u>See</u> Response ¶ 5, at 2.   The IHS website indicates that Peter is the Acting Area Director and that Thompson is the IHS Agency Lead Negotiator who represents the IHS Area Director during negotiations with Tribes over self-determination contracts.  <u>Compare</u> Indian Health Service: Key Leaders, https://www.ihs.gov/aboutihs/includes/themes/newihstheme /.../DouglasGenePeter.pdf (last visited Nov. 19, 2016), <u>with</u> Indian Health Service, Agency Lead Negotiators,  https://www.ihs.gov/selfgovernance/agencyleadsnegotiators/?mobileFormat=true (last visited Nov. 19, 2016).  The Court notes that these job titles are incongruous with job titles listed on LinkedIn and in the Leadership Directory.  The Navajo Area IHS does not list its leadership.  <u>See</u> Indian Health Service: Navajo Area, https://www.ihs.gov/navajo/ (last visited Nov. 19, 2016).  Because Sage Hospital and the United States dispute job titles but not the duties attached to those titles and positions, the Court concludes that no genuine issue of fact for trial exists under rule 56(c)(1) of the Federal Rules of Civil Procedure.

MSJ ¶ 6, at 5 (stating this fact).  See Response ¶, at 2 (not disputing this fact).

"Effective in 2009 Sage contracted with IHS under the ISDEA."  MSJ ¶ 7, at 5 (stating this fact).  See Response ¶ 7, at 2 (not disputing this fact).  "Sage and IHS extended the 2009 contract without interruption for successive years, through September 30, 2013." MSJ ¶ 8, at 5 (stating this fact).  See Response ¶ 8, at 2 (not disputing this fact).  "This Court deemed Defendants to have approved (a) Sage's proposed three-year contract renewal for FY 2014-2016, (b) Sage's proposed three-year contract renewal for FY2015-2017, (c) Sage's proposed successor FY 2014 AFA, and (d) Sage's proposed FY 2015AFA, and ruled that Sage's proposals must be fully funded as proposed by Sage." MSJ ¶ 9, at 5 (stating this fact).  See Response ¶ 9, at 2 (not disputing this fact).

"Sage submitted its Proposed 2016 AFA (at issue in this motion) by letter dated May 28, 2015."  MSJ ¶ 10, at 5-6 (stating this fact).  See Response ¶ 10, at 2 (not disputing this fact).

> Such Proposed 2016 AFA was submitted in redline form, showing all the differences between it and the FY 2015 AFA that this Court held was deemed approved by Defendants in the Opinion. Those differences are confined to changes to the applicable years, non-substantive updates on pages 1 and 6 of the proposed AFA (Doc. 175-2 at 8, 13) and a change to the signature line of the agreement with the Gallup Regional Supply Service Center to reflect the replacement of former Sage CEO Ahmad Razaghi with current CEO Christi El-Meligi (Doc. 175-2 at 27).

MSJ ¶ 11, at 6 (stating this fact).  See Response ¶ 11, at 2 (not disputing this fact).  "The Proposed 2016 AFA seeks the same amount of funding as approved under the FY 2015 AFA." MSJ ¶ 12, at 6 (stating this fact).  See Response ¶ 12, at 2 (not disputing this fact).  "The Proposed 2016 AFA proposes to continue the same PFSAs as approved under the FY 2015 AFA." MSJ ¶ 13, at 6 (stating this fact).  See Response ¶ 13, at 2 (not disputing this fact).

"On October 26, 2015, the Navajo Area Indian Health Service (NAIHS) declined Sage's proposed FY 2016 AFA." Response at 2 (stating this fact).[3]   "NAIHS fully declined Sage's proposal for two reasons: (1) because "the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory"; and (2) because "the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract."   Response at 2 (stating this fact).[4]

> The NAIHS also partially declined Sage's proposal for three reasons: (1) because $8,760,323 of the proposed funding for the Secretarial amount was "in excess of the applicable funding level for the contract, as determined under [25 U.S.C. § 450j-1(a)] . . . ; (2) because the proposed funding amounts were not supported by the statutory requirements that apply to CSC amounts paid under the ISDEAA and, therefore, were "in excess of the applicable funding level . . . ; and (3) to the extent that the declined portion of the Secretarial amount had an impact on Sage's CSC calculations, because such CSC amounts are "in excess of the applicable funding level" to which Sage is entitled . . . .

Response at 2-3 (stating this fact).[5]

---

[3]Under local rule 56.1(b), the Reply

> must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact. All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M. Local R. Civ. P. 56.1(b). Because Sage Hospital does not respond in its Reply to the United States' asserted fact, the Court deems the asserted fact undisputed.

[4]Under local rule 56.1(b), the Reply

> must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact. All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M. Local R. Civ. P. 56.1(b). Because Sage Hospital does not respond in its Reply to the United States' asserted fact, the Court deems the asserted fact undisputed.

[5] Under local rule 56.1(b), the Reply

## PROCEDURAL HISTORY

Sage Hospital moves for summary judgment on the issue of liability on its Sixth Claim for Relief, which alleges that the Indian Health Service unlawfully declined to approve Sage Hospital's proposed 2016 AFA.  See MSJ at 1.  In an earlier opinion, the Court granted Sage Hospital summary judgment on its first three claims for relief, ruling that: (i) the United States unlawfully declined Sage Hospital's proposed three-year renewal contracts for FY 2014-2016 and for FY 2015-2017; (ii) the United States unlawfully declined Sage Hospital's proposed successor FY 2014 and 2015 AFAs; (iii) the United States had deemed these contracts and AFAs approved; and (iv) the United States should fully fund the contracts and AFAs.  See Memorandum Opinion and Order, No. CIV 14-0958 JB/GBW 55-91, filed August 31, 2015 (Doc. 96).  The Court recounts prior proceedings insofar as they are directly relevant to the current MSJ.

### 1.    The Plaintiff's Motion for Summary Judgment on its First Three Claims for Relief.

On June 1, 2015, Sage Hospital moved the Court for summary judgment on its first three claims for relief.  See Plaintiff's Motion for Summary Judgment on Its First Three Claims for Relief, With Memorandum of Supporting Points and Authorities, filed June 1, 2015 (Doc. 68)("Motion").  The Motion addressed five issues.  First, Sage Hospital said that, under the law-

---

must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection.  Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact.  All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

D.N.M. Local R. Civ. P. 56.1(b).  Because Sage Hospital does not respond in its Reply to the United States' asserted fact, the Court deems the asserted fact undisputed.

of-the-case doctrine, the Court's holdings in Sage "'govern the same issues in subsequent phases

of the same case.'"  Motion at 17 (quoting Mocek v. City of Albuquerque, 3 F. Supp. 1002, 1046

(D.N.M. 2014)(Browning, J.)).  Sage Hospital noted that, among other things, the Court decided

several legal issues of significance to the Motion:

> First, the Court determined that Defendants may not lawfully decline a proposed
> contract renewal "'where no material and substantial change to the scope or
> funding of a program, functions, services, or activities has been proposed by
> the . . . tribal organization'" and that Defendants may not lawfully decline a
> proposed successor AFA if it is "'substantially the same' as its predecessor."  Id.
> at *34 (quoting 25 C.F.R. §§ 900.33, 900.32).  Second, this Court ruled that a
> determination of whether a proposed contract renewal has any material and
> substantial changes and whether a proposed successor AFA is substantially the
> same as the prior AFA must be determined within the "four corners" of the
> contracts and AFAs.  Id. at *51, *54; see id. at *50 (whether Secretary may apply
> declination criteria to proposed successor AFA "turns on the proposal's contents
> rather than on a holistic assessment of the . . . tribal organization's performance of
> the existing AFA . . ."); *54 (IHS authority to decline contract renewal proposal is
> "strictly limited to the contract renewal proposal's contents").  Third, if the
> Secretary can decline only a portion of a contract proposal, she must approve all
> other severable portions of the proposal.  Id. at *34 (citing 25 C.F.R. § 900.25).
> Fourth, the prior decision found that, even assuming arguendo that the
> Declination Criteria applied, neither the Moss Adams Audit nor the IHS
> Performance Monitoring report provided any evidence to establish that Sage
> violated any federal regulations regarding program compliance necessary to
> support either of the two criteria invoked by IHS in its Declination.  This Court
> reiterated that the Secretary bears the burden to show the propriety of any
> declination by clear and convincing evidence.  Id. at *60.

Motion at 20-21.

Second, Sage Hospital argued that the ISDEAA required HHS to approve and fully fund

the 2013 Renewal and the 2014 AFA.  See Motion at 16-19.  Sage Hospital explained that the

HHS Secretary must fully fund a contract renewal proposal if "'no material and substantial

change to the scope or funding of a program, function, services, or activities [PFSAs] has been

proposed by the tribal organization.'"  Motion at 16 (alterations in Motion but not in quoted

source)(quoting 25 C.F.R. § 900.33)(citing Sage, 2015 WL 1906107, at *34, *54 (holding that

the HHS Secretary's authority to decline a contract proposal is "strictly limited to the contract renewal proposal's contents")).  Sage Hospital said that, because the 2013 Renewal proposed no changes to Sage Hospital's PFSAs or budget, HHS was legally required to award and fully fund it.  See Motion at 22 (citing Sage, 2015 WL 1096107, at *53 ("The 2013 Renewal proposes only minor amendments to update the 2013 Renewal for a new three-year term and to fix a few typographical errors.  The 2013 Renewal offers no modifications to the provisions of the 2010 Contract that speak to the scope and funding of Sage Hospital's PFSAs.")).

Sage Hospital argued that, similarly, the HHS Secretary must approve and fully fund a proposed successor AFA that is "'substantially the same'" as its predecessor.  Motion at 22 (quoting 25 C.F.R. § 900.32)(citing Sage, 2015 WL 1906107, at *34, *51 (holding that the HHS Secretary should determine if the declination criteria apply based on the information within the "four corners" of the AFA documents)).  Sage Hospital explained that the 2013 AFA "was automatically amended, without an additional writing, to reflect any additional funding."  Motion at 23.  Sage Hospital asserted that, because the 2014 AFA was substantially the same as the 2013 AFA, the ISDEAA required HHS to provide $20,116,437.00 in funding to Sage Hospital for FY 2014.  See Motion at 24.

Third, Sage Hospital maintained that the ISDEAA required HHS to approve and fully fund the 2014 Renewal and the 2015 AFA.  See Motion at 25.  Sage Hospital asserted that its second proposed three-year contract renewal -- under which the HHS would fund Sage Hospital through September 30, 2017 -- proposed no changes to Sage Hospital's PFSAs.  See Motion at 25.  Sage Hospital contended that, accordingly, HHS must approve and fully fund it.  See Motion at 25 (citing 25 C.F.R. § 900.33; Sage, 2015 WL 1906107, at *54 (explaining that the HHS Secretary's authority to decline a contract proposal is "strictly limited to the contract proposal's

contents")).  Sage Hospital then turned to the 2015 AFA and said that, although HHS "ha[d] not

argued that Sage's proposed 2015 AFA is not substantially the same as the prior 2014 or 2013

AFA," the Court observed in the Sage opinion that the proposed 2015 AFA was 55% more than

the funding specified in the 2013 AFA -- which, in the Court's view, "suggests that the 2015

AFA is not substantially the same as the 2013 AFA.'"  Motion at 26-27 (quoting Sage, 2015 WL

1906107, at *39).

Sage Hospital contended that, even if the proposed 2015 AFA is not substantially the

same as the 2013 AFA and HHS could apply the ISDEAA's declination criteria to it, HHS "must

invoke the particular criterion or criteria that she can justify with clear and convincing evidence."

Motion at 27 (citing Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d 1059, 1068

(D.S.D. 2007)("Simply reciting the declination criteria is absolutely insufficient.  The law

requires a detailed explanation of the Secretary's rationale for his decision and a disclosure of the

facts or documents on which he relied for his decision.")).  Sage Hospital asserted that the IHS

declined to enter into the proposed 2015 AFA, "'for the same reasons IHS declined [Sage's]

August 23, 2013 Proposal, as articulated in IHS's [1st Declination].'"  Motion at 27 (first

alteration in Motion but not in quoted source)(quoting 2d Declination at 11).  Sage Hospital

explained that the 1st Declination, in turn, invoked two of the ISDEAA's declination criteria:

(i) "'the service to be rendered to the Indian beneficiaries of the particular program or function to

be contracted will not be satisfactory'"; and (ii) "'the proposed project or function to be

contracted for cannot be properly completed or maintained by the proposed contract.'"  Motion

at 28 (quoting 1st Declination at 3-4).  Sage Hospital contended that IHS "did not even mention

the only declination criterion that could arguably support its present litigation position": that the

"'amount of funds proposed under the contract is in excess of the applicable funding level for the contract.'"  Motion at 28 (quoting 25 U.S.C. § 450f(a)(2)).

Sage Hospital maintained that the ISDEAA's regulations prescribe the steps which the HHS Secretary must take to properly decline a proposed AFA:

> The procedures in subpart E require the Secretary to make her declination within 90 days of her receipt of the proposal, 25 C.F.R. § 900.21; advise the tribal organization in writing of the Secretary's objections and include a specific finding that clearly demonstrates that the basis for declination exists in that 90-day period, and provide any documents relied on in making that decision, 25 C.F.R. § 900.29; and offer technical assistance to the tribal organization to overcome the stated objection, 25 C.F.R. § 900.30.

Motion at 28-29.  Sage Hospital asserted that Burwell "did none of this" in declining the proposed 2015 AFA.  Motion at 29.  Sage Hospital argued that the Court therefore should reverse the 2d Declination and compel Burwell to accept the 2015 AFA, and to "add to the contract the full amount proposed, i.e., $32,614,916."  Motion at 29.

Fourth, Sage Hospital argued that both the 1st Declination and the 2d Declination "are illegal for IHS' failure to provide technical assistance."  Motion at 29 (capitalization and bolding omitted).  Sage Hospital said that this violation "provides an independent ground for reversing the declinations" of the 2013 Renewal, the 2014 AFA, the 2014 Renewal, and the 2015 AFA. Motion at 30 (citing Sage, 2015 WL 1906107, at *34 (stating that, if the HHS Secretary declines a contract proposal, he or she must "provide assistance to the . . . tribal organization to overcome the stated objections"); Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d at 1068; 25 C.F.R. § 900.33).  Sage Hospital asserted that "this basis for invalidating the Secretary's actions depends on whether the Secretary could substantiate any such objections and prove them by clear and convincing evidence."  Motion at 30.

Fifth, and finally, Sage Hospital asked the Court to schedule a hearing on damages.  <u>See</u> Motion at 30.  Sage Hospital pointed out that the preliminary injunction which was in place at that time provided only prospective relief to Sage Hospital.  <u>See</u> Motion at 30.  Sage Hospital asserted that the ISDEAA provided a remedy in "'money damages'" for Sage Hospital's lost revenue.  Motion at 31 (quoting <u>Sage</u>, 2015 WL 1906107, at *36).  Sage Hospital also noted that it had incurred other damages which HHS' unlawful declination decisions caused, "including additional insurance costs, costs for pharmaceutical supplies, and employee turnover."  Motion at 31 (citations omitted).  Sage Hospital said that the ISDEAA permitted the award of consequential damages, "including lost third-party reimbursements and intangible damages."  Motion at 31 (citing <u>Ramah Navajo Sch. Bd., Inc. v. Leavitt</u>, No. CIV 07-0289 MV/SMV, Memorandum Opinion and Order at 61-72, filed May 9, 2013 (D.N.M.)(Vazquez, J.)(Doc. 143)).  Sage Hospital said that the Court therefore should set a hearing on the issue of damages.  <u>See</u> Motion at 31.

## 2.  <u>The June 2015 Response</u>.

Sylvia Mathews Burwell et al. (collectively the "Defendants") responded to the Motion on July 6, 2015.  <u>See</u> Defendants' Response to Plaintiff's Motion for Summary Judgment on Its First Three Claims for Relief, filed July 6, 2015 (Doc. 80)("June 2015 Response").  The June 2015 Response attacked the Motion on five grounds.  First, the Defendants contended that Sage Hospital incorrectly argued that the Court's holdings in the <u>Sage</u> opinion govern the Court's resolution of the Motion.  <u>See</u> June 2015 Response at 7 (citing Motion at 12).  The Defendants argued that the "'district courts generally remain free to reconsider their earlier interlocutory orders.  In fact, in the Tenth Circuit, law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another.'"

Response at 7 (quoting <u>Mocek v. City of Albuquerque</u>, 3 F. Supp. 3d at 1046)(emphasis omitted).

Second, the Defendants contended that, in the <u>Sage</u> opinion, the Court improperly had held that the canon of construction under which courts interpret ambiguous statutes and regulations in favor of American Indian tribes and tribal organizations trumped the deference typically afforded to an agency's interpretation of its own regulations under <u>Auer v. Robbins</u>, 519 U.S. 452 (1997)("<u>Auer</u>").  June 2015 Response at 7-8 (citing <u>Sage</u>, 2015 WL 1906107, at *36, *48).   According to the Defendants, the Court then improperly had held that HHS' interpretation of 25 C.F.R. §§ 900.32 and 900.33 -- which allowed the Defendants to look beyond the four corners of Sage Hospital's contract proposals to determine whether they were "substantially the same" as their predecessors -- was not persuasive.  June 2015 Response at 7-9 (citing <u>Mashantucket Pequot Tribal Nation v. IHS</u>, DHHS Departmental Appeals Board, Appellate Division, No. A-06-60, Decision No. 2028, 2006 WL 1337419 (May 3, 2006)("<u>Pequot</u>")).  The Defendants asserted that the canon of Indian deference "'is inapplicable when the competing interests at stake both involve Native Americans.'"  June 2015 Response at 8 (quoting <u>Cherokee Nation of Okla. v. Norton</u>, 241 F. Supp. 2d 1374, 1380 (N.D. Okla. 2002)(citing <u>United States v. Jicarilla Apache Nation</u>, 131 S. Ct. 2313, 2328 (2011)("The Government may also face conflicting obligations to different tribes or individual Indians."); <u>N. Cheyenne Tribe v. Hollowbreast</u>, 425 U.S. 649, 655 n.7 (1976))("[This] canon has no application here; the contesting parties are an Indian tribe and a class of individuals consisting primarily of tribal members."); <u>Chugach Alaska Corp. v. Lujan</u>, 915 F.2d 454, 457 n.4 (9th Cir. 1990)("[T]he question here is not whether to favor Native Americans but which Native Americans to favor.")).

The Defendants explained that,

as the Court has found, investigation of Sage's finances by the Navajo Area Indian Health Service (NAIHS) came about due to concerns within the Navajo Nation that Sage was misusing funding meant to protect its citizens' health. As a news article reported, "the Ganado Chapter of the Navajo Nation passed a resolution requesting that 'Mr. Ahman [sic] Razaghi, Chief Executive Officer of Sage Memorial Hospital be terminated and immediately escorted off the Navajo Nation land.'" This resolution was, according to the article, spurred by complaints of former Navajo employees of Sage who discovered financial discrepancies and voiced concerns that Sage was diverting money that should otherwise have been applied toward patient care. As this Court found, "[o]n October 16, 2013, Jonathan Hale -- the Chairman of the Health, Education and Human Services Committee of the Navajo Nation Council -- wrote a letter to the former HHS Secretary -- Kathleen Sebelius -- voicing a number of concerns about Sage Hospital." Specifically, Mr. Hale was concerned "that, without a thorough investigation, 'the Navajo Nation cannot be assured that funds designated for the health of its people are being properly managed.'" Accordingly, Mr. Hale requested NAIHS to conduct a performance monitoring review of Sage, which ultimately led to the declination decisions at issue in this case.

June 2015 Response at 8-9 (citations omitted). The Defendants argued that, because the interests of the Navajo nation and its members are at stake in this case, resolving it "is not a simple matter of deferring to a tribal organization's litigation position over a federal agency's interpretation of its own regulation." June 2015 Response at 9. The Defendants asserted that the canon of Indian deference thus did not apply, and that HHS' interpretation of §§ 900.32 and 900.33 should control "unless it is plainly erroneous or inconsistent with the regulation." June 2015 Response at 9 (citing Utah v. Babbitt, 53 F.3d 1145, 1150 (10th Cir. 1995); Auer, 519 U.S. at 461).

Third, the Defendants asked the Court to revisit its holding in the Sage opinion that IHS' "offer of technical assistance in the second declination letter was an 'empty gesture.'" June 2015 Response at 10 (quoting Sage, 2015 WL 1906017, at *15 n.19). The Defendants contended that the language in the 2d Declination was standard and "used by IHS in most declinations." June 2015 Response at 10. The Defendants added that, although the Court faulted IHS for putting "'the onus on Sage Hospital to identify what assistance it needed,' the ISDEAA and its regulations in fact do place the onus on the tribal organization to identify what assistance is

- 13 -

needed." June 2015 Response at 10 (emphasis in original). According to the Defendants, the ISDEAA required them to provide technical assistance to Sage Hospital only "'upon the request of any tribal organization and subject to the availability of appropriations.'" June 2015 Response at 10 (quoting 25 U.S.C. § 450h(d)(3))(citing 25 C.F.R. § 900.28 (describing the HHS Secretary's duty as providing "any necessary requested technical assistance" to avoid declination); 25 C.F.R. § 900.30 (same)). The Defendants asserted that "IHS will provide Sage with technical assistance at Sage's request," which complied fully with the ISDEAA. June 2015 Response at 11.

Fourth, the Defendants argued that, even if the declinations violated the ISDEAA, the Court should not deem Sage Hospital's contract proposals accepted. See June 2015 Response at 11. According to the Defendants, the ISDEAA provides that, upon receiving a contract proposal, the HHS Secretary "'shall approve the proposal and award the contract,' unless she issues a declination letter within 90 days of [receiving] the proposal." June 2015 Response at 11 (quoting 25 U.S.C. § 450f(a)(2)). The Defendants asserted that the ISDEAA "is therefore very specific that the Secretary must decline a proposal within 90 days; if she does not, the contract must be awarded." June 2015 Response at 11. The Defendants contended that similar language "is decidedly absent from the other provisions of law that Sage Hospital claims were violated in this case" -- for example, the requirement to provide technical assistance and the ISDEAA's prohibition of applying the Declination criteria to contract proposals which are substantially the same as their predecessors. June 2015 Response at 11 (citing 25 U.S.C. § 450f(b)(2); 25 C.F.R. §§ 900.32-.33). The Defendants asserted that "[t]his absence is telling" and that, "[p]articularly where the consequences are so severe (i.e., deemed approval of a contract), this Court should not read such penalties into the ISDEAA." June 2015 Response at 11-12.

Fifth, the Defendants challenged Sage Hospital's assertion that the ISDEAA requires them to fully fund Sage Hospital's contract proposals. See June 2015 Response at 11. The Defendants pointed out that, when a contract proposal is deemed approved under the ISDEAA, the HHS Secretary must "'add to the contract the full amount of funds pursuant to section 106(a) of the Act.'" June 2015 Response at 12 (quoting 25 C.F.R. § 900.18). The Defendants said that section 106, in turn, provides that the amount of funds under an ISDEAA contract "'shall not be less than the appropriate Secretary otherwise would have provided for the operation of the programs or portions thereof for the period covered by the contract'" -- i.e., the Secretarial amount. June 2015 Response at 12 (quoting 25 U.S.C. § 450j-1(a)(1)). The Defendants asserted that Sage Hospital's contract proposals "do not necessarily reflect that amount; the Secretary still has to review the proposal and determine the appropriate level of funding." June 2015 Response at 12. The Defendants contended:

> Thus, the remedy for violating the provisions in 25 C.F.R. §§ 900.32 and 900.33 should not be that Sage's proposals are deemed accepted. The most Sage is entitled to on the strength of the Court's April 9 findings is an order requiring the Secretary to review Sage's proposals and fund them according to ISDEAA Section 106(a) within 90 days of the date of the order. The Court could also order the parties to return to the negotiating table and attempt to reach an agreement on the amount of funding Sage receives under Section 106(a). Likewise, the remedy for violating the technical assistance requirement should be an order requiring the Secretary to comply with the statute, i.e., provide Sage with technical assistance to overcome the stated objections.

June 2015 Response at 12. The Defendants added that the ISDEAA does not require the HHS Secretary to provide Sage Hospital the higher funding levels set forth in the proposed 2015 AFA. See June 2015 Response at 13. The Defendants asserted that Sage Hospital's request for a permanent injunction ordering them to fully fund the proposed 2015 AFA "is akin to a request for mandamus, which is only available if there is a clear statutory command to perform a certain action." June 2015 Response at 13 (citing Carpet, Linoleum & Resilient Tile Layers v. Brown,

656 F.2d 564, 566 (10th Cir. 1982)).  The Defendants contended that, although the Sage opinion

"arguably found that there is a statutory command" to enter into a contract with Sage Hospital,

"there is no parallel command to fund the contract to the full extent requested by Sage."  June

2015 Response at 13.  The Defendants also noted that, if Sage Hospital were to win summary

judgment on Count I -- which sought to impose a three-year contract that would expire in 2016 --

then Count II -- which sought to impose a three-year contract that would expire in 2017 -- would

be moot, because granting both requests would result in overlapping contracts.  See June 2015

Response at 13.

      Sixth, the Defendants argued that, if the Court were to deem all of Sage Hospital's

contract proposals approved, it should not order the Defendants to fund the 2015 AFA to the full

extent requested.  See June 2015 Response at 14.  The Defendants said that, as the Court had

noted, the 2015 AFA asked for substantially more funding than either the 2013 AFA or the 2014

AFA.  See June 2015 Response at 14.  The Defendants argued that an AFA is not substantially

the same as its predecessor when it contains a "'different proposed funding amount.'"  June 2015

Response at 14 (quoting 25 C.F.R. § 900.32).  The Defendants asserted that, accordingly, the

portion of the 2015 AFA that requested funding in excess of the 2013 AFA was subject to the

ISDEAA's declination criteria.  See June 2015 Response at 14.

      In response to Sage Hospital's argument that HHS "'failed to predicate the declination of

the proposed 2015 AFA on the basis that it sought a different funding amount,'" the Defendants

argued that Sage Hospital "confuses the regulations, which explain when declination criteria may

be invoked, with the declination criteria themselves."  June 2015 Response at 14-15 (quoting

Motion at 29).  The Defendants asserted that

> § 900.29 requires the Secretary "[t]o advise the Indian tribe or tribal organization
> in writing of the Secretary's objections, including a specific finding that clearly

demonstrates that (or that is supported by a controlling legal authority that) one of the conditions set forth in § 900.22 exists." Section 900.22, in turn, is the list of substantive declination criteria; it is not the limitations on using those criteria set forth in 25 C.F.R. § 900.32. The fact that the declination letter did not cite § 900.32 is therefore irrelevant.

June 2015 Response at 15.

The Defendants contended that Sage Hospital's argument that the Court must approve the 2015 AFA, because Burwell did not furnish a decision on it within ninety days of receiving it, is "factually untrue." June 2015 Response at 15. The Defendants pointed out that Sage Hospital submitted the proposed 2015 AFA on September 19, 2014, and IHS issued the 2d Declination on December 12, 2014 -- eighty-four days later. See June 2015 Response at 15. The Defendants also attacked Sage Hospital's argument that the 2d Declination violated the ISDEAA because it did not "invoke valid, applicable declination criteria, and did not offer technical assistance." June 2015 Response at 15. The Defendants asserted that the sole basis for this argument was the Sage opinion, which consisted of preliminary findings only and listed a number of categories of evidence that the Defendants could present which might change the Court's mind on those preliminary findings. See June 2015 Response at 15 (citing Sage, 2015 WL 1906017, at *58-60). The Defendants argued that they would present that evidence "in a full hearing on the merits of its declination proposal after completion of discovery." June 2015 Response at 15 (citing Sage, 2015 WL 1906017, at *40 (describing in detail the typical procedure in these cases -- for example, holding a series of hearings and a six-day trial); Declaration of Angela M. Belgrove (dated July 6, 2015) ¶¶ 18-19, at 6, filed July 6, 2015 (Doc. 80-2)("Belgrove Decl.")).

The Defendants contended that an assumption underlying Sage Hospital's argument "seems to be that the Secretary not only had to explain her declination decision and set forth reasons, but also . . . support that decision by clear and convincing evidence." June 2015

Response at 16 (internal quotation marks omitted).  The Defendants asserted that the ISDEAA "disproves that assumption," because it requires only that a declination letter "'contain[] a specific finding that clearly demonstrates that' one or more declination criteria are applicable." June 2015 Response at 17 (alterations in Response but not quoted source)(quoting 25 U.S.C. § 450f(a)(2)).  The Defendants maintained that the 2d Declination contained "highly specific findings invoking applicable criteria"; it was not also required to demonstrate those findings with clear and convincing evidence.  June 2015 Response at 17.  The Defendants urged that the ISDEAA imposes the clear and convincing evidence standard "in the course of subsequent litigation, not the declination process."  June 2015 Response at 17.  The Defendants argued that HHS is entitled to take discovery and justify its declination decision with evidence at a full hearing.  See June 2015 Response at 17.  The Defendants contended that the Motion therefore was premature and that the Court should either deny it or defer ruling on it until after discovery and trial.  See June 2015 Response at 17.

Seventh, and finally, the Defendants said that they did not oppose Sage Hospital's request for a hearing on the issue of damages so long as it occurs after the completion of discovery and "after the entry of final judgment on the declination decision."  June 2015 Response at 17.  The Defendants argued that, at this point, Sage Hospital's purported damages "are supported by conclusory, untested affidavits."  June 2015 Response at 17.  The Defendants maintained that they were entitled to take the affiants' depositions and request all relevant documents.  See June 2015 Response at 17.  They added that delaying a decision on damages until the trial date scheduled at that time for early April 2015 would not prejudice Sage Hospital, because it would continue to receive roughly $1.5 million in funding per month until trial.  See June 2015 Response at 17.

3.      **The July 2015 Reply**.

Sage Hospital replied to the Response on July 20, 2015.  See Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Summary Judgment on its First Three Claims for Relief, filed July 20, 2015 (Doc. 85)("July 2015 Reply").  Sage Hospital reiterated that the Sage opinion resolved many of the legal disputes that the Defendants raised in the June 2015 Response.  See July 2015 Reply at 7.  Sage Hospital contended that the law-of-the-case doctrine posits that, "'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  July 2015 Reply at 9 (quoting United States v. Monsisvais, 946 F.2d 114, 115 (10th Cir. 1991)).  Sage Hospital argued that the Defendants had not provided any proper justification for the Court to revise its rulings in the Sage opinion.  See July 2015 Reply at 9.

Sage Hospital said that the Defendants' main argument -- which was that the Indian canon does not apply in this case and that the Court instead should defer to HHS' interpretation of the ISDEAA's regulations -- is "erroneous."  July 2015 Reply at 10.  Sage Hospital explained that this dispute is between IHS and Sage Hospital, and no other tribal interests are involved. See July 2015 Reply at 5.  According to Sage Hospital, IHS "satisfied the request of Navajo Nation Council delegate Hale to investigate Sage's finances, and there is no indication that the Navajo Nation has lingering concerns."  July 2015 Reply at 5 (citing Declaration of Alton Joe Shepherd (dated Feb. 6, 2015), filed February 11, 2015 (Doc. 41-4)("Shepherd Decl."); Declaration of Kee Allen Begay, Jr. (dated Feb. 6, 2015), filed February 11, 2015 (Doc. 41-4)("Begay Decl."); Declaration of Lee Jack, Sr. (dated Feb. 6, 2015), filed February 11, 2015 (Doc. 41-4)("Jack Decl."); Declaration of Raymond Smith Jr. (dated Feb. 6, 2015), filed February 11, 2015 (Doc. 41-4)("Smith Decl.")).  Sage Hospital contends that IHS "essentially

posits that any dispute over money involving a tribal organization that is not universally esteemed or any dispute with IHS that threatens a reduction of funding for other tribal organizations pits Indian against Indian."  July 2015 Reply at 10 (citing Response at 8-9).  Sage Hospital argued that, if the Defendants were correct, the Indian canon would be "rendered largely nugatory" in declination disputes with the IHS, contrary to Congress' intent and Tenth Circuit law.  July 2015 Reply at 10 (citing Sage, 2015 WL 1906107, at *36-37).

Sage argued that the Court's interpretation of §§ 900.32 and 900.33 in the Sage opinion not only properly applied the Indian canon, but also was consistent with the ISDEAA, the ISDEAA's implementing regulations, and Sage Hospital's ISDEAA contract.  See July 2015 Reply at 10 (citing 25 U.S.C. § 450l(c)("Each provision of the Indian Self-Determination and Education Assistance Act . . . and each provision of this Contract shall be liberally construed for the benefit of the Contractor to transfer the funding and the following related functions, services, activities, and programs . . . ."); 2010 Contract at 14 (providing a similar provision); 25 C.F.R. § 900.3(a)(5)("Congress has further declared that each provision of the Act and each provision of contracts entered into thereunder shall be liberally construed for the benefit of the tribes or tribal organizations to transfer the funding and the related functions, services, activities, and programs . . . ."); 25 C.F.R. § 900.3(b)(11)).  Sage Hospital said that "[t]here is simply no basis for IHS' contention that th[e] Court erred in not deferring to . . . an unpublished administrative decision in a case distinguishable in several major respects."  July 2015 Reply at 11 (citing Sage, 2015 WL 1906107, at *46-52 & n.26).

Next, Sage Hospital challenged the Defendants' assertion that ordering the Defendants to approve and fund the 2013 Renewal and the 2014 AFA would moot Sage Hospital's request that the Court order the Defendants to approve and fund the 2014 Renewal and the 2015 AFA.  See

- 20 -

July 2015 Reply at 11.  According to Sage Hospital, "[s]tandard principles of contract law . . . dictate otherwise."  July 2015 Reply at 12 (citation and internal quotation marks omitted).  Sage argued that, "'[w]hen two parties execute a second contract that deals with the same subject matter as the first, the two contracts must be interpreted together; insofar as the contracts are inconsistent, the later one prevails.'"  July 2015 Reply at 12 (quoting K & V Sci. Co., Inc. v. BMW, 164 F. Supp. 2d 1260, 1263 (D.N.M. 2011)(Black, J.), rev'd on other grounds, 314 F.3d 494 (10th Cir. 2002)).  Sage Hospital said that, in New Mexico, this concept is known as the merger doctrine.  See July 2015 Reply at 12 (citing K & V Sci. Co., Inc. v. BMW, 164 F. Supp. 2d at 1263 n.2).  Sage Hospital asserted that, accordingly, if the Court were to order the Defendants "to execute the first contract renewal, that contract will be merged into the second renewal proposal, with the net effect of extending the contract an additional year (through September 30, 2017) and establishing the funding for FY 2015 at $32,614,916."  July 2015 Reply at 12 (citing Mobil Oil Expl. & Producing S.E., Inc. v. United States, 530 U.S. 604, 607-08 (2000)(explaining that, when the United States enters into contracts, the law applicable to contracts between private individuals generally governs the United States' rights and duties)).

Sage Hospital reiterated that Burwell did not validly decline the proposed 2014 Renewal and the 2015 AFA within ninety days of their submission.  See July 2015 Reply at 12-13.  Sage Hospital said that, once it filed the 2014 Renewal and the 2015 AFA, IHS had ninety days to decline them "to the extent the proposed funding is 'in excess of the applicable funding level for the contract'" as determined under § 450j-1(a) of the ISDEA.  July 2015 Reply at 14 (citations omitted)(quoting 25 U.S.C. § 450f(a)(2)(D)).  Sage Hospital argued that IHS did not cite that criterion for declining the proposals, but instead invoked the same inapposite reasons for declining the 2014 Renewal and the 2015 AFA as it did for the 2013 Renewal and the 2014

AFA.  See July 2015 Reply at 14 (citing 2d Declination at 13-16; Sage, 2015 WL 1906107, at

*54).  Sage Hospital asserted that, if HHS believed the amount of funds Sage Hospital sought

were excessive, it had the ability and the duty to invoke -- within the ninety-day period which the

ISDEAA prescribes -- the one declination criterion that would apply: Sage Hospital's contract

proposal was in excess of the applicable funding level.  See July 2015 Reply at 14 (citing Seneca

Nation of Indians v. HHS, 945 F. Supp. 2d 135, 150 (D.D.C. 2013)).  Sage Hospital contended

that, in Seneca Nation of Indians v. HHS, the

> Seneca Nation had proposed an increase of $3,774,392 over the $7,802,211 that it
> had been awarded the year before, a 48% increase.  945 F. Supp. 2d at 137-39.
> Much as IHS argues here, IHS argued in Seneca that the tribe should not get a
> "windfall" due to a "procedural technicality," id. at 150; that such "windfall"
> would come at the expense of other tribal organizations, id. at 151; that the court
> should get into the weeds on the validity of the tribe's calculations, id. at 151-52;
> and that the court should "evaluate the bargain the parties have struck through
> their Contract and operation of law," id. at 151-52.  The Seneca court rejected all
> of those arguments, ruling that the propriety of the tribe's increased funding
> request "is a matter properly addressed through contract negotiations or through
> declination of the proposed amendment pursuant to 25 U.S.C. § 450f(a)(2) if the
> Secretary truly believed the amount was unsupported."  Id. at 152.  In ruling the
> tribe's contract approved at the higher funding level as proposed, the court
> rejected the "Secretary's argument that she was not obligated to give a timely
> response of the precise type of response articulated by the statute," i.e., the one
> declination criterion specifically addressed to the funding level.  Id. at 150
> (emphasis added).

July 2015 Reply at 14-15.  Sage Hospital says that other decisions are in accord.  See July 2015

Reply at 15 (citing Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d at 1068;

Maniilaq Ass'n v. Burwell, No. CIV 13-0380 TFH, 2014 WL 5558336, at *9-10 (D.D.C. Nov. 3,

2014); Yurok Tribe v. Dep't of the Interior, 785 F.3d 1405, 1408 (Fed. Cir. 2015); Crownpoint

Inst. of Tech. v. Norton, No. CIV 04-0531 JP/DJS, Findings of Fact and Conclusions of Law,

filed Sept. 16, 2005 (D.N.M.)(Parker, J.)(Doc. 86)("Crownpoint")).

Sage Hospital argued that the ISDEAA and its regulations reflect Congress' intent that tribal organizations have potent rights and effective remedies for the IHS' unlawful declination decisions.  See July 2015 Reply at 16 (citing Sage, 2015 WL 1906107, at *51-52).  Sage Hospital contended that, although the Defendants argued that the ISDEAA does not establish an enforceable duty to fund Sage Hospital's contract proposals, the ISDEAA

> itself . . . stat[es] that the Court may "compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this subchapter or regulations promulgated hereunder (including immediate injunctive relief to reverse a declination finding . . . or to compel the Secretary to award and fund an approved self-determination contract)."

July 2015 Reply at 17 (alterations in Reply but not in quoted source)(quoting 25 U.S.C. § 450m-1(a)).  Sage Hospital maintains that it is therefore entitled to such relief.  See July 2015 Reply at 17.

Sage Hospital reiterated that IHS violated § 900.30 by refusing to provide Sage Hospital technical assistance before declining Sage Hospital's contract proposals.  See July 2015 Reply at 17.  Sage Hospital stated that, contrary to the Defendants' contentions, "the requirement for IHS to provide technical assistance does not require a request from the tribal contractor."  July 2015 Reply at 17.  Instead, Sage Hospital argued, the applicable regulation states:

> **When the Secretary declines all or a portion of a proposal, is the Secretary required to provide an Indian tribe or tribal organization with technical assistance?**
>
> Yes.  The Secretary shall provide additional technical assistance to overcome the stated objections, in accordance with section 102(b) of the Act, *and* shall provide any necessary *requested* technical assistance to develop any modifications to overcome the Secretary's stated objections.

July 2015 Reply at 17 (bold in original; italics in Reply but not in original)(quoting 25 C.F.R. § 900.30).  Sage Hospital asserted that the Defendants omitted the first half of this regulation when they quoted it in the June 2015 Response.  See July 2015 Reply at 17.  Sage Hospital asserted

that the Defendants were not entitled to obtain evidence on this issue through discovery, because, "if there is any evidence that IHS offered technical assistance before December 12, 2014 (or at any time thereafter) it would be in IHS' possession!" July 2015 Reply at 13.

Sage Hospital said that the Defendants' argument that summary judgment was premature at this stage of the case "ignores the Court's prior rulings on the applicable law and does not satisfy the requirements of Fed. R. Civ. P. 56(d)." July 2015 Reply at 19. Sage Hospital contended that, under rule 56(d), the Defendants must: (i) file an affidavit; (ii) identify the probable facts not available, their relevance, and what steps have been taken to obtain those facts; (iii) explain why facts precluding summary judgment cannot be presented; and (iv) state with specificity how the desired time would enable the nonmoving party to meet its burden in opposing summary judgment. See July 2015 Reply at 19-20. Sage Hospital argued that the Belgrove Decl. had not satisfied these requirements, noting that "[i]t is not enough for IHS to say that facts necessary to oppose summary judgment are unavailable or are in Sage's exclusive control." July 2015 Reply at 20-21. Sage Hospital asserted that one of the issues mentioned in the Belgrove Decl. was relevant to whether the contents of Sage Hospital's contract proposals "significantly differ from that of their predecessors or show how discovery would justify either the retroactive use of a declination criterion not invoked when IHS rejected [the 2015 AFA] or validate the use of the two criteria that IHS did invoke." July 2015 Reply at 23. Sage Hospital said that, because the Court had confined its inquiry in resolving the Motion to the "four corners" of Sage Hospital's contract proposals, "discovery by IHS into other issues is unnecessary." July 2015 Reply at 20. Sage Hospital conceded, however, that IHS was entitled to discovery limited to the issue of damages, and clarifies that it was not seeking an injunction ordering IHS to cease its disparagement of Sage. See July 2015 Reply at 23.

4.      **The July 2015 Hearing**.

The Court held a hearing on July 31, 2015.  See Transcript of Hearing (taken July 31, 2015), filed August 12, 2015 (Doc. 94)("2015 Tr.").  The hearing was relatively short, with the parties largely sticking to their briefing.  The parties raised a few new issues, however.  First, Sage Hospital explained that the Defendants had not served it with any discovery requests.  See 2015 Tr. at 8:15-19 (Frye).  The Defendants said that they had not requested any discovery, because they believed that the Court could resolve three issues at the summary-judgment stage: (i) whether the 2014 AFA and the 2013 Renewal were substantially the same as the 2010 Contract and the 2013 AFA; (ii) whether Sage Hospital's claim that the Defendants unlawfully declined the 2014 Renewal and the 2015 AFA were moot if the Court were to grant Sage Hospital the requested relief regarding the 2013 Renewal and the 2014 AFA; and (iii) if Sage Hospital's claims regarding the 2014 Renewal and the 2015 AFA were not moot, whether those proposals were substantially the same as the 2010 Contract and the 2013 AFA.  See 2015 Tr. at 32:22-25 (Grohman).  The Defendants explained that, if the Court were to hold that Sage Hospital's claims regarding the 2014 Renewal and 2015 AFA were not moot, but were to determine that those proposals were not substantially the same as the 2010 Contract and the 2013 AFA, there remained a fourth issue: whether the Defendants properly applied the Declination criteria to the 2014 Renewal and 2015 AFA.  See 2015 Tr. at 33:10-18 (Grohman).  The Defendants said that, because they "don't have endless resources," they did not want to attempt to obtain discovery on the fourth issue before litigating the Motion if the Court's resolution of the Motion would make discovery on the fourth issue irrelevant.  2015 Tr. at 34:11-16 (Grohman).  The Defendants noted, however, that if the Court were to hold that Sage Hospital's claims regarding the 2014 Renewal and 2015 AFA were not moot, but were to determine that

those proposals were not substantially the same as the 2010 Contract and the 2013 AFA, it should allow the Defendants to obtain discovery and proceed to trial on the whether they properly applied the Declination criteria to the 2014 Renewal and 2015 AFA. See 2015 Tr. at 33:20-34:3 (Grohman).

Second, the parties and the Court took up what the Defendants asserted was "the biggest mistake or error that [the Court] made in the [Sage] opinion" -- that the Indian canon trumps Auer deference. 2015 Tr. at 18:1-3 (Court). The Defendants reiterated the argument from the Response that, when American Indians' interests are pitted against each other in a case, the Indian canon is inapplicable. See 2015 Tr. at 19:23-20:7 (Grohman). Although the Defendants initially said that Auer deference applies to agencies' interpretations of regulations stated in legal briefs filed at the district court level, see 2015 Tr. at 21:2-22:10 (Grohman)(citing Qwest Corp. v. Colo. Pub. Utils. Comm'n, 656 F.3d 1093 (10th Cir. 2011)), they later clarified that they are not "asking [the Court] to defer to the brief [, but are instead] asking for deference for the Secretary's interpretation, as expressed in an administrative decision, and the same consistent interpretation expressed in legal briefs in this case," 2015 Tr. at 44:1-6 (Court, Grohman). Sage Hospital countered that it "can't see the Indians on the other side of our case. I see the Indian Health Service, . . . a federal agency[, but] I don't see any other Indians." 2015 Tr. at 38:20-23 (Frye). Sage Hospital reiterated that the ISDEAA, its regulations, Sage Hospital's ISDEAA contract, and Tenth Circuit authority require the Court to apply the Indian canon. See 2015 Tr. at 40:20-23 (Frye).

The Defendants replied that Sage Hospital's contractual argument is erroneous, because the parties "don't have a contract," and the Court is not being asked to interpret a provision of an existing contract between the parties. 2015 Tr. at 44:19 (Grohman). The Defendants asserted

that the ISDEAA's regulations are similarly inapposite, because "[i]f a tribe and a tribal organization are at odds, there is not a clear-cut picture of who to defer to."  2015 Tr. at 44:24-45:1 (Grohman).  The Defendants explained:

> The fact that the Navajo Nation's internal politics are complicated, I think, only underscores that it would be very difficult to determine who should be deferred to here.  Is it individual council members?  Is it the Ganado Chapter that passed a resolution asking Sage to leave?  It's -- you know, this is not the business of federal courts.  And this is what the Tenth Circuit is saying; that when you have internal disputes, the Canon of Deference simply has no role to play.

2015 Tr. at 45:2-11 (Grohman).  With the final word on the matter, Sage Hospital asserted that, even if the Court were to conclude that the Indian canon does not trump Auer deference, HHS' interpretation of § 900.32 in the Pequot decision was "plainly inconsistent with the plain language of the regulations."  2015 Tr. at 45:20-24 (Frye).

Third, addressing Sage Hospital's merger argument -- that the Court essentially could combine the 2013 Renewal, the 2014 Renewal, the 2014 AFA, and the 2015 AFA -- the Defendants stated that the merger doctrine applies only when parties execute two contracts and requires courts to read those two contracts together.  See 2015 Tr. at 50:8-10 (Grohman).  The Defendants contended that the merger doctrine is irrelevant, because "[n]o contracts have been executed," and "IHS's intent is not to enter into a contract."  2015 Tr. at 50:11-13.  The Defendants said that the issue is: "[I]f IHS and Sage are deemed to have a contract running from 2013 to 2016, should they also be deemed to have this contract for an overlapping term from 2014 to 2017?"  2015 Tr. at 50:14-17 (Grohman).  The Defendants contended that Sage Hospital improperly proposed the 2015 AFA when it no longer was under contract with IHS.  See 2015 Tr. at 50:20-51:11 (Grohman).  Sage Hospital clarified that it still was under contract with the IHS when it proposed the 2015 AFA, because it was "getting . . . monthly letters from the IHS

that are in the record saying, [w]e are going to extend your contract through this period."  2015

Tr. at 51:21-52:6 (Frye).

**5.      The Notice.**

Sage Hospital filed the Supplemental Authorities on Issue of Deference on August 10,

2015 (Doc. 93)("Notice").  In the Notice, Sage Hospital clarified a few issues from the hearing.

First, Sage Hospital addressed the Defendants' argument that the Court should defer to the HHS'

interpretation of ISDEAA regulations set forth in their briefing.  See Notice at 2.

> Sage cites Investment Co. Inst. v. Camp, 401 U.S. 617 (1971), as supplemental authority on this issue.  The Supreme Court stated that "counsel for the Comptroller in the course of this litigation and specifically in his briefs and oral argument in this Court, has rationalized the basis of Regulation 9 with great professional competence.  But this is hardly tantamount to an administrative interpretation of §§ 16 and 21 [of the Glass-Steagall Act, 48 Stat. 162]. . . . Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands." Id. at 627-28; accord, e.g., Pitzak v. Office of Personnel Management, 710 F.2d 1476, 1479 n.2 (10th Cir. 1983)(argument made in a brief by counsel for agency is not an official interpretation by the agency and not entitled to deference as such); Church of Scientology of Calif. v. I.R.S., 792 F.2d 153, 162 n.4 (D.C. Cir. 1986)(en banc) ("There is some question, to begin with, whether an interpretive theory put forth only by agency counsel in litigation, which explains agency action that could be explained on different theories, constitutes an 'agency position' for purposes of Chevron. . . .  Whatever position counsel was taking, one thing is clear: it is impossible to find here the sort of clear and consistent agency view (even as purportedly expressed by counsel) that must be given deference.")(Scalia, J.); Doc. 41-5 at 3 of 4 (DOI/IHS Internal Agency Procedures Handbook, providing, contrary to Defendants' gloss on the Pequot administrative decision, that the tribal organization's "performance under the existing contract shall have no effect on the contract renewal process except as stated in 25 C.F.R. § 900.33. . . .  Note in particular that renewal of term contracts with the IHS and the BIA where there are no material and substantial changes proposed will not be reviewed under the declination criteria.")(emphases added).  Sage "proposed" no material and substantial changes in its contract renewal applications.

Notice at 2-3 (alterations in Notice but not in quoted sources)(emphases in Notice but not in

quoted source).

Second, Sage Hospital clarified that, although the Defendants said at the hearing that, when Sage Hospital submitted the 2014 Renewal and 2015 AFA, "no contracts had been executed," two of Sage Hospital's exhibits suggest otherwise.  Notice at 3 (brackets omitted)(citing 2014 Renewal; Letter from Floyd Thompson, Executive Officer of the Navajo Area Indian Health Service to Ahmad Razaghi, Chief Executive Officer of Navajo Health Foundation -- Sage Memorial Hospital, Inc. (dated July 11, 2014) at 26, filed June 1, 2015 (Doc. 68-1)("July 11, 2014, Ltr.")).  Third, and finally, Sage Hospital noted that, although the Defendants had stated at the hearing that they had been funding Sage Hospital from "January to October" of 2015 pursuant to the Sage opinion, the Court issued that opinion on April 9, 2015, and the Defendants had provided prospective funding to Sage Hospital only from that date. Notice at 3-4 (citations and internal quotation marks omitted).

### 6.    Sage Hospital's Current MSJ.

Sage Hospital asserts that it submitted the Proposed 2016 AFA on May 28, 2015, see MSJ at 2, and that the United States declined Sage Hospital's Proposed 2016 AFA on October 26, 2015, see MSJ at 2.  According to Sage Hospital, the Proposed 2016 AFA is substantially the same as the FY 2015 AFA that the Court deemed the United States to have approved.  See MSJ at 3.  Sage Hospital argues, therefore, that the Court should also deem the Proposed 2016 AFA approved under 25 C.F.R. § 900.32's plain language[6] and under the Court's reasoning in its

---

[6]The relevant portion of the 25 C.F.R. § 900.32 regulatory text reads as follows:

**Can the Secretary decline an Indian tribe or tribal organization's proposed successor annual funding agreement?**

No.  If it is substantially the same as the prior annual funding agreement (except for funding increases included in appropriations acts or funding reductions as provided in section 106(b) of the Act) and the contract is with DHHS or the BIA, the Secretary shall approve and add to the contract the full amount of funds to which the contractor is

earlier opinion.  See MSJ at 3, 9.  Sage Hospital further argues that the Court should determine damages that arose from the declination and should award those damages to Sage Hospital during the trial scheduled for October 2016.  See MSJ at 3.

      **7.**      **United States' Response.**

      The United States filed its Response on August 15, 2016.  See Response to Plaintiff's Motion for Summary Judgment on the Issue of Liability on the Sixth Claim for Relief (Unlawful Declination of Proposed FY 2016 AFA), filed  August 15, 2016 (Doc. 210)("Response").  The United States agrees with Sage Hospital that the Court's Memorandum Opinion and Order concerning Sage Hospital's Motion for Summary Judgment on its First Three Claims for Relief prohibits the HHS Secretary from considering the statutory declination criteria with respect to a successor AFA if that successor AFA is substantially the same as the prior AFA.  See Response at 4.  The United States notes, however, that the Court also held, conversely, that the Secretary may consider the statutory declination criteria with respect to a successor AFA proposal if that successor is not substantially the same as the prior AFA.  See Response at 4.  According to the United States, determining whether successive AFAs are "substantially the same" requires juxtaposing the two documents and determining whether their text is substantially similar. Response at 4.

---

      entitled, and may not decline any portion of a successor annual funding agreement.  Any portion of an annual funding agreement proposal which is not substantially the same as that which was funded previously (e.g., a redesign proposal; waiver proposal; different proposed funding amount; or different program, service, function, or activity), or any annual funding agreement proposal which pertains to a contract with an agency of DOI other than the BIA, is subject to the declination criteria and procedures in subpart E [§ 450f(a)(2)].

25 C.F.R. § 900.32 (bold in original).

According to the United States, Sage Hospital fails to address key questions that undermine its assertion that Sage Hospital is automatically entitled to full funding of its 2016 AFA proposal.  See Response at 5.  The United States argues that Sage Hospital errs when it assumes that the Court's deemed approval of the FY2015 AFA proposal equates to there being a prior funding agreement as 25 C.F.R. § 900.32 uses that term.  See Response at 5.  The United States maintains that Sage Hospital fails to demonstrate that the remedy that the Court previously awarded to Sage Hospital equates to an AFA and that the ISDEAA regulation defining that term does not suggest that it equates to an AFA.  See Response at 5.  As the United States sees it, the ISDEAA regulation, 25 C.F.R. § 900.06, defines an annual funding agreement as "a document that represents the ***negotiated*** agreement of the Secretary to fund, on an annual basis, the programs, services, activities and functions transferred to an Indian tribe or tribal organization under the Act."  Response at 5-6 (quoting 25 C.F.R. § 900.06)(emphasis added in the Response). The United States argues that there is no question that the 2015 AFA proposal never has been negotiated and that Sage Hospital's motion does not rely on a negotiated document.  See Response at 6.  According to the United States, Sage Hospital instead relies on the Court's earlier remedy for what it held to be an improper declination.  See Response at 6.  To summarize this point, the United States says that Sage Hospital's argument that it is automatically entitled to a fully funded 2016 AFA fails because Sage Hospital "has not shown it has the requisite 2015 AFA."  Response at 6.

The United States then builds a bolder argument, asserting that Sage Hospital's analysis in the MSJ is premised upon the correctness of the Court's earlier ruling on Sage Hospital's motion for summary judgment concerning its first three claims for relief.  See Response at 6. The United States recognizes that the Court held that the HHS Secretary's declination of Sage

Hospital's 2015 proposal was improper and that the only available remedy for that declination was an order to fully fund the 2015 proposal.  See Response at 6.  The United States, however, reasserts and incorporates the arguments that it set forth in their responses to those motions for summary judgment.  See Response at 6.  The United States maintains that those arguments are just as applicable here and that the Court can be persuaded to change its mind.  See Response at 6-7.  As a closing argument, the United States asserts that Sage Hospital's motion does not address the HHS Secretary's application of the statutory declination or negotiation factors to the FY 2016 AFA, because Sage Hospital's motion is limited to the proposition that the Court may not consider either, neither with respect to full declinations nor with respect to partial declinations.  See Response at 7.

### 8. **Sage Hospital's Reply.**

Sage Hospital filed its Amended Reply on September 8, 2016.  See Plaintiff's Amended Reply to Defendants' Response to Plaintiff's Motion for Summary Judgment on the Issue of Liability on Its Sixth Claim for Relief (Unlawful Declination of Proposed FY 2016 AFA)(Doc. 196), filed September 8, 2016 (Doc. 234)("Reply").  Sage Hospital asserts that the United States concedes in its Response that the FY 2016 AFA proposal's language is "substantially similar to the FY 2015 AFA proposal."  Reply at 2 (quoting Response at 3).  According to Sage Hospital, the United States thereby hoists itself on its own petard, conceding that HHS lacks the authority to decline the successor FY 2016 AFA under 25 C.F.R. § 900.32.  See Reply at 2.

Sage Hospital accuses the United States of making a mockery out of the ISDEAA by even making an opposing argument on this motion.  See Reply at 2.  Sage Hospital rejects as subterfuge the United States' argument that the parties never negotiated the 2015 AFA,[7] because

_____

[7]Sage Hospital says "2014" instead of "2015" in its Reply.  See Reply at 3.  It clearly

the only reason it was not negotiated was that the HHS Secretary refused to sign it, and the Court therefore had to declare the agreement in effect.  See Reply at 3.  Furthermore, Sage Hospital says, nothing on the face of 25 C.F.R. § 900.32 or of 25 C.F.R. § 900.6 makes the distinction that the United States attempts to make between a routine AFA and an AFA that comes about after litigation.  See Reply at 3.  Sage Hospital insists that § 900.32 forbids the HHS Secretary from declining a proposal that is substantially the same as the prior AFA and that a substantially similar agreement therefore continues by operation of law.  See Reply at 3.  According to Sage Hospital, the United States' refusal to execute a prior AFA cannot deprive Sage Hospital of the rights it possesses under the successor FY 2016 AFA.  See Reply at 3.

      **9.**     **The Hearing.**

      The Court held a hearing on September 16, 2016.  See Transcript of Hearing (taken September 16, 2016)("Tr.")[8]  The parties mostly stuck to their briefing.  Importantly, however, Sage Hospital raised a new issue, asking the Court to grant summary judgment on damages for the FY 2016 AFA in the event that it found that IHS had unlawfully declined the FY 2016 AFA.

      **a.**     **Sage Hospital.**

      Sage Hospital said that the United States has abandoned all three reasons it offered last year for declining the FY 2016 AFA.  See Tr. at 6:21-25 (Miller).  In their stead, according to Sage Hospital, the United States has moved onto a fourth rationale, one that latches onto the word "negotiated" in 25 C.F.R. § 900.6.  Tr. at 6:25-7:2 (Miller).  Sage Hospital insisted that the new post hoc rationale collapses under the weight of the Court's prior decision, as the FY 2016

---

means "2015," however, as (i) the United States referred to the 2015 AFA, not to the 2014 AFA, in its Response, see Response at 5-6; and (ii) this MSJ implicates the 2015 AFA, not the 2014 AFA.

     [8]The Court's citation to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

AFA is identical to the FY 2015 AFA and a Tribe cannot have fewer rights under the ISDEAA when the HHS Secretary breaks the law.  See Tr. at 7:2-24 (Miller).  Furthermore, Sage Hospital asserted, the Court correctly noted in an earlier opinion that the courts' sole remedy when a federal agency unlawfully declines a contract proposal is to order the agency to fund the proposal.  See Tr. at 8:1-8 (Miller).

Sage Hospital expressed a fear, however, that by winning the motion it could "lose the war."  Tr. at 8:8-14 (Miller).  The Court asked Sage Hospital to clarify how such a Cadmean victory would come to pass.  See Tr. at 8:15-16 (Court).  Sage Hospital responded that the United States is shortchanging it $32.4 million in 2016 if the declination was unlawful but that the United States currently is paying only a small fraction of a lower amount from the 2013 FY AFA.  See Tr. at 8:17-9:7 (Miller, Court).  Sage Hospital accused the United States of defying the Court's preliminary injunction in April, 2016, ordering it for the time being to continue funding Sage Hospital at the 2013 level, stating that the United States prorated payments off of an eighteen million dollar base instead of off of the twenty million dollar base in the FY 2013 AFA.  See Tr. at 8:25-9:10 (Miller).  Sage Hospital argued that the United States had compounded its defiance in response to the Court's summary judgment decision on October 23, 2015, not honoring the Court's decision that the United States should start prorated monthly payments of the $32.4 million funding base from the FY 2016 AFA.  See Tr. at 9:11-20 (Miller).  Sage Hospital said that it could win this motion but lose the war, because case law out of the United States Court of Appeals for the D.C. Circuit indicates that any of the $32.4 million in funding that they do not receive by the end of the fiscal year will be forfeit.  See Tr. at 9:24-10:4 (Miller).

Taking the Court's observation that much had transpired since the preliminary injunction as a cue to shift gears, Sage Hospital argued that the issue with respect to the current motion is that IHS needs to pay Sage Hospital the remainder of what it is due under the FY 2016 AFA. See Tr. at 10:8-25 (Court, Miller).  Sage Hospital said that, if the remainder is not funded before the end of the fiscal year, the parties would enter a "damages environment."  Tr. at 11:7-11 (Miller).  Furthermore, Sage Hospital said it will continue to lack the funds to operate several million dollars' worth of programs from across two cycles that the Court already approved.  See Tr. at 11:7-11 (Miller).

The Court indicated that the MSJ's wording had led it to believe that it would be ruling on liability but not on the damages issue.  See Tr. at 11:23-12:5 (Court).  Sage Hospital clarified that some damages flow directly from IHS' failure to timely sign or fund the contract.  See Tr. at 12:6-8 (Miller).  According to Sage Hospital, it would prove those damages at trial, but it also insisted that the Court should order IHS to pay the base amount in the meantime.  See Tr. at 12:8-20 (Miller).

### b.      The United States.

The United States indicated that the Response adequately describes its position on the MSJ, but that it wished to respond in particular to an issue that it said Sage Hospital raised for the first time, namely, that anything IHS might owe Sage Hospital ought to be paid immediately in one lump sum.  See Tr. at 13:21-14:14 (Wolak, Court).  The Court turned to Sage Hospital to confirm whether it seeks such an upfront lump sum payment.  See Tr. at 14:12-13 (Court).  Sage Hospital indicated that, once an agency allocates funds through an internal appropriations process, they are paid to Tribes in a lump sum if that is what the Tribe wants.  See Tr. at 14:15-

15:5 (Miller).  Sage Hospital indicated that it wishes for such a lump sum, because the fiscal year

was coming to a close.  See Tr. at 15:24-16:12 (Miller).

Having heard the clarification, the United States argued that the Court's order that the

2014 and 2015 AFAs were in effect was not a final order, and that the United States' obligation

to pay any of the decisions that have monetary consequences does not accrue until all issues

implicated in the case have been litigated and potentially appealed.  See Tr. at 16:13-23 (Wolak).

Until the Court has entered a final order, the United States insisted, Sage Hospital's only remedy

if it needs additional money is to seek modification of the preliminary injunction and show that it

cannot survive until the end of this litigation.  See Tr. at 17:15-20 (Wolak).  The United States

argued that, even any funds which normally would have lapsed probably are not an issue to

manage and it can pay them whenever litigation ends, as they could be paid from the judgment

fund.  See Tr. at 18:17:24-18:8 (Wolak).

The Court said it had interpreted the MSJ as requiring the Court to make a ruling on

liability but not on damages.  See Tr. at 18:13-19:1 (Court).  The United States agreed with the

Court's interpretation.  See Tr. at 19:2-3 (Wolak).  The United States then repeated that there are

other procedural mechanisms, such as a modification of the preliminary injunction, which Sage

Hospital can use if it needs any payments before the Court issues a final order in the case.  See

Tr. at 19:3-12 (Wolak, Court).

        **c.**      **Sage Hospital.**

Sage Hospital replied that the MSJ as initially framed speaks of damages at trial.  See Tr.

at 19:17-19 (Miller).  Sage Hospital said that while its counsel was preparing for the hearing,

however, it occurred to him that damages are not the appropriate outcome on a summary

judgment motion.  See Tr. at 19:19-23 (Miller).  According to Sage Hospital, based on the MOO

and an opinion that the Honorable Rosemary M. Collyer, United States District Judge of the United States District Court for the District of Columbia wrote, the sole remedy the Court which has is to order IHS to fully fund.  <u>See</u> Tr. at 19:23-20:3 (Miller).  According to Sage Hospital, IHS has a four-billion-dollar appropriation and millions of dollars on hand, but hopes to stick the United States Treasury, through the judgment fund, with a bill that should come out of agency appropriations.  <u>See</u> Tr. at 20:8-21:2 (Miller).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  <u>Herrera v. Santa Fe Pub. Sch.</u>, 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991)).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, <u>or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."</u>  <u>Celotex</u>, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment."  <u>Cardoso v. Calbone</u>, 490 F.3d 1194, 1197 (10th Cir. 2007).

<u>Plustwik v. Voss of Norway ASA</u>, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.) (emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  <u>Celotex Corp. v.</u>

Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[9]  Once the movant meets

this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is

a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238,

1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)

("However, the nonmoving party may not rest on its pleadings but must set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof.")(internal quotation marks omitted).   Rule 56(c)(1) provides: "A party

asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including those made for purposes of the

motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It

is not enough for the party opposing a properly supported motion for summary judgment to "rest

on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at

256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v.

United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary

---

[9]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court
of the United States of America, dissented in Celotex Corp. v. Catrett, this sentence is widely
understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R.
Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued
a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment
burden of proof operates; they disagreed as to how the standard was applied to the facts of the
case.").

judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.")(citation and internal quotation marks omitted).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party,

there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain

principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of

ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court

must "bear in mind the actual quantum and quality of proof necessary to support liability."

Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable

inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most

favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999);

Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot

decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's

version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In

Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was

appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.

550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable
> to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed.
> Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has
> carried its burden under Rule 56(c), its opponent must do more than simply show
> that there is some metaphysical doubt as to the material facts . . . .   Where the
> record taken as a whole could not lead a rational trier of fact to find for the
> nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec.
> Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote

omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted).  "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[10]] explained that the

---

[10]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009), and United States v. Aragones, 483

blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning,

J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

> In evaluating a motion for summary judgment based on qualified immunity, we
> take the facts "in the light most favorable to the party asserting the injury."  Scott
> v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the
> plaintiff's version of the facts," id. at 378, unless that version "is so utterly
> discredited by the record that no reasonable jury could have believed him," id. at
> 380.  In Scott, the plaintiff's testimony was discredited by a videotape that
> completely contradicted his version of the events.  550 U.S. at 379.  Here, there is
> no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads'
> testimony. There is only other witnesses' testimony to oppose his version of the
> facts, and our judicial system leaves credibility determinations to the jury. And
> given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory
> problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads
> alleges that his injuries resulted from a beating rendered without resistance or
> provocation. If believed by the jury, the events he describes are sufficient to
> support a claim of violation of clearly established law under Graham v. Connor,
> 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the United States Court of Appeals for the Tenth Circuit, stated

that courts must focus first on the legal question of qualified immunity and "determine whether

plaintiff's factual allegations are sufficiently grounded in the record such that they may

permissibly comprise the universe of facts that will serve as the foundation for answering the

legal question before the court," before inquiring into whether there are genuine issues of

material fact for resolution by the jury.  584 F.3d at 1326-27 (Holmes, J., concurring)(citing

Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting))(observing that,

---

F. App'x 415 (10th Cir. 2012), have persuasive value with respect to material issues, and will
assist the Court in its preparation of this Memorandum Opinion and Order.

even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING THE ISDEAA

The ISDEAA authorizes American Indian tribes and tribal organizations to contract with either the DOI or the HHS Secretary[11] to provide their members federally funded services that a federal agency would otherwise provide directly. See 25 U.S.C. 450a(f); S. Rep. No. 100-274, at 1 (1987), reprinted in 1988 U.S.C.C.A.N. at 2620 ("1987 Senate Report"); Seneca Nation of Indians v. HHS, 945 F. Supp. 2d at 143 ("[S]elf-determination contracts essentially allow Indian tribes to step into the shoes of certain United States government agencies in providing certain services to their members."). When Congress passed the ISDEAA in 1975, it recognized that "the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities," and has "denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians." 25 U.S.C. § 450(a)(1). Congress thus enacted the ISDEAA to "permit an orderly transition of federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." 25 U.S.C. § 450a(b).

An ISDEAA contract proposal typically consists of two parts: (i) a multi-year agreement that satisfies 25 U.S.C. § 450*l*(c); and (ii) an AFA. See 25 U.S.C. § 450j(c). The AFA must contain: (i) "terms that identify the programs, services, functions, and activities to be performed

---

[11]The ISDEAA defines "the Secretary" throughout 25 U.S.C. § 450, without specifying the specific department that the Secretary supervises. 25 U.S.C. § 450. In the ISDEA's "definition" provision, it defines "the Secretary" as "either the Secretary of Health and Human Services or the Secretary of the Interior or both." 25 U.S.C. § 450b(i). Accordingly, in this Law Regarding the ISDEA section, when the Court refers to "the Secretary" it means "either the DOI or the HHS Secretary." 25 U.S.C. § 450b(i).

or administered, the general budget category assigned, the funds to be provided, and the time and method of payment"; and (ii) "such other provisions, including a brief description of the programs, services, functions, and activities to be performed (including those supported by financial resources other than those provided by the Secretary), to which the parties agree."  25 U.S.C. § 250*l*(c).

## 1.      **The Declination Process.**

The ISDEAA contracting process begins when a Tribe or Tribal organization submits a contract proposal to the Secretary.  See 25 U.S.C. § 450a(2).  Unless the Tribe or Tribal organization agrees to an extension, the Secretary must approve or decline the proposal within ninety days.  See 25 U.S.C. § 450a(2)(A); 25 C.F.R. §§ 900.16, 900.17.  Otherwise, the proposal is deemed approved.  See 25 U.S.C. 450j-1(a); 25 C.F.R. § 900.18.

Should the Secretary decide to decline the proposal in part or in its entirety, he or she must do so based on one of these five reasons:

> **(A)**      the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;

> **(B)**      adequate protection of trust resources is not assured;

> **(C)**      the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract;

> **(D)**      the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j-1(a) of this title; or

> **(E)**      the program, function, service, or activity (or portion thereof) that is the subject of the proposal is beyond the scope of programs, functions, services, or activities, . . . because the proposal includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 450f(a)(2).  See 25 C.F.R. § 900.22 (setting forth the same declination criteria).

There are a number of limitations on the Secretary's authority to apply § 450f(a)(2)'s declination criteria. See 25 C.F.R. §§ 900.25, .32, .33.  The Secretary cannot decline a contract renewal proposal "where no material and substantial change to the scope or funding of a program, functions, services, or activities has been proposed by the Indian tribe or tribal organization."  25 C.F.R. § 900.33.  Similarly, the Secretary cannot decline a successor AFA proposal that is "substantially the same" as its predecessor.  25 C.F.R. § 900.32.  The Secretary also cannot decline any proposal based on any objections "that will be overcome through the contract."  25 C.F.R. § 900.33.  Moreover, if the Secretary can decline only a portion of a contract proposal, he or she must approve all other severable portions of the proposal.  See 25 C.F.R. § 900.25.

After the Secretary declines a proposal, he or she must: (i) state any objections in writing to the Tribe or Tribal organization; (ii) provide assistance to the Tribe or Tribal organization to overcome the stated objections; and (iii) provide the Tribe or Tribal organization with a hearing on the record with the right to engage in full discovery on any issue raised in the matter, and the opportunity to appeal the Secretary's objections.  See 25 U.S.C. § 450f(b).  The Tribe or Tribal organization may, in lieu of filing an appeal, initiate an action in federal district court.  See 25 U.S.C. §§ 450f(b)(3), 450m-1.  In any hearing, appeal, or action in federal court regarding a contract declination, the Secretary bears "the burden of proof to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof)."  25 U.S.C. § 450f(e)(1).  Courts faced with ISDEAA declination claims thus have required the Secretary to establish "by clear and convincing evidence" the validity of the grounds of his or her declination decision.  Navajo Health Foundation-Sage Memorial Hospital v. Burwell, 100 F. Supp. 3d, 1122, 1188 (D.N.M. 2015)(Browning, J.); S. Ute Indian Tribe v.

Leavitt, 497 F. Supp. 2d 1245, 1252 (D.N.M. 2007)(Johnson, J.).   See Cheyenne River Sioux

Tribe v. Kempthorne, 496 F. Supp. 2d at 1068.

    2.  **The Reassumption Process.**

   The Secretary also has the authority to reassume ISDEA contracts.   See 25 U.S.C.

§ 450m.   Reassumption means "rescission, in whole or in part, of a contract and assuming or

resuming control or operation of the contracted program . . . without consent of the Indian tribe

or tribal organization."   25 C.F.R. § 900.246.   A federal agency within the HHS or the DOI may

unilaterally reassume a contract on either an emergency or non-emergency basis.   See 25 C.F.R.

§ 900.246.   An emergency reassumption is permitted when a tribe or tribal organization fails to

fulfill the ISDEA contract's requirements, and that failure poses either: (i) an immediate threat of

imminent harm to any person's safety, or (ii) an imminent substantial and irreparable harm to

trust funds, trust lands, or interest in such lands.   See 25 C.F.R. § 900.247.   A non-emergency

reassumption is permitted when there has been either: (i) a violation of the rights, or

endangerment of the health, safety, or welfare of any person, or (ii) gross negligence or

mismanagement in the handling or use of contract funds, trust funds, trust lands, or interest in

trust lands under the contract.   See 25 C.F.R. § 900.247.

   In an emergency reassumption, the Secretary must: (i) immediately rescind, in whole or

in part, the contract; (ii) assume control or operation of all or part of the program; and (iii) give

written notice of the rescission to the Tribe or Tribal organization, and to the community that the

contract serves.   See 25 C.F.R. § 900.252.   The written notice must include: (i) a detailed

statement of the findings that support the Secretary's decision; (ii) a statement explaining the

tribe or tribal organization's right to a hearing on the record within ten days of the reassumption,

or such later date as the tribe or tribal organization may approve; (iii) an explanation that the

tribe or tribal organization may be reimbursed for actual and reasonable "wind up costs" incurred after the effective date of the reassumption; and (iv) a request for the return of property, if any. 25 C.F.R. § 900.253.

In a non-emergency reassumption, the Secretary must: (i) notify the Tribe or Tribal organization in writing of the deficiencies in contract performance; (ii) ask the Tribe or Tribal organization to take specific corrective action within a reasonable period of time, which cannot be less than forty-five days; and (iii) offer and provide, if requested, the necessary technical assistance and advice to help the Tribe or Tribal organization overcome the deficiencies.  See 25 C.F.R. § 900.248.  If the Tribal organization fails to ameliorate the deficiencies, the Secretary shall provide a second written notice to the Tribe or Tribal organization that the Secretary will reassume the contract, in whole or in part.  See 25 C.F.R. § 900.249.  The second written notice shall include: (i) the intended effective date of the reassumption; (ii) the details and facts supporting the intended reassumption; and (iii) an explanation of the Tribe or Tribal organization's right to a formal hearing within thirty days of receiving the notice.  See 25 C.F.R. § 900.250.  The Secretary cannot reassume the contract before the issuance of a final decision in any administrative hearing or appeal.  See 25 C.F.R. § 900.251.

### 3.    Relief Available Under the ISDEAA.

The ISDEAA provides a comprehensive range of remedies for a Tribe or Tribal organization whose contract the Secretary unlawfully terminates.  See 25 U.S.C. § 450m-1(a).  In any action brought under the ISDEAA, the district court "may order appropriate relief," including

> money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this subchapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this subchapter or regulations promulgated hereunder

(including immediate injunctive relief to reverse a declination finding under section 450f(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

25 U.S.C. § 450m-1(a).

Applying § 450m-1(a) to the DOI Secretary's contract declination decision in Crownpoint Inst. of Tech v. Norton, No. CIV 04–0531 JP/DJS, Findings of Fact and Conclusions of Law at 26, filed Sept. 16, 2005 (D.N.M.) (Parker, J.) (Doc. 86)("Crownpoint"), the Honorable James A Parker, United States District Judge for the District of New Mexico, said that "[t]he specific mandamus relief authorized by the ISDA relieves [the plaintiff] of proving the usual equitable elements including irreparable injury and absence of an adequate remedy at law." Crownpoint at 26 (citations omitted). Other federal district courts have similarly concluded that a Tribe or Tribal organization does not need to demonstrate the traditional grounds for equitable relief to obtain injunctive or mandamus relief under the ISDEA. See, e.g., Pyramid Lake Paiute Tribe v. Burwell, No. CIV 13-1771 CRC, 2014 WL 5013206, at *7 (D.D.C. Oct. 7, 2014)(Cooper, J.)("Because the IDEAA specifically provides for both injunctive and mandamus relief to remedy violations of the Act, 25 U.S.C. § 450m-1(a), however, the Tribe need not demonstrate the traditional equitable grounds for obtaining the relief it seeks."); Red Lake Band of Chippewa Indians v. Dep't of the Interior, 624 F. Supp. 2d 1, 25 (D.D.C. 2009)(Kollar-Kotelly, J.)(granting specific performance on an ISDEAA contract without considering the ordinary grounds for such relief, because the statute provides for injunctive relief); Susanville Indian Rancheria v. Leavitt, No. CIV 07-259 GEB/DAD, 2008 WL 58951, at *10-11 (E.D. Cal. Jan. 3, 2008)(Burrell, J.)(holding that a plaintiff seeking injunctive relief under the ISDEAA need not satisfy the traditional equitable requirements); Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d at 1068 (ordering a writ of mandamus where the plaintiffs had not

established the traditional equitable requirements, but had established that the DOI Secretary's contract declination decision violated the ISDEAA).

### 4.    <u>The Rules for Interpreting Ambiguous ISDEAA Provisions.</u>

When faced with an ambiguous federal statute, federal courts typically defer to the administering agency's interpretation.  <u>See</u> <u>Chevron U.S.A. v. Natural Res. Def. Council</u>, 467 U.S. 837, 842-45 (1984)("<u>Chevron</u>").  In cases involving American Indians, however, the Tenth Circuit has "taken a different approach to statutory interpretation," holding that the "normal rules of construction do not apply when Indian treaty rights, or even non-treaty matters involving Indians, are at issue."  <u>Ramah Navajo Chapter v. Lujan</u>, 112 F.3d 1455, 1461 (10th Cir. 1997)(quoting <u>EEOC v. Cherokee Nation</u>, 871 F.2d 937, 939 (10th Cir. 1989))(internal quotation marks omitted).  Consequently, the Tenth Circuit has held that federal statutes "are to be construed liberally in favor of Native Americans, with ambiguous provisions interpreted to their benefit."  <u>EEOC v. Cherokee Nation</u>, 871 F.2d at 939 (citation omitted)(internal quotation marks omitted).

The ISDEAA is designed to "circumscribe as tightly as possible the discretion of the Secretary."  <u>Ramah Navajo Sch. Bd. v. Babbitt</u>, 87 F.3d at 1344.  The ISDEAA instructs that "[e]ach provision of [the ISDEA] and each provision of contracts entered into thereunder shall be liberally construed for the benefit of the tribes or tribal organizations . . . ."  25 C.F.R. § 900.3(a)(5).  The Tenth Circuit has confirmed that the canon of construction favoring American Indian tribes applies to ISDEAA claims, noting that "it would be entirely inconsistent with the purpose of the [ISDEAA], as well as with the federal policy of Native American self-determination in general, to allow the canon favoring Native Americans to be trumped in this case."  <u>Ramah Navajo Chapter v. Lujan</u>, 112 F.3d at 1462.  The Tenth Circuit has explained that

this canon of construction "controls over more general rules of deference to an agency's interpretation of an ambiguous statute." S. Ute Indian Tribe v. Sebelius, 657 F.3d at 1078. Consequently, in the Tenth Circuit, federal courts must not afford Chevron deference to the HHS' or the DOI's interpretation of the ISDEAA's ambiguous provisions.

Only a few federal district courts have addressed whether the "arbitrary and capricious standard" of the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA"), applies to ISDEAA claims. The majority of district courts have concluded that ISDEAA's text, its legislative history, and the general presumption favoring Indian tribes dictates a de novo review of ISDEA claims. See, e.g., Pyramid Lake Paiute Tribe v. Burwell, 70 F. Supp. 3d at 542; Seneca Nation of Indians v. Dep't of Health and Human Servs., 945 F. Supp. 2d at 141-42 & n.5; Cheyenne River Sioux Tribe v. Kempthorne, 496 F. Supp. 2d at 1066-67; Cherokee Nation of Okla. v. United States, 190 F. Supp. 2d 1248, 1258 (E.D. Okla. 2001)(Seay, J.), rev'd on other grounds by, 543 U.S. 631 (2005); Shoshone-Bannock Tribes of the Fort Hall Reservation v. Shalala, 988 F. Supp. at 1318. A minority of district court cases -- three of which are unpublished -- used the APA's arbitrary-and-capricious standard to review ISDEAA claims. See, e.g., Citizen Potawatomi Nation v. Salazar, 624 F. Supp. 2d 103, 108 (D.D.C. 2009)(Kessler, J.); Suquamish Tribe v. Deer, No. CIV 96-5468 (W.D. Wash. Sept. 2, 1997)(Bryan, J.); Cal. Rural Indian Health Bd., Inc. v. Shalala, No. CIV 96-3526 (N.D. Cal. Apr. 24, 1997)(Jensen, J.); Yukon-Kuskokwim Health Corp. v. Shalala, No. CIV 96-155 (D. Alaska April 15, 1997). Those courts have reasoned that, because the ISDEAA does not provide a standard of review, courts must use the APA's arbitrary-and-capricious standard. See Citizen Potawatomi Nation v. Salazar, 624 F. Supp. 2d at 108 ("Both the Supreme Court and [the D.C. Circuit] Court of Appeals have declared

that, where a statute does not provide a standard of review, as is true of the ISD[E]A[A], courts must look to the APA standard.").

## LAW REGARDING THE INDIAN CANON

The Indian canon of construction requires that courts liberally construe treaties, agreements, statutes, and executive orders in favor of American Indians.  See Montana v. Blackfeet Tribe, 471 U.S. at 766.  See generally Philip P. Frickey, Marshalling Past and Present: Colonialism, Constitutionalism, and Interpretation in Federal Indian Law, 107 Harv. L. Rev. 381, 400-40 (1993)(offering a scholarly commentary on the Indian canon).  Courts are to construe treaties and other agreements as the American Indians who entered into the treaties or agreements would have understood them.  See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 196 (1999)("[W]e interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them.")  Any ambiguity in an agreement is to be resolved in favor of American Indians.  See, e.g., Carpenter v. Shaw, 280 U.S. 363, 367 (1930).[12]

The Indian canon sometimes can come into conflict with other canons of statutory interpretation.  When canons clash, the Indian canon usually trumps competing canons.  See 1-2 Cohen's Handbook of Federal Indian Law (Nell Jessup Newton et al. eds., 2015 LEXIS ed.), at 2.02[3].  The United States Court of Appeals for the District of Columbia has held that the Indian canon also supersedes deference to agency interpretations under Chevron.  The D.C. Circuit explained in Cobell v. Norton, 240 F.3d 1081 (D.C. Cir. 2001), in an opinion that Judge David Bryan Sentelle wrote, and Judges Stephen Fain Williams and Judith Ann Wilson Rogers joined:

---

[12]This case is old, but two United States Courts of Appeals recently have held that this principle still applies.  See Gila River Indian Cmty. v. United States, 729 F.3d 1139, 1148 (9th Cir. 2013)("Ambiguous statutes are to be construed in favor of Indians."); Cal. Valley Miwok Tribe v. United States, 515 F.3d 1262, 1266 n. 7 (D.C. Cir. 2008)(statutes are "to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit").

> This departure from the *Chevron* norm arise from the fact that the rule of liberally construing statutes to the benefit of the Indians arises not from ordinary exegesis, but "from principles of equitable obligations and normative rules of behavior," applicable to the trust relationship between the United States and the Native American people.

240 F.3d at 1102.  The Tenth Circuit at least twice has rejected agencies' statutory interpretations that are contrary to the Indian canon.  See Governor of Kansas v. Kempthorne, 516 F.3d 833 (10th Cir. 2008)(stating that Indian canon trumps Chevron deference even though Chevron was not applicable in a case with competing Tribal interests)(dicta); Ramah Navajo Chapter v. Lujan, 112 F.3d 1455, 1461-62 (10th Cir. 1997)("Ramah").

When an agency interprets its own regulations -- to, for example, adjudicate whether a regulated party was in compliance with them -- courts typically afford its interpretation Auer deference.  Under Auer deference, the Court accepts the agency's interpretation of its ambiguous regulation unless the regulation is "plainly erroneous or inconsistent with the regulation."  Auer, 519 U.S. at 461. [13]  Although the Tenth Circuit has not decided whether Indian deference trumps

---

[13]Antonin Scalia and a number of the current Justices on the Supreme Court have challenged Auer's logical underpinnings as being on much shakier grounds than those of Chevron deference.  Justice Scalia, after years of applying the doctrine followed by years of gradually beginning to question its soundness, finally denounced Auer deference in his dissent in Decker v. Northwest Environmental Defense Center, 133 S. Ct. 1326 (2013).  The Court cannot describe the reasons for Justice Scalia's abandonment of the doctrine better than the Justice did:

> For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of "defer[ring] to an agency's interpretation of its own regulations."  Talk America, Inc. v. Michigan Bell Telephone Co., 131 S. Ct. 2254, 2265 (2011)(Scalia, J., concurring).  This is generally called Seminole Rock or Auer deference.

> The canonical formulation of Auer deference is that we will enforce an agency's interpretation of its own rules unless that interpretation is "plainly erroneous or inconsistent with the regulation."  But of course whenever the agency's interpretation of the regulation is different from the fairest reading, it is in that sense "inconsistent" with the regulation.  Obviously, that is not enough, or there would be nothing for Auer to do.  In practice, Auer deference is Chevron

deference applied to regulations rather than statutes.  The agency's interpretation will be accepted if, though not the fairest reading of the regulation, it is a plausible reading -- within the scope of the ambiguity that the regulation contains.

Our cases have not put forward a persuasive justification for <u>Auer</u> deference.  The first case to apply it, <u>Seminole Rock</u>, offered no justification whatever -- just the *ipse dixit* that "the administrative interpretation . . . becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."  Our later cases provide two principal explanations, neither of which has much to be said for it.  First, some cases say that the agency, as the drafter of the rule, will have some special insight into its intent when enacting it.  The implied premise of this argument -- that what we are looking for is the agency's intent in adopting the rule -- is false.  There is true of regulations what is true of statutes.  As Justice Holmes put it: "[w]e do not inquire what the legislature meant; we ask only what the statute means."  Whether governing rules are made by the national legislature or an administrative agency, we are bound by what they say, not by the unexpressed intention of those who made them.

The other rationale our cases provide is that the agency possesses special expertise in administering its "'complex and highly technical regulatory program.'"  That is true enough, and it leads to the conclusion that agencies and not courts should make regulations.  But it has nothing to do with who should interpret regulations -- unless one believes that the purpose of interpretation is to make the regulatory program work in a fashion that the current leadership of the agency deems effective.  Making regulatory programs effective is the purpose of rulemaking, in which the agency uses its "special expertise" to formulate the best rule.  But the purpose of interpretation is to determine the fair meaning of the rule -- to "say what the law is."  Not to make policy, but to determine what policy has been made and promulgated by the agency, to which the public owes obedience.  Indeed, since the leadership of agencies (and hence the policy preferences of agencies) changes with Presidential administrations, an agency head can only be sure that the application of his "special expertise" to the issue addressed by a regulation will be given effect if we adhere to predictable principles of textual interpretation rather than defer to the "special expertise" of his successors.  If we take agency enactments as written, the Executive has a stable background against which to write its rules and achieve the policy ends it thinks best.

Another conceivable justification for <u>Auer</u> deference, though not one that is to be found in our cases, is this: If it is reasonable to defer to agencies regarding the meaning of statutes that Congress enacted, as we do per <u>Chevron</u>, it is a fortiori reasonable to defer to them regarding the meaning of regulations that they themselves crafted.  To give an agency less control over the meaning of its own regulations than it has over the meaning of a congressionally enacted statute seems quite odd.

But it is not odd at all.  The theory of <u>Chevron</u> (take it or leave it) is that when Congress gives an agency authority to administer a statute, including authority to issue interpretive regulations, it implicitly accords the agency a degree of discretion, which the courts must respect, regarding the meaning of the statute.   While the implication of an agency power to clarify the statute is reasonable enough, there is surely no congressional implication that the agency can resolve ambiguities in its own regulations.   For that would violate a fundamental principle of separation of powers -- that the power to write a law and the power to interpret it cannot rest in the same hands.  "When the legislative and executive powers are united in the same person . . . there can be no liberty; because apprehensions may arise, lest the same monarch or senate should enact tyrannical laws, to execute them in a tyrannical manner."  Montesquieu, <u>Spirit of the Laws</u> bk. XI, at 151-152 (O. Piest ed., T. Nugent trans. 1949).  Congress cannot enlarge its own power through <u>Chevron</u> -- whatever it leaves vague in the statute will be worked out by someone else.  <u>Chevron</u> represents a presumption about who, as between the Executive and the Judiciary, that someone else will be. (The Executive, by the way -- the competing political branch -- is the less congenial repository of the power as far as Congress is concerned.)   So Congress's incentive is to speak as clearly as possible on the matters it regards as important.

But when an agency interprets its own rules -- that is something else. Then the power to prescribe is augmented by the power to interpret; and the incentive is to speak vaguely and broadly, so as to retain a "flexibility" that will enable "clarification" with retroactive effect.  "It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz[e] agency power."  Combining the power to prescribe with the power to interpret is not a new evil: Blackstone condemned the practice of resolving doubts about "the construction of the Roman laws" by "stat[ing] the case to the emperor in writing, and tak[ing] his opinion upon it."  1 Wm. Blackstone, <u>Commentaries on the Laws of England</u> 58 (1765).  And our Constitution did not mirror the British practice of using the House of Lords as a court of last resort, due in part to the fear that he who has "agency in passing bad laws" might operate in the "same spirit" in their interpretation.  The Federalist No. 81, at 543-544 (Alexander Hamilton)(J. Cooke ed. 1961).   <u>Auer</u> deference encourages agencies to be "vague in framing regulations, with the plan of issuing 'interpretations' to create the intended new law without observance of notice and comment procedures."  <u>Auer</u> is not a logical corollary to <u>Chevron</u> but a dangerous permission slip for the arrogation of power.

It is true enough that <u>Auer</u> deference has the same beneficial pragmatic effect as <u>Chevron</u> deference: The country need not endure the uncertainty produced by divergent views of numerous district courts and courts of appeals as to what is the fairest reading of the regulation, until a definitive answer is finally provided, years later, by this Court.  The agency's view can be relied upon, unless

Auer deference, it has said that Indian deference trumps Chevron deference -- at least when it comes to interpreting the ISDEAA's ambiguous provisions.  See Ramah Navajo Chapter v. Lujan, 112 F.3d at 1462.  Given that Auer deference "is applied in the same manner as *Chevron* deference and is substantively identical," Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Servs., No. CIV 12-0069 JB/JKM, 2015 WL 711044, at *31 (D.N.M. Feb. 9, 2015)(Browning, J.), the Tenth Circuit's holding in Ramah Navajo Chapter v. Lujan suggests that Indian deference trumps Auer deference in this case.

---

it is, so to speak, beyond the pale.  But the duration of the uncertainty produced by a vague regulation need not be as long as the uncertainty produced by a vague statute.  For as soon as an interpretation uncongenial to the agency is pronounced by a district court, the agency can begin the process of amending the regulation to make its meaning entirely clear.  The circumstances of this case demonstrate the point.  While these cases were being briefed before us, EPA issued a rule designed to respond to the Court of Appeals judgment we are reviewing.  It did so (by the standards of such things) relatively quickly: The decision below was handed down in May 2011, and in December 2012 the EPA published an amended rule setting forth in unmistakable terms the position it argues here.  And there is another respect in which a lack of Chevron-type deference has less severe pragmatic consequences for rules than for statutes.  In many cases, when an agency believes that its rule permits conduct that the text arguably forbids, it can simply exercise its discretion not to prosecute.  That is not possible, of course, when, as here, a party harmed by the violation has standing to compel enforcement.

In any case, however great may be the efficiency gains derived from Auer deference, beneficial effect cannot justify a rule that not only has no principled basis but contravenes one of the great rules of separation of powers: He who writes a law must not adjudge its violation.

Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. at (Scalia, J., dissenting).  Justice Scalia's attack on Auer was in a dissent, but two other Justices, the Honorable John G. Roberts and Samuel A. Alito, joined in a concurring opinion stating that "[i]t may be appropriate to reconsider [Auer deference] in an appropriate case.  But this is not that case."  133 S. Ct. at 1338 (Roberts, C.J., concurring).  Although the Court shares Justice Scalia's concerns about Auer deference, it is, for the time being, the law of the land, and, as a federal district court, the Court must apply it.  Accordingly, were this case brought under another statute rather than the ISDEA, the Court would have to accord Auer deference to the HHS Secretary's interpretation of § 900.32.

## THE ISDEAA'S LEGISLATIVE HISTORY

If possible, the Court interprets statutes according to the statutory text's plain meaning and structure.  When the text's meaning and structure leave ambiguities, however -- something which the Allocation and Duplication MSJs, the Response, the Replies, and the Hearing suggest may be true in this case -- even the ardent textualist "routinely takes purpose into account, but in its concrete manifestations as deduced from close reading of the text." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 20 (2012).  In this spirit, the Court here assembles a legislative history of the ISDEAA and subsequent amendments to help shed light on the disputed sections' meaning.  The Court gives special interpretive weight to committee reports,[14] which congressional staffers consider the most reliable sources of congressional intent.  See Abbe R. Gluck & Lisa Schultz Bressman, Statutory Interpretation from the Inside -- An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901, 977 fig.8 (2013).  Given the central role that the Executive Branch played in ISDEAA history, the Court also examines related presidential signing statements.[15]  Historical

---

[14]Congress defines Committee Reports as follows:

one set of documents among the variety of document types produced by the House and Senate committees that address legislative and other policy issues, investigations, and internal committee matters. Committee reports usually are one of these types: (1) reports that accompany a legislative measure when it is reported for chamber action; (2) reports resulting from oversight or investigative activities; (3) reports of conference committees; and (4) committee activity reports, published at the conclusions of a Congress.

United States Congress, https://www.congress.gov/congressional-reports/about (last visited Oct. 24, 2016).

[15]The Congressional Research Service defines Presidential signing statements as follows:

official pronouncements issued by the President contemporaneously to the signing of a bill into law that, in addition to commenting on the law generally, have been

background is woven throughout the discussion as needed to knit a process that transpired over a quarter century into a coherent narrative.

1.   **Indian Self-Determination and Education Assistance Act of 1975.**

The ISDEAA became law in 1975.  See Pub. L. No. 93-638 (1975).  It did not emerge out of a vacuum, rather representing in some respects a continuation of and in other respects a break with nearly two centuries of federal policy regarding American Indian healthcare.   In this section, the Court first examines the historical background behind the ISDEAA.  It then looks to the House and Senate Committee reports and President Ford's signing statement to uncover legislative intent and help triangulate the proper interpretation of ISDEAA terms and provisions at issue in the present motions for summary judgment.

a.   **Background.**

The United States has provided medical care to American Indians since at least 1802, when Army physicians began treating American Indians for smallpox.  See U.S. Public Health Service, Health Services for American Indians 86 (1957)("U.S. Health Service").   Congress appropriated money for more extensive American Indian healthcare in 1819, routing the money through missionaries and philanthropic organizations.  See U.S. Health Service at 86.  In 1832, Congress passed the first measure specifically targeted to American Indian health, authorizing

---

used to forward the President's interpretation of the statutory language; to assert constitutional objections to the provisions contained therein; and, concordantly, to announce that the provisions of the law will be administered in a manner that comports with the administration's conception of the President's constitutional prerogatives.

Todd Garvey, Congressional Research Service, Presidential Signing Statements: Constitutional and Institutional Implications, http://fas.org/sgp/crs/natsec/RL33667.pdf (last visited Oct. 24, 2016).

Indian agents to purchase smallpox vaccine and to appoint army physicians to administer the vaccines.  See Act of May 5, 1832, 4 Stat. 514.

Starting in the 1830s, the United States entered into numerous treaties with Tribes that included promises of physicians, medical supplies, and hospitals, first for the Cherokees and other Tribes forced westward, see, e.g., Treaty with the Cherokee, art. 8, 7 Stat. 478 (1835), and later for western Tribes in a quid pro quo for land cessions, see, e.g., Treaty with the Yakima, art. 5, 12 Stat. 951 (1855).[16]  Subsequent crowding of American Indians onto reservations led to epidemics and unsanitary conditions that outstripped federal healthcare capacity, especially after Congress transferred Indian affairs from the War Department to the Department of the Interior. See U.S. Health Service at 87.  Even in the few reservations that received promised hospitals, the standard of care usually was very low.  See S. Rep. No. 83-1530 (1954).

In 1910, Congress made the first general appropriation for Indian healthcare.  See Act of Apr. 4, 1920, 36 Stat. 269 (appropriating $40,000.00 to provide for healthcare, and to prevent infectious and contagious disease).  In 1921, some Congress members began to chafe at such appropriations and block Interior Department funding.  See, e.g., H.R. Rep. No. 275, 67th Cong. (1921); S. Rep. No.294, 67th Cong. (1921).  A congressional majority, however, wished for the

---

[16]John Marshall, the fourth Chief Justice of the United States, put the exchange poetically in Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1 (1831):

> A people once numerous, powerful, and truly independent, found by our ancestors in the quiet and uncontrolled possession of an ample domain, gradually sinking beneath our superior policy, our arts and our arms, have yielded their lands by successive treaties, each of which contains a solemn guarantee of the residue, until they retain no more of their formerly extensive territory than is deemed necessary to their comfortable subsistence . . . .

30 U.S. (5 Pet.) 15 (1831).  In exchange, Marshall waxed, the American Indians "look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the president as their great father."  30 U.S. (5 Pet.) 17 (1831).

funding to continue and passed the Snyder Act, 25 U.S.C. § 13, to give the Bureau of Indian

Affairs broad discretion to direct programs that would benefit American Indians' health:

> The Bureau of Indian Affairs, under the supervision of the Secretary of the Interior, shall direct, supervise, and expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes: . . . .  For the relief of distress and conservation of health.

25 U.S.C. § 13.

Given the Tribes' difficulties attracting and retaining qualified medical staff in the first

half of the twentieth century, the Bureau of Indian Affairs called in 1953 for the transfer of

medical services among American Indians living on reservations to the United States Public

Health Service.  See Indian Health Unit Asks Doctor Shift, N.Y. Times, May 30, 1953 at A17.

The following year, Congress found that this persistent human capital shortage demanded such a

shift, see S. Rep. No. 83-1530 at 3-4 (1954), and Congress fully federalized Indian healthcare

with the support of the American Medical Association and state departments of health in every

state with a significant American Indian population,  see Transfer Act of 1954, 42 U.S.C. § 2001;

S. Rep. No. 83-1530 at 2 (listing these and other medical organizations, departments, and boards

supporting the transfer).

The 1960s, a decade that unmoored so many other longstanding federal policies, barely

left a ripple in federal policies related to American Indian healthcare.  Shortly after his Senate

confirmation in 1961, Stewart Udall, President John F. Kennedy's Interior Secretary, assembled

a taskforce to study the issue of American Indian self-determination.  See Udall Tells of Plan for

Reorganization, N.Y. Times, Jan. 29, 1961 at A32.  Yet the task force accomplished little of

practical value, more replete with grandiloquence than grand strategy.  See Bureau of Indian

Affairs, Report of Task Force on Indian Affairs 2-7 (Feb. 9, 1961)("1961 Report of Task

Force").  In a stunning rebuke of the very concept of self-determination even at the ideational stage, Udall paternalistically told task force members that "test[ing] our thinking against the thinking of the wisest Indians and their friends did not mean that we are going to let, as someone put it, the Indian people decide what the policy should be."  1961 Report of Task Force at 2.  For the remainder of the Kennedy and Lyndon B. Johnson Administrations, neither the White House nor Congress paid much attention to American Indians.  <u>See</u> Thomas Francis Clarkin, The New Trail and the Great Society: Federal Indian Policy During the Kennedy-Johnson Administrations (May 1998)(unpublished Ph.D. dissertation, University of Texas at Austin)(on file with ProQuest Dissertations & Theses Global).

Beginning in the 1960s, IHS also faced problems along many fronts, including congressional attempts to control its budget.  <u>See</u> Leah Kalm-Freeman, The Community Health Representative Program: Early Voices and Program History 115-18 (June 2009)(unpublished Ph.D. dissertation, Johns Hopkins University)(on file with ProQuest Dissertations & Theses Global)(providing an easily digestible summary of IHS finances and budgetary concerns from the late 1950s until the passage of the ISDEAA).  For their part, Tribal leaders nationwide began to agitate for a greater say in healthcare services on their reservations.  <u>See</u>, <u>e.g.</u>, Indians of North America, Declaration of Indian Purpose: The Voice of the American Indian 9-10 (1961)(coauthored by leaders of sixty-seven American Indian Tribes).  Tribes also began to undertake small federally funded local projects through Indian Community Action Programs established under President Johnson's War on Poverty, spurring greater American Indian for self-determination in general.  <u>See</u> Sar Levitan & Barbara Hetrick, Big Brother's Indian Programs, With Reservations 90 (1971).

During his presidential campaign in 1968, Richard M. Nixon issued a statement to the National Congress of American Indians in Omaha, Nebraska in which he seconded Tribes' calls for greater self-determination.  See Richard Nixon and the American Indian: The Movement to Self-Determination (Smithsonian National Museum of the American Indian broadcast Nov. 15, 2012) at 20:14-:30, available at https://www.nixonfoundation.org/2012/11 /nixon-and-the-american-indian-the-movement-to-self-determination/ (last visited Oct. 26, 2016) ("Smithsonian Video").

Nixon did not forget this support for greater American Indian self-determination after the election.[17]  On October 8, 1969, Nixon sent Vice President Spiro Agnew to Albuquerque, New Mexico, to deliver a speech on the topic to lay the groundwork for American Indian legislation Nixon's domestic policy advisers were drafting.  See Smithsonian Video at 24:15-25:21.  The legislative proposal was ready by the following summer, and Nixon proposed to Congress what eventually would become the ISDEAA at the start of July 1970.  See Richard Nixon, Special Message to the Congress on Indian Affairs, July 8, 1970, available at http://www.presidency .ucsb.edu/ws/?pid=2573 (last visited Oct. 26, 2016)("Nixon's Special Message to Congress").[18]

---

[17]According to a White House domestic policy staffer who oversaw much of the push behind the ISDEAA, the issue was extremely important to Nixon, in part because his former football coach, an American Indian, had taught the teenage Nixon how to be confident and self-reliant.  See Smithsonian Video at 22:55-:59.  Nixon believed that attitudes prevailing in the 1960s that American Indians were less able to perform or manage projects than white Americans were benighted and bigoted, and that federal resistance to allowing American Indians to run IHS projects was "destructive, discriminatory, and debilitating."  Smithsonian Video at 2:05-:14.

[18]Nixon's Special Message to Congress, as available online, is not paginated.  Most of the message, however, is broken into enumerated sections.  To direct readers as precisely as possible to supporting text, citations to Nixon's Special Message to Congress will include the section number wherever applicable.

Decrying the disorientation and excessive dependency that federal hegemony over American Indian healthcare had spawned as "morally and legally unacceptable," Nixon challenged Congress (i) to assure Tribes that the federal government would continue to perform its treaty and trusteeship obligations;[19] and (ii) to guarantee that, "whenever Indian groups decided to assume control or responsibility for government service programs, they could do so and still receive adequate Federal financial support." Nixon's Special Message to Congress § 1. The second assurance, according to Nixon, was a very important rejection of suffocating paternalism and bureaucratic inefficiency in favor of American Indian self-determination. See Nixon's Special Message to Congress §1.

Nixon told Congress that the assumption prevailing at the time was that American Indian programs could not exist without Federal administration. See Nixon's Special Message to Congress § 1. Nixon said that he believed this assumption was incorrect, and that there was no reason that Congress should deprive American Indians of the privilege of self-determination merely because they receive monetary support from the federal government. See Nixon's Special Message to Congress § 2. In Nixon's opinion, it "should be up to the Indian tribe to determine whether it is willing and able to assume administrative responsibility for a service program which is presently administered by a Federal agency." Nixon's Special Message to Congress § 3. He therefore proposed legislation that would "empower a tribe or a group of tribes or any other Indian community to take over the control or operation of Federally-funded and administered programs in the Department of the Interior and the Department of Health,

---

[19]The concept of a federal trust responsibility to the American Indians arose early in Supreme Court of the United States jurisprudence with Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1 (1831). The Supreme Court more recently recognized it in County of Oneida v. Oneida Indian Nation. See County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 247 (1985).

Education and Welfare whenever the tribal council or comparable community governing group voted to do so."  Nixon's Special Message to Congress § 3.[20]

Nixon proposed that discretion to take on a program or to not take on a program should lie completely with American Indians; it would not be necessary for the federal agency administering a program to approve the transfer of responsibility to a Tribe or Tribal organization, nor could a Tribe or Tribal organization be compelled into a transfer it did not want.  See Nixon's Special Message to Congress § 3.  Tribes or Tribal organizations also would, under Nixon's proposal, retain the "right of retrocession," by which he meant that an American Indian group could elect to administer a program and then later decide to give it back to the federal government.  See Nixon's Special Message to Congress § 3.  Nixon wanted appropriate technical assistance to help local organizations successfully operate programs they took over, and for locally-administered programs to be funded on equal terms with services that federal agencies continued to administer.  See Nixon's Special Message to Congress § 3.

Nixon said that his proposed legislation would triply benefit American Indians.  See Nixon's Special Message to Congress § 3.  First, Nixon wrote, contracting programs out to Tribes or Tribal organizations would directly channel more money into American Indian communities, because American Indians -- not federal bureaucrats -- would be administering the programs and drawing salaries.  See Nixon's Special Message to Congress § 3.  Second, Nixon contended, contracting programs out to Tribes or Tribal organizations would "help build greater

---

[20]The Department of Education Organization Act, 93 Stat. 695, abolished the United States Department of Health, Education and Welfare ("HEW") on October 17, 1979.    See National Archives, General Records of the Department of Health, Education and Welfare, available at https://www.archives.gov/research/guide-fed-records/groups/235.html (last visited Oct. 27, 2016).  The United States Department of Health and Human Services, of which Burwell is the Secretary, is the successor to HEW for all Indian healthcare programs.  See United States Department of Health and Human Services, HHS Historical Highlights, http://www.hhs.gov /about/historical-highlights/index.html# (last visited Oct. 24, 2016).

pride and resourcefulness within the Indian community."  Nixon's Special Message to Congress § 3.  Third, Nixon asserted, American Indians would get better and more efficacious programs if the people whom the programs most directly affected were responsible for creating them.  See Nixon's Special Message to Congress § 9.

Nixon insisted that, "[a]s we move ahead in this important work, it is essential that the Indian people continue to lead the way by participating in policy development to the greatest possible degree."  Nixon's Special Message to Congress § 9.  According to Nixon, the federal government had not always realized that it needed American Indian energy and leadership if its assistance were to be effective in improving the conditions of American Indian life.  See Nixon's Special Message to Congress § 9.  Nixon concluded that his proposed legislation would turn a new page, however, striking a "new and balanced relationship between the United States government and the first Americans . . . ."  Nixon's Special Message to Congress § 9.

During 1970 and 1971, Nixon Administration officials met with Tribal leaders at ten regional conferences and discussed the President's proposed legislation with them.  See generally Smithsonian Video.  The ISDEAA's first version was introduced in the Senate as 92 S. 3157 on February 9, 1972, and was reported to the Senate on July 27, 1972.  Indian Self-Determination Act of 1972, S. 3157, 92d Cong. (1972)("1972 ISDEEA").  It was referred to the House Committee on Interior and Insular Affairs on August 3, 1972, see 1972 ISDEAA, but it died there as Washington became embroiled in the Watergate scandal and the related conviction of some of Nixon's White House aides, see Bob Woodward & Carl Bernstein, The Final Days 14-17 (2005)(providing a detailed chronology of the last two years of Nixon's presidency).

Undaunted, Nixon called for greater American Indian self-determination in his fourth State of the Union Address in 1973.[21]  In that Address, Nixon indicated that his Administration would continue to advance opportunities for American Indian self-determination.  See Richard Nixon, State of the Union Message to the Congress on Human Resources, 61 Public Papers of the Presidents of the United States 143-44 (John Woolley & Gerhard Peters eds. 2005)("1973 Address").  Expounding in more depth on the same issue, Nixon said:

> Just as it is essential to put more decision-making in the hands of the State and local governments, I continue to believe that Indian tribal governments should assume greater responsibility for programs of the Bureau of Indian Affairs and the Department of Health, Education, and Welfare which operate on their reservations.  *As I first proposed in 1970, I recommend that the Congress enact the necessary legislation to facilitate this take-over of responsibility.*

1973 Address at 144 (emphasis in the original).  Nixon continued:

> Meanwhile the new statutory provisions for Indian tribal governments under General Revenue Sharing will assist responsible tribal governments in allocating extra resources with greater flexibility.  *I shall also propose new legislation to foster local Indian self-determination by developing an Interior Department program of bloc[k] grants to Federally recognized tribes as a replacement for a number of existing economic and resource development programs.*  The primary purpose of these grants would be to provide tribal governments with funds which they could use at their own discretion to promote development of their reservations.

---

[21]Article II, Section 3 of the United States Constitution requires Presidents of the United States to deliver a "State of the Union Address" to Congress "from time to time."  U.S. Const. art. II, § 3.  Until 1973, every President of the United States except for George Washington had interpreted "from time to time" to mean at most once per calendar year.  See George Washington, First Annual Message to Congress on the State of the Union, January 8, 1790, reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), available at http://www.presidency.ucsb.edu/ws/index.php?pid=29431 (last visited Oct. 27, 2016); George Washington, Second Annual Message, December 8, 1790,  reprinted in The American Presidency Project (John Woolley & Gerhard Peters eds.), available at http://www.presidency .ucsb.edu/ws/index.php?pid=29432 (last visited Oct. 27, 2016).  In 1973, in a break from tradition, Nixon gave six State of the Union addresses -- the first an overview and the following five each focused on one specific policy theme.  See State of the Union Addresses and Messages, The American Presidency Project, http://www.presidency.ucsb.edu/sou.php#nixon1973 (explaining that Nixon gave six addresses and linking to each)(last visited Oct. 27, 2016).

1973 Address at 144 (emphasis in the original).  Nixon concluded his remarks on American Indians with an expression of exasperation with Congress for having failed to pass the version of the ISDEAA that he had proposed in his 1970 Message and said that, "[t]o accelerate organizational reform, I have directed the Secretary of the Interior to transfer day to day operational activities of the Bureau of Indian Affairs out of Washington to its field offices." 1973 Address at 144.

The Senate was increasingly preoccupied with Watergate and declined to pursue the ISDEAA with the urgency that Nixon demanded in the 1973 Address.  The bill languished in committee for nearly a year before Nixon drove home the pressing need for it in his 1974 State of the Union Address.  See Richard Nixon, Annual Message to the Congress on the State of the Union, 26 Public Papers of the Presidents of the United States 56 (2005)("1974 Address").  Perhaps sensing that this would be his final opportunity to advocate for American Indian self-determination in a State of the Union Address, Nixon spoke passionately:

> For too many years the American Indians -- the first Americans -- have been the last Americans to receive the rights and opportunities to which they are entitled.  This Administration has taken the initiative to change this picture.  For its part, the Federal Government must put behind it the role of autocratic manager of Indian reservations.  We shall continue to encourage Indians and their tribal governments to play an increasing role in determining their own future.

1974 Address at 75.  Nixon noted that "[o]ne measure of our attempt to foster a better, more humane policy is the level of Federal funding benefitting American Indians -- over twice what it was five years ago or about $1.6 billion."  1974 Address at 76.  Nixon chided Congress for not having acted on his proposals "to permit turning over to Indian tribal governments the management and control of Indian programs" and "to provide greater local control over federally assisted reservation programs through a program of tribal grants."  1974 Address at 76.  Nixon then closed his discussion of American Indian self-determination with a final promise to

American Indians that had first taken embryonic form in his 1968 campaign speech in Omaha: "I shall ask that the Bureau of Indian Affairs make specific plans to accelerate the transfer of significant portions of its programs to Indian tribal management, although I repeat my assurance that, while accelerated, these transfers will not be forced on Indian tribes not willing to accept them." 1974 Address at 76.

Even as the long shadows of possible impeachment over Watergate began to darken the Oval Office in the spring of 1974, Nixon pressed forward with his efforts to pressure the Senate into passing the ISDEAA. Resurrecting his strategy of sending out surrogates with speeches that he first had tried with Vice President Agnew's Albuquerque speech in 1969, Nixon dispatched his special counsel and the executive assistant to his special counsel to Albuquerque in March 1974 to deliver two more speeches advocating for the ISDEAA and American Indian self-determination. See Leonard Garment, Speech to Indian Law Students Association, Albuquerque, New Mexico (Mar. 14, 1974)(available for scan or photocopy at the Nixon Presidential Library); Bradley H. Patterson, Albuquerque Speech. After having sat on the bill for nearly a year, the Senate reported it out from the Committee on Interior and Insular Affairs two weeks later, on March 28, 1974. See S. Rep. No. 93-682.

### b.      Senate Report No. 93-682.

The section of the Senate Committee Report dedicated to congressional findings left no doubt that Congress had followed Nixon's lead in advocating for "a definitive break from the past." Smithsonian Video at 19:40. After careful review of the federal government's historical and special legal relationship with American Indians and of federal responsibilities that result from it, the Senate Committee found that:

> (1) the prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people and their communities by

depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government, and has denied to the Indian people an effective voice in the planning and implementation of programs for the benefit of Indians which are responsive to the true needs of Indian communities; and

(2) the Indian people will never surrender their desire to control their relationships both among themselves and with non-Indian governments, organizations, and persons.

S. Rep. No. 93-682, at 1 (1974).  The Senate Committee further recognized

the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of educational as well as other Federal services to Indian communities so as to render such services more responsive to the needs and desires of those communities.

S. Rep. No. 93-682, at 2.  Furthermore, the Senate Committee declared that its

commitment to the maintenance of the Federal Government's unique and continuing relationship with and responsibility to the Indian people through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from Federal domination of programs for and services to Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.

S. Rep. No. 93-682, at 2.  After diving into the bill's text, section by section, see S. Rep. No. 93-682, at 3-11, the Senate Committee wrote at length about the purpose behind and the need for the bill that it had just christened the "Indian Self-Determination and Educational Reform Act."  S. Rep. No. 93-682, at 1, 12-14.

Priming fellow senators for the discussion about the ISDEAA's purpose, the Senate Committee chronicled the history of federal relations with American Indians.  See S. Rep. No. 93-682, at 12-13.  The Supreme Court of the United States, the Senate Committee said, first recognized Tribal sovereignty in 1832.  See S. Rep. No. 93-682, at 12 (citing Worcester v. Georgia, 31 U.S (6 Pet.) 515, 519 (1832)).  Expanding on this point by quoting from a leading Indian law treatise's commentary on that case, the Senate Committee remarked that

> From the earliest years of the Republic, the Indian tribes have been recognized as distinct, independent, political communities and as such, qualified to exercise powers of self-government, not by virtue of any delegation of powers from the Federal government, but rather by reason of their original Tribal sovereignty. Thus treaties and statutes of Congress have been looked to by the Courts as limitations upon original tribal powers, or, at most, evidences of recognition of such powers rather than as the direct source of tribal powers.

S. Rep. No. 93-682, at 12 (quoting Cohen's Handbook of Federal Indian Law)(internal citations and quotation marks removed).  The Senate Committee declared that the extent to which the semi-independent Tribes are able to function depends on the degree to which Congress exercises its derived plenary power.  See S. Rep. No. 93-682, at 12.  The Senate Committee noted what it saw as a trend in both statutory and case law over the previous forty years to put greater emphasis on American Indian sovereignty and greater limitations on federal oversight of American Indians.  See S. Rep. No. 93-682, at 12-13 (referencing the Indian Reorganization Act of June 18, 1934, 48 Stat. 984; the Indian Bill of Rights of 1968, 82 Stat. 77; and Begay v. Miller, 70 Ariz. 380, 222 P.2d 624, 627 (1950)).

The ISDEAA, the Senate Committee indicated, would be the next stage in this progression, being "in essence an effort to provide tribes with the means to implement tribal self-governing power by providing finances and procedures to achieve progressive development of tribal resources and institutions."  S. Rep. No. 93-682, at 13.  Lest the bill's purpose not yet be clear enough, the Senate Committee continued, "The purpose of S. 1017 [the ISDEAA] is to implement a policy of self-determination whereby Indian tribes are given a greater measure of control over the programs and services provided to them by the Federal government." S. Rep. No. 93-862, at 13.[22]

---

[22]The Senate Committee listed another purpose related to American Indian education, a subject that dominated the ISDEAA -- at least in terms of column-inches -- but that is not directly relevant to this case.  See S. Rep. No 93-682, at 13.

Having discussed the ISDEAA's purpose, the Senate Committee then turned to discussing the need for the bill.  See S. Rep. No. 93-682, at 13.  In the recent past, the Senate Committee said, federal Indian policy had experienced a dramatic shift with respect to the delivery of programs and services that the Bureau of Indian Affairs and the IHS formerly had administered.  See S. Rep. No. 93-682, at 13 (citing four different statutes).  The Senate Committee noted, however, that the policy changes had been made on very shaky authority, through a "mixture of broad interpretation and unrelated statutes . . . ."  S. Rep. No. 93-682, at 13.  Such policy potpourri, the Senate Committee said, had created "numerous administrative and management problems," such as "the inability of the Federal government to exempt tribal contracts from Federal Procurement Regulations and to authorize payments in advance of tribal performance on such contracts."  S. Rep. No. 93-682, at 13, 14.  The ISDEAA, according to the Senate Committee, was designed to alleviate such problems by providing direct statutory authority for American Indians' federal contracting.  See S. Rep. No. 93-682, at 14.

### c.    House Report No. 93-1600.

The House Committee on Interior and Insular Affairs ("1974 House Committee") reported S. 1017 to the House floor on December 16, 1974.  H.R. Rep. No. 93-1600 (1974).  In the preamble to its report, the 1974 House Committee indicated that one of the bill's goals was to "provide for the full participation of Indian tribes in programs and services conducted by the Federal Government for Indians . . . ."  1974 U.S.C.C.A.N. 7775.  The bill, according to the 1974 House Committee, therefore "authorizes and directs the Secretary of the Interior and the Secretary of Health, Education, and Welfare to contract with Indian tribes or tribal organizations for the operation of programs provided by the Bureau of Indian Affairs and the Indian Health Service under guidelines and criteria established by the bill . . . ." 1974 U.S.C.C.A.N. 7775.

Providing fellow House members with a quick rationale to support the bill, the 1974 House Committee indicated that S. 1017 provides "flexible authority to efficiently and realistically permit contracting of Bureau of Indian Affairs and Indian Health Service programs to the Indian tribes while maintaining the integrity of the programs and services funded by Federal appropriations." 1974 U.S.C.C.A.N. 7782. According to the 1974 House Committee, S. 1017 simultaneously would expand the Interior Secretary's authority and the HEW Secretary's authority to enter into negotiated contracts with Indian Tribes and Tribal organizations under clear guidelines and contract requirements. See 1974 U.S.C.C.A.N. 7782.

The 1974 House Committee also explained, mostly at the Interior Department's and the General Accounting Office's recommendation, that it had adopted several major amendments to S. 1017 which the Senate passed. See 1974 U.S.C.C.A.N. 7782. First, the 1974 House Committee adopted three new sections in S. 1017's preliminary provisions that it meant to tighten up the ISDEAA's contract requirements in the areas of auditing and reporting, criminal penalties for the misuse of contract funds, applicability of the Davis-Bacon Act, 46 Stat. 1494, to contracts under the ISDEAA, and preferences for Indians and Indian subcontractors. See 1974 U.S.C.C.A.N. 7782. Second, the 1974 House Committee expanded the grant provisions in section 104 to facilitate contracting by Tribes and Tribal organizations under the ISDEAA's terms. See 1974 U.S.C.C.A.N. 7782-83. Third, the 1974 House Committee adopted amendments which would:

> (1) permit tribes and tribal contractors to be eligible for grants from the Civil Service Commission under the Intergovernmental Personnel Act to strengthen personnel administration of the contractors; (2) permit Federal employees transferring to tribal employment under such contracts to retain various fringe benefits of Federal employment; and (3) exempt such transferring employees from the conflict-of-interest provisions of section 205 and 207 of title 18 U.S.C., which would be inappropriate to the circumstances of such contracts.

1974 U.S.C.C.A.N. 7783.  Just as important, the 1974 House Committee indicated that it had deleted four parts of the Senate bill authorizing new programs, based on the Interior Department's advice, because the Interior Department believed that such programs would be duplicative of existing programs.  See 1974 U.S.C.C.A.N. 7783.

Something that the House Committee did not explicitly mention is something central to this case.  The Senate ISDEAA bill had made no explicit mention in section 106 whether the HEW Secretary could reduce the amount of funding a Tribe or Tribal organization received if the Tribe or Tribal organization took control of administration of a program.  The House Committee added subsection 106(h) that addressed this issue.  It provided that

> the amount of any funds provided to a contractor under a contract shall not be less than the amount the Secretary would have expended had the United States performed the service itself.  It also provides that savings, if any, realized by the tribal contractor would be available for additional services and benefits.

1974 U.S.C.C.A.N. 7779.  This subsection that made it into the enacted ISDEAA retained the sense but neither the House Committee version's sentence structure nor wording, reading as follows:

> The amount of funds provided under the terms of contracts entered into pursuant to sections 102 nad [sic] 103 shall not be less than the appropriate Secretary would have otherwise provided for his direct operation of the programs or portions thereof for the period covered by the contract: Provided, that any savings in operation under such contracts shall be utilized to provide additional services or benefits under the contract.

88 Stat 2204.

### d.   President Ford's Signing Statement.

Nixon resigned the Presidency approximately four months before Congress passed the ISDEAA.  See Richard Nixon, Letter to Henry Kissinger Resigning the Office of President of the United States, 246 Public Papers of the Presidents of the United States (John Woolley & Gerhard

Peters eds. 2005), <u>available at</u> http://www.presidency.ucsb.edu/ws/index.php?pid=4326&st =resignation&st1= (last visited Oct. 26, 2016).  Gerald Ford succeeded Nixon as President on August 9, 1974.  <u>See</u> Gerald Ford, Remarks on Taking the Oath of Office, 1 <u>Public Papers of the Presidents of the United States</u>, <u>available at</u> http://www.presidency.ucsb.edu/ws/index.php?pid =4409&st=resignation&st1= (last visited Oct. 26, 2016).  On January 4, 1975, Ford signed the ISDEAA.  <u>See</u> 10 <u>Public Papers of the Presidents of the United States</u>, <u>available at</u> http://www .presidency.ucsb.edu/ws/index.php?pid=4739 (last visited Oct. 26, 2016)("1975 Signing Statement").

In his signing statement, Ford indicated that his Administration "is committed to furthering the self-determination of Indian communities without terminating the special relationships between the Federal government and the Indian people.  The Congress is to be congratulated for its passage of the legislation.  It will enhance our efforts to implement the policy of Indian self-determination."  1975 Signing Statement.  Ford continued

> Title I of this act gives the permanence and stature of law to the objective of my Administration of allowing -- indeed encouraging -- Indian tribes to operate programs serving them under contract to the Federal Government.  Furthermore, with the passage of this act Indian communities and their leaders now share with the Federal Government the responsibility for the full realization of this objective. It will be through the initiatives of Indian communities that the authorities provided in this act will be implemented.  I urge these communities to make the fullest possible use of them and pledge the support of this Administration.

1975 Signing Statement.  Ford concluded his discussion of American Indian self-determination on a practical note: "In addition to making this kind of contracting a right, the act does much to make it feasible and practical. . . . The granting authority in this act can also be used to strengthen tribal governments and tribally-funded programs."  1975 Signing Statement.

2.       **1988 Amendments.**

ISDEAA implementation did not go completely smoothly in the years after 1975.  See S.

Rep. No 100-274, at 6-7 (1988).    As evident in the 1974 Senate Committee and House

Committee Reports, Congress had aimed to encourage Tribes to contract for the administration

of programs that IHS and the Bureau of Indian Affairs ("BIA") previously had administered.

See supra at 67-72.  In the years after ISDEAA enactment, however, Tribes encountered many

problems in their contracts with the federal agencies.    See, e.g., 1987 Senate Committee

Hearing, 156-58 (prepared statement on behalf of Standing Rock Sioux Tribes, North and South

Dakota et al.)("Standing Rock").  Tribes complained that federal contracting requirements and

bureaucratic regulations were too rigid and too burdensome, preventing the Tribes from being

able to implement their own priorities and agenda for Tribal self-determination.  See, e.g.,

Second 1987 Senate Hearing at 24 (statement of Suzan Shown Harjo, Executive Director,

National Congress of American Indians). Moreover, many Tribes contended that they were

paying a financial penalty for the right to contract for the administration of federal programs, as

federal agencies did not cover many costs associated with the performance of the contracts, and

these costs therefore had to come out of Tribes' coffers.  See, e.g., 1987 Senate Committee

Hearing at 93-97 (prepared statement of Edward Loke Fight).

Federal agencies such as IHS recognized that many of these "contract support costs" --

first defined in the 1988 amendments and including costs associated with audits, insurance, legal

fees, and accounting fees --  were ones that the agencies would not have incurred themselves had

they still been administering the same programs.  See S. Rep. No. 100-393 (1987), at 4.  In an

effort to cover such costs for the Tribes, the BIA started to use a special line item in its

Congressional Budget Requests that called for such CSC.  See S. Rep. No. 100-393 (1987), at 4.

- 74 -

The House and Senate Appropriation Committees, however, requested BIA to merge CSC with other program funds. <u>See</u> H.R. Rep. No. 99-761 (1986), at 4. Starting in 1985, BIA decided to cover CSC in another way, grandfathering the costs on a one time basis in one lump sum in existing contracts at one hundred percent of the level of need in the previous year. <u>See</u> H.R. Rep. No. 99-761 (1986), at 4-5. BIA, however, never requested the additional CSC funding from Congress and never received sufficient funds to fully cover CSC that Tribes were incurring. <u>See</u> S. Rep. No. 100-393 (1987), at 4. Because many Tribes lacked sufficient resources to continue operating programs without CSC, many threatened to invoke their right to retrocede contracts to federal agencies under the ISDEAA. <u>See</u> H.R. Rep. No. 99-761 (1986), at 5. Wishing to prevent a mass termination of Tribal contracts, the House of Representatives began to consider ISDEAA amendments in February 1987 that would (i) guarantee Tribes an adequate level of funding for CSC; and (ii) give Tribes a stronger voice in determining policies affecting the various federal programs they were contracting. <u>See</u> S. Rep. No. 100-393 (1987), at 4.

        a.      **<u>House Report No. 103-653</u>.**

On October 26, 1987, the House Committee on Interior and Insular Affairs reported proposed ISDEAA amendments out to the floor. <u>See</u> H.R. Rep. No. 100-393 (1987). The House Committee found:

> The Indian Self-Determination and Education Assistance Act . . . has furthered the development of local self-government and education opportunities for Indian tribes, but its goal and progress have been impeded by lack of clarity and direction on the part of Federal agencies regarding their role in implementing the Federal policy of Indian self-determination.

H.R. Rep. No. 100-393, at 1 (1987). The House Committee further found that the "Federal responsibility for the welfare of Indian tribes demands effective self-government by Indian tribal communities," and that "additional legislation is necessary to assure that Indian tribes have an

effective voice in the planning and implementation of programs for the benefit of Indians." H.R. Rep. No. 100-393, at 1 (1987).

The House Committee therefore proposed multiple ISDEAA amendments pertinent to this case. H.R. Rep. No. 100-393, at 2-3. It recommended amending ISDEAA § 4 to define "contract support costs" as

> the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which --
>
> > (1) normally are not carried on by the respective Secretary in his direct operation of the program; or
> >
> > (2) are provided by the Secretary in support of the contracted program from resources other than those under contract

H.R. Rep. No. 100-393, at 2 (1987). The House Committee then tackled the issue of CSC funding levels, proposing that the ISDEAA § 106(h) be amended to read as follows:

> (1) The amount of funds provided under the terms of contracts entered into pursuant to this Act shall be no less than the appropriate Secretary would have otherwise provided for his operation of the programs or portion thereof for the period covered by the contract.
>
> (2) To the amount available under subsection (h)(1) of this section shall be added the negotiated contract support costs.
>
> . . . .
>
> (4) Costs incurred by the contracting agency in monitoring contracts shall not be subtracted from the amount of funds provided under subsection (h)(1).
>
> (5) Contract support costs shall be awarded for all programs for which a tribal organization has contracted pursuant to sections 102 and 103 of this Act.
>
> (6) Except for general assistance grants, once contract and grant obligations are negotiated, the contract or grant amount may be decreased only with the consent of the contractor or grantee or to reflect a reduction in congressional appropriations from the previous fiscal year as reflected in the appropriation line item from which the contract or grant funds are derived.

(7) Any savings realized by the contractor or grantee in the operation or administration of such contract or grant shall be used to provide additional services or benefits under the contract or grant and shall be carried over to the succeeding fiscal years without any reduction in the funding to which the contractor or grantee is otherwise entitled.

(8) The appropriate Secretary shall provide supplemental reports to the Congress on or before March 15 of each year identifying any deficiency of funds needed to provide required contract support costs and indirect costs to all contractors for that fiscal year.

(9) The appropriate Secretary shall advise the Congress in annual budget requests of the amount of funds which should have been appropriated in the preceding fiscal year in order to have funded at the full amount the indirect costs and contract support costs negotiated by tribal organizations pursuant to this Act. The appropriate Secretary shall also provide the Congress with an estimate of the indirect costs and contract support costs that will be needed for new contracts in the fiscal year covered by the budget request.

(10) At the request of any Indian tribe, the appropriate Secretary shall disclose to such tribe the current amount of funds allocated, obligated, and expended for any program, or portion thereof, administered for the benefit of such tribe.

H.R. Rep. No. 100-393, at 2-3 (1987). The House Committee recommended more than just amendments to existing ISDEAA sections; it also proposed that entirely new sections be added to the ISDEAA. See H.R. Rep. No. 100-393, at 3 (1987). A new ISDEAA § 112 would read as follows:

(a) Whenever an indirect cost rate is negotiated annually between a tribe or tribal organization and the cognizant federal agency, that rate shall be applicable to all contracts and grants made with such tribe or tribal organization pursuant to Sections 102, 103, and 104 of this Act.

(b) Where a contractor's allowable indirect cost recoveries are below the level of indirect costs that the contractor should have received for any given year pursuant to its approved indirect cost rate, and such shortfall is the result of lack of full indirect cost funding by any Federal, state, or other agency, such shortfall shall not form the basis for any theoretical under or over-recovery or other adverse adjustment to any future years' indirect cost rate or amount for such contractor, nor shall any agency seek to collect such short fall from the contractor.

(c) Indian tribal governments shall not be held liable for amounts of indebtedness attributable to theoretical or actual under-recoveries or over-recoveries of indirect

- 77 -

costs, as defined in Office of Management and Budget Circular A-87, incurred for fiscal years prior to fiscal year 1988.

H.R. Rep. No. 100-393, at 3 (1987).

       b.      **Senate Report No. 100-274.**

On April 22, 1987, in response to multiple complaints from American Indian tribes about problems associated with ISDEAA implementation, the Senate Indian Affairs Committee conducted an oversight hearing. See First Session on Recommendations for Strengthening the Indian Self-Determination Act: Hearing Before the S. Comm. on Indian Affairs, 100th Cong. (1987)("1987 Senate Committee Hearing"). At that hearing, Tribal witnesses described the ISDEAA as a constructive public policy that had, among other things, resulted in American Indians using healthcare facilities more frequently. E.g., 1987 Senate Committee Hearing at 30 (statement of Ron Allen, Chairman, Jamestown Klallam Tribe, Sequim, Washington). At the same time, Tribal witnesses told the Senate Committee that inappropriate application of labyrinthine federal procurement law and federal acquisition regulations to self-determination contracts had resulted in excessive paperwork and unduly burdensome reporting requirements. See 1987 Senate Committee Hearing, 156-58 (prepared statement on behalf of Standing Rock Sioux Tribes, North and South Dakota et al.)("Standing Rock").

Perhaps the single most serious problem with ISDEAA implementation, however, according to the Tribal witnesses at the hearing, was BIA's and IHS' failure to provide full funding for the indirect costs associated with self-determination contracts. See, e.g., 1987 Senate Committee Hearing 172 (prepared statement of United South & Eastern Tribes, Inc.)("It is very difficult not to believe that the BIA has been playing the budget cutting game largely at the expense of tribes. For a number of years in its [budget] justification the Bureau under-estimated . . . tribal administrative needs . . . and funded tribes for only a percentage of the indirect costs

that were due them.").   The Tribal witnesses said that the agencies' consistent failure to fully fund Tribal indirect costs had resulted in financial management problems for Tribes as they struggled to pay for federally mandated annual single-agency audits, liability insurance, financial management systems, personnel systems, property management and procurement systems, and other administrative requirements.  See, e.g., 1987 Senate Committee Hearing at 93-97 (prepared statement of Edward Loke Fight)(showing indirect CSC calculations and incomplete federal reimbursement for them).   Tribal witnesses indicated that their Tribes had diverted trust resources needed for community and economic development to cover these CSC.  See Standing Rock at 150.

The Senate Committee took note of these Tribal concerns and held another hearing featuring American Indian tribal leaders on September 21, 1987 -- this one to discuss proposed ISDEAA amendments. See First Session on S. 1703 to Amend the Indian Self-Determination and Education Act: Hearing Before the S. Select Comm. on Indian Affairs, 100th Cong. (1987)("Second 1987 Senate Hearing").[23]   After eight months of working together with Tribal leaders, according to Committee Chairman Daniel K. Inouye, United States Senator from Hawaii, the Committee produced a draft bill meant to address many Tribal concerns, including:

> the need for the Bureau of Indian Affairs and the Indian Health Service to fully fund tribal indirect costs for self-determination contracts; the need for year-to-year stability of contract funding levels in order to improve planning and management of programs; clarifying that Federal acquisition regulations do not apply to self-determination contracts; . . . reducing the paperwork and reporting requirements for mature contracts; alleviating problems associated with over-recovery and under-recovery of indirect costs from Federal agencies other than the BIA and IHS . . . .

---

[23]The Senate Committee held four hearings from April 22, 1987, to February 18, 1988, confusingly giving the title of "First Session" to the first three of them.  See First Session on Recommendations for Strengthening the Indian Self-Determination Act: Hearing Before the S. Comm. on Indian Affairs, 100th Cong. (1987).  The Court modifies this naming convention in the short forms to help the reader distinguish the three hearings from each other.

Second 1987 Hearing at 1-2 (1987)(statement of Hon. Daniel K. Inouye).  Senator Daniel Evans

of Washington, the Vice Chairman of the Senate Committee, further shared with witnesses:

> It is certainly my hope -- and I know that of the chairman and the members of the
> committee -- to attempt to move strongly in this field during this congress to try to
> open up new opportunities to finally fulfill, as closely as we can, the real concepts
> of self-determination that have been the goal of so many years.

Second 1987 Hearing at 2 (statement of Hon. Daniel Evans).  Tribal leaders, for the most part,

praised the Senate Committee for the progress it had made to address these concerns over the

previous few months, but still insisted there were structural problems with the ISDEAA's

approach to CSC that needed to be remedied.  See, e.g., Second 1987 Senate Hearing at 24

(statement of Suzan Shown Harjo, Executive Director, National Congress of American Indians).

Most particularly, the Tribal leaders indicated that they preferred the language of the House bill

amending the ISDEAA as it related to CSC recovery:

> The second recommended change to accomplish is full recovery of costs and
> funding allocations.  The House bill language amending the P.L. 93-638 [the
> ISDEAA], defining contract support costs and requiring full allocation of contract
> support costs, provides a more complete description of what contract funding
> allocations should be based upon.  We would like to see that language given full
> consideration. . . . By including this proposed language, Tribes would receive a
> fair allocation of funds, irrespective of their indirect cost rates.

Second 1987 Senate Hearing at 78 (statement of Joseph B. DeLaCruz, President, Affiliated

Tribes of Northwest Indians).  Unless Tribes could rely on such strong statutory protection for

recovery of full CSC, Tribal leaders maintained, BIA and IHS would continue to fail to provide

sufficient funds to cover CSC.  See Second 1987 Senate Hearing at 83 (statement of Clarence W.

Skye, United Sioux Tribes of South Dakota Development Cooperation).

Taking such critiques to heart, the Senate Committee went to work on the amendments,

and scheduled a third hearing on them for the following month.  See First Session on S. 1703 to

Amend the Indian Self-Determination and Education Assistance Act: Hearing Before the S. Select Comm. On Indian Affairs, 100th Cong. (1987)("Third 1987 Senate Hearing").  The third hearing, unlike the first two, provided BIA and IHS witnesses with significant time to present their view of the amendments.  See Third 1987 Senate Hearing 25-52.  The Vice Chairman of the Senate Committee grilled the Assistant Secretary for Indian Affairs, with the latter noting that the agency had veered very far from Nixon's clear intent in his July 8, 1970 Message, and had gotten "bound up in conflicting and probably unnecessary regulations[.]"  Third 1987 Senate Hearing at 34 (statement of Hon. Daniel Evans).  Responding to a question about CSC from Senator John McCain, the Assistant Secretary indicated that Tribes which found themselves short of CSC to cover overhead could simply dip into their program costs to pay for it.  See Third 1987 Senate Hearing at 37 (statement of Ross Swimmer, Assistant Secretary for Indian Affairs, U.S. Dep't of the Interior).  Responding to a question from Senator Evans, the IHS Director indicated that inadequate appropriations for CSC at the overall agency level meant that there was a chronic CSC shortfall spread around at the Tribal contractor level as well, but that there was no better solution, because funding excess CSC for one tribe from a finite pot of money meant that IHS would need to shortchange other Tribes by the equivalent amount.  See Third 1987 Senate Hearing 47-48 (statement of Everett Rhoades, Director, Indian Health Services).

Tribal leaders at the hearing took issue with the Assistant Secretary's and the IHS Director's statements about CSC.  See Third 1978 Senate Hearing 53-61.  They rejected the suggestion that excess CSC should be funded out of the Secretarial amount.  See, e.g., Third 1978 Senate Hearing 53-54 (statement of William Ron Allen, Chairman, Jamestown Klallam Tribe, Sequim, Washington).  Tribes also rejected any proposal that CSC should be funded using a flat fee or some other simplified approach, arguing that "any kind of approach of a flat rate is

just not workable within the system of addressing the true costs of the recovery of those costs by

the tribes administering BIA/IHS contracts and grants."   Third 1978 Senate Hearing 54

(statement of William Ron Allen, Chairman, Jamestown Klallam Tribe, Sequim, Washington).

After a little more than two months following the Third 1978 Senate Hearing, the Senate

Committee had considered and marked up CSC amendments, reporting them to the full Senate

on December 22, 1987.  See S. Rep. No. 100-274, at 1 (1987).  The Senate Committee called for

a "comprehensive reexamination" of the ISDEAA "to increase tribal participation in the

management of Federal Indian programs," and to "remove many of the administrative and

practical barriers that seem to persist" under the ISDEAA.  S. Rep. No. 100-274, at 2.

The Senate Committee also commended ISDEAA's enactment twelve years earlier as the

"the major reason for assumption by Indian tribes of responsibility for Federal Indian programs."

S. Rep. No. 100-274, at 2-3.  The transfer of responsibility had been a boon to American Indians,

the Senate Committee said:

> In addition to operating health services, human services, and basic governmental
> services such as law enforcement, water systems and community fire protection,
> tribes have developed the expertise to manage natural resources and to engage in
> sophisticated economic and community development.  All of these achievements
> have taken place during a time when tribes have also developed sophisticated
> systems to manage and account for financial, personnel and physical resources. . .
> . Compared to state, county and municipal governments of similar demographic
> and geographic characteristics, the level of development attained by tribal
> governments over the past twelve years is remarkable.

S. Rep. No. 100-274, at 4.  The Senate Committee further found:

> Improvements in tribal financial, personnel, property, and procurement systems
> have enabled tribes to manage increasingly complex matters.  In response to both
> federal and tribal demands for accountability, most Indian tribes that operate
> programs now have annual single-agency audits of tribal finances.   The
> Department of Interior Office of Inspector General has reported an increase in
> tribal assumption of responsibility for tribal financial management.

S. Rep. No. 100-274, at 4.  The Senate Committee noted many more of the improvements that the ISDEAA had induced in American Indian communities, including custodial care placements for children, outreach to isolated American Indian families through community health workers, increased health facility utilization, and the construction of safe water and sanitation systems. See S. Rep. No. 100-274, at 5.  The common thread among all these successes, according to the Senate Committee, was that the ISDEAA had given Tribal communities an opportunity to "plan and deliver services appropriate to their diverse demographic, geographic, economic, and institutional needs" -- whether in the Navajo Nation, the largest Tribe in the United States, or on isolated rancherias in California with a few dozen residents. [24]  S. Rep. No. 100-274, at 5.

---

[24]It is unclear from the Senate Committee Report text how the Senate Committee came to identify the Navajo Nation as the largest Tribe in the United States, as the Court's search of United States Census Bureau archives finds only a population count of population by reservation in the 1980 Census, i.e., no summed totals by Tribal affiliation.  See 1 United States Bureau of the Census, 1980 Census of Population, Social Characteristics for American Indian Persons on Reservations and Alaska Native Villages: 1980 tbl.251 at 451-56, available at http://www2 .census.gov/prod2/decennial/documents/1980a_usC.zip (PDF document 1980a_usC-07 in the zip file)(last visited Oct. 19, 2016)("1980 Census").  According to the 1980 Census, however, the Navajo Reservation had by far the largest population of any reservation or Alaskan native village in the United States, with 110,606 persons.  See 1980 Census tbl.251 at 452.  It appears that the reference to the California rancherias with a few dozen residents refers to reservations such as Bridgeport Colony, California (population 48) and Middletown Rancheria, California (population 37).  See 1980 Census tbl.251 at 451-52.  Other California rancherias had as few as six residents. See 1980 Census tbl.251 at 451 (Cedarville Rancheria, California).

As of the 2010 Census, the largest Tribe in the United States is either the Navajo or the Cherokee, depending on whether one counts individuals who identify as multiracial or as members of more than one Tribe.  Among those who identify exclusively as a member of a single Tribe, the Navajo are slightly more populous than the Cherokee -- 286,731 Navajo compared to 284,247 Cherokee.  See United States Census Bureau, The American Indian and Alaska Native Population: 2010 tbl.7, at 17 (2012), available at http://www.census.gov/prod /cen2010/briefs/c2010br-10.pdf (last visited Oct. 27, 2016)("2010 Census").  Including those who identify as multiracial or as members of more than one Tribe, Cherokees are almost three times as populous as any other Tribe in the country -- 819,105 Cherokee compared to 332,129 Navajo.  See 2010 Census at 17.

The Senate Committee also found that IHS' actions attempting to implement the ISDEAA largely had been praiseworthy.  See S. Rep. No. 100-274, at 6.  As of 1987, the Senate Committee said, IHS directly operated forty-five hospitals, seventy-one health centers, and several hundred smaller health stations and satellite clinics.  See S. Rep. No. 100-274, at 6 (citing Indian Health Service, Fiscal Year 1988 Budget Request).  Nevertheless, the Senate Committee noted with concern that many Tribes had reported that IHS had refused to negotiate for the transfer of central office funds and had exhibited an overall resistance to Tribal efforts to redesign programs, and to reallocate resources and personnel in support of Tribal self-determination.  See S. Rep. No 100-274, at 6.  The Senate Committee therefore provided:

> [T]he [HHS] Secretary shall negotiate annual funding agreements with each Indian tribe.  These agreements authorize the tribe to plan, conduct, consolidate, and administer programs, services, functions, and activities to Indian tribes or Indians.  Pursuant to the terms of the agreement and at the request of the tribe, the Secretary shall provide funds to carry out the agreement in a [sic] amount equal to the amount that the Indian tribe would have been eligible for under Self-Determination Act contracts and grants.  The bill also provides that the Secretary shall interpret each Federal low [sic] in a manner that will facilitate inclusion of programs or activities under the agreement.

S. Rep. No. 100-274, at 8.  The Senate Committee then adopted an amendment in the nature of a substitute that made several modifications to language in H.R 3508 as introduced.  See S. Rep. No. 100-274, at 8-13.  Touching for the first time on the duplication issue that forms the pith of Sage Hospital's second MSJ, the Senate Committee stated that it was concerned that "if an Indian tribe is participating as part of a consortium that tribe should not be able to contract for any of the programs or activities which are already part of the consortium's self-governance agreement."  S. Rep. No. 100-274, at 8.  The Senate Committee noted further that the amendments that it proposed would "prevent this type of duplication of services and programs. The Senate Committee also adopted language which instructed the HHS Secretary to "interpret

each Federal law and regulation in a manner that will facilitate the inclusion of programs and services and the implementation of agreements . . . ."  S. Rep. No. 100-274 at 15.

A more noticeable change to the ISDEAA that the Senate Committee proposed, however, was to add a sixth title to the statute focused squarely on Tribal self-governance.  See S. Rep. No 100-274 at 14, 17-21.  Section 403(g)(3) within that proposed sixth title stated that, subject to exclusions for community colleges, public primary and secondary schools, the Flathead Agency Irrigation Division, and the Flathead Agency Power Division,

> the HHS Secretary shall provide funds to the tribe for one or more programs, services, functions, or activities in an amount equal to the amount that the tribe would have been eligible to receive under contracts and grants under this Act, including amounts for direct programs and contract support costs and amounts for those activities that are specifically or functionally related, but not part of the service delivery program, without regard to the organizational level within the Department where such functions are carried out.

S. Rep. No. 100-274 at 20.  Furthermore, the Senate Committee clarified in a proposed Section 406(a): "Nothing in this title shall be construed to limit or reduce in any way the services, contracts, or funds that any other Indian tribe or tribal organization is eligible to receive under section 102 or any other applicable Federal law."  S. Rep. No. 100-274 at 21.

For the purposes of this case, however, the most important change to the ISDEAA that the Senate Committee proposed was to add Section 106 to clarify provisions for funding self-determination contracts, including direct costs.  See S. Rep. No. 100-274 at 30.  The Senate Committee walked slowly through each subsection to explain its import.  See S. Rep. No. 100-274 at 30-34.  Starting off with its proposed Subsection 106(a), the Senate Committee said:

> It is apparent from the wording of the new section 106(a) that the Committee is strongly committed to the principle of assisting tribes to succeed in their efforts to plan, manage and operate programs and services under self-determination contracts. . . . The intent of these amendments is to protect and stabilize tribal programs from inappropriate administrative reduction by Federal agencies.

S. Rep. No. 100-274 at 30.  The Senate Committee alleged that the BIA had made many such reductions over the years in direct contravention of Tribal funding priorities, see S, Rep. No. 100-274 at 30-31, and threw up Subsection 106(a)(5) as a barricade to prevent any such chicanery in the future:

> Section 106(a)(5) would prevent the [HHS] Secretary from reducing funds for a self-determination contract, except in response to a reduction in appropriations enacted by the Congress.  Such a reduction should be a proportional, across-the-board reduction. . . .  These amendments are intended to prevent Federal agencies from passing on the entire amount, or a disproportionate amount, of a reduction in Congressional appropriations, to tribal contracts in order to protect the base for Federally-operated functions.

S. Rep. No. 100-274 at 31.  The Senate Committee accused the BIA of cutting Tribal self-determination budgets to free up money for pay increases for BIA personnel, of financial mismanagement, and of over-aggressively reducing Tribal programmatic budgets under the guise of congressional-imposed sequestrations, see S. Rep. No. 100-274 at 31-32, adding with comparative sangfroid that "the intent of these amendments is to prevent such administrative reductions of tribal contract funds,"  S. Rep. No. 100-274 at 31.

The Senate Committee briefly discussed its proposed Subsections 106(b)-(f), which are not directly relevant to this case, before turning to its proposed Subsection 106(g).  See S. Rep. No. 100-274 at 33.  That Subsection, according to the Senate Committee, would "require the [HHS] Secretary to add indirect costs to the amount of funds provided for direct program costs associated with self-determination contracts for the initial year of tribal program operation, upon the request of the tribal contractor."  S. Rep. No. 100-274 at 33.  The intent behind this provision, according to the Senate Committee, is

> to require the [HHS] Secretary to provide indirect costs for each contract year in addition to the program funding which would have been available to the Secretary to operate a contracted program and to prohibit the practice which requires tribal contractors to absorb all or part of such indirect costs within the program level of

funding, thus reducing the amount available to provide services to Indians as a direct consequence of contracting.

S. Rep. No. 100-274 at 33.  The Senate Committee then added:

> The combined amount of direct and indirect costs shall then be available for each subsequent year that the program remains continuously under contract.  While the Committee has concerns about the changes to the methods of budgeting for and allocating indirect costs funds, whether those methods be the so-called "grandfather" approach,[25] the single line-item indirect cost fund, or some other method, the Committee does not believe that it should determine the method of distribution.  The "grandfather" approach and the "single fund" approach both have advantages and disadvantages from the perspective of Federal agency budgets and from the perspective of individual tribal contracts.  It is the Committee's hope that the Department of the Interior Office of Inspector General, the Bureau of Indian Affairs, and the Indian Health Service will coordinate their efforts with the tribes to develop the most effective method of distributing indirect cost funds.  The Committee amendment will insure that, whatever method is used, the tribal contractor will realize the full amount of direct program costs and indirect costs to which the contractor is entitled.

S. Rep. No. 100-274 at 33-34.  The Senate Committee then turned to its proposed Subsection 106(h), a Subsection that Sage Hospital and the United States also contest in this case.  See S. Rep. No. 100-274 at 34.  The Senate Committee's commentary on the Subsection is not germane to the case, however, as the Senate Committee specifically addressed only construction contracts in the discussion.  See S. Rep. No. 100-274 at 34.

---

[25]On November 3, 1983, the DOI Inspector General wrote a letter to the Office of Management and Budget in which he reported the BIA's decision to "grandfather" indirect cost dollars into a Tribe's recurring Secretarial amount, so that, after the first year of a self-determination contract, indirect costs would be paid off of the top of the total contract amount. S. Bobo Dean & Joseph H. Webster, Contract Support Funding and the Federal Policy of Indian Tribal Self-Determination, 36 Tulsa L.J. 349, 356 (quoting Letter from Richard Mulberry, DOI Inspector General, to Deputy Director, OMB (Nov. 3, 1983)("1983 OMB Letter")).  The DOI Inspector General expected that this "grandfather" approach would encourage Tribes to develop more efficient administrative systems, but he also indicated that there was a risk that the heavy and inconsistent requirements of the federal bureaucracy were jeopardizing Tribes' ability to handle federal programs.  S. Bobo Dean & Joseph H. Webster, Contract Support Funding and the Federal Policy of Indian Tribal Self-Determination at 356 (quoting 1983 OMB Letter).

c.      **President Reagan's Signing Statement**.

In his first Statement on Indian Policy, issued January 24, 1983, Reagan extended his general philosophical preference for programmatic decentralization to American Indian Tribes. See Ronald Reagan, Statement on Indian Policy, 40 Public Papers of the Presidents of the United States, available at http://www.presidency.ucsb.edu/ws/index.php?pid=41665&st=&st1= (last visited Oct. 26, 2016)("Reagan Statement on Indian Policy").[26]   Reagan praised Nixon's policy of Tribal self-determination from Nixon's 1970 Message and noted how the 1975 ISDEAA had captured Nixon's vision.   See Reagan Statement on Indian Policy at 1.   Reagan believed, however, that the ISDEAA had not gone far enough, having been "more rhetoric than action." Reagan Statement on Indian Policy at 796.   Instead of fostering and encouraging Tribal self-government, Reagan said, "Federal policies have by and large inhibited the political and economic development of the tribes.   Excessive regulation and self-perpetuating bureaucracy have stifled local decision-making, thwarted, Indian control of Indian resources, and promoted dependency rather than self-sufficiency."   Reagan Statement on Indian Policy at 796.   Reagan established that his Administration intended to

> reverse this trend by removing the obstacles to self-government and by creating a more favorable environment for the development of healthy reservation economies.   Tribal governments, the Federal Government, and the private sector will all have a role.   This administration will take a flexible approach which recognizes the diversity among tribes and the right of each tribe to set its own priorities and goals.

---

[26]Reagan's published diary entry from September 20, 1982, indicates that he already held a Cabinet meeting on this topic on that day.   See Ronald Reagan, 1 The Reagan Diaries 155 (Douglas Brinkley ed. 2009)("A Cabinet meeting -- main subject our relations with Am. Indians. We are going to put our relationship with tribes on a govt. to govt. basis.").   These early discussions notwithstanding, Reagan did not issue any public presidential statement about American Indians before his January 24, 1983 Statement on Indian Policy.

Reagan Statement on Indian Policy at 796-97.  Reagan acknowledged that "[c]hange will not happen overnight," but he was determined to "honor the commitment this nation made in 1970 and 1975 to strengthen tribal governments and lessen Federal control over tribal governmental affairs."  Reagan Statement on Indian Policy at 797.  Delving into specifics, Reagan noted:

> Tribal governments, like State and local governments, are more aware of the needs and desires of their citizens than is the Federal Government and should, therefore, have the primary responsibility for meeting those needs.  The only effective way for Indian reservations to develop is through tribal governments which are responsive and accountable to their members.

Reagan State on Indian Policy at 797.  For generations, according to Reagan, federal employees had performed functions on American Indians' behalf.  See Reagan State on Indian Policy at 797-98.  Despite ISDEAA passage, Reagan continued, "major tribal government functions -- enforcing tribal laws, developing and managing tribal resources, providing health and social services, educating children -- are frequently still carried on by Federal employees."  Reagan State on Indian Policy at 797.

Reagan asked Tribes to reduce their dependence on Federal funds by providing a greater percentage of the cost of their self-government, and pledged to "assist tribes in strengthening their governments by removing the Federal impediments to tribal self-government and tribal resource development."  Reagan State on Indian Policy at 797.  At the same time, Reagan would not simply make Tribes fly before they were fully fledged, ensuring that "[n]ecessary Federal funds" would remain available for all Tribes, and developing a Small Tribes Initiative to provide financial support smaller Tribes needed to develop basic Tribal administrative and management capabilities.  Reagan State on Indian Policy at 797.

Speaking directly to the issue of American Indian healthcare services the following year, Reagan pocket vetoed the Indian Health Care Amendments of 1984 on October 22, 1984.[27]  See United States Senate, S. 2166 - Indian Health Care Amendments of 1984, https://www.congress .gov/bill/98th-congress/senate-bill/2166/all-actions (last visited Oct. 26, 2016)(listing all actions, including the pocket veto, taken on the bill).  His reasoning behind the veto, Reagan said in an accompanying memorandum, was that he believed the bill to be seriously deficient in fulfilling the goals of the Indian Health Care Improvement Act, Pub. L. 94-437 (1976)("IHCIA").  See Ronald Reagan, Memorandum Returning Without Approval the Indian Health Care Amendments of 1984, 40 Public Papers of the Presidents of the United States 1584 (1984), available at http://www.presidency.ucsb.edu/ws/index.php?pid=39292&st=&st1= (last visited Oct. 26, 2016) ("1984 Reagan Memorandum").  What Reagan identified as especially troublesome in the bill was a provision that would reduce access to health services for American Indians.  See 1984 Reagan Memorandum at 1584.  The provision in question, Reagan said, "would set a precedent for potentially changing the fundamental relationship of the Indian Health Service to State and local entities, as well as depriving eligible Indians of benefits that should be due them by virtue of their citizenship in the State." 1984 Reagan Memorandum at 1584.  "As a matter of both principle and precedent," Reagan asserted, "I cannot accept this provision."  1984 Reagan Memorandum at 1584.

---

[27]Under Article 1, Section 7 of the United States Constitution, "[i]f any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law."  U.S. Const. art. 1, § 7, cl. 2.  A "pocket veto" refers to the situation when a congressional adjournment prevents the President from returning the bill.  See generally Wright v. United States, 302 U.S. 583, 594-98 (1938) (discussing what constitutes an adjournment for pocket veto purposes).

Reagan's interest in American Indian issues seemed to wane during his second term, being expressed only in a trio of ceremonial proclamations in the three years leading up to the ISDEAA amendment of 1988.[28]   In Reagan's 1986 and 1988 proclamations marking National American Indian Heritage Week, however, Reagan revisited his theme of increased Tribal self-sufficiency.   See Ronald Reagan, Proclamation 5577 -- American Indian Week, 1986, 101 Stat. 2041 (1986); Ronald Reagan, Proclamation 5868 -- National American Indian Heritage Week, 1988, 102 Stat. 5068 (1988).   In the 1986 proclamation, Reagan noted:

> Indians make contributions in every area of endeavor and American life, and our literature and all our arts draw upon Indian themes and wisdom. . . . We look to the future with the expectation of even stronger tribal governments and lessened Federal control over tribal government affairs.   We look to a future of development of economic independence and self-sufficiency, and an enhanced government-to-government relationship that will allow greater Indian control of Indian resources.

101 Stat. 2041.   Two years later and just one week before Congress sent him the ISDEAA amendments of 1988, Reagan repeated this self-determination theme in his 1988 proclamation:

> Despite past periods of conflict and changes in Indian affairs policies, the government-to-government relationship between the United States and Indian tribes has endured.   The Constitution, treaties, laws, and court decisions have consistently recognized a unique political relationship between tribal elected governments and the United States.   We look to a future of increasing economic independence and self-sufficiency on Indian reservations, and we support efforts to foster greater Indian control of Indian resources.

102 Stat. 5068.   Read in light of Reagan's refrain about Tribal self-sufficiency over the five years preceding the ISDEAA amendments of 1988, it is difficult to miss the same tones in his signing statement to the bill on October 5, 1988.   See Ronald Reagan, Statement on Signing the Indian Self-Determination and Education Assistance Act Amendments of 1988, 40 Public Papers of the

---

[28]American Indian issues did not make a single appearance in Reagan's personal diary during the period of time that Congress was considering the 1988 ISDEAA amendments.   See Ronald Reagan, 1 The Reagan Diaries 692-819 (Douglas Brinkley ed. 2009)

Presidents of the United States 1284, available at http://www.presidency.ucsb.edu/ws/index

.php?pid=34969&st=&st1= (last visited Oct. 26, 2016)("Reagan Signing Statement").

Reagan started the signing statement on a general note: "This Act will assist in furthering

Administration efforts to transfer the development and operation of programs from the Federal

Government to Indian tribes.   Tribal self-governance allows tribes more freedom to design

programs to serve the specific needs of their members."  Reagan Signing Statement at 1284.  He

immediately thereafter turned, however, to a rejection of one of the provisions in the bill added

to the proposed new ISDEAA § 106.  See Reagan Signing Statement at 1284.  Reagan wrote: "A

provision in section 205 of the Act stated that the Secretaries of the Interior and Health and

Human Services shall reduce funding to Indian tribes if so directed by a statement from a

Member of Congress that accompanies a conference report."   Reagan Signing Statement at

1284.[29]  Reagan asserted that the provision purported to authorize a process altering Executive

branch officials' legal duties without both Congressional houses and the President's

participation, thus violating the requirements for presentment and bicameralism that the Supreme

Court five years earlier had enunciated in Immigration and Naturalization Service v. Chadha,

462 U.S. 919 (1983).   Aside from this objection and two others focused on reporting

requirements, Reagan did not voice any objections to any provisions in the 1988 ISDEAA

amendments.  See Reagan Signing Statement at 1284.

---

[29]The object of the rejection is not entirely clear from the signing statement's text. Subsection (a)'s relevant portion reads as follows: "The amount of funds provided under the terms of self-determination contracts entered into pursuant to this Act shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract."  102 Stat. 2292.  Subsection (a)'s relevant portion reads as follows: "The amount of funds provided under the terms of self-determination contracts entered into pursuant to this Act shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract."  102 Stat. 2292.

3.    **1994 Amendments.**

Under the 1988 ISDEAA amendments' terms, HHS and DOI were supposed to work with Tribes to reach agreement on draft regulations to cover self-determination contracts within ten months of bill enactment.  Pub. L. 100-472 § 207(b)(3)-(4).[30] Approximately two years after the statutory deadline -- and without first consulting Tribes -- IHS developed new policy guidelines governing the award of CSC.  See Indian Self-Determination Memorandum No 92-2 (Feb. 27, 1992)("1994 IHS Memorandum").  The new guidelines provided for the use of CSC to pay for all negotiated indirect costs, and IHS distributed available funds to contractors based on an annually negotiated rate.  1994 IHS Memorandum at 1.  The guidelines, however, also authorized IHS to use CSC to pay for direct costs under ISDEAA § 106(a)(2).  See 1994 IHS Memorandum at 1.

Oftentimes such payments never materialized, at least not in full.  See United States General Accounting Office, Indian Self Determination Act: Shortfalls in Indian Contract Support Costs Need to be Addressed, GAORCED 99-150 at 6 (June 1999), available at http://www.gao.gov/assets/230/227485.pdf)(last visited Oct. 26, 2016)("GAO Report"). Although CSC funding had been incommensurate with Tribal needs since the ISDEAA's enactment in 1975, the shortfalls started to become acute at the end of the 1980s and the beginning of the 1990s, because of Congress' failure to anticipate the increased Tribal demand for self-determination contracts that arose after the 1988 ISDEAA amendments.  See GAO

---

[30]Congress split this requirement across two statutory Subsections.  The first Subsection read as follows: "Within seven months from the date of enactment of the Indian Self-Determination and Education Assistance Act Amendments of 1988, the Secretary shall publish proposed regulations in the Federal Register for the purpose of receiving comments from tribes and other interested parties."  Pub. L. 100-472 § 207(b)(3).  The second Subsection read as follows: "Within ten months from the date of enactment of the Indian Self-Determination and Education Assistance Act Amendments of 1988, the Secretary shall promulgate regulations to implement the provisions of such Act."  Pub. L. 100-472 § 207(b)(4).

Report at 25-28.  From 1989 to 1994, these CSC shortfalls ranged from seventy million dollars to over one hundred million dollars per year.  See GAO Report at 32 fig.2.5.

Nearly five years after the statutory deadline and still without having meaningfully consulted with Tribes, the DOI and HHS published eighty pages of proposed regulations conforming to the 1988 ISDEAA amendments in the Federal Register.[31]  See Indian Self-Determination and Education Act Amendments; Proposed Rule, 59 Fed. Reg. 3166 (January 20, 1994)(codified at 25 CFR pt. 900).   Tribal reaction to the proposed regulations was overwhelmingly negative, because of both their content and their length.  See First Session on Oversight Hearing to Establish a Detailed Timeframe for the Swift Development of New Implementing Regulations with Close Tribal Participation: Hearing Before the S. Comm. on Indian Affairs, 103d Cong., at 1-2 (1993)("1993 Senate Hearing")(statement of Hon. Daniel K. Inouye, Chairman).  In response, HHS and DOI began to hold regional meetings with Tribal leaders in a de facto inversion of usual notice and comment rulemaking.[32]  See 1993 Senate

---

[31]The DOI and HHS admitted in the notice of proposed rulemaking:

[A] major area of concern for the current Administration relates to the adequacy of outreach to, and participation in the drafting process by, tribes and tribal organizations during the post-August 1990 period.  The DOI's concern is heightened by the fact that the September 1990 draft (which did reflect tribal input) was significantly modified during the more than two-year period in which the two Departments worked on the draft without tribal participation.

59 Fed. Reg. 3166.

[32]In notice and comment rulemaking, also known as "informal rulemaking," the Administrative Procedure Act, 5 U.S.C. § 551-84, generally requires that agencies publish a notice of proposed rulemaking in the Federal Register. Maeve P. Carey, Congressional Research Service, The Federal Rulemaking Process: An Overview 5-6 (June 17, 2013)("Federal Rulemaking Process").  The notice must contain (i) a statement of the public rulemaking proceedings' time, place, and nature; (ii) reference to the legal authority under which the rule is proposed; and (iii) either the proposed rule's terms or substance, or a description of the subjects and of the issues involved.  See Federal Rulemaking Process at 6.  After considering public

- 94 -

Hearing at 34 (statement of Eddie F. Brown, Assistant Secretary, Indian Affairs, Department of the Interior).

### a.      House Report 103-653.

On August 3, 1994, the House Committee on Natural Resources reported to the full House on another set of ISDEAA amendments.  See H.R. Rep. No. 103-653 (1994).  In its report's preamble, the House Committee indicated that the bill's purpose was "to amend the Indian Self-Determination and Education Assistance [A]ct to permanently establish Tribal Self-Governance in the Department of the Interior."  H.R. Rep. No. 103-653 at 5.  The House Committee commended IHS for having entered into self-determination contracts with fourteen American Indian tribes during the previous two-and-a-half years, see H.R. Rep. No. 103-653 at 6, but it also revealed that it was

> very concerned about reports from many of the Self-Governance tribes that officials of the Indian Health Service have refused to negotiate for the transfer of central office funds and have exhibited an overall resistance to tribal efforts to redesign programs and reallocate resources and personnel under the authority of Tribal Self-Governance.

H.R. Rep. No. 103-653 at 6.  The House Committee diagnosed the cause of such resistance within IHS to be "a misapprehension that Tribal Self-Governance is a temporary project."  H.R. Rep. No. 103-653 at 6.  To the contrary, the House Committee said, Tribal self-determination was to be a permanent policy, and IHS must take steps to "begin to plan for and implement changes that will result in reductions in the Federal bureaucracy which correspond to the transfer of program funds, resources, and responsibilities to Self-Governance tribes."  H.R. Rep. No. 103-653 at 6.

---

comments, the agency may then publish the final rule, incorporating a general statement of its basis and purpose.  See Federal Rulemaking Process at 6.  Agencies commonly allow at least thirty days for public comment.  See Federal Rulemaking Process at 6.

Although the House Committee proposed adding an entire ISDEAA section dedicated exclusively to AFAs, the House Committee had surprisingly little to say about issues directly relevant to the Allocation MSJ or the Duplication MSJ. In one Subsection, however, it packed a punch far above its weight, instructing HHS to interpret not just the ISDEAA, but rather "each Federal law and regulation," except where otherwise provided by law, in a manner that would facilitate "the inclusion of programs, service, functions, and activities in the agreements entered into under" Tribal self-determination contracts.  H.R. Rep. No. 103-653 at 20.

b.    **Senate Committee Report.**

On April 20, 1994, Senators McCain and Inouye introduced a Senate version of the 1994 ISDEAA amendments, and the bill was referred to the Senate Committee on Indian Affairs.  See S. Rep. No. 103-374 at 4 (1994).  On August 10, 1994, the Senate Committee reported the bill to the full Senate. See S. Rep. No 103-374 at 1.  According to the Senate Committee, the major impetus for the bill was HHS and DOI's incorrigibility; Congress mandated in 1988 to quickly promulgate simple regulations to govern Tribal self-determination contracts, but the agencies had done the opposite for six years.[33]  See S. Rep. No. 103-374 at 14.  The Senate Committee keelhauled the agencies:

> This action is a direct result of the failure of the Secretaries to respond promptly and appropriately to the comprehensive amendments developed by this Committee six years ago.  The recently promulgated proposed regulations

_____

[33]Such caustic congressional condemnation of the BIA was common during the 1980s and early 1990s.  See George Pierre Castile, Taking Charge: Native American Self-Determination and Federal Indian Policy, 1975-1993, at 49-110 (2006).  The Senate Special Committee on Investigations found massive failure of the BIA to serve American Indians in 1989 and noted "at least 42 congressional investigations have recommended federal reorganization, restructuring, retinkering.  And in one nine year period alone, the BIA was actually reorganized ten times."  United States Senate, A Report of the Special Committee on Investigations of the Select Committee on Indian Affairs 15, 101st Cong., 1st Sess. (Nov. 20, 1989).

> severely undercut Congress' intent in the original Act and those [1988] amendments to liberalize the contracting process and to put these programs firmly in the hands of the tribes.   The proposed regulations erect a myriad of new barriers and restrictions upon contractors rather than simplifying the contracting process and freeing tribes from the yoke of excessive federal oversight and control.

S. Rep. No. 103-374 at 14.   The Senate Committee explained that, because of the agencies' recalcitrance, its proposed 1994 ISDEAA amendments would cabin their rulemaking authority even more than the original ISDEAA and the 1988 ISDEAA amendments had.   See S. Rep. No. 103-374 at 14:

> Section 5(1) delegates to the Secretary the authority only to promulgate implementing regulations in certain limited subject matter areas. . . .   A second key limitation on the delegation of rulemaking authority is provided in the twelve month limitation on the Secretaries' authority to promulgate the regulations.   This limit is necessary to prevent another regulation drafting process that goes on for years without satisfactory or final resolution.

S. Rep. No. 103-374 at 14.   Because of the agencies' obduracy in refusing to follow congressional instructions to consult Tribes before proposing regulations,[34] the Senate Committee explained, its proposed 1994 ISDEAA amendments also would require HHS and DOI to employ the negotiated rulemaking process, publishing a proposed rule within six months of the amendments' enactment.   See S. Rep. No. 103-374 at 14.

---

[34]It appears that the Senate Committee may have been somewhat hyperbolic when haranguing HHS and DOI for completely "disregarding" American Indian input.   S. Rep. No. 103-374 at 14.   On at least one occasion, on September 29, 1990, President George Bush's Interior Secretary, Michael Lujan, met with nearly seven hundred Tribal leaders.   See Seth Mydans, Old Angers Still Fresh As Indians Meet Lujan, N.Y. Times, Sept. 30, 1990, available at http://www.nytimes.com/1990/09/30/us/old-angers-still-fresh-as-indians-meet-lujan.html   (last visited Oct. 21, 2016)("Old Angers").   Even at this meeting, however, DOI effectively presented the Tribal leaders with a regulatory fait accompli, eliciting strong resentment from the Tribal leaders present. Old Angers at 1 (quoting, among others, Wayne Ducheneaux, president of the National Congress of American Indians, as challenging Lujan: "You say you want consultation with the Indian tribes, but I don't think you truly want it.").

Having ground its ax, the Senate Committee also delved deeply into amendments that it proposed for ISDEAA § 106, which Congress had added to the ISDEAA in 1988.  See S. Rep. No. 103-374 at 8-14.  The Senate Committee proposed to amend Sections 106(a)(2) and (3) to more fully define the meaning of the term "contract support costs" to "include both funds required for administrative and other overhead expenses and 'direct' type expenses of program operation."  S. Rep. No. 103-374 at 8-9.  The Senate Committee said that, in the event that the Secretarial amount for a particular function proves to be insufficient in light of a contractor's needs for prudent management, "contract support costs are to be available to supplement such sums."  S. Rep. No. 103-374 at 9.  The Senate Committee proposed retaining the ISDEAA's process for negotiations between the agencies and Tribes for indirect cost agreements, see S. Rep. No. 103-374 at 9, but still smarting from the agencies' impenitent disregard for its earlier instructions, the Senate Committee drew a line in the sand even on these negotiations:

> Throughout this section the Committee's objective has been to assure that there is no diminution in program resources when programs, services, functions or activities are transferred to tribal operation. . . .  [If] a tribe would be compelled to divert program funds to prudently manage the contract, [it is] a result Congress has consistently sought to avoid.

S. Rep. No. 103-374 at 9.  The Senate Committee micromanaged even further, sidestepping HHS and DOI and directing the Office of Management and Budget ("OMB") to develop new cost principles unique to Tribal organizations for HHS and DOI to apply to self-determination contracts.  See S. Rep. No. 103-374 at 10.

The Senate Committee also proposed two new ISDEAA subsections that would codify existing practice and policy, and two new subsections that would reverse existing practice.  See S. Rep. No. 103-374 at 10-12.  The first new subsection would codify "the current policy and practice regarding program income earned by a tribal organization during the course of

administering a contract (such as third party income paid by insurance companies insuring persons served by a tribal organization's health program)."  S. Rep. No. 103-374 at 10.  The second new subsection would

> incorporate[] the longstanding canon of statutory interpretation that laws enacted for the benefit of Indians are to be liberally construed in their favor, and further to clarify that all functions, services, activities or programs or portions thereof, as well as all administrative functions, are contractible, as clearly provided in the Act.

S. Rep. No. 103-374 at 11.  The third new subsection would make it clear that Tribal contractors operating under self-determination contracts are "not subject to [HHS or DOI] manuals, guidelines, regulations or unpublished requirements unless expressly authorized under the [ISDEAA] or agreed to by the Contractor."  S. Rep. No. 103-374 at 12.  The fourth new subsection would permit "a unilateral modification of [a self-determination] contract when that modification only adds supplemental funding for programs or other functions that are already included in the annual funding agreement."  S. Rep. No. 103-374 at 13.

### c.    President Clinton's American Indian Policy.

President William J. Clinton issued more than fifty percent more signing statements than any other President in history.  See Congressional Research Service, Presidential Signing Statements: Constitutional and Institutional Implications 5-7 (Jan. 4, 2012), available at http://fas.org/sgp/crs/natsec/RL33667.pdf (last visited Oct. 26, 2016).  His choice not to issue one on the ISDEAA amendments is therefore as notable as a dog that does not bark,[35] especially

---

[35]The "dog didn't bark" canon derives from a short story from Sir Arthur Conan Doyle, in which Sherlock Holmes deduces the identity of the villain after realizing that the dog of the house did not bark when the individual came to the house.  See Sir Arthur Conan Doyle, The Adventure of Silver Blaze, The Complete Sherlock Holmes 347 (A.C. Doyle Memorial ed. 1960).  The Supreme Court repeatedly has invoked this unofficial canon of statutory construction.  See, e.g., Zuni Pub. Sch. Dist. No. 89 v. Dep't of Ed., 550 U.S. 81, 88 (2007); Scheidler v. National Organization of Women, 547 U.S. 9, 20 (2006).

given that he wrote four other signing statements on other bills the same day that he signed the ISDEAA amendments of 1994. <u>See</u> Presidential Signing Statements -- 1994, http://www .presidency.ucsb.edu/signingstatements.php?year=1994&Submit=DISPLAY   (providing   a chronological listing of every presidential signing statement from 1994).

Clinton had not been silent about American Indian self-determination, however, during the months when the 1994 ISDEAA amendments were coursing through Congress; six months before the ISDEAA amendments reached his desk, Clinton had summoned the leaders of all 547 federally recognized Tribes to the meeting on the White House lawn.  <u>See</u> Douglas Jehl, Clinton Meets Indians, Citing a New Respect, N.Y. Times, Apr. 30, 1994.  In his welcoming remarks to the Tribal leaders, Clinton said:

> All governments must work better.  We must simply be more responsive to the people we serve and to each other.  It's the only way we'll be able to do good things with the resources we have.  I know that you agree with that.  More and more of you are moving to assume fuller control of your governments.  Many are moving to take responsibility for operating your own programs.  Each year the Bureau of Indian Affairs is providing more technical services and fewer direct services.
>
> One avenue for greater tribal control is through self-governance contracts.  There are about 30 self-compacting tribes today.  We're working with Congress to raise that number by 20 tribes every year.  We'd like self-governance to become a permanent program.  But we must ensure services will still be provided to the smaller tribes that do not choose to participate.

William J. Clinton, Remarks to Native American and Native Alaskan Tribal Leaders, 42 <u>Public Papers of the Presidents of the United States</u> PP (Apr. 29, 1994), <u>available</u> <u>at</u> http://www .presidency.ucsb.edu/ws/index.php?pid=50070&st=&st1= (last visited Oct. 26, 2016).   In the memorandum that Clinton ceremoniously signed immediately after his welcoming remarks, Clinton went further: "Each executive department and agency shall take appropriate steps to remove any procedural impediments to working directly and effectively with tribal governments

on activities that affect the trust property and/or governmental rights of the tribes."  William J. Clinton, Memorandum on Government-to-Government Relations With Native American Tribal Governments, 42 Public Papers of the Presidents of the United States PP (Apr. 29, 1994), available at http://www.presidency.ucsb.edu/ws/index.php?pid=50064&st=&st1= (last visited Oct. 26, 2016).

At Clinton's instruction, the Departments of Justice, Interior, and Housing and Urban Development followed up on the White House meeting with a joint "National American Indian Listening Conference" in Albuquerque.  Louis Sahagun, Tribal Leaders Meet, Voice Sovereignty Concerns, Los Angeles Times, at 12 (May 6, 1994)("Tribal Leaders Meet").  At that meeting, ninety federal officials, including Attorney General Janet Reno and Secretaries Bruce Babbitt and Henry Cisneros, fielded questions from more than 200 Tribal leaders to discuss how Tribes could develop their economies and social services free of the interference of federal agencies. See Tribal Leaders Meet at 12.  Reno indicated that the goal of the conference was to make a first "step toward doing away with the old, closed way of doing business."  See Tribal Leaders Meet at 12.

## ANALYSIS

The Court grants Sage Hospital's motion for summary judgment on the issue of liability on its sixth claim for relief.  The Court does not conclude that there are any genuine disputes as to material fact.  Further, the Court concludes that: (i) the FY 2015 AFA and the FY 2016 AFA are substantially similar; and (ii) the FY 2016 AFA is a successor funding agreement under 25 C.F.R. § 900.33.  The Court, therefore, deems the FY 2016 AFA approved.  The Court also grants Sage Hospital's request at the hearing that the Court, at this time, award damages that allegedly arose from the declination.

## I.   NO GENUINE DISPUTE EXISTS AS TO ANY MATERIAL FACT ON LIABILITY ON SAGE HOSPITAL'S SIXTH CLAIM FOR RELIEF.

As the movant, who is also the party who will bear the burden of persuasion at trial, Sage Hospital bears the burden of showing that no genuine dispute exists as to any material fact on the sixth claim for relief.  See Celotex Corp. v. Catrett, 477 U.S. at 331.  As discussed in pages 2-5 supra, Sage Hospital lays out thirteen statements of fact in its MSJ that the United States does not dispute in its Response.  See MSJ at 3-6; Response at 1-2.  The United States asserts three additional facts in its Response that Sage Hospital does not dispute in its Reply.  See Response at 2-3; Reply at 2-4.  Because Sage Hospital does not otherwise respond to these three asserted facts, the Court deems the asserted facts undisputed.  See D.N.M. Local R. Civ. P. 56.1(a)("All material facts set forth . . . will be deemed undisputed unless specifically controverted.").  The Court therefore concludes that no genuine dispute exists as to any material fact on liability on Sage Hospital's sixth claim for relief.

## II.   THE FY 2015 AFA AND THE FY 2016 AFA ARE SUBSTANTIALLY THE SAME.

Section 900.32 prohibits the HHS Secretary from declining a successor AFA proposal that is "substantially the same" as its predecessor.  25 C.F.R. § 900.32.  The text of the 2016 AFA is substantively identical to the text of the 2015 AFA.  Compare 2016 AFA passim, with 2015 AFA passim.  Section 900.32 affords no discretion to the HHS Secretary to decline or approve such a proposal.  When faced with such a proposal, the Secretary's duty is clear: he or she "shall approve and add to the contract the full amount of funds to which the contractor is entitled, and may not decline, any portion of a successor annual funding agreement."  25 C.F.R. § 900.32.  Because the 2016 AFA's contents are substantially the same as the 2015 AFA's contents, the United States improperly declined the 2016 AFA.

### III.   THE FY 2016 AFA IS A SUCCESSOR FUNDING AGREEMENT UNDER 25 C.F.R. § 900.33.

The United States argues that the 2016 AFA cannot be a successor funding agreement for the purposes of 25 C.F.R. § 900.33 based on the following implied nested syllogism:

---

($P_1$) All annual funding agreements must be negotiated.

($P_2$) The 2015 AFA was not negotiated.

($C_1$) Ergo, the 2015 AFA was not an annual funding agreement.

($P_3$) The 2015 AFA was the only document immediately before the 2016 AFA.

($C_2$) Ergo, no document immediately before the 2016 AFA was an annual funding agreement.

($P_4$) No document without a prior funding agreement is a successor funding agreement.

($C_3$) Ergo, the 2016 AFA is not a successor funding agreement.

---

According to the rules of modern formal logic, the United States' conclusions $C_1$, $C_2$, and $C_3$ are sound if based on valid premises $P_1$-$P_4$.  See generally Harry J. Gensler, Introduction to Logic 2-5 (2d ed. 2010)(speaking broadly about what makes for a valid premise and a sound conclusion).[36]  Unfortunately for the United States, Section 900.6's plain language, textual

---

[36]Logicians do not agree how many of the 256 possible syllogisms are valid; the moderns count twenty-four as valid, whereas Aristotle and Kant believed only a subset of nineteen of those syllogisms valid.  Compare Medieval Theories of the Syllogism, in Stanford Encyclopedia of Philosophy, http://plato.stanford.edu/entries/medieval-syllogism/ (last updated June 19, 2016), with Aristotle, Posterior Analytics (Hugh Tredennick & E.S. Forster trans., Loeb Classical Library ed. 1960), and Immanuel Kant, The Critique of Pure Reason 17 (Norman Kemp Smith trans. 1963).  The Court need not, and should not, decide here which of the two schools to follow, as all three of the nested arguments the United States makes here -- (i) $P_1 + P_2 \rightarrow C_1$; (ii) $C_1 + P_3 \rightarrow C_2$; and (iii) $C_2 + P_4 \rightarrow C_3$ -- fall into the valid subset for both schools. The first argument, the only one that will be unpacked in the analysis to follow, is translated from the more natural syntax above into the shorthand form "camestres": All $A$ are $B$, and no $C$ is $B$, ergo no $C$ is $A$.  See Aristotle's Logic, in Stanford Encyclopedia of Philosophy, http://plato.stanford

canons of construction, the ISDEAA's legislative history, and HHS practice strongly suggest alternative interpretations that sufficiently undermine the validity of $P_1$ and $P_2$ and the soundness of $C_1$ for the syllogism to be inductively invalid and for the Indian canon to require the Court to defer to Sage Hospital's interpretation on this point.

A.   **Section 900.6's Plain Language Suggests That the FY 2015 AFA Was Negotiated, Whether the Term "Negotiated" is Given Its Customary Legal Meaning or Used as an IHS Term of Art, Thereby Undermining Premise $P_2$ and All Conclusions That Depend on It.**

The regulation's plain language suggests that the 2015 AFA was negotiated. Black's Law Dictionary defines "negotiate," in the relevant sense, as either "to discuss or arrange a sale or bargain," or "to arrange the preliminaries of a business transaction." Black's Law Dictionary, http://thelawdictionary.org/negotiate/. Notably absent from the definition is any requirement that the discussion or arrangement must be (i) brought to a successful completion; or (ii) end on a mutually satisfactory note. Seen through a philosophical or philological lens, a negotiation is either a process or a system for decision making rather than an end state.[37] In simpler terms, one

---

.edu/entries /aristotle-logic/ (last updated Apr. 29, 2015).

[37]One philosophical school, following John Rawls, would more often than not consider negotiation a process "working out a problem of deliberation" when triangulating a policy acceptable to all parties. E.g., John Rawls, A Theory of Justice 16 (1971). A separate philosophical school, following Jürgen Habermas, would categorize negotiation as a system structure for working out such deliberative problems. See, e.g., Jürgen Habermas, The Postnational Constellation 107, 117 (2001). Despite an extensive search through leading academic literature on negotiation theory, the Court did not find any source that understood negotiation as meaning exclusively an end state. See, e.g., Susan E. Brodt & Leah E. Dietz, Shared Information and Information-Sharing: Understanding Negotiation as Collective Construal, in 7 Research in Negotiation in Organizations 263-283 (Robert J. Bies et al. eds. 1999); Ron S. Fortgang, David A. Lax & James K. Sebenius, Negotiating the Spirit of the Deal, Harv. Bus. Rev. (Feb, 2003), 66-75; Max H. Bazerman, Jared R. Curhan, Don A. Moore & Kathleen L. Valley, Negotiation, 51 Annual Review of Psychology 279, 279-314 (2000); Michele J. Gelfand & Anu Realo, Individualism-Collectivism and Accountability in Intergroup Negotiations, 84 Journal of Applied Psychology 721, 721-736 (1999); Bruce Barry & Raymond A. Friedman, Bargainer Characteristics in Distributive and Integrative Negotiation, 74 Journal of

can start to negotiate topic *X* without ending negotiations on topic *X*, and topic *X* still was "negotiated."  When Sage Hospital submitted its 2015 AFA proposal to IHS, it commenced a contract discussion, and it arranged preliminaries of a business transaction for program costs and CSC that it envisioned incurring in FY 2015 for PFSA administration.  In other words, Sage Hospital began negotiations, and the 2015 AFA, in a strict sense, therefore was "negotiated" even though it was not negotiated to completion/acceptance.

The Court should reject the plain meaning if it produces an absurd result.  See, e.g., Sebelius v. Cloer, 133 S. Ct. 1886, 1896 (2013).  The foregoing interpretation does not produce such an absurdity; rather, it solves one that would arise under the United States' preferred interpretation of the word.  If a Tribe submits an AFA proposal to IHS, then IHS must approve or decline it within ninety days, else the AFA is automatically approved.  See 25 C.F.R. § 900.18.  If, on a given occasion, (i) IHS does not approve or decline a given AFA proposal within the ninety day window; and (ii) the United States' interpretation of the word "negotiated" is correct, IHS and the Tribe would be caught alongside Schrödinger's cat in an inescapable paradox where the proposed AFA -- never negotiated -- both must be an annual funding agreement and must not be an annual funding agreement.

Lest the Court play the scholastic and fall prey to what Justice Antonin Scalia once referred to as "degraded textualism,"[38] construing the word "negotiated" so tightly that it squeezes out much of what the language, in context, fairly contains, the Court recognizes that the word "negotiated" in 25 C.F.R. § 900.6 might be used as a term of art.  IHS' Tribal Self-

---

Personality and Social Psychology 345, 345-59 (1998).

[38]Antonin Scalia, Common-Law Courts in a Civil Law System: The Role of the Federal Courts in Interpreting the Constitution and Laws, in A Matter of Interpretation: Federal Courts and the Law 3, 23 (Amy Gutmann ed. 1997).

Governance Program Negotiations Handbook suggests this use might be the case.  See Indian Health Service, Tribal Self-Governance Program Negotiations Handbook (2012)("Negotiations Handbook").  According to the Negotiations Handbook, the process by which a Tribe or Tribal organization assumes control over a PFSA or PFSAs under a self-determination contract progresses through five stages as represented in a simplified flowchart below:



During the "Planning" stage, a Tribe conducts legal and budgetary research, and it develops an internal Tribal government plan for organizing and administering a given healthcare program. Negotiations Handbook at 9-11.  During the "Pre-negotiation" stage, Tribal and federal negotiation teams review and discuss issues identified during the planning stage, and the Tribe produces a funding table.  Negotiations Handbook at 12.  During the "Negotiation" stage, Tribal

and federal negotiations teams come together to mutually review and discuss budget and program issues, working through issues as they arise in an effort to reach agreement on the final documents.  Negotiations Handbook at 13.  During the "Post-negotiation" stage, an authorized Tribal official and an IHS agency lead negotiator ("ALN") accept and sign the final contract or annual funding agreement, validate the funding amounts, and certify the availability of headquarter tribal shares.  Negotiations Handbook at 14.  Also during this stage, the IHS Director must conduct a final contract or funding agreement review before the contract or funding agreement becomes legally binding and enforceable.  See Negotiations Handbook at 14.

The "Post-negotiation" stage cleaves contracts and funding agreements, as the shift from solid to dashed arrows in the flowchart represents.  If the Tribal official, the IHS Director, and the ALN all approve the contract or funding agreement, then the subject PFSA or PFSAs go into Tribal operation.  If IHS and the Tribe do not reach mutual resolution on issues by the end of the "Post-negotiation" stage, however, then a Tribe may submit a "Final Offer" to the IHS Director or the ALN that describes how the Tribe wants to resolve all outstanding disagreements.  This offer is a proposal that the IHS Director or ALN cannot refuse unless he or she reviews it within forty-five days, and declines it in writing under one of the five declination criteria listed in the law regarding section on declination supra.  See Negotiations Handbook at 18.  If the IHS Director or the ALN refuses the offer, the Tribe is entitled to two additional appeals, first to the HHS Secretary and then to a federal district court.  See Negotiations Handbook at 18-19.

Grounded in this understanding of the negotiations process for Tribal self-determination contracts and annual funding agreements, the Court notes that the United States' argument apparently would define a proposed AFA as "negotiated" if it progresses smoothly through the negotiations process along the bolded horizontal path in the flowchart.  From the Response and

the hearing, it is unclear whether the United States would consider an AFA as "negotiated" if it took a detour through (IV)(a) or (IV)(b), but neither of these routes is applicable to the present case.  What the United States makes abundantly clear both in its Response and at the hearing, however, is that it does not consider an AFA that detours through (IV)(c) to be "negotiated."

The United States' narrow definition of "negotiated," even when used as a term of art, directly contradicts IHS' own understanding of the negotiations process.  The existence of a "Post-negotiation" stage, stage IV, implies that negotiation ends at the end of stage III.  An appeal to a federal district court postdates the end of stage III.  Indeed, it even postdates all other portions of the "Post-negotiation" stage, including Tribal submission of a final offer at stage (IV)(a) and a Tribal appeal to the HHS Secretary at stage (IV)(b).  Accordingly, any annual funding agreement that reaches a federal district court has, by IHS' own definition and practice, been "negotiated."   This undermines premise $P_2$ in the United States' syllogism on page 103 supra, causing all conclusions nested underneath it to collapse. In its place, the syllogism stops at $C_1$ with a new conclusion that the 2015 AFA was an annual funding agreement.  Using an analogue to the United States' nested syllogism from that point, conclusion $C_3$ becomes "the 2016 AFA is a successor funding agreement."

> **B.     One Textual Canon of Construction, Combined with a Plausible Thought Experiment, Suggests That Not All Annual Funding Agreements Must Be Negotiated, Thereby Undermining Premise $P_1$ and All Conclusions That Depend on It.**

Even if, for the sake of argument, premise $P_2$ were valid, the grammar canon of construction suggests that premise $P_1$ might be invalid, thereby just as effectively undermining the United States' argument that the 2016 AFA is not a successor funding agreement.  The grammar rule looks to how internalized rules of the English language affect the minutiae of sentence structure and word choice.  See, e.g., Flora v. United States, 362 U.S. 145, 150 (1960).

One common use of the grammar canon is to distinguish when a statute or regulation mandates an action through use of the word "shall" as opposed to when it permits an action through use of the word "may" or "can."  E.g., 1A Sutherland § 21.8 (6th ed. 2002).  Throughout the United States Code sections that pertain to the ISDEAA, the permissive "may" or "can" -- or similar permissive language -- accompanies nearly every relevant use of the word "negotiate" or its grammatical variations.  25 U.S.C. §§ 450b(g), 450c(f)(2), 450j(c)(2),  450j-1(a).

This realization births an interesting thought experiment.  Suppose a Tribe submits a proposed AFA to IHS that is an ALN's dream, perfectly incorporating everything for which IHS could hope.  Because IHS does not wish to change anything, it does not enter into negotiations to do so.  At the same time, the Tribe sees in the United States Code's permissive language no obligation to agitate for changes to the proposed AFA that it submitted and so refrains from doing so.  Under the United States' interpretation of 25 C.F.R. § 900.6, the proposed AFA could not be approved, even though both IHS and the Tribe are in full agreement, because they did not negotiate.  At the same time, however, 25 C.F.R. § 1000.4(c)(5) requires IHS to enter into annual funding agreements with Tribes whenever possible.  Both IHS and the Tribe would again be sharing a cramped box with Schrödinger's cat.

**C.    Two Other Textual Canons of Construction, Informed by ISDEAA Legislative History, Qualify Premise $P_1$, Suggesting That All Annual Funding Negotiations Need Only Be Negotiated if the Contracting Tribe so Wishes It, Thereby Rendering Conclusion $C_1$ Unsound and Undermining Conclusions $C_2$ and $C_3$ That Depend on It.**

The Whole Act Rule canon of construction demands textual coherence and integrity, treating a text as a holistic endeavor where ambiguous provisions can be clarified, "because the same terminology is used elsewhere in a context that makes everything clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of

the law."  United States Sav. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371

(1988).  In this regard, the Whole Act Rule is the quark of all textual canons, simultaneously

both their fundamental building block and their most comprehensive expression.[39]  Yet just as

different flavors of quarks are relevant to the study of certain particles, the Court has identified

two specific canons under the umbrella of the Whole Act Rule that are especially relevant to the

inquiry here.

　　　The first of these two canons is in pari materia, which states that regulations on the same

matter or subject are to be construed together if possible.  See, e.g., Erlenbaugh v. United States,

409 U.S. 239, 243-44 (1972).  Applying this canon, the Court notes that the word "negotiate" --

in its various grammatical forms -- appears six other times in the same part of title 25 of the

Code of Federal Regulations from which the United States draws its definition of "annual

funding agreement."  25 C.F.R. §§ 900.50, .65, .68, .89(b), .132, .236.  Revealingly, each use of

the term fits restraints onto IHS during the contract negotiation process and creates wiggle room

for Tribes to negotiate away many of the default requirements on reporting, applicability of

regulations to subcontractors, retention of federal property after completion of a contract,

payment schedules, and conflict-of-interest contract provisions.  See 25 C.F.R. §§ 900.50, .65,

.68, .89(b), .132, .236.

　　　Equally revealing is the fact that no provision in this part of title 25 of the Code of

Federal Regulations gives IHS leeway to negotiate away from default contract or annual funding

_____

　　　[39]Current theory in subatomic physics holds that quarks are the most elementary and
fundamental constituent of matter.  They consist of six different flavors -- up, down, strange,
charm, top, and bottom -- which combine in various ways to produce protons and neutrons.  See
Quang Ho-Kim & Pham Xuan Yem, Elementary Particles and Their Interactions: Concepts and
Phenomena 5-6 (1998).  They also are the only known elementary particles to experience all four
of the fundamental physical forces -- gravitational, electromagnetic, strong nuclear, and weak
nuclear.  See Quang Ho-Kim & Pham Xuan Yem, Elementary Particles and Their Interactions:
Concepts and Phenomena 8-9 (1998).

agreement terms.  Combining in pari materia with the dog did not bark canon, this absence suggests quite strongly that the Code of Federal Regulations envisions negotiations as a one-way street: they can take place, within certain bounds, only at a Tribal contractor's request and only for the Tribe's benefit.  A Tribal contractor's failure to invoke this optional right to negotiate does not vitiate a related contract or annual funding agreement.

Recourse to the ISDEAA's legislative history fortifies the Court's confidence that the textual canons have latched onto something substantive in making this distinction.  Multiple leitmotivs are evident in that history.  From the moment that President Richard Nixon roused Congress to adopt a policy of American Indian self-determination with his 1970 Special Message to Congress, Congress has signaled in no uncertain terms that it wishes for IHS to make American Indian self-determination contracting as easy and as common as possible.  This principle was especially evident in the 1988 and 1994 ISDEAA amendments.  In 1988, Congress created a demonstration project for such contracts, since expanded to cover every Tribe and Tribal organization, which granted Tribal contractors unprecedented flexibility to redesign programs and reallocate funding to suit local needs. Furthermore, Congress instructed the HHS Secretary to "interpret each Federal law and regulation in a manner that will facilitate the inclusion of programs and services and the implementation of agreements . . . ." S. Rep. No. 100-274, at 15 (1988).  Cf. 25 U.S.C. § 450k(a)(prohibiting the HHS Secretary from promulgating any regulation or imposing any non-regulatory requirement on a Tribal self-determination contract outside of narrow exceptions).

Six years later, Congress was so aggravated that HHS and DOI had defied it, and continued to refuse to negotiate with Tribes and Tribal organizations on a line-by-line basis, that

they brought the hammer down on the agencies.   The Senate Committee on Indian Affairs keelhauled both HHS and DOI:

> The recently promulgated proposed regulations severely undercut Congress' intent in the original Act and those [1988] amendments to liberalize the contracting process and to put these programs firmly in the hands of the tribes. The proposed regulations erect a myriad of new barriers and restrictions upon contractors rather than simplifying the contracting process and freeing tribes from the yoke of excessive federal oversight and control.

S. Rep. No. 103-374 at 14.   The Senate Committee explained that, because of the agencies' recalcitrance, its proposed 1994 ISDEAA amendments would cabin their rulemaking authority even more than the original ISDEAA and the 1988 ISDEAA amendments had.   See S. Rep. No. 103-374 at 14:

> Section 5(1) delegates to the Secretary the authority only to promulgate implementing regulations in certain limited subject matter areas. . . .   A second key limitation on the delegation of rulemaking authority is provided in the twelve month limitation on the Secretaries' authority to promulgate the regulations.   This limit is necessary to prevent another regulation drafting process that goes on for years without satisfactory or final resolution.

S. Rep. No. 103-374 at 14.   Because of the agencies' obduracy in refusing to follow congressional instructions to consult Tribes before proposing regulations,[40] the Senate Committee explained, its proposed 1994 ISDEAA amendments also would require HHS and

---

[40]It appears that the Senate Committee may have been somewhat hyperbolic when haranguing HHS and DOI for completely "disregarding" American Indian input.   S. Rep. No. 103-374 at 14.   On at least one occasion, on September 29, 1990, President George Bush's Interior Secretary, Manuel Lujan, met with nearly seven hundred Tribal leaders.   See Seth Mydans, Old Angers Still Fresh As Indians Meet Lujan, N.Y. Times, Sept. 30, 1990, available at http://www.nytimes.com/1990/09/30/us/old-angers-still-fresh-as-indians-meet-lujan.html   (last visited Nov. 19, 2016)("Old Angers").   Even at this meeting, however, DOI effectively presented the Tribal leaders with a regulatory fait accompli, eliciting strong resentment from the Tribal leaders present. Old Angers at 1 (quoting, among others, Wayne Ducheneaux, president of the National Congress of American Indians, as challenging Lujan: "You say you want consultation with the Indian tribes, but I don't think you truly want it.").

DOI to employ the negotiated rulemaking process, publishing a proposed rule within six months of the amendments' enactment.  See S. Rep. No. 103-374 at 14.

The Court could fire off multiple other passages from the 1988 and 1994 amendments' legislative history, but it believes that their tenor is so clear even from these few passages that it does not need to fusillade Sage Hospital and the United States with them.  It is clear that Congress meant for negotiations to facilitate Tribal self-determination contracting, even -- and the Court dares to say, especially -- when Tribal contractors needed some accommodations to start down the road of self-determination.  The United States' implicit assertion within premise $P_1$ that all annual funding agreements must be negotiated even if this negotiation would reduce the odds that a Tribe will be able to enter into or sustain a contract is diametrically opposed to Congress' manifest intent.  It would truncate the negotiations process as laid out in the flowchart on page 106 supra and, if taken to its extreme, return self-determination contracting back to the IHS practice before 1988 that Congress so vociferously censured.

The Court concludes that the textual canons of construction and legislative intent compel it to qualify premise $P_1$.  All annual funding agreements must be negotiated, if a Tribe wishes for them to be negotiated.  This qualified language does no violence to 25 C.F.R. § 900.6's plain meaning, and it avoids the absurdity mentioned in relation to the thought experiment in Subsection (C)(2) supra.  It also, to the United States' certain chagrin, renders conclusion $C_1$ unsound, and undermines conclusions $C_2$ and $C_3$, which depend on it.

**D.    Because 25 C.F.R. § 900.6's Plain Language, Multiple Textual Canons of Construction, the ISDEAA's Legislative History, and HHS Practice All Strongly Suggest Alternative Interpretations that Undermine the Validity of $P_1$ and $P_2$ and the Soundness of $C_1$, the Indian Canon Requires the Court to Defer to Sage Hospital's Interpretation on this Point.**

The United States might object that the Court's analysis in Subsections (C)(1)-(3) supra with respect to the 2015 AFA is not incontrovertible.  Such an objection even might be correct, but it would set the wrong benchmark for deciding the larger question whether the 2016 AFA is a successor funding agreement.   Under the Indian canon, the Court must liberally construe agreements in favor of American Indians.  See Montana v. Blackfeet Tribe at 766.  See generally Philip P. Frickey at 381 (offering a scholarly commentary on the Indian canon).  The Court must construe treaties and other agreements as the American Indians who entered into the treaties or agreements would have understood them.  See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians at 196.  The Court must resolve any ambiguity in an agreement in favor of American Indians.  See, e.g., Carpenter v. Shaw at 367.

The Indian canon sometimes can come into conflict with other canons.  When canons clash, the Indian canon usually trumps competing canons.  See 1-2 Cohen's Handbook of Federal Indian Law at 2.02[3].  The D.C. Circuit has held that the Indian canon also supersedes deference to agency interpretations under Chevron.  The D.C. Circuit explained in Cobell v. Norton:

> This departure from the *Chevron* norm arises from the fact that the rule of liberally construing statutes to the benefit of the Indians arises not from ordinary exegesis, but "from principles of equitable obligations and normative rules of behavior," applicable to the trust relationship between the United States and the Native American people.

240 F.3d at 1102.  The Tenth Circuit at least twice has rejected agency interpretations contrary to the Indian canon.  See Governor of Kansas v. Kempthorne, 516 F.3d at 833 (dicta); Ramah at 1461-62.

The Court notes that, if nothing else, its analysis in Subsection's (c)(1)-(3) reveals ambiguity in 25 C.F.R. § 900.6, potentially undermining the entirety of the syllogism upon which the United States bases its argument that the 2016 AFA was not a "successor funding agreement." That ambiguity is sufficient to trigger the Indian canon and override any deference to agency interpretation that normally would apply under Chevron.[41] The Court therefore concludes that (i) Sage Hospital's 2015 AFA was a prior funding agreement; (ii) Sage Hospital's 2016 AFA was a successor funding agreement; and (iii) IHS, with no authority to decline a substantially similar successor funding agreement, unlawfully declined the 2016 AFA.

## IV.  THE COURT GRANTS SAGE HOSPTIAL'S REQUEST TO AWARD IT DAMAGES AT THIS TIME FOR IHS' UNLAWFUL DECLINATION OF SAGE HOSPITAL'S FY 2016 AFA.

Sage Hospital focuses on liability in this motion, speaking of damages only at trial. See Tr. at 10:8-25, 11:7-11, 12:6-20, 14:15-16:12 (Miller). During the hearing, Sage Hospital sought to accelerate the timeline for the Court to consider damages, asking it to order IHS to pay the base amount on the 2016 AFA before trial. See Tr. at 12:8-20 (Miller). Sage Hospital indicated that it urgently required the remainder of what it asserted it was due under the FY 2016 AFA, because it otherwise would lack sufficient funds to operate several million dollars' worth of programs from across two cycles that the Court already had approved. See Tr. at 11:7-11 (Miller). Sage Hospital asked the Court to grant it the full funding amount in one lump sum, as the end of the fiscal year was approaching. See Tr. at 15:24-16:12 (Miller).

---

[41]The Tenth Circuit extends Chevron deference to agencies' litigating positions. See Mitchell v. C.I.R., 775 F.3d 1243, 1249 (2015)("If, by contrast, the meaning of the regulations is not plain, we defer to the Commissioner's reasonable interpretations, even those advanced in his legal brief, unless plainly erroneous or inconsistent with the regulation, or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.")(internal quotation marks omitted). This position accords with current Supreme Court precedent. See, e.g., Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156 , 2166 (2012); Chase Bank USA, N.A. v. McCoy, 562 U.S. 195, 208 (2011).

Rule 56(a) of the Federal Rules of Civil Procedure says: "A party may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought." Fed. R. Civ. P. 56(a). An important question with respect to the request for award of damages at this time, therefore, is whether Sage Hospital moved for summary judgment on the damages issue in its MSJ. Sage Hospital said at the hearing that it had not so moved, acknowledging that the idea of requesting an immediate damages award first occurred to Sage Hospital's counsel as he was preparing for the hearing. See Tr. at 19:19-23 (Miller).

Independently reviewing the MSJ, the Court agrees with Sage Hospital -- and the United States -- that Sage Hospital did not ask the Court to decide the damages issue in the MSJ. The closest it came to requesting such a decision was in the final sentence in the MSJ, in which "Sage respectfully requests that the Court . . . reverse such declination and declare it to be unlawful, and award damages and other relief as Sage will prove at the trial in this matter scheduled for October, 2016." MSJ at 9 (emphasis added). Merriam-Webster's Dictionary suggests that Sage Hospital may have used the word "as" any of three ways: (i) to signal contemporaneity, i.e. that Sage Hospital asks the Court to award damages simultaneous with the trial; (ii) to ask the Court to grant damages to the extent that Sage Hospital proves them at trial; or (iii) to ask the Court to award damages in accord with what Sage Hospital intends to prove at the scheduled October, 2016, trial. Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/as. Alternatively, the "last antecedent" canon of construction could signal that Sage Hospital meant for the "as" clause only to modify "other relief," rather than "damages and other relief." See generally 2A Sutherland § 47.33 (7th ed. 2007)(discussing the last antecedent canon).

- 116 -

The combination of the definition of "as" and the last antecedent rule leaves the Court with the six possible interpretations of the "as" clause, which the Court tabulates as follows:

|  | "Contemporaneous with" | "To the extent that" | "In accord with" |
|---|---|---|---|
| **Last antecedent canon does not apply** | I | II | III |
| **Last antecedent canon does apply** | IV | V | VI |

None of the six interpretations permits the Court to grant Sage Hospital's request at the hearing to award, at this time, damages related to the unlawfully declined FY 2016 AFA. Punctuation excludes interpretations III and VI, because the absence of a preceding comma means that the "as" clause is restrictive.   Chicago Manual of Style § 6.23, http://www .chicagomanualofstyle.org/16/ch06/ch06_sec023.html   (last   visited   Nov.   23,   2016). Interpretations II and V cannot hold, because the Court cannot say to what extent Sage Hospital will be able to prove its FY 2016 FA damages argument at a future trial when material facts about the damages issue have not yet been shown to be undisputed.   Interpretation IV falls to the grammar canon and the punctuation rule, because of (i) the absence of a comma; (ii) the absence of a verb attached to "other relief"; and (iii) a departure from parallel structure that would arise. The Court therefore adopts interpretation I as the correct interpretation of the "as" clause, in accord with the interpretation that Sage Hospital indicated at the hearing.

The inquiry into the damages issue does not end with the MSJ, however.  Although Sage Hospital did not raise the damages issue in its MSJ, Sage Hospital raised it multiple times during the   hearing.   See Tr. at 10:8-25, 11:7-11, 12:6-20, 14:15-16:12 (Miller).   The Court has discretion to grant summary judgment on issues on a ground not formally raised in a summary judgment motion, so long as lack of notice did not prejudice the losing party.  See Kannady v. City of Kiowa, 590 F.3d 1161, 1170 (10th Cir. 2010); Ward v. Utah, 398 F.3d 1239, 1245-46

(10th Cir. 2005); Howell Petroleum Corp. v. Leben Oil Corp., 976 F.2d 614, 620 (10th Cir. 1992).  If the nonmovant lacks notice, however, "the practice of granting summary judgment sua sponte is not favored."  Procter & Gamble Co. v. Haugen, 317 F.3d 1121, 1132 (10th Cir. 2003). See also Celotex Corp. v. Catrett, 477 U.S. at 326.

It is difficult for the Court to countenance an argument that the United States either lacked notice of the damages or will be prejudiced by summary judgment on the damages issue. Sage Hospital explicitly states, in the section of its MSJ on material facts as to which there is no genuine issue, the exact dollar amount of damages -- both as part of the base amount and as part of CSC -- that would apply if the Court were to decide that IHS had unlawfully declined the 2016 AFA.  See MSJ ¶ 12, at 6.  The United States did not dispute these amounts in the Response.  See Response ¶ 12, at 2.  Because the Court has concluded that IHS unlawfully declined the 2016 AFA, IHS must fully fund the 2016 AFA.  Requiring the United States to satisfy this obligation does not prejudice the United States.  The Court therefore exercises its discretion to grant summary judgment on the damages issue at this time.

**IT IS ORDERED** that: (i) the Plaintiff's Motion for Summary Judgment on the Issue of Liability on Its Sixth Claim for Relief (Unlawful Declination of Proposed FY 2016 AFA), filed July 29, 2016 (Doc. 196) is granted; and (ii) the Plaintiff's request at the hearing for summary judgment on damages arising from IHS' unlawful declination of Sage Hospital's FY 2016 AFA is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Paul E. Frye
Frye Law Firm
Albuquerque, New Mexico

-- and --

Stephen D. Hoffman
Lewis Brisbois Bisgarrd & Smith, LLP
Phoenix, Arizona

-- and --

Lloyd B. Miller
Sonosky, Chambers, Sachse,
   Miller, & Munson, LLP
Anchorage, Alaska

        *Attorneys for the Plaintiff*

Damon P. Martinez
   United States Attorney
Karen F. Grohman
   Assistant United States Attorney
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

-- and --

Benjamin C. Mizer
   Principal Deputy Assistant Attorney General
Robert E. Kirshman, Jr.
   Director
Steven J. Gillingham
   Assistant Director
Devin Wolak
Russell J. Upton
   Trial Attorneys
United States Department of Justice
Washington, D.C.

        *Attorneys for the Defendants*